FILED
WILLIAMSPORT

JAN 02 2025

PER_____NJR_____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.

Case No. ___4:25-CV-00001-WIA___

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,
**Defendants.**

## COMPLAINT

Plaintiffs Stephen H. Sokolowski and Christopher H. Sokolowski

(collectively, "Plaintiffs"), by and through their own capacity as pro se litigants,

hereby file this Complaint against Defendants Digital Currency Group, Inc.

("DCG"), Barry E. Silbert ("Silbert"), and Soichiro "Michael" Moro ("Moro")

(collectively, "Defendants"), and allege as follows:

## NOTE

Plaintiffs acknowledge that this Complaint is lengthy. However, given the

complexity of the alleged scheme, the number of parties involved, the need to

plead fraud with particularity under Rule 9(b), and the importance of establishing a

factual basis for piercing the corporate veil, Plaintiffs believe that a detailed

recitation of the facts is necessary to state a plausible claim for relief and to

provide Defendants with fair notice of the grounds upon which the claims rest.

Plaintiffs have made every effort to present the facts concisely and to avoid

unnecessary repetition.

## NATURE OF THE ACTION

1.     This action arises from Defendants' deceptive and fraudulent conduct

that induced Plaintiffs, who sought a safe, consumer-oriented financial service, to

entrust their personally owned cryptocurrency and US Dollars to Genesis Global

Capital, LLC ("Genesis"), a subsidiary of DCG. Through misleading financial statements—specifically, a fraudulent balance sheet (*Exhibit A*)—and assurances presented as stable interest-bearing loan arrangements, Defendants deceived Plaintiffs into maintaining and extending their loans to Genesis.

2.    Plaintiffs believed they were engaging in a transaction akin to a Certificate of Deposit or interest-bearing financial service for their household assets. They did not purchase securities or equity; they simply lent their personally owned cryptocurrency and US Dollars to Genesis in exchange for interest, relying on Defendants' misrepresentations of Genesis's financial health and stability.

3.    Defendants' conduct violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 - 201-9.2, causing Plaintiffs substantial monetary loss and denying them the safe, consumer-level financial service they reasonably believed they were receiving.

**PARTIES**

4.    Plaintiff Stephen H. Sokolowski is an adult individual residing at 3178 Carnegie Drive, State College, PA 16803. He personally owned substantial amounts of cryptocurrency and US Dollars and treated these assets as personal

3

savings. He engaged with Genesis's platform believing it offered a stable, interest-bearing arrangement suitable for personal, household-level financial management.

5.    Plaintiff Christopher H. Sokolowski is an adult individual residing at 3178 Carnegie Drive, State College, PA 16803. He also contributed personally owned cryptocurrency and US Dollars. Christopher relied on Defendants' representations and believed he was placing his assets into a reliable, consumer-friendly lending environment.

6.    Genesis Global Capital, LLC ("Genesis") is the entity through which Plaintiffs engaged in lending activities. Genesis was a subsidiary of DCG. On January 19, 2023, Genesis filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (*In re Genesis Global Capital, LLC, No. 23-10063-SHL (Bankr. S.D.N.Y.)* - hereinafter the "Genesis Bankruptcy Action"). Genesis is not named as a defendant in this action.

7.    Defendant Digital Currency Group, Inc. ("DCG") is a Delaware corporation with its principal place of business in Stamford, Connecticut. DCG owned and controlled Genesis and oversaw the financial strategies and disclosures that misled Plaintiffs.

8.    Cryptocurrency Management LLC ("CM LLC") is a nominal Pennsylvania limited liability company formed solely to meet certain Genesis deposit thresholds. Although CM LLC was a signatory to a "Master Loan

Agreement" with Genesis, none of the named Plaintiffs (in their personal capacities) nor any of the named Defendants (Digital Currency Group, Inc., Barry E. Silbert, or Soichiro "Michael" Moro) were parties to that agreement. As fully discussed below, CM LLC's minimal role was purely clerical: it held no assets other than those beneficially owned by Plaintiffs, had no employees, and maintained no independent business operations.

9.    Defendant Barry E. Silbert ("Silbert") is the Chief Executive Officer of DCG and a resident of New York. As CEO of DCG, Silbert was intimately involved in setting policy for how loans to DCG were classified. Silbert knew or should have known that reporting a $1.1 billion long-term, unsecured promissory note as a "current asset" would materially misrepresent Genesis's solvency. Silbert directly signed this fraudulent promissory note.

    a.    As CEO of DCG, Silbert received substantial financial compensation, the continued receipt of which was directly dependent on DCG and its subsidiary Genesis remaining operational. His actions in signing the fraudulent promissory note and overseeing Genesis's misleading financial disclosures were motivated, in part, by the desire to prevent the imminent collapse of Genesis and subsequent veil-piercing liability for DCG, thereby ensuring the continuation of his lucrative compensation package.

10.     Defendant Soichiro Michael Moro ("Moro") was the Chief Executive Officer of Genesis during the time the fraudulent promissory note was signed and served up until his resignation on August 24, 2022. Moro resided in New York. As CEO of Genesis during the relevant period, Moro supervised the preparation and circulation of Genesis's financial documents. Along with Silbert, Moro directly signed the fraudulent promissory note. Moro approved or knowingly permitted the dissemination of false and misleading balance sheets and failed to stop their dissemination before he resigned. At minimum, he acted with reckless disregard for the truth of the financial classifications that Genesis presented to consumers like Plaintiffs.

> a.     As CEO of Genesis until his resignation around August 24, 2022, Moro received significant financial compensation—the continuation of which was directly tied to Genesis's solvency. His actions in signing the fraudulent promissory note and approving or knowingly permitting the dissemination of false and misleading balance sheets were undertaken, in part, to prevent Genesis's collapse during his tenure, thus ensuring the continued payment of his lucrative compensation package.

11.     Griffin Tiedy ("Tiedy") was a Genesis employee who communicated the fraudulent balance sheet to Plaintiffs and who resided in Connecticut at the time.

   a. Although Plaintiffs currently do not name Tiedy as a defendant, they expressly reserve the right to seek leave of this Court to add him as a defendant if discovery reveals that he had actual knowledge of, or participated in, the fraudulent misclassification or other deceptive practices alleged herein.

   b. If evidence demonstrates that Tiedy was aware of internal directives—such as a warning from Genesis's own CFO not to misrepresent Genesis as "well-capitalized"—yet continued to convey or endorse statements that misled Plaintiffs about Genesis's financial health, Plaintiffs will seek to hold him personally accountable for his role in the fraud.

12. Ahmed Derar Islim ("Islim") was the Chief Executive Officer of Genesis following Moro's resignation. He served as CEO during the time the fraudulent balance sheet was presented to Plaintiffs.

   a. Although Plaintiffs currently do not name Islim as a defendant, they expressly reserve the right to seek leave of this Court to add him as a defendant if discovery reveals that he had actual knowledge of, or participated in, the fraudulent misclassification or other deceptive practices alleged herein.

13. Although Plaintiffs do not presently name as defendants other Genesis employees or agents who may have had knowledge of or participated in the

misclassification of the $1.1 billion promissory note and other deceptive acts alleged herein, Plaintiffs expressly reserve the right to seek leave of this Court to add such individuals as defendants if and when discovery reveals their direct knowledge of, substantial assistance in, or personal participation in the fraudulent misrepresentations or other unlawful conduct described in this Complaint.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is diversity of citizenship between Plaintiffs (Pennsylvania citizens) and Defendants (New York citizens).

15.    Personal jurisdiction is proper because Defendants directed their deceptive acts into Pennsylvania where Plaintiffs reside and suffered harm. Defendants regularly conducted lending operations and communicated their misrepresentations to Plaintiffs in Pennsylvania.

a.    The application of Pennsylvania law to the UTPCPL claim is proper because Plaintiffs are Pennsylvania residents who received and relied upon Defendants' misrepresentations while physically present in Pennsylvania and suffered harm in Pennsylvania.

b.      Defendants knew Plaintiffs resided in Pennsylvania because Plaintiffs provided their home addresses and identity documents when they registered with Genesis to comply with Know Your Customer requirements and Anti-Money-Laundering checks. Defendants communicated the fraudulent balance sheet directly to Plaintiffs in Pennsylvania and intended to induce Plaintiffs' reliance in Pennsylvania. Defendants' purposeful direction of misrepresentations into Pennsylvania justifies the exercise of personal jurisdiction.

c.      The exercise of personal jurisdiction over Defendants Silbert and Moro is proper because they directly benefited financially from the deceptive acts directed into Pennsylvania. Their actions in furtherance of maintaining their lucrative employment—including the signing of the fraudulent promissory note and the dissemination of misleading financial information—were integral to the scheme that harmed Plaintiffs in Pennsylvania. This direct personal benefit derived from activities affecting Pennsylvania establishes sufficient minimum contacts for personal jurisdiction.

d.      Defendants intentionally signed the fraudulent promissory note fully aware it would enable and perpetuate a misrepresentation of Genesis's financial condition to its customers, including Pennsylvania residents. In

9

doing so, Defendants "expressly aimed" their fraudulent conduct at this forum, thereby subjecting themselves to personal jurisdiction under the standard recognized in *Calder v. Jones, 465 U.S. 783, 789–90 (1984)*.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred here. Plaintiffs relied on Defendants' deceptive statements while located in Pennsylvania.

17.     Key evidence, such as the computers upon which the communications with the Defendants were conducted, are located in Pennsylvania within this District. Conversely, much of the pertinent evidence related to Genesis's business operations has already been published to the public on court dockets and is already referenced in this Complaint.

18.     Plaintiffs intend to call multiple witnesses who reside in Pennsylvania and can provide firsthand testimony regarding Plaintiffs' reliance on Defendants' misrepresentations and their decision-making process. These witnesses include an individual who personally viewed the fraudulent balance sheet, as well as others who were present for discussions and communications relevant to Plaintiffs' lending decisions.

        a.     Much of the documentary evidence relevant to Plaintiffs' claims, including Genesis's financial statements, internal communications

10

related to the $1.1 billion promissory note, and other documents pertinent to the fraudulent misrepresentations, has already been made public through the bankruptcy docket of the *Genesis Bankruptcy Action*.

      b.    Therefore, it is neither necessary nor convenient for this Court to transfer this case to the Southern District of New York for discovery or to secure evidence, as this evidence is already readily available to all parties regardless of the location of this case.

      c.    Further evidence of Defendants' fraudulent activity is available on the docket of *The People of the State of New York v. Digital Currency Group, Inc., Barry E. Silbert, and Genesis Global Capital, LLC, Index No. 452784/2023 (Sup. Ct. N.Y. Cnty.),* a case pending in the Supreme Court of the State of New York, County of New York. The public documents and information in this case include significant evidence relating to the defendants' deceptive practices, including the misclassification of the $1.1 billion promissory note that has harmed Plaintiffs. This New York State case also demonstrates that these defendants are already subject to discovery in the state of New York and that no additional benefit would accrue to the defendants by requiring the current case to take place in that same state.

19.    The UTPCPL is intended to protect Pennsylvania consumers from deceptive practices directed into the state, and the Commonwealth has a strong

interest in ensuring that its residents have convenient access to redress for fraudulent conduct. This Court is well-versed in applying Pennsylvania law, promoting judicial economy.

20.    Transfer to the Southern District of New York would not only impose undue hardship on Plaintiffs but effectively deny them access to any meaningful judicial forum.

      a.    While Defendants maintain their substantial resources, Plaintiffs' limited assets, which Defendants' fraudulent conduct depleted, render litigation in New York impossible. This runs counter to the principles of equity and would reward Defendants for the very misconduct that has hampered Plaintiffs' financial means.

      b.    Although Genesis is involved in bankruptcy proceedings in the Southern District of New York, that action is distinct and independent. Plaintiffs assert claims under Pennsylvania's UTPCPL for fraudulent and deceptive conduct that directly caused them harm. These claims are not part of the bankruptcy estate, nor do they seek to recover assets subject to the bankruptcy court's jurisdiction. Plaintiffs' UTPCPL claim is personal to them and seeks damages beyond any distribution they might receive as creditors in the bankruptcy. Moreover, the legal and factual issues in this case differ substantially from those in the bankruptcy proceedings.

21.    Plaintiffs acknowledge that an arbitration and forum-selection provision exists in the "Master Loan Agreement" executed only between CM LLC and Genesis Global Capital, LLC. However:

      a.    Plaintiffs in their individual capacities never signed nor agreed to any arbitration or forum-selection clause with Defendants;

      b.    Defendants Barry E. Silbert, Soichiro "Michael" Moro, and Digital Currency Group, Inc. likewise are not signatories or third-party beneficiaries to that Master Loan Agreement; and

      c.    The instant claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") do not arise from the performance or breach of that Master Loan Agreement but rather from fraudulent misrepresentations and omissions directed at Plaintiffs personally. Consequently, the arbitration and forum-selection clauses in that separate Master Loan Agreement do not bind or affect the parties to this litigation and cannot bar Plaintiffs' statutory consumer-protection claims in this Court.

## FACTUAL ALLEGATIONS

**Plaintiffs' Ownership and Intent**

22.    Plaintiffs were individuals seeking a safe, stable rate of return for their assets. They believed Defendants were offering a hands-off, interest-based lending service suitable for personal and household asset management, not a high-risk, unregistered security or complex investment scheme involving a web of intercompany loans. They had used and had evaluated competing lending firms in the cryptocurrency industry to earn interest on their assets.

23.    Plaintiffs were not professional traders, possessed no financial licenses, and did not trade crypto assets as speculative instruments. Instead, they treated their cryptocurrency holdings as a form of digital savings—akin to keeping money in a high-yield savings account. Plaintiff Stephen Sokolowski had regularly stated and believed that Bitcoin would eventually become a "world currency" and had intended never to sell any of his Bitcoins.

24.    Plaintiff Stephen Sokolowski had held his Bitcoin and Ethereum holdings continuously for nearly a decade prior to the Defendants' misrepresentations. For seven of those years, he never even transferred his 2013-purchased Bitcoins out of their original "Bitcoin Core" wallet. During this period, he weathered multiple market downturns and never engaged in trading or profit-taking from his Bitcoin investments.

25.     Plaintiffs also saved significant value in US Dollars earned from their employment. During this saving period, Plaintiffs lived a modest lifestyle typical of an average consumer, driving 2005 and 2006 model cars, and residing in an ordinary house in the suburbs of a small city sitting on less than ¼ acre of land. Stephen held a typical "9 to 5" software development job, during which he sometimes worked overtime, and from which he saved over 60% of his income and invested it for early retirement.

26.     Plaintiffs managed their cryptocurrency and US Dollar savings from their Pennsylvania home, made lending decisions there, and relied on the fraudulent balance sheet while physically located in Pennsylvania. Plaintiffs conducted all research relating to the renewal of their loans and participated in all calls with Genesis representatives while in Pennsylvania.

27.     The assets loaned to Genesis were Plaintiffs' personal savings, inherited from a deceased family member, put aside from two decades of work, and saved through years of frugality.

a.     The Plaintiffs requested periodic withdrawals from Genesis to pay for personal expenditures, including trivial purchases like a set of wall decorations.

b.    Before the fraud, the Plaintiffs were in a position to achieve early retirement and specifically avoided spending their assets, which were loaned to Genesis, to have money available for retirement.

c.    Plaintiffs actively discussed with Genesis and others the need to leave a small amount of "open term" loans so that immediate expenses could be paid—similar to how money could be withdrawn from a bank account.

d.    Records specifically show that the Plaintiffs requested periodic withdrawals from Genesis to pay personal income taxes.

28.    Plaintiffs actively avoided, and Plaintiff Stephen Sokolowski publicly recommended the avoidance of, complex and risky financial products like "flash loans," "distributed exchanges," "NFTs," "ICOs," and "ERC-20 tokens." They retained nearly all their life savings in large, well-established assets like Bitcoin, Ethereum, US Dollars, and large-cap US stocks, and used Genesis because Genesis represented itself as a simple, safe alternative for ordinary consumers to earn interest on cryptocurrency and US Dollar assets.

29.    At times, Plaintiffs entrusted over ninety percent (90%) of their total net worth to Genesis under the reasonable belief that they were placing their personal, household-level savings into a stable, interest-bearing financial service. This extreme concentration of their assets in what they believed to be a safe, consumer-oriented lending environment further underscores both their reliance on

16

Defendants' assurances and the magnitude of the harm inflicted when those assurances proved to be deceptive.

      a.     The large dollar value of Plaintiffs' cryptocurrency holdings resulted from long-term appreciation rather than from speculative trading, high-risk investments, or sophisticated financial maneuvers. Plaintiffs maintained two distinct accounts for their household finances: a traditional stock account for standard retirement planning and a separate cryptocurrency holding. At the time of the fraudulent balance sheet's presentation, Plaintiffs relied on a financial advisor and delegated management of their stock portfolios to that advisor.

      b.     Over time, the cryptocurrency—originally acquired as a personal savings measure—significantly appreciated in value, not due to any complex investment strategy, but simply because Plaintiffs held these assets passively for many years.

      c.     The sheer magnitude of the loss does not alter the fundamental consumer nature of the transaction. Plaintiffs were not professional traders or hedge fund managers; they were everyday consumers who passively held cryptocurrency as a form of savings and who relied, to their detriment, on Defendants' misrepresentations that this lending arrangement was stable and trustworthy. In this way, the household character of the Plaintiffs and their

intentions remained fundamentally the same even as the nominal value of their assets increased over time

**The Nominal LLC Structure**

30.    Plaintiffs each personally owned their cryptocurrency assets and their US Dollars at all times. They did not transfer title to any LLC or other entity; instead, they used a nominal LLC, CM LLC–a bare bones entity with no independent business purpose—at Defendants' suggestion to meet Genesis's minimum deposit thresholds. CM LLC thus was created only weeks before its use with Genesis. Plaintiffs' intention was to safely lend their personally owned assets and earn modest interest—akin to placing money in a high-yield savings account.

31.    Plaintiffs' assets–both cryptocurrency and US Dollars—were nominally funneled through CM LLC—solely for the purpose of meeting Genesis's minimum deposit requirement—and then immediately loaned to Genesis. At all times, Plaintiffs remained the true beneficial owners of these assets.

32.    At the time of Defendants' fraud, CM LLC had no business activities or assets other than lending to Genesis. CM LLC had no office, and its registered address was the same as that of both Plaintiffs'. CM LLC had no employees, no website, no E-Mail addresses, and no marketing, and its bland name ("Cryptocurrency Management") was selected specifically to describe its sole

purpose. CM LLC sold no products or services and produced no revenue. Currently, CM LLC holds no assets or liabilities.

33.    CM LLC never adopted formal governance documents beyond the bare minimum required by state law to register; no formal resolutions, meetings, or minutes exist. CM LLC held no insurance, no permits, and no licenses typical of a functioning business entity.

34.    CM LLC never engaged in negotiations, business planning, or due diligence activities separate from the Plaintiffs' personal efforts. Loans passed through CM LLC were often discussed directly between CM LLC's lenders and Genesis. All decisions were personal decisions made by Plaintiffs and simply executed via the nominal LLC structure.

35.    Plaintiffs never intended to convey ownership or title of these assets to CM LLC, nor did CM LLC ever obtain beneficial ownership.

36.    In nearly all cases, Plaintiffs sent their own cryptocurrencies and withdrew cryptocurrencies directly to their personal wallets without CM LLC even taking possession of the coins.

37.    CM LLC's operating agreement contained a clause stating that its owner would never make any profit from CM LLC. CM LLC's tax filings–as an IRS "disregarded entity"–show that CM LLC never earned any profit throughout its lifetime.

19

38.    No reasonable third party interacting with Plaintiffs would have recognized CM LLC as a genuine, standalone business given its complete lack of separate existence, resources, and operational identity.

39.    Genesis was aware of and facilitated the use of this LLC structure specifically to allow Plaintiffs to circumvent Genesis's minimum deposit requirement. Genesis understood that, despite the LLC form, it was dealing with individual consumers making personal financial decisions.

**Misrepresentation of Consumer Lending Products**

41.    Genesis's marketing and communications with Plaintiffs emphasized safety, stability, and reliability—qualities a reasonable consumer would associate with a conservative financial service, not a complex investment product. Genesis's marketing made no mention of their actual business practices, which involved a complex web of unsecured intercompany loans between Genesis, DCG, and DCG's subsidiaries.

42.    Genesis provided a simplified Web dashboard to customers, which displayed current balances and interest rates. The dashboard provided access to account statements detailing accrued and paid interest.

43.    In marketing materials and communications directed at individual depositors—and specifically to Plaintiffs located in Pennsylvania—Genesis and

DCG repeatedly compared their lending services to stable and secure saving mechanisms. This assertion was not "puffery," as Defendants never warned Plaintiffs or similarly situated consumers that their funds would be locked into long-term, unsecured promissory notes to its parent company mischaracterized as current assets.

44.    Defendants and Genesis provided no meaningful risk disclosures, disclaimers, or warnings that would alert an ordinary consumer to the hidden, long-term, unsecured nature of the critical $1.1 billion promissory note, thereby ensuring that Plaintiffs remained under the misimpression that Genesis was financially sound. Defendants had a duty to warn the Plaintiffs of the insolvent nature of Genesis's finances and failed to do so.

45.    Even if Defendants had provided boilerplate disclaimers warning of general risks or potential volatility, no reasonable disclaimer could excuse or legitimize the deliberate and egregious misrepresentation described herein. The gross misclassification of a $1.1 billion long-term, unsecured promissory note as a "current asset" transcends ordinary risk or volatility and instead constitutes outright fraud. Such an intentional and material deception cannot be disclaimed away by any purported notice of risk, nor would any reasonable consumer reading such a disclaimer understand it to include a massive, carefully orchestrated financial distortion of this nature.

21

46.    Genesis entered into loans with Plaintiffs using simple one-page term sheets. The term sheets stated the loan amount, the interest rate, and the maturity date. Interest was to be paid at specific times, and the asset loaned was to be returned in full on the maturity date. Plaintiffs expected to receive the originally loaned asset back with interest and to retain that asset after maturity.

    a.    These loans were not subject to risks involving volatile cryptocurrency exchange rates. They involved loaning a single asset and receiving back that same asset at maturity.

    b.    Genesis consistently offered relatively modest interest rates—often as low as 1% APY and never exceeding 6% APY—levels comparable to traditional, low-risk savings or deposit products rather than speculative, high-yield investments. This reasonable rate structure reinforced Plaintiffs' belief that they were participating in a stable, consumer-level financial service rather than a high-risk venture.

    c.    All Genesis interest rates were fixed at the time of loan origination and not dependent on Genesis's financial performance.

47.    Plaintiffs believed that Genesis was engaged in simple, bank-type lending, as Plaintiff Stephen Sokolowski stated during a contemporaneous public video interview with journalist Laura Shin for her "Unchained" podcast conducted

in January 2023—the same month that Genesis declared bankruptcy (Transcript in

*Exhibit E*)–hereinafter the "Shin Interview":

> But you also, should--shouldn't be misleading customers
> about… just kind of like making loans and then, you know
> charging a higher interest rate and… pocketing the difference. I
> mean, that was my understanding of what these companies
> were doing, and it's pretty clear that that was not their entire or
> even their primary business model to just borrow money and
> then lend it out at a higher interest rate.

48.    Genesis's claim that it catered solely to sophisticated, institutional

clientele is belied by its longstanding, lucrative relationship with Gemini, a well-

known cryptocurrency exchange and lending platform. Gemini actively marketed

its lending services—which merely passed customer cryptocurrency deposits

through to Genesis—to retail customers in Pennsylvania and elsewhere. Both at the

time of the presentation of the fraudulent balance sheet and also at the time of

Genesis's bankruptcy, Gemini had in fact become Genesis's largest creditor.

49.    Many of these Gemini depositors held relatively small amounts of

cryptocurrency—often less than $100—reflecting typical consumer-level

transactions rather than institutional-scale investments. Genesis, aware that Gemini

was aggregating these retail deposits from unsophisticated investors who sought

safe returns, accepted them without objection, further demonstrating its knowledge

that it was effectively receiving funds sourced from ordinary Pennsylvania consumers.

50.    Far from catering to large corporations, DCG and Genesis were so dependent upon Gemini's consumer deposits that the companies actively discussed a merger for, among other reason, streamlining operations. (See *The People of the State of New York by Letitia James, Attorney General of the State of New York v. Gemini Trust Company, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte. Ltd., Genesis Global Holdco, LLC, Digital Currency Group, Inc., Soichiro Moro (a.k.a. Michael Moro), and Barry E. Silbert, Index No. 452784/2023 (Sup. Ct. N.Y. Cnty.)* – hereinafter the "NYAG Action."

a.    In one E-Mail (*NYAG Action, Doc. 45*), Defendant Silbert states: "Gemini is Genesis' largest and most important partner."

51.    Far from Genesis catering exclusively to sophisticated institutional investors, a June 21, 2022 chat message from Defendant Silbert explicitly references retail depositors.

a.    In this message (*NYAG Action, Doc. 44*), Silbert stated "the Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage."

   b. This direct acknowledgment of the "retail channel like Gemini" as a source of capital directly contradicts the notion that Genesis operated solely as an institutional lender.

   c. Defendants Moro and Silbert knew, or should have known, that both Genesis and Gemini served Pennsylvania retail customers.

  52. In fact, Plaintiffs had also previously lent their assets to Gemini. Seeking a moderately higher interest rate and believing that direct lending to Genesis would provide the same stable, consumer-oriented arrangement, Plaintiffs moved their cryptocurrency loans from Gemini to a direct relationship with Genesis.

**Defendants' Public Representations After the Three Arrows Capital Bankruptcy**

  53. Genesis had not been financially sound at least since the company took a massive loss on a loan to Three Arrows Capital, a company which declared Chapter 15 bankruptcy in June 2022.

  54. After the Three Arrows Capital loss, internal communications in the *NYAG Action* show that Genesis and Defendant Moro urgently needed to restore solvency but were aware of the need to present Genesis's services as akin to stable, consumer-level financial products.

a.    In a June 13, 2022 chat message, Defendant Moro stated in regards to raising interest rates to encourage more deposits: "Not too much though as we don't want to seem desperate, but we are willing to pay above where we have been." (*NYAG Action, Doc. 40*).

b.    This comment suggests a deliberate strategy to avoid appearing like a high-risk venture, consistent with the Plaintiffs' claim that Genesis sought to attract customers by offering rates that would be perceived as reasonable within a consumer lending context.

55.    On June 17, 2022, at 11:40am EDT, Defendant Moro publicly posted on X (then Twitter):

> We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on…. We continue to operate 24/7 and have met every client request. We are extremely confident in our ability to service lenders, borrowers and traders within our service level agreements.

a.    In Moro's misleading statement, the term "finite" actually meant that Genesis was insolvent, but that Genesis had by then taken steps to ensure it would not lose *any more money* due to the Three Arrows Capital disaster.

b.    During the *Shin Interview*, Plaintiff Stephen Sokolowski stated:

And that's by the way what I understood their June 17th
statement to—to read, that… they took 1.1 billion
dollars, you know, and—and in exchange… they took the
debt and they paid Genesis 1.1 billion dollars. Maybe I
should have read between the lines or something like that
in June, you know, but… that's a little dishonest to me
that they didn't state exactly what happened at the time,
and, you know, use these terms like they 'netted against
their balance sheet' or whatever the exact quote is.

    c.    Plaintiffs read Defendant Moro's statement while at their home
in Pennsylvania.

56.    On or around June 30, 2022, two weeks after posting the misleading
tweets, Defendant Moro, along with Defendant Silbert, signed the fraudulent $1.1
billion promissory note. (*Exhibits B and C.*)

    a.    This $1.1 billion so-called "promissory note" was not a typical
lending transaction at all and involved no actual transfer of money. The
arrangement was highly unusual and did not create any real, immediately
accessible capital for Genesis.

    b.    Because no funds changed hands, Defendants had essentially
papered over the massive hole in Genesis's finances created by the Three
Arrows Capital bankruptcy. The interest rate charged–1.0% per annum–was
unreasonable for a typical unsecured loan between distinct commercial
entities.

c.    The text of the note, among other things, included: "Assignor has substantial doubts that it will be able to recover any additional amounts from TAC [Three Arrows Capital] in respect of the TAC Loans."  As signatories to this contract, Defendants Silbert and Moro were thus well-aware that Genesis was deeply insolvent at the time the contract was signed.

d.    During the *Shin Interview*, Plaintiff Stephen Sokolowski also referred to the note's unusual structure:

> Well, I also would dispute, I mean, maybe legally you could call it a loan but I would dispute that in common language that we would call what happened there a loan. I mean… when does a loan ever involve not actually giving somebody any money, right? When I take out a loan to buy a house, they give me money and then I use it to buy the house. I don't get some promise that they'll pay for the house in 10 years.

**Reliance on the Fraudulent Balance Sheet**

57.    On September 21, 2022, at 1:49pm EDT, while seated in front of his home computer in Pennsylvania, Plaintiff Stephen Sokolowski received an E-Mail from Tiedy. Attached to the message was a balance sheet purporting to show Genesis's financial condition as stable.

a.    Stephen discussed this balance sheet with Tiedy on the same day (September 21, 2022) during a Telegram audio call. The audio call was

conducted in the same room, in Pennsylvania, while viewing the fraudulent balance sheet.

   b.    This document (*Exhibit A*) included $1.726 billion in the "other assets" row, listed under the "current assets" column. As the fraudulent $1.1 billion promissory note represented the vast majority of these "current" "other assets," the balance sheet grossly misrepresented Genesis's liquidity and solvency.

58.    Plaintiff Stephen Sokolowski talked with Tiedy in multiple other instances throughout 2022. During all calls, Stephen was located in Pennsylvania, and all discussions about the content of those calls with Plaintiff Christopher Sokolowski took place in Pennsylvania.

   a.    At all relevant times, Tiedy failed to disclose the true nature of the promissory note and its inclusion in "other assets" under the "current assets" header in this balance sheet.

59.    On September 21, 2022, at 2:07pm EDT, Plaintiff Stephen Sokolowski forwarded this balance sheet by E-mail to Plaintiff Christopher Sokolowski, who personally reviewed it later that afternoon, while also located in the same house in Pennsylvania.

60.    Plaintiffs, relying on the deceptive balance sheet provided to them and the overall impression that Genesis's service was safe and well-capitalized, continued to lend their assets to Genesis rather than withdrawing them.

61.    Plaintiffs have obtained a substantially similar fraudulent balance sheet that Genesis presented to another creditor under analogous circumstances (*Exhibit D.*) The second balance sheet lists "Other Assets" of $1.691 billion under "Current Assets" and is watermarked with the name of a different Genesis customer. This second balance sheet, which similarly classified a long-term, illiquid promissory note as a "current asset" to create the illusion of solvency, further demonstrates that Genesis's deception was not confined to Plaintiffs alone.

62.    Both balance sheets (*Exhibits A and D*) include a "Weighted Avg" table, which materially understated the average loan duration of Genesis's loan book. The balance sheet presented to Plaintiffs (*Exhibit A*) stated that the "Total" average term of the loans outstanding due to Genesis was just 35.5 days. This figure was impossible to reconcile with a 10-year promissory note representing roughly one third of Genesis's reported assets, since including even one such note would necessarily push the weighted average duration well beyond 35.5 days. Accordingly, the Weighted Avg table was willfully or recklessly misleading and furthered Defendants' overall scheme to conceal the long-term, unsecured nature of the $1.1 billion promissory note.

a.    The consistency of the "Weighted Avg" table with the

misclassified "current assets" further suggests that the inclusion of the

fraudulent promissory note as a "current asset" was not a clerical error.

63.    Under Generally Accepted Accounting Principles (GAAP), a "current

asset" is defined as an asset that is expected to be converted into cash, sold, or

consumed within one year or the operating cycle of the business, whichever is

longer. This definition is widely understood in the financial and investment

communities and informs how investors and creditors interpret a company's

balance sheet and assess its liquidity. The classification of an asset as "current"

signifies that it is readily available to meet short-term obligations.

64.    The classification of the $1.1 billion unsecured, 10-year promissory

note from DCG as a "current asset" was particularly critical to Plaintiffs' decision-

making. Plaintiffs understood the term "current asset" to mean that such an asset

could be readily liquidated or converted to cash within one year. Because the

decision at hand was whether to call expiring short term loans or renew them with

a term of one year, the presence of a substantial "current asset" on Genesis's

balance sheet assured them that the funds necessary to repay their principal at

maturity would be available. In other words, the misclassification reinforced

Plaintiffs' belief that Genesis would remain solvent and liquid at the time Plaintiffs'

31

loans came due, significantly influencing Plaintiffs' decision to renew and maintain their lending relationship with Genesis.

     a.    During the *Shin Interview*, Plaintiff Stephen Sokolowski stated:

> So my interpretation of that was I was offering Genesis a
> one-year loan or considering offering them a one-year
> loan, and since that's a current asset, that means that all
> of the assets that are listed in that column should be able
> to be called before my one-year loan is due. And,
> apparently now it turns out that one of their assets is this
> 10-year promissory note to Digital Currency Group, and,
> if that was listed in the one in the current assets then
> obviously they do not borrow--I've never heard of them
> ever borrowing from a customer for 10 years.

65.    Plaintiffs also evaluated competing lending platforms and had the opportunity to transfer all assets to competing lending firms at higher rates but chose to sign long-term loans at Genesis for the majority of the assets due to Genesis's perceived safety and stability.

     a.    During the *Shin Interview*, Plaintiff Stephen Sokolowski stated the following, referring to his research on Ledn, a Genesis competitor:

> And, [Ledn] told me that they were doing low-risk trades
> and uh, they uh,--they wanted to offer a lower rate, but
> they wouldn't present their balance sheet to me. So, that
> was the reason we didn't go with Ledn. I kept asking
> them for that balance sheet, and they wouldn't present it
> to me.

32

66.    Classifying this long-term, unsecured promissory note as a current asset was a materially false and deceptive misrepresentation. Defendants Silbert and Moro, as high-level executives intimately familiar with Genesis's financial structure, knew or should have known that this misclassification misled anyone viewing the statement into believing Genesis was financially sound.

67.    The misclassification of the promissory note on the balance sheet was so material that its absence would have made it immediately clear to a reasonable person that Genesis faced significant financial instability. Had this critical misrepresentation not existed, it is highly likely that a reasonable person would have declined to lend their assets to Genesis regardless of any other factors evaluated. The importance of this single factor alone would have played a decisive role in that assessment.

68.    On September 26, 2022 and September 30, 2022, Plaintiffs renewed their large cryptocurrency term loans with Genesis as a direct result of viewing the fraudulent balance sheet. Plaintiffs also elected to continue existing "open term" US Dollar and USDC loans as a direct result of viewing the balance sheet. But for the presentation of the fraudulent balance sheet, Plaintiffs would not have renewed their loans and would have withdrawn all assets from Genesis.

69.     On January 19, 2023, Genesis Global Capital, LLC and two affiliated

entities filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy

Court for the Southern District of New York (*Genesis Bankruptcy Action.*)

**Defendants' Knowledge and Control**

70.     From communications disclosed in the *NYAG Action*, it is clear that

Defendants willfully and recklessly shaped their external messaging to retain

lender confidence despite dire internal realities. One docket entry references a

Microsoft Teams chat, in which both Silbert and Moro were present and chatting

(*NYAG Action, Doc. 69.*)

       a.     One Genesis employee warned, "we need to still be very

cautious about what we say and how we say it, we don't know they're not

recording." (Matthew Ballensweig, 6/15/2022, 12:55 AM), demonstrating

conscious efforts to conceal the truth.

       b.     In response, Defendant Moro (6/15/2022, 12:55AM) stated "I

agree with the caution. Happy to join."

       c.     These communications also reference a "Genesis Source of

Strength Talking Points" document being used that day, indicating a

coordinated effort to present a misleading narrative of stability. As members

of the Teams chat, Moro and Silbert had access to this document.

71.     Internal communications show that on June 21, 2022, Defendant Silbert privately acknowledged a substantial "hole" in Genesis's equity due to the collapse of Three Arrows Capital. Silbert described the situation as "super confidential/sensitive stuff." In these communications, Silbert urged select DCG and Genesis personnel not to share this information "with anybody" outside a "circle of trust." (*NYAG Action, Doc. 44.*)

    a.     This directive underscores Silbert's and DCG's direct, personal knowledge of Genesis's precarious financial state and their deliberate efforts to keep it hidden from lenders like Plaintiffs, further evidencing that their misrepresentations were not the result of oversight or negligence, but part of a calculated scheme to deceive.

72.     Internal communications dated June 28, 2022, revealed in the *NYAG Action*, show that DCG and Genesis executives, including Silbert and Moro, explicitly acknowledged a significant "equity hole" in Genesis's balance sheet. In these internal emails, Silbert directed both DCG *and Genesis* personnel to work "24/7" to fill this shortfall by the June 30 reporting deadline (*NYAG Action, Doc. 91.*)

    a.     This contemporaneous recognition of a massive deficit, coupled with urgent efforts to mask it, stands in direct contrast to Defendants' public portrayal of Genesis as financially stable, further supporting Plaintiffs'

allegations that Defendants knowingly misled lenders such as Plaintiffs regarding Genesis's true financial condition.

73.    On August 24, 2022, Defendant Moro posted on X (then Twitter) that he had resigned from his position as CEO of Genesis.

    a.    At the time of his resignation, Moro failed to notify the public of the fraudulent promissory note that he had signed, and the actions he took at Genesis before resigning were inadequate to prevent fraudulent balance sheets from continuing to be presented to Genesis customers, including the Plaintiffs.

    b.    Moro, when he failed disclose the existence of the fraudulent scheme, knew or should have known that the fraudulent note would continue to be used to deceive consumers after his resignation.

74.    DCG, through Silbert and Moro, orchestrated and approved the presentation of Genesis's financial condition. Defendants knew these representations were false or acted with reckless disregard for their truth. As sophisticated corporate actors, Silbert, Moro, and DCG understood the nature of this promissory note and its impact on Genesis's balance sheet because they had personally signed it.

a.     Defendants were well-aware that Plaintiffs and other consumers would rely on these statements when deciding whether to lend their personal assets.

75.    Defendants carefully avoided calling these arrangements "investments," presumably due to securities law concerns. By doing so, and by actively accepting assets from Genesis customers, they reinforced the consumer perception that these were ordinary, low-risk lending services, not speculative financial instruments.

76.    Plaintiffs relied on Defendants' misrepresentations in Pennsylvania, where they managed their household financial affairs. Defendants' actions directly impacted Plaintiffs' personal financial decisions and caused them to forgo safer options.

**DCG's Involvement in Genesis Operations**

77.    Defendant Silbert, as CEO of DCG, exerted substantial control over the entire DCG enterprise, including Genesis. His pervasive influence was further underscored by his significant personal financial stake in DCG. As reported by The Wall Street Journal on November 1, 2021, Silbert owned approximately 40% of DCG's stock, making him the largest single shareholder. (See

*https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-*

*standard-oil-11635764400?st=7a338mejs53urq0, last accessed Dec. 25, 2024*).

This substantial ownership interest not only solidified his control but also directly aligned his personal financial fortunes with the performance of DCG and its subsidiaries.

78.    Multiple records of internal communications in evidence discovered during the NYAG action demonstrate that Defendant Silbert was frequently present and actively involved in Genesis's internal affairs, acting on behalf of Defendant DCG.

a.    In a June 13, 2022 chat message (*NYAG Action, Doc. 40*), Silbert stated directly:

> were scheduling a DCG board update and strategy call
> for tomorrow late morning, pencilling in 11 am. I'd like
> for moro, derar, matt and arianna to join. okay?

This direct instruction from DCG's CEO to Genesis's top personnel to attend a DCG board strategy session underscores the integrated nature of the two entities and DCG's direct command over Genesis's leadership.

79.    Before this June 14, 2022 board meeting, Silbert E-Mailed DCG and Genesis executives, as well as outside investors (*NYAG Action, Doc. 42*). He discussed several options to address the crisis at Genesis.

a.    The E-Mail outlines three options DCG was considering for

Genesis: "Support Genesis," "Jettison the Genesis Capital business," and a

"Shock & Awe" plan. (*Id.*). Notably, Silbert states that the Genesis team was

unaware of the "Jettison" and "Shock & Awe" options *(Id.)*:

> **IMPORTANT:** we have not discussed either the Jettison
> or Shock & Awe plans with the Genesis team. As far as
> they know, we're on path #1 [support Genesis] right now,
> so please do not bring up the alternative paths on the call
> today with the team.
>
> (emphasis in original).

This statement further demonstrates that DCG was directing Genesis's future

without even the knowledge or input of Genesis's own management, not

only actively planning to attend Genesis management's calls but also

intending to hide critical information during those calls *(Id.)*.

b.    The "Shock & Awe" plan, in particular, provides compelling

evidence of DCG's disregard for corporate separateness and its intent to use

Genesis as a tool to benefit DCG and its shareholders. The plan involved

Silbert becoming CEO of Genesis, DCG contributing the assets and

investing team of another subsidiary (DCGI) to Genesis, and pursuing a

public offering of Genesis in 2023 (*Id.*). This plan constituted a blatant

commingling of assets and personnel between DCG and its subsidiaries, treating them as interchangeable parts of a single enterprise.

      c.     Silbert's email explicitly acknowledges the potential risks of the "Shock & Awe" plan to DCGI's assets, stating that "as 100% owner of Genesis, DCG shareholders are no worse off, other than DCGI's assets being put under Genesis creditors." (*Id.*). This demonstrates that DCG was willing to potentially sacrifice the assets of one subsidiary to prop up another, prioritizing the interests of DCG shareholders over the potential harm to Genesis's creditors. Furthermore, the plan's stated goal of providing "a clear path to liquidity for DCG shareholders via Genesis IPO" reveals that DCG was motivated, at least in part, by a desire to create a liquidity event for its own shareholders even while Genesis was facing a severe financial crisis. (*Id.*). The fact that this plan was being considered without the knowledge of Genesis' management further underscores DCG's utter disregard for Genesis' separate corporate existence.

      d.     The "Support Genesis" plan contemplated DCG "look[ing] to secure our own additional liquidity to keep in reserve should we decide later to contribute capital to stabilize the Genesis balance sheet" while Genesis "makes every effort to bolster its own balance sheet." (*Id.*) This underscores that DCG would use its own resources—potentially commingling or

redirecting funds to shore up Genesis's finances if necessary—even as DCG simultaneously coordinated "with counsel to ensure best defenses against veil piercing." (*Id.*) The notion that DCG might inject its own liquidity to keep Genesis afloat, yet remain free from liability to Genesis's creditors, confirms DCG's recognition that its direct operational involvement blurred corporate boundaries and exposed DCG to potential veil-piercing claims.

80.    Internal communications disclosed in the *NYAG Action Doc. 91* show that Defendant Moro also later discussed "Option 3," which in the *Doc. 91* communication involved "some combination of assets from DCG parent and DCGI placed into GGC, again for equity purposes only."

81.    In another internal communication (*NYAG Action, Doc. 44*), Silbert indicated that Foundry—another DCG subsidiary—would be brought in to address Genesis's lending issues. By stating that a new hire would "help Foundry assess their loan book and address any issues," Silbert effectively enlisted yet another affiliated DCG entity in the effort to stabilize Genesis. This further demonstrates Defendants' practice of treating DCG subsidiaries as interchangeable resources rather than maintaining their supposed independence and corporate boundaries.

a.    This June 21, 2022 chat message also highlights the importance DCG placed on maintaining "trust and confidence in Genesis" to prevent "money leaving Genesis and depleting our liquidity." (Id.). Silbert stated that

DCG and Genesis had around $2 billion in liquidity but were in "bunker mode" to "withstand whatever negative event comes next." (Id.). This shows that DCG was acutely aware of the risk of a liquidity crisis at Genesis and was actively working to prevent it, not for the benefit of Genesis's creditors, but, as referenced by the use of the word "our," to protect DCG's own liquidity.

      b.    Silbert's chat message also reveals DCG's intention to intervene directly in Genesis's affairs to address the "hole" in its equity. He stated that (Id.):

> DCGI [another DCG subsidiary] will play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the downstream of certain/all assets until prices recover.

82.    DCG's active involvement in managing the perception of Genesis's stability is further evidenced in a June 15, 2022 chat involving Silbert and other DCG and Genesis personnel. (*NYAG Action, Doc. 43*). Amidst reports of increasing withdrawal requests from lenders," Silbert inquired, "is there anything we/DCG can do to further install confidence in genesis?" (Id.).

      a.    A Genesis employee reported speaking with representatives from other DCG portfolio companies, stating, "so if they triangulate with you, you can just reaffirm our position etc." (Id.) This indicates that DCG

was actively managing communications across its network of subsidiaries to present a unified front of strength and stability, even as concerns about Genesis's financial health were mounting. Silbert himself stated in the same email chain, "we need to continue to perpetuate that of course," referring to Genesis' reputation as the "blue chip" in the market. (Id.).

83.    All of the previously mentioned E-Mails and chats in the *NYAG Action* discussing the Genesis situation were sent to or from multiple high-ranking DCG employees in addition to Defendant Silbert, demonstrating that the involvement of DCG in Genesis's operations went well beyond the CEO's involvement (*NYAG Action, Doc. 42, 43, 44).*

84.    On October 20, 2022, Defendant Silbert sent an E-Mail to DCG and Genesis employees discussing a potential merger involving DCG, Genesis, and Gemini (*NYAG Action, Doc. 45*). In this message, Silbert stated:

> Good lunch with Cameron [Winklevoss, CEO of Gemini]. Tldr:
> he is intrigued about the idea of a closer partnership between
> Genesis/Gemini/DCG, including a potential merger of the
> companies. I put him on clear notice that the path we're on right
> now could lead to a Genesis bankruptcy, which would put
> Gemini's deposits (and therefore, Gemini's business) at
> significant risk. He took that part surprisingly well and
> appreciates we need to work together to mitigate that risk.

a.    This E-Mail not only indicates that DCG and Genesis were acting as a unified economic entity rather than separate corporate forms but

also shows DCG's active consideration of a merger with Gemini—a company that had taken on consumer deposits from Pennsylvania residents. This further evidences Defendants' willingness to restructure assets and relationships to conceal financial instability and minimize accountability all at the expense of consumers like Plaintiffs.

      b.     Further demonstrating the intertwined nature of DCG and Genesis, and DCG's direct financial interest in concealing Genesis's true condition, Silbert admitted in this E-Mail that "I can't raise money at DCG if there is a Genesis bankruptcy risk" (*Id.*). This statement reveals that DCG's ability to attract investors and secure funding was inextricably linked to Genesis's financial stability or at least the appearance of stability. This underscores that Genesis's continued operation, even while insolvent, was not merely a matter of independent business judgment but was crucial to DCG's own financial viability.

85.     Later in the same email (*NYAG Action, Doc. 45*), Silbert mentioned informing Cameron Winklevoss, CEO of Gemini, that DCG could further entangle the companies' operations by moving DCG subsidiary Grayscale's cryptocurrency assets over to Gemini's custody. Such a move, he noted, would make Gemini "the largest custody provider in the world," again demonstrating the Defendants'

willingness to restructure and merge operations across multiple supposedly independent entities.

86.    Far from being a "hands-off" holding company, Defendant DCG directly controlled and actively participated in Genesis's financial affairs throughout Genesis's existence. Genesis and DCG engaged in complex lending and investment strategies, particularly those involving the Grayscale Bitcoin Investment Trust ("GBTC"), managed by DCG subsidiary Grayscale.

87.    On November 10, 2022, as further detailed in the *NYAG Action, Doc. 52*, DCG, Genesis, and Gemini entered into an agreement whereby 30,905,782 shares of GBTC (valued at $296 million at the time) were pledged as collateral to secure Gemini's consumer loans to Genesis. This maneuver further demonstrates the Defendants' willingness to disregard corporate distinctions and commingle assets across affiliated entities.

    a.    Public filings with the United States Securities and Exchange Commission reveal the significant scale of this collateralization. Grayscale Investments, LLC's Form 10-Q for the quarter ending September 30, 2022, indicates that DCG, Genesis, Grayscale, and CoinDesk, Inc. (another DCG subsidiary at the time) collectively held 66,972,889 shares of GBTC. Therefore, the shares pledged as collateral in the November 10, 2022

agreement constituted nearly half of the entire DCG conglomerate's reported GBTC holdings.

88.    At the time Genesis collapsed, the debt that DCG had incurred with Genesis, in addition to the fraudulent $1.1 billion promissory note, demonstrates that DCG and Genesis were operating together as a single financial entity. Based on media reports from November 2022, the debt owed by DCG to Genesis represented up to 50% of Genesis's total assets.

89.    After Genesis halted withdrawals in November 2022, DCG and Silbert actively sought investors to provide money to save Genesis from collapse, demonstrating their full awareness and direct control of Genesis's financial condition and their attempts to directly fix the financial situation at the company they were intimately involved with. Their failure to adequately manage Genesis's assets, combined with their fraudulent activity, demonstrates that DCG and Silbert operated with reckless disregard for the safety of lenders, including the Plaintiffs.

a.    On November 21, 2022, *Bloomberg* reported:

For the investors who were approached for the $1 billion lifeline being sought, some began to balk at the interconnectedness between the entities, according to people familiar with the discussions. Another simply said it was a matter of how these types of firms do business.

(*Available at https://www.bloomberg.com/news/articles/2022-11-21/crypto-firm-genesis-warns-of-possible-bankruptcy-without-funding, last visited Dec. 25, 2024.*)

      b.     Significantly, the size of the "lifeline" DCG and Silbert desperately sought–$1 billion–was strikingly similar to the $1.1 billion value of the fraudulent promissory note, strongly suggesting that these efforts were a direct attempt months later to remedy the same financial shortfall concealed by the misclassification of that note.

      c.     Furthermore, the fact that DCG and Silbert actively sought but ultimately failed to obtain a $1 billion lifeline for Genesis from independent investors is highly telling. This inability to attract external funding suggests that the risk associated with lending to Genesis was deemed too high by those outside the DCG ecosystem. Consequently, DCG's own extension of credit via the promissory note appears less like a sound financial decision and more like a necessary action driven by the recognition that their own fortunes were inseparable from those of Genesis.

90.    Upon information and belief, in or around November 2022, Defendant Silbert or another DCG representative circulated a letter to DCG shareholders discussing a "liability" to Genesis of $575 million—in addition to the $1.1 billion promissory note. According to a publicly reported copy of that letter, DCG had

borrowed this money from Genesis "to fund investment opportunities and to repurchase DCG stock from non-employee shareholders." (*X post by @Tier10K, Nov. 21, 2022, available at https://x.com/tier10k/status/1595140018871631873, last visited Dec. 25, 2024.*) Plaintiffs do not presently possess a copy of this shareholder letter but intend to obtain it in discovery. This new information—if confirmed—further evidences that DCG was using Genesis as a source of capital for its own benefit, consistent with Plaintiffs' allegation that DCG and Genesis functioned as a single commingled entity rather than independent corporate entities.

> a.    The existence of multiple additional loans from Genesis to DCG and DCG subsidiaries totaling to this $575 million debt is corroborated by loan term sheets contained in the *Genesis Bankruptcy Action, Doc. 680, Exhibits 1-7 and Doc. 681, Exhibits 1-5.*

91.    The sheer volume of intercompany transactions, including DCG's multi-billion-dollar loans to Genesis, coupled with DCG's hands-on orchestration of Genesis's strategic decisions, demonstrates that DCG, Genesis, and other DCG subsidiaries operated as a single financial enterprise rather than as truly distinct entities. Internal communications reveal that DCG executives—often without Genesis's own management's knowledge—unilaterally considered drastic measures such as "jettisoning" Genesis, merging its assets with other DCG

affiliates, or orchestrating a so-called "Shock & Awe" plan to restructure Genesis and pursue an eventual IPO. DCG's own recognition of the need to "ensure best defenses against veil piercing" underscores that it was aware its direct oversight, asset-shuffling, and disregard for corporate formalities could subject DCG to liability for Genesis's debts. By exercising near-complete control over Genesis's finances, planning massive inter-subsidiary transfers, and misclassifying a $1.1 billion promissory note as a current asset, DCG effectively intermingled funds and personnel across multiple business lines. This lack of corporate separateness deliberately exposed Plaintiffs—who believed they were dealing with a solvent, standalone lender—to undisclosed risks, thereby causing them injury under the UTPCPL when Genesis ultimately collapsed.

### Damages to Plaintiffs and Mitigation Efforts

92.    When Genesis declared bankruptcy, the Plaintiffs' personally owned cryptocurrency assets and US Dollars —which would have been withdrawn or placed elsewhere but for Defendants' deception—were lost or severely diminished.

93.    On January 27, 2023, in the Genesis Global Capital, LLC Chapter 11 bankruptcy proceeding pending in the United States Bankruptcy Court for the Southern District of New York, CM LLC sold its bankruptcy claim against Genesis

to Jefferies Leveraged Credit Products LLC (See *Genesis Bankruptcy Action, Doc. 50.*)

94.     This quickly agreed fire sale was directed by Plaintiffs to save their own personal finances after Genesis declared bankruptcy. Plaintiffs, at the time, owed around $300,000 to Wells Fargo Bank, N.A, collateralized against their long-term stock portfolio, as a result of a June 2, 2022 home purchase. Plaintiffs had expected to be able to withdraw US Dollars from Genesis to repay that loan. Without the ability to withdrawal US Dollars from Genesis, the Plaintiffs were exposed to potential liquidation of their long-term stock holdings at a low valuation. When the bankruptcy sale payment was received from Jefferies, Plaintiffs immediately paid off the Wells Fargo loan.

95.     While the sale partially mitigated the losses associated with the Genesis bankruptcy distribution, it did not compensate Plaintiffs for the full measure of their harm as the sale price was substantially lower than the value of their assets—and even on the low end of the market value of the bankruptcy claims at the time.

96.     The sale of CM LLC's bankruptcy claim did not and could not release or waive Plaintiffs' individual claims under UTPCPL or their right to recover damages directly from Defendants for the alleged deceptive practices that induced Plaintiffs to maintain their loans with Genesis.

50

97.    Plaintiffs never intended to engage in a high-stakes investment gamble. They trusted Defendants' false assurances of solvency and stable returns, a trust based on the fraudulent balance sheet and consumer-oriented marketing approach. This trust and reliance caused Plaintiffs substantial financial harm.

# COUNT I

## VIOLATION OF PENNSYLVNIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)

### 73 P.S. §§ 201-1 - 201-9.2 (Against DCG and All Defendants as Participants)

98.    Plaintiffs incorporate by reference all preceding paragraphs.

99.    Defendants engaged in unfair or deceptive acts by misrepresenting Genesis's financial health. Through the fraudulent balance sheet and related communications, Defendants created the impression that Genesis offered a stable, safe environment for personal asset lending, akin to a consumer savings product.

100.    Plaintiffs justifiably relied on these misrepresentations. Even a prudent, good-faith consumer would understand a "current asset" as something readily convertible to cash within one year. Defendants never provided any contrary definition or disclaimer. Absent such disclosure, Plaintiffs reasonably believed that the listed assets would be available to satisfy their loans at maturity. This is especially true given that Defendants marketed their services as stable and

reliable, not as speculative or high-risk ventures demanding sophisticated financial acumen.

     a.    *In Pirozzi v. Penske Olds-Cadillac-GMC, Inc., 605 A.2d 373 (Pa. Super. 1992)*, the Court wrote regarding a car that was presented as "new": "It is unrealistic to expect the average consumer to specifically ask if the car was damaged in transit."  It would also be unrealistic for the Plaintiffs to specifically ask whether a 10-year fraudulent promissory note existed and was listed under "Current Assets."

101.   Defendants' conduct constitutes unfair and deceptive acts and practices as defined under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4), including but not limited to: (v) representing that their financial services had characteristics or benefits that they did not have; (vii) representing that their financial services were of a particular standard, quality, or grade when they were not; and (xxi) engaging in other fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding.

     a.    Defendants violated § 201-2(4)(v) by representing that their lending platform was stable, well-capitalized, and secure, when in fact they knowingly included a non-current, long-term, unsecured promissory note as a "current asset," thus falsely inflating Genesis's solvency and misleading consumers about the platform's true liquidity.

b.  Defendants violated § 201-2(4)(vii) by holding out their financial services as akin to a reliable, safe, interest-bearing consumer-level savings product when the underlying structure was neither conservative nor low-risk.

c.  Defendants violated § 201-2(4)(xxi) by engaging in overall deceptive and misleading practices—specifically, the fraudulent misclassification of the $1.1 billion unsecured promissory note and the omission of material facts about Genesis's true financial condition—thereby causing Plaintiffs to misunderstand the nature and security of the financial relationship and services offered.

102.  Pursuant to the UTPCPL, 73 P.S. § 201-2(3), "trade" and "commerce" mean:

> [The] advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.

This broad definition encompasses the conduct of Defendants in marketing and offering their financial services to Plaintiffs and other Pennsylvania consumers.

a.     The United States Internal Revenue Service's *IRS Notice 2014-21, 4(A-1)*, states "For federal tax purposes, virtual currency is treated as property."

b.     As the UTPCPL defines trade as involving "any property," the UTPCPL protects Plaintiffs against misrepresentations involving both cryptocurrency and US Dollars.

103.   Pennsylvania courts recognize the remedial nature of the UTPCPL. As the Pennsylvania Supreme Court has observed: "Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices." (*Commonwealth by Creamer v. Monumental Props., Inc., 459 Pa. 450, 459, 329 A.2d 812, 816 (1974)*). In this case, the Court further noted: "Although the Consumer Protection Law did articulate the evils desired to be remedied, the statute's underlying foundation is fraud prevention."  Given this guidance, the UTPCPL must be read broadly to protect Plaintiffs and similarly situated Pennsylvania consumers from the Defendants' fraudulent and deceptive conduct.

104.   In *Commonwealth ex rel. Zimmerman v. Nickel, 26 Pa. D. & C.3d 115 (Pa. Ct. Comm. Pl. Dauphin Cnty. 1983)*, the court emphasized that what triggers liability under the UTPCPL is the capacity of the defendants' conduct or statements to mislead consumers, rather than any particular classification or regulatory status

54

of the actual product the defendants were making misleading statements about. Thus, attempts to characterize the underlying transaction under a different regulatory scheme do not remove it from the UTPCPL's protective scope. The statute's central purpose is to protect Pennsylvania consumers from deceptive practices, regardless of how those practices might be labeled in another legal context.

105.   Plaintiffs relied on these deceptive acts and practices while in Pennsylvania, making personal and household financial decisions. Had Plaintiffs known the truth—that Genesis was not stable, that a critical "current asset" was in fact a long-term, unsecured promissory note—they would have withdrawn their assets and avoided loss.

106.   Plaintiffs are "persons" within the meaning of the UTPCPL, 73 P.S. § 201-2(2), and the lending services offered by Genesis and directed by DCG and its executives were presented as consumer-oriented financial services, not sophisticated investments.

107.   Defendants' deceptive conduct caused Plaintiffs an ascertainable loss of money and property. The UTPCPL aims to protect consumers like Plaintiffs from such fraudulent schemes.

108.   The UTPCPL contains no provision limiting the level of intelligence or sophistication of deceived consumers covered by the statute. The UTPCPL

protects all Pennsylvania consumers, regardless of level of knowledge or educational achievement. Reading such an exception into the statute would contradict public policy by discouraging consumers from conducting due diligence before entering into financial arrangements.

109.   As demonstrated by *Commonwealth v. TAP Pharmaceutical Products, Inc., 36 A.3d 1112 (Pa. Cmwlth. 2011),* where the Commonwealth recovered $27,715,904 under the UTPCPL, the statute's applicability is not foreclosed by the magnitude of the consumer losses. This precedent underscores that large financial amounts do not disqualify a claim from consumer-oriented protection under the UTPCPL. Although this judgment was ultimately vacated on appeal, the Court did so based on the conclusion that the Commonwealth's evidence did not meet the legal standard to establish deceptive conduct or fraud under the relevant statutes— not because of the magnitude of the judgment.

110.   The assets defrauded in these loans —Bitcoin, Ether, USDC (a stablecoin consistently valued at one U.S. dollar), and U.S. Dollars—are not securities. Bitcoin and Ether, as indicated by United States Securities and Exchange Commission statements, function similarly to commodities, while USDC and U.S. Dollars are treated as currency or cash equivalents. At no time did Plaintiffs intend to purchase investment contracts or other instruments that could be deemed securities under prevailing legal standards.

111.   In the ongoing *SEC v. Binance Holdings Ltd., No. 23-1599, slip op. at 52 (D.D.C. June 28, 2024)*, the court dismissed the SEC's claim specifically regarding Binance's "Simple Earn" crypto lending program, stating: "The holders of crypto assets simply agreed to loan them to the company for a specified period of time at a specified rate of interest, and the complaint lacks any allegation that they were led to believe that Binance's efforts would generate the return or make the assets more valuable at the end of the day."

    a.    By contrast, the Binance court also distinguished a different offering called "BNB Vault," allowing that portion of the SEC's complaint to survive. The court found that BNB Vault, which paid varying rewards depending on Binance's performance, potentially involved a "common enterprise" and profit-sharing from multiple yield sources, so the investors' profits depended on Binance's "managerial or entrepreneurial efforts."

    b.    Here, Plaintiffs merely agreed to lend their assets at a fixed interest rate without any expectation that Defendants' managerial efforts would enhance their intrinsic value–similar to the arrangement of Simple Earn.

    c.    Even if Defendants attempt to frame Plaintiffs' transaction as involving securities, nothing in the UTPCPL's text or purpose categorically excludes transactions involving securities from its protection. Therefore,

regardless of how Defendants characterize the underlying assets, the

UTPCPL applies to the deceptive practices alleged herein.


## DAMAGES


112.   Plaintiffs incorporate by reference all preceding paragraphs of this

Complaint as if fully set forth herein.

113.   Under the Pennsylvania Unfair Trade Practices and Consumer

Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 - 201-9.2, Plaintiffs are entitled to

recover their actual damages caused by Defendants' deceptive and fraudulent

conduct, and the Court may, in its discretion, award up to three times those

damages, plus reasonable attorneys' fees and costs. 73 P.S. § 201-9.2(a).

   a.   When fraud pervades the entire transaction, courts have ordered

   full restitution of the consumer's property. See *Neal v. Bavarian Motors,*

   *Inc., 882 A.2d 1022 (Pa. Super. 2005)* (affirming award of full purchase

   price due to pervasive misrepresentation).

114.   Plaintiffs entrusted specific amounts of cryptocurrency to Genesis,

believing—based on Defendants' misrepresentations—that Genesis was fully

solvent and financially sound, and that those same assets would be returned to

them at the end of the loan's term. Because these misclassifications of a $1.1

58

billion promissory note went to the core of Genesis's purported liquidity, the entire lending relationship was tainted from the outset.

    a.    Under a rescission-like theory, Plaintiffs are entitled to be restored to their position prior to Defendants' misrepresentations *(Neal, 882 A.2d at 1033)*.

    b.    The only true way to "undo" Defendants' fraud is to return the same number of coins that Plaintiffs originally lent, given that the asset remains in active commerce and that Plaintiffs never intended to relinquish these coins in a high-risk, deceptive scenario.

115.    Moreover, any damages calculation based solely on cryptocurrency prices around the time of Genesis's bankruptcy would be inherently unjust. By then, Genesis's and Gemini's desperate attempts to cover their insolvency—such as collateral liquidations and forced asset sales—had contributed to an artificial depression of the assets' market prices. In other words, Defendants' own misconduct triggered a chain reaction that drove down Bitcoin's value beyond ordinary market fluctuations, thereby heightening Plaintiffs' losses.

    a.    In fact, the price of Bitcoin sharply rose immediately after Genesis declared bankruptcy, climbing roughly 11% within the next week alone, underscoring that the earlier low was not a simple function of market volatility but rather an outgrowth of Defendants' concealed insolvency.

b.    Awarding damages based on that suppressed price would fail to place Plaintiffs in the position they would have occupied had Defendants' wrongdoing never occurred.

c.    Selecting a valuation at some arbitrary date would be unacceptably speculative, as it assumes that Plaintiffs would have disposed of those assets on whatever chosen date. In truth, Plaintiffs' well-documented practice was to hold these coins for the long term, and they would not have sold them but for Defendants' fraud.

d.    Awarding damages based on the artificially low price of Bitcoin at the time of Defendants' bankruptcy would create an unwarranted windfall for Defendants. By fraudulently inducing Plaintiffs to maintain their assets at Genesis, Defendants suppressed Plaintiffs' ability to benefit from the subsequent price appreciation. If the Court were to measure damages at that artificially depressed snapshot, Defendants—who caused and concealed the financial collapse—would effectively reap the benefit of the later market rebound at Plaintiffs' expense. Such an outcome would neither make Plaintiffs whole nor comport with the principles underlying Pennsylvania's consumer-protection laws.

116.    Plaintiffs acknowledge they received some monetary proceeds from the sale of their bankruptcy claim—an amount that is only a fraction of the fair

value of the coins taken. To the extent that this partial dollar payment might otherwise constitute a double recovery, Plaintiffs seek to offset that amount from the total coin-based award so as to avoid any windfall.

     a.    For example, if Plaintiffs lent 1 BTC now worth $100,000 each (total $100,000) but already received $1,000 through bankruptcy distributions, Plaintiffs would remain owed the equivalent of $99,000 worth of BTC. In a scenario where the Court orders in-kind restitution (i.e., coins), an offset of the partial dollar repayment would simply reduce the number of coins or the total monetary equivalent so that Defendants are credited for that prior payment.

     b.    This approach ensures that Plaintiffs recover only what is necessary to restore them to their pre-fraud position without duplicating what little they have already received.

117.   Plaintiffs request the return of the following cryptocurrency amounts (and US dollars, for loans denominated in that currency), subject to appropriate offsets for the partial dollar payments already received:

| Plaintiff | Asset | Quantity | Approx. Current Value |
|---|---|---|---|
| Stephen Sokolowski | BTC | 50 | $5,055,850 |

| | | | |
|---|---|---|---|
| Stephen Sokolowski | ETH | 848.9679943 | $3,245,604 |
| Stephen Sokolowski | USDC | 86360.757695 | $86,360 |
| Stephen Sokolowski | USD | $45,282.45 | $45,282 |
| Christopher Sokolowski | ETH | 220.09263209 | $841,414 |
| Christopher Sokolowski | USDC | 155064.735245 | $155,064 |
| Christopher Sokolowski | USD | $2,621.22 | $2,621 |

| Plaintiff | Claim Sale Offset Amount |
|---|---|
| Stephen Sokolowski | -$618,627.50 |
| Christopher Sokolowski | -$123,515.23 |

118. If Defendants are unable to return the exact coins, Plaintiffs seek a monetary award of the remaining fair market value of those coins—again accounting for the partial bankruptcy proceeds as an offset—calculated at the time of payment or at final judgment, whichever the Court deems equitable.

a. Granting only the historic loan-date value would fail to make Plaintiffs whole under the UTPCPL and would effectively reward Defendants' deception.

b. Courts routinely award the full current value of property when a consumer has been fraudulently deprived of it, in line with Neal's affirmation of granting the entire purchase price where the transaction is fatally misrepresented. *882 A.2d at 1033*.

119. Plaintiffs further request that this Court exercise its discretion to treble the damages *73 P.S. § 201-9.2(a)*. The systematic, knowing misrepresentation of solvency—particularly through the misclassification of a massive, long-term promissory note as a "current asset"—demonstrates willful or reckless disregard for the truth.

a. In *Schwartz v. Rockey, 593 Pa. 536 (Pa. 2007),* the Supreme Court stated that "Centrally, courts of original jurisdiction should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL" *(at 557)* and that "many individual claims asserted under the UTPCPL will be small, as the statute covers a wide range of consumer transactions. Thus, it seems reasonably likely that the Legislature wished to enhance the impact of monetary awards under the

statute to deter wrongful trade practices affecting the public at large" *(at 556-557)*. Furthermore, the Supreme Court stated that "the courts' discretion to treble damages under the UTPCPL should not be closely constrained by the common-law requirements associated with the award of punitive damages" *(at 557)*.

b.      Defendants' intentionally deceptive actions here similarly warrant an enhanced award to deter future fraudulent practices and to ensure Plaintiffs are fully compensated.

120.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs seek their attorneys' fees and costs. Although they currently appear pro se, they reserve the right to recover all documented legal expenditures if they retain counsel or incur additional litigation costs.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against all Defendants and grant the following relief:

121.    An order directing Defendants to deliver to Plaintiffs the identical number and type(s) of cryptocurrency coins that Plaintiffs originally entrusted to

Genesis, subject to an appropriate offset for the partial bankruptcy claim sale proceeds Plaintiffs have received, so as to avoid any double recovery.

122.   In the event Defendants cannot return the same cryptocurrency coins, an award to Plaintiffs of the full and fair market value of those coins, measured at the time of payment or at final judgment (whichever the Court deems just), similarly offset by any prior partial recovery, together with prejudgment interest on all sums awarded for Plaintiffs' loaned US Dollar losses from the date of the wrongful conduct to the date of entry of judgment, and postjudgment interest thereafter, at the highest lawful rate.

a.    For clarity, Plaintiffs do not seek interest on the BTC and ETH portion of their losses, as Plaintiffs request the return of the actual coins or the equivalent value of the coins at the time of payment.

123.   An award of treble damages pursuant to 73 P.S. § 201-9.2(a), in light of Defendants' willful misrepresentations and reckless disregard for the truth of their financial condition.

124.   An award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 73 P.S. § 201-9.2(a). While Plaintiffs currently appear pro se, they expressly reserve the right to recover any documented legal expenditures should they retain counsel or incur other recoverable costs.

125.   Such other and further relief as this Court deems just and proper to effectuate the remedial purposes of the UTPCPL, ensure that Plaintiffs are fully compensated for Defendants' deceptive conduct, and deter similar unfair or deceptive practices in the future.

Dated: January 2, 2025

Respectfully submitted,


Stephen H. Sokolowski, Pro Se Plaintiff

3178 Carnegie Drive

State College, PA 16803

(814) 600-9800

steve@shoemakervillage.org


Christopher H. Sokolowski, Pro Se Plaintiff

3178 Carnegie Drive

State College, PA 16803

(814) 600-9804

chris@shoemakervillage.org