## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI AND
CHRISTOPHER H. SOKOLOWSKI,

              Plaintiffs,

     v.

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, AND SOICHIRO
"MICHAEL" MORO,

             Defendants.

Case No. 4:25-CV-00001-PJC

## MEMORANDUM OF LAW IN SUPPORT OF SOICHIRO "MICHAEL" MORO'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone +1 202.942.5000

KLEHR HARRISON HARVEY BRANZBURG LLP
1835 Market St., Suite 1400
Philadelphia, PA 19103
Telephone: +1 215.569.3003

# **<u>TABLE OF CONTENTS</u>**

Preliminary Statement.........................................................................................1

Procedural History ..............................................................................................1

Factual Background ............................................................................................2

Statement Of Questions ......................................................................................5

Argument.............................................................................................................5

      I.     Plaintiffs Lack Standing To Assert Any UTPCPL Claims .................5

           A.     Plaintiffs Were Not Parties To The Lending Agreement ...........6

           B.     Plaintiffs Fail to Allege CM Was Not A Distinct Legal Entity ................................................................................................7

           C.     CM Assigned All Claims In the Genesis Bankruptcy Proceeding.........................................................................................11

      II.    Plaintiffs Do Not allege Mr. Moro Violated The UTPCPL................14

      III.   Plaintiffs Fail to Allege The Court Has Personal Jurisdiction Over Mr. Moro ...........................................................................................16

Conclusion ........................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)........................................................................................7, 11

*Ciolli v. Iravani*,
    651 F. Supp. 2d 356 (E.D. Pa. 2009)...........................................................16, 18

*Duffy v. Lawyers Title Ins. Co.*,
    972 F. Supp. 2d 683 (E.D. Pa. 2013) .................................................................6

*Gemini Phys. Therapy & Rehab., Inc., v. State Farm Mut. Auto Ins. Co.*,
    40 F.3d 63 (3d Cir. 1996) ...................................................................................6

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..........................................................................................16

*ITT Corp. v. Lee*,
    663 F. App'x 80 (2d Cir. 2016) ..........................................................................6

*Lutz v. Portfolio Recovery Assocs., LLC*,
    49 F.4th 323 (3d Cir. 2022)...............................................................................13

*Marten v. Godwin*,
    499 F.3d 290 (3d Cir. 2007) .............................................................................17

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    859 F.2d 242 (2d Cir. 1988) ...........................................................................6, 7

*Trafford Distribution Center v. N.L.R.B.*,
    478 F.3d 172 (3d Cir. 2007) .............................................................................13

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*,
    877 F. Supp. 2d 228 (M.D. Pa. 2012)...............................................................13

<u>Statutes</u>

UTPCPL, Pa. Stat. § 201-1 *et seq.*...................................................................*passim*

Pa. Stat. § 5322(b) ..................................................................................................16

**Other Authorities**

FRCP 12(b) ...........................................................................................................1

Defendant Soichiro "Michael" Moro ("Mr. Moro") submits this Memorandum of Law in Support of his Motion to Dismiss. ECF No. 24.

## PRELIMINARY STATEMENT

In the largely AI-generated Amended Complaint filed March 25, 2025, ECF no. 22 (the "Complaint"), Plaintiffs allege that Mr. Moro violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") in connection with certain cryptocurrency loans made by non-party Cryptocurrency Management LLC ("CM") to non-party Genesis Global Capital, LLC ("Genesis"), pursuant to a Master Loan Agreement "executed only between [CM] and [Genesis]" (the "Lending Agreement"). Compl. ¶ 22. Despite being 80 pages and 163 paragraphs, Plaintiffs' Complaint must be dismissed pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and (6) because Plaintiffs have no standing to assert a UTPCPL claim against Mr. Moro, and, even if they did, Plaintiffs fail to allege they relied on any deceptive act or practice by Mr. Moro or were harmed thereby. *Infra* §§ I-II. Plaintiffs' Complaint against Mr. Moro must also be dismissed under FRCP 12(b)(2) for lack of personal jurisdiction. *Infra* § III.

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on January 2, 2025. ECF No. 1. Defendants Barry Silbert ("Silbert") and Digital Currency Group, Inc. ("DCG" and, together with Silbert, the "DCG Defendants") timely filed their motion to dismiss

the initial complaint On March 4, 2025, and filed their memorandum of law in support on March 18, 2025. ECF Nos. 9, 16. Mr. Moro timely filed his motion to dismiss the initial complaint on March 21, 2025. ECF No. 19. Plaintiffs then filed an amended complaint on March 25, 2025. ECF No. 22. As a result, the Court entered an order denying Defendants' original motions to dismiss without prejudice as moot on March 26, 2025. ECF No. 23. The DCG Defendants and Mr. Moro both filed motions to dismiss the amended complaint on April 8, 2025. ECF Nos. 24 (Moro), 25 (DCG Defendants). Mr. Moro now files this memorandum in support of his motion to dismiss the Complaint.

## FACTUAL BACKGROUND[1]

Plaintiffs allege that Plaintiff Stephen Sokolowski first began lending cryptocurrency to Genesis directly through a personal account on April 13, 2021. Compl. ¶ 41. Plaintiff Stephen Sokolowski later inquired about depositing funds from Plaintiff Christopher Sokolowski, as well as non-parties James Webster ("Webster") and PROHASHING LLC ("PROHASHING" and, together with Plaintiffs and Webster, the "CM Participants") but was informed that the other CM Participants "could not open individual accounts due to Genesis's minimum deposit

---

[1] While Mr. Moro has focused on the facts relevant to his motion, Mr. Moro refers the Court to the "Factual Background" section of the Memorandum of Law in Support of Motion to Dismiss of Defendants Digital Currency Group, Inc. and Barry E. Silbert filed April 22, 2025 (the "DCG Memorandum") for a more fulsome discussion of the allegations in Plaintiffs' Complaint. References to "DCG Ex." herein refer the exhibits to the DCG Memorandum.

requirements." *Id.* Given these limitations, Plaintiffs allege that they setup CM "at Defendants' suggestion to meet Genesis's minimum deposit thresholds," Compl. ¶ 31, and that a Genesis employee, Hanson Birringer ("Birringer"), "suggested and facilitated the creation of an LLC account, knowing that its purpose was to aggregate funds from these individuals," Compl. § 41. From that point forward, the CM Participants, including Plaintiffs, lent cryptocurrency to CM which, in turn, lent that cryptocurrency to Genesis pursuant to the Lending Agreement. Compl. ¶ 32; Compl. Ex. G, ECF No. 22-8 (CM Operating Agreement) (referring to CM Participants as "lenders" and Genesis as "borrower"). Plaintiffs concede that the Lending Agreement was "executed only between [CM] and [Genesis]," and that Plaintiffs were not parties to the agreement. Compl. ¶¶ 8, 22.

As further alleged, Mr. Moro served as CEO of Genesis until his resignation on August 24, 2022. Compl. ¶ 10. Plaintiffs do not allege that Mr. Moro, or any Defendant, ever communicated with any Plaintiff, CM, or CM Participant. Nor do Plaintiffs allege that Mr. Moro, or any Defendant, knew that CM was a lender to Genesis or knew that any Genesis employees ever interacted with Plaintiffs. [2]

---

[2] Plaintiffs' only attempt to allege a connection between Mr. Moro, CM, and Plaintiffs is through spurious logic that (1) it was "highly improbably" that Genesis' CFO, non-party Matthew Ballensweig, was unaware of the relationships between Genesis, CM, and Plaintiffs and, as a result, (2) "given the close working relationship between" Mr. Moro and Ballensweig, "it is further implausible that Defendant Moro would not have discussed the nature of the CM LLC arrangement and its implications for Genesis's lending practices and financial reporting with Ballensweig." Compl. ¶ 73. Plaintiffs' opinions regarding the "plausibility" of the CEO knowing the details of every Genesis lender aside, Plaintiffs' Complaint

Plaintiffs further concede that Defendants, including Mr. Moro, "[were] not signatories or third party beneficiaries to [the Lending Agreement]." Compl. ¶ 8, 22(b).

Plaintiffs allege that Defendants violated the UTPCPL by: "(v) representing that their financial services had characteristics or benefits that they did not have; (vii) representing that their financial services were of a particular standard, quality, or grade when they were not; and (xxi) engaging in other fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding." Compl. ¶ 139 (citing sections of 73 Pa. Stat. § 201-4). Specifically, the "act" Plaintiffs allege violated the UTPCPL was Genesis' provision of an allegedly fraudulent balance sheet to CM on September 21, 2022--a month after Mr. Moro stepped down from his role at Genesis.[3] Plaintiffs do not allege reliance on or harm by any other conduct or representation.

---

includes no allegations to suggest that Mr. Ballensweig and Mr. Moro ever discussed the arrangements for *any* Genesis lenders, much less non-lenders like Plaintiffs.

[3] *See* Compl. ¶¶ 15(b) ("Defendants communicated the fraudulent balance sheet directly to Plaintiffs"); 19 ("witnesses include an individual who personally viewed the fraudulent balance sheet…"); 94-106 (section titled "Reliance on the Fraudulent Balance Sheet"); 97 ("Plaintiffs, relying on the deceptive balance sheet provided to them and the overall impression that Genesis's service was safe and well-capitalized, continued to lend their assets to Genesis rather than withdrawing them."); 111 (alleging defendants "understood the nature of this promissory note ant its impact on Genesis's balance sheet" which "Plaintiffs and other consumers would rely on…"); 135 (alleging Plaintiffs "trusted Defendants' false assurances of solvency and stable returns, a trust based on the fraudulent balance sheet…"). While Plaintiffs also allege that Mr. Moro executed a "fraudulent" promissory note between Genesis and DCG, *Id.* ¶ 93, Plaintiffs do not allege they relied on the promissory note itself. Instead, Plaintiffs allege they relied on and were harmed by the "classification" of the promissory note on the September 2022 balance sheet. *Id.* at 101.

## STATEMENT OF QUESTIONS

1) Should Plaintiffs' claim against Mr. Moro be dismissed with prejudice because Plaintiffs do not have standing to assert such a claim?

   SUGGESTED ANSWER: Yes.

2) Should Plaintiffs' claim against Mr. Moro be dismissed because Plaintiffs fail to state a UTPCPL claim?

   SUGGESTED ANSWER: Yes.

3) Should Plaintiffs' claim against Mr. Moro be dismissed because Plaintiffs fail to allege the Court has personal jurisdiction over Mr. Moro?

   SUGGESTED ANSWER: Yes.

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING TO ASSERT ANY UTPCPL CLAIMS

Before even considering the elements of their UTPCPL claim, which fails for the reasons explained below, Plaintiffs' Complaint must be dismissed because Plaintiffs were not parties to the Lending Agreement between Genesis and CM and thus never had standing to bring any UTPCPL claim, much less against Mr. Moro. Even if they somehow had standing, which they did not, they no longer do so as a result of CM's assignment of its claims under the Lending Agreement to Jefferies as part of the Genesis bankruptcy proceeding.[4]

---

[4] In addition to the arguments outlined herein, Mr. Moro refers the Court to the further arguments and caselaw relating to Plaintiffs' lack of standing included in § I of the DCG Memorandum.

### A.    Plaintiffs Were Not Parties To The Lending Agreement

The UTPCPL "unambiguously permits only persons who have purchased or leased goods or services to sue." *Duffy v. Lawyers Title Ins. Co.*, 972 F. Supp. 2d 683, 689 (E.D. Pa. 2013). Further, the Third Circuit has stated that the UTPCPL "contemplates as the protected class only those who purchase goods or services, not those who may receive a benefit from the purchase." *Gemini Phys. Therapy & Rehab., Inc., v. State Farm Mut. Auto Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1996).

Plaintiffs concede that CM was the signatory to the Lending Agreement with Genesis, and that "none of the named Plaintiffs (in their personal capacities) nor any of the named Defendants ([DCG, Silbert, or Mr. Moro]) were parties to that agreement." Compl. ¶ 8. The Lending Agreement, in turn, clearly stated that:

> Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligations upon any person or entity other than the parties hereto.

Loan Agreement at 140493.[5] Given Plaintiffs' admission that they are not parties to the Lending Agreement, and the Lending Agreement's explicit negation of third-

---

[5] New York law, which governs the Lending Agreement, enforces clear contractual language limiting the parties and beneficiaries to an agreement. *See* DCG Ex. 2 at Genesis_DCG_00140490 (providing the Loan Agreement "shall be construed and enforced under" New York law); *see, e.g., ITT Corp. v. Lee*, 663 F. App'x 80, 83-84 (2d Cir. 2016). Negation clauses like the one in the Lending Agreement even preclude tort liabilities. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 248-49 (2d Cir. 1988) (dismissing negligence claim by third-party where agreement contained "controlling" term providing for "explicit negation of third party beneficiary obligations.").

party beneficiary rights, Plaintiffs do not have standing to assert any claims arising from the Lending Agreement. *Morse*, 859 F.2d at 248-49 ("where a provision in a contract expressly negates enforcement by third parties, that provision is controlling").

### B.    Plaintiffs Fail to Allege CM Was Not A Distinct Legal Entity

In an attempt to plead around the fact that they were not parties to the Lending Agreement and cannot assert a claim under the UTPCPL, Plaintiffs engage in a ploy to affirmatively pierce their own veil. In a section titled "The Nominal LLC Structure," Plaintiffs essentially claim (or rather, admit) they set up a fraudulent limited liability company, CM, for the sole purpose of "circumventing" Genesis's minimum deposit thresholds. Compl. ¶¶ 31-40. Plaintiffs further allege that Genesis "was aware of and facilitated the use of this LLC structure specifically to allow Plaintiffs to circumvent Genesis's minimum deposit requirement," and knew that CM's "purpose was to aggregate funds from [the CM Participants]." Compl. ¶¶ 40-41. Despite these claims, Plaintiffs' factual allegations and the exhibits to their Complaint show that both Genesis *and Plaintiffs* treated CM as a legitimate, distinct legal entity.

"Incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). Given this, whether Genesis did or did not know that CM was established in order to "aggregate funds from [the CM Participants" has no bearing on the legitimacy of CM as a distinct legal entity. Compl. ¶¶ 40-41. Every corporation with multiple shareholders and every LLC with multiple members necessarily aggregates funds from individuals in order to deploy them for a common purpose. Accepting Plaintiffs' allegations, CM was established to do the same here—aggregate the CM Participants' funds into a separate, distinct legal entity capable of satisfying Genesis' minimum lending requirements.

Plaintiffs' allegations that "Genesis understood at all times that it was working with these four persons *directly and individually*" and that Genesis "was aware of and facilitated the use of" CM in order to "circumvent" Genesis' minimum deposit requirements, simply do not follow from Genesis's alleged knowledge that CM was established to aggregate the CM Participants' funds. Compl. ¶¶ 40, 44. To the contrary, the allegations and exhibits clearly show that Genesis *enforced* its minimum deposit requirements with regards to the CM Participants. Genesis's employees explained its minimum deposit requirements multiple times beginning from the very first messages with Stephen Sokolowski. Compl. Ex. F, ECF No. 22-7 at 1; Compl. Ex. H, ECF No. 22-9 at 1. And as Plaintiffs' complaint makes clear, Genesis ultimately did not allow any CM Participant who could not meet the minimum deposit requirements to setup an individual account. Compl. ¶ 41. Instead,

Genesis conducted due diligence on CM directly and, after determining that it could satisfy Genesis' minimum deposit requirements, set up an account for CM. Compl. ¶ 42; Compl. Ex. K, ECF No. 22-12 (CM Due Diligence Questionnaire dated May 7, 2021).

Not only do Plaintiffs' allegations show that Genesis onboarded CM in order to enforce, not circumvent, its minimum deposit requirements, Plaintiffs' Complaint and exhibits thereto are replete with examples of both Genesis **and Plaintiffs** acknowledging that CM was a distinct legal entity and treating it as such. Some examples include:

- On May 11, 2021, when discussing onboarding CM, Birringer asks Stephen Sokolowski to "clarify the ownership of the LLC." Stephen responds "we set it up that I am the sole owner, and we will make contracts for loans," referring to contracts for loans *from CM Participants to CM*. He went on to state: " I think I submitted an ownership agreement that describes how there are four people involved and *we will keep loan documents that specify who is owed what*," again referring to documentation for loans between *CM Participants and CM*. Compl. Ex. H at 27;

- On May 14, 2021, Stephen Sokolowski asked if Genesis could "just transfer the money between accounts," referring to funds from his personal account at Genesis being transferred directly to the new CM account. Birringer responded "legally we cannot do that" and later explained "unfortunately we cannot facilitate the transmission of these funds from your individual account to the [CM] business entity - we are not set up with the proper legal framework/license to do so." Compl. ¶ 47, Compl. Ex. F at 9-10;

- On January 7, 2022, Stephen Sokolowski asked whether he could withdrawal CM funds to his own account, to which Birringer responded "[y]ou will need to have a bank account in the name [of] the entity we have onboarded[,] so the LLC yes[.] We cannot send funds to a personal account." *Id*. at 52;

- On May 4, 2022, Stephen Sokolowski wrote to Genesis "I want to make sure that Genesis understands that Chris [Sokolowski], and then James [Webber], in that order of succession, are to control this account *in the case that I die…*" A Genesis employee responds confirming that Genesis could set these CM Participants up with full access but that Steve "would need to be the one authorizing this" and asking "[a]re they only supposed to have full access if you pass away?" Stephen responds "I'm the only owner of the LLC" and "I just want them to be able to manage this account *if I'm not around.*" *Id*. at 70 (emphasis added); and

- On December 1, 2022, Stephen stated "I just want to remind here (sic) that I am the only person authorized to speak or make decisions for the company right now, so anything said by anyone else does not represent my position and does not constitute a request for action…" *Id*. at 116.

Likewise, CM's Operating Agreement, Compl. Ex. H, establishes that Genesis and Plaintiffs believed that CM was a legitimate, distinct legal entity and not simply a means of "circumventing" the minimum deposit requirements for the CM Participants.[6] For example, the "Lenders" section of the Operating Agreement provided that "[a]dditional lenders may be accepted at the sole discretion of Cryptocurrency Management's owner," and also provided that "[CM's] owner has the right to end a lender's participation in [CM]". *Id.* at 3. The Operating Agreement also stated that "[n]o lender or owner of this LLC shall be personally liable for the expenses, debts, obligations, or liabilities of the LLC, or for claims made against it."

---

[6] Plaintiffs concede that they both were aware of the terms of Operating Agreement, with Stephen Sokolowski executing the Operating Agreement as the 100% owner of CM and Christopher Sokolowski executing an Agreement to Operating Agreement acknowledging that he "understand[s] and agree[s] with the terms described in the" agreement. Compl. Ex. H at 8-9. Genesis, too, had requested and received the Operating Agreement and knew that Plaintiffs had both signed the agreement. Compl. ¶¶ 45, 58.

Compl. Ex. H at 5. CM's *sole discretion* to add or remove its own lenders, together with the limitations on Genesis's ability to bring claims against the CM Participants, are inconsistent with Plaintiffs' allegation that "Genesis understood at all times that it was working with these four persons *directly and individually*." Compl. ¶ 44 (emphasis added). Similarly, CM's ability to lend coins to a different borrower than Genesis, Compl. Ex. H at 3-4, is inconsistent with Plaintiffs' allegation that CM was established "specifically to allow Plaintiffs to circumvent Genesis's minimum deposit requirements." Compl. ¶ 40.

As a result, Plaintiffs fail to allege that CM was anything but "a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the" Plaintiffs. *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163. Plaintiffs' attempt to affirmatively "pierce the veil" of their own company and assert UTPCPL based on the Lending Agreement they were not individually party to should be rejected.

## C.    CM Assigned All Claims In the Genesis Bankruptcy Proceeding

While it is clear that Plaintiffs never had a UTPCPL claim to assert against Defendants, even if they had, CM's assignment of the claims against Genesis under the Lending Agreement, including any "claims or causes of action in and to, or arising under or in connection with," that claim, extinguished Plaintiffs' right to assert it here. Compl. ¶ 93; DCG Ex. 2 (Notice of Transfer of Claim, the "Notice").

Plaintiffs effectively concede that the UTPCPL claim they seek to assert here is a "claim or cause of action in and to, or arising under or in connection with" CM's bankruptcy claim. *Id.* In relevant part, Plaintiffs allege that "[t]he only true way to 'undo' Defendants' fraud is to return the same number of coins that Plaintiffs originally lent." Compl. ¶¶ 73; 156 (proposing alternative "if Defendants are unable to return the exact coins"). Recovery of these coins is the same "claim" that CM submitted in the Genesis bankruptcy. Compl. ¶¶ 131-133; *see also* Ex 2 (Notice). As Plaintiffs admit, CM's sale of its claim in the Genesis bankruptcy "partially mitigated the losses" on their UTPCPL claim, even if "it did not compensate Plaintiffs for the full measure of their harm." Compl. ¶¶ 133, 154. Plaintiffs further admit that that they personally received $742,142.73 in return for CM's assignment of its claim to Jefferies, referring to this both as a "partial dollar payments already received" and "claim sale offset amount." *Id.* ¶ 155. As a result, Plaintiffs' purported UTPCPL claim is a "cause of action in and to, or arising under" CM's bankruptcy claim—both originating from loans to Genesis under the Lending Agreement. Likewise CM's assignment, which was approved by Plaintiff Stephen Sokolowski,[7]

---

[7] In addition to executing the Notice as the owner of CM, DCG Ex. 2 at 3, Stephen Sokolowski directly admits the decision to sell CM's claim was his own, stating "[t]hat was why I decided to sell ***my claim*** because I don't want to stick around in this bankruptcy." Compl. Ex. E, ECF No. 22-6 (Tr. Of Interview of S. Sokolowski) at 15 (emphasis added).

and for which both Plaintiffs received compensation, assigned and extinguished Plaintiffs' purported claims.

Plaintiffs' allegation that "[t]he sale of CM LLC's bankruptcy claim did not and could not release or waive Plaintiffs' individual claims under UTPCPL," Compl. ¶ 134, should be disregarded as a barebones legal conclusion. *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022) (courts "disregard[]…legal conclusions" alleged in a complaint). Even if the Court were to consider the allegation, while Plaintiffs did not have any UTPCPL claim against Defendants to begin with, *supra* § I.A., even if they did, UTPCPL claims are not exempt from assignments made using language similar to the assignment language in the Notice here. *See Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 877 F. Supp. 2d 228, 231 (M.D. Pa. 2012) (holding UTCPL claims transferred by assignment of "any and all rights, claims and causes of action arising out of" an insurer's failure to defend). Meaning CM could, and did, assign any UTPCPL claim arising under the Lending Agreement.

Finally, in the event this Court accepts Plaintiffs' allegations that CM was nothing more than a fraudulent alter ego for Plaintiffs and allows Plaintiffs to pierce their own corporate veil, Plaintiffs' would remain bound by the terms of the MLA, the loan transactions, ***and the Notice***. *See, e.g.*, *Trafford Distribution Center v. N.L.R.B.*, 478 F.3d 172, 174, 182 (3d Cir. 2007) (affirming decision that party is bound by the agreements of its alter ego). As a result, CMs' assignment of its claims

under the Lending Agreement, including any purported UTPCPL claims, would simply become assignments of Plaintiffs' claims under the Lending Agreement, leading to the same result: dismissal of the Complaint because all claims arising out of the Lending Agreement were sold in the Genesis bankruptcy.

For all of these reasons, Plaintiffs have no standing to bring any UTPCPL claims against Mr. Moro and their Complaint should be dismissed.[8]

## II.    PLAINTIFFS DO NOT ALLEGE MR. MORO VIOLATED THE UTPCPL

If the Court were to find that Plaintiffs have standing to bring a UTPCPL claim here, Plaintiffs do not allege any violation of the UTPCPL by Mr. Moro. The DCG Memorandum analyzes the UTPCPL at length, explaining that Plaintiffs are not purchasers or lessees, § III(A)(i) (ii), and Plaintiffs do not allege a purchase or lease of goods or services, §III(B), both of which are required to bring a claim under the UTPCPL. Mr. Moro refers the Court to those sections of the DCG brief and focuses the remainder of this section on additional arguments specific to him.

To establish a violation of the UTPCTL, Plaintiffs must allege that Mr. Moro used or employed "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. §§ 201-3, 201-9.2.

---

[8] In the event the Court holds otherwise, Mr. Moro reserves his rights to argue this Court should compel arbitration of Plaintiffs' claims pursuant the Lending Agreement's arbitration clause. Compl. ¶ 22; DCG Ex. 1 at GENESIS_DCG_00140490-91.

Plaintiffs must also demonstrate that they (i) "justifiably relied on [Mr. Moro's] wrongful conduct or representation" and (ii) "suffered harm as a result." Dobson v. Milton Hershey School, 356 F. Supp. 3d 428, 435 (M.D. Pa. 2018).

Plaintiffs have not alleged—and cannot allege—Mr. Moro violated the UTPCPL as a result of the September 2022 balance sheet because Mr. Moro resigned as CEO and no longer had any relationship with Genesis as of August 24, 2022, ***a month before*** Genesis provided the allegedly fraudulent balance sheet to Plaintiffs. Compl. ¶ 10. Plaintiffs do not allege that Mr. Moro had any continuing ability to direct Genesis or any of its employees to provide any balance sheet (fraudulent or not) to Plaintiffs after he resigned. Compl. ¶ 94. Furthermore, the balance sheet Plaintiffs allege was provided to CM was itself labeled "Genesis Lending Snapshot as of 9/21/2022," Compl. Ex. A, meaning Mr. Moro did not have any involvement in preparing, reviewing, or signing off on the balance sheet – all of which occurred ***a month after Mr. Moro left Genesis***. Plaintiffs' allegations are also clear that "but for" the allegedly fraudulent balance sheet, they would have suffered no harm:

> On September 25, 2022 and September 30, 2022, Plaintiffs renewed their large cryptocurrency term loans with Genesis as a direct result of viewing the fraudulent balance sheet. Plaintiffs also elected to continue existing 'open term'…loans as a direct result of viewing the balance sheet. But for the presentation of the fraudulent balance sheet, Plaintiffs would not have renewed their loans and would have withdrawn all assets from Genesis.

Compl. ¶ 105; *Dobson*, 356 F.3d at 435. Accordingly, there is no connection between Mr. Moro and the "wrongful conduct or representation" Plaintiffs allege they relied on to their detriment. *Dobson*, 356 F. Supp. 3d at 435.[9]

## III.    PLAINTIFFS FAIL TO ALLEGE THE COURT HAS PERSONAL JURISDICTION OVER MR. MORO

Plaintiffs' Complaint against Mr. Moro should also be dismissed for the independent reason that the Court lacks personal jurisdiction over Mr. Moro. Mr. Moro is a resident of New York, not Pennsylvania. Compl. ¶¶ 10, 14. While they have failed to allege it, Plaintiffs presumably claim jurisdiction pursuant to Pennsylvania's long-arm statute, which extends jurisdiction "to the fullest extent allowed under the Constitution," 42 Pa. Stat. § 5322(b). As a result, Plaintiffs must allege Mr. Moro has "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

In the Third Circuit, Plaintiffs "may rely on either the traditional test or the effects test" to establish personal jurisdiction. *Ciolli v. Iravani*, 651 F. Supp. 2d 356,

---

[9] Plaintiffs remaining allegations against Mr. Moro fall into three categories. First, that "Moro approved or knowingly permitted the dissemination of false and misleading balance sheets and failed to stop their dissemination before he resigned." Compl. ¶ 10. Yet Plaintiffs Complaint is devoid of any allegation that Genesis disseminated *any* balance sheets while Mr. Moro was CEO, much less that any were "false and misleading" or that Plaintiffs relied on one. Second, that Mr. Moro sent a "misleading" tweet on June 17, 2022. Compl. ¶ 92. But Plaintiffs do not allege they relied on this tweet in any way. Third, that Mr. Moro was involved in non-public conversations between DCG and Gemini employees. *See, e.g.*, Compl. ¶¶ 91, 107, 109, 118. Given Plaintiffs did not know about these non-public conversations, Plaintiffs could not have relied on them.

365 (E.D. Pa. 2009) (citing *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007)).

Under the traditional test, Plaintiffs must show, among other things, that Mr. Moro

(i) did "some act or consumate[d] some transaction with the forum or perform[ed]

some act by which he purposefully avails himself of the privilege of conducting

activities in the forum," and (ii) that Plaintiffs' "claim must be one which arises out

of or results from [Mr. Moro's] forum-related activities." *Id.* The effects test

similarly requires Plaintiffs to show that Mr. Moro (i) "committed an intentional

tort," (ii) "that the 'brunt' of the injury caused by [Mr. Moro's] tortious acts would

be felt by the [Plaintiffs] in the forum," and (iii) "the tort was expressly aimed at the

forum." *Id.* at 368 (citations omitted). Plaintiffs' allegations fail under both tests.

As discussed above, Plaintiffs allege that they only relied on one deceptive

act: Genesis' provision of an allegedly fraudulent balance sheet in September 2022.

*Supra* § 2(A). Plaintiffs point to this singular act as the sole basis for asserting this

Court's personal jurisdiction over Defendants, including Mr. Moro, stating:

"Defendants communicated the fraudulent balance sheet directly to Plaintiffs in

Pennsylvania and intended to induce Plaintiffs' reliance in Pennsylvania." Compl. ¶

15(b). But once again, the September 2022 balance sheet cannot be a basis for this

Court to assert personal jurisdiction over Mr. Moro because Mr. Moro had no

involvement in Genesis' preparation of the balance sheet or the decision to send that

balance sheet to Plaintiffs – both of which Plaintiffs allege occurred a month after

Mr. Moro had departed from Genesis. Compl. ¶¶ 10, 94. Accordingly, Plaintiffs'

UTPCPL claim does not arise out of any forum-related activities by Mr. Moro,

as required under the traditional test, nor do Plaintiffs allege any connection between

Mr. Moro and the supposed "intentional tort" that was responsible for Plaintiffs'

alleged injury in the forum, as required under the effects test. *Ciolli*, 651 F. Supp. 2d

at 365, 368.

The remaining "acts" that Plaintiffs allege Mr. Moro engaged in are similarly

insufficient to support personal jurisdiction, regardless of their failure to plead them

as a basis for such jurisdiction. Plaintiffs do not allege that they relied on, much less

that they were injured by, Mr. Moro's June 17, 2022 tweet, Mr. Moro's signing the

promissory note on behalf of Genesis on June 30, 2022, or Mr. Moro's participation

in various internal correspondences. And while Plaintiffs allege that *Genesis* knew

that Plaintiffs were located in Pennsylvania, Plaintiffs fail to allege facts to suggest

that *Mr. Moro* knew Plaintiffs, or any lenders for that matter, were located in this

state. As a result, Plaintiffs have failed to allege this Court has personal jurisdiction

over Mr. Moro and their Complaint must be dismissed.[10]

---

[10] Mr. Moro also opposes Plaintiffs' request for jurisdictional discovery as set forth
in Section IV of the DCG Memorandum.

## <u>CONCLUSION</u>

For the foregoing reasons, and those reasons outlined in the DCG Memorandum, Mr. Moro respectively requests that the Court dismiss Plaintiffs' Complaint with prejudice.

Dated: April 22, 2025

Respectfully submitted,

*/s/ Christian D. H. Schultz*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Joshua M. Link
1835 Market St., Suite 1400
Philadelphia, PA 19103
Telephone: +1 215.569.3003
Fax: +1 215.568.6603

**ARNOLD & PORTER KAYE SCHOLER LLP**
Christian D. H. Schultz (*pro hac vice*)
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone +1 202.942.5000
Fax: +1 202.942.5999

Tyler J. Fink (*pro hac vice*)
250 West 55th Street
New York, NY 10019-9710
Telephone: +1 212.836.8000
Fax: +1 212.836.8689

*Attorneys for Defendant Michael Moro*

**CERTIFICATE OF SERVICE**

I, CHRISTIAN D. H. SCHULTZ, hereby certify that on April 22, 2025, I caused a true and accurate copy of the foregoing and all supporting documents, filed with this Court, to be served upon plaintiffs via first class mail and the Court's ECF filing system and counsel of record for each party via the Court's ECF filing system.

*/s/ Christian D. H. Schultz*
Christian D. H. Schultz

**CERTIFICATE OF WORD LIMIT COMPLIANCE**

I, CHRISTIAN D. H. SCHULTZ, hereby certify, pursuant to Local Rule 7.8(b)(2), that the attached Memorandum of Law in Support of Soichiro "Michael" Moro's Motion to Dismiss Plaintiffs' Amended Complaint does not exceed 5,000 words in length, exclusive of all captions, tables, signature blocks, and the certificate of service. According to the word count feature of the word processing system used to prepare this brief, with the exclusions of the above it comprises around 4,860 words.

*/s/ Christian D. H. Schultz*
Christian D. H. Schultz