# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

Electronically Filed

v.

Case No. 4:25-cv-00001-PJC

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,
**Defendants.**

Hon. Phillip J. Caraballo

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................... iv

TABLE OF TERMS ............................................................................. xiv

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ................................................................. 3

ARGUMENT ...................................................................................... 11

I    ALL DEFENDANTS ARE EQUITABLY ESTOPPED FROM ASSERTING MULTIPLE DEFENSES BASED ON THEIR INCONSISTENT CONDUCT AND MISREPRESENTATIONS ........................................................ 11

    A    The Doctrine of Equitable Estoppel Under Pennsylvania Law. ................. 11

    B    Flaws in Defendants' Case Citations and Arguments ................................. 18

    C    Defendants' Conduct is The Focus ............................................................. 18

    D    Conclusion on Estoppel ............................................................................. 19

II    PLAINTIFFS PURCHASED A COMPREHENSIVE FINANCIAL SERVICE SUBJECT TO UTPCPL PROTECTION. ......................................................... 21

    A    The Genesis Service is a UTPCPL-Covered Service ................................. 21

    B    If Plaintiffs Were Not Interested in Purchasing Genesis's Service Platform, They Would Simply Have Made Direct Loans ........................................... 23

    C    *Walden* Shows That if the Service Had Functioned As Represented, Defendants' Compensation Through the "Spread" Constituted a Purchase ........................................................................................................ 24

    D    Deceptive Conduct Alone Is Actionable Under the UTPCPL .................... 26

    E    Flaws in Defendants' UTPCPL Case Citations ......................................... 27

    F    Conclusion on UTPCPL Purchase ............................................................. 29

III    THE MLA'S DISCLAIMERS AND WAIVERS ARE UNENFORCEABLE TO SHIELD DEFENDANTS FROM LIABILITY FOR FRAUDULENT MISREPRESENTATION UNDER THE UTPCPL ......................................... 30

    A    Fraud Vitiates Contractual Waivers and Disclaimers Intended to Shield Deceptive Conduct ..................................................................................... 30

    B    Public Policy Precludes Enforcement of Exculpatory Clauses for Intentional Torts and Violations of Consumer Protection Statutes. ........... 31

C    The Scope of the MLA Waiver Does Not Encompass Plaintiffs' Personal Tort Claims Against Non-Party Affiliates. .................................32

D    The Integration Clause Does Not Bar Claims of Fraudulent Inducement or Reliance on Subsequent Misrepresentations. ...............................34

E    At Least One of Defendants' Many Contradictory Arguments Must Necessarily Fail ..............................................................35

F    Flaws in Defendants' Case Citations ..........................................36

G    Conclusion on the MLA .........................................................40

IV   THIS COURT POSSESSES PERSONAL JURISDICTION OVER ALL DEFENDANTS ........................................................................41

A    Pennsylvania's Governing Framework .........................................41

B    Six Interlocking Contacts Confer Jurisdiction on All Defendants.............42

C    Fair Play and Substantial Justice ..............................................46

D    Defendants Carefully Word Their Briefs Regarding Pennsylvania Contacts .............................................................................46

E    Other Courts Have Already Refused to Dismiss Individual Defendants on the Grounds That They Personally Participated in the Fraudulent Scheme .............................................................................47

F    Alternatively, Limited Jurisdictional Discovery Is Warranted ..................48

G    Flaws in Defendants' Jurisdictional Case Citations..........................49

H    Conclusion On Personal Jurisdiction .........................................53

V    THE ASSIGNMENT OF CM LLC'S BANKRUPTCY CLAIM DOES NOT EXTINGUISH PLAINTIFFS' PERSONAL UTPCPL CLAIMS AGAINST DEFENDANTS ........................................................................53

A    Plaintiffs' UTPCPL Claim is Legally Distinct from the Assigned Bankruptcy Claim...............................................................54

B    New York Law Does Not Govern UTPCPL Claims and Pennsylvania Law Holds These Claims Unassignable .............................................55

C    The UTPCPL Claim Vests Personally in the Deceived Consumer and Was Never Owned by CM LLC.........................................................56

D    The Scope of the Assignment Did Not Encompass These Distinct Third-Party Tort Claims. ................................................................58

E    Defendants Introduced an Incomplete Contract.............................59

    F   CM LLC and its Agent Lacked Authority to Assign Plaintiffs' Individual Claims.............................................................................................60

    G   Defendants Are Equitably Estopped (For A Second Reason) From Relying on the Assignment Document ........................................................61

    H   Flaws in Defendants' Case Citations ...........................................61

    I   Conclusion on Assignment............................................................65

VI  DEFENDANTS MISREPRESENT PLAINTIFFS' POSITIONS ...................65

    A   Defendants Introduce Improper Evidence and Factual Disputes...............65

    B   Plaintiffs Never Referred To CM LLC As A "Sham" ................................67

    C   Plaintiffs Are Not Judicially Estopped ........................................67

    D   Defendants Conflate Plaintiffs' Damages Request .....................67

VII PLAINTIFFS EXHAUSTIVELY DESCRIBE THE FRAUD AND THEIR RELIANCE.............................................................................................68

    A   Plaintiffs Adequately Plead Fraud.................................................68

    B   Defendants' Reliance Cases Do Not Apply .................................70

    C   Treble Damages Are Not Only Warranted, but Required Due to Defendants' Egregious Conduct..................................................72

VIII CONCLUSION .........................................................................................72


APPENDIX A: Supplemental Tables....................................................... A-1

APPENDIX B: Summary of Evidence of Single Enterprise and Disregard for Corporate Separateness .......................................B-1

# TABLE OF AUTHORITIES

## Cases

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*,
731 F.2d 112 (2d Cir. 1984) ................................................................61

*Allstate Prop. & Cas. Ins. Co. v. Wolfe*,
105 A.3d 1181 (Pa. 2014) ...................................................................64

*Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*,
122 F.3d 130 (2d Cir. 1997) ................................................................38

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
170 F.3d 349 (2d Cir. 1999) ................................................................37

*Balderston v. Medtronic Sofamor Danek, Inc.*,
285 F.3d 238 (3d Cir. 2002) ................................................................28

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) ................................................................45

*Betz Labs., Inc. v. Hines*,
647 F.2d 402 (3d Cir. 1981) ................................................................34

*Blofsen v. Cutaiar*,
460 Pa. 411 (1975) ................................................................... 13, 16

*Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001) .................................................................33

*Bolus v. Fleetwood Motor Homes of Ind., Inc.*,
2012 WL 3579609 (M.D. Pa. Aug. 17, 2012) ....................................52

*Bolus v. United Penn Bank*,
363 Pa. Super. 247, 525 A.2d 1215 (Pa. Super. 1987)......................60

*Branche v. Wells Fargo Home Mortg., Inc.*,
624 F. App'x 61 (3d Cir. 2015) ..........................................................29

*Brownell v. State Farm Mut. Ins. Co.*,
757 F. Supp. 526 (E.D. Pa. 1991) .......................................................29

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)..........................................................................46

*Calder v. Jones*,
465 U.S. 783 (1984)..........................................................................41

*Carlson v. Arnot-Ogden Mem'l Hosp.*,
918 F.2d 411 (3d Cir. 1990) ...............................................................12

*Carteret Sav. Bank v. Shushan*,
954 F.2d 141 (3d Cir. 1992) ...............................................................45

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001)..........................................................................18

*Chester Extended Care Ctr. v. Dep't of Pub. Welfare*,
526 Pa. 350 (1991) ...........................................................................11

*Ciolli v. Iravani*, 625
F. Supp. 2d 276 (E.D. Pa. 2009) ........................................................50

*Ciolli v. Iravani*,
651 F. Supp. 2d 356 (E.D. Pa. 2009) ..................................................49

*Commonwealth v. Monumental Properties, Inc.*,
459 Pa. 450 (1974)............................................................................22

*Commonwealth v. Navient Corp.*,
354 F. Supp. 3d 529 (M.D. Pa. 2018) .................................................24

*Compagnie des Bauxites de Guinée v. L'Union Atlantique S.A. d'Assurances*,
723 F.2d 357 (3d Cir. 1983) ...............................................................49

*D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft, Ltd.*,
566 F.3d 94 (3d Cir. 2009) .................................................................52

*DeFazio v. Gregory*,
836 A.2d 935 (Pa. Super. 2003) .........................................................28

*Dixon v. Nw. Mut.*,
  146 A.3d 780 (Pa. Super. 2016) ..........................................................................34

*Donsco, Inc. v. Casper Corp.*,
  587 F.2d 602 (3d Cir. 1978) ...............................................................................44

*Duffy v. Lawyers Title Ins. Co.*,
  972 F. Supp. 2d 683 (E.D. Pa. 2013) ..................................................................29

*Dwyer v. Ameriprise Fin., Inc.*,
  313 A.3d 969 (Pa. 2024) .....................................................................................24

*Earl v. NVR, Inc.*,
  990 F.3d 310 (3d Cir. 2021) ...............................................................................34

*In re Enron Corp.*,
  379 B.R. 425 (S.D.N.Y. 2007) ...........................................................................57

*eToll, Inc. v. Elias/Savion Adver., Inc.*,
  811 A.2d 10 (Pa. Super. 2002) ...........................................................................35

*Eurofins Pharma U.S. Holdings v. BioAlliance Pharma S.A.*,
  623 F.3d 147 (3d Cir. 2010) ...............................................................................49

*Foster v. Westmoreland Cas. Co.*,
  145 Pa. Commw. Ct. 638 (1992) ........................................................................12

*Francis v. Humana, Inc.*,
  2025 WL 365687 (M.D. Pa. Jan. 31, 2025) ........................................................70

*Frank v. TeWinkle*,
  45 A.3d 434 (Pa. Super. 2012) ...........................................................................56

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007) ...............................................................................69

*Frowen v. Blank*,
  425 A.2d 412 (Pa. 1981) .....................................................................................68

*Gabriel v. O'Hara*,
  368 Pa. Super. 383, 534 A.2d 488 (Pa. Super. 1987) ............................ 22, 24, 57

*Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*,
40 F.3d 63 (3d Cir. 1996) ....................................................................28

*Giannone v. United States Steel Corp.*,
238 F.2d 544 (3d Cir. 1956) ...............................................................35

*Gregg v. Ameriprise Fin., Inc.*,
245 A.3d 637 (Pa. 2021) ........................................................ 22, 26, 27

*Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*,
517 Pa. 522 (Pa. 1988) ............................................................. 56, 57

*Henehan v. Penn Anthracite Colliers Co.*,
2023 WL 4854831 (M.D. Pa. July 11, 2023)......................................70

*Hurley v. Hurley*,
342 Pa. Super. 156 (Pa. Super. 1985) ...............................................56

*IMO Indus., Inc. v. Kieckert AG*,
155 F.3d 254 (3d Cir. 1998) ...............................................................52

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)............................................................................41

*ITT Corp. v. Lee*,
663 F. App'x 80 (2d Cir. 2016) ..........................................................37

*Kaneff v. Delaware Title Loans*,
587 F.3d 616 (3d Cir. 2009) ...............................................................55

*Katz v. Aetna Cas. & Sur. Co.*,
972 F.2d 53 (3d Cir. 1992) .................................................................28

*In re KB Toys, Inc.*,
470 B.R. 331 (Bankr. D. Del. 2012) ..................................................58

*In re KB Toys, Inc.*,
736 F.3d 247 (3d Cir. 2013) ...............................................................57

*Klitzner Industries, Inc. v. H.K. James Co.*,
535 F. Supp. 1249 (E.D. Pa. 1982) ....................................................57

*Knight v. Springfield Hyundai*,
   81 A.3d 940 (Pa. Super. 2013)................................................................34

*Legal Cap., LLC v. Med. Pro. Liab. Catastrophe Loss Fund*,
   750 A.2d 299 (Pa. 2000) ................................................ 56, 57, 63

*Loc. Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*,
   67 F.4th 107 (2d Cir. 2023)................................................................38

*Loften v. Diolosa*,
   2008 WL 2994823 (M.D. Pa. July 31, 2008) ....................................71

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)................................................................69

*Lutz v. Portfolio Recovery Assocs., LLC*,
   49 F.4th 323 (3d Cir. 2022)................................................................62

*LVL Co., LLC v. Atiyeh*,
   469 F. Supp. 3d 390 (E.D. Pa. 2020) ................................................17

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.*,
   557 Pa. 595 (Pa. 1999)................................................................59

*Marten v. Godwin*,
   499 F.3d 290 (3d Cir. 2007)................................................................41

*Max Daetwyler Corp. v. Meyer*,
   762 F.2d 290 (3d Cir. 1985)................................................................51

*Metcalfe v. Renaissance Marine, Inc.*,
   566 F.3d 324 (3d Cir. 2009)................................................................49

*Miller Yacht Sales, Inc. v. Smith*,
   384 F.3d 93 (3d Cir. 2004)................................................ 42, 44

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
   859 F.2d 242 (2d Cir. 1988)................................................................39

*Moser v. DeSetta*,
   527 Pa. 157 (1991)................................................................16

*In re Motors Liquidation Co.*,
    689 F. App'x 95 (2d Cir. 2017) ............................................................................62

*Murphy & Slota v. Burke*,
    454 Pa. 391 (1973) ..................................................................................................15

*Novelty Knitting Mills, Inc. v. Siskind*,
    457 A.2d 502 (Pa. 1983) .................................................................................. 12, 19

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007) .................................................................................41

*Odell v. CIT Bank, N.A.*,
    2017 WL 3675401 (E.D. Pa. Aug. 24, 2017)........................................................71

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) .................................................................................44

*PennDOT v. Semanderes*,
    109 Pa. Commw. Ct. 505 (1987) ..........................................................................58

*Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*,
    149 F.3d 197 (3d Cir. 1998) .................................................................................51

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
    998 F.2d 1192 (3d Cir. 1993) ...............................................................................66

*People v. Gemini Trust Co., LLC et al.*,
    No. 452784/2023 (N.Y. Sup. Ct.) .............................................................. passim

*People v. Greenberg*,
    95 A.D.3d 474 (1st Dep't 2012) ...........................................................................48

*Phelps v. Caperoon*,
    190 A.3d 1230 (Pa. Super. Ct. 2018) ...................................................................32

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*,
    324 U.S. 806 (1945)..............................................................................................61

*Public Sch. Bldg. Auth. v. Noble C. Quandel Co.*,
    585 A.2d 1136 (Pa. Commw. Ct. 1991) ........................................................ 12, 19

*Rector v. Calamus Grp., Inc.*,
    794 N.Y.S.2d 470 (N.Y. App. Div. 2005) ...........................................................39

*Redev. Auth. of Cambria Cnty. v. Int'l Ins. Co.*,
    685 A.2d 581 (Pa. Super. Ct. 1996) ...................................................................33

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001) ...............................................................................53

*S. Seafood Co. v. Holt Cargo Sys., Inc.*,
    1997 WL 539763 (E.D. Pa. Aug. 11, 1997).......................................................50

*Schwartz v. Rockey*,
    593 Pa. 536 (2007) .............................................................................................72

*Segal v. Zieleniec*,
    2015 WL 1344769 (E.D. Pa. Mar. 24, 2015) .....................................................27

*Sensenig v. Pa. R.R.*,
    229 Pa. 168 (1910) .............................................................................................56

*Shadduck v. Christopher J. Kaclik, Inc.*,
    713 A.2d 635 (Pa. Super. 1998) .........................................................................62

*Shapiro v. Shapiro*,
    415 Pa. 503 (1964) .............................................................................................61

*Siegel v. Goldstein*,
    657 F. Supp. 3d 646 (E.D. Pa. 2023) .................................................................12

*Skurnowicz v. Lucci*,
    798 A.2d 788 (Pa. Super. 2002) ................................................................... 55, 72

*Smith/Enron Cogen. Ltd. P'ship v. Smith Cogeneration Int'l*,
    198 F.3d 88 (2d Cir. 1999) .................................................................................15

*Sullivan v. Chartwell Inv. Partners L.P.*,
    873 A.2d 710 (Pa. Super. 2005) .........................................................................35

*Tayar v. Camelback Ski Corp., Inc.*,
    47 A.3d 1190 (Pa. 2012) ....................................................................................31

*Taylor v. Creditel Corp.*,
　　2004 WL 2884208 (E.D. Pa. Dec. 13, 2004) .......................................................27

*Topp Copy Prods., Inc. v. Singletary*,
　　533 Pa. 468 (1993) ...................................................................................32

*Toy v. Metropolitan Life Ins. Co.*,
　　928 A.2d 186 (Pa. 2007) ................................................... 31, 34, 37, 56

*Toys "R" Us, Inc. v. Step Two, S.A.*,
　　318 F.3d 446 (3d Cir. 2003) ...................................................................49

*Tracy v. P.N.C. Bank, N.A.*,
　　2021 WL 3682198 (W.D. Pa. Aug. 19, 2021) ...................................................28

*Trafford Distrib. Ctr. v. N.L.R.B.*,
　　478 F.3d 172 (3d Cir. 2007) ...................................................................18

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*,
　　75 F.3d 147 (3d Cir. 1996) ...................................................................52

*Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*,
　　316 F.3d 641 (7th Cir. 2003) ...................................................................37

*Vinco Ventures, Inc. v. Milam Knecht & Warner, LLP*,
　　2021 WL 4399682 (E.D. Pa. Sept. 27, 2021) ...................................................50

*Walden v. BNY Mellon*,
　　No. 2:20-cv-01972-CBB (W.D. Pa. Dec. 16, 2024) ...................................................25

*Walden v. BNY Mellon*,
　　No. 2:20-cv-01972-CRE (W.D. Pa. Apr. 10, 2024) ...................................................25

*Weinberg v. Sun Co.*,
　　777 A.2d 442 (Pa. 2001) ................................................................. 57, 71

*Weissman v. Weissman*,
　　384 Pa. 480 (1956) ...................................................................................3

*Wicks v. Milzoco Builders, Inc.*,
　　503 Pa. 614 (1983) ...................................................................................42

*Wilson v. Dantas,*
    746 F.3d 530 (2d Cir. 2014) ................................................................39

*Wolfe v. Allstate Prop. & Cas. Ins. Co.,*
    877 F. Supp. 2d 228 (M.D. Pa. 2012) ...............................................63

*Yocca v. Pittsburgh Steelers Sports, Inc.,*
    854 A.2d 425 (Pa. 2004) ............................................................ 36, 37

*In re Zisholtz,*
    226 B.R. 824 (Bankr. E.D. Pa. 1998) ...............................................54

*Zitelli v. Dermatology Educ. & Research Found.,*
    633 A.2d 134 (Pa. 1993) ....................................................................17

## Statutes

11 U.S.C. § 101(5) ..................................................................................54

15 Pa. Stat. Ann. § 8816(a) ....................................................................60

20 Pa. C.S. § 5602(a)(20) .......................................................................60

42 Pa. C. S. § 5322(b) ............................................................................41

73 P.S. § 201-2(3) ...................................................................................21

73 P.S. § 201-9.2(a) .................................................................... 30, 56, 72

73 P.S. §§ 201-1 et seq. .................................................................. passim

Fed. R. Civ. P. 11 ...................................................................................67

Fed. R. Civ. P. 12(b) ....................................................................... passim

Fed. R. Civ. P. 12(d) ..............................................................................66

Fed. R. Civ. P. 8(d)(2) ...........................................................................35

Fed. R. Civ. P. 9(b) ...................................................................... 9, 38, 68, 70

**Treatises**

Restatement (Second) of Conflict of Laws § 187(2)(b) ..........................................55

Restatement (Second) of Contracts § 195(1) .........................................................32

Restatement (Second) of Contracts § 206 .............................................................59

# TABLE OF TERMS

3AC ................................................................... Three Arrows Capital

AC ..................................................... Amended Complaint (ECF No. 22)

CM LLC ........................................... Cryptocurrency Management LLC

DCG ........................................................ Digital Currency Group, Inc.

DDQ ...................................... Due Diligence Questionnaire (AC Ex. K)

Genesis .................................................... Genesis Global Capital LLC

Jefferies .................................... Jefferies Leveraged Credit Products LLC

MLA ....................................... Master Loan Agreement (ECF No. 37-1)

Moro ................................................... Soichiro "Michael" Moro

NYAG Action ............................................... *People v. Gemini Trust Co., LLC et al.*,
                                    No. 452784/2023 (N.Y. Sup. Ct)

Silbert ............................................................. Barry E. Silbert

UTPCPL ....... [Pennsylvania] Unfair Trade Practices and Consumer Protection Law
                                    (73 P.S. §§ 201-1, et seq.)

**INTRODUCTION**

Plaintiffs Stephen Sokolowski and Christopher Sokolowski respond in a consolidated brief to Defendants Digital Currency Group (hereinafter "DCG"), Barry E. Silbert (hereinafter "Silbert"), and Soichiro "Michael" Moro (hereinafter "Moro")'s Fed. R. Civ. P. 12(b) motions to dismiss.

Defendants' briefs (ECF. Nos. 37, 38) present confusing and contradictory arguments, omit key facts, and misrepresent Plaintiffs' positions. Accordingly, Plaintiffs begin with an extended "Factual Background" to lay out a clear, chronological summary of what happened.

Defendants frequently attempt to distance themselves from each other's conduct, arguing that Plaintiffs rarely identify specific acts where a single Defendant was the only person involved. Throughout this brief, the Court should keep in mind that all Defendants *conspired with* each other to *participate in* a massive fraudulent scheme—and the courts of New York (*People v. Gemini Trust Co., LLC et al.*, No. 452784/2023 (Sup. Ct. N.Y. Cnty.), hereinafter "NYAG Action") have recently denied a similar motion from these same Defendants to dismiss similar claims against them:

1

[A]llegations plainly establish that Silbert and Moro had knowledge of the purported fraud and **participated in** the overall scheme…

*People v. Gemini Trust Co., LLC et al.*,
No. 452784/2023 (Sup. Ct. N.Y. Cnty.), Dkt. No. 116, at 17 (emphasis added) (denying Silbert's, Moro's, and DCG's motion to dismiss)

The conspiracy was so pervasive that all Defendants planned and executed nearly every major step of the nationwide scheme—such as signing the fraudulent promissory note—together. No Defendant has identified *even one statement* in any of the numerous public court records suggesting they ever objected to another participant's actions in the scheme. All Defendants personally directed the assets and employees of multiple companies interchangeably, with no regard for boundaries between themselves and any of the corporations involved (see *infra* App'x B.)

For the reasons set forth below, Defendants' motions to dismiss should be DENIED in their entirety.

## FACTUAL BACKGROUND

> [E]quity is to law what the helicopter is to aviation—able to travel in any direction to achieve its objective of truth, and when it has found truth it can land on terrain utterly futile and unapproachable to formalistic law.

*Weissman v. Weissman*, 384 Pa. 480, 485 (1956)


This brief will tell a simple story. The story is about fraud.

Genesis Global Capital LLC (hereinafter "Genesis"), well before it had any contact with Cryptocurrency Management LLC (hereinafter "CM LLC") and Plaintiffs Stephen Sokolowski and Christopher Sokolowski—and continuing until the scam collapsed—existed as the primary funding source for a convoluted scheme that Defendants DCG, Silbert, and Moro conspired to construct and execute and which ruined the lives of many Pennsylvanians—including the Plaintiffs. All three Defendants received substantial compensation from their roles within the enterprise (Amended Complaint (ECF No. 22, hereinafter "AC") ¶¶ 9a, 10a), and these benefits continued even after Genesis became insolvent.

This fraudulent scheme was misrepresented to the Plaintiffs as a safe, consumer-level financial service platform from the very beginning (AC ¶¶ 2, 76-81), so Plaintiffs entrusted 90% of their life savings (AC ¶ 30) to the Defendants— just as countless other Pennsylvania residents may have through Genesis,

passthrough LLCs, and the Genesis-affiliated lending platform Gemini (AC ¶¶ 85-88). Plaintiffs were induced to send money through a nominal LLC (CM LLC) suggested by Genesis personnel, created just a few days before it was used to pass funds to Genesis (AC ¶¶ 31, 41). The LLC's sole purpose as a passthrough mechanism was clearly, precisely, and unequivocally stated (AC ¶ 48) in Defendants' Due Diligence Questionnaire (hereinafter "DDQ", AC Ex. K). The Defendants effectively concede their inconsistent treatment of CM LLC by highlighting specific evidence in their briefs where they treated the LLC formally (e.g., ECF No. 37, at 11-13; ECF No. 38, at 9-10; aggregated *infra* App'x A, at 5-6 (Table A-2)) in situations where courts, regulators, banks, and prosecutors might be watching or where money was *leaving* Genesis.

They do not address the larger number of circumstances where they communicated with the Plaintiffs directly and individually (AC ¶¶ 54, 70, 72; App'x A at 1-4 (Table A-1)) to *ingest* more individuals' money into the scheme. One of the latter circumstances included an instance when Genesis's CFO directly negotiated with Plaintiff Christopher Sokolowski (who was not the owner of CM LLC), acknowledging the clear distinction between Plaintiff Christopher Sokolowski's own funds that were used for personal, family, and household purposes; and those he was depositing on behalf of non-party business PROHASHING LLC (AC ¶ 72).

4

The fraudulent scheme relied upon ingesting money from individuals through nominal entities like CM LLC, other suggested nominal entities (AC ¶ 69), and consumer fund aggregator Gemini (AC ¶ 85-86) *precisely because* these entities allowed Defendants to paint the depositors as "sophisticated" and avoid attention from banks and regulators.

Defendants—both then and now—claimed that these deposits were "loans," and they were so convincing that Plaintiffs adopted the term in their own documents and chats (See, e.g., loan terminology in AC Ex. F, H, I). In reality, far from the "deposits at 5%, lend at 6%" business model Defendants advertised (Narrative based on AC ¶¶ 76-81), the deposits were akin to contributions to what functioned as DCG's funding arm (Plaintiffs' interpretation based on intercompany dealings). Around the same time Genesis employee Griffin Tiedy told Plaintiff Stephen Sokolowski that Genesis was "just a middle/third party for lenders/borrowers in the market with our borrowers posting liquid collateral," (AC Ex. H. at 39) Defendant Silbert himself contradicted Genesis by privately acknowledging that Genesis, led by Defendant Moro, was sending substantial sums to Defendant DCG—long before the scheme's insolvency was revealed to the public (*NYAG Action*, Dkt. No. 40).

In addition to intercompany "loans," all Defendants, controlling Genesis, used customers' assets to fund very risky investments, one prominent example

being a large extension of credit—which contrary to representations was undercollateralized with illiquid assets created by DCG subsidiary Grayscale—to foreign borrowers who performed highly leveraged speculative trading (referencing Three Arrows Capital (hereinafter "3AC") loss context, AC ¶ 90).

When that loan inevitably defaulted, leaving Genesis essentially bankrupt (AC ¶ 90), Defendant Moro posted a tweet (AC ¶ 92)—which Plaintiffs read while in Pennsylvania (AC ¶ 92(c)) and which Plaintiff Stephen Sokolowski later stated was critical to his reasoning (AC Ex. E, at 5-6) and which also reached individual and Gemini Pennsylvania depositors[1]. Around this time, Plaintiffs upgraded their previously open-term arrangement to three-month fixed terms at much higher interest rates—something Plaintiffs had never done before (AC Ex. E at 5-6). Not only did Defendant Moro write the tweet, he himself was also responsible for these higher rates. (In internal communications, Moro stated "we don't want to seem desperate, but we are willing to pay more than we have been." (AC ¶ 91(a)). Meanwhile, all Defendants, blurring all corporate boundaries, were engaged in strategizing (AC ¶¶ 116-117), presenting talking points to perpetuate the story Plaintiffs believed—that Genesis was the "blue chip" bank of last resort which could not fail (AC ¶ 120(a); *infra* App'x A, at 7-8 (Table A-3))

---

[1] Even though only directly stated for Plaintiff Stephen Sokolowski, the Court can and should reasonably infer from the existing allegations in the AC that Plaintiff Christopher Sokolowski, who was made aware of Moro's writings in the Telegram chats (AC Ex. H, at 39), was also influenced by Moro's tweet.

Next, facing a public reporting deadline that would reveal the scheme, all Defendants intentionally and maliciously signed a $1.1 billion fraudulent promissory note (AC ¶ 93, Exs. B, C) that they knew could not be repaid in under one year (as evidenced by its 10-year term with 1% interest), and where no money actually changed hands. They intended the note to be used to cover up Genesis's dire financial situation and induce deposits from Pennsylvania and other states, and the text of the note acknowledged that the billion-dollar loss was unlikely to be recoverable (AC ¶ 93(d), referencing note text).

Plaintiffs retained their assets at Genesis for the three-month term due to the false information provided to them. When the renewal period approached, Genesis employees sent a false balance sheet into Pennsylvania (AC ¶ 94, Ex. A). This balance sheet referenced the fraudulent promissory note signed by Defendants as a "current asset," inducing Plaintiffs to renew the loans a second time (AC ¶ 105). Genesis employees also sent a similar sheet to at least one other non-party depositor (AC ¶ 98, Ex. D). By this time, the fraud had arguably become a true Ponzi scheme, with Plaintiffs' money potentially used to fund stock buybacks (AC ¶ 128, alleging shareholder letter stated this purpose for DCG borrowing from Genesis) and withdrawals from other depositors.

Defendants DCG/Silbert attempted to keep the fraud going by any means necessary, acknowledging that the ability of DCG to continue to attract investors

was inextricably attached to Genesis's appearance of stability (AC ¶ 122(b)) and that Genesis's bankruptcy would present "veil piercing" risks (AC ¶ 117(d)). Yet, even after suggesting his attorneys start researching veil piercing law and suspecting that DCG, Genesis, and himself would be treated as one and the same by courts (as the *NYAG Action* has done (see Introduction, *supra*)), Silbert, acting on behalf of DCG, continued to pull in additional DCG subsidiaries to keep the scheme afloat (AC ¶¶ 118-119, 123). Defendant Moro's offered defense of having resigned in August 2022, while insufficient to exonerate him, implies that Defendants DCG/Silbert were even more responsible for the commingling of funds and employees between DCG's many "subsidiaries" that occurred thereafter (ECF No. 38, at 15).

After Genesis halted withdrawals and the fraudulent scheme was revealed, Defendants DCG/Silbert allowed public information to leak that suggested DCG was nearly bankrupt, likely for advantage in the Genesis bankruptcy. They allowed knowledge of stock buybacks, funded by Genesis's funds, to run rampant (AC ¶ 128). As a result, Plaintiffs feared that they would lose the house they had purchased for their 70-year-old mother, leaving her homeless. Plaintiffs sold their bankruptcy claims to preserve whatever lifestyle could remain for them, their family, and their household (AC ¶¶ 131-133). After having worked weekends for

most of their lives to retire early, they returned to working 10-hour days, including weekends and Christmas Day (AC ¶ 115).

As a direct result of Defendants' conduct, they are now forced to bring this suit unrepresented, against several of America's most prestigious law firms. These firms attempt to intimidate Plaintiffs by making improper inferences from Plaintiffs' adherence to Judge Caraballo's AI certification policy (ECF No. 37, at 7), alleging without Fed. R. Civ. P. 9(b) particularity that Plaintiffs committed criminal fraud (ECF No. 37, at 10), and implying that Plaintiffs will be sanctioned (ECF No. 37, at 2) for exercising their rights—but without actually moving for sanctions.

That is the story. The story is about what Plaintiffs' research suggests may be the largest UTPCPL case in the history of the Commonwealth of Pennsylvania. This simple story is consistent from start to finish.

Meanwhile, all Defendants fail to present a coherent story of their own. Their arguments are complex, convoluted, difficult to understand, irrelevant, rely upon inadmissible evidence, and—most importantly—**are contradictory**.

Defendants do, however, effectively concede one crucial fact—their briefs acknowledge that the evidence shows they treated CM LLC formally when it served them to do so (ECF No. 38, at 9-10, 13; ECF No. 37, at 11-13, 18;

aggregated *infra* App'x A, at 5-6 (Table A-2)), and their briefs do not defend the situations where it is undeniable that they treated Plaintiffs as individuals to obtain their money (App'x A, *infra*, at 1-4 (Table A-1)).

The evidence is clear, precise, and unequivocal: As a result of their contradictory positions and conduct, **all Defendants are equitably estopped from offering nearly all their defenses.**

**ARGUMENT**

**I    ALL DEFENDANTS ARE EQUITABLY ESTOPPED FROM ASSERTING MULTIPLE DEFENSES BASED ON THEIR INCONSISTENT CONDUCT AND MISREPRESENTATIONS**

Defendants' motions rely heavily on technical defenses derived from the formal structure of the transaction involving CM LLC and the characterization of the underlying product as simple "loans." However, Defendants are estopped from arguing that only CM LLC has standing or that CM LLC's assignment bars Plaintiffs' claims, because Genesis (operating under Defendants' control and for their benefit) engaged in a pattern of inconsistent conduct that induced Plaintiffs to believe that they were the true parties in interest and that the LLC formality would not be used to shield Defendants from accountability.

**A  The Doctrine of Equitable Estoppel Under Pennsylvania Law.**

Equitable estoppel is a doctrine of fairness designed to prevent a party from taking a position or asserting a right that is inconsistent with their prior conduct or representations. See *Chester Extended Care Ctr. v. Dep't of Pub. Welfare*, 526 Pa. 350 (1991) (equitable estoppel prevents a party from asserting rights inconsistent with a position previously taken when it would prejudice another who relied). The Pennsylvania Supreme Court has defined it thus:

11

> Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity.

*Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503 (Pa. 1983) (internal citations omitted).

The core elements of estoppel are:

1. inducement by the party sought to be estopped, leading the other party to believe certain facts exist;

2. justifiable reliance on that inducement by the other party; and

3. prejudice to the other party if the first party is permitted to deny the existence of those facts.

See *Public. Sch. Bldg. Auth. v. Noble C. Quandel Co.*, 585 A.2d 1136 (Pa. Commw. Ct. 1991)*; Foster v. Westmoreland Cas. Co.*, 145 Pa. Commw. Ct. 638 (1992); .

Equitable estoppel is not a separate cause of action and may be raised "as grounds to prevent the defendant from raising a particular defense" (*Siegel v. Goldstein*, 657 F. Supp. 3d 646, 662 (E.D. Pa. 2023)) quoting *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990).

12

### 1. Inducement: Defendants' Knowledge of CM LLC as a Conduit and Pattern of Direct, Substantive Dealings with Individual Plaintiffs.

After stating that individual accounts could not be created for CM LLC's depositors on the grounds that the individuals had insufficient funds (ECF No. 38, at 2), Genesis employees then suggested that a passthrough LLC be created to bypass Genesis's own deposit minimums (AC ¶ 40) and set up a Telegram group chat to communicate with the individuals directly (AC ¶ 54).

Genesis next received CM LLC's DDQ which *clearly, precisely, and unequivocally* states: "The purpose of this organization is to collect funds and exceed Genesis's minimum loan amounts and to loan funds to Genesis Trading." (AC ¶ 48, Ex. K). This provided undisputed, contemporaneous notice that CM LLC was not an independent operating business but a vehicle created solely to aggregate Plaintiffs' (and others') funds to meet thresholds. See *Blofsen v. Cutaiar*, 460 Pa. 411 (1975) (knowledge of true facts is relevant to inducement).

CM LLC's unprofessional and unusual Operating Agreement, provided to Genesis at the time of account creation, stated in paragraph 6: "The purpose of Cryptocurrency Management LLC is to securely store cryptocurrencies and lend those cryptocurrencies to earn interest. The sole borrower at the time of formation will be Genesis Trading." (AC Ex. G. at 2) Defendants also received a "balance sheet.pdf" document, which stated that CM LLC had no assets because it was

13

awaiting account approval by Genesis (AC ¶ 46). Defendants, through their control over Genesis (AC ¶¶ 115-129), shared this knowledge.

Despite the LLC form, Genesis personnel, including senior officers like CFO Matthew Ballensweig, exclusively engaged in extensive, direct communications via Telegram and calls with *individual* Plaintiffs and other CM LLC passthrough individuals concerning core aspects of the lending relationship: discussing terms, setting rates, distinguishing funds between personal and business sources (PROHASHING LLC), reconciling accounts, addressing tax withdrawals, and handling security concerns (AC ¶¶ 66-74, Ex. F, H, I).

Defendants cannot deny that CM LLC was merely a funding conduit for the individual Plaintiffs because *Defendants' own words and deeds said exactly that.* Plaintiffs sent coins directly to Genesis rather than through any "CM LLC wallet." (e.g. AC Ex. F, at 24). **Appendix A, *infra*, at 1-4 (Table A-1) critically highlights** some of the overwhelming evidence where Defendants treated Plaintiffs as the true parties at interest.

By contrast, Defendants highlight instances where Genesis *did* adhere to formalities, such as requiring separate accounts to avoid regulator attention, mandating specific paperwork, and restricting cash (but not cryptocurrency) *withdrawals* to entity-named accounts (ECF No. 38, at 9-10, 13; ECF No. 37, at

11-13, 18) to reduce visibility at banks (Plaintiffs' assertion). **App'x A, *infra*, at 5-6 (Table A-2) critically aggregates** the instances where Defendants acknowledge having treated CM LLC as a distinct entity.

This selective adherence—requiring legal formalities during interactions with regulators and banks—stands in stark contrast to the disregard for the LLC's separate existence in direct, substantive communications aimed at acquiring and retaining Plaintiffs' funds in the scheme. This inconsistent behavior constitutes inducement, signaling that the corporate form was significant only when convenient for Genesis/Defendants, not a barrier to the underlying reality of dealing with individuals. See *Murphy & Slota v. Burke*, 454 Pa. 391 (1973) (estoppel can arise from acts or conduct inconsistent with rights later asserted).

In the persuasive opinion *Smith/Enron Cogen. Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88 at 97-98 (2d Cir. 1999)--cited by Defendants—courts in that circuit enforced arbitration upon a corporation that "treated a group of related companies as though they were interchangeable but now asks for strict adherence to the corporate form." These messages (App'x A, *infra*, at 1-6 (Table A-1, Table A-2)) illustrate how Defendants took inconsistent positions on CM LLC's separateness as it suited them and should now also be estopped from insisting on "strict adherence to the corporate form."

## 2. Justifiable Reliance: Plaintiffs' Reliance on the Understanding Created by Defendants' Conduct.

Plaintiffs justifiably relied on the understanding induced by Defendants'/Genesis's conduct. Plaintiffs state that they were seeking a low-risk method to store their personal assets and would not have used Genesis had Genesis required CM LLC to operate as a commingled investment firm (AC ¶¶ 23-30).

Given Genesis's initial suggestion of the LLC structure, its documented knowledge of the structure's purpose via the DDQ, and its personnel's consistent pattern of direct, substantive communication and negotiation with the individual Plaintiffs (including the CFO) (App'x A, *infra*, at 1-4 (Table A-1); AC Ex. H), the Plaintiffs believed that Genesis (and its controllers who orchestrated the overall fraudulent scheme, the Defendants) recognized them as the true beneficial owners and counterparties, and that the LLC form was secondary to the substance of the relationship.

Additionally, Genesis made no effort to correct Plaintiffs' belief that they were the true parties in interest, which it could have done, for example, by refusing at any time to accept deposits from individual depositors. Had Genesis done so, Plaintiffs would have stopped dealing with Genesis (AC ¶ 59). Under *Blofsen*, 460 Pa. at 417, "silence when he ought to speak out" supports the case for equitable estoppel. See also *Moser v. DeSetta*, 527 Pa. 157, 163 (1991) ("The concealment of

16

a material fact can amount to a culpable misrepresentation no less than does an intentional false statement.")

### 3. Prejudice: Harm to Plaintiffs if Defendants Can Now Assert Inconsistent Positions.

Defendants benefited from acquiring and retaining Plaintiffs' substantial personal assets by knowingly facilitating the conduit structure and dealing directly with Plaintiffs, only insisting on corporate formalities to appear to be in legal compliance when banks and regulators were watching—presumably to avoid investigations into their true activities they were misrepresenting to Plaintiffs. Defendants now also seek to use that very structure's formality as a shield.

When a defendant's own manipulation of corporate formalities causes the very uncertainty it later exploits, Pennsylvania courts forbid use of that uncertainty as a defense. See *LVL Co., LLC v. Atiyeh*, 469 F. Supp. 3d 390, 417 (E.D. Pa. 2020) (estopped defendants who were found to "treat these companies as little more than interchangeable shell companies.")

If Defendants are permitted to hide behind corporate formalities and deny facts their conduct led Plaintiffs to believe, Plaintiffs would suffer severe prejudice, as they would be unable to seek relief for Defendants' conduct. See *Zitelli v. Dermatology Educ. & Research Found.*, 633 A.2d 134 (Pa. 1993) (prejudice is essential element).

17

**B  Flaws in Defendants' Case Citations and Arguments**

Defendant Moro's case citations misrepresent Plaintiffs' arguments. Moro's citation to *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ——for the general principle of corporate separateness—is not relevant here, as it does not address whether Defendants are equitably estopped from rigidly asserting CM LLC's distinct status.

Furthermore, Defendant Moro's reliance on *Trafford Distrib. Ctr. v. N.L.R.B.,* 478 F.3d 172 (3d Cir. 2007)—regarding alter ego liability—is misplaced. Equitable estoppel is a distinct legal theory from the alter ego doctrine applied in *Trafford* to bind a parent company to its subsidiary's labor obligations. Second, the specific operational and managerial control factors central to the alter ego finding in *Trafford* are completely unrelated to the relationship between individual Plaintiffs and CM LLC, a nominal entity for personal funds passthrough. *Trafford* involved findings involving two commercial (not personal) entities with the same customers, supervision, management, labor relations, and common financial control—none of which are present in this case.

**C  Defendants' Conduct is The Focus**

Finally, all Defendants have selectively quoted small portions of the CM LLC Operating Agreement (AC Ex. G) and Telegram chats (AC Exs. F, H, I) to argue that Plaintiffs operated CM LLC as an independent business. But even if

Plaintiffs had treated CM LLC as a business in Defendants' Telegram chats or anywhere else, that fact is irrelevant to whether *Defendants* are estopped from *their* arguments regarding CM LLC's identity. Only the Defendants' conduct is important here. See *Novelty Knitting*, 457 A.2d 502, *State Pub. Sch. Bldg. Auth. v. Noble C. Quandel Co.*, 585 A.2d 1136, 1139–40 (Pa. Commw. Ct. 1991) (the party to be estopped must have intentionally or negligently misrepresented some material fact and induced the other party to act to its detriment; *no requirement made of other party's behavior in this test*.)

And, even if Plaintiffs' conduct were in question, it is entirely reasonable that the judge adjudicating this case at the bench trial could reasonably view the overwhelming opposing evidence demonstrating Defendants' contradictory positions as favoring the Plaintiffs over Defendants' selected quotations from the CM LLC operating agreement and Telegram chats. The meaning of these statements is a matter of factual dispute, and because Plaintiffs are disallowed from presenting new evidence in the instant 12(b)(6) response brief to dispute the meaning of Operating Agreement clauses, it is inappropriate to grant Defendants' motions to dismiss solely based upon Defendants' interpretations.

### D  Conclusion on Estoppel

Defendants treated the CM LLC structure flexibly, insisting upon it only when it served to avoid attention from regulators and banks, while dealing with the

individuals at all other times. Therefore, the Court cannot allow them to rely upon CM LLC's status for the following defenses:

*Standing*: Defendants are equitably estopped from denying Plaintiffs are the real parties in interest with standing to bring Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. (hereinafter "UTPCPL") claims related to their personal assets.

*Waivers and Disclaimers:* Defendants are equitably estopped from arguing that waivers and disclaimers in the Master Loan Agreement (ECF No. 37-1, hereinafter "MLA")—to which CM LLC was a party—bind the individual Plaintiffs.

*Assignment:* Defendants are equitably estopped from using the assignment by CM LLC of a bankruptcy claim *against Genesis* as a shield against Plaintiffs' personal claims.

*Personal/Household Use:* Defendants are equitably estopped from arguing that because CM LLC is a corporate entity, Plaintiffs' funds were "commercial loans" instead of funds used for personal, household, or family purposes solely because they passed through CM LLC.[2]

---

[2]For clarity, Plaintiffs do not argue that non-party PROHASHING LLC's funds were used in a personal or household manner. Defendants DCG/Silbert contest the separation between PROHASHING LLC's funds and Plaintiffs' funds. (ECF No. 37, at 11). Plaintiffs possess terabytes of database rows from PROHASHING LLC contradicting that assertion; factual disputes are not grounds to dismiss the case at this stage. (Rule 12(b)(6))

## II    PLAINTIFFS PURCHASED A COMPREHENSIVE FINANCIAL SERVICE SUBJECT TO UTPCPL PROTECTION.

### A    The Genesis Service is a UTPCPL-Covered Service

Defendants contend that Plaintiffs' claims must fail because the underlying transactions were merely "loans," which they argue fall outside the UTPCPL's protection afforded only to those who "purchase or lease goods or services." (ECF No. 37, § III.B; ECF No. 38, § I). This argument fundamentally mischaracterizes the nature of Plaintiffs' engagement with Genesis and ignores the breadth of Pennsylvania's consumer-protection law. Plaintiffs did not simply extend isolated loans; they purchased access to, and use of, what was marketed as a bundled financial-services platform—operated and controlled by Defendants—that promised convenient, professionally managed yield generation within a purportedly safe environment without the risks of direct market participation. Such a transaction constitutes the purchase of "services" squarely within the meaning and protective purpose of the UTPCPL.

The UTPCPL plain language defines "trade" and "commerce" expansively to include the "advertising, offering for sale, sale or distribution of any services and any property, *tangible or intangible* … and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3) (emphasis added). The statute is remedial legislation designed to prevent fraud and deception in commercial dealings and must be construed liberally to effectuate

21

that purpose, and numerous court rulings have confirmed that interpretation.
*Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 460 (1974)
("Consumer Protection Law … is to be construed liberally to effect its object of
preventing unfair or deceptive practices."); *Zimmerman*, 26 Pa. D.&C.3d at 120
(the UTPCPL focuses on the capacity of the defendant's conduct to deceive
consumers about the nature of the transaction, not on technical classifications);
*Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021) (reaffirming the Act's
broad remedial nature); *Gabriel v. O'Hara*, 368 Pa. Super. 383, 534 A.2d 488 (Pa.
Super. 1987) (reiterating the UTPCPL's broad remedial purpose and the mandate
for liberal construction).

Plaintiffs state they sought a "hands-off, interest-based lending service
suitable for personal and household asset management," relying on Genesis's
representations of itself as a "simple, safe alternative for ordinary consumers" (AC
¶¶ 23, 29). The services purchased included:

- Intermediation and Access: Providing a platform connecting capital
  providers (Plaintiffs) with yield-generating opportunities (Genesis's
  borrowers or internal strategies), sparing Plaintiffs the effort and risk of
  finding, vetting, and contracting with end-borrowers themselves.

22

- Purported Risk Management: Representing that Genesis managed the risks associated with deploying customer assets and portraying itself as stable and well-capitalized (AC ¶¶ 76, 94, 101).

- Convenience and Platform Infrastructure: Offering a user-friendly dashboard, account statements, transaction processing, and customer support, thereby simplifying the process of deploying and managing assets (AC ¶¶ 77, 80, Ex. J). Plaintiffs utilized open-term arrangements and frequently made withdrawals for household purchases (AC ¶ 28).

- Advice: The lengthy Telegram chats show many instances where Genesis employees advised Plaintiffs about cryptocurrency interest generation and show how Plaintiffs engaged in mutual friendly discussions with the employees (AC Ex. F).

## B  If Plaintiffs Were Not Interested in Purchasing Genesis's Service Platform, They Would Simply Have Made Direct Loans

The characteristics of the service Genesis provided become stark with the following statement: Had Plaintiffs merely wished to make loans, they could have sought direct counterparty relationships and undertaken the associated due-diligence burden, accepting concentrated counterparty risk.

Instead, Plaintiffs chose Genesis precisely because it offered a packaged service promising simplicity and safety; a full relationship with the consumer (AC

¶¶ 23, 29-30)—quintessential hallmarks of a UTPCPL-covered transaction.

Pennsylvania courts routinely treat analogous financial-risk products as "services."

See *Gabriel*, 368 Pa. Super. 383 (real-estate interests within UTPCPL); *Dwyer v. Ameriprise Fin., Inc.*, 313 A.3d 969 (Pa. 2024) (UTPCPL squarely governs deceptive marketing of consumer financial products).

Even in the area of solely direct loans, a characterization that is inappropriate for the transactions at issue in this case, the UTPCPL has been applied specifically to loan servicers: see *Commonwealth v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018) (motion to dismiss denied; loan-servicer's deceptive practices actionable under UTPCPL catch-all.)

## C  *Walden* Shows That if the Service Had Functioned As Represented, Defendants' Compensation Through the "Spread" Constituted a Purchase

The "purchase" element of the UTPCPL is satisfied because if Genesis had operated as it was advertised (and not in the Ponzi-like manner it actually did,) Plaintiffs provided valuable consideration in exchange for Genesis's services. While Genesis charged no explicit fee, the economic reality is that Plaintiffs would have paid through the embedded "spread"—the difference between the yield Genesis retained and the interest it credited to Plaintiffs (AC ¶ 84). The UTPCPL imposes no particular form of consideration; providing capital for managed

deployment in exchange for a promised risk-adjusted return comfortably fits the Act's broad conception of purchasing a service.

A recent decision underscores the point. In *Walden v. BNY Mellon*, No. 2:20-cv-01972-CRE (W.D. Pa. Apr. 10, 2024)*,* the court refused to dismiss a UTPCPL claim where the bank accrued charges *inside* the affiliated mutual funds—fees "internal to the funds" that do not show up as explicit line-item charges to the client but are rather reflected in the funds' expense ratios and where "a portion of the [affiliated mutual fund's] investment-advisory fee is *credited to BNY Mellon*." The court treated those hidden, fund-level charges—captured only through the expense ratio—as part of the price plaintiffs paid for BNY Mellon's discretionary-management *service*, never questioning that such embedded remuneration satisfies the UTPCPL's "purchase" element. It then let the UTPCPL count proceed on the merits, holding that the bank's undisclosed "conflicts of interest" around that fee structure were actionable deception. Id. at 30-32. *Walden* thus confirms that Pennsylvania courts look to the economic reality of who ultimately pockets the spread, not to whether the fee appears on a monthly statement.

A later ruling in *Walden, Walden v. BNY Mellon*, No. 2:20-cv-01972-CBB (W.D. Pa. Dec. 16, 2024), also underscores that, while there is no disagreement whatsoever on the issue of securities in this case—Plaintiffs strongly maintain their position that they did not intend in any way to purchase securities (AC ¶ 23) and

Defendants have also not characterized their services as securities (AC ¶ 113)—

Plaintiffs' purchases would still be afforded UTPCPL protection even if they had

purchased securities. In that later *Walden* ruling, the court invited a motion to

amend the complaint and assert an individual UTPCPL claim for the securities

transactions at issue.

### D   Deceptive Conduct Alone Is Actionable Under the UTPCPL

> The plain language of the current [UTPCPL] statute imposes liability
> on commercial vendors who engage in conduct that has the potential
> to deceive and which creates a likelihood of confusion or
> misunderstanding. That is all that is required.

*Gregg*, 245 A.3d at 649

If Defendants reply that Genesis didn't earn any profit from fees through its

lending practices (because Genesis actually became a Ponzi-like scheme),

Defendants' UTPCPL defenses fail for another independent reason: modern

interpretations of the UTPCPL require only that the defendants create "confusion

or misunderstanding" surrounding their services. Plaintiffs clearly were confused

about the nature of the services Defendants were offering and misunderstood what

was actually occurring with their money from the very beginning and throughout

the entire relationship.

Examples of confusion perpetrated by the Defendants are **importantly**

**illustrated** *infra* **App'x A, at 6-7 (Table A-3).** In fact, the creation of CM LLC

26

itself was the result of confusion and misunderstanding induced by the Defendants. Under *Gregg*, 245 A.3d 637, these contradictions that create "confusion or misunderstanding" alone constitute strict liability that defeats any motion to dismiss, regardless of characterization of the underlying service.

Most critically, it is indisputable that the fraudulent promissory note's classification on the balance sheet represented "characteristics… benefits, or qualities" that the note "did not have", causing "confusion or misunderstanding." (UTPCPL § 201-2(4)(ii) & (v).)

## E  Flaws in Defendants' UTPCPL Case Citations

Defendants cite many UTPCPL cases where the facts significantly differ from the fraud at issue in this case.

*One-Time Deals*: Defendants cite *Segal v. Zieleniec*, 2015 WL 1344769 (E.D. Pa. Mar. 24, 2015), which involved a plaintiff who directly funded *identified* one-to-one private real-estate loans under a trust agreement. *Taylor v. Creditel Corp.*, 2004 WL 2884208 (E.D. Pa. Dec. 13, 2004) – an older case superseded by modern precedent - concerned a one-time investment note rather than obtaining ongoing asset-management services. Neither decision addressed a consumer's purchase of access to a managed, multi-counterparty platform like Genesis's.

27

*Commercial Transactions*: Defendants cite several cases involving transactions that were clearly commercially oriented and not associated with personal or household funds. *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238 (3d Cir. 2002) featured a strictly commercial, professional transaction driven by a physician purchasing surgical screws on behalf of his patients. *Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63 (3d Cir. 1996) involved corporate medical provider reimbursement, not individual consumer services.

*Different Roles*: *DeFazio v. Gregory*, 836 A.2d 935 (Pa. Super. 2003) bars UTPCPL claims by a *seller* of goods; Plaintiffs, by contrast, paid Genesis for a custodial-lending service and suffered personal losses—*Genesis* was the seller in Plaintiffs' transaction. *Tracy v. P.N.C. Bank, N.A.*, 2021 WL 3682198 (W.D. Pa. Aug. 19, 2021) was dismissed because the plaintiffs failed to provide a detailed factual narrative; Plaintiffs provide excruciating detail in the AC and the instant brief (see § I (A)(2), *supra*). *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53 (3d Cir. 1992) held that third-party claimants lack UTPCPL standing because they did not purchase the policy and had no dealings with the insurer; here, Plaintiffs directly bought and renewed Genesis's services. Defendants are liable because they directly participated in the conduct that led to those purchases.

28

*Different Focus*: *Duffy v. Lawyers Title Ins. Co.*, 972 F. Supp. 2d 683 (E.D. Pa. 2013) involved a home sale, but the home sale was not the core issue. The court dismissed a UTPCPL claim because the plaintiff homeowners never even knew about the title insurance policy that involved the misrepresentations, so they could not have been a UTPCPL purchaser.

*Ignoring Critical Findings*: Defendants cite *Brownell v. State Farm Mut. Ins. Co.*, 757 F. Supp. 526 (E.D. Pa. 1991), a narrow early UTPCPL case involving insurance claims. *Brownell* actually *permits* UTPCPL claims against an entity that stands in the consumer-facing chain (there, State Farm). It only bars claims against a truly outside third-party, which Defendants are not because, as documented throughout this brief, they controlled Genesis and orchestrated the scheme (see Factual Background, *supra*, at 2; see also *infra* App'x B.) *Branche v. Wells Fargo Home Mortg., Inc.*, 624 F. App'x 61 (3d Cir. 2015), a non-precedential opinion, is inapposite because the plaintiff there *never actually parted with any money*; she simply inherited an existing mortgage from someone else.

## F  Conclusion on UTPCPL Purchase

The mere presence of "loans" does not negate the economic substance of the purchase - a comprehensive suite of custodial and intermediation services that would have been paid for through a spread had the service not operated in a Ponzi-like manner. Denying UTPCPL protection here would subvert the statute's

29

remedial goals—particularly where the service platform involved systematic

deception regarding its fundamental characteristics and safety in a massive scheme.

Plaintiffs have therefore adequately pleaded purchaser status under 73 P.S. § 201-

9.2(a).

## III    THE MLA'S DISCLAIMERS AND WAIVERS ARE UNENFORCEABLE TO SHIELD DEFENDANTS FROM LIABILITY FOR FRAUDULENT MISREPRESENTATION UNDER THE UTPCPL

Defendants DCG and Silbert place significant weight on provisions within

the MLA—specifically the waiver of claims against affiliates and the integration

clause—arguing these contractual terms bar Plaintiffs' UTPCPL claim. (ECF No.

37, §§ II, III.C). This reliance is misplaced. Pennsylvania law has long held that

fraud unravels all aspects of a transaction it infects. It is a bedrock principle of

Pennsylvania law that contractual waivers and disclaimers, however broadly

drafted, cannot be invoked to shield a party from liability for its own fraud or

deceptive conduct, particularly when such conduct violates the Commonwealth's

strong public policy embodied in the UTPCPL.

### A    Fraud Vitiates Contractual Waivers and Disclaimers Intended to Shield Deceptive Conduct

Disclaimers of reliance or waivers of liability, often found in standard

contracts, cannot immunize a party who has engaged in fraudulent

misrepresentation. *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190 (Pa. 2012) shows that a waiver cannot insulate defendants from the lower standard of reckless conduct, let alone the planned intentional conduct Defendants in this case engaged in. Specifically, regarding the UTPCPL, the Pennsylvania Supreme Court has indicated that reliance-disclaimer clauses may not bar claims where deceptive conduct is alleged under the statute. See *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 197–207 (Pa. 2007) (finding justifiable reliance sufficiently pleaded under UTPCPL despite contractual disclaimers, noting the statute addresses deceptive conduct broadly).

The pervasive fraudulent scheme (see Factual Background, *supra*, at 2) induced Plaintiffs not only to initially deposit their assets but also to enter into the MLA framework and, critically, to renew their participation based on subsequent misrepresentations (AC ¶ 105). Allowing Defendants to now hide behind clauses within an agreement procured and perpetuated through such deception would fundamentally undermine the principle that fraud vitiates the transaction and contravene the UTPCPL's protective purpose.

## B  Public Policy Precludes Enforcement of Exculpatory Clauses for Intentional Torts and Violations of Consumer Protection Statutes.

Even if viewed purely as exculpatory clauses, the MLA's waiver and integration provisions are void as against Pennsylvania's public policy when

invoked to shield intentional or reckless misconduct like fraud or violations of the

UTPCPL. While Pennsylvania enforces exculpatory clauses in some contexts, they

are strictly construed and will not be enforced if they violate public policy. *Topp*

*Copy Prods., Inc. v. Singletary*, 533 Pa. 468, 471 (1993). A key aspect of this

public policy limitation is that such clauses generally cannot relieve a party from

liability for intentional torts or reckless misconduct. Restatement (Second) of

Contracts § 195(1) ("A term exempting a party from tort liability for harm caused

intentionally or recklessly is unenforceable on grounds of public policy."). See

*Phelps v. Caperoon*, 190 A.3d 1230 (Pa. Super. Ct. 2018) ("as-is" clause cannot

waive statutory duties.)

### C  The Scope of the MLA Waiver Does Not Encompass Plaintiffs' Personal Tort Claims Against Non-Party Affiliates.

Beyond the unenforceability due to fraud and public policy, the specific

language of the MLA waiver does not cover the claims asserted here. The MLA

was a contract solely between CM LLC and Genesis. Defendants DCG, Silbert,

and Moro were not signatories to this MLA in any personal capacity that would

afford them protection against the UTPCPL claims brought by the individual

Plaintiffs.

The waiver clause states that claims "against Genesis arising in any way *out*

*of this Agreement* are only the obligation of Genesis, and not any of its parents or

affiliates," and that "none of Genesis' parents or affiliates shall have any liability *under this Agreement*'" (ECF No. 37-1, at GENESIS_DCG_00140493) (emphasis added). This language is narrowly tailored. It addresses contractual liability under the MLA itself, aiming to prevent CM LLC (the contractual counterparty to Genesis) from pursuing Genesis's affiliates for Genesis's potential breach of its obligations under the MLA.

However, Plaintiffs' UTPCPL claim is not a claim for breach of the MLA, nor is it asserted "under this Agreement." It is an independent statutory tort claim asserted directly against DCG, Silbert, and Moro based on their own fraudulent conduct in the scheme. The third circuit wrote:

> [T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus.
>
> *Redev. Auth. of Cambria Cnty. v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (en banc), quoted in *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001).

Furthermore, even if the claims did arise from the contract, this circuit has made clear that the "gist of the action" doctrine does not preclude UTPCPL claims:

[B]oth *Dixon* and *Knight* thus suggest that the gist of the action
doctrine should not preclude liability under the UTPCPL where the
contract is collateral to any allegedly deceptive conduct, as has been
alleged in this case. We therefore hold that the gist of the action
doctrine does not bar [the plaintiff's] UTPCPL claim from going
forward.

*Earl v. NVR, Inc.*, 990 F.3d 310, 315-316 (3d Cir. 2021), citing *Knight
v. Springfield Hyundai*, 81 A.3d 940 (Pa. Super. 2013) and *Dixon v.
Nw. Mut.*, 146 A.3d 780 (Pa. Super. 2016)

## D    The Integration Clause Does Not Bar Claims of Fraudulent Inducement or Reliance on Subsequent Misrepresentations.

Defendants' reliance on the MLA's integration clause (ECF No. 37-1 at

GENESIS_DCG_00140492) also fails. As stated in *Betz Labs., Inc. v. Hines*, 647

F.2d 402, 408 (3d Cir. 1981), "To give effect to an integration clause permits

language to shield a party from the consequences of his fraud, contrary to public

policy." It is also well-established under Pennsylvania law that the parol evidence

rule, which integration clauses invoke, does not bar evidence of fraudulent

misrepresentations that *induced* the contract *Toy*, 593 Pa. at 46.

Additionally, the integration clause speaks to representations made *prior to

or contemporaneous with* the MLA's execution. Even if the initial entry were not

fraudulently induced, subsequent material misrepresentations by Defendants—

including Defendant Moro's June 2022 tweet (AC ¶ 92)[3] and the fraudulent

September 2022 balance sheet provided by Genesis personnel (AC ¶ 94, Ex. A)—

---

[3]Even though only directly stated for Plaintiff Stephen Sokolowski, the Court can and should reasonably infer from the existing allegations in the AC that Plaintiff Christopher Sokolowski, who was made aware of Moro's writings in the Telegram chats (AC Ex. H, at 39), was also influenced by Moro's tweet.

were designed to and did induce Plaintiffs to continue and renew their participation in the lending program *under the existing MLA framework*. These subsequent acts of fraud, leading to new Loan Term Sheets incorporating the MLA, fall squarely outside the protective scope of the MLA's original integration clause, which cannot immunize defendants from the consequences of later deceit. See *Sullivan v. Chartwell Inv. Partners L.P.*, 873 A.2d 710 (Pa. Super. 2005) where the court noted that "the gist-of-the-action doctrine would not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract," citing *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. 2002)

### E  At Least One of Defendants' Many Contradictory Arguments Must Necessarily Fail

Arguing in the alternative is expressly permitted by Rule 8(d)(2), and Defendants are permitted to engage in "even if" arguments. This protection works in both directions—even prohibiting alternative theories in plaintiffs' *complaints* from different suits from being introduced as evidence. See *Giannone v. United States Steel Corp.*, 238 F.2d 544, 548 (3d Cir. 1956) ("The authorities generally concede that one of two inconsistent pleas cannot be used as evidence in the trial of the other.")

That said, Defendants contradict themselves so often in their briefing that the Court cannot credit all their positions simultaneously. Adopting one strand of

their logic necessarily collapses another. Whatever factual scenario the Court

ultimately accepts, at least half of Defendants' arguments across all topics fall

before the Court reaches their substance.

A prime example is Defendants' treatment of the MLA. If the Court accepts

Defendants's representation that "none of the parties to the MLA… are parties in

the lawsuit" (ECF No. 37, at 3; similarly ECF No. 38, at 6)—a fact strongly

supported by nobody having signed the document—then it follows that they lack

any contractual footing to invoke the MLA's waiver and disclaimer provisions.

Conversely, if the Court credits DCG/Silbert's reliance on the MLA's disclaimer

clause to defeat liability (ECF No. 37, at 22-23), then DCG/Silbert acknowledges a

relationship so close to Genesis that it imputes liability from Genesis employees'

conduct (without even needing to address their own). Their waiver argument would

still fail for the reasons set out in §§ A–D, and ***personal jurisdiction against them***

***would be established.***

## F  Flaws in Defendants' Case Citations

Defendants DCG/Silbert cite the case *Yocca v. Pittsburgh Steelers Sports,*

*Inc.*, 854 A.2d 425 (Pa. 2004), as supporting their argument. *Yocca* involved

specific contractual language disclaiming reliance on the *exact type* of prior

representations at issue (stadium seating location representations in brochures)

within a fully integrated agreement. Id. at 500-01. However, *Yocca* did not involve

allegations of *subsequent* fraudulent documents or a pervasive scheme violating a consumer protection statute, as occurred here.

Additionally, unlike *Yocca*, 854 a.2d 425, the fraudulent representations at issue here were not specifically identified in any contract. No contract at issue in this case disclaimed reliance on intercompany loans, misleading tweets, fraudulent promissory notes, or false balance sheets. See also *Toy*, 593 Pa. at 54; accord *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644-45 (7th Cir. 2003) ("an integration clause does not bar a claim of fraud based on statements not contained in the contract")

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999) is a Second-Circuit admiralty decision compelling non-signatories to arbitrate because they sued *on* the contract conferring them unique, contract-dependent benefits. Plaintiffs' UTPCPL claim, by contrast, is a statutory tort under Pennsylvania law, turns on no contract interpretation, involves only incidental loan payments, and arises from an agreement that expressly disclaims third-party rights.

*ITT Corp. v. Lee*, 663 F. App'x 80 (2d Cir. 2016), is a poor match to this case. *ITT* dismissed an untimely attempt to recast a pure rep-and-warranty contract claim as fraud; here, prior deceptive statements *induced* Plaintiffs to enter into all

agreements, and statutory UTPCPL violations that impose duties independent of any contract, so the case has no bearing.

Defendants DCG/Silbert cite *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130 (2d Cir. 1997) to suggest that individual Plaintiffs waived their rights through the MLA (ECF No. 37 at 21). However, that case actually refused to treat the non-signatory corporation as an alter-ego and declined to bind it to the contract, holding that domination alone is insufficient *without proof the corporate form was used to perpetrate a specific fraud or wrong*. Here, Defendants' "bankruptcy fraud" allegations are not pled with particularity (Rule 9(b)), so there is no specific wrong conducted by Plaintiffs. The alleged deception was aimed at Plaintiffs, not originating from Plaintiffs. Moreover, *Am. Fuel* applied New-York veil-piercing doctrine to an arbitration clause, whereas this case turns on Pennsylvania UTPCPL rights—public-policy claims the Third Circuit treats as personal and non-derivative. And again, while Defendants DCG/Silbert do mention arbitration, they do so only to reserve an argument for later, not to use *Am. Fuel* to compel arbitration in their motions.

*Loc. Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107 (2d Cir. 2023) merely confirms that courts compel arbitration only when a collective-bargaining agreement's grievance clause unambiguously covers the dispute, a ruling that sheds no light on whether Plaintiffs' personal UTPCPL

claims were ever owned, assigned, or vitiated by fraud and therefore offers

Defendants no support on standing or alter-ego arguments.

*Rector v. Calamus Grp., Inc.*, 794 N.Y.S.2d 470 (N.Y. App. Div. 2005),

concerning the obligations of a third-party beneficiary, is inapposite as Plaintiffs'

UTPCPL claims are direct statutory tort actions against Defendants for their own

fraudulent conduct, not contract claims asserted as third-party beneficiaries of the

MLA. *Wilson v. Dantas*, 746 F.3d 530 (2d Cir. 2014) similarly concerns a non-

signatory's inability to enforce contractual terms and is inapposite because

Plaintiffs' UTPCPL claims are not attempts to enforce the MLA; they are distinct

tort claims.

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242 (2d Cir. 1988), a

Second Circuit case applying New York law to common law negligence claims in a

commercial construction dispute, is again unpersuasive against UTPCPL claims

governed by Pennsylvania law. *Morse/Diesel,* 859 F.2d 242 did not involve

allegations of direct fraud by the party invoking the contractual disclaimer against

the plaintiff. Plaintiffs here allege that Defendants DCG and Silbert directly

orchestrated and participated in the fraudulent scheme that induced Plaintiffs' harm

(AC ¶¶ 9, 90, 93, 103, 109, 111), including the creation of the misleading

promissory note. This direct, intentional tortious conduct is fundamentally different

from the scenario in *Morse/Diesel*, where the plaintiff subcontractor sought to hold

another subcontractor liable in negligence for economic losses *based on a contract* to which it was not a party and which expressly negated third-party duties.

*Smith*, 198 F.3d 88, which compelled a non-signatory to *arbitrate* based upon a contract dispute does not apply here because fraud induced the agreement at issue in this case.

## G  Conclusion on the MLA

Not only do Plaintiffs' allegations surpass the plausibility threshold relevant for this stage, *there exists no genuine dispute of material fact* over the non-applicability of the MLA waivers because the Defendants attached the entire text for the Court.

In sum, neither the waiver nor the integration clause in the MLA can shield Defendants DCG and Silbert from Plaintiffs' UTPCPL claim. Plaintiffs' claims arise from deception that is beyond the legitimate protective scope of such contractual clauses, and their enforcement to shield this alleged fraud would violate fundamental principles of Pennsylvania contract law and public policy.

# IV    THIS COURT POSSESSES PERSONAL JURISDICTION OVER ALL DEFENDANTS

## A  Pennsylvania's Governing Framework

Pennsylvania's long-arm statute extends "to the fullest extent allowed under the Constitution." 42 Pa. C. S. § 5322(b). Accordingly, the constitutional, three-part test controls:

1. *Purposeful direction:* the defendant purposefully availed himself of forum benefits or *expressly aimed* intentional conduct at the forum;

2. *Relatedness:* the claims arise out of or relate to that conduct; and

3. *Fair play:* exercising jurisdiction comports with traditional notions of fair play and substantial justice.

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007).

For intentional torts, the "*Calder* effects test" refines the first prong: (i) an intentional tort, (ii) foreseeable harm felt in the forum, and (iii) conduct *expressly aimed* at the forum. *Calder v. Jones*, 465 U.S. 783, 789–90 (1984); *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).

Contacts of a dominated subsidiary or of an agent/partner are imputed when the complaint plausibly pleads alter-ego domination or partnership/agency (see

41

*infra* App'x B for evidence supporting veil-piercing among the scheme's various entities.) *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101-02 (3d Cir. 2004).

Additionally, individual officers are personally answerable for torts in which they personally participate. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614 (1983).

*Wicks* states that:

> Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

*Wicks*, 503 Pa. at 621

## B  Six Interlocking Contacts Confer Jurisdiction on All Defendants

Personal jurisdiction can be conferred on all Defendants through the following logical chain:

1. *Intentional act:* On 30 June 2022 Defendants Silbert, Moro, and DCG executed a $1.1 billion demand promissory note payable to Genesis. (AC ¶¶ 9–10, 93).

2. *Fraudulent purpose:* All Defendants intentionally and maliciously executed the scheme, including signing the fraudulent promissory note. Evidence of scinter includes Silbert's acknowledgement of "veil piercing" liability (AC ¶ 117(d)) and Moro's acknowledgement to be careful about clients

"recording" (AC ¶ 72). The fraudulent note's text itself acknowledged "substantial doubts" about recovery of the massive loss. (AC Ex. B, at 1)

3. *Knowledge of Pennsylvania lenders:* Genesis' DDQ and mandatory KYC on *individual* Plaintiffs identified them as Pennsylvania residents, and Defendants' nationwide offering of the Gemini Earn program to customers in all 50 states necessarily informed them that additional Pennsylvania lenders participated. As Genesis's CEO, Moro knew those Pennsylvania lenders would reasonably rely on his insider assurances from his tweets. (AC ¶¶ 10, 15(b), 42, 47, 88(c), 92).

4. *Objective: reassure all lenders:* The promissory note's purpose was to calm Genesis lenders and stem withdrawals nationwide. (AC ¶¶ 101–03, 109).

5. *Forum-directed contact:* On September 23, 2022, Genesis e-mailed Plaintiffs in State College, Pennsylvania a false balance sheet that incorporated the Note (AC ¶¶ 94-97 & Ex. A). The fraudulent balance sheet was the culmination of a years-long course of Pennsylvania-directed misstatements from a scheme in which all Defendants participated (see AC ¶¶ 76-90, 94-105, Exs. F, H), so jurisdiction would be proper even if the Court looked at the total pattern rather than this one transmission.

6. *Imputation (App'x B)*

a. *DCG:* DCG signed the fraudulent promissory note. DCG exercised complete domination over Genesis, which also signed the fraudulent promissory note. It had 100 % ownership of Genesis, used inter-company loans for DCG stock buy-backs; pledged Grayscale Bitcoin Trust (GBTC) shares to further the Genesis scheme, exchanged employees between DCG subsidiaries and Genesis, and executed plans without Genesis's knowledge. (AC ¶¶ 115-29; *infra* App'x B). Participation and veil-piercing (see *infra* App'x B) impute the balance sheet act from Genesis to DCG. *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001)

b. *Silbert:* Silbert personally signed the promissory note, secretly directed Genesis's treasury, and managed other crisis-response activities without the knowledge of Genesis's board (AC ¶¶ 9, 108-09, 115-19, 122). *Miller Yacht*, 384 F.3d at 101-02; *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir. 1978) ("A corporate officer is individually liable for the torts he personally commits…").

c. *Moro:* Moro personally signed the promissory note, approved the public messaging, and posted the misleading 17 June tweet. (AC ¶¶ 10, 92-93). *Donsco*, 587 F. 2d 602

44

d. *Belmont bridge:* Defendants themselves invoke *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013), which confirms that an employee's UTPCPL violations may be imputed to the employer. By the same logic, Genesis employee Griffin Tiedy's Pennsylvania-directed transmission of the fraudulent balance sheet is imputable to Genesis and, given their domination and orchestration (*infra* App'x B), to DCG, Silbert, and Moro.

e. *Withdrawal no escape:* Jurisdiction attaches once the forum-directed tort is committed; a defendant's later resignation or retreat cannot erase those contacts. *Carteret Sav. Bank v. Shushan*, 954 F.2d 141 (3d Cir. 1992) (Louisiana lawyer's single New Jersey meeting sufficed for specific jurisdiction despite subsequent work elsewhere). Moro's resignation prior to September 2022 therefore does not negate his Pennsylvania contacts. Allowing Moro to avoid liability would imply that any corporate officer could conduct fraud in Pennsylvania and resign minutes later to escape blame.

Taking these facts as true, Defendants purposefully targeted Pennsylvania, Plaintiffs' claims arise directly from that conduct, each Defendant satisfies *Calder* and *Marten,* and jurisdiction is fair.

## C  Fair Play and Substantial Justice

Pennsylvania has a compelling interest in protecting resident investors: Plaintiffs' evidence and witnesses are located here; Defendants are headquartered in nearby New York. Modern communication reduces the burden of well-resourced defendants defending in Pennsylvania. See *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

## D  Defendants Carefully Word Their Briefs Regarding Pennsylvania Contacts

Defendants DCG/Silbert deny Pennsylvania jurisdiction by carefully wording their brief. These Defendants state "There still is no alleged basis to assert personal jurisdiction over DCG or Silbert who are not residents of or alleged to have taken any actions in or directed toward Pennsylvania in connection with the loans at issue" (ECF No. 37, at 6). The addition of the clause "in connection with the loans at issue" implies that DCG/Silbert acknowledge activities in Pennsylvania.

The Court should also note that DCG/Silbert do not deny having directed actions towards Pennsylvania related to Genesis, DCG, Gemini, the many DCG subsidiaries that commingled assets and employees, other passthrough LLCs, and individual customers' deposits that were ensnared in the fraudulent scheme in which DCG, Silbert and Moro participated.

46

Defendant Moro concedes in his brief the existence of "various internal correspondences." Moro's brief states: "Plaintiffs do not allege that they relied on, much less that they were injured by, Mr. Moro's June 17, 2022 tweet, Mr. Moro's signing the promissory note on behalf of Genesis on June 30, 2022, or Mr. Moro's ***participation in*** various internal correspondences." (ECF No. 38, at 18, emphasis added). These "various internal correspondences" likely contain references to Pennsylvania that support personal jurisdiction for Defendant Moro.

### E  Other Courts Have Already Refused to Dismiss Individual Defendants on the Grounds That They Personally Participated in the Fraudulent Scheme

Plaintiffs have provided a summary of the overwhelming evidence supporting veil piercing in App'x B, *infra*, and participation has already been ruled by other courts.

On April 9, 2025, after the AC in the instant case had been filed, a New York court, having devoted significant time to evaluating the exact same evidence referenced in this case, refused to dismiss claims related to Gemini's Earn passthrough program—a structure nearly identical to CM LLC's passthrough—against the same Defendants as the instant case. (*NYAG Action*, Dkt. No. 116). That court wrote: "In addition, individual defendants Silbert and Moro… are not entitled to dismissal at this juncture." Id. at 17. "Officers and directors are liable for a corporation's fraud where they either personally participate in the fraud or have

actual notice of its existence" *People v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012), aff'd 21 N.Y.3d 439 (2013). "OAG's allegations plainly establish that Silbert and Moro had knowledge of the purported fraud ***and participated in the overall scheme*** to cover up Genesis' liquidity hole…" (*NYAG Action*, Dkt. No. 116, at 17), emphasis added).

And, if the Court credits this finding, then it also cannot reasonably dismiss DCG for lack of personal jurisdiction, given that Silbert acted on behalf of DCG throughout the scheme, and because DCG was not dismissed from that case either.

### F  Alternatively, Limited Jurisdictional Discovery Is Warranted

Plaintiffs believe the evidence all Defendants participated in the fraudulent scheme is overwhelming. However, if the Court believes that a limited round of jurisdictional discovery is still required to assist in its analysis, Plaintiffs respectfully defer to whatever sequence, custodians, and search parameters the Court considers appropriate. At a minimum, discovery should encompass internal dashboards, compliance questionnaires, investor-relations materials, and Slack/Telegram (or comparable) channels that evidence Defendants' awareness of Pennsylvania lenders and their strategy for disseminating the $1.1 billion promissory note.

Such discovery is routinely granted once the complaint shows "reasonable particularity." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003); *Metcalfe v. Renaissance Marine, Inc.* states:

> We have explained that if "the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." (*Compagnie des Bauxites de Guinée v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983)) Furthermore, we have found jurisdictional discovery particularly appropriate where the defendant is a corporation.

*Metcalfe v. Renaissance Marine, Inc.*,
566 F.3d 324, 336 (3d Cir. 2009)

Indeed, where, as here, the pleadings already identify concrete internal communications (e.g., the "monitored Telegrams," (AC ¶ 74), Defendant Moro's "various internal correspondences" (ECF No. 38, at 18)), that are solely within Defendants' control, jurisdictional discovery is not speculative but *necessary*. *Eurofins Pharma U.S. Holdings v. BioAlliance Pharma S.A.*, 623 F.3d 147, 157-58 (3d Cir. 2010) (approving discovery when plaintiff's request rested on specific facts rather than a mere hope of finding them).

## G  Flaws in Defendants' Jurisdictional Case Citations

Defendants DCG/Silbert cite *Ciolli v. Iravani*, 651 F. Supp. 2d 356 (E.D. Pa. 2009) to review the requirements for jurisdiction stating: "But the lack of any alleged conduct by DCG or Silbert in or expressly aimed at Pennsylvania negates these elements." (ECF No. 37, at 33). They omit that earlier in the same case, that

49

court declared that "Plaintiff has presented sufficient factual allegations to demonstrate the need for jurisdictional discovery in this case" and awarded jurisdictional discovery. *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 292-93 (E.D. Pa. 2009). Here Plaintiffs plead direct, forum-targeted communications, so the case Defendants cited favors discovery.

Defendants DCG/Silbert cite *S. Seafood Co. v. Holt Cargo Sys., Inc.*, 1997 WL 539763 (E.D. Pa. Aug. 11, 1997). Since this is an unpublished opinion, and Defendants did not comply with Local Rule 7.8(a) which requires that unpublished opinions cited by a brief be accompanied as an attachment to said brief, Plaintiffs do not have access to the full text of this opinion. From performing research of second-hand sources that analyzed this case (this opinion's text is not electronically available in its court's online system), Plaintiffs believe that this case held that jurisdictional discovery is only warranted when it is not a mere "fishing expedition." If that summary is true, then the Defendants' use of this case is correct, and Plaintiffs believe that the specific communications mentioned throughout this section and the AC meet the standard of *S. Seafood*. If this analysis is incorrect, plaintiffs ask the court for leave to file a sur-reply to correct their interpretation of this case.

Unlike the plaintiff's insufficient allegations in *Vinco Ventures, Inc. v. Milam Knecht & Warner, LLP*, 2021 WL 4399682 (E.D. Pa. Sept. 27, 2021), where the

court found the plaintiff "made no effort in the first instance to plead any contacts or expressly aimed conduct" by four of the defendants (id., at *15), Plaintiffs here have made a substantial showing: the promissory note (AC ¶¶ 9, 10, 93), misrepresentations of Genesis's financial stability (AC ¶¶ 103, 108-109), knowledge of Pennsylvania residents like Plaintiffs (AC ¶¶ 15(b), 42, 47, 88(c)), and actual communications into Pennsylvania (AC ¶¶ 94, 97, 101, 105). These are not speculative assertions but specific factual allegations suggesting "with reasonable particularity" the possible existence of the requisite contacts and purposefully directed tortious conduct, warranting jurisdictional discovery to substantiate these claims regarding Defendants' precise knowledge and intent— information primarily within their control (AC ¶ 16).

In *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 203-04 (3d Cir. 1998), the court, quoting *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 300 (3d Cir. 1985), pointed out the "'stream of commerce' theory by which specific jurisdiction is asserted over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either "derived [a] substantial benefit from the forum state or had a reasonable expectation of [deriving a substantial benefit from it]". Here, Defendants clearly had a reasonable expectation of deriving substantial benefits—their large salary and stock appreciation (AC ¶¶

9(a), 10(a), 115)—from Plaintiffs' assets and the assets of other Pennsylvania depositors passing through companies into the Genesis scheme.

DCG/Silbert cite *Bolus v. Fleetwood Motor Homes of Ind., Inc.*, 2012 WL 3579609 (M.D. Pa. Aug. 17, 2012), but *Bolus v. Fleetwood* denied jurisdiction and discovery where the defendants' only forum "contacts" were national ads and a passive website; here Defendants sent loan documents, funds, and misleading balance-sheets directly into Pennsylvania. They also cite *D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft, Ltd.*, 566 F.3d 94 (3d Cir. 2009), which rejected jurisdiction where a Swiss manufacturer had *no forum-directed contacts*. The cited case *IMO Indus., Inc. v. Kieckert AG*, 155 F.3d 254 (3d Cir. 1998) held that letters sent to Italy and New York—only *incidentally forwarded* to New Jersey—were not "expressly aimed" at New Jersey. Here, numerous communications were sent directly into Pennsylvania: E-Mails, balance sheets, tweets, Telegram messages, and voice calls. None of these was a second-hand communication forwarded to Pennsylvania, and all of these contacts can be imputed to all Defendants.

Defendants DCG/Silbert's citation to *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147 (3d Cir. 1996), which analyzed personal jurisdiction based on contractual contacts for a breach of contract claim, is inapposite as Plaintiffs' claims arise under Pennsylvania's UTPCPL for fraudulent and deceptive conduct external to and inducing any contractual relationship.

Finally, *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001), is misplaced because unlike the broadly disseminated, untargeted communications in that case, the fraudulent scheme here involved direct misrepresentations predicated on the fraudulent note signed by Defendants DCG, Silbert, and Moro being communicated directly into Pennsylvania to known Pennsylvania residents to induce their reliance (AC ¶¶ 94, 97, 98-104).

### H  Conclusion On Personal Jurisdiction

The AC pleads specific, intentional conduct expressly aimed at Pennsylvania and at these Plaintiffs. The Court should deny Defendants' Rule 12(b)(2) motions. In the alternative, it should permit jurisdictional discovery.

## V  THE ASSIGNMENT OF CM LLC'S BANKRUPTCY CLAIM DOES NOT EXTINGUISH PLAINTIFFS' PERSONAL UTPCPL CLAIMS AGAINST DEFENDANTS

In addition to being equitably estopped from relying on CM LLC's assignment of claims (see § I, *supra*), Defendants also conflate CM LLC's *bankruptcy proof-of-claim* with the *personal UTPCPL claims* Plaintiffs assert against DCG, Silbert, and Moro. (ECF No. 37, § I; ECF No. 38, § I-C.) Because the Jefferies Leveraged Credit Products LLC (hereinafter "Jefferies") assignment transferred only CM LLC's creditor rights against the Genesis estate and could not,

as a matter of law, convey the individuals' statutory-fraud claims, Defendants'

extinguishment theory fails on multiple, independent grounds.

**A    Plaintiffs' UTPCPL Claim is Legally Distinct from the Assigned Bankruptcy Claim.**

The claim assigned to Jefferies and the claim asserted in this case are

fundamentally different in nature, origin, and target. The assigned claim was CM

LLC's right, as a creditor, to recover its deposited assets from the *Genesis*

*bankruptcy estate*. That claim was a claim for repayment of a debt or breach of the

deposit/loan agreement by *Genesis*, the debtor. See 11 U.S.C. § 101(5) (defining a

bankruptcy "claim" broadly as a right to payment or equitable remedy against the

debtor's estate).

In stark contrast, Plaintiffs' claim under the UTPCPL is a personal, statutory

tort claim asserted against *third-party non-debtors*—DCG, Silbert, and Moro. This

claim does not arise merely from Genesis's failure to repay; it arises from

Defendants' independent, fraudulent, and deceptive conduct *directed at Plaintiffs*

that induced their reliance and caused ascertainable loss. (AC, Count I). It is

predicated on duties imposed by statute to refrain from unfair or deceptive acts in

commerce, duties distinct from the contractual obligation of Genesis to repay its

debt. *In re Zisholtz*, 226 B.R. 824, 831 (Bankr. E.D. Pa. 1998) (quoting § 201-9.2

and holding that "any person who purchases… for personal, family or household

purposes… may bring a private action," thus confirming the UTPCPL right

belongs to the individual consumer-purchasers.) See also *Skurnowicz v. Lucci*, 798

A.2d 788, 795 (Pa. Super. 2002) ("An individual who purchases goods, including

real estate, may bring a private action to recover damages caused by another's 'act

or practice declared unlawful' by the UTPCPL.")

### B   New York Law Does Not Govern UTPCPL Claims and Pennsylvania Law Holds These Claims Unassignable

Defendants cite many New York cases, possibly to imply that New York law

governs the UTPCPL claims at issue. They then contradict themselves by citing

Pennsylvania law when convenient on other topics.

Pennsylvania's UTPCPL is a remedial, "fundamental-policy" statute that no

private contract may waive or re-route. Under Restatement (Second) of Conflict of

Laws § 187(2)(b), a contractual New-York governing-law clause is unenforceable

where (i) Pennsylvania has the materially greater interest in the issue and (ii)

applying New-York law would undermine a core Commonwealth policy. The Third

Circuit applied precisely that rule in *Kaneff v. Delaware Title Loans*, 587 F.3d 616

(3d Cir. 2009), refusing to honor a Delaware clause because it would gut

Pennsylvania's usury protections.

Pennsylvania long ago adopted—and has repeatedly reaffirmed—the rule

that unliquidated personal-tort claims are not assignable. See *Sensenig v. Pa. R.R.*,

229 Pa. 168, 172 (1910) ("a right of action for a pure tort is not the subject of assignment"); *Hurley v. Hurley*, 342 Pa. Super. 156, 160-161 (Pa. Super. 1985) (same, collecting cases). Pennsylvania courts have also held that assignment of malpractice claims to unrelated third parties—parties in a similar position to Jefferies—were champertous and invalid. *Frank v. TeWinkle*, 45 A.3d 434 (Pa. Super. 2012).

### C  The UTPCPL Claim Vests Personally in the Deceived Consumer and Was Never Owned by CM LLC.

A cornerstone of assignment law is that an assignor can only transfer the rights it actually possesses; the assignee stands in the shoes of the assignor and acquires no greater rights. *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 517 Pa. 522 (Pa. 1988); *Legal Cap., LLC v. Med. Pro. Liab. Catastrophe Loss Fund*, 750 A.2d 299 (Pa. 2000). Because CM LLC never held a UTPCPL cause of action, it had nothing to assign to Jefferies.

The UTPCPL grants a private right of action to "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss… as a result of" deceptive conduct. 73 P.S. § 201-9.2(a). Pennsylvania appellate courts treat that right as personal to the deceived consumer:

- *Toy*, 593 Pa. at 46-54  (plaintiff must show own justifiable reliance)

56

- *Weinberg v. Sun Co.*, 777 A.2d 442 (Pa. 2001) (same).

- *Gabriel,* 368 Pa. Super., at 396 (UTPCPL claim is "separate and distinct" from contract claims).

Federal courts applying Pennsylvania law likewise hold that a business entity cannot sue under the UTPCPL because its transactions are not "primarily personal, family or household." *Klitzner Industries, Inc. v. H.K. James Co.*, 535 F. Supp. 1249, 1258 (E.D. Pa. 1982).

Here, the AC alleges that Plaintiffs Stephen and Christopher Sokolowski— natural-person consumers—were the ones targeted by Defendants' misrepresentations, relied on the supposed safety of Genesis, and lost personal savings managed for household purposes (AC ¶¶ 4-5, 23, 94-97, 105, 130, 137-39). CM LLC, a nominal investment vehicle, neither purchased for household purposes nor personally "relied" on Defendants' deception. Consequently:

- CM LLC never owned a UTPCPL claim;

- Under *Hedlund*, 517 Pa. 522 and *Legal Capital*, 750 A.2d 299, it could not assign rights it lacked. See also *In re Enron Corp.*, 379 B.R. 425 at 436 (S.D.N.Y. 2007) ("an assignor cannot give more than he has"); and *In re KB Toys, Inc.*, 736 F.3d 247 at 252 (3d Cir. 2013)

("claims that are disallowable … must be disallowed no matter who

holds them"); and

- Jefferies acquired nothing that could extinguish the Plaintiffs' personal

  statutory fraud claim.

The UTPCPL cause of action "vests personally in the deceived consumer" and

remains wholly outside the Jefferies assignment.

### D  The Scope of the Assignment Did Not Encompass These Distinct Third-Party Tort Claims.

Even assuming CM LLC *could* theoretically possess rights related to the

UTPCPL claim, the scope of the assignment, understood in its context, did not

include these claims. Assignments, particularly standard forms used in bankruptcy

claim trading like the Notice of Transfer (ECF No. 37-2), are generally focused on

transferring the "Claim" against the debtor and associated rights necessary to

*recover on that Claim from the bankruptcy estate. In re KB Toys, Inc.*, 470 B.R.

331 (Bankr. D. Del. 2012) (purchasers take only the claim filed against the debtor).

> [W]hen a contract is ambiguous, it is undisputed that the rule of contra
> proferentem requires the language to be construed against the
> drafter… and in favor of the other party if the latter's interpretation is
> reasonable.

*PennDOT v. Semanderes*, 109 Pa. Commw. Ct. 505, 511 (1987)

Even if the Notice of Transfer could be read two ways, any residual ambiguity must be resolved against Jefferies, the party that supplied the form language, because Pennsylvania applies the *contra-proferentem* doctrine to all contracts. Jefferies is engaged in the business of purchasing *bankruptcy claims*, not personal tort actions, and Defendants point to no record of Jeffries ever pursuing a personal tort claim. And even if *contra-proferentem* is at issue, such a dispute is a matter for trial, not a reason for dismissal. See also *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595 (Pa. 1999) (contra-proferentem applied by Supreme Court); Restatement (Second) of Contracts § 206.

In conclusion, because the Notice of Transfer is confined to the bankruptcy-estate claim, and Pennsylvania law construes any doubt against the drafter, the assignment cannot bar Plaintiffs' personal UTPCPL cause of action.

### E  Defendants Introduced an Incomplete Contract

Under Rule 12(b)(6), the Court must accept Plaintiffs' well-pleaded assertions as true and draw all reasonable inferences in Plaintiffs' favor. Defendants are offering extremely broad characterizations of this claim assignment based upon a document ancillary to the full contract between Jefferies and CM LLC—the full contract which Defendants have not seen and which Plaintiffs have stated does not reference the type of UTPCPL tort claims at issue in this case (AC ¶ 134). Defendants' assertion that this summarized "Notice of Transfer" (ECF No.

59

37-2) with no qualifying text represents the meaning of the entire contract is again, at worst, a factual dispute to be settled at trial where additional evidence can be presented.

### F  CM LLC and its Agent Lacked Authority to Assign Plaintiffs' Individual Claims.

The assignment fails to bar Plaintiffs' claims because the assignor, CM LLC, lacked the legal authority to transfer the personal property rights of the individual Plaintiffs. Stephen Sokolowski executed the assignment agreement and Notice of Transfer explicitly *in his capacity* as "Owner" (this specific word is present in the docketed notice) of CM LLC. (ECF No. 37-2; AC ¶ 131). An agent acting on behalf of a principal (here, CM LLC) binds only the principal regarding matters within the scope of the agency. *Bolus v. United Penn Bank*, 363 Pa. Super. 247, 525 A.2d 1215 (Pa. Super. 1987) (An agent can bind his principal only when he acts within the scope of the authority conferred upon him by the principal.)

By statute, a Pennsylvania LLC is a legal entity distinct from its members. 15 Pa. Stat. Ann. § 8816(a). Pennsylvania's Power-of-Attorney Act requires specific language to empower an agent to "execute, assign, release or settle claims and litigation." 20 Pa. C.S. § 5602(a)(20). Actions taken on CM LLC's behalf therefore bind the LLC alone, not Plaintiffs in their individual capacities.

Because Defendants identify no document empowering CM LLC to give away Plaintiffs' personal UTPCPL claims, the Jefferies assignment conveyed only CM LLC's bankruptcy proof-of-claim and leaves Plaintiffs' consumer fraud cause of action untouched.

### G  Defendants Are Equitably Estopped (For A Second Reason) From Relying on the Assignment Document

Plaintiffs further allege that they sold CM LLC's bankruptcy claim only after Defendants allowed—and never denied—media reports that DCG had borrowed $575 million from Genesis to fund DCG share buybacks (AC ¶ 128; Silbert letter, Nov. 22, 2022). Concluding the estate had been gutted, Plaintiffs accepted Jefferies' low offer. Equity will not permit a party whose own misconduct induced that distressed sale to wield the assignment as a shield. See *Shapiro v. Shapiro*, 415 Pa. 503, 506 (1964) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945)): "…closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief").

### H  Flaws in Defendants' Case Citations

Again, many of the Defendants' case citations are inappropriate.

*Wrong Jurisdiction:* Defendants cite *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112. 125 (2d Cir. 1984), a 1984 Second-Circuit

decision applying New York contract law, for the proposition that an "unequivocal assignment" destroys standing. But again, as with many of the case citations, the UTPCPL is governed by *Pennsylvania* law. That case is neither binding here nor on point, and it addressed a private commercial assignment—unlike the consumer-protection rights conferred by Pennsylvania's UTPCPL.

*Arbitration: Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635 (Pa. Super. 1998) addresses the arbitrability of a UTPCPL claim between contracting parties; here, no party is a signatory to the MLA, arbitration is not at issue, and Plaintiffs' UTPCPL claim arises from pre-contract misrepresentations.

*Off-topic: In re Motors Liquidation Co.*, 689 F. App'x 95 (2d Cir. 2017) confirms only that an assignor loses standing as to the claim actually assigned. It nowhere suggests that a bankruptcy claim transfer sweeps in independent statutory torts against non-debtors**,** which is the question before this Court.

*Misleading: Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323 (3d Cir. 2022) stands for the unremarkable proposition that courts disregard conclusory allegations. Plaintiffs, however, provide specific facts: the assignment document (ECF No. 37-2) transfers only CM LLC's proof-of-claim; CM LLC never owned the personal UTPCPL claim; and no instrument authorizes CM LLC to alienate

Plaintiffs' individual rights (AC ¶¶ 94-97, 105, 130, 137-39). Those well-pleaded facts must be accepted as true at the Rule 12 stage.

*Incomplete*: In *Legal Capital*, 750 A.2d 299, the Pennsylvania Supreme Court enforced assignments of *liquidated* malpractice-judgment proceeds and held that the CAT Fund, as obligor, must remit payment to the assignee. The Court carefully noted "nothing in the Act prohibits … assignment of settlements or awards," Id. at 301-302 and applied settled principles that an assignee stands in the shoes of the assignor, but in this case, the Defendants posit transfer of an *unliquidated, punitive, and personal UTPCPL claim*—a right CM LLC never possessed—without identifying any instrument of assignment or statute permitting such transfers.

*Unsupported conclusions:* All Defendants invoke *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 877 F. Supp. 2d 228 (M.D. Pa. 2012) ("Wolfe I") to argue that the UTPCPL claims are assignable. However, in *Wolfe I*, the district court denied Allstate's motion to dismiss the UTPCPL claim primarily because Allstate failed to meet its burden of persuasion. The court explicitly noted, "Allstate submits no authority to this Court supporting its position that UTPCPL claims are unassignable as either a statutory penalty or a claim for unliquidated tort damages. … ***Allstate presents neither argument nor example*** supporting its broad assertion that the claim is invalid and must be dismissed. Accordingly, we find no merit in

63

this argument..." Id. at 231-32 (emphasis added). Thus, *Wolfe I* was not a broad, affirmative ruling that all UTPCPL claims are inherently assignable; rather, its decision rested on the *defendant's failure in that specific instance* to adequately support its non-assignability argument. It did not establish a general rule of UTPCPL assignability overriding Pennsylvania's traditional prohibition against assigning personal torts.

More importantly, the subsequent Pennsylvania Supreme Court decision in the same litigation, *Allstate Prop. & Cas. Ins. Co. v. Wolfe*, 105 A.3d 1181 (Pa. 2014) ("Wolfe II"), addressed only the assignability of statutory bad-faith claims under 42 Pa. C.S. § 8371. That court explicitly stated: "[The UTPCPL] is outside the scope of our present review." Id. at 1188. This definitive statement from Pennsylvania's highest court means it did not affirm or adopt any ruling from *Wolfe I* concerning UTPCPL assignability. The *Wolfe II* court's rationale for allowing assignment of § 8371 bad-faith claims—that they "supplement" pre-existing, contract-based rights and facilitate unitary adjudication of a bad-faith dispute (id. at 1189)—is fundamentally different from the nature of UTPCPL claims. which (i) arise independently of any assignable contract right, (ii) hinge on each consumer's individual reliance, and (iii) fall squarely within Pennsylvania's general bar on assigning personal-tort claims.

*Wolfe I*'s comment on UTPCPL assignability was based on a failure of proof by the defendant, and *Wolfe II* expressly sidestepped the issue, leaving intact the established Pennsylvania principle that personal tort claims, such as the UTPCPL claims asserted by Plaintiffs here, are not assignable.

**I   Conclusion on Assignment**

For these independent reasons—the fundamental distinction between the claims, CM LLC's lack of ownership of the personal UTPCPL claims, the limited scope of the assignment, and the lack of authority to transfer individual rights—the assignment of CM LLC's bankruptcy claim presents no bar to Plaintiffs' prosecution of their UTPCPL claims against these Defendants.

**VI   DEFENDANTS MISREPRESENT PLAINTIFFS' POSITIONS**

Defendants misrepresent several of Plaintiffs' positions.

**A   Defendants Introduce Improper Evidence and Factual Disputes**

Defendants DCG/Silbert selectively quote multiple external writings by Plaintiff Stephen Sokolowski (ECF No. 37, at 8). Consideration of such materials, which are not attached to or integral to the AC, is forbidden unless the Court elects to convert the motion to one for summary judgment. Should the Court decide to do so, Plaintiffs must be permitted to introduce hundreds of other relevant and contrary blog posts. See *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998

F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally

consider only the allegations in the complaint, exhibits attached to the complaint,

and matters of public record."); Fed. R. Civ. P. 12(d).

Additionally, Defendant Moro states that it was "implausible" for him to

know the details of all of Genesis's customers (ECF No. 38, at 7) despite Genesis's

CFO having contacted Plaintiff Christopher Sokolowski. While evidentiary rules

do not permit Plaintiffs to respond to this issue at this time, the Court must

recognize that Moro's statement is a factual assertion that Plaintiffs dispute and

which is not dispositive for this motion. (Rule 12(d)).

Finally, Defendants did not comply with Local Rule 7.8(a). Local Rule

7.8(a) requires that "a copy of any unpublished opinion which is cited must

accompany the brief as an attachment." This noncompliance provided an additional

burden to plaintiffs to hunt for and obtain the text of these unpublished sources

through various third parties. Plaintiffs believe they have been able to obtain the

original text of all except one of the unpublished opinions cited in Defendants'

briefs (the exception being *S. Seafood Co. v. Holt Cargo Sys., Inc.*, 1997 WL

539763 (E.D. Pa. Aug. 11, 1997), which is not electronically available from the

court) and have included the text they have obtained of the Defendants' cited

unpublished opinions as an attachment to the instant brief, in addition to the full

text of the other unpublished opinions cited in the instant brief. Should the

Plaintiffs have acquired and analyzed the incorrect text of an unpublished opinion cited in the Defendants' briefs, Plaintiffs intend to ask the court for leave to submit a sur-reply to correct any misinterpretation.

### B  Plaintiffs Never Referred To CM LLC As A "Sham"

Defendants DCG/Silbert inaccurately imply that Plaintiffs "concede" various facts about CM LLC throughout their briefs. Most importantly, DCG/Silbert repeatedly use the term "sham" (ECF No. 37, at 4, 5, 20) in reference to CM LLC—a word that appears nowhere in Plaintiffs' complaints or briefs. The Court should be careful to avoid being influenced by this framing. Plaintiffs have always maintained that that CM LLC "is a *nominal* Pennsylvania limited liability company formed solely to meet Genesis deposit thresholds." (AC ¶ 8).

### C  Plaintiffs Are Not Judicially Estopped

Defendants DCG/Silbert claim that Plaintiffs either committed bankruptcy fraud or violated Rule 11(ECF No. 37, at 4), which Plaintiffs rebuff. Plaintiffs have never represented to any court that they lacked the UTPCPL claim. Defendants have not actually moved to impose any sanctions in any court and point to no indictment. Defendants speculate but provide no evidence of inconsistency in Plaintiffs' position—let alone bad faith or intent to commit fraud.

### D  Defendants Conflate Plaintiffs' Damages Request

Defendants DCG/Silbert's brief states that "Plaintiffs even seek to recover…
the 'exact coins' that CM [LLC] lent to Genesis" (ECF No. 37, at 20) and therefore
Plaintiffs' and CM 's claims are inseparable.

Plaintiffs pleaded rescission and restitution in the complaint (Prayer ¶ (d)),
requesting the "same number of coins." (AC ¶ 152).  Plaintiffs would never have
deposited any money into the fraudulent scheme but for Defendants'
misrepresentations and the false balance sheet. Because *fraud vitiates even the
most solemn contracts* and empowers a court of equity to restore the status quo
ante (see *Frowen v. Blank,* 425 A.2d 412 (Pa. 1981)), the MLA and its term sheets
are voidable at Plaintiffs' option once the fact-finder credits the allegations.

## VII    PLAINTIFFS EXHAUSTIVELY DESCRIBE THE FRAUD AND THEIR RELIANCE

### A   Plaintiffs Adequately Plead Fraud

Plaintiffs adequately plead fraud from *start to finish*. Rule 9(b) demands that
a fraud claim "state the circumstances of the alleged fraud with sufficient
particularity to place the defendant on notice of the *precise misconduct* with which
[it] is charged," supplying "the *date, time and place* of the alleged fraud or
otherwise inject[ing] precision or some measure of substantiation." *Frederico v.*

*Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) citing *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)

The AC meets that standard throughout the lifecycle of the scheme:

- *Who:* Genesis personnel acting at the direction of Silbert and Moro (AC ¶¶ 9-10, 23, 76-78, 90-93)

- *What:*

  o Early-on marketing and onboarding statements that Genesis made "loans" that were collateralized, low-risk, and supported by a "blue-chip" balance-sheet (AC ¶¶ 23, 29, 41, 48, 76-81 & Exs. H, K)

  o Moro's June 17, 2022 tweet falsely assuring lenders Genesis had "moved on" from the 3AC collapse (AC ¶ 92 & Ex. E)

  o The $1.1 billion fraudulent promissory note executed June 30, 2022 to plug the balance-sheet hole (AC ¶¶ 93-95 & Ex. B)

  o The September 23, 2022 balance sheet listing that note as a "current asset" (AC ¶¶ 94-105 & Ex. A)

  o Numerous other misrepresentations and false statements from Genesis employees directed by Defendants; imputed to Defendants through veil piercing and participation in the fraudulent scheme

- *When / Where:*

    o Specific chats and e-mails between March 2021 and April 2022 during account opening and false statements about the nature of Genesis's service

    o The public tweet on June 17, 2022

    o The note signed in New York on June 30, 2022

    o The balance sheet sent into Pennsylvania on September 23, 2022

- *How:* Each misstatement hid Genesis's true insolvency, induced Plaintiffs to open the account, to keep 90 % of their savings on platform, and to renew twice, causing the loss pleaded at AC ¶¶ 97, 101-06, 130-39.

Exhibits attached to the AC (website captures, Telegram logs, lending agreements, tweet, note, balance-sheet) "inject precision" and corroborate every element, satisfying Rule 9(b).

## B  Defendants' Reliance Cases Do Not Apply

In *Francis v. Humana, Inc.*, 2025 WL 365687 (M.D. Pa. Jan. 31, 2025), the court dismissed a *bare-bones* complaint—without prejudice—for lack of factual specificity. *Henehan v. Penn Anthracite Colliers Co.*, 2023 WL 4854831 (M.D. Pa. July 11, 2023) dismissed a complaint alleging only an insurer's failure to pay (non-

70

feasance) and no reliance, whereas Plaintiffs here plead detailed affirmative misstatements, malfeasance, and explicit justifiable reliance.

Defendants also argue that Plaintiffs could not have relied on the $1.1 billion promissory note itself if they were unaware of its specific terms when receiving the September 2022 balance sheet, citing *Weinberg*, 777 A.2d 442, which requires a private UTPCPL plaintiff alleging deceptive conduct to prove justifiable reliance on the defendant's misrepresentation. Their argument misses the point of fraudulent concealment and misrepresentation. Plaintiffs justifiably relied on the misleading financial picture presented in the balance sheet (AC ¶¶ 94, 97, 101, 105), which falsely portrayed Genesis as solvent and liquid. This misrepresentation was a direct result of Defendants' actions in creating and signing the note. The entire purpose of Defendants' overall scheme, including the creation and classification of this note, was to conceal Genesis's true financial instability from lenders like Plaintiffs (see Factual Background, *supra*, at 2).

Defendants wrongly cite several cases where fraudulent conduct was not pleaded. The UTPCPL misrepresentation claim in *Loften v. Diolosa*, 2008 WL 2994823 (M.D. Pa. July 31, 2008) was dismissed—without prejudice—because the plaintiffs held nonspecific and inconsistent positions such as explicitly pleading "no contact… whatsoever" with the defendant mortgage company. *Odell v. CIT Bank, N.A.*, 2017 WL 3675401 (E.D. Pa. Aug. 24, 2017) is inapposite because

71

*Odell* was dismissed for a failure to allege any specific deceptive acts. Plaintiffs'

AC, in contrast, alleges direct, affirmative fraudulent acts by DCG, Silbert, and

Moro, including their personal involvement in the creation of the fraudulent $1.1

billion promissory note and their orchestration of Genesis's misleading financial

presentation (AC ¶¶ 9, 90, 93, 103, 109, 111).

### C  Treble Damages Are Not Only Warranted, but Required Due to Defendants' Egregious Conduct

Should the Court find Defendants' conduct intentional or reckless, the

UTPCPL authorizes an award of "up to three times the actual damages sustained."

73 P.S. § 201-9.2(a). Pennsylvania appellate courts repeatedly affirm the

availability of such relief when, as alleged here, the deception is deliberate. *See*

*Schwartz v. Rockey*, 593 Pa. 536 (2007); *Skurnowicz*, 798 A.2d 788. Plaintiffs

therefore preserve their request for treble damages, to be addressed after liability is

determined.

## VIII CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court DENY the

Defendants' motions: *Soichiro "Michael" Moro's Motion to Dismiss Plaintiffs'*

*Amended Complaint* (ECF No. 24) and *Motion of Digital Currency Group, Inc.*

*and Barry E. Silbert to Dismiss Plaintiffs' Amended Complaint* (ECF No. 25) with prejudice.