# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-PJC

Hon. Phillip J. Caraballo

## ATTACHMENT OF UNPUBLISHED OPINIONS CITED

As specified by Local Rule 7.8(a), the following unpublished opinions cited

in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to

Dismiss are included:

*Bolus v. Fleetwood Motor Homes of Ind., Inc.*,
    2012 WL 3579609 (M.D. Pa. Aug. 17, 2012)

*Branche v. Wells Fargo Home Mortg., Inc.*,
    624 F. App'x 61 (3d Cir. 2015)

*Francis v. Humana, Inc.*,
    2025 WL 365687 (M.D. Pa. Jan. 31, 2025)

*Henehan v. Penn Anthracite Colliers Co.*,
    2023 WL 4854831 (M.D. Pa. July 11, 2023)

*In re Motors Liquidation Co.*,
    689 F. App'x 95 (2d Cir. 2017)

*ITT Corp. v. Lee*,
    663 F. App'x 80 (2d Cir. 2016)

*Loften v. Diolosa*,
    2008 WL 2994823 (M.D. Pa. July 31, 2008)

*Odell v. CIT Bank, N.A.*,
    2017 WL 3675401 (E.D. Pa. Aug. 24, 2017)

*Segal v. Zieleniec*,
    2015 WL 1344769 (E.D. Pa. Mar. 24, 2015)

*Taylor v. Creditel Corp.*,
    2004 WL 2884208 (E.D. Pa. Dec. 13, 2004)

*Tracy v. P.N.C. Bank, N.A.*,
    2021 WL 3682198 (W.D. Pa. Aug. 19, 2021)

*Vinco Ventures, Inc. v. Milam Knecht & Warner, LLP*,
    2021 WL 4399682 (E.D. Pa. Sept. 27, 2021)

*Walden v. BNY Mellon*,
    No. 2:20-cv-01972-CRE (W.D. Pa. Apr. 10, 2024)

*Walden v. BNY Mellon*,
    No. 2:20-cv-01972-CBB (W.D. Pa. Dec. 16, 2024)

*People v. Gemini Trust Co., LLC et al.*,
    No. 452784/2023 (N.Y. Sup. Ct.)

Dated: May 27, 2025

Respectfully submitted,


/s/ Stephen H. Sokolowski

Stephen H. Sokolowski, Pro Se

3178 Carnegie Drive

State College, PA 16803

(814) 600-9800

steve@shoemakervillage.org


/s/ Christopher H. Sokolowski

Christopher H. Sokolowski, Pro Se

3178 Carnegie Drive

State College, PA 16803

(814) 600-9804

chris@shoemakervillage.org

**ROBERT BOLUS, individually, and d/b/a BOLUS TRUCK SALES CENTER, Plaintiffs,**

**v.**

**FLEETWOOD MOTOR HOMES OF IN, INC., TOM JOHNSON CAMP CENTER, and CUMMINS ATLANTIC, Defendants.**

<u>Civil Action No. 3:11-2027.</u>

**United States District Court, M.D. Pennsylvania.**

August 17, 2012.

# MEMORANDUM

A. RICHARD CAPUTO, District Judge.

Presently before the Court are motions to dismiss Plaintiffs' Complaint filed by Defendants Cummins Atlantic ("Cummins") (Doc. 15) and Tom Johnson Camping Center Charlotte, Inc. ("Tom Johnson"). (Doc. 17.) Plaintiffs Robert Bolus ("Bolus") and Robert Bolus Truck Sales Center assert a number of claims against the three named Defendants related to a recreational vehicle (the "RV") that Plaintiffs purchased from Tom Johnson and was manufactured by Fleetwood Motor Homes of IN, Inc. ("Fleetwood"). Defendants Cummins and Tom Johnson move to dismiss the Complaint based on lack of personal jurisdiction and improper venue. Because these Defendants do not have "continuous and systematic" contact with this forum and have not "purposefully availed themselves of the privilege of conducting activities with the forum," the Court cannot exercise personal jurisdiction over Cummins and Tom Johnson. However, because statute of limitations issues may arise as a result of the time that has lapsed between the filing of this action and now, justice requires that the action be transferred to the Middle District of North Carolina.

# I. Background

Plaintiffs commenced this action against Fleetwood, Cummins, and Tom Johnson alleging that jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. §§ 1332, 1391. (*Compl.,* ¶¶ 1-3.)

Plaintiff Bolus is an adult citizen of Pennsylvania and Plaintiff Bolus Truck Sales Center is a business existing under the laws of Pennsylvania. (*Id.* at ¶¶ 4-5.) Defendant Fleetwood is a business organized under the laws of Indiana with a principal place of business in Indiana. (*Id.* at ¶ 7.) Fleetwood is in the business of manufacturing motor coaches. (*Id.* at ¶ 10.)

Defendant Tom Johnson is a North Carolina corporation with a principal place of business in North Carolina. (*Id.* at ¶ 8) Tom Johnson is a licenced dealer of Fleetwood motor coaches and is also a full service repair center of motor coaches. (*Id.* at ¶¶ 11-12.)

Defendant Cummins is a North Carolina limited liability company with a principal place of business in North Carolina. (*Id.* at ¶ 9.) Cummins is in the business of manufacturing engines for motor coaches. (*Id.* at ¶ 27.)

Bolus was the owner of a 2007 Revolution L.E., Class A Motor Home. (*Id.* at ¶ 13.) In an attempt to upgrade his motor home, Bolus contacted employees or representatives for Tom Johnson and Fleetwood from his residence and business located in Pennsylvania. (*Id.* at ¶ 14.) Bolus informed Tom Johnson and Fleetwood of his desired specifications for the RV, including an engine with at least 425 horse power. (*Id.* at ¶¶ 15-16.) Tom Johnson then informed Bolus that Fleetwood was manufacturing an RV for an order that had recently been canceled. (*Id.* at ¶ 17.)

On or about October 12, 2009, Bolus visited Fleetwood's manufacturing plant in Indiana to inspect the RV. (*Id.* at ¶ 18.) At this time, Bolus was informed that the RV was equipped with a 425 horse power engine. (*Id.* at ¶ 19.) This was confirmed by the RV's window sticker. (*Id.*) Bolus then entered into an agreement to purchase the RV manufactured by Fleetwood and sold through Tom Johnson. (*Id.* at ¶ 20.)

After Bolus purchased the RV, he attempted to drive the vehicle to Florida. (*Id.* at ¶ 22.) During the trip, however, he noticed that the RV lacked power. (*Id.*) As such, he took the vehicle to Tom Johnson's service repair center in North Carolina. (*Id.*) Bolus agreed to leave the RV for repair and inspection and told Tom Johnson that he would return for it around Thanksgiving. (*Id.* at ¶¶ 24-25.)

Due to the lack of engine power, Tom Johnson sent the RV to Cummins, the manufacturer of the engine, for repair. (*Id.* at ¶¶ 26-27.) Despite the RV's window sticker, Cummins determined that the RV was not equipped with a 425 horse power engine. (*Id.* at ¶ 28.) Cummins then upgraded the engine. (*Id.* at ¶ 29.) However, while the RV was at Cummins' facility for repairs, the RV was vandalized causing a large amount of damage. (*Id.* at ¶ 30.)

Bolus learned of the vandalism once he returned to Tom Johnson's facility in North Carolina to pick up the RV. (*Id.* at ¶ 31.) Bolus then drove the RV to a service center in Florida and waited for payment from Cummins to have the RV repaired. (*Id.* at ¶¶ 32-33.) Cummins, however, did not provide enough money to pay for all of the necessary repairs, and Plaintiffs' attempts to obtain additional money were unsuccessful. (*Id.* at ¶¶ 34-37.) On or about September 2010, Bolus returned the RV to Tom Johnson for additional repairs and the RV has remained there ever since. (*Id.* at ¶¶ 39-40.)

As a result of the foregoing events, Plaintiffs commenced the present action on October 31, 2011 asserting a number of state law claims against Defendants. On March 19, 2012, Defendant Fleetwood filed an Answer with Affirmative Defenses. Thereafter, on May 4, 2012, Defendant Cummins filed a motion to dismiss (Doc. 15), and on May 14, 2012, Defendant Tom Johnson filed a motion to dismiss. (Doc. 17.) Both motions seek dismissal for lack of personal jurisdiction and improper venue. As the motions have now been fully briefed, they are ripe for disposition.

## II. Discussion

## A. Personal Jurisdiction

While the Court can accept Plaintiff's allegations regarding jurisdiction as true for purposes of the motions to dismiss, "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 147 (3d Cir. 1992) (internal citation omitted).

District courts are permitted to exercise personal jurisdiction over a nonresident to the extent allowed under the laws of the state where the district court sits. Fed. R. Civ. P. 4(e); *Pennzoil Prods. Co. v. Colelli & Assoc., Inc.*, 149 F.3d 197, 200 (3d Cir. 1998). Pennsylvania's long-arm statute, 42 Pa. Cons. Stat. Ann. § 5322, "permits Pennsylvania courts to exercise personal jurisdiction over nonresident defendants `to the constitutional limits of the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992)).

Such due process requires that an out-of-state defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)); *see also Goodyear Dunlop Tires Operations v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796 (2011) (affirming that "[t]he canonical opinion in this area remains *International Shoe*"). Due process also requires some voluntary action by the defendant; this action serves as "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (citations omitted).

Having the requisite contacts with the forum state may subject the defendant to either general jurisdiction or specific jurisdiction. General jurisdiction allows a court to "hear any and all claims against [a party]" when their affiliations with the State are so `continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851 (citing *International Shoe*, 326 U.S. at 317). The hallmark of general jurisdiction is "continuous and systematic" contacts with the forum state, even where the cause of action is unrelated to those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

Specific jurisdiction, on the other hand, "arises out of" or "relates to" the cause of action when the contacts are "isolated or specific." *Burger King*, 471 U.S. at 472-73. It depends not on an entity's overall vulnerability to suit in a forum, but "on an

`affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." _Goodyear_, 131 S.Ct. at 2851 (citing von Mehren & Trautman, _Jurisdiction to Adjudicate: A Suggested Analysis,_ 79 Harv. L. Rev. 1121, 1136 (1966)).

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of an action where the district court lacks personal jurisdiction over the defendant. Once a defendant raises a jurisdiction defense, "the plaintiff must `prove by affidavits or other competent evidence that jurisdiction is proper.'" _Metcalfe v. Renaissance Marine, Inc.,_ 566 F.3d 324, 331 (3d Cir. 2009) (quoting _Dayhoff Inc. v. H.J. Heinz Co.,_ 86 F.3d 1287, 1302 (3d Cir. 1996)). And, where, as here, there has been no evidentiary hearing, "`the plaintiffs need only establish a _prima facie_ case of personal jurisdiction.'" _Id._ (quoting _O'Connor v. Sandy Lane Hotel Co.,_ 496 F.3d 312, 316 (3d Cir. 2007)). Plaintiffs argue that the Court may assert either general or specific jurisdiction over Cummins and Tom Johnson.

## 1. General Jurisdiction

"When the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its _in personam_ jurisdiction when there are sufficient contacts between the State and the foreign corporation." _Helicopteros,_ 466 U.S. at 414. "A court may exercise general jurisdiction over a defendant where he or she has `continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action." _Metcalfe,_ 566 F.3d at 334 (citing _Helicopteros,_ 466 U.S. at 416). "In considering general jurisdiction, we must look to all defendants' contacts, which must be `extensive and pervasive. . . .'" _Lolli v. Parc Mgmt., LLC,_ No. 11-1372, 2012 WL 688475, at *3 (M.D. Pa. Mar. 2, 2012). Thus, "[t]he standard for evaluating whether minimum contacts satisfy the test for general jurisdiction is more stringent than the test applied to questions of specific jurisdiction." _Saudi v. Acomarit Maritimes Servs., S.A.,_ 114 F. App'x 449, 453 (3d Cir. 2004) (citing _Noonan v. Winston Co.,_ 135 F.3d 85, 93 (1st Cir. 1998)).

_Helicopteros Nacionales de Colom. v. Hall_ considered whether a Texas state court could exercise jurisdiction over a Colombian corporation ("Helicol") for the crash of one of its helicopters in Peru. 466 U.S. 408, 409, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984). The combined contacts with the Texas forum included "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas corporation] for substantial sums; and sending personnel to . . . Fort Worth for training." _Id._ at 416, 104 S. Ct. 1868. These contacts were not trivial; the helicopters purchased in Texas constituted 80% of Helicol's fleet and constituted more than four million dollars of commerce over seven years preceding the accident. _Id._ at 411, 104 S. Ct. 1868. Still, the Court held that these contacts did not "constitute the kind of continuous and systematic general business contacts" necessary for general jurisdiction. _Id._ at 412, 104 S. Ct. 1868. In finding as much, the Court promulgated a long list of considerations it found relevant to a lack of jurisdiction:

> Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited an employee in Texas. In addition, Helicol never has owned real or personal property in Texas and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State.

_Id._ at 411, 104 S. Ct. 1868.

As to Cummins, it is a North Carolina business with its principal place of business in North Carolina. (_Jordan Aff.,_ ¶¶ 3-4.) Cummins has no investors, board members, partners, shareholders, officers, employees, contractors, or agents in Pennsylvania. (_Id._ at ¶ 7.) Nor does Cummins have any offices, bank accounts, business addresses, phone numbers, or listings in Pennsylvania. (_Id._ at ¶ 8.) It is also not registered nor licensed to do business in the Commonwealth of Pennsylvania, it does not own, rent, or lease property in Pennsylvania, and it has never paid any Pennsylvania taxes. (_Id._ at ¶¶ 8-11.) Lastly, Cummins has never been a party to litigation in Pennsylvania. (_Id._ at ¶ 12.)

Similarly, Tom Johnson is a North Carolina corporation with its principal place of business in North Carolina. (_Stroud Aff.,_ ¶ 2.) It has never registered to conduct business in Pennsylvania and has never paid any Pennsylvania taxes. (_Id._ at ¶¶ 9, 10.) Tom Johnson does not maintain any offices or addresses in Pennsylvania, nor does it have any investors, board members, partners, shareholders, officers, employees, contractors, or agents in Pennsylvania. (_Id._ at ¶¶ 6-7.) It also does

not own, rent, lease, or sublease any property in Pennsylvania. (*Id.* at ¶ 8.) Tom Johnson does not advertise or market in Pennsylvania. (*Id.* at ¶ 5.) It also did not solicit Plaintiffs. (*Id.* at ¶ 12.)

Nevertheless, Plaintiffs allege that Defendants' activities within the forum in the form of Tom Johnson's advertisements in RV magazines, Cummins maintaining a toll-free number, Defendants' websites, and communications with Plaintiffs while they were in Pennsylvania sufficiently form the basis for general personal jurisdiction.

## a. Advertisements in Magazines

Pennsylvania district courts have "previously held that advertisements and solicitations alone are insufficient to support general personal jurisdiction over nonresidents corporations, . . . even where those efforts were targeted specifically at Pennsylvania residents." *Rivera v. Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 616 (E.D. Pa. 2011) (citing *Ferro v. Atl. City Showboat, Inc.*, No 07-1016, 2007 WL 4275506, at *3 (E.D. Pa. Dec. 3, 2007); *Feldman v. Bally's Park Place, Inc.*, No. 05-5345, 2006 WL 1582331, at *3 (E.D. Pa. June 5, 2006)). Similarly, the Third Circuit has determined that advertising in "non-Pennsylvania newspapers with international circulations . . . does not constitute `continuous and substantial' contacts with the forum state." *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 542 (3d Cir. 1985).

Here, while Plaintiffs assert that they learned about Tom Johnson through advertisements in RV magazines, (*Bolus Aff.*, ¶ 12), this evidence is simply not extensive and pervasive enough to confer general jurisdiction. As such, Defendants' advertising activities in RV magazines does not give rise to general personal jurisdiction in this forum.

## b. Toll-Free Phone Number

Plaintiffs also suggest that general personal jurisdiction is proper as to Cummins because it has a 1-800 number. However, "providing a toll-free phone number without more specific targeting of the forum state is insufficient for general personal jurisdiction." *Brown v. AST Sports Sci., Inc.*, No. 01-1682, 2002 WL 32345935, at *8 (E.D. Pa. June 28, 2002) (citing *S. Morantz Inc. v. Hang & Shine, Ultrasonics, Inc.*, 79 F. Supp. 2d 537, 540-41 (E.D. Pa. 1999); *Composite Marine Propellers, Inc. v. Vanderwoude*, 741 F. Supp. 873, 878 (D. Kan. 1990)). Accordingly, the fact that Cummins maintains a toll-free number is an insufficient basis to conclude that it is subject to general personal jurisdiction in Pennsylvania.

## c. Defendants' Websites

Plaintiffs also assert that Defendants' websites subject it to general jurisdiction in Pennsylvania. In determining whether a website confers personal jurisdiction, courts in the Third Circuit consider:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper . . . At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction . . . The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the website.

*Henning v. Suarez Corp.*, 713 F. Supp. 2d 459, 469 (E.D. Pa. 2010) (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). And, "[c]ourts have recently placed particular emphasis on the need for a website to specifically target a forum in order for it to serve as a basis for general jurisdiction." *Id.* (citing *Davis v. PNGI Charles Town Gaming, LLC*, No. 07-2352, 2007 WL 4553695, at *6 (E.D. Pa. Dec. 26, 2007)).

In this case, it appears that this case falls somewhere in the middle ground: Tom Johnson and Cummins' websites both primarily serve as advertisements of their services, but they also allow users to exchange information via the internet. Thus, the nature and quality of commercial activity that Tom Johnson and Cummins conduct over the internet, and especially activity directed at Pennsylvania, must be considered. *See, e.g., Live Face on Web, LLC v. Highview Travel, LLC,* No. 11-2497, 2012 WL 246016, at *5 (E.D. Pa. Jan. 25, 2012). Plaintiffs, however, do not allege that Defendants targeted or selectively directed promotional activities at Pennsylvania. Nor do Plaintiffs allege that Cummins or Tom Johnson sold products to consumers over the internet. Accordingly, Defendants' websites do not give rise to general jurisdiction in Pennsylvania.

## d. Telephone and E-Mail Communications

Lastly, Plaintiffs assert that an unspecified number of telephone and email communications with Tom Johnson and Cummins employees or representatives establishes general jurisdiction in this forum. However, district courts in the Third Circuit have routinely determined that a non-resident defendant's participation in telephone calls with a resident plaintiff is insufficient to establish general jurisdiction. *See, e.g., Tangible Value, LLC v. Town Sports Int'l Holdings, Inc.,* No. 10-1453, 2011 WL 773218, at *10 (D. N.J. Feb. 28, 2011) ("several phone calls" with plaintiff was insufficient to demonstrate that defendant had continuous and systematic contact with New Jersey); *Kubin v. Orange Lake Country Club, Inc.,* No. 10-1643, 2010 WL 3981908, at *3 (D. N.J. Oct. 8, 2010) ("ten phone calls Defendant made soliciting Plaintiffs to purchase more timeshares, or to sell their own timeshare, are insufficient to establish general jurisdiction"); *Davis v. PNGI Charles Town Gaming, LLC,* No. 07-2352, 2007 WL 4553695, at *5 (E.D. Pa. Dec. 26, 2007) (the defendant's "telephone solicitation of Pennsylvania residents" was insufficient to confer general personal jurisdiction over the defendant"); *Automated Med. Prods. Corp. v. Int'l Hosp. Supply Corp.,* No. 97-2328, 1998 WL 54351, at *4 (E.D. Pa. Jan. 30, 1998) (139 telephone calls by the defendant to forum was not continuous and systematic part of its business to allow the court to exercise general jurisdiction over the defendant). In line with this authority, Defendants' telephone calls and emails to and from Plaintiffs in Pennsylvania are insufficient to establish "continuous and systematic" contact with this forum.

Based on the foregoing, none of Defendants' contacts with the forum taken separately are significant enough to confer the basis of general jurisdiction. And, taken together, Defendants' contacts with Pennsylvania are still not "continuous and systematic." As such, there is a lack of general jurisdiction over Cummins and Tom Johnson in the instant case.

## 2. Specific Jurisdiction

The Third Circuit employs a three-part analysis for specific personal jurisdiction. For specific jurisdiction to exist, it must be true that: (1) the defendant "purposefully directed [its] activities" at Pennsylvania, (2) the litigation "arise[s] out of or relate[s] to" at least one of the defendant's activities in Pennsylvania, and (3) the exercise of jurisdiction comports with traditional notions of "fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007) (citations omitted).[1] In actions where multiple claims are asserted, specific jurisdiction is claim specific because "a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim. . . does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims." *Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir. 2001).

Defendant Cummins argues that specific jurisdiction does not exist in this case because Plaintiffs' action arises from events in North Carolina and not from anything that occurred in Pennsylvania. Similarly, Defendant Tom Johnson argues that Plaintiffs reached out to Tom Johnson at its North Carolina location, the sale of the RV occurred in North Carolina, and any work performed on the RV by Tom Johnson occurred in North Carolina. In opposition, Plaintiffs argue that Tom Johnson purposefully created contacts with Pennsylvania by advertising in RV magazines and through its website, which resulted in communications with Tom Johnson while Plaintiff was in Pennsylvania. Additionally, Plaintiffs argue that Cummins availed itself to Plaintiffs by "voluntarily taking the task of working on a vehicle which it knew was registered to an owner in Pennsylvania." (Doc. 23, 8) As such, Plaintiffs assert that specific jurisdiction exists in this case because "[b]oth Defendants were aware of Plaintiff being from Pennsylvania and voluntarily undertook the task to have a business relationship with him for their own commercial benefit. They could have declined the opportunity to do business with Plaintiff, but wanted the financial benefit of the business." (*Id.* at 9.)

## a. Purposeful Direction

The threshold inquiry for specific personal jurisdiction considers whether Defendants have "`purposefully availed [themselves] of the privilege of conducting activities within the forum.'" _O'Connor_, 496 F.3d at 318 (quoting _Hanson v. Denckla_, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). "[W]hat is necessary is a deliberate targeting of the forum. Thus, the `unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient." _Id._ (quoting _Hanson_, 357 U.S. at 253). Specific jurisdiction is established when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." _World-Wide Volkswagen Corp. v. Woodson_, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

While "[m]ail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction," _Grand Entm't Grp., Ltd. v. Star Media Sales, Inc._, 988 F.2d 476, 482 (3d Cir. 1993), the Third Circuit has also held that "`informational communications in furtherance of [a contract between a resident and nonresident] does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant].'" _Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co._, 75 F.3d 147, 152 (3d Cir. 1996) (quoting _Sunbelt Corp. v. Noble, Denton & Assoc., Inc._, 5 F.3d 28, 32 (3d Cir. 1993)).

In internet cases, the "purposeful availment" requirement is satisfied "[i]f a web site operator intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site." _Toys "R" Us, Inc. v. Step Two, S.A._, 318 F.3d 446, 452 (3d Cir. 2003). Thus, "`something more' than simply having a website accessible to individuals in the forum state must be shown." _Planet Goalie, Inc. v. Monkeysports, Inc._, No. 10-2629, 2011 WL 3876178, at *4 (M.D. Pa. Sept. 1, 2011). When a website is "interactive", the website must be shown to target a particular remote jurisdiction. _See id._

In addition, "a few email and telephone communications by themselves are generally not enough to establish" specific personal jurisdiction. _InfoMC, Inc. v. Comprehensive Behavioral Care, Inc._, No. 10-4907, 2012 WL 1114360, at *8 (E.D. Pa. Mar. 20, 2012) (finding purposeful availment where the parties exchanged 1,580 pages of emails); _Rychel v. Yates_, No. 09-1514, 2011 WL 1363751, at *16 (W.D. Pa. Apr. 11, 2011) ("agreement-related telephone and email correspondence between Plaintiff and Defendant are insufficient to support an exercise of specific personal jurisdiction over Plaintiff's breach of contract claim"). Similarly, "follow-up telephone calls to officers of [Plaintiffs] in Pennsylvania cannot suffice as a basis for [specific personal] jurisdiction over it." _Mellon Bank_, 983 F.2d at 556.

In this case, the contacts Plaintiffs allege that Defendants had with Pennsylvania are insufficient to establish that Defendants purposefully availed themselves to this forum. First, as to Tom Johnson's contract contacts with Plaintiffs, they are largely similar to the contacts the Third Circuit deemed insufficient to establish specific jurisdiction in _Vetrotex_. 75 F.3d at 151.

> Vetrotex solicited Conglas to obtain the 1991 Supply Agreement by telephone and by personal visits to Conglas headquarters in California. Conglas did not solicit the 1991 Supply Agreement, and no Conglas personnel ever visited Pennsylvania. Conglas signed the 1991 Supply Agreement in California and sent it to CertainTeed in Pennsylvania. Similarly, with respect to the 1992 Supply Agreement, officers of CertainTeed flew to California to negotiate that contract. The 1992 Supply Agreement was prepared by CertainTeed and sent to Conglas in California, where it was executed. No product was shipped from, through, or to Pennsylvania. Instead, the chopped strand was manufactured in Texas and shipped directly from Vetrotex's plant in Texas to Conglas's facility in California. Vetrotex handled all of the transportation arrangements and paid the transportation costs. Vetrotex's invoicing for product sold under the 1992 Supply Agreement was handled by Vetrotex's California office. Conglas made all payments for goods to Vetrotex's California office.

_Id._ at 151. Based on these facts, the Third Circuit held "that the undisputed circumstances attending Conglas's 1991 and 1992 Supply Agreements with Vetrotex do not support the conclusion that Conglas `purposefully availed' itself of the privileges of doing business in Pennsylvania for purposes of the district court's exercise of personal jurisdiction over Conglas." _Id._ at 152. Here, Tom Johnson never entered Pennsylvania, the RV was sold in North Carolina, Plaintiffs solicited Tom Johnson after learning about it through advertisements in magazines, and Tom Johnson did not ship the RV to Pennsylvania.

Second, the email and telephone communications between the parties also fail to establish that Defendants "purposefully availed" themselves to this forum. The evidence set forth by Plaintiffs only establishes that the parties engaged in telephone

and e-mail communications[2] without Defendants' representatives or employees traveling to Pennsylvania. This evidence of informational communications regarding Defendants' products, without more, is insufficient to establish that Defendants "purposefully availed" themselves to this forum. *See, e.g., SMB Consulting & Investing LLC v. Apple Valley Waste Serv., Inc.*, No. 11-2939, 2011 WL 2937432, at *3 (E.D. Pa. July 21, 2011) ("although Defendant may have sent numerous e-mails and made several phone calls in furtherance of the contract, Plaintiff has not identified anything concerning those communications that establish any kind of connection with Pennsylvania").[3] Without identifying the extent of the parties communications, Plaintiffs have failed to establish "purposeful availment" by a preponderance of the evidence. Thus, the "minimal exchange of emails and phone calls [does] not subject the defendant[s] to jurisdiction in the forum state." *Ciolli v. Iravani*, 651 F. Supp. 2d 356, 371 (E.D. Pa. 2009) (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 n.2 (3d Cir. 1998)).

Lastly, Plaintiffs have failed to present any evidence that Defendants' websites targeted a specific, remote location- in this case the Middle District of Pennsylvania. While Plaintiffs argue that Tom Johnson's website advertised "specifically to entice the out of state customer, some who would travel the interstate highways, for example, north and south through North Carolina," Plaintiffs provide no evidence that Tom Johnson (or Cummins for that matter) intentionally and directly targeted these website advertisements specifically at Pennsylvania.

Based on the foregoing, Plaintiffs have not demonstrated that Defendants "purposefully availed" themselves to Pennsylvania, *see, e.g., Hufnagel v. Ciamacco*, 281 F.R.D. 238, 249 (W.D. Pa. 2012), and the Court cannot exercise specific personal jurisdiction in this case.

## b. Relatedness

Furthermore, even if Defendants "purposefully availed" themselves to Pennsylvania, the Court would be unable to exercise personal jurisdiction over all of Plaintiffs' claims because not all of the causes of actions arose out of Defendants' forum related activities. *See, e.g., Croyle v. Hutchinson*, No. 11-1141, 2012 WL 2358999, at *4 (W.D. Pa. June 20, 2012). While "the Supreme Court has not yet explained the scope of the [arises out of or related to] requirement," the Third Circuit has concluded that the "relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *O'Connor*, 496 F.3d at 318-24.

Indeed, Plaintiffs' claims against Cummins relate to the allegedly negligent conduct that occurred in North Carolina and are not at all intertwined with Cummins' advertisements on the internet or the parties' communications. In fact, Plaintiffs' evidence indicates that the contacts with Cummins did not occur until after the RV was vandalized. Accordingly, Plaintiffs' negligence, bailment, and intentional infliction of emotional distress claims cannot be said to "arise out of" Cummins' contacts with Pennsylvania. Plaintiffs, therefore, cannot establish specific personal jurisdiction over Cummins.[4]

## 3. Jurisdictional Discovery

Plaintiffs request that if it is determined that they have failed to meet their burden to establish personal jurisdiction over Tom Johnson and Cummins, that prior to dismissal of the claims they be permitted to conduct jurisdictional discovery. According to the Supreme Court, "where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n. 13, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978). The Third Circuit has instructed that "if `the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden.'" *Metcalfe*, 566 F.3d at 336 (quoting *Compagnie Dex Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983)). "Jurisdictional discovery may be denied `where the party that bears the burden of establishing jurisdiction fails to establish a threshold *prima facie* showing of personal jurisdiction.'" *Shouse v. Nat'l Corrective Grp., Inc.*, No. 10-175, 2011 WL 1376403, at *2 (M.D. Pa. Apr. 12, 2011) (quoting *S. Seafood Co. v. Holt Cargo Sys., Inc.*, No. 96-5217, 1997 WL 539763, at *8 (E.D. Pa. Aug. 11, 1997)). "A *prima facie* case requires factual allegations that suggest `with reasonable particularity' the possible existence of the requisite `contacts between [the party] and the forum state.'" *S. Seafood Co.*, 1997 WL 539763, at *8 (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

Here, Plaintiffs have simply asked the Court to open discovery on the jurisdictional issue without articulating with any particularity the additional contacts they hope to find. And, in light of the allegations made in the Complaint, the Court is unable to ascertain how allowing Plaintiffs to seek more information would help demonstrate jurisdiction in this case-as information relating to specific jurisdiction in this case would already be in Plaintiffs' possession. Plaintiffs' request to conduct jurisdictional discovery will therefore be denied.

## B. Improper Venue

Tom Johnson and Cummins argue that if the action is not dismissed for lack of personal jurisdiction, then the case should be dismissed for improper venue pursuant to 28 U.S.C. § 1391. Because there is no personal jurisdiction in this case, Defendants' motion to dismiss for improper venue is rendered moot. *See, e.g.,* Cabot Corp. v. Niotan, Inc., No. 08-1691, 2011 WL 4625269, at *15 (E.D. Pa. Sept. 30, 2011); *Lee v. Super King Sauna NJ,* No. 11-2710, 2011 WL 3652490, at *6 (E.D. Pa. Aug. 18, 2011).

## C. Transfer of Venue

Plaintiffs argue that in the event that the Court determines that personal jurisdiction over Defendants cannot be exercised, that the action be transferred to an appropriate venue rather than dismissed. "A court may choose to exercise its authority under 28 U.S.C. § 1406(a) and transfer a case to a more suitable venue even if it lacks personal jurisdiction." *Lee,* 2011 WL 3652490, at *6 (citing Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465-66, 82 S. Ct. 913, 8 L. Ed. 2d 39 (1962)). Here, personal jurisdiction could be exercised in North Carolina- specifically the Middle District of North Carolina- as Tom Johnson's Concord facility where the work on the RV was done is located in that district. As such, rather than risk any statute of limitations issues that may arise as a result of the time that has lapsed between the filing of this action and now, the Court finds that justice requires a transfer to the Middle District of North Carolina.

## III. Conclusion

For the above stated reasons, upon consideration of Cummins and Tom Johnson's motions to dismiss, this action will be transferred to the Middle District of North Carolina pursuant to 28 U.S.C. § 1406(a).

An appropriate order follows.

[1] All the parties' specific jurisdiction arguments focus on the traditional three-step test for specific jurisdiction and not the "effects" test enunciated in Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984).

[2] Plaintiffs have not identified the number of telephone conversations or email exchanges that they had with Cummins and/or Tom Johnson while Plaintiffs were located in Pennsylvania.

[3] Plaintiffs also have not presented any evidence that Defendants knew Plaintiffs were Pennsylvania residents. (*Bolus Aff.,* ¶¶ 14, 18, 26); *Cf. Hyndman v. Johnson,* No. 10-7131, 2011 WL 57008, at *4 (E.D. Pa. Feb. 15, 2011) (Defendant was aware during the course of negotiations that Plaintiff was a Pennsylvania resident).

[4] As to the claims against Tom Johnson, based on the evidence presented by Plaintiffs, even if Tom Johnson has "purposefully availed" itself to Pennsylvania, most of Plaintiffs' claims likely do not "arise out of or relate to" its forum-related contacts. Specifically, even in the event that the contract's claim resulted from Defendants' "contacts with the forum [that] were instrumental in . . . formation . . . of the contract," *Control Screening LLC v. Technological Application & Publ'n,* ___ F.3d ___, 2012 WL 3037824, at *2 (3d Cir. 2012), as Plaintiffs provide no evidence that the alleged fraud, misrepresentation, and/or concealed material facts related to their interactions with Tom Johnson's website or with their communications from Pennsylvania with Tom Johnson's employees or agents, it is not clear that these claims "arose out of" Tom Johnson's contacts with Pennsylvania. Stated differently, Plaintiffs presented no evidence that Tom Johnson fraudulently conveyed any information, or failed to disclose any material facts, when it communicated with Plaintiffs while they were in Pennsylvania. And, to the extent that any misrepresentations occurred by Tom Johnson when Bolus was in North Carolina or Indiana, this likely does not relate to its contacts with Pennsylvania. But, as Tom Johnson did not "purposefully avail" itself to this forum, this issue need not be conclusively resolved.

Save trees - read court opinions online on Google Scholar.

**ANNETTE BRANCHE, Appellant,**

v.

**WELLS FARGO HOME MORTGAGE, INC.**

<u>No. 13-4639.</u>

**United States Court of Appeals, Third Circuit.**

Submitted for Possible Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6 August 6, 2015.
Opinion filed: August 12, 2015.

Before: FISHER, SHWARTZ and GREENBERG, Circuit Judges.

# NOT PRECEDENTIAL

OPINION[*]

PER CURIAM.

Annette Branche appeals pro se and in forma pauperis from the District Court's order granting defendant's motion for summary judgment and denying her motion for summary judgment. Because this appeal does not present a substantial question we will summarily affirm the District Court's order. See 3d Cir. LAR 27.4; 3d Cir. I.O.P. 10.6.

## I.

Branche is the administrator of her common law husband's (Charles White's) estate, which includes the house in which Branche resides. Defendant/Appellee Wells Fargo Home Mortgage Inc. ("Wells Fargo") is the mortgage servicer for the house, which is now in the name of Mr. White's estate. The dispute between Branche and Wells Fargo arose out of a botched home renovation. In short, after Branche's first contractor damaged her house, the homeowner's insurance policy provided money for repairs, and Wells Fargo, as the mortgage servicer, was authorized to oversee the repairs and disburse the insurance funds to the contractor. Accordingly, the insurance money was initially distributed to an escrow account held by Wells Fargo.

On December 3, 2008, Wells Fargo sent to the Estate (in care of Branche) a letter describing the procedures for the distribution of the insurance funds for the repairs, which would be released in one-third increments. The first payment would be made after Wells Fargo received, among other things, an estimate and proof of the contractor's licensure. The second payment would be made after the work was fifty percent complete. The final payment was to be released after the work was fully completed, as evidenced by a certified statement and final inspection. Branche selected a contractor whose estimate for the work was $29,800, well over the amount of the insurance funds. Although Branche informed the contractor that the payment would be disbursed through an insurance policy, she did not explain the payment process.

Wells Fargo released the first payment ($6,497.30), six days after receiving the required contractor documentation. The second disbursement ($6,497.31) was released on January 9, 2009, one day after the work was certified as fifty percent complete. Branche's contractor stopped work after becoming dissatisfied with the timing of the payments, and she hired a new contractor to finish the project for an estimated cost of $18,200.

Thereafter, Wells Fargo released a payment in the amount of $10,400. And in May 2010, after Branche certified that the repairs were complete, Wells Fargo released the final disbursement. In total, Wells Fargo released approximately $29,000 for the work.[1] Branche still owes the final contractor $5,542.11, and she states that the first contractor is owed approximately $2,500.

Branche filed a lawsuit in state court against the contractors, the insurance company, and Wells Fargo. The lawsuit was removed to the District Court on the basis of Branche's apparent attempt to assert federal claims. Ultimately, in light of

rulings not at issue here and Branche's decision to drop her claims against certain defendants, she proceeded only on claims for breach of contract and deceptive trade practices against Wells Fargo. Branche asserted that Wells Fargo failed to timely pay the contractors, violated an implied contractual obligation to allow her to safely occupy her home, violated the duty of good faith, and engaged in deceptive practices and fraudulent behavior.

The parties filed cross-motions for summary judgment, and on November 6, 2013, the District Court entered judgment on behalf of Wells Fargo and against Branche. It determined that Wells Fargo abided by its obligation to disburse the insurance proceeds to the contractors as delineated by the December 3, 2008 letter. The District Court explained that Branche conceded that she understood the disbursement protocol but that she did not explain it to her contractor, and that it was not Wells Fargo's fault that Branche's contractors were unsatisfied with the payment schedule. Further, Wells Fargo was required only to disburse the amount of the insurance proceeds. It was not obligated to provide payment for the total amount of the work.

As to Branche's assertion that Wells Fargo breached an obligation to ensure that she could safely occupy her house—which Branche stated was akin to a landlord's obligation to his or her renter—the District Court determined that Wells Fargo had no such obligation. The District Court also concluded that Wells Fargo did not violate its duty of good faith and fair dealing, as it complied with Branche's reasonable expectations in disbursing the insurance proceeds, and Branche testified that she understood the disbursement process.

The District Court then determined that Branche lacked standing to proceed on her claim against Wells Fargo under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. Ann. § 201-9.2(a). The District Court agreed with Wells Fargo that, because Mr. White had been the borrower, Branche herself was not a "purchaser" permitted to bring a lawsuit under the UTPCPL. The District Court also determined that the December 3, 2008 letter was not a commercial transaction, as it merely outlined the process for the disbursement of insurance proceeds.

The District Court thus granted judgment in favor of Wells Fargo, and Branche timely appealed. Wells Fargo has now filed a motion which we have construed as seeking summary action. Branche opposes the motion.[2]

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment and apply the same standard as does the district court. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012).

After careful review of the record, we conclude that the District Court correctly granted Wells Fargo's motion for summary judgment and denied Branche's cross-motion for the reasons provided in its November 6, 2013 memorandum.

Only the question of Branche's standing under the UTPCPL requires brief discussion.[3] As the District Court explained, the UTPCPL prohibits "unfair or deceptive acts or practices," and protects a person who "purchases or leases goods or services . . . and thereby suffers any ascertainable loss of money or property . . . as a result of the use . . . of a method, act or practice declared unlawful" by the Act. 73 Pa. Cons. Stat. Ann. § 201-9.2(a). For a private person to have standing, he or she must be a "purchaser" of the good or services, and must prove justifiable reliance. Hunt v. U.S. Tobacco Co., 538 F.3d 217, 221, 224 (3d Cir. 2008).

Here, the District Court correctly stated that "only those who purchase goods or services, not those who may receive a benefit from the purchase," satisfy the requirement that one be a "purchaser." Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 65 (3d Cir. 1994). Although direct privity is not required, the statute "unambiguously permits only persons who have purchased or leased goods or services to sue. . . . Had the Pennsylvania legislature wanted to create a cause of action for those not involved in a sale or lease, it would have done so." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

Although Branche has had many dealings with Wells Fargo concerning the repairs to the house and payment of contractors, the District Court correctly determined that she was not a purchaser of Wells Fargo's services, as it was Branche's common law husband who obtained the mortgage. After Mr. White's death, his estate was listed on the mortgage, and while the

estate may have had a claim under the UTPCPL, we need not and do not decide that issue because Branche, who brought the claim in her individual capacity, does not. Accordingly, the District Court properly dismissed this claim.

For the foregoing reasons, we grant Wells Fargo's motion and will summarily affirm the District Court's judgment.

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The insurance company had periodically adjusted the claim upwards from the initial amount it agreed to cover.

[2] Although Branche has appealed pro se, we note that she was represented by multiple counsel at various stages in the District Court, including when she filed her Second Amended Complaint and at the summary judgment stage.

[3] Although some of our previous decisions have framed this issue in terms of statutory "standing" under the UTPCPL, the Supreme Court recently clarified that the concept of statutory standing is "misleading" because the question is not one of subject matter jurisdiction but simply whether the plaintiff has stated a cause of action under the statute. Lexmark Int'l, Inc v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 n.4 (2014). We are satisfied that Branche had Article III standing to assert her claims.

Save trees - read court opinions online on Google Scholar.

**DORIS ANN FRANCIS, Plaintiff.**

**v.**

**HUMANA, INC., Defendant.**

<u>No. 1:24-cv-02017.</u>

**United States District Court, M.D. Pennsylvania.**

January 31, 2025.

YVETTE KANE, District Judge.

# MEMORANDUM

Before the Court is a motion to dismiss Counts I and II of Plaintiff Doris Ann Francis ("Plaintiff")'s complaint filed by Defendant Humana, Inc. ("Defendant"). (Doc. No. 4.) For the reasons that follow, the Court will grant the motion.

# I. BACKGROUND

# A. Factual Background[1]

Plaintiff is an adult individual who resides at Country Meadows Senior Living at 459 Sand Hill Road, Hershey, Dauphin County, Pennsylvania, 17033. (Doc. No. 1-1 at 8 ¶ 1.) Defendant is a corporation that regularly conducts business in Dauphin County, Pennsylvania, is registered to do business in Pennsylvania, and has a principal place of business located at 120 Interstate North Parkway SE, Building 100, Atlanta, Georgia, 30339. (Id. at 8 ¶ 2.) Plaintiff avers that "[m]any, many years ago," she purchased Humana Preventative Plus Dental Insurance Policy #XXXXXXXXXXXX (hereinafter "Humana Preventative Dental Policy") from Defendant when she was a resident of Clinton, Mississippi, and the most recent monthly premium was $19.99 per month. (Id. at 8 ¶¶ 3-4.) At the time of filing her complaint, Plaintiff was ninety-two (92) years of age, having been born on October 2, 1932. (Id. at 8 ¶ 9.)

Plaintiff's husband died on January 4, 2023, causing Plaintiff to move, on or about April 24, 2024, to Hershey, Pennsylvania to be near her daughter. (Id. at 9 ¶ 6.) Plaintiff wanted to keep her Humana Preventative Dental Policy, even after her move to Pennsylvania from Mississippi. (Id. at 9 ¶ 7.) Plaintiff alleges that she contacted Defendant and, per Defendant's agent's instruction in early May 2024, submitted a completed Pennsylvania application to Defendant (hereinafter "Plaintiff's May 2024 Dental and Vision Application"). See (id. at 9 ¶ 8) (citing Doc. No.1-1 at 18).[2] Plaintiff's May 2024 Dental and Vision Application lists her Hershey, Dauphin County, Pennsylvania address and requests coverage in Pennsylvania beginning June 1, 2024. (Id. at 9 ¶ 9.) Plaintiff alleges that she was advised by Defendant's agent that the Pennsylvania premium was also $19.99 per month. (Id. at 9 ¶ 10.) Plaintiff maintains that she "consistently, without interruption, and on a timely basis, made all monthly premium payments in the amount of $19.99, which premium payments have been retained by [Defendant]." (Id. at 9 ¶ 11.) Plaintiff alleges that Defendant rejected her May 2024 Dental and Vision Application for the following two reasons: (1) the application stated "moved out of state" and not "state to state transfer," and (2) the "reinstatement/reapplication" box was checked and not the "change/modification to existing coverage" box. (Id. at 9 ¶ 12.)

Plaintiff claims that, on July 29, 2024, she submitted a second Pennsylvania application (hereinafter "July 2024 Dental and Vision Application") with the changes and/or corrections requested by Defendant in Defendant's previous rejection, and requested coverage as of June 1, 2024. See (id. at 9-10 ¶ 13) (citing Doc. No. 1-1 at 20). Plaintiff maintains that "no new policy, policy number, or confirmation of Pennsylvania dental coverage" was issued to her by Defendant. (Id. at 10 ¶ 14.) Thereafter, in August 2024, Plaintiff alleges that she called Defendant and was told by an agent of Defendant that "her coverage was in process, her address had been changed[,] and she would soon receive confirmation of Pennsylvania dental coverage." (Id. at 10 ¶ 15.) Plaintiff maintains that she received no policy coverage or confirmation from Defendant after this call. (Id. at 10 ¶ 16.)

Plaintiff asserts that on September 16, 2024, she asked her daughter (her lawful agent) to call Defendant because Plaintiff needed to see a dentist and had no confirmation of Pennsylvania dental coverage. (Id. at 10 ¶ 17.) Plaintiff states that her daughter called Defendant at 866-537-0232 and spoke to Nicole, an agent of Defendant. (Id. at 10 ¶ 18.) Plaintiff alleges that the call took forty-eight (48) minutes and included the involvement of a second agent. (Id. at 10 ¶ 19.) Plaintiff remarks that the "net result" of the phone call was that her daughter was told that Plaintiff was at fault for not cancelling Plaintiff's Mississippi policy and that "a state to state transfer needs to be done." (Id. at 10 ¶ 20.) Plaintiff further asserts that Nicole told Plaintiff's daughter that she, Nicole, was "not allowed to change an address `at her level.'" (Id. at 10 ¶ 21.) Plaintiff maintains that an agent of Defendant[3] told her daughter that Plaintiff has to go through the "`sales department at 877-499-6485' and speak with a `licensed agent'" to change Plaintiff's address. (Id. at 10 ¶ 22.) Plaintiff claims that she "made it clear in May that she needs a Pennsylvania policy and she will never return to Mississippi." (Id. at 11 ¶ 23.)

Plaintiff alleges that on or about September 24, 2024, she received a letter from Defendant, dated September 18, 2024, stating that Defendant was "`unable to process the application due to the reason listed below.'" See (id. at 11 ¶ 24) (quoting Doc. No. 1-1 at 22 (September 18, 2024 Letter)). She maintains that the letter "lists no information or request for information." (Id. at 11 ¶ 25.) The reason listed is "Missing Required Information." (Id. at 22.) Plaintiff claims that the letter gave her the option of calling Defendant, "but she had already done that multiple times (once through her daughter)." (Id. at 11 ¶ 26.)

## B. Procedural Background

On October 18, 2024, Plaintiff filed a complaint against Defendant in the Court of Common Pleas of Dauphin County, Pennsylvania. (Doc. No. 1-1 at 5-16.) The complaint was served upon Defendant via process server on October 22, 2024. (Id. at 4.) Plaintiff's complaint alleges the following four (4) claims: violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (hereinafter "UTPCPL") (Count I); fraud (Count II); breach of contract (Count III); and quantum meruit (Count IV). (Id. at 11-16 ¶¶ 27-49.)

On November 20, 2024, Defendant filed a Notice of Removal to this Court on the basis of diversity jurisdiction. (Doc. No. 1.) Thereafter, on November 27, 2024, Defendant filed a motion to dismiss accompanied by a brief in support, arguing that Counts I and II of Plaintiff's complaint should be dismissed. (Doc. Nos. 4-5.) On December 11, 2024, Plaintiff filed a brief in opposition to the motion. (Doc. No. 7.) Defendant did not file a reply brief. Having been fully briefed, Defendant's motion to dismiss Counts I and II is ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not `show[n]'—`that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the

elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III. DISCUSSION

As noted supra, Defendant seeks dismissal of Plaintiff's UTPCPL claim (Count I) and the fraud claim (Count II). As to Count I, Defendant argues that Plaintiff fails to allege that Defendant acted in a manner which had the tendency or capacity to deceive, and further fails to aver that she suffered concrete harm as a result of her reliance on Defendant's purported actions. As to Count II, Defendant asserts that Plaintiff fails to state a claim upon which relief may be granted because Plaintiff fails to allege that Defendant acted with the prerequisite intent to deceive necessary to recover pursuant to Federal Rule of Civil Procedure 9(b). The Court addresses each argument in turn.

## A. Plaintiff's UTPCPL Claim

The UTPCPL is a Pennsylvania statute that applies to "unfair or deceptive acts or practices in the conduct of any trade or commerce." See 73 PA. CONS. STAT. § 201-3(a). The statute generally prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145, 154 (Pa. Super. Ct. 2012) (quoting 73 PA. CONS. STAT. § 201-2(4)(xxi)). The UTPCPL provides twenty (20) "unfair or deceptive" practices, see 73 PA. CONS. STAT. § 201-2(4)(i)-(xx), as well as a "catch-all provision" that generally prohibits other fraudulent and deceptive conduct, see id. 73 PA. CONS. STAT. § 201-2(4)(xxi). The statute "is to be liberally construed to effectuate its objective of protecting the consumers of [Pennsylvania] from fraud and unfair or deceptive business practices." See Ash v. Cont'l Ins. Co., 932 A.2d 877, 881 (Pa. 2007); see also Bennett, 40 A.3d at 154 (recognizing a lower pleading standard under the UTPCPL catch-all provision than for common law fraud).

Under the catch-all provision, "a showing of deceptive activity, as opposed to establishing the elements of a common law fraud claim, is sufficient to impose liability." See Wilson v. Parisi, 549 F. Supp. 2d 637, 666 (M.D. Pa. 2008). To establish liability under the catch-all provision, a plaintiff must present evidence showing: "(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." See Slapikas v. First Am. Title Ins. Co., 298 F.R.D. 285, 292 (W.D. Pa. 2014) (citing Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009)). Pennsylvania law requires that a "plaintiff alleging violations of the UTPCPL must prove justifiable reliance." See Toy v. Metro. Life Ins. Co., 928 A.2d 186, 202 (Pa. 2007); Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001) (interpreting the UTPCPL's causation provision to demand a showing of justifiable reliance and not simply a causal connection); Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (stating that the justifiable reliance requirement applies to all substantive subsections of the UTPCPL); Simply put, "[t]o bring a private cause of action under the [UTPCPL], a plaintiff must show that [s]he justifiably relied on the defendant's wrongful conduct or representation and that [s]he suffered harm as a result of that reliance." See Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004) (citing Weinberg, 777 A.2d at 446). "For pleading purposes, the complaint must establish that, had the plaintiff known of the deceptive conduct, he would have acted differently." Seplow v. Closing Pro, Inc., No. 23-cv-03628, 2024 WL 649260, at *5 (E.D. Pa. Feb. 15, 2024).

In arguing that Plaintiff's UTPCPL claim is subject to dismissal, Defendant asserts that Plaintiff "fails to allege that [Defendant] acted in a manner which had the tendency or capacity to deceive, and further fails to aver that she suffered concrete harm as a result of her reliance on [Defendant]'s purported actions." (Doc. No. 5 at 1-2.) Defendant also argues that Plaintiff "does not, and cannot, allege that she ever contacted [the specific phone number provided by Defendant] to proceed with the processing of her application." (Id. at 3.) Defendant maintains that, "in essence," Plaintiff's claim constitutes a claim under the catch-all provision because Defendant claims that Plaintiff's complaint includes "a one paragraph (but otherwise unsupported) assertion that [Defendant]'s customer service agents also violated [73 PA. CONS. STAT. § 201-2(4)

(ii), (xi), (xii), and (xiv)]."[4] (Id. at 5 n.2.) Defendant claims that Plaintiff's allegations, even when taken as true, "do not establish that [Defendant] engaged in any false or deceptive conduct when [Plaintiff] contacted the customer service agents, and further fails to establish that [] [Plaintiff] justifiably relied upon [Defendant]'s purported actions to sustain an ascertainable loss." (Id. at 4.)

First, as to whether the alleged conduct had the capacity or tendency to deceive, Defendant states that:

> Plaintiff fails to sufficiently allege any particular conduct that has either the capacity or tendency to deceive. Rather, Plaintiff claims that the acts, omissions, and so-called (but wholly unsupported) "fraudulent" conduct by [Defendant]'s customer service agents created a likelihood of confusion or misunderstanding. In essence, this constitutes a claim under the UTPCPL's catch[-]all provision, which requires a [p]laintiff to adequately plead some form of deceptive conduct. Boehm v. Riversource Life Ins. Co., 117 A.3d 308, 324 (Pa. Super. Ct.] 2015).

See (id. at 5) (internal footnotes omitted). Further, Defendant argues that Plaintiff's "boilerplate allegations of allegedly improper conduct do not establish that [Defendant] acted deceptively," noting that Defendant informed Plaintiff as to the status of her application and as to what information Plaintiff needed to provide. (Id. at 6.) Defendant maintains that, at best, Plaintiff's allegations suggest that there was some kind of misunderstanding, and the allegations do not demonstrate that Defendant's agents "intentionally gave Plaintiff a false impression or otherwise recklessly provided advice with an intent to deceive Plaintiff." See (id.) (emphasis in original).

Second, Defendant claims that, even if Plaintiff sufficiently pleaded that Defendant engaged in some form of deceptive conduct, Plaintiff must also allege that she justifiably relied on Defendant's actions with regard to her insurance policy. (Id. at 7.) As to justifiable reliance, Defendant maintains that Plaintiff fails to plead "even a basic set of facts" tending to show that See (Doc. No. 1-1 at 12 ¶ 30) (citing 73 PA. CONS. STAT. § 201-2(4)(ii), (xi), (xii), and (xiv)). she relied upon the alleged conduct of Defendant's agents. (Id.) Defendant notes that Plaintiff pleads that she was already a long-time customer prior to her move and continued to make premium payments on her Mississippi policy—and claims that Plaintiff did not specifically plead that she engaged in some detrimental activity. (Id.) Therefore, Defendant contends that Plaintiff's UTPCPL claim fails because "she has not adequately plead justifiable reliance resulting in an ascertainable loss." (Id. at 8.)

In response, Plaintiff states that she is not required to prove all elements of a prima facie case to survive a motion to dismiss, and that a higher standard of proof is more appropriate for a motion for summary judgment. (Doc. No. 7 at 5-6, 10-11.) Plaintiff argues that Defendant's conduct was deceptive because Defendant "has intentionally and knowingly never given [Plaintiff] a reason for her application being `slow played' or `rejected[,']'[] but [Defendant] continued to intentionally and knowingly take her premium payments." See (id. at 8) (emphasis in original). Plaintiff claims that this conduct "is a very unfair, deceptive and confusing business practice, especially when the consumer is a trusting, naïve, elderly, existing insured." (Id.) As to the element of justifiable reliance, Plaintiff asserts that she relied "totally on [the agents'] instructions and promises," and that "[h]er reliance was such that she continued to pay premiums," which she claims is an ascertainable loss. (Id. at 10.)

Upon consideration of the complaint, the parties' briefing, and relevant authority, and taking all allegations in the complaint to be true, the Court finds that Plaintiff fails to sufficiently allege that Defendant engaged in deceptive acts in violation of the catch-all provision and the other cited subsections of the UTPCPL. Further, Plaintiff also fails to allege that she justifiably relied upon such acts. Plaintiff's complaint alleges the following conduct by Defendant:

> 29. The aforesaid actions and/or inactions of [Defendant], a) are false and misleading; b) constitute fraudulent and/or deceptive conduct; c) created a likelihood of confusion and/or of misunderstanding on the part of [Plaintiff]; and d) constitute a failure to comply with the terms of oral and written guarantees.

> 30. The aforesaid actions and/or inactions of [Defendant], constitute violations of 73 P.S. §201-2(4)(ii), (xi), (xii),. (xiv) and (xxi) known as the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

> 31. [Plaintiff] has properly applied for Pennsylvania Dental insurance coverage, [Plaintiff] has been promised Pennsylvania Dental Insurance coverage, continues to pay monthly premiums, and has suffered an ascertainable loss of premium dollars and coverage as a result of the use by [Defendant] and/or its representatives, employees and agents, of methods acts and/or practices declared unlawful by the [UTP]CPL which included, but are not limited to, the following:

a. Claiming that the application submitted in May of 2024 was incomplete, improper, defective and/or could not be acted upon by [Defendant];

b. Claiming that the application submitted on July 29, 2024 was incomplete, improper, defective and/or could not be acted upon by [Defendant];

c. Verbally telling [Plaintiff] in August of 2024 that her address had been changed and that she would soon be awarded coverage or receive a policy;

d. Advising [Plaintiff's] daughter that [Plaintiff] needed to cancel the Mississippi policy;

e. Advising [Plaintiff's] daughter that only a "licensed agent" in the sales department could change an address;

f. Issuing a letter to [Plaintiff] advising her that [Defendant] was unable to process the application due to the reason listed on the letter, but providing no reason;

g. Failing to adhere to the terms of its verbal and written representations and guarantees;

h. Engaging in fraudulent and/or deceptive billing practices which created a likelihood of confusion and misunderstanding;

i. Engaging in fraudulent and/or deceptive conduct which created a likelihood of confusion and misunderstanding by processing [Plaintiff's] premium payments without providing coverage;

j. Accepting [Plaintiff's] monthly premium payments while refusing dental coverage; and

k. Ignoring both applications.

32. As a result of the conduct set forth above, [Plaintiff] has suffered damages as described herein.

See (Doc. No. 1-1 at 12-13 ¶¶ 29-32).

These allegations are conclusory in nature and lack facts to support that Defendant's agents engaged in fraudulent or deceptive conduct. The only two allegations that allege deceptive conduct that created a likelihood of confusion or misunderstanding—"[e]ngaging in fraudulent and/or deceptive billing practices . . ." and "[e]ngaging in fraudulent and/or deceptive conduct . . ."— are blanket assertions that are not supported by facts suggesting that Defendant's agents intentionally engaged in deceptive conduct. See (Doc. No. 1-1 at 12-13 ¶¶ 31(h)-(i)). These conclusory allegations are insufficient to plausibly allege fraudulent conduct. See Monck v. Progressive Corp., No. 15-cv-00250, 2015 WL 1638574, at *7 (M.D. Pa. Apr. 13, 2015) (holding that conclusory allegations of alleged wrongdoing and related reliance lack the specificity required to survive a motion to dismiss); Edwards v. Monumental Life Ins. Co., No. 17-cv-05260, 2017 WL 6327573, at *4 (E.D. Pa. Dec. 11, 2017) (holding that conclusory allegations of "engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding" without alleging facts of the deceptive conduct is insufficient to defeat a motion to dismiss); Phillips v. State Farm Mut. Auto. Ins. Co., No. 14-cv-01919, 2015 WL 3454537, at *3 (M.D. Pa. May 29, 2015) (finding that a blanket assertion that conduct "constitutes deceptive conduct under the UTPCPL is an unsupported legal conclusion" is insufficient to overcome a motion to dismiss). Plaintiff's complaint simply fails to plausibly allege that Defendant engaged fraudulent or deceptive conduct and that Defendant's conduct is likely to deceive a consumer under similar circumstances—specifically as to Plaintiff's averment that she was already paying a monthly premium prior to her conversations with Defendant's agents. See Walkup v. Santander Bank, N.A., 147 F. Supp. 3d 349, 361 (E.D. Pa. 2015) (granting a motion to dismiss where a UTPCPL claim was not supported by "enough factual specificity to demonstrate a plausibility of success").

Plaintiff also fails to plausibly allege another required element of a UTPCPL claim that she justifiably relied upon Defendant's alleged conduct. See Hunt, 538 F.3d at 222 (stating that all UTPCPL subsections require a showing of justifiable reliance); Weinberg, 777 A.2d at 446 (stating that a plaintiff asserting a UTPCPL claim "must allege reliance"). In her opposing brief, Plaintiff claims that she relied "totally on [the agents'] instructions and promises" and is entitled to reasonable inferences. (Doc. No. 7 at 10.) Although Plaintiff correctly notes that she is entitled to reasonable inferences, there is no "presumption of reliance" under Pennsylvania law because Plaintiff "must prove justifiable reliance affirmatively." See Hunt, 538 F.3d 217 at 227. Plaintiff's complaint fails to allege that, "had the plaintiff known of the deceptive conduct, [s]he would have acted

differently." See Seplow, 2024 WL 649260, at *5; see also Walkup, 147 F. Supp. 3d at 362 (granting a motion to dismiss when a plaintiff failed to articulate "a factually plausible account of their extensive reliance on [d]efendants' conduct"). In short, Plaintiff's complaint fails to allege facts supporting a plausible inference that she relied to her detriment on Defendant's representations. Because justifiable reliance is a necessary element for a UTPCPL claim under any subsection, the Court will grant Defendant's motion to dismiss as to Plaintiff's UTPCPL claim (Count I) and afford Plaintiff leave to amend her complaint in an attempt to cure the deficiencies outlined herein in regard to her UTPCPL claim.

## B. Plaintiff's Fraud Claim

To state a cause of action for fraud under Pennsylvania law, a plaintiff must establish five elements: "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as the proximate result." See Brindle v. W. Allegheny Hosp., 594 A.2d 766, 768 (Pa. Super. Ct. 1991). Federal Rule of Civil Procedure 9(b) provides that in order to allege a claim of fraud, "a party must state with particularity the circumstances constituting fraud or mistake." See Fed. R. Civ. P. 9(b); see also Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (holding that Rule 9(b) requires "sufficient particularity to place the defendant on notice of the `precise misconduct with which it is charged'"). Further, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." See id.

In arguing that Plaintiff's fraud claim is subject to dismissal, Defendant argues that Plaintiff's "threadbare allegations fail to establish that [Defendant] acted with the prerequisite intent to deceive necessary to recover under a theory of fraud." (Doc. No. 5 at 2.) Defendant maintains that Plaintiff's complaint "does little more than recite the elements of fraud necessary for recovery," and presumes that her phone calls with Defendant's agents "about her pending application were `knowingly, intentionally, and willfully made with the intent to induce [Plaintiff] to continue paying premiums without coverage.'" See (id. at 9) (citing Doc. No. 1-1 at 14 ¶ 35). Defendant further asserts that:

> Plaintiff's threadbare recitals of the elements of fraud, bald assertions unsupported by the facts alleged, and legal conclusions throughout the Complaint fail to adequately state a claim for "fraud" against [Defendant]. Plaintiff has failed to adequately demonstrate that [Defendant] made any material misrepresentation; in fact, agents informed her that her application was pending and that statement was reiterated when she received a letter explaining the same. Even if Plaintiff could demonstrate that there had been a misrepresentation, she has not plead any facts which demonstrate that [Defendant] acted with reckless disregard and/or a specific intention to induce Plaintiff to continue making premium payments under her longstanding Mississippi policy.

See (id.). On that basis, Defendant argues that such threadbare allegations do not satisfy "the stringent pleading requirements of [Federal] Rule [of Civil Procedure] 9(b), and this Court should similarly dismiss Plaintiff's fraud claim for the same reason." (Id. at 10.)

In response, Plaintiff states that Defendant is on notice of the precise conduct alleged pursuant to Federal Rule of Civil Procedure 9(b). (Doc. No. 7 at 11.) Plaintiff also claims that taking her alleged facts as true, she pleads the necessary elements of fraud. (Id. at 12.) She concludes her brief in opposition by arguing that "there is no ambiguity" in her complaint. (Id.)

Upon consideration of the complaint, the parties' briefing, and relevant authority, and taking all allegations to be true, the Court concludes that Plaintiff fails to put Defendant on notice as to the "precise conduct" she alleges as fraud. See Frederico, 507 F.3d at 200; see also In re Craftmatic Secs. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) (stating that Federal Rule of Civil Procedure 9(b) is to ensure "that defendants are placed on notice"). The Court notes that Plaintiff alleges the same misconduct under both Counts I and II. Compare (Doc. No. 1-1 at 12-13 ¶ 31 with Doc. No. 1-1 at 13-14 ¶ 34). As to her fraud claim, Plaintiff's complaint avers that:

> 34. [Defendant], through its agents, made materially false representations to [Plaintiff] and her agent, including, but not limited to:

> a. Claiming that the application submitted in May of 2024 was incomplete, improper, defective and/or could not be acted upon by [Defendant];

b. Claiming that the application submitted on July 29, 2024 was incomplete, improper, defective and/or could not be acted upon by [Defendant];

c. Verbally telling [Plaintiff] in August of 2024 that her address had been changed and that she would soon be awarded coverage or receive a policy;

d. Advising [Plaintiff's] daughter that [Plaintiff] needed to cancel the Mississippi policy;

e. Advising [Plaintiff's] daughter that only a "licensed agent" in the sales department could change an address;

f. Issuing a letter to [Plaintiff] advising her that [Defendant] was unable to process the application due to the reason listed on the letter, but providing no reason;

g. Failing to adhere to the terms of its verbal and written representations and guarantees;

h. Engaging in fraudulent and/or deceptive billing practices which created a likelihood of confusion and misunderstanding;

i. Engaging in fraudulent and/or deceptive conduct which created a likelihood of confusion and misunderstanding by processing [Plaintiff's] premium payments without providing coverage;

j. Accepting [Plaintiff's] monthly premium payments while refusing dental coverage; and

k. Ignoring both applications.

See (Doc. No. 1-1 at 13-14 ¶ 34). The complaint further states that "said statements, assertions and/or representations were false and inaccurate and were knowingly, intentionally and willfully made with the intent to induce [Defendant] to continue paying premiums without coverage," and Plaintiff "justifiably relied" on these misrepresentations. (Id. at 14 ¶¶ 35-36.) The complaint also alleges that Plaintiff suffered a loss of "premium payments of $19.99 a month," "dental treatment," and "[t]he expenses of bringing this action to seek redress for the losses described herein, including attorney's fees." See (id. at 14 ¶ 38).

Plaintiff's complaint fails to allege facts that support her contention that Defendant's agents' statements were "made falsely, with knowledge of its falsity and recklessness as whether it is true or false," and "with the intent of misleading another into relying on it." See Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). Plaintiff's claim of fraud lacks "some measure of substantiation" as required by Rule 9(b)'s heightened pleading standard. See Frederico, 507 F.3d at 200. Plaintiff has failed to "adequately describe[ ] the nature and subject of the alleged misrepresentation" with sufficient detail. See In re Craftmatic Secs. Litig., 890 F.2d at 645.

In addition, likes a UTPCPL claim, a fraud claim requires a plausible allegation of justifiable reliance on the misrepresentation. See Gibbs, 647 A.2d at 889 (stating that an element of fraud is justifiable reliance); Horrell v. ABB Enter. Software, No. 20-cv-01454, 2021 WL 1103527, at *13 (M.D. Pa. Mar. 23, 2021) (stating that under Pennsylvania law, a claim of fraud requires a complaining party to act in justifiable reliance on the misrepresentation and that some injury result). For the same reasons articulated supra in connection with Plaintiff's UTPCPL claim, Plaintiff's complaint fails to plausibly allege that she acted or refrained from acting in reliance on any alleged misrepresentations to her detriment. Therefore, the Court will grant Defendant's motion to dismiss as to Plaintiff's fraud claim (Count II) and afford Plaintiff leave to amend her complaint in an attempt to cure the deficiencies outlined herein.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion, dismiss Counts I and II without prejudice, and grant Plaintiff leave to file an amended complaint. An appropriate Order follows.

[1] The factual background is drawn from Plaintiff's complaint (Doc. No. 1-1 at 5-16), the allegations of which the Court accepts as true for purposes of the pending motion to dismiss. See Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017).

[2] Plaintiff's application is undated, but Plaintiff's complaint refers to this as her "May 2024 Pennsylvania Dental Application." (Doc. No. 1-1 at 9.)

[3] It is unclear from Plaintiff's complaint if Plaintiff is referring to Nicole or to the second agent that assisted Plaintiff's daughter. See (Doc. No. 1-1 at 10).

[4] In addition to the catch-all provision (73 PA. CONS. STAT. § 201-2(4)(xxi)), Plaintiff cites to the following subsections:

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;. . .

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(xii) Promising or offering prior to time of sale to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the referral of the name or names of another or others for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase;

. . .

(xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;

Save trees - read court opinions online on Google Scholar.

**CHRISTOPHER HENEHAN and LORI HENEHAN Plaintiffs,**

**v.**

**PENN ANTHRACITE COLLIERS CO., and AMCO INSURANCE COMPANY, D/B/A NATIONWIDE MUTUAL INSURANCE CO. Defendant.**

Civil No. 3:22-cv-466.

**United States District Court, M.D. Pennsylvania.**

July 11, 2023.

REPORT AND RECOMMENDATION

MARTIN C. CARLSON, Magistrate Judge.

# I. Introduction

Pending before the court is the defendant's, Amco Insurance Company ("Amco"), motion to dismiss two claims in the plaintiffs' amended complaint. (Doc. 18). Initially, the plaintiffs, Christopher and Lori Henehan, brought suit in the Pennsylvania Court of Common Pleas of Lackawanna County against the City of Scranton, Penn Anthracite Colliers Co., and Amco, alleging various federal and state law claims relating to water damage to their residence and their residence being condemned. (Doc. 1-3, Ex. B). In March of 2022, Amco removed the case to federal court, and subsequently, Amco and the City of Scranton filed motions to dismiss. (Docs. 10, 11). The plaintiffs then filed an amended complaint no longer naming the City of Scranton as a defendant, but asserting claims against Amco, their homeowner insurance company, and Penn Anthracite Colliers. (Doc. 17).

The amended complaint asserts the following claims against Amco: bad faith (Count I), breach of contract (Count II), and unfair or deceptive practices under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III). (Id.) Additionally, the plaintiffs assert a negligence claim (Count IV) against Penn Anthracite Colliers. (Id.) After the amended complaint was filed, Amco moved to dismiss Count I and Count III of the amended complaint. (Doc. 18). This motion is ripe for resolution, and for the reasons that follow, we will recommend that the defendant's motion to dismiss be granted.

# II. Statement of Facts and of the Case

The factual background of this case is taken from the allegations set forth in the plaintiffs' amended complaint (Doc. 17), which this court must accept as true when deciding a motion to dismiss. The plaintiffs owned a property located in the City of Scranton. (Id.) The plaintiffs' residence was subjected to a variety of damage, such as subsidence of their basement wall and flooding. (Id., ¶ 7). The plaintiffs allege that their residence was harmed because the neighbor's trees damaged their gutters. (Id.) Also, in their complaint they note that their neighbor had the flexible hoses of their downspouts pointed at the foundation of the plaintiffs' residence. (Id., ¶ 8).

The plaintiffs allege that they filed insurance claims regarding their residence with the defendant, and the defendant did not accept any of the plaintiffs' claims nor did the defendant provide any financial assistance. (Id., ¶ 19). For example, in the summer of 2017, the plaintiffs filed an insurance claim with the defendant that was denied. (Id., ¶ 13). Regarding this denial of their claim, the complaint states that: "Plaintiffs believe the claim was denied because Nationwide contended it did not cover water damage coming in below the foundation, and that water is considered an Act of God." (Id.)

In March of 2018, a section of the plaintiffs' front basement wall collapsed due to water running down the opposite side of the house. (Id., ¶ 14). Subsequently the left wall of the basement collapsed. (Id., ¶ 15). Following this, the plaintiffs had an engineer inspect the situation, the engineer determined that due to a sinkhole on the right side of the basement, which was still intact at the time, the right wall was sinking more than the than the left wall that had recently collapsed. (Id.)

Prior to the neighbor's sale of their residence, the plaintiffs allege that in July of 2019 the neighbor had the trees that were touching the plaintiffs' house cut. (Id., ¶ 16). Subsequently the plaintiffs filed insurance claims concerning the neighbor's trees still causing issues with the gutter and the foundation of the plaintiffs' house. (Id., ¶ 17). The defendant denied these claims, and the plaintiffs allege the defendant informed them "that they are not covered for this and . . . ha[ve] no responsibility to a different homeowner for that homeowner's tree issues." (Id.) The plaintiffs further allege that: "Nationwide had a duty to approve and cover Plaintiffs' multiple claims, which were caused by the known water infiltration from Plaintiffs' neighbors' home and/or in the alternative by the hole underneath Plaintiff's home, which was caused by co-Defendant, Penn Anthracite Colliers Co., mining company." (Id., ¶ 18). The plaintiffs have not resided at the residence at issue since 2018. (Id., ¶ 21). The plaintiffs' home was condemned by the City of Scranton in approximately May of 2021. (Id., ¶ 22).

In November 2021, the plaintiffs initiated this action through a Writ of Summons in the Pennsylvania Court of Common Pleas in Lackawanna County. (Doc. 1-2, Ex. A). The plaintiffs filed a complaint on February 28, 2022, against the following defendants: the City of Scranton, Penn Anthracite Colliers Co., and Amco. (Doc. 1-3, Ex. B). On March 29, 2022, Amco filed a notice of removal of the action to federal court. (Doc. 1). Following removal of the action to federal court, Amco and the City of Scranton filed motions to dismiss the complaint. (Doc. 10-11). The plaintiffs then filed an amended complaint on May 10, 2022, which no longer named the City of Scranton as a defendant. (Doc. 17). The plaintiffs' amended complaint asserts the following three claims against Amco: bad faith (Count I), breach of contract (Count II), and unfair or deceptive practices under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III). (Id.) Also, the plaintiffs assert a negligence claim (Count IV) against Penn Anthracite Colliers. (Id.) Currently pending before the court is Amco's motion to dismiss the plaintiffs' claims of bad faith (Count I) and unfair or deceptive practices under the UTPCPL (Count III). (Doc. 18).

In its motion to dismiss, Amco contends that the plaintiffs fail to meet the standard of pleading required for a statutory bad faith claim under 42 Pa. Cons. Stat. § 8371, and further fail to plead the necessary elements for a claim under the "catchall provision" of the UTPCPL. (Id.) This motion is fully briefed, (Docs. 18, 21) and is therefore ripe for resolution. For the reasons set forth below, it is recommended that this motion to dismiss be granted.

# III. Discussion

## A. Motion to Dismiss — Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal,____ U.S. ____, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of actions will not do."Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level."Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."Id. at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."Id. at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the Court of Appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully."Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of `entitlement of relief.'"

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied, 132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."Id., at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover,

"documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

## B. The Plaintiffs' Bad Faith Claim Should be Dismissed.

Pennsylvania law provides for a cause of action by insurance customers against insurance companies that engage in bad faith claims handling, stating that:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%; (2) Award punitive damages against the insurer; (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371.

Under Pennsylvania law, "[b]ad faith is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 (3d Cir. 1999) (citing Coyne v. Allstate Ins. Co., 771 F. Supp. 673, 678 (E.D. Pa. 1991) (bad faith is failure to acknowledge or act promptly on the claims or refusing to pay without reasonable investigation of all available information)); Romano v. Nationwide Mut. Fire Ins. Co., 435 Pa. Super. 545, 646 A.2d 1228 (1994)). "Ultimately, in order to recover on a bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005). Case law sets exacting standards for any bad faith claim. As the Court of Appeals has observed:

> In the primary case construing bad faith under 42 Pa.C.S.A. § 8371, Terletsky v. Prudential Property & Casualty Co., the Superior Court of Pennsylvania explained:
>
> "Bad faith" on [the] part of [an] insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.
>
> 437 Pa. Super. 108, 125, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). Terletsky held that, "to recover under a claim of bad faith," the insured must show that the insurer "did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim."Id. Thus, an insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions. Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 307 (3d Cir. 1995). Our Court has described "the essence of a bad faith claim" as "the unreasonable and intentional (or reckless) denial of benefits." UPMC Health Sys. v. Metro. Life. Ins. Co., 391 F.3d 497, 506 (3d Cir. 2004). Bad faith "must be proven by clear and convincing evidence and not merely insinuated." Terletsky, 649 A.2d at 688 (collecting cases). As the District Court noted, this heightened standard requires the insured to provide evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." Bostick v. ITT Hartford Grp., 56 F.Supp.2d 580, 587 (E.D. Pa. 1999) (citations omitted).

Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 179 (3d Cir. 2011).

These same exacting standards apply to assessing the sufficiency of complaints alleging bad faith claims under § 8371. When considering whether a proposed statutory bad faith claim under § 8371 fails as a matter of law,

Many federal district courts have recently been called upon to evaluate bad faith complaints in light of Iqbal and Twombly. Under these Supreme Court decisions, plaintiffs must plead sufficient facts to make out a plausible claim for relief against the defendant. See Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557). In the bad faith context, district courts have required more than `conclusory' or `bare-bones' allegations that an insurance company acted in bad faith by listing a number of generalized accusations without sufficient factual support. See e.g., Liberty Ins. Corp. v. PGT Trucking, Inc., Civ. A. No. 11-151, 2011 WL 2552531, at *4 (W.D. Pa. Jun. 27, 2011); Pfister v. State Farm Fire & Cas. Co., Civ. A. No. 11-799, 2011 WL 3651349 (W.D. Pa. Aug. 18, 2011); Atiyeh, 742 F. Supp. 2d at 599 ("However, these averments are merely conclusory legal statements and not factual averments.").

Palmisano v. State Farm Fire & Cas. Co., CIV.A. 12-886, 2012 WL 3595276 (W.D. Pa. Aug. 20, 2012). See Yohn v. Nationwide Ins. Co., 1:13-CV-024, 2013 WL 2470963 (M.D. Pa. June 7, 2013) (collecting cases). Thus, the assessment of the sufficiency of a particular complaint often turns on the specificity of the pleadings and calls for recital of specific factual allegations from which bad faith may be inferred in order to defeat a motion to dismiss. Compare Sypeck v. State Farm Mut. Auto. Ins. Co., 3:12-CV-324, 2012 WL 2239730 (M.D. Pa. June 15, 2012) with Zimmerman v. State Farm Mut. Auto. Ins. Co., 3:11-CV-1341, 2011 WL 4840956 (M.D. Pa. Oct. 12, 2011). Where a complaint's § 8371 bad faith claim simply relies upon breach of contract allegations, coupled with a conclusory assertion that the failure to pay under an insurance policy was "unreasonable" or made in bad faith, courts have dismissed such claims, but typically have afforded litigants an opportunity to further amend and articulate their bad faith claims. See e.g., Wanat v. State Farm Mut., Auto. Ins. Co., 4:13-CV-1366, 2014 WL 220811 (M.D. Pa. Jan. 21, 2014); Cacciavillano v. Nationwide Ins. Co. of Am., 3:12-CV-530, 2012 WL 2154214 (M.D. Pa. June 13, 2012).

Judged against these legal benchmarks, we recommend that Amco's motion to dismiss the plaintiffs' claim of bad faith be granted. In its motion dismiss, Amco asserts that the plaintiffs' amended complaint fails to meet the exacting standard of pleading required for a statutory bad faith claim under 42 Pa. Cons. Stat. § 8371. We agree, finding that the factual averments in the amended complaint state a claim for breach of an insurance contract; however, more is required to state a viable bad faith claim under § 8371. See Moran v. United Services Automobile Ass'n, No. 3:18-cv-2085, 2018 WL 6524385, at *3 (M.D. Pa. Dec. 12, 2018).

In the instant case, Count I of the plaintiffs' complaint consists of little more than allegations of a failure to pay under an insurance policy, coupled with conclusory assertions of bad faith. Such meager allegations, standing alone, do not meet the pleading standards required for a statutory bad faith claim under § 8371. The plaintiffs alleged that the defendant "had a duty to approve and cover Plaintiffs' multiple claims, which were caused by the known water infiltration from Plaintiffs' neighbors' home and/or in the alternative by the hole underneath Plaintiff's home, which was caused by co-Defendant, Penn Anthracite Colliers Co., mining company." (Doc. 17, ¶ 18). In our view, these averments by themselves do not demonstrate a "frivolous or unfounded refusal to pay proceeds of a policy . . ." Terletsky, 437 Pa. Super. 108, 125, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). Such claims, stated in a conclusory manner, do not meet federal pleading standards for a bad faith claim. As the Eastern District of Pennsylvania Court explained in Pasqualino v. State Farm Mut. Auto. Ins. Co., 2015 WL 3444288 (E.D. Pa. May 28, 2015):

> Essentially, Plaintiff's cursory allegations assert that Defendant lacked a reasonable basis for denying Plaintiff's claim for benefits, but do not provide any factual allegations from which the Court could make a plausible inference that Defendant knew or recklessly disregarded its lack of a reasonable basis for denying benefits.

Id. at *5 (footnote omitted).

Accordingly, we conclude that the plaintiffs have failed to meet the exacting standards for pleading a bad faith claim against Amco, and this claim should be dismissed.

## C. The Plaintiffs' UTPCPL Claim Should be Dismissed.

Amco also has moved to dismiss the plaintiff's state law claim under Pennsylvania's Unfair Trade Practices and Consumer Protection law, 73 P.S. § 202-1, et seq. ("UTPCPL"). "[T]he UTPCPL is designed to protect the public from fraud and deceptive business practices." Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 564 (3d Cir. 2008).

In this regard:

> The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits any person from engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices." 73 Pa. Stat. Ann. § 201-3. The UTPCPL enumerates twenty specific forms of prohibited conduct and contains a catchall provision that forbids "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." § 201-2(4). The statute further creates a private cause of action for "[a]ny person who purchases or leases goods or services . . . and thereby suffers any ascertainable loss . . . as a result of the use or employment by any person of a method, act or practice declared unlawful." § 201-9.2(a).

Post v. Liberty Mut. Group, Inc., 2014 WL 2777396 at *2 (E.D. Pa. Jun. 18, 2014).

In their complaint, the plaintiffs do not specify which section of the statute they allege the defendant has violated. (Doc. 17). We conclude that to the extent the complaint could be construed to allege a private cause of action under § 201-9.2(a) the claim fails. On this score: "In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the [UTPCPL], and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 307 (3d Cir. 1995) (citing Gordon v. Pa. Blue Shield, 378 Pa. Super. 256, 548 A.2d 600, 604 (1988)). Thus, if a plaintiff's claim is solely based upon the insurer's refusal to pay under the insurance contract, such an allegation would not rise to the level of malfeasance and constitute a private cause of action under § 201-9.2(a) of the UTPCPL. Zaloga v. Provident Life & Acc. Ins. Co. of Am., 671 F.Supp.2d 623, 632 (M.D. Pa. 2009). Here, the plaintiffs only allege nonfeasance, a "mere failure to perform" rather than misfeasance, "an improper performance of a contracted obligation . . ." (Gordon v. Pennsylvania Blue Shield, 378 Pa. Super. 256, 264 (1988) (quoting Raab v. Keystone Ins. Co., 271 Pa. Super. 185, 412 A.2d 638, 639 (1979)).

In the plaintiffs' brief in opposition, they argue that they have sufficiently alleged a claim for which relief can be granted under the catchall provision of the UTPCPL. In this regard,

> [I]n order `[t]o establish liability under the catch-all provision of the UTPCPL, "a plaintiff must present evidence showing: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss."

Angino v. Santander Bank, N.A., No. 1:15-CV-1145, 2015 WL 13738828, at *10 (M.D. Pa. Dec. 15, 2015), report and recommendation adopted as modified, No. 1:15-CV-1145, 2016 WL 386377 (M.D. Pa. Feb. 2, 2016) (collecting cases).

The defendant argues that the plaintiffs' claim should fail because they have not alleged facts showing justifiable reliance. (Doc. 18, at 25). In response the plaintiffs assert: "Pennsylvania Law is now clear that proof of common law fraud is no longer needed to show a catchall violation. As such, as a legal matter, Plaintiff need not show justifiable reliance." (Doc. 21, at 12) (citations omitted). However, in our view, the plaintiffs' notion that justifiable reliance is no longer required to state a claim under catchall provision is simply incorrect. In 1996, the Pennsylvania General Assembly expanded the catchall provision to include not only fraudulent conduct but also deceptive conduct. See § 201-2(4)(xxi) ("fraudulent *or deceptive conduct* which creates a likelihood of confusion or of misunderstanding.") (emphasis added). Justifiable reliance is an element of common law fraud and although only mere deceptive conduct is required under the statute, justifiable reliance remains a necessary element for relief under the catchall provision even if the plaintiff is only alleging deceptive conduct. Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008). As the Third Circuit has noted:

> Given the Pennsylvania courts' repeated holdings that "[t]o bring a private cause of action under the [Consumer Protection Law], a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance," Yocca, 854 A.2d at 438 (where, as here, the plaintiffs pressed a claim under the post-1996 catch-all provision . . . ), we conclude that private plaintiffs alleging deceptive conduct under the statute's post-1996 catchall provision must allege justifiable reliance.

Id.

Accordingly, this complaint fails because, as pleaded, the plaintiffs do not allege any deceptive conduct by Amco, nor have they alleged that they justifiably relied upon any deceptive conduct to their detriment. In our view, simply refusing to pay a

claim under an insurance policy does not amount to deceptive conduct. The plaintiffs argue: "it is hard to imagine how Plaintiff did not justifiably rely on Defendant's representations Plaintiffs would be covered under the instance insurance policy." (Doc. 21, at 12). However, the amended complaint merely asserts that the defendant "had a duty to approve and cover Plaintiffs' multiple claims." (Doc. 17, ¶ 18). Notably absent from the complaint is any allegation that the plaintiffs relied on the insurance policy, and the plaintiffs do not allege any deceptive conduct by Amco upon which they justifiably relied with respect to these insurance claims. Further, a sweeping assertion that plaintiffs relied upon the fact of an insurance policy to believe that they were covered for any and all hazards proves too much and would, in essence, convert every insurance coverage dispute into a UTPCPL violation. This plainly was not the intent of the statute. Simply put, as currently pleaded, the plaintiffs' UTPCPL claim fails to state a claim upon which relief can be granted. Therefore, this state law claim is also subject to dismissal.

We note that the plaintiffs amended their complaint once already in the course of this litigation, and in our view, the plaintiffs did not add sufficient well pleaded facts concerning Count I and Count III to sustain these claims. Nonetheless, acting out of an abundance of caution, we recommend that these claims be dismissed without prejudice to one final opportunity for the plaintiffs to amend their complaint to properly state well-pleaded facts supporting a claim for bad faith and a claim under the UTPCPL upon which relief can be granted,

## IV. Recommendation

For the foregoing reasons, IT IS RECOMMENDED THAT the defendant's motion to dismiss (Doc. 18) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Save trees - read court opinions online on Google Scholar.

**In the Matter of: Motors Liquidation Company, Debtor.**

**Doris Powledge Phillips, Individually and as Representative of the Estate of Adam Powledge, deceased, the Estate of Rachel Powledge, deceased, the Estate of Isaac Powledge, 16-2472 deceased, the Estate of Christian Powledge, deceased, and the Estate of Jacob Powledge, deceased, FKA Doris Powledge, Plaintiff-Appellant,**

**v.**

**General Motors LLC, Wilmington Trust Company, as GUC Trust Administrator, Defendants-Appellees.**

No. 16-2472.

**United States Court of Appeals, Second Circuit.**

May 3, 2017.

Appeal from the judgment of the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*).

JOSHUA P. DAVIS, Davis Law Group, Houston, TX., for Plaintiff-Appellant.

ARTHUR J. STEINBERG (Scott I. Davidson, *on the brief*), King & Spalding LLP., New York, NY, *for* General Motors LLC., for Defendants-Appellees.

Richard C. Godfrey (Andrew B. Bloomer, *on the brief*), Kirkland & Ellis LLP, Chicago, IL, *for* General Motors LLC., for Defendants-Appellees.

GABRIEL K. GILLETT (Mitchell A. Karlan, Aric H. Wu, *on the brief*), Gibson Dunn & Crutcher LLP., New York, NY *for* Wilmington Trust Co., for Defendants-Appellees.

PRESENT: AMALYA L. KEARSE, JOSÉ A. CABRANES, RAYMOND J. LOHIER, JR., *Circuit Judges*.

## SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

Plaintiff-appellant Doris Powledge Phillips appeals the June 22, 2016 judgment of the district court, denying Phillips's request for relief under Federal Rule of Civil Procedure 60(b) because she was not a party or its legal representative. On appeal, Phillips argues that the court should vacate her Settlement Agreement with General Motors Corporation ("Old GM") because Old GM failed to produce responsive documents during discovery and fraudulently induced her to accept the Settlement Agreement. The bankruptcy court held that Phillips lacked "standing" under Rule 60(b) because she had assigned all interest in her claim "without limitation" to a third party. *See* A-100. The district court affirmed the bankruptcy court's decision. A-5-10. For the reasons set forth in the district court's well-reasoned opinion, we find these arguments to be without merit. We assume the parties' familiarity with the underlying facts, procedural history of the case, and issues on appeal.

* * *

We review a bankruptcy court's denial of Rule 60(b) relief for abuse of discretion. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009); *Grace v. Bank Leumi Tr. Co.*, 443 F.3d 180, (2d Cir. 2006). Relief under Rule 60(b) is only available to "a party or its legal representative." Fed. R. Civ. P. 60(b). Since Phillips assigned all claims "without limitation" relating to her lawsuit against Old GM to a third party, she cannot bring a Rule 60(b) motion. *See* A-100.

Our precedents are clear that a transferor is no longer a proper party to the litigation. "An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n.*, 731 F.2d 112, 125 (2d Cir. 1984); *accord Commonwealth of Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 550-51 (2015).

Phillips cites several cases that are inapposite here. As the district court noted, we have "'extended standing under Rule 60 to non-parties only twice'—in *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180 (2d Cir. 2006) and *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044 (2d Cir. 1982)—and in each instance [we] `expressly limited [our] holding to the facts' at issue." A-8. Those cases are not analogous to the instant appeal. We have no precedent for allowing substantially affected parties to bring Rule 60 motions once their rights have been transferred to another party. *See Aaron Ferer & Sons Ltd.*, 731 F.2d at 125.

Accordingly, we conclude that the district court properly denied Phillips's motion for Rule 60(b) relief because Phillips is no longer a party within the meaning of Rule 60(b).

# CONCLUSION

We have considered all of appellant's claims on appeal and found them to be without merit. For the foregoing reasons, the judgment of the District Court is AFFIRMED.

Save trees - read court opinions online on Google Scholar.

**ITT CORPORATION, ITT ENIDINE INC., INTERNATIONAL MOTION CONTROL INC., Plaintiffs-Appellants,**

**CLEVELAND MOTION CONTROLS, INC., NOW KNOWN AS ITT TORQUE SYSTEMS, Plaintiff,**

**v.**

**PATRICK P. LEE, MICHAEL A. SIINO, E. WAYNE FOLEY, Defendants-Appellees.**

No. 16-0615-cv.

**United States Court of Appeals, Second Circuit.**

October 18, 2016.

Appeal from the February 8, 2016 judgment of the United States District Court for the Southern District of New York (Forrest, J.).

RUSSELL S. JONES, JR., (Ronald M. Daignault, on the brief), Polsinelli PC, Kansas City, Missouri and New York, New York, for Plaintiffs-Appellants.

ROBERT J. LANE, JR., (Cynthia Giganti Ludwig, on the brief), Hodgson Russ LLP, Buffalo, New York, for Defendants-Appellees.

PRESENT: JON O. NEWMAN, GERARD E. LYNCH, CHRISTOPHER F. DRONEY Circuit Judges.

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

On September 7, 2007, ITT Corporation acquired International Motion Control Inc. ("IMC"), and its subsidiaries Enidine Incorporated ("Enidine") and Cleveland Motion Controls, Inc., through a merger agreement (the "Agreement"). The Agreement transferred the rights to numerous patents, including U.S. Patent No. 7,131,367 ("the '367 Patent"),[1] to ITT. IMC warranted that, "to the Knowledge of the Company," those patents were valid and enforceable. App'x at 37. "Knowledge of the Company" was defined as "the actual knowledge, after reasonable investigation . . . of responsible managerial employees" including the defendants, who were executives of the acquired companies. *Id.* at 86. In 2012, defendant Patrick P. Lee became associated with Kyntec Corporation and is now Chairman of Kyntec's Board of Directors. At the time of the Agreement, Lee was Chairman and CEO of IMC, as well as its "Stockholders' Representative," and signed the Agreement in those capacities. *Id.* at 131.

In April 2014, Kyntec commenced an action in the Western District of New York, seeking a declaratory judgment that the '367 Patent and its claims were invalid and unenforceable.[2] In response, the plaintiffs brought the instant suit on April 8, 2015 against the defendants—alleging (1) breach of contract, (2) intentional breach of contract, (3) fraud, and (4) breach of fiduciary duty—in connection with the defendants' alleged obligation under the Agreement to make a reasonable investigation of IMC's patents' validity and enforceability. The Plaintiffs-Appellants appeal the district court's grant of the defendants' motion to dismiss all claims. We assume the parties' familiarity with the underlying facts and procedural history of this case.

"We review the grant of a motion to dismiss *de novo.*" *Fahs Constr. Grp, Inc. v. Gray*, 725 F.3d 289, 290 (2d Cir. 2013) (per curiam). We "accept all factual claims in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Id.* (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012)) (internal quotation marks omitted).

# 1. Obligations Under the Agreement

In Section 3.12 of the Agreement, IMC warranted that "to the Knowledge of the Company," the intellectual property being transferred was valid and enforceable. App'x at 37. The Agreement defined "Knowledge of the Company" as "the actual knowledge, after reasonable investigation" of various managerial employees including the defendants. *Id.* at 86. Notably, Section 11.8 stated that no past, present, or future officer, employee, or stockholder "shall have any liability for any obligations or liabilities of the Company or the Stockholders' Representative under this Agreement." *Id.* at 78.

The plaintiffs contend that Section 11.8 does not bar their claims, because they allege that defendants breached *their own* obligations under the Agreement, rather than IMC's. Indeed, each count of the Amended Complaint alleges that the defendants breached individual obligations and duties under the Agreement to perform reasonable investigations of patent validity. The defendants contend that no such individual obligations exist under the contract. We agree. Section 3.12—which plaintiffs allege created a duty for the defendants—specifically sets out the "Representations and Warranties" *of IMC,* not the defendants. Article IV of the Agreement specifies the "Representations and Warranties" of the stockholders individually and does not include any obligation to reasonably investigate the validity of any intellectual property. *Id.* at 48-50. Meanwhile, although the "Definitions and Defined Terms" section of the Agreement contemplates "reasonable investigation" by the defendants, it does not explicitly impose any obligation on the defendants to engage in such investigation. We therefore hold that the Agreement did not impose an obligation on defendants to reasonably investigate the intellectual property's validity. Since the plaintiffs' claims are premised upon the existence of such an obligation, their claims necessarily fail.

# 2. Statute of Limitations

Even assuming *arguendo* that the defendants *did* have obligations to reasonably investigate, we agree with the district court that the plaintiffs' claims are time-barred.

The merger closed on September 7, 2007. Plaintiffs commenced this action on April 7, 2015—over seven years later. Section 9.4(f) of the Agreement stipulates that representations and warranties of the Parties survive for two years after the closing date, or five years for warranties and representations regarding "Fundamental Matters." *Id.* at 71. Section 9.4(g) provides an exception in cases of fraud, intentional breach, or willful misconduct—in which case a longer statute of limitations could govern. Even assuming that Section 9.4(g) applies, plaintiffs commenced this action outside of New York's six-year statute of limitations for breach of contract, *see* N.Y. C.P.L.R. § 213(2).

Plaintiffs contend that their breach of contract claims are nonetheless timely because ITT did not know of the alleged breach until 2014. However, New York does not apply the discovery rule to the statute of limitations in contract actions. *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015). Instead, the limitations period "begins to run from the time when liability for [the] wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *Id.* (internal quotation mark omitted).

Plaintiffs further argue that their breach of contract claims are timely because they are subject to equitable tolling. The district court declined to equitably toll the plaintiffs' claims. We review that decision for abuse of discretion. *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003). Equitable tolling is warranted only in rare and exceptional circumstances. *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011). A litigant seeking equitable tolling must establish: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). We find that the district court did not abuse its discretion in concluding that the plaintiffs had not alleged such an extraordinary circumstance, especially where the plaintiffs have failed both on appeal and below to allege *any* diligence during the limitation period. Thus, we find the plaintiffs' contract claims untimely.

Plaintiffs seek to avoid the time bar by pleading an actual fraud claim. Under New York law, actions based on fraud have a limitations period of six years *or* two years from the time the plaintiff discovered the fraud. N.Y. C.P.L.R. § 213(8). However, "

[w]hen a fraud claim is incidental to another asserted claim, the claim does not sound in fraud for purposes of taking advantage of the longer limitations period." _Corcoran v. New York Power Auth._, 202 F.3d 530, 545 (2d Cir. 1999). A fraud action is not incidental to another claim "only when: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." _Id._ The alleged fraud did not occur separate from and subsequent to the alleged breach of contract. In fact, the claims rest upon violation of the exact same contractual provisions, and the plaintiffs allege no subsequent fraudulent conduct. Moreover, the alleged injuries caused are plainly not distinct, given that the Amended Complaint lists identical damages for the fraud and breach of contract claims. Therefore, the plaintiffs are not entitled to take advantage of the longer limitations period for fraud claims.

The plaintiffs further claim that their intentional breach of contract claims sound in tort. In New York, "a tort cause of action cannot accrue until an injury is sustained." _Kronos, Inc. v. AVX Corp._, 612 N.E.2d 289, 292 (N.Y. 1993). Plaintiffs' claims might be deemed timely under that standard.[3] However, their claims do not sound in tort. "A breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." _Bd. of Managers of Beacon Tower Condo. v. 85 Adams St., LLC_, 25 N.Y.S.3d 233, 239 (N.Y. App. Div. 2016); _see also New York Univ. v. Cont'l Ins. Co._, 662 N.E.2d 763, 767 (N.Y. 1995) ("[D]efendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations."). The plaintiffs allege no such independent legal duty. Their claims are based on the defendants' alleged breach of their purported _contractual_ duty to perform a reasonable investigation of IMC's intellectual property. Since the plaintiffs' claims do not sound in tort, they are not entitled to the statute of limitations applicable to tort claims. _See Corcoran_, 202 F.3d at 544-45 ("In applying a Statute of Limitations it is basic that one look[s] to the essence of plaintiff's claim and not to the form in which it is pleaded." (quoting _State v. Cortelle Corp._, 341 N.E.2d 223, 224 (N.Y. 1975)) (internal quotation marks omitted)).

Lastly, the plaintiffs' fiduciary duty claim is also time-barred. In New York, breach of fiduciary duty claims seeking money damages are subject to a three-year statute of limitations under N.Y. C.P.L.R. § 214(4). _IDT Corp. v. Morgan Stanley Dean Witter & Co._, 907 N.E.2d 268, 272 (N.Y. 2009). However, "where an allegation of fraud is essential to a breach of fiduciary duty claim," courts have instead applied N.Y. C.P.L.R. § 213(8)—which includes a two-year discovery rule. _Id._ Plaintiffs assert that their fiduciary duty claim is based on an allegation of fraud. We disagree. As with plaintiffs' other claims, plaintiffs' fiduciary duty claim is, in essence, a breach of contract claim, refashioning alleged violations of purported contractual obligations as breaches of fiduciary duty. Fraud is not essential to the claim.

We have considered the Appellants' remaining arguments and find them to be without merit. Accordingly, we AFFIRM the judgment of the district court.

[1] The '367 Patent concerns a recoil damper design for firearms. App'x at 169.

[2] On January 25, 2016, the United States Patent and Trademark Office issued an _Ex Parte_ Reexamination Certificate, confirming the patentability of all the '367 Patent's claims. The parties filed a joint notice in the declaratory judgment action in which ITT Enidine Inc. represented that it would not appeal the Office's confirmation of the patentability of the '367 Patent to any court or agency. _See_ Joint Notice ¶ 4, Kyntec Corp. v. ITT Enidine Inc., No. 14 Civ. 271 (W.D.N.Y. Jan. 26, 2016), ECF No. 73.

[3] The plaintiffs argue that their alleged tort action is timely because they were "unaware of Appellees' intentionally fraudulent conduct" prior to Kyntec's filing suit in April 2014. Appellant's Br. at 16. However, in New York, tort claims accrue at the date injury was sustained rather than the date plaintiff discovered the injury. _Kronos_, 612 N.E.2d at 292. Plaintiffs' alleged injuries include "significant patent maintenance fees and other fees paid in connection with the Registered Intellectual Property." App'x at 149. If such alleged injuries occurred more than six years prior to commencement of this action, the plaintiffs' claims would be untimely even if construed as tort claims.

Save trees - read court opinions online on Google Scholar.

(2008)

**JIMMIE E. LOFTEN Plaintiff,**

**v.**

**FRANCINE DIOLOSA, et al., Defendants.**

Civil Action No. 3:CV-05-1193.

**United States District Court, M.D. Pennsylvania.**

July 31, 2008.

# MEMORANDUM

THOMAS I. VANASKIE, District Judge.

This predatory lending practice action arises out of the sale of real estate to a new home buyer in the Pocono Mountain region of Pennsylvania. Pending before this Court are motions to dismiss. Defendants — consisting of real estate developers, a mortgage broker, appraisers, and a mortgage lender — essentially challenge the viability of each claim asserted by the plaintiff purchaser under federal and state law. For the reasons that follow, the motions to dismiss will be granted in part and denied in part. Specifically, this case will be allowed to proceed on the claims asserted under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., against all Defendants, as well as the claim of breach of fiduciary duty against the real estate developer and mortgage broker asserted in the Eighth Claim for relief and the claim of unjust enrichment against all Defendants presented in the Ninth Claim for relief. Claims asserted under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq.; the Truth in Lending Act ("TILA"), 15 U.S.C. § 1664, et seq. and its implementing Regulation Z, 12 C.F.R. § 226.24, et seq.; the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601, et seq.; and the Pennsylvania common law on fraud will be dismissed without prejudice, affording Plaintiff leave to amend the deficiently presented causes of action.[1]

# I. BACKGROUND

Plaintiff Jimmie E. Loften avers that as a result of Defendants' "conspiracy and fraudulent acts," Plaintiff "purchased a house for approximately 50% to 100% in excess of its actual value; he was obligated to pay a note and mortgage based upon the inflated valuation of the home and not the true value," and Defendants all profited from this allegedly fraudulent endeavor. (Am. Compl., ¶ 100.) Plaintiff avers that Defendants Francine and Joe Diolosa and their affiliated companies[2] engaged in false advertising directed toward unsophisticated, lower income, first time home buyers living in the New York Metropolitan Area. (Id. at ¶¶ 21-23.) Plaintiff claims that there were material misrepresentations as to the amount in real estate taxes that would be required, pre-payment penalties, the market value of the home, and the benefit of legal representation in connection with the transaction. (Id. at ¶¶ 36, 37, 63, 65.) Plaintiff avers that the Diolosa Defendants conspired with Defendant appraisers Robert and Jean Innamorati to inflate the value of the property being acquired. (Id. at ¶ 75.) Plaintiff avers that the Diolosa Defendants procured Defendant Fremont Mortgage & Loan Company ("Fremont") to provide the financing necessary for the transaction. (Id. at ¶¶ 44-46.) Plaintiff asserts that Fremont, as a knowing participant in the conspiracy, failed to follow its customary underwriting guidelines and due diligence procedures (id. at ¶ 125), and that Fremont "fraudulently completed a `Request for Verification of Employment' form" necessary for the mortgage. (Id. at ¶ 116.) Plaintiff claims that Fremont "knew or should have known that it was procuring a sub-prime loan from inflated values from a person who may not have been able to procure the mortgage." (Id. at ¶ 106.) Plaintiff further avers, "upon information and belief," that Fremont was aware of the predatory lending practices in the Pocono region, but "[r]ather than forego the profitability of sub-prime lending . . . Fremont . . . agreed to provide funding." (Id. at ¶¶ 120, 121.)

Plaintiff avers "upon information and belief" that Fremont "intended to hold the loan for a short period of time and then intended to sell or `flip' the loan to Freddie Mac or Fannie Mae or some other pooled mortgage fund" in order to receive (1) "the original principal amount of the loan without having to wait for each amortized payment;" (2) "an additional approximate 3% to 4% of the gross amount of the loan as premium;" and (3) a percentage of "each monthly mortgage payment over the

life of the loan as a result of their servicing agreement with a secondary mortgage holder." (Id. at ¶ 96.) Four months after the closing, Fremont transferred servicing rights of the mortgage to another mortgage company, Saxon Mortgage.[3] (Id. at ¶ 97.)

The First Claim for relief asserted in the Amended Complaint is against Defendants Diolosa and Builders. It alleges that Francine Diolosa, Joe Diolosa, Builders, MOC, Lenders Financial, Robert Innamorati, and Jean Innamorati comprised an association-in-fact enterprise within the meaning of RICO. (Id. at ¶ 175.) Plaintiff avers that Francine and Joe Diolosa, both solely and jointly, conducted the affairs of the enterprise through a pattern of racketeering activity consisting of mail and wire fraud. (Id. at ¶¶ 179-188.) Plaintiff avers that he has been injured as a result of this pattern of racketeering activity in that he has purchased a home at a price substantially below its fair market value, with a mortgage he cannot afford. He also asserts that he has sustained "emotional and psychological damages," and that his credit worthiness has been destroyed. (Id. at ¶¶ 189, 190.)

The Second Claim for relief is premised upon an alleged conspiracy between Defendants MOC and Lenders Financial with Defendants Diolosa. It alleges that Defendants MOC and Lenders Financial knowingly participated in and facilitated the alleged conspiracy through a number of overt acts, including mail and wire fraud, from which they received substantial remuneration. (Id. at ¶¶ 195-208.)

The Third Claim for relief asserts that Defendant Fremont conspired with Defendants Diolosa, Builders, MOC, and Lenders Financial in violation of 18 U.S.C. § 1962(c). Plaintiff avers that Fremont knowingly participated in the conspiracy and performed overt acts in furtherance of the alleged conspiracy, the object of which was "to bring each of the prospective home purchasers, including the instant Plaintiff, to the point of settlement for which the Defendants Diolosa, Mortgage, Lenders Financial and Defendant Fremont would receive substantial remuneration." (Id. at ¶¶ 209-223.)

The Fourth Claim for relief essentially mirrors the Third Claim, asserting similar RICO conspiracy allegations against appraiser Defendants Innamorati. (Id. at ¶¶ 225-239.)

The Fifth Claim for relief is asserted against all Defendants for alleged violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. § 201-1, et seq. Plaintiff avers that all Defendants "acted in concert with each other to execute the fraudulent scheme and deceptive conduct" covered by this anti-fraud statute. (Id. at ¶ 241.) Allegedly, this conduct included misrepresentations about the value and financing of the home as well as Plaintiff's ability to repay the mortgage. (Id. at ¶¶ 243-286.) Although the paragraphs set within the Fifth Claim do not differentiate among Defendants, earlier averments that do differentiate are incorporated by reference in the Fifth Claim.

The Sixth Claim for relief is brought against all Defendants for violations of the Truth in Lending Act ("TILA") and Regulation Z, 12 C.F.R. § 226.24(c). Essentially, Plaintiff asserts that violations of these federal laws constitute per se violations of the UTPCPL. Again, the averments presented under this claim for relief do not identity the spection actions attributable to particular Defendants, but generally alleges that all Defendants have violated these federal laws.

The Seventh Claim for relief, asserted against all Defendants, is brought under the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601, et seq. Plaintiff avers payments of unearned fees and kickbacks, failure to provide notice of the transfer of Plaintiff's mortgage, and failure to provide proper settlement forms at closing, all in violation of RESPA. (Id. at ¶¶ 302-309.) Once again, the Amended Complaint does not delineate the actions that each Defendant supposedly took in violation of this federal law.

The Eighth, Ninth, and Tenth Claims assert violations of Pennsylvania common law. Plaintiff brings the Eighth Claim against Defendants MOC and Lenders Financial alleging a breach of fiduciary duty for failure to act in Plaintiff's best interests. The Ninth Claim asserts an unjust enrichment claim against all Defendants. (Id. at ¶¶ 320-325.) The Tenth Claim alleges common law fraud as to all Defendants. The allegations of fraud set forth in the Tenth Claim do not differentiate among Defendants, though earlier averments that do are incorporated by reference in the Tenth Claim. (Id. at ¶¶ 326-331.)

The Complaint asserts one prayer for relief, asking for an award of compensatory damages in excess of $500,000 dollars against all Defendants, jointly and severally; treble damages for sums paid by the initial lender to the brokers, allegedly in violation of RESPA; and damages against all Defendants, in an amount not to exceed $1,000 per Plaintiff, for the alleged violations of RESPA. In addition, Plaintiff seeks attorneys' and experts' fees, injunctive and equitable relief, and punitive damages.

The original Complaint was filed on June 15, 2005, (Dkt. Entry 1), and motions to dismiss were filed by Defendants. (Dkt. Entries 11, 12, 16, 26, 51.) While motions were pending, Plaintiff's original Counsel withdrew (Dkt. Entry 54), and this Court stayed litigation by Order dated September 29, 2006. (Dkt. Entry 55.) Plaintiff's current Counsel entered the proceedings on August 27, 2007, (Dkt. Entry 57) and the Order staying litigation was vacated on October 10, 2007. (Dkt. Entry 59.) Oral argument on the first round of motions to dismiss was heard on November 28, 2007. During oral argument, Counsel for Plaintiff expressed a desire to file an amended complaint, which could be done as a matter of right pursuant to FED. R. CIV. P. 15(a). Plaintiff filed the Amended Complaint on January 14, 2008, (Dkt. Entry 64), setting off a new round of motions to dismiss by Defendants. Three separate motions to dismiss have been filed. (Dkt. Entries 65, 66, and 71.) With the exception of Defendants Diolosa, Builders, Lenders Financial, and MOC, all moving parties have submitted memoranda of law in support of their positions.[4] Plaintiff has filed appropriate opposition briefs. The motions for dismissal are ripe for decision.

## II. DISCUSSION

### A. Standard of Review

The Court's task on a motion to dismiss is to "determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief . . . ." Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). In doing so, all factual allegations and all reasonable inferences drawn therefrom are assumed to be true. Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

Dismissal of a complaint is appropriate only if, accepting as true all facts alleged, Plaintiff has not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). As a result of Twombly, Plaintiffs must now nudge their claims "across the line from conceivable to plausible." Id. To state a claim consistent with the language of FED. R. CIV. P. 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," a complaint must contain factual allegations enough "to raise a right to relief above a speculative level." Id. Each of the claims asserted in the Complaint will be assessed in the context of this standard of review.

### B. First through Fourth Claims for Relief — The RICO Claims Against All Defendants

The First Claim is brought under RICO against Defendants Diolosa and Builders. The Second Claim is brought against Defendants Lenders Financial and MOC, alleging these Defendants conspired with the Diolosas to violate the RICO Act. In the Third Claim for relief, Plaintiff claims lender Defendant Fremont conspired with Defendants Diolosa, Builders, MOC, and Lenders Financial to violate 18 U.S.C. § 1962(c). The Fourth Claim is brought against Defendants Robert and Jean Innamorati, appraisers who purportedly conspired with Defendants Diolosa, Builders, MOC, and Lenders Financial to violate 18 U.S.C. § 1962(c).

To state a claim for relief under 18 U.S.C. § 1962(c), a plaintiff must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). A RICO conspiracy claim requires additional averments showing a plausible conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. See e.g., Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989), overruled on other grounds, Beck v. Prupis, 529 U.S. 494 (2000). Defendants' motions present the question of whether the averments of the Amended Complaint show a plausible ability to meet each of these elements of the RICO and RICO conspiracy claims. Defendants Diolosa, Builders, MOC, and Lenders Financial argue that the Amended Complaint fails to sufficiently plead an enterprise and a pattern of racketeering activity, the elements necessary to establish a claim under 18 U.S.C. § 1962. Relying on Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993), Defendants argue that because the underlying claim is deficient, the RICO conspiracy claim asserted against them, accordingly, fails. Arguments of Defendants Innamorati essentially mirror those of Defendants Diolosa, Builders, MOC, and Lenders Financial. Defendant Fremont argues that Plaintiff's averments against Fremont are too "vague" and "generic" to assert a viable RICO conspiracy claim against it. Fremont also claims it was not involved in any of the predicate acts of mail and wire fraud alleged in the complaint.

## 1. RICO Enterprise

An essential requirement of a RICO claim is the existence of an enterprise. See 18 U.S.C. § 1962(b) and (c). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiff asserts the existence of an association-in-fact enterprise.

There are three factors elements to an association-in-fact enterprise: (1) "an ongoing organization, formal or informal;" (2) "the various associations function as a continuing unit;" and (3) the enterprise exists "separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981). The Third Circuit has expanded Turkette by additionally requiring "that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions." United States v. Irizarry, 341 F.3d 273, 286 (3d Cir. 2003) (quoting United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983)).

Defendants Innamorati argue that the Amended Complaint fails to adequately plead an association-in-fact enterprise, particularly its existence "separate and apart from" the pattern of racketeering activity, as required by Turkette. Contrary to the premise of this argument, a plaintiff is not required to satisfy the Turkette factors at the pleadings stage. Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790 (3d Cir. 1984), cert denied, 469 U.S. 1211 (1985). "Riccobene and Turkette certainly stand for the proposition that a plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be pleaded in order to state a cause of action." Id. In Seville, the complaint's "bare allegation" of four entities believed to be enterprises was enough "put the defendant on notice of the claims against him." Id. "The rules of pleading require nothing more at this early juncture than that bare allegation." Id. Therefore, it is unnecessary to demonstrate the Turkette and Riccobene factors, and it is enough that Plaintiff alleged the existence of an enterprise consisting of an association of various individuals and corporations, i.e., Francine and Joe Diolosa, Builders, MOC, Lenders Financial, and Robert and Jean Innamorati. Such pleading of an association-in-fact enterprise is sufficient to survive this stage of litigation. In this regard, Twombly does not alter the result. The averments indicate a plausible association-in-fact enterprise under the leadership and direction of the Diolosas, with the other individuals and entities playing a contributory role in an ongoing business association.

## 2. Pattern of Racketeering Activity

Another essential element of a RICO claim is a pattern of racketeering activity. See e.g., Sedima, 473 U.S. at 496. A pattern of racketeering activity is defined as "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity includes a number of indictable acts under the federal criminal code, including mail and wire fraud under 18 U.S.C. §§ 1341, 1343. 18 U.S.C. § 1961(1). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The principal purpose of this particularity requirement at the pleading stage is "to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading." Beard v. World Wide Mortgage Corp., 354 F. Supp. 2d 789, 799 (W.D. Tenn. 2005). "The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum `the time, place, and content of the alleged misrepresentation . . .; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Id. (quoting Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993).

> Instances of mail and wire fraud are averred in the Complaint as follows: 169. The misrepresentations of the value of the property being sold and the Plaintiff's employment status generated by the Defendants in the preparation of the transmittal of the appraisal report and mortgage application constitute violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 . . . . 170. The misrepresentations, statements, and conversations between the Defendants Diolosa, Builders, and Lenders with the Plaintiff utilizing the telephone wires, postal transmittals, and facsimile transmittal through the telephone wires constitute a violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 . . . . 188. The Defendants Diolosa committed countless acts of mail fraud and wire fraud related to the instant Plaintiff . . . [including] mailings containing misrepresentations or omissions made in furtherance of the schemes, and the utilization of radio and television transmissions placed by other builders and developers which contained misrepresentations or omissions in furtherance of the schemes.

Plaintiff avers that these are predicate acts constituting a pattern of racketeering activity under 18 U.S.C. § 1961. These averments are stated with some modicum of particularity, and suffice to put Defendants on notice of the nature of the alleged fraudulent activity. For instance, the Defendants are on notice of the time period, 2001 through March 2005, over which the alleged fraud took place. Additionally, Plaintiff has indicated that alleged fraud took place over the wires and through the mail, and that the content of the alleged fraud dealt with the value and characteristics of the property being sold and Plaintiff's employment status. Accordingly, the RICO claim will not be dismissed for failure to adequately plead a pattern of racketeering activity.

## 3. Conspiracy

To plead a conspiracy under § 1962(d), a "plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." Shearin, 885 F.2d at 1166. "[A]greement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity" must also be plead. Id. at 1166-67. Finally, although the Complaint need not allege that each Defendant in the conspiracy claim himself violated the underlying substantive provision, Smith v. Berg, 247 F.3d 532, 537-38 (3d Cir. 2001), it must be shown that at least one of the co-conspirators violated the relevant predicate subsection, in this case 18 U.S.C. § 1962(c). See e.g., Lum v. Bank of America, 361 F.3d 217, 227 n. 5 (3d Cir. 2004) (upholding dismissal of § 1962(d) claim because plaintiff failed to adequately plead any substantive RICO violation).

The Complaint approximates the time period for the conspiracy as beginning in 2001 and continuing through March 2005. (Am. Compl., ¶ 212, 229.) The object of the conspiracy was allegedly "to bring each of the prospective home purchasers, including the instant Plaintiff, to the point of settlement," for which Defendant Fremont received "substantial remuneration in the form of sales proceeds, settlement fees, debt service, and the ability . .. to resell the loan and/or servicing rights and receive new funds," and for which Defendants Innamorati received "substantial remuneration in the form of sales proceeds, financing charges, servicing fees, and appraisal fees." (Id. at ¶¶ 213, 230.) Actions taken in furtherance of the alleged scheme included, with regard to Fremont, failure "to follow [Fremont's] own guidelines and regulations pertaining to a review of the mortgage application and financial determinations," and failure to "exercise due diligence in [Fremont's] determination, if any, of the mortgage being tendered to the instant Plaintiff." (Id. at ¶¶ 214, 223.) With regard to Defendants Innamorati, actions taken in furtherance of the alleged conspiracy include conducting and supervising a fraudulent and inflated appraisal on Plaintiff's property. (Id. at ¶¶ 231-238.) The Complaint contains averments that Defendants Fremont and Innamorati knew or should have known of and agreed to the commission of numerous predicate acts, reflecting the necessary mens rea for the existence of a conspiracy. (Id. at ¶¶ 215, 234.)

Plaintiff has adequately plead the elements required to assert a conspiracy claim against moving Defendants: the time period for the conspiracy, the object of the conspiracy, the actions taken in furtherance of the conspiracy, and the agreement to commit conspiracy. Furthermore, as noted above, Plaintiff has adequately plead the elements of enterprise and pattern of racketeering activity necessary to assert the underlying substantive claim, a violation of § 1962(c). Accordingly, motions to dismiss the Third and Fourth Claims asserting RICO conspiracy claims against Defendants Fremont and Innamorati must be denied.

## C. Fifth Claim for Relief — Violation of the UTPCPL by All Defendants

The Fifth Claim generally avers that "Defendants' acts, misrepresentations, omissions of material facts, practices, and non-disclosures alleged [in the Complaint] constituted unlawful, unfair, deceptive, and fraudulent business practices and acts within the meaning of the PaUTPCPL." (Am. Compl., ¶ 243.) For example, Plaintiff alleges that "Defendants made misleading and deceptive statements and omissions concerning the value and the financing of the home being purchased by this Plaintiff with the intent that this Plaintiff relied [sic] on their statements concerning the value of the house and the financing." (Id. at ¶ 249.) Plaintiff alleges that Defendants violated the following:

> (i) Passing off goods or services as those of another;

> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;

(iii) Causing likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with, or certification by another;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

(vii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

(Id. at ¶¶ 272, 283.) Plaintiff claims to have been injured as a result of these specific unfair or deceptive acts or practices, and therefore entitled to seek redress as authorized by 73 P.S. § 201-9.2.

Defendants Innamorati and Fremont argue that none of these enumerated provisions apply to any actions taken specifically by these Defendants. Furthermore, they move to dismiss on the ground that unfair or deceptive acts have not been alleged with sufficient particularity.[5]

The UTPCPL enumerates twenty "unfair methods of competition" and "unfair or deceptive acts or practices," see 73 P.S. § 201-2(4)(I)-(xx), and contains a catch-all provision proscribing "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. § 201-2(4)(xxi). The catch-all provision has been recognized as applying to residential real estate transactions. See e.g., Wilson, et al. v. Parisi, et al., No. 3:CV-04-1737 (Feb. 7, 2006, Dkt. Entry 104); Hearns v. Parisi, et al., No. 3:CV-05-0323 (March 27, 2006, Dkt. Entry 42); Lester v. Percudani, No. 3:01-CV-1182, 2008 WL 763591, at *13-15 (M.D. Pa. Mar. 21, 2003); In re Barker, 251 B.R. 250, 261-62 (Bankr. E.D. Pa. 2000).

Courts have used the elements of common law fraud as a guideline for evaluating a claim under the UTPCPL catch-all provision. See e.g., Skurnowicz v. Lucci, 798 A.2d 788, 794 (Pa. Super. Ct. 2000) (catch-all provision requires proof of common law fraud); Booze v. Allstate Ins. Co., 750 A.2d 877, 880 (Pa. Super. Ct. 2000) (same). The elements of common law fraud include (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that a recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; (5) damage to the recipient as the proximate result of the misrepresentation. See e.g., City of Philadelphia v. Lead. Indus. Assoc., No. 90-CV-7064, 1992 WL 98482, at *5 (E.D. Pa. Apr. 23, 1992) (citing Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991)). "Fraud must normally be plead with specifics concerning time, place, speaker, and at times even the content of the alleged misrepresentation." In re Johnson, 292 B.R. 821, 827 (E.D. Pa. Bankr. 2003) (citing Luce v. Edelstein, 802 F.2d 49, 52 (2d Cir. 1986)). The purpose of pleading these elements is to provide defendants notice of particular unfair or deceptive acts asserted against them and "reasonable opportunity to answer." Id. (quoting Ross v. A.H. Robins Co., 607 F.2d 545, 557-58 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980)).

The Fifth Claim alleges violations of the UTPCPL by "all Defendants" without any differentiating averments. Though he incorporates "by reference each and every allegation set forth [in other sections of the Complaint] as if alleged in full [in the UTPCPL claim]," Plaintiff has failed to articulate the conduct of each Defendant alleged to constitute a violation of the UTPCPL. Nor has he alleged the particular provisions of the UTPCPL violated by a particular Defendant. Furthermore, allegations that Fremont violated the UTPCPL are inconsistent with other sections of the Amended Complaint, which aver that Plaintiff had no contact with Fremont whatsoever.[6] Under these circumstances, the Amended Complaint does not satisfy the requirement that fraud be alleged with particularity as to each Defendant. Accordingly, motions challenging the viability of the Fifth Claim for relief will be granted and the UTPCPL claim dismissed with leave to amend.

## E. Sixth Claim for Relief — Violation of the UTPCPL by all Defendants Based Upon Violations of the Federal Truth in Lending Act and Regulation Z

The Sixth Claim for relief asserts that all Defendants violated 15 U.S.C. § 1664(d) and 12 C.F.R. § 226.24, et seq., and that these violations of federal law constitute unfair trade practices actionable under the UTPCPL.[7] Defendants Innamorati move to dismiss this claim on the grounds that there is no averment in the Complaint that the appraiser Defendants engaged in any advertising pertinent to this case. Plaintiff concedes in his Opposing Memorandum that the allegations contained in this claim are not attributable to Defendants Innamorati. Accordingly, the challenge brought by Defendants Innamorati is meritorious and they will be dismissed as Defendants to the Sixth Claim.

Defendant Fremont also moves to dismiss the Sixth Claim on the alternative grounds that a violation of these federal statutes is not a per se violation of the UTPCPL. Like the Innamoratis, Defendant Fremont also contends that the Complaint does not contain any averment that Fremont participated in any advertisement pertinent to this case. Plaintiff has not identified any paragraph in the Complaint to contradict this assertion. The Sixth Claim can be dismissed as to Defendant Fremont on the ground that no false advertising has been attributed to it, obviating consideration of whether or not violations of these federal statutes constitute per se violations of the UTPCPL. Accordingly, the Sixth Claim for relief

> The down payment, if any. (2) The terms of repayment. (3) The rate of finance charge expressed as an annual percentage rate. 12 C.F.R. §226.24 (Regulation Z) provides:
>
> If any of the following terms is set forth in an advertisement, the advertisement shall meet the requirements of paragraph (c)(2) of this section: (i) The amount of percentage of any down payment. (ii) The number of payments or period of repayment. (iii) The amount of any repayment. (iv) The amount of any finance charge. against Defendants Innamorati and Fremont will be dismissed, with leave to amend.

## F. Seventh Claim for Relief — Violation of Real Estate Settlement and Procedures Act by all Defendants

The Seventh Claim for relief alleges that all Defendants violated the anti-kickback, unearned fee, and notice provisions of the Real Estate Settlement and Procedures Act (RESPA). 12 U.S.C. § 2601, et seq.[8] Plaintiff also avers that Defendants violated the provision of RESPA requiring that notice be given to a borrower not less than fifteen (15) days before the effective date of the closing or transfer of the servicing of the mortgage loan or not more than thirty (30) days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan. 12 U.S.C. § 2605(2).

Defendants move to dismiss this claim for relief as legally insufficient. Defendants, noting that RESPA expressly permits payment of different types of fees for services and facilities, see 12 U.S.C. § 2607(c); Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004, 1005-06 (9th Cir. 2002), assert that the utter failure of Plaintiff to identify (a) any particular fee or payment proscribed by RESPA;[9] (b) who paid the fee; and (c) who received the alleged improper fee render the Seventh Claim for relief deficient.

This Court in Wilson, emphasized that "a particular plaintiff may have a RESPA anti-kickback claim against a particular defendant or defendants, but no plaintiff would have a RESPA claim against every defendant." Wilson, et al. v. Parisi, et al., No. 3:CV-04-1737 (Feb. 7, 2006, Dkt Entry 104). The Court, as it did in Wilson, now admonishes Plaintiff to identify a particular Defendant or Defendants implicated in an alleged illegal payment in order to afford Defendants adequate notice of the basis for such a claim. Plaintiff's attempts at clarification in his memorandum in opposition to Defendants' motions to dismiss do not remedy the deficiencies in his Amended Complaint. Furthermore, with regard to the notice provision violations, Plaintiff has not countered Defendants' objections at all. Moreover, because allegations pertaining to the lack of notice are made against all Defendants, despite the duties being incumbent only on some Defendants, Plaintiff has failed to show a plausible claim for relief based upon an alleged RESPA notice violation. Accordingly, Plaintiff's RESPA claim against all Defendants must be dismissed. Plaintiff, however, will be given leave to file an amended complaint with respect to the matter of allegedly prohibited payments and violations of the notice provision under RESPA. Again, Plaintiff is avers that this additional $3000 fee was paid solely to Defendants Diolosa. This $3000 payment paid to the Diolosas is the only one alleged in violation of RESPA. No payment to Defendants Innamorati or Fremont is specifically averred to have been made in violation of RESPA. admonished to specify the fees he claims were improper, who paid the fees, who received the fees, the amount of the fees, and why each fee was improper. Such a claim may be asserted only against the generator and recipient of the allegedly improper payment, and Defendants may not be lumped together. Likewise, Plaintiff is cautioned to

identify a particular Defendant or Defendants allegedly responsible for breach of the notice provisions of § 2605, indicating how the notice provisions were purportedly violated.[10]

## G. Ninth Claim for Relief — Unjust Enrichment Claim Against All Defendants[11]

The Ninth Claim for relief asserts an unjust enrichment claim against all Defendants. Unlike other causes of action brought against all Defendants, Plaintiff avers in his Ninth Claim for relief facts attributable to specific Defendants as evidencing unjust enrichment. Plaintiff articulates the unjust enrichment claim in the following paragraphs:

321. The Defendant Fremont issued a loan to the Plaintiff which it knew he could not afford to repay in order to unjustly generate fees for itself and enable it to sell the Plaintiff's mortgage loan to Saxon in order to reap further financial benefits all of which was done to the detriment of the Plaintiff.

322. The Defendants Innamorati willfully inflated the appraisal of the Plaintiff's property in order to secure future business from the Defendants Diolosa, Mortgage and Lenders, and to enrich itself and the other Defendants to the detriment of the Plaintiff.

323. The Defendants Diolosa and Builders fraudulently inflated the cost of labor and materials used in the reconstruction of the Plaintiff's home in order to increase the sales price of the home, and to enrich themselves and the other Defendants to the detriment of the Plaintiff.

324. The Defendants Fremont, Mortgage and Lenders fraudulently completed a "Request for Verification of Employment" form in order to fund and then sell the Plaintiff's mortgage loan to enrich themselves and the other Defendants to the detriment of the Plaintiff.

325. The Defendants Fremont, Mortgage and Lenders willfully and knowingly withheld information regarding the terms of the Plaintiff's mortgage loan from the Plaintiff in order to conceal the pre-payment penalty and sub-prime terms, and to force the Defendants into executing the mortgage loan to enrich themselves and the other Defendants to the detriment of the Plaintiff.

(Am. Compl., ¶¶ 321-325.)

Relying on Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999), Defendant Fremont moves to dismiss the Ninth Claim on the ground that Plaintiff is barred from asserting an unjust enrichment claim as a matter of law because an explicit, written contract, the Note and Mortgage signed at closing, exists between the parties. Plaintiff concedes that the existence of an explicit, written contract would bar a claim for unjust enrichment, but contends that a valid contract does not exist between the parties.

In order to assert a claim of unjust enrichment, a plaintiff must show (1) he or she has conferred a benefit on the defendant, (2) the defendant has appropriated the benefits, and (3) that the defendant has accepted and retained these benefits under such circumstances as to make it unjust. See e.g., Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000); Temple Univ. Hosp. Inc., v. Healthcare Mgmt. Alternatives, Inc., 82 A.2d 501, 507 (Pa. Super. Ct. 2003). The unjust enrichment claim asserted by Plaintiff contains all of these elements as to each Defendant. Defendant Fremont's motion to dismiss this claim fails because an unjust enrichment claim can exist in the face of a written contract if the contract was procured by fraud. See e.g., Abdulaziz v. City of Philadelphia, No. 00-CV-5672, 2001 WL 818476, at *2 (E.D. Pa. June 26, 2001) (denying defendant's motion to dismiss an unjust enrichment claim where it was not clear that an express written contract existed between the parties because plaintiff alleged that the contract had been procured by fraud.) Accordingly, because Plaintiff has adequately plead the elements of an unjust enrichment claim against all Defendants, motions to dismiss the Ninth Claim for Relief will be denied.

## H. Tenth Claim for Relied — Fraud Claim Against All Defendants

Plaintiff generally avers that "Defendants misrepresented the facts relating to the Plaintiff's purchase of the property and the mortgage loan in order to induce him to buy the property . . . ." (Am. Compl., ¶ 328.) Defendants move to dismiss the Tenth

Claim on the grounds that Plaintiff has failed to allege fraud with the particularity required by FED. R. CIV. P. 9(b).

As laid out above in the discussion on the Fifth Claim for Relief asserting violations of the UTPCPL, "[f]raud must normally be plead with specifics concerning time, place, speaker, and at times even the content of the alleged misrepresentation." In re Johnson, 292 B.R. 821, 827 (E.D. Pa. Bankr. 2003) (citing Luce v. Edelstein, 802 F.2d 49, 52 (2d Cir. 1986)). These specifics must be plead as to each Defendant in order to accomplish the purpose of providing defendants with notice of particular unfair or deceptive acts asserted against them and "reasonable opportunity to answer." Id. (quoting Ross v. A.H. Robins Co., 607 F.2d 545, 557-58 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980)).

The required level of specificity is not reached by Plaintiff's allegations, which provide in part:

> The Defendants knowingly and intentionally misrepresented material facts of their transaction with the Plaintiff by inflating the appraised value of the property, by misrepresenting the market value of the property, by providing the Plaintiff with a loan he could not afford to repay, by misrepresenting the terms of his mortgage loan, by misrepresenting the actual size of the property when Defendant J. Diolosa told the plaintiff that the property was greater than an acre when it was not, by not giving the Plaintiff credit for a $3000 payment on the property, and by inflating the cost of labor and materials used in reconstructing the property.

(Am. Compl., ¶ 327). Because each Defendant's participation in the transaction varied, it is imperative that notice of particular fraudulent acts or practices be provided as to each Defendant. The Amended Complaint clearly fails to meet this basic pleading obligation. Accordingly, the Tenth Claim for Relief asserting a common law fraud claim against all Defendants is dismissed without prejudice. Plaintiff is admonished to provide the required specificity as to each Defendant in the Amended Complaint.

## I. Other Issues

Defendants Innamorati have also moved pursuant to FED. R. CIV. P. 12(e) to require Plaintiff to re-plead, asserting that much of the lengthy pleading is too vague or ambiguous to allow for a meaningful response. Defendants Innamorati also rail against the indefinite nature of many of the Amended Complaint's averments, which fail to distinguish among Defendants.

These issues have been addressed to a large degree in determining whether viable claims for relief have been presented against particular Defendants in this matter. For example, the UTPCPL, RESPA, and common law fraud claims must be amended by specifying conduct attributable to a particular defendant. The RICO and unjust enrichment claims have been found adequate and Plaintiff will not be required to file a more definite pleading as to those particular claims.

Defendants have also moved to strike the request for injunctive relief for violations of the UTPCPL, on the grounds that relief for private actions under the UTPCPL is limited to money damages, attorneys' fees and costs, and that injunctive relief may only be granted when an action is brought under the UTPCPL by the Attorney General of Pennsylvania. See 73 P.S. §§ 201-4, 201-4.1. Plaintiff concedes that Defendants are correct on this point. Accordingly, any amended pleading must not include a prayer for injunctive relief in connection with any UTPCPL claim.

## III. CONCLUSION

For the reasons set forth in the foregoing Memorandum, Defendants' motions to dismiss will be granted in part. Specifically, the Fifth, Sixth, Seventh, and Tenth Claims will be dismissed with leave to amend. In all other respects, the motions to dismiss will be denied. An appropriate Order follows.

ORDER for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. The Motion to Dismiss filed on behalf of Defendants Diolosa, Builders, MOC, and Lenders Financial (Dkt. Entry 65) is GRANTED IN PART. The claims asserted against Defendants Diolosa, Builders, MOC, and Lenders Financial in Claims Five, Six, Seven, and Ten are DISMISSED, WITHOUT PREJUDICE. In all other respects, the Motion to Dismiss of Defendants Diolosa, Builders, MOC, and Lenders Financial is DENIED.

2. The Motion to Dismiss filed on behalf of Defendants Robert and Jean Innamorati (Dkt. Entry 66) is GRANTED IN PART. The claims asserted against Defendants Robert and Jean Innamorati in Claims Five, Six, Seven, and Ten are DISMISSED,

WITHOUT PREJUDICE. In all other respects, the Motion to Dismiss of Defendants Innamorati is DENIED.

3. The Motion to Dismiss filed on behalf of Defendant Fremont (Dkt. Entry 71) is GRANTED IN PART. The claims asserted against Defendant Fremont in Claims Five, Six, Seven, and Ten are DISMISSED, WITHOUT PREJUDICE. In all other respects, the Motion to Dismiss of Defendant Fremont is DENIED.

4. A telephonic scheduling conference shall be held on September 4, 2008, at 2:00 p.m. Counsel for Plaintiff is responsible for making the arrangements for the conference call.

[1] This action is similar to several other actions brought in this Court alleging fraudulent sales and lending practices in the Pocono Mountain Real Estate Market. See e.g., Wilson, et al. v. Parisi, et al., No. 3:CV-04-1737 (Feb. 26, 2008, Dkt. Entry 301) (granting in part and denying in part Defendants' Motions for Summary Judgment,); Hearns v. Parisi, et al., No. 3:CV-05-0323, (Mar. 3, 2008, Dkt. Entry 117) (granting Defendants' Motions for Summary Judgment); Jeppson v. Parisi, et al., No. 3:CV-05-0564 (Oct. 4, 2007, Dkt. Entry 97)(granting Defendants' Motions for Summary Judgment); Vicuna v. Parisi, et al., No. 3:CV-05-1515 (July 26, 2007, Dkt. Entry 47) (granting in part and denying in part Defendants' Motions to Dismiss); Alvarez, et al. v. Parisi, et al., No. 3:CV-05-0624 (June 18, 2007, Dkt Entry 59) (dismissing action for failure to comply with Court order); and Gaines v. Parisi, et al., No. 3:CV-06-0074 (March 30, 2007, Dkt. Entry 36) (granting in part and denying in part lender's motion to dismiss). Though these other cases differ from the instant case primarily in the identity of the defendant developers, apparent consensus that the holdings in resolving motions to dismiss filed in these other cases would apply in the instant case was reached at the oral argument on motions to dismiss the original Complaint, held on November 28, 2007. (Dkt. Entry 76, at 3-4.) The holdings in this case are essentially consistent with the rulings in those other cases.

[2] Builders R Us, Inc. ("Builders"), incorporated by Joe Diolosa, who serves as the company's controlling shareholder and officer (Am. Compl., ¶ 11); Mortgage Office Corp. ("MOC"); and Lenders Financial, allegedly owned and operated by Defendant MOC as a fictitious business entity (Am. Compl., ¶ 13.)

[3] Saxon Mortgage was named as a defendant in the original Complaint,(Dkt. Entry 1), but was not included as a defendant in the Amended Complaint.

[4] Local Rule of Court 7.5 provides that a supporting memorandum of law must be filed within ten days of filing any pre-trial motion, in default of which the motion will be deemed withdrawn. Indications by this Court at oral argument on November 28, 2007, may have caused Defendants Diolosa, Builders, MOC, and Lenders Financial to believe that they could rely upon briefs in support of their original motion to dismiss if new motions to dismiss were filed in response to Plaintiff's Amended Complaint. Therefore, where arguments made by these Defendants in the original and fully briefed motion to dismiss and the current pending motion overlap, this Court will consider these arguments. Where there is no overlap, however, this Court will dismiss these new arguments by Defendants Diolosa, Builders, MOC, and Lenders Financial, pursuant to Local Rule 7.5.

[5] Defendants Innamorati also argued that this Court should decline to exercise supplemental jurisdiction over this state law claim, as well as the other state law claims: the Ninth Claim for relief alleging an unjust enrichment claim and the Tenth Claim alleging a common law fraud claim. That argument was premised upon an assumption that Plaintiff could not present any viable federal law claims. Because the RICO claims have withstood the motion to dismiss, this Court may properly exercise supplemental jurisdiction over the related state law claims.

[6] Similar inconsistencies existed in Wilson, et al. v. Parisi, No. 3:CV-04-1737 (Feb. 7, 2006, Dkt. Entry 104), and Hearns v. Parisi, et al., No. 3:CV-05-0323 (March 27, 2006, Dkt. Entry 42), leading this Court to conclude that the UTPCPL claim did not satisfy the requirement that fraud be plead with particularity as to the lender defendants in those cases, and the UTPCPL claim was, accordingly, dismissed.

[7] 15 U.S.C. § 1664(d) (TILA) provides:

Requisite disclosures in advertisement If any advertisement to which this section applies states the amount of the down payment, if any, the amount of any installment payment, the dollar amount of any finance charge, or the number of installments of the period of repayment, then the advertisement shall state all of the following items: (1)

[8] The unearned fee and anti-kickback provision articulated in § 2607(a) provides:

No person shall give and no person shall receive any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident or a part of a real estate settlement service involving a federally related mortgage shall be referred to any person.

[9] Plaintiff does identify one fee in the Seventh Claim, the additional $3000 fee tendered after closing that was not contained on the HUD-1 Settlement Sheet. Plaintiff

[10] Plaintiff also asserts that the "RESPA regulations provide that the Purchaser, the instant Plaintiff, receive a HUD-1 Settlement Sheet . . . at the time of the settlement" and that Plaintiff never received it. Though the Amended Complaint does not specify, presumably Plaintiff is asserting a violation of § 2603, which requires a lender provide this type of form to borrowers. As Defendants correctly point out, § 2603

does not explicitly provide for a private cause of action and courts have determined that no implicit cause of action exists under § 2603. See Morrison v. Brookstone Mortgage Co., Inc., 415 F. Supp. 2d 801, 806 (S.D. Ohio 2005).

[11] Though in their presently pending motion to dismiss Defendants MOC and Lenders Financial challenge the sufficiency of the Eighth Claim for relief, asserting a breach of fiduciary duty against them, this argument is not addressed in the memorandum in support of Defendants' original motion to dismiss. Accordingly, pursuant to Local Rule of Court 7.5, the motion to dismiss the Eighth Claim on behalf of Defendants MOC and Lenders Financial is deemed withdrawn.

Save trees - read court opinions online on Google Scholar.

**DREMA ODELL,**

**v.**

**CIT BANK, Formerly One West Bank, N.A. and SAFEGUARD PROPERTIES.**

Civil Action No. 17-1850.

**United States District Court, E.D. Pennsylvania.**

August 24, 2017.

DREMA ODELL, Plaintiff, Pro Se.

CIT BANK, Defendant, represented by CARMON M. HARVEY, LECLAIRRYAN & EMILY SANTORO, LECLAIR RYAN.

SAFEGUARD PROPERTIES, Defendant, represented by DIANE B. CARVELL, RAWLE & HENDERSON LLP.

# MEMORANDUM OPINION

TIMOTHY J. SAVAGE, District Judge.

This dispute arises out of a state-court foreclosure action brought by CIT Bank, which holds a mortgage on real property in Newtown Square, Pennsylvania. Plaintiff Drema Odell resides in the property, which was part of the estate of the late Edward W. Weingartner, Jr. Although she is the executrix of the estate, Odell brings this action in her own capacity, not as the personal representative of the estate. She sues CIT Bank, N.A., which holds the mortgage on the property, and Safeguard Properties, the company CIT Bank hired to secure the property during the foreclosure process.

Odell claims the defendants broke into her home, stole her personal belongings, and engaged in deceptive business practices, causing her emotional distress. In her *pro se* complaint, she brings claims for conversion, trespass, negligence, negligent infliction of emotional distress, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL),[1] punitive damages, and quiet title.

The defendants have filed motions to dismiss. CIT Bank argues that Odell has not stated a cognizable claim against it. Safeguard Properties moves to dismiss the emotional distress, UTPCPL, and punitive damages claims against it.

Because Odell does not state claims for negligent infliction of emotional distress, violations of the UTPCPL, or punitive damages against Safeguard Properties, we shall grant its motion to dismiss those claims only. Against CIT Bank, Odell has not stated claims for conversion, negligent infliction of emotional distress, UTPCPL, punitive damages, and quiet title. She does state claims for trespass and negligence. Therefore, we shall grant CIT Bank's motion in part and deny it in part.

# Background[2]

On November 2, 2007, Edward W. Weingartner, Jr., granted a reverse mortgage for property located at 1801 Whispering Brooke Drive, Newtown Square, Pennsylvania to Financial Freedom Senior Funding Corporation.[3] On May 5, 2009, the mortgage was assigned to Mortgage Electronic Registration Systems, Inc. (MERS).[4] In February 2012, two months after Weingartner's death, MERS assigned the mortgage to One West Bank, now CIT Bank, N.A.[5]

The same day Weingartner took out the mortgage, he deeded the property to Florida Real Estate, LLC.[6] According to CIT Bank, Odell is the sole and managing member of Florida Real Estate.[7]

Odell was named "executrix and sole beneficiary and heir of Mr. Weingartner's estate."[8] According to CIT Bank, she has been residing at the property rent-free "since at least the time of Weingartner's death."[9]

On March 26, 2012, One West Bank filed a foreclosure action against Florida Real Estate in the Chester County Court of Common Pleas.[10] On May 19, 2013, it amended the complaint to add Odell as a defendant in her capacity as executrix of Weingartner's estate.[11] Odell claims that One West Bank agreed to a short sale in July 2013 and February 2015.[12] Apparently, there was no sale.

On March 25, 2015, Odell discovered that the front door lock of the property had been changed.[13] The back door window was broken and the master bedroom had been "trashed."[14] The water had stopped running.[15] Many of her belongings, including jewelry and designer handbags, were missing.[16] Odell called two locksmiths and the police.[17]

That same day, Odell's attorney sent a letter to One West Bank inquiring if it was aware of the incident.[18] One West Bank did not respond.[19] One week later, Odell found a snake in her closet.[20]

On April 27, 2015, Odell walked downstairs after returning home from work and found a contractor in the house.[21] The contractor informed her that "they were there on behalf of the bank that owned the house to finish winterizing the house."[22] Odell asked him to step outside the house, where she discovered a second contractor.[23] The contractors showed her a work order and later emailed it to her.[24] Defendant Safeguard Properties was hired by "NSTAR" to winterize the property and change the locks.[25]

On February 5, 2016, Safeguard placed a white sticker on the front door of the property. The sticker provided a phone number to call if the property was not vacant.[26] When Odell called Safeguard, a customer service agent informed her that "the Bank named Nationstar" had hired Safeguard on behalf of One West Bank.[27] She now alleges that Safeguard contractors, agents of One West Bank, were responsible for the earlier entry.

Meanwhile, in April 2015, One West Bank had filed a quiet title action against Odell as executrix of Weingartner's estate and against Florida Real Estate in the Chester County Court of Common Pleas.[28] On July 7, 2015, the court consolidated the quiet title and the foreclosure actions.[29]

On the morning of February 10, 2016, on her way to the Chester County courthouse to attend a pretrial conference, Odell's security company called her, reporting that "the security had been breached."[30] Odell claims that "[s]omeone with the bank tried to break in at that exact moment."[31] There is no allegation that there had been an unauthorized entry into the property or who actually breached security.

On March 2, 2016, Odell filed an action in this district court against One West Bank, N.A. and Safeguard Properties, as well as four other defendants: Financial Freedom Senior Funding Corporation, Nationstar Mortgage, MERS, and John Doe.[32] On June 30, 2016, the complaint was dismissed for lack of diversity jurisdiction.[33]

Subsequent to filing the March 2, 2016 complaint, Odell filed two bankruptcy actions. The first case, a Chapter 13 bankruptcy filed by Odell as the executrix of Weingartner's estate on March 10, 2016, was dismissed May 24, 2016.[34] The second case, a Chapter 11 bankruptcy filed by Florida Real Estate on April 27, 2016, was dismissed April 12, 2017.[35]

Twelve days later, on April 24, 2017, Odell filed this action against CIT Bank and Safeguard Properties. In addition to alleging the same causes of action as her March 2, 2016 complaint, she asserts a quiet title action against CIT Bank.

On June 26, 2017, the Chester County Court of Common Pleas entered judgment in favor of CIT Bank on its quiet title claims against Florida Real Estate and Odell in her capacity as executrix of Weingartner's estate.[36] The parties entered into a stipulation in which they agreed to withdraw all claims and defenses regarding the legal description of the property or the validity of the mortgage.[37] CIT Bank also agreed to pay Odell $5,000.[38] On July 20, 2017, pursuant to their agreement, the parties filed a praecipe for entry of judgment and assessment of damages against Odell as executrix of Weingartner's estate and Florida Real Estate in the amount of $950,739.45 in exchange for CIT Bank forbearing and refraining from any legal action against the property for sixty days and not causing any sheriff's sale until February 14, `.[39]

## Standard of Review

A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint. In order to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009) (quoting _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Iqbal_, 556 U.S. at 678.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. Then, we determine whether the facts alleged, if proven, show that the plaintiff has a plausible claim for relief. _Fowler v. UPMC Shadyside_, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting _Iqbal_, 556 U.S. at 679).

All well-pleaded allegations of the complaint must be accepted as true and interpreted in the light most favorable to the plaintiff and all inferences must be drawn in the plaintiff's favor. _See McTernan v. City of York_, 577 F.3d 521, 526 (3d Cir. 2009) (internal quotation marks omitted). To survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." _Victaulic Co. v. Tieman_, 499 F. 3d 227, 234 (3d Cir. 2007) (quoting _Twombly_, 550 U.S. at 555).

A conclusory recitation of the elements of a cause of action is not sufficient. _Phillips v. Cty. of Allegheny_, 515 F.3d 224, 233 (3d Cir. 2008). The plaintiff must allege facts necessary to make out each element. _Id._ (quoting _Twombly_, 550 U.S. at 563 n.8). In other words, the complaint must contain facts which, if proven later, support a conclusion that a cause of action can be established.

Additionally, the _pro se_ plaintiff's pleadings are considered deferentially, affording her the benefit of the doubt where one exists. _Mala v. Crown Bay Marina, Inc._, 704 F.3d 239, 244 (3d Cir. 2013) (citing _Higgs v. Att'y Gen._, 655 F.3d 333, 339 (3d Cir. 2011)). With these standards in mind, we shall accept as true the facts as they appear in Odell's complaint and draw all possible inferences from these facts in her favor.

# Analysis

## _Statute of Limitations_

Actions for conversion, trespass, negligence resulting in injury to property, and negligent infliction of emotional distress must be filed within two years of the accrual of the cause of action. 42 Pa. Cons. Stat. § 5524.[40] Odell filed this action on April 24, 2017. Thus, Odell's tort claims that accrued before April 24, 2015 are barred by the statute of limitations.

Odell bases her claims for trespass and negligent injury to property on three separate occurrences. First, on March 25, 2015, Odell returned home to find her locks changed, her back window broken, her water turned off, and her closet open with items missing, including jewelry and designer handbags.[41] One week later, she discovered a snake in her bedroom, which she attributed to the incident the previous week.[42] Second, on April 27, 2015, Odell discovered two men inside the house who "said they were there on behalf of the bank that owned the house to finish winterizing the house" and provided her with a Safeguard work order.[43] Third, on February 10, 2016, "the bank tried to break in" when she was en route to court in her Chester County case.[44]

The April 27, 2015 and February 10, 2016 acts fall within the limitations period. The March 25, 2015 events do not. Therefore, unless an exception applies, her claims for conversion and negligent infliction of emotional distress arising from the March 25, 2015 occurrences are barred by the statute of limitations.

# Pennsylvania Discovery Rule

The statute of limitations does not start running until the plaintiff knows or could have known that she had been injured and the defendant caused the injury. _Morgan v. Petroleum Prods. Equip. Co._, 92 A.3d 823, 828 (Pa. Super. 2014). The plaintiff has an obligation to exercise reasonable diligence to inform herself of the facts and circumstances giving rise to her cause of action and to initiate suit within the limitations period. _Crouse v. Cyclops Indus._, 745 A.2d 606, 611 (Pa. 2000) (citing _Hayward v. Med. Ctr. of Beaver Cty._, 608 A.2d 1040, 1042 (Pa. 1992)).

The application of the discovery rule is generally a question of fact. *Id.* (quoting *White v. Owens-Corning Fiberglas Corp.*, 668 A.2d 136, 144 (Pa. Super. 1995)). However, where the facts are clear and reasonable minds would not differ, the commencement of the limitations period may be decided as a matter of law. *Id.* (citing *Hayward*, 608 A.2d at 1043).

Odell knew that she had been injured and suspected CIT Bank on March 25, 2015. That same day, her lawyer sent a letter to CIT Bank "inquiring if they were aware of the break in." If she did not know of CIT Bank's involvement at that time, she had an obligation to exercise due diligence to discover who was responsible. About a month later, she learned the identity of the Safeguard Properties subcontractor. In February 2016, she knew that Safeguard was there at the request of One West Bank, CIT Bank's predecessor. Therefore, Odell cannot rely on the discovery rule to toll the limitations period for the March 25, 2015 trespass.

# Continuing Violations

Odell cannot show that the April 27, 2015 and February 10, 2016 events are continuing violations of the March 25, 2015 events. The continuing violations doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). The doctrine applies when: (1) the violations are of the same type and are connected; (2) the acts are recurring; and (3) the initial act did not have the degree of permanence that would have alerted the plaintiff that she had a duty to assert her rights then. *Id.* (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 n.9 (3d Cir. 1995)).

The incidents of April 27, 2015 and February 10, 2016 are not practices continuing from March 25, 2015. Each involves a discrete act. Hence, the continuing violations doctrine does not apply.

In sum, there is no exception to toll the statute of limitations for Odell's conversion and negligent infliction of emotional distress claims. Accordingly, we consider only the claims arising after April 24, 2015.

## Conversion

Odell alleges the unlawful deprivation of her property in only one instance: the March 25, 2015 break-in. She alleges "jewelry bags had been emptied" and designer "handbags were missing."[45] The alleged conversion took place more than two years before Odell started this action. Therefore, because it is barred by the statute of limitations, Count I will be dismissed as to CIT Bank.

## Trespass

Odell alleges two unauthorized entrances into the property within the limitations period. The first was on April 27, 2015, when two men from Safeguard were inside the house.[46] She contends that the defendants had "a duty to ensure that Safeguard and its subcontractors only entered vacant property or otherwise appropriate properties for maintenance, ensure that the subcontractors were not thieves to steal property and to otherwise refrain from disturbing the peace, peaceful use and enjoyment of the owners and occupants of the property."[47] She also alleged facts explaining how she learned that CIT Bank engaged Safeguard.[48]

Odell has stated a claim for trespass against CIT Bank based on the April 27, 2015 allegations. The complaint alleges that Odell resides at the property, persons acting on behalf of CIT Bank entered the property without her permission, and the entry was not privileged.

Under the doctrine of respondeat superior, "[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment." *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. 2000). Viewing the allegations in the light most favorable to Odell, she may be able to show that the bank directed the actions of the persons who entered the property without authorization. Therefore, she has stated a claim for trespass against CIT Bank based on the April 27, 2015 incident. She may proceed on Count II of her complaint.

The second incident occurred on February 10, 2016, when "the security company called and said that the security had been breached."[49] She concludes that "[s]omeone with the bank tried to break in at that exact time."[50] She alleges no other facts supporting her claim that anyone entered the house. One could not reasonably find or infer that the defendants had any connection to the security alarm activating, nor that there was anyone in the property. She has not stated a claim against either of the defendants arising from the incident of February 10, 2016.

## Negligence

To establish a *prima facie* case of negligence under Pennsylvania law, a plaintiff must show: (1) a defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) the breach caused the injury at issue; and (4) the plaintiff incurred actual loss or damages. *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27 (Pa. 2006).

Odell claims that the defendants had a duty "to properly vet its winterizing company prior to hiring it to winterize Plaintiff's house and to determine the record owner of the premises. . . . not to enter upon her property without permission . . . to as certain [sic] that it was in fact a vacant house prior to ordering the contractors to do the work and then to leave some indication as to who was in the house so that Plaintiff did not have worry that it was a family member or drug people."[51]

Viewing the facts in the light most favorable to Odell, she has stated a claim for negligence. She has alleged that CIT Bank breached its duty owed her as the occupant and owner of the property when persons under the defendants' control and direction unlawfully entered her home. With respect to damages, Odell alleges that the contractors "disturb[ed] the peace" and prevented the "peaceful use and enjoyment of the owners and occupants of the property."[52] Therefore, because Odell alleges the elements of a negligence claim against CIT Bank, she may proceed on Count III.

## Negligent Infliction of Emotional Distress

Odell does not dispute that she did not allege a physical injury as a result of having discovered her home had been ransacked. Instead, she argues that she need not do so.

In her complaint, she describes her emotional harm as follows:

> It is an understatement to say that the shock of seeing the entire contents of one's home dumped on the floor is more than the emotional harm a reasonable person should be expected to bear. To see her house ransacked and valuable heirlooms taken, doors and windows broken. And in the next few days to have no running water in the house in zero weather. And, a week later to wake up to go to work and find a snake which was left by the robbers in the Plaintiff's bedroom closet under the clothes they had thrown on the floor.
> [53]

In short, she alleges the initial shock upon seeing the condition of her home on March 25, 2015 and a snake in her closet a week later. She does not allege any physical harm. Thus, because she has not stated a requisite element of a cause of action for negligent infliction of emotional distress, we shall dismiss Count IV of her complaint against both defendants. *Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. 2008), *aff'd, Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 94-95 (Pa. 2011)).

## Unfair Trade Practices and Consumer Protection Law

In her response to CIT Bank's motion to dismiss, Odell does not address the UTPCPL argument made by CIT Bank.[54] She apparently concedes that she has not made out a cause of action under the UTPCPL. Nevertheless, had Odell opposed the motion, her claim would not survive.

The UTPCPL provides a private cause of action for any "person who purchases or leases goods or services" who sustains the loss of money or property as the result of unfair and deceptive practices. 73 Pa. Cons. Stat. § 201-9.2(a). It aims to protect consumers of goods and services.

Odell was not a consumer of either of the defendants' goods or services. There was no consumer transaction. Therefore, Odell has not alleged the essential elements of a claim under the UTPCPL.

Even if there had been the requisite relationship alleged, her UTPCPL count would still fail. She recites the elements of a cause of action under the UTPCPL and makes conclusory statements. She does not allege facts that make out unfair or deceptive practices or that she suffered harm caused as a result of such conduct. Therefore, we shall dismiss her claim under the UTPCPL in Count V.

## Punitive Damages

With respect to punitive damages, Safeguard argues that "[t]his matter is an ordinary negligence case and does not warrant punitive damages."[55] CIT Bank argues that Odell has "failed to plead any facts supporting such a claim."[56]

Punitive damages are damages awarded in addition to compensatory damages to "punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct." _Hutchison ex rel. Hutchison v. Luddy_, 870 A.2d 766, 770 (Pa. 2005). They "are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." _Id._

There is no independent cause of action for punitive damages. _DiGregorio v. Keystone Health Plan E._, 840 A.2d 361, 370 (Pa. Super. 2003) ("It is settled law that one cannot recover punitive damages independently from an underlying cause of action."). "If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages are only an element of damages." _Id._ (internal quotation marks omitted) (quoting _Kirkbride v. Lisbon Contractors, Inc._, 555 A.2d 800, 802 (Pa. 1989)).

Odell has claimed punitive damages as a separate count in her complaint. We shall dismiss Count VI, the punitive damages count. However, we shall allow her to seek punitive damages provided she can prove a basis for such damages.

## Quiet Title

CIT Bank argues that Odell does not have standing to bring a quiet title action in her individual capacity because she does not have a legal interest in the property. In the alternative, CIT Bank argues that we should abstain from deciding the claim pursuant to _Brillhart v. Excess Ins. Co. of Am._, 316 U.S. 491 (1942), because the quiet title and foreclosure case it brought in the Chester County Court of Common Pleas was ongoing.

The state court action has been adjudicated. On June 26, 2017, the Chester County Court of Common Pleas entered judgment in favor of CIT Bank on its quiet title claim. Later, on July 20, 2017, the parties filed a praecipe for entry of judgment in favor of CIT Bank on its foreclosure claims against Florida Real Estate and Odell in her capacity as executrix of Weingartner's estate.[57] In this case, Odell brings her quiet title claim in her individual capacity, not as the executrix of Weingartner's estate.

In her complaint, Odell alleges that she resides at 1801 Whispering Brooke Drive.[58] She alleges that she owns the parcel at issue and that the ongoing foreclosure proceeding "impairs the right and title of Plaintiff to real property outside the `footprint' described by the metes and bounds of the outside edge of the residential structure at 1801 Whispering Brooke Drive."[59] She claims "all of the real property from outside the edges of the residential structure and extending to the perimeter described in the metes and bounds deep description."[60] Because she does not seek to eject another occupant from the property, she brings her action to quiet title "to determine any right, lien, title or interest in the land or determine the validity or discharge of any document, obligation or deed affecting any right, lien, title or interest in land." Pa. R. Civ. P. 1061(b)(2).

A motion to dismiss for lack of standing is brought under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. A motion to dismiss for lack of standing can be "factual" or "facial." _Constitution Party of Pa. v. Aichele_, 757 F.3d 347, 358 (3d Cir. 2014). Because CIT Bank argues that Odell does not have a legal interest in the property, it makes a factual attack on her standing. In considering a factual attack, we "may weigh and `consider evidence outside the pleadings.'" _Id._ (quoting _Gould Elecs. Inc. v. United States_, 220 F.3d 169, 176 (3d Cir. 2000)).

The jurisdiction of federal courts is limited to actual cases or controversies. Article III of the Constitution requires that a plaintiff suffer an injury-in-fact, that is, "the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical." <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 278 (3d Cir. 2014) (citing <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992)); <u>see also</u> <u>In re Horizon Healthcare Servs. Inc. Data Breach Litig.</u>, 846 F.3d 625, 633 (3d Cir. 2017). "An injury is `concrete' if it is real, or distinct and palpable, as opposed to merely abstract, and is sufficiently particularized if `it affect[s] the plaintiff in a personal and individual way.'" <u>Blunt</u>, 767 F.3d at 278 (quoting <u>N.J. Physicians, Inc. v. President of the U.S.</u>, 653 F.3d 234, 238 (3d Cir. 2011)).

CIT Bank argues that Odell does not have a concrete and particularized legally protected interest in the property. It challenges Odell's claim of ownership of the property, specifically the allegation in her complaint that, on November 2, 2007, "Weingartner . . . deeded the Unit 1801 to himself and a limited liability company, [sic] Florida Real Estate LLC."[61] Odell counters that she was the "executrix and sole beneficiary and heir" of Weingartner's estate,[62] suggesting that she inherited Weingartner's individual interest in 1801 Whispering Brooke Drive.

CIT Bank contends that Weingartner deeded 1801 Whispering Brooke Drive only to Florida Real Estate, not to himself. It attached to its motion to dismiss the November 2, 2007 deed, which shows Edward W. Weingartner as grantor and Florida Real Estate as grantee.[63] So, CIT Bank argues that because Weingartner did not deed 1801 Whispering Brooke Drive to himself, Odell has no interest in the property as his executrix, sole beneficiary, and heir. In her response, Odell does not address CIT Bank's arguments regarding Weingartner's deed.

A plaintiff "does not have an interest to support an action to quiet title" when "it has no possessory rights" in the property at issue. <u>Nat'l Christian Conference Ctr. v. Schuylkill Twp.</u>, 597 A.2d 248, 250 (Pa. Commw. 1991). Relying on <i>National Christian Conference Center,</i> the Third Circuit concluded that a county recorder of deeds could not "maintain a quiet title claim, as she does not claim an interest in land, only an interest in recording fees." <u>Montgomery Cty., Pa. v. MERSCORP Inc.</u>, 795 F.3d 372, 374 n.2 (3d Cir. 2015) (citing <u>Nat'l Christian Conference Ctr.</u>, 597 A.2d at 250).

Odell brings her action to quiet title on the metes and bounds of the property at 1801 Whispering Brooke Drive. Yet, she does not dispute that Weingartner deeded the property to Florida Real Estate. Accordingly, once he deeded the property to Florida Real Estate, Weingartner no longer had an ownership interest in the property for Odell to inherit.

Even though she currently resides at 1801 Whispering Brooke Drive, she has no possessory rights in the land in her individual capacity. She cannot allege any facts that show a possessory right. She cannot maintain an interest in the metes and bounds of property in which she has no legal or possessory rights. Therefore, because Odell lacks standing in her individual capacity to quiet title of the metes and bounds of 1801 Whispering Brooke Drive, we shall dismiss Count VII of her complaint.

# Conclusion

We shall grant Safeguard's motion to dismiss the negligent infliction of emotional distress, UTPCPL, and punitive damages claims against it. We shall grant CIT Bank's motion to dismiss the conversion, negligent infliction of emotional distress, UTPCPL, punitive damages, and quiet title claims. We shall deny the motion to dismiss the trespass and negligence claims.

[1] 73 Pa. Cons. Stat. § 201-1 <i>et seq.</i>

[2] As we must in considering a Rule 12(b)(6) motion, we accept the facts recited in Odell's complaint as true and view them in the light most favorable to her. We also take judicial notice of public records, including judicial proceedings, not for the truth of their content, but for their existence. <u>Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.</u>, 458 F.3d 244, 256 n.5 (3d Cir. 2006) (quoting <u>S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.</u>, 181 F.3d 410, 426 (3d Cir. 1999)). Thus, unless noted otherwise, the facts recited in this memorandum opinion are as they appear in her amended complaint.

[3] Compl. (Doc. No. 1) ¶ 11; <i>see id.</i>, Ex. D (Doc. No. 1-1) at ECF 1-17.

[4] Compl. ¶ 13; <i>see id.</i>, Ex. F (Doc. No. 1-2) at ECF 2-4. The assignment was made by a subsidiary, "Financial Freedom Acquisition LLC."

[5] Compl. ¶¶ 14, 16; <i>see id.</i>, Ex. G (Doc. No. 1-2) at ECF 5-8.

[6] CIT Bank Mot. to Dismiss, Ex. 2 (Doc. No. 4-5)

[7] CIT Bank Mot. to Dismiss at 3 n.5.

[8] Compl. ¶ 15.

[9] CIT Bank Mot. to Dismiss at 3 n.5.

[10] CIT Bank Mot. to Dismiss, Ex. 3 (Doc. No. 4-5) at ECF 9. Odell alleges that One West Bank filed a foreclosure action against both Odell as executrix of Weingartner's estate and Florida Real Estate in August 2013. Compl. ¶ 20. CIT Bank attached to its motion to dismiss the docket sheet for the foreclosure action, which shows that it filed the foreclosure action on May 26, 2012 and amended its complaint to add Odell as a defendant in her capacity as the executrix of Weingartner's estate on May 19, 2013.

[11] CIT Bank Mot. to Dismiss, Ex. 3 at ECF 10.

[12] Compl. ¶¶ 21, 25; *id.,* Ex. H (Doc. No. 1-2) at ECF 9-19.

[13] Compl. ¶ 26.

[14] *Id.* ¶ 27.

[15] *Id.*

[16] *Id.*

[17] *Id.; see also id.,* Ex. I (Doc. No. 1-2) at ECF 20-21.

[18] Compl. ¶ 28.

[19] *Id.*

[20] *Id.* ¶ 27.

[21] *Id.* ¶ 29.

[22] *Id.* ¶ 30.

[23] *Id.*

[24] *Id.*

[25] *Id.* ¶¶ 30, 32; *see id.,* Ex. I at ECF 22-29.

[26] Compl. ¶ 35.

[27] *Id.*

[28] *Id.* ¶ 33.

[29] CIT Bank Mot. to Dismiss, Ex. 3 at ECF 12-13.

[30] Compl. ¶¶ 36-37.

[31] *Id.*

[32] Compl. (Doc. No. 1), Odell v. One West Bank, NA, Civ. No. 16-984 (E.D. Pa. filed Mar. 2, 2016).

[33] *See* Mem. Op. (Doc. No. 33), Odell v. One West Bank, NA, Civ. No. 16-984 (E.D. Pa. filed June 30, 2016).

[34] Docket, *In re* Odell, No. 16-11643 (Bankr. E.D. Pa.).

[35] Docket, *In re* Fla. Real Estate, LLC, No. 16-12958 (Bankr. E.D. Pa.).

[36] Order, CIT Bank NA v. Fla. Real Estate LLC, No. 2012-03038-RC (Pa. Ct. C.P. Chester Cty. filed June 26, 2017).

[37] Order Ex. A, CIT Bank NA v. Fla. Real Estate LLC, No. 2012-03038-RC (Pa. Ct. C.P. Chester Cty. filed June 26, 2017).

[38] *Id.*

[39] Stip. for Entry of J. in Rem in Favor of Pl. & Against Defs., CIT Bank NA v. Florida Real Estate LLC, No. 2012-03038-RC (Pa. Ct. C.P. Chester Cty. filed July 20, 2017).

[40] The statute provides, in relevant part:

The following actions and proceedings must be commenced within two years:

. . .

(3) An action for taking, detaining or injuring property, including actions for specific recovery thereof.

(4) An action for waste or trespass of real property.

. . .

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud. . . .

42 Pa. Cons. Stat. § 5524.

[41] Compl. ¶¶ 26-27.

[42] *Id.* ¶ 27.

[43] *Id.* ¶ 30; *id., Ex. I (Doc. No. 1-2) at ECF 22-29.

[44] Compl. ¶ 36.

[45] *Id.* ¶ 27.

[46] Compl. ¶ 30.

[47] *Id.* ¶ 32.

[48] *Id.* ¶ 35.

[49] *Id.* ¶ 36.

[50] *Id.*

[51] *Id.* ¶ 50-51.

[52] *Id.* ¶ 32.

[53] *Id.* ¶ 58.

[54] In response to Safeguard's motion, with respect to her UTPCPL claim, Odell states only that "the defendants and their agents were aware of their conduct in previous lawsuits." Mem. of Law in Supp. of Pl.'s Answer to Safeguard Props. LLC's Mot. to Dismiss (Doc. No. 8) at 10. This argument cannot save her UTPCPL claims.

[55] Safeguard Mot. to Dismiss ¶ 39.

[56] CIT Bank Mot. to Dismiss at 23.

[57] Docket, CIT Bank NA v. Florida Real Estate LLC, No. 2012-03038-RC (Pa. C.P. Ct. Chester Cty. filed June 26, 2017).

[58] Compl. ¶ 1.

[59] *Id.* ¶ 8.

[60] *Id.* ¶ 84.

[61] Compl. ¶ 10.

[62] *Id.* ¶ 15.

[63] CIT Bank Mot. to Dismiss, Ex. 2 (Doc. No. 4-5).

Save trees - read court opinions online on Google Scholar.

**GLENN SEGAL, Plaintiff,**

**v.**

**SAMUEL ZIELENIEC, Defendant.**

<u>Civil Action No. 13-7493.</u>

**United States District Court, E.D. Pennsylvania.**

March 24, 2015.

# MEMORANDUM OPINION

CYNTHIA M. RUFE, District Judge.

Presently before the Court is Defendant Samuel Zieleniec's motion to dismiss the Amended Complaint for failure to state a claim.

# I. FACTUAL AND PROCEDURAL HISTORY

The Amended Complaint alleges the following facts. Starting in 2007, Zieleniec solicited investments from Plaintiff Glenn Segal, a resident of Pennsylvania, to fund a series of loans to owners of real property in Israel. Between June 4, 2007 and October 18, 2007, Zieleniec and Segal entered into four Trust Agreements that are the subject of this litigation: the Baka Trust, the Katamon Trust, the Metudela Trust, and the Avida Trust. Zieleniec was the trustee, and Segal was the beneficiary. After problems developed with the Trusts, Defendant Zieleniec's father Henry Zieleniec became co-trustee.

The Trust Agreements provide that "the beneficiary together with others have decided to provide private loans to third parties" and that the beneficiary would wire a specified principal amount into an escrow account set up on the Trust's behalf. [1] Zieleniec, as trustee, would use the principal to make and manage loans to owners of real property in Israel on Segal's behalf. The loans were for a term of six months at an interest rate of 16% per annum, minus a 2% per annum administrative fee to be paid to the trustee Zieleniec. On 30 days' notice, the loan's term could be extended to twelve months on the same terms. If the principal and interest were not repaid to Segal in full at the end of the six or twelve month term, interest would continue to accrue at a rate of 2% per month. The parties intended that the loans would be secured by either a mortgage on the borrower's property, or in the case of the Baka Trust, by a lien on shares in the borrowing company. These security interests were to be the property of each Trust (the "Trust Property").

Zieleniec, as trustee, agreed to undertake certain fiduciary duties to Segal as beneficiary. Zieleniec agreed to "hold and manage" the Trust property on Segal's behalf, and not to benefit from the Trust or Trust property without Segal's written consent. [2] The Trusts, and Zieleniec's fiduciary duties as Trustee, were to continue in existence until the loans were repaid to Segal in full. The Trust Agreements further provide that the Trust Agreements "shall be governed by and construed according to the laws of the state of Israel." [3]

Between July 1, 2007 and October 18, 2007, Segal wired a total of $1,060,000 to the escrow accounts of the Trust in order to fulfill his obligations under the Trust Agreements. Even if extended to twelve months, the term of every loan made pursuant to the Trust Agreements had expired by October 18, 2008. At that time, Segal's investment was not repaid in full. Although Segal never received any payments whatsoever on his investment in the Baka Trust, Segal received interest payments totaling $578,482.19 on his investments in the Katamon, Metudela, and Avida Trusts, with the last payment received on November 20, 2012. Segal alleges losses on his investments totaling $1,935,580.01 in outstanding principal and unpaid interest, with interest continuing to accrue at 2% per month after the filing of this case.

Segal contends that his losses were caused by Zieleniec's failure to perform his fiduciary duties under the Trust and Zieleniec's fraudulent misrepresentations. Zieleniec allegedly did not fund any loans, rendering all of his representations regarding the nature of the loan transactions fraudulent. Segal alleges that the Trusts were a Ponzi scheme and Zieleniec used the funds deposited into escrow for his own personal gain and to repay earlier investors. Defendant Zieleniec and his

father Henry Zieleniec allegedly made fraudulent representations regarding their attempts to collect the loans, including that payment was delayed by the borrowers' bankruptcies or involvement in litigation. Defendant Zieleniec and Henry Zieleniec also allegedly refused to provide documentation of their administration of the Trusts, including an accounting of their actions on behalf of the Trusts. Notably, Segal does not plead when any of these failures to perform a fiduciary duty or fraudulent misrepresentations occurred.

On November 20, 2013, Segal filed this action in the Montgomery County Court of Common Pleas against Defendant Zieleniec and Henry Zieleniec. On December 23, 2013, Defendants timely removed the case to this Court and Segal filed an Amended Complaint on January 13, 2014. The Amended Complaint asserts nine state law causes of action arising out of Zieleniec's alleged failures to perform his fiduciary duties and fraudulent misrepresentations: 1) Breach of Contract; 2) Breach of Fiduciary Duty; 3) and 4) Two Counts of Fraud; 5) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL");[4] 6) Conversion; 7) Negligence; 8) Unjust Enrichment; and 9) Civil Conspiracy.

On January 27, 2014, Defendants moved to dismiss the Amended Complaint for lack of personal jurisdiction and failure to state a claim. By memorandum opinion and order dated June 16, 2014, this Court dismissed all claims against Henry Zieleniec for lack of personal jurisdiction, but held that Defendant Zieleniec's contacts with Pennsylvania were sufficient to subject him to personal jurisdiction. Zieleniec is therefore the sole remaining defendant in this action. With regard to whether Segal had stated a claim against Zieleniec, the Court found that it could not determine what law to apply due to the parties' agreement that Israeli law would govern the trust agreements. The Court therefore denied this aspect of Defendants' motion without prejudice until the parties briefed the choice of law issue.

On July 28, 2014, Zieleniec filed a renewed motion to dismiss for failure to state a claim, which raises a statute of limitations defense to Segal's claims for breach of contract, breach of fiduciary duty, fraud, conversion, negligence, unjust enrichment and civil conspiracy. Zieleniec further contends that Segal's remaining claim, for violation of the UTPCPL, should be dismissed because Segal's claims do not fall within the statute. For the purposes of this motion, the parties agree that Pennsylvania law governs the statute of limitations defense.[5] Contrary to the Court's directives, however, neither party makes any argument as to which law governs the merits of Segal's claims.

## II. STANDARD OF REVIEW

In order to survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[6] Additionally, it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[7] A plaintiff who survives a motion to dismiss for failure to state a claim on which relief may be granted states facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[8] In deciding a motion to dismiss, the Court may consider exhibits attached to the complaint as well as the allegations of the complaint itself.[9]

A plaintiff is not required to plead facts sufficient to overcome affirmative defenses, such as failure to comply with the statute of limitations, in order to survive a motion to dismiss.[10] If, however, "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations," then the complaint may be dismissed.[11] But "[i]f a time-bar is not clear on the face of the complaint, then the motion to dismiss should be denied and the issue should be decided at a later stage of the litigation."[12] Thus, dismissal pursuant to Rule 12(b)(6) on statute of limitations grounds requires the plaintiff to "'effectively plead[] herself out of court by alleging facts that are sufficient to establish the defense.'"[13]

## III. DISCUSSION

### A. Statute of Limitations Defense

Under Pennsylvania law, the statute of limitations begins to run "as soon as the right to institute and maintain suit arises."[14] The statute of limitations for Segal's breach of contract and unjust enrichment claims is four years,[15] whereas the statute of limitations for Segal's tort claims is two years.[16] In order to obtain dismissal of Segal's claims on statute of limitations

grounds, therefore, Zieleniec must show that Segal's right to institute and maintain suit on his breach of contract and unjust enrichment claims had arisen by November 20, 2009, and that Segal's right to institute and maintain suit on his tort claims had arisen by November 20, 2011.[17] Zieleniec contends that Segal could have brought suit on all of his claims on October 18, 2008, when the term of any loan made under the Trust Agreements must have expired, but Segal had not received full repayment of his investment.

Based upon the current record, the Court cannot determine as a matter of law that any of the claims are time-barred because the statutes of limitation for all of Segal's claims are subject to tolling under Pennsylvania's "discovery rule." The discovery rule "applies in Pennsylvania to all causes of action, including breach of contract."[18] Where "`the injury or its cause was neither known nor reasonably knowable,'"[19] the statute of limitations may be tolled until "the plaintiff knew, or through the exercise of reasonable diligence should have known, of the injury and its cause."[20] Whether the discovery rule applies "involves a factual determination ... [and] [t]hus, this issue is generally decided by a jury, unless the court finds that `reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause' and that therefore the discovery rule does not apply as a matter of law."[21] Zieleniec contends that the discovery rule does not apply because Segal should have been aware of all of his alleged injuries when Segal's investment was not repaid in full on October 18, 2008 as expected.

However, that Segal did not receive full repayment of his investment is insufficient to establish, as a matter of law, that Segal knew or should have known of the alleged cause of his injuries: Zieleniec's failure to perform his fiduciary duties and fraudulent misrepresentations. The Trust Agreements provided that the loans were to be made to third parties in Israel, and Plaintiff argues that he was deceived by allegedly fraudulent statements by the Zieleniecs that the purported Israeli borrowers were unable to pay on time because they were involved in bankruptcies or litigation. Segal also alleges that he received what were purported to be interest payments from the Katamon, Metudela, and Avida Trusts into 2012. The Amended Complaint also alleges that Segal made repeated requests for records of the Trusts' activities, but the Zieleniecs refused to provide them. Segal does not plead when he discovered the alleged causes of his injury, and he is not required to do so at this stage of the proceedings.

In the context of the discovery rule, "when the pleading does not reveal when the statute of limitations period began to run ... the statute of limitations cannot justify Rule 12 dismissal."[22] For the same reasons that the facts as plead in the Amended Complaint do not establish that the cause of Segal's injury was known or reasonably knowable, the Amended Complaint does not reveal when Segal knew or reasonably should have known of the cause of his injuries. Thus, none of Segal's claims will be dismissed pursuant to Rule 12(b)(6) as time-barred.[23] Following discovery, however, Defendant may, if appropriate, renew his statute of limitations defense.

## B. UTPCPL Claim

Rather than raising a statute of limitations defense, Zieleniec moves to dismiss Segal's UTPCPL claim on the basis that the loan transactions at issue do not fall within the scope of the UTPCPL. Because the UTPCPL is a Pennsylvania statute, the Court may apply Pennsylvania law in determining its merits. The private right of action under the UTPCPL applies only to "purchases or leases [of] goods or services primarily for personal, family, or household purposes."[24] Thus, a claim may fall outside the scope of the UTPCPL on two grounds: 1) plaintiffs did not purchase or lease a good or service;[25] or 2) the good or service purchased was not primarily for personal, family, or household purposes.[26] Segal does not respond to Zieleniec's claim that the loan transactions at issue in this case do not fall within the scope of the UTPCPL or defend the viability of the UTPCPL claim in any other fashion.

The Court finds that Segal cannot obtain relief under the plain language of the statute. In funding loans to Israeli borrowers through the Trust Agreements, Segal did not purchase a good or service. Segal also does not allege that he viewed the loan transactions as anything other than an investment, and investment is not a personal, family or household purpose as those terms are ordinarily used. Thus, Segal's UTPCPL claim will be dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendant's Renewed Motion to Dismiss the Amended Complaint will be granted in part and denied in part. None of Segal's claims will be dismissed as time-barred because the Amended Complaint does not permit the conclusion that the discovery rule does not apply or when the cause of Segal's injuries was known or reasonably knowable. Dismissal of the UTPCPL claim will be granted because the investment transactions at issue in this case do not fall within the scope of the statute.

An appropriate order follows.

[1] *E.g.,* Baka Trust, Exh. A to Am. Compl.

[2] *E.g., id.*

[3] *E.g., id.*

[4] 73 P.S. § 201-1 *et seq.*

[5] The choice of law provision of the contract does not affect the application of Pennsylvania law to the statute of limitations defense, however, because to do so, the choice of law provision must be specific as to the statute of limitations. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992) ("Choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express.").

[6] Fed. R. Civ. P. 8(a)(2).

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

[8] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[9] *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[10] *See Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014).

[11] *Id.* at 249 (internal quotations omitted).

[12] *Wise v. Mortgage Lenders Network USA, Inc.*, 420 F. Supp. 2d 389, 393 (E.D. Pa. 2006).

[13] *Schmidt*, 770 F.3d at 251 (quoting *Hollander v. Brown*, 457 F.3d 688, 691 n. 1 (7th Cir. 2006)).

[14] *Morgan v. Petroleum Products Equipment Co.*, 92 A.3d 823, 828 (Pa. Super. Ct. 2014) (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)).

[15] 42 Pa. C.S.A. § 5525.

[16] 42 Pa. C.S.A. § 5524. The statute of limitations for civil conspiracy is determined by the unlawful act that the defendant allegedly conspired to commit. *Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir. 1974). Segal alleges that Zieleniec conspired to commit fraud and therefore the two year statute of limitations for fraud applies.

[17] As discussed in the next section, Defendant does not argue that Plaintiff's UTPCPL claim is time-barred.

[18] *Morgan*, 92 A.3d at 828 (citing *Sadtler v. Jackson-Cross Co.*, 587 A.2d 727, 731 (Pa. Super. Ct. 1991)).

[19] *Padalino v. Standard Fire Ins. Co.*, 616 F. Supp. 2d 538, 547 (E.D. Pa. 2008) (quoting *Drelles v. Mfr. Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. Ct. 2005)).

[20] *Wise*, 420 F. Supp. 2d at 395 (internal quotations omitted).

[21] *Padalino*, 616 F. Supp. 2d at 547 (quoting *Drelles*, 881 A.2d at 832) (internal citations omitted).

[22] *Schmidt*, 770 F.3d at 251 (internal quotations omitted) (ellipsis original).

[23] Segal also contends that the statute of limitations for all of his claims should be tolled on fraudulent concealment grounds. Because the Court finds that Segal's claims are not time-barred on other grounds, the Court makes no ruling as to whether the injuries alleged in Segal's claims were fraudulently concealed.

[24] 73 P.S. § 201-9.2.

[25] *See Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 240-42 (3d Cir. 2002).

[26] *See Taylor v. Creditel Corp.*, No. 04-CV-2702, 2004 WL 2884208 at *7 (E.D. Pa. Dec. 13, 2004) (dismissing UTPCPL claim on grounds including that the transaction at issue was primarily for business purposes).

(2006)

## MICHAEL E. TAYLOR

v.

## CREDITEL CORPORATION and JOHN OSBORNE[1]

<u>Civil Action No. 04-2702.</u>

**United States District Court, E.D. Pennsylvania.**

January 19, 2006.

# MEMORANDUM AND ORDER

JACOB HART, Magistrate Judge.

The Defendant has filed a summary judgment motion in this fraud case. In this action, Plaintiff seeks damages for the breach of a promissory note and his reliance on an offer of employment that never came to fruition. For the reasons that follow, we will grant the Defendant's Motion with respect to the breach of the promissory note. However, because we find that material issues of fact remain, we will deny the remainder of the Defendant's Motion.

# Factual Background

In June or July of 2001, Plaintiff's friend, William Yates, introduced Plaintiff to John Osborne, who had been identified in a newspaper article as the Director of Corporate Planning of Creditel. (Taylor Dep., at 9). Yates had previously met Osborne and was considering investing in Creditel. (Taylor Dep., at 11). Yates had suggested to Taylor that Creditel might be interested in hiring Taylor. (Taylor Dep., at 11-12). Yates passed Taylor's phone number along to Osborne and Osborne contacted Taylor. (Taylor Dep., at 13-14). During their initial conversation, they discussed both employment and investment opportunities with Creditel. (Taylor Dep., 14-15). Osborne stated that Creditel could offer Taylor a position as National Sales Manager at a salary of $120,000 a year. (Taylor Dep., 26-27). After this telephone conversation, Osborne sent Taylor Creditel's prospectus and Taylor drafted an employment contract. (Taylor Dep., 31-33).

Thereafter, Osborne and Yates showed Taylor a newspaper article about Creditel, including its office addresses, website addresses, and identifying George Elias as Creditel's CEO. The article also included a caution that Creditel was a "start up" company. (Taylor Dep., 114-15). In mid-July, Osborne and Taylor met in Philadelphia. (Taylor Dep., at 40). At that time, Osborne and Taylor executed the first of a series of Notes.[2] Taylor gave Osborne a check for $25,000, made out to Osborne alone, and the two discussed more particulars with respect to Taylor's job with Creditel. (Taylor Dep., 40-43).

When Osborne left Philadelphia after his mid-July visit, he attempted to cash Taylor's $25,000 check, but was unable to do so because he had an out-of-state license. (Taylor Dep., 43-44). When Taylor was contacted by the bank, he stopped payment on the check. Taylor stated that he doesn't remember what Osborne's explanation was when he questioned Osborne about his attempt to cash the check. (Taylor Dep., at 47). In late July, Yates contacted George Elias, the CEO of Creditel, regarding his possible investment in the company and mentioning that his friend, Taylor had been in contact with Osborne about investing, himself. Yates also posed a number of questions about Osborne. In response, Elias described Osborne as a "co-founder" of Creditel. With Elias's knowledge, Yates forwarded the emails to Taylor. See Emails attached to Response, at Exhibits B, C, and D).

In August, Osborne and Taylor continued their employment discussions, including a start-date of October, 2001. (Taylor Dep., 38-39, 58). Also in August, Osborne sent Taylor a cleaned-up version of the Promissory Note, incorporating the changes they had discussed in July. The Note lists Osborne as the co-founder of Creditel, and Osborne's signature appears under the corporate name, Virtual Fonlink. See Convertible Promissory Note, attached to Defendant's Exhibit H. When

Taylor signed the note, he returned it to Osborne with a $50,000 money order, payable to Osborne. (Taylor Dep., at 57). He included with this investment, his draft of the employment agreement. (Taylor Dep., 31-32). .

From August through September, 2001, Osborne did not fulfill his promises that he would be sending an employment application, an employment agreement, and a cellphone. (Taylor Dep., at 60-61, 66, 80). According to Taylor, Osborne disappeared in mid September, when he was no longer able to reach Osborne at all. (Taylor Dep., at 66). In the meantime, based on the representations by Osborne, Taylor had resigned his $109,000 position at Burger King. (Taylor Dep., at 75-77). In October or November, Taylor wrote to Osborne at the California offices of Creditel. (Taylor Dep., at 72). He also contacted the California offices via telephone and was told that they would take a message for Osborne. (Taylor Dep., 80-81). Osborne then phoned Taylor and told him that his employment start date was delayed until 2002. (Declaration of Taylor).

When the Note matured in January, 2002, Osborne told Taylor that the payment would be made before the end of the second quarter, 2002. Osborne explained that delays in funding delayed the payment. (Declaration of Taylor).

On March 1, 2002, Taylor filed suit against Osborne, Elias, Creditel, and other officers of the management company running Creditel. The Honorable William H. Yohn, to whom the original case was assigned, dismissed the Complaint without prejudice on January 22, 2004. The Complaint was dismissed for lack of personal jurisdiction over the three individual defendants and lack of service of process upon the individuals and the corporation. On June 18, 2004, Taylor filed this case against Creditel and Osborne. It appears that Osborne has never been served with the Complaint. On December 13, 2004, the Honorable Bruce Kauffman, to whom the case was assigned before its referral to the undersigned, dismissed the unfair practices claim that was contained in the Complaint.

On December 13, 2005, Creditel filed this motion for summary judgment, arguing that the fraud claims are untimely; that the Plaintiff has failed to make out the prima facie case of fraud; that there is no evidence to support the Note default claim; and that the note is not enforceable.

## Summary Judgment Standard

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

## Default on the Promissory Note

The Defendant argues that the Promissory Note issued by Osborne is an unambiguous contract, requiring performance by Osborne alone, not Creditel. The Plaintiff argues that Creditel is bound by the terms of the Note because Osborne was acting as its agent in executing the Note, with Creditel's knowledge and blessing.

The Plaintiff's argument is based on an agency theory — that an agent can bind the principal by the acts the agent does with or within the actual or apparent authority from the principal. See Turner v. Hydraulics, Inc. V. Susquehanna Construction Corp., 606 A.2d 532, 534 (Pa. Super. 1992). Focusing on the emails sent between Yates and Elias, see supra, at , the Plaintiff argues that Elias "cloaked" Osborne with the authority to act for Creditel. Similarly, Plaintiff argues that Elias's failure to seek a retraction of a newspaper article provided further corporate support for Osborne's activities. In the article appearing in a Florida newspaper, Osborne was identified as the Director of Corporate Planning of Creditel. (Article attached to Plaintiff's Response).[3]

The Plaintiff's argument fails to acknowledge one key fact, however. The Promissory Note is not ambiguous and does not bind Creditel or Virtual Fonlink. Two cases are instructive in our determination. In Viso v. Werner, 369 A.2d 1185 (Pa. 1977), the Pennsylvania Supreme Court concluded that there was no individual liability for a breach of contract when the individual defendant entered the contract as an agent of the corporate defendant. In coming to this conclusion, the Court relied on the following facts: the contract was printed on the letterhead of the corporation; it was styled in the first person plural; and it

was signed "Werner Contracting Co. By: s/Michael N. Werner." Id. at 1187. "Thus, a facial inspection of the contract would indicate that the [individual defendant] was contracting on behalf of the disclosed principal." Id.

The Court specifically noted, however,

> [T]he mere signature of the appellant preceded by the word `by' and following the typed name of the corporation on the corporation's letterhead is not conclusive that he was acting in a representative capacity, if the alleged contract showed an intent to bind appellant individually. However, no such intent appeared either in the written contract, or in the evidence proffered by the appellees at trial.

Id. at 1188.

The second case, In re Estate of Duran, 692 A.2d 176, 179 (Pa. Super. 1997), picks up where the caveat in Viso left off. In Duran, the owner of a company had contracted to purchase a life insurance policy on himself, naming an employee as the beneficiary, until such time as a pension plan could be funded for the employee.

> I, Jay Duran, promise to purchase an insurance policy on myself for $50,000 with Tim Redlinger as sole beneficiary, in the interim of establishing a retirement plan for Tim, which will consist of $100,000 and represents contributions and accumulated interest retroactive to Tim's 21st year of age, August 20, 1976. When the retirement plan is established, I will change the beneficiary of the life insurance plan to whomever I choose.

JAY DURAN ASSOCIATES INC. */s/ Jay Duran* Jay Duran JD/tk

Duran, at 177.

The company owner died without having purchased the promised insurance policy. The employee brought suit against the estate. The Superior Court, relying in part on the caveat in Viso, concluded that the contract's terms were unambiguous and the owner of the company had taken on a personal obligation.

> [F]rom our reading, we conclude that Duran clearly undertook a personal obligation to purchase an insurance policy on his life in the *interim* before the establishment of a pension plan by the corporation. The mere presence of the corporate name above the signature line does not exclusively indicate corporate liability.

Duran, at 179.

The facts before us are remarkably similar to those in Duran and the caveat of Viso. Although written on Creditel letterhead and signed "VIRTUAL FONLINK, INC BY J.L. OSBORNE," the content of the Note unambiguously binds only J.L. Osborne. The "Obligation" portion of the Note reads as follows:

> J.L. OSBORNE CO-FOUNDER OF CREDITEL, AND MAJOR SHARE HOLDER OF VIRTUAL FONLINK, INC . . . FOR VALUE RECEIVED HEREBY PROMISES TO PAY MICHAEL TAYLOR OUT OF HIS OWN SHARES OF VIRTUAL FONLINK, INC ON OR BEFORE JANUARY 1, 2002 THE PRINCIPAL SUM OF FIFTY THOUSAND DOLLARS, AND TO PAY INTEREST ON SUCH PRINCIPAL SUM FROM THE DATE HEREOF AT THE RATE OF 12% PER ANNUM . . . .

Promissory Note, at ¶1. The "Default" section only references a default by Osborne. "THE FOLLOWING EVENTS CONSTITUTE A DEFAULT IN THE PERFORMANCE OF NOTE BY J.L. OSBORNE." Similarly, the "Attorneys Fees" section of the Note refers only to Osborne.

> IF J.L. OSBORNE FAILS TO MAKE PAYMENT TO THE HOLDER OF THE NOTE AS PROVIDED HEREIN THE HOLDER OF THE NOTE WILL BE ENTITLED AND EMPOWERED TO TAKE SUCH MEASURES AS MAY BE APPROPRIATE TO ENFORCE OSBORNE'S OBLIGATIONS UNDER THE NOTE . . . .

Promissory Note, at ¶7. Not only are the references to Osborne only, but it is clear that he has made a personal guarantee by pledging his own stock to satisfy the Note. We therefore find no liability flowing to Creditel for the breach of the Promissory Note.[4]

We realize that this conclusion is contrary to that found by Judge Kauffman when this issue was considered in the Motion to Dismiss. However, Judge Kauffman never addressed whether there was any ambiguity in the Note. Because we find that there is no ambiguity, we find no reason to consider any extrinsic evidence regarding Osborne's representations to the Plaintiff and conclude that the Note clearly establishes Osborne's personal liability for the Note only.

## Fraud

## Statute of Limitations

Defendant argues that Plaintiff's fraud and negligent misrepresentation claims are barred by the applicable two year statute of limitations. See Beauty Time, Inc. V. VU Skin Systems, Inc., 118 F.3d 140 (3d Cir. 1997)(Pennsylvania has a two-year statute of limitations for fraud). The statute begins to run when "the right to institute and maintain the suit arises." Pocono International Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983). Pennsylvania employs the "discovery rule," which provides that the limitations period begins to run when the "plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." Redenze by Redenze v. Rosenberg, 520 A.2d 883, 885 (Pa. Super. 1987), *allocatur denied,* 533 A.2d 93 (Pa. 1987).

When Judge Kauffman ruled on the motion to dismiss, he allowed the fraud claims to proceed. Relying on the discovery rule, he determined that "the question of when the statute of limitations commenced is one of fact, to be determined by the jury." (Kauffman order, at 9). Creditel now claims with the completion of discovery, there is no doubt that the statute of limitations expired, at the latest, in late 2003. (Defendant's Memorandum, at 9-10).

In support of this argument, the Defendant points to a number of red flags — instances that, according to the Defendant, should have alerted the Plaintiff to the fact that he had suffered an injury. For example, in mid-October, when Plaintiff had already left his job at Burger King, Taylor was aware that Osborne had failed to fulfill the promises of employment. Similarly, when Osborne had "disappeared," a term used by the Plaintiff, Plaintiff had his counsel draft a letter to Creditel's California office, indicating that Osborne had perpetrated a fraud. (Taylor Dep., at 94-95). However, each time one of these flags was raised, Osborne had contact with Taylor to alleviate his fears or, in the case of Taylor's contact with Creditel, Creditel did nothing to alert Taylor to the fact that Osborne was not authorized to solicit funds or make employment decisions. Thus, we do not find the Defendant's argument compelling.

The Defendant also relies on the filing of the earlier lawsuit to establish the time at which Taylor was aware of the fraud. The Defendant argues that, at the latest, the limitations period began to run when Taylor signed his "Verification" in the first lawsuit, June 7, 2002. Because the current lawsuit was not filed until June 18, 2004, the Defendant argues, the fraud claim is untimely. The Plaintiff responds that the two lawsuits, although related, are not identical. Notably, the original Complaint filed in the earlier suit did not allege any wrongdoing on the part of Creditel. It was not until June 24, 2002, when the Amended Complaint was filed, that any claims were made against Creditel. The Plaintiff also draws the court's attention to the Plaintiff's Declaration attached to his Response, in which Taylor states that it was not until July, 2002, that he "became aware that Mr. Osborne and Creditel had no intention of satisfying the Promissory Note, and began to suspect that [he] had been defrauded." (Verification, at ¶10). Thus, argues the Plaintiff, a genuine issue of material fact exists regarding Taylor's knowledge of the fraud and its alleged perpetrator.

As Judge Kauffman found in deciding the Motion to Dismiss, ordinarily, when faced with the assertion of the discovery rule, the pertinent question is left for the jury. Only "where reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law." Fine v. Checcio, 582 Pa. 253, 267 (2005).

Here, the Complaint and Verification in the earlier suit provide strong support for the Defendant's argument. However, considering the Plaintiff's Declaration, we cannot conclude that reasonable minds could not differ regarding when Taylor became aware of the fraud and its cause. This credibility determination will have to be made by the jury.

## Justifiable Reliance on the Statements of Osborne

The Defendant next claims that the Plaintiff cannot prove the "justifiable reliance" element of the *prima facie* fraud case. In order to prove both fraud and negligent misrepresentation, the Plaintiff must establish the following: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp., 315 F.Supp.2d 666, 686 (E.D. Pa. 2004)(quoting Gibbs v. Ernst, 647 A.2d 882, 889, 538 Pa. 193, 207 (1994)).

With respect to the *prima facie* fraud claim, Creditel first argues that Taylor cannot establish justifiable reliance on Osborne's statements. Justifiable reliance requires not only that the Plaintiff relied on a representation made, but also that the reliance on the representation must be reasonable. See Argent, at 686; In re Allegheny International, Inc., 954 F.2d 167, 178 (3d Cir. 1992). In sum, the Defendant argues that there was no reasonable basis for Plaintiff's reliance on Osborne's representations.

This argument hearkens back to the earlier argument that Taylor should have been alerted to the fraud by numerous red flags. However, as we pointed out in discussing this claim's earlier iteration, each time something "fishy" occurred, Osborne had contact with Taylor to offer an explanation.[5] See supra, at 9. Whether or not the explanations were reasonable will be decided by the jury.

# Statements by George Elias

Creditel next argues that George Elias, the CEO of Creditel, never made any representations to Taylor. In an earlier Declaration, Taylor stated that Elias had represented that Osborne was a co-founder of the company, who played a major role in developing key relationships for the company. He also stated that Elias was aware that Osborne had solicited investments in Creditel from Taylor. (Declaration of Taylor, attached to Response to Motion to Dismiss). Now that discovery is complete, the Defendant argues that Elias never made any representations to Taylor.

In fact, the "representations" to which Taylor made reference in his Declaration, were from a series of emails forwarded to him by Yates. Yates contacted Elias via email regarding "a relationship" with Creditel. (Exhibit B, attached to Plaintiff's Response). In the first email, Yates propounds numerous questions regarding Creditel, its capitalization, and its relationship with Mr. Osborne. In that email, Yates refers to Taylor, "Mr. Michael Taylor, a friend whom I told about Creditel (and who has had discussions with Mr Osborne) may have additional questions as well." (Exhibit B, attached to Plaintiff's Response).

In response to the original email, Mr. Elias describes Osborne as a co-founder of Creditel and explains that "Mr. Osborne has played and currently plays a major role in developing and maintaining key relationships for [Creditel]." In responding to a question about Osborne's background, Elias describes Osborne as an "integral member of its management team," and directs any further questions to Osborne. (Exhibit D, attached to Plaintiff's Response). Upon receipt of Elias's response, Yates responded to Elias, declining the opportunity to invest in the company, but advising Elias that he is forwarding these answers to Taylor. (Exhibit D., attached to Plaintiff's Response). Based on these facts, Creditel argues that Elias never made any representation to Taylor.

Considering the facts, we believe Creditel takes too narrow a view. At the outset, Yates made Elias aware that Taylor might also have an interest in Creditel and Taylor had already met Mr. Osborne. Once Elias answered Yates's questions, Yates told him that he was going to forward the answers on to Taylor. Thus, the fact that Elias did not address his emails directly to Taylor is immaterial.

# Proximate Cause

Creditel next argues that the Plaintiff cannot establish that the employment damages he seeks were proximately caused by Creditel. Specifically, the Plaintiff seeks damages for salary, benefits, and stock options he lost as a result of his resignation from Burger King. The Defendant argues that the Plaintiff, after resigning his position, never made any attempt to reacquire it, and did not begin to look for alternative employment until February or March, 2002. We reject the Defendant's argument. Although these facts may be relevant to the issue of mitigation, to be considered by the jury, the facts, considered in the light most favorable to the Plaintiff, establish that the job offer by Osborne led to his resignation.

An appropriate Order follows.

# ORDER

AND NOW, this 19th day of January , 2006, upon consideration of Creditel's Motion for Summary Judgment, the response, thereto, and for the reasons stated in the accompanying Memorandum, IT IS HEREBY ORDERED that the Motion is GRANTED IN PART and DENIED IN PART. To the extent Creditel sought judgment on Count IV of the Complaint, alleging default on the note against Creditel, the Motion is GRANTED. In addition, the Motion is GRANTED to the extent Taylor seeks damages for the breach of the note through the other theories of liability. In all other respects, the Motion is DENIED.

[1] Some confusion exists over the proper name of the corporate Defendant in this case. In the Motion for Summary Judgment, the corporate Defendant states that its proper designation is Virtual Fonlink, Inc. d/b/a Creditel. At this point, the Court will continue to refer to the corporate Defendant as Creditel. However, where Virtual Fonlink is referenced in the supporting documentation, the Court will use the name Virtual Fonlink. In addition, although the Complaint was filed against Creditel Corporation and John Osborne, it does not appear that Mr. Osborne was ever served with the Complaint and no counsel has ever entered an appearance on his behalf. Therefore, in this Memorandum, when reference is made to the Defendant, we are referring to Creditel.

[2] A draft of this Promissory Note was faxed to Taylor before the meeting and he reviewed it with a lawyer. When Osborne and Taylor met, Taylor made some changes to it and requested a "cleaned up" copy. When the changes were incorporated, the Note was re-executed in August, 2001. The Note for $50,000 plus 12% interest, matured on January 1, 2002.

[3] During his deposition, Mr. Elias stated that Osborne was not authorized to do anything for the company and never received any paycheck. (Elias Dep., at 99, 110-11).

[4] This conclusion is further bolstered by the fact that Taylor had reviewed a stock subscription agreement prior to executing the Note. During his deposition, Taylor stated that Yates had given him a copy of the stock subscription agreement. (Taylor Dep., at 33). Clearly the Promissory Note was not the subscription agreement sent by the company to its potential stockholders.

[5] The term "fishy" was used by Taylor during his deposition, in describing the basis for his concern in November of 2001. (Taylor Dep., at 96).

Save trees - read court opinions online on Google Scholar.

**RICHARD TRACY, Plaintiff,**

v.

**P.N.C. BANK, N.A., Defendant.**

No. 2:20-cv-1960-NR.

**United States District Court, W.D. Pennsylvania.**

August 19, 2021.

# MEMORANDUM ORDER

J. NICHOLAS RANJAN, District Judge.

Presently before the Court is PNC Bank's motion to dismiss the complaint with prejudice. ECF 9. For the reasons below, the Court grants the motion, but will dismiss the complaint without prejudice and will grant Mr. Tracy leave to amend. In short, Mr. Tracy's complaint does not sufficiently plead the requisite legal elements to support his claims—many of his allegations are conclusory and perfunctory, while other allegations are inconsistent or otherwise lacking in sufficient detail. *See* >*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").[1]

First, as to Count I, Mr. Tracy fails to sufficiently plead enough facts to support his claim that PNC Bank violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See, e.g.,* 73 P.S. § 201-9.2(a) ("Any person who *purchases or leases goods or services* primarily for personal, family or household purposes *and thereby suffers* any ascertainable loss of money or property ... may bring a private action to recover actual damages[.]" (emphasis added)); *Latuska v. Sethuraman,* No. 15-208, 2016 WL 4082738, at *6 (W.D. Pa. July 29, 2016) ("Because [Plaintiffs] have failed to allege that they purchased goods or services from, or had any commercial dealings with [Defendant], the Court will grant [the] motion to dismiss[.]" (citations omitted)); *Walkup v. Santander Bank, N.A.,* 147 F. Supp. 3d 349, 358 (E.D. Pa. 2015) ("[T]he UTPCPL clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action... [and further,] a plaintiff's loss-causing reliance on the prohibited conduct must be justifiable[.]" (cleaned up)).

Mr. Tracy's allegations take aim at some sort of debit of $70,236 or $70,200 (he pleads both)—but doesn't otherwise plead sufficient facts as to the nature of any deceptive conduct that might form the basis of the UTPCPL claim. Mr. Tracy also appears to allege some type of improper conduct by PNC Bank as to the initial $141,763.20 wire, but doesn't connect those allegations to the UTPCPL in a way that states a plausible claim. Additionally, the UTPCPL concerns the purchase of goods or services, but the complaint does not allege with any degree of clarity what was purchased from PNC Bank.

Second, as to Count II, Mr. Tracy likewise fails to adequately plead that PNC Bank violated the Pennsylvania Uniform Commercial Code. To begin with, his allegations as to Count II are, again, entirely conclusory and barebones allegations; and further, his allegations do not appear to be connected to his relied-upon provisions of the Code. For these reasons alone, dismissal is warranted. Additionally, Mr. Tracy relies on several provisions that seemingly apply to only the "receiving bank," which according to Mr. Tracy's allegations, does not encompass PNC Bank. *E.g.,* ECF 1-2, ¶¶ 24-25. Dismissal is therefore appropriate.

Third, Count III also falls short, as Mr. Tracy fails to adequately plead that PNC Bank breached a fiduciary duty, or that there's a fiduciary duty in the first place. *See, e.g., Morris v. First Union Nat'l Bank,* No. 01-1953, 2002 WL 47961, at *3 (E.D. Pa. Jan. 14, 2002) ("Under Pennsylvania law, a fiduciary duty arises from a special relationship of trust in which there is confidence reposed by one side and domination and influence exercised by the other.... Under Pennsylvania law, a lender is not a fiduciary of the borrower, nor does a bank/customer relationship give rise to a fiduciary relationship[.]" (cleaned up)); *United States AG v. PNC Bank,* No. 07-417, 2008 WL 11515399, at *2 (E.D. Pa. May 8, 2008) ("A fiduciary duty rarely arises between a bank and its customer[.]" (citations omitted)). Count III, then, is also dismissed.

For these reasons, this 19th day of August, 2021, it is hereby ORDERED that Defendant's motion to dismiss (ECF 9) is GRANTED. However, given that many of the complaint's deficiencies are based on insufficient or unclear facts, the Court cannot say that amendment would be entirely futile, and therefore will dismiss the complaint without prejudice and will grant Plaintiff leave to amend. IT IS FURTHER ORDERED that Plaintiff may file an amended complaint by September 9, 2021. If no amended complaint is filed by then, the Court will order that this case be closed.[2]

[1] With its motion to dismiss, PNC Bank asks the Court to take judicial notice of, or otherwise consider, various documents that were not attached to the complaint. The Court, however, is not persuaded that all of these documents may properly be considered on a motion to dismiss. Rather, to the extent PNC Bank's documents are considered early in this case, they appear better suited to be considered on a motion for judgment on the pleadings.

[2] Ultimately, as to all three claims, the initial shortcomings of Mr. Tracy's complaint arise from a lack of sufficient factual allegations to allow the Court to understand the chronology and details leading to, and underlying, Mr. Tracy's claims. In various places, the complaint is unclear; other times, the complaint seems to contradict itself; and still elsewhere, the complaint simply doesn't provide enough factual background to allow the reader to understand what is being alleged. These factual deficiencies, coupled with the complaint's interwoven legal conclusions, require dismissal of the complaint. Should he choose to amend his complaint, Mr. Tracy should ensure that these factual deficiencies are remedied. That said, it's not enough for Mr. Tracy to simply provide more factual allegations—the factual allegations must support the requisite legal elements of his claims. Conclusory assertions are not sufficient.

Save trees - read court opinions online on Google Scholar.

**VINCO VENTURES, INC, f/k/a EDISON NATION INC, et al., Plaintiffs,**

**v.**

**MILAM KNECHT & WARNER, LLP, et al., Defendants.**

<u>No. 5:20-cv-6577.</u>

**United States District Court, E.D. Pennsylvania.**

September 27, 2021.

## OPINION

ELIZABETH T. HEY, District Judge.

## Motion to Dismiss for Failure to State a Claim, ECF No. 32 — Granted in part and Denied in part

## I. INTRODUCTION

This case involves claims by Plaintiffs[1] against Defendants[2] that arise from the filing of a lawsuit in California and various business transactions that underlie that California Lawsuit. Plaintiffs claim that the California lawsuit was frivolous and that defamatory statements made in conjunction with that lawsuit resulted in harmful effects to Plaintiffs, some of which are domiciled Pennsylvania. Plaintiffs assert several claims against the named Defendants, including abuse of process, trade libel, civil extortion, conspiracy, claims under the California Unfair Competition Law ("UCL"), and defamation. Defendants Gerald Whitt ("GWhitt"), Alexander Whitt ("AWhitt"), Matthew Whitt ("MWhitt"), Christopher Whitt ("CWhitt"), and Deborah Milam ("DMilam") collectively[3] move to dismiss Plaintiff's Amended Complaint for lack of personal jurisdiction, improper venue, and failure to state a claim.

Following a review of Plaintiffs' Amended Complaint, the Whitt-DMilam Defendants' motion to dismiss is granted in part and denied in part as more fully set forth below.

## II. BACKGROUND

The background is taken, in large part, from the allegations in Plaintiffs' Amended Complaint. Plaintiff Vinco Ventures was formerly known as Edison Nation, Inc. ("Edison"), and consistent with the parties' briefing, it is referred to as Edison throughout this Opinion. Edison, through its subsidiaries, SRM Entertainment Limited (HK) ("SRM") and CBAV1, LLC ("CBAV1"), engaged in the manufacture and sale of consumer products. *See* Amend. Compl. ¶ 36. Edison is organized under the laws of Nevada, and its principal place of business is in Pennsylvania. *See id.* ¶ 2. Cloud b is a company that engaged in the sale of children's sleep aid toys. *See id.* ¶ 18. Cloud b is incorporated in California with its principal place of business in the same. *See* Resp. 2, ECF No. 34.

On or about June 4, 2018, Edison, through its subsidiary, CBAV1, purchased a loan that was secured by all of the assets of Cloud b. *See id.* ¶ 37. On October 24, 2018, Edison purchased approximately 72.15% of Cloud b's shares.[4] *See id.* ¶ 39. In early 2019, Edison learned that Cloud b's financial records could not be audited because they were "unreliable" and "unsubstantiated." *See id.* ¶ 40. Accordingly, Edison foreclosed on Cloud b's assets, exercising its right under the terms of the loan agreement. *See id.* ¶ 41. On February 11, 2019, Edison Nation, through CBAV1, purchased those foreclosed assets for $2,000,000. *See id.* ¶ 42.

Edison claims that Cloud b's minority shareholders engaged in actions to defraud Edison between 2011 and 2018. *See id.* ¶ 46. From 2011 to 2013, Plaintiffs allege that certain Defendants caused Cloud b to pay $5,621,713 in shareholder

distributions, during a period where the net income of Cloud b was only $5,121,626. *See id.* ¶ 47. From 2013 to 2018, Plaintiffs allege that some Defendants collected in excess of $3,000,000 in shareholder distributions during a period where Cloud b had losses of approximately $10,878,328. *See id.* ¶ 51. Edison also claims that Defendant Milam, Knecht, and Warner LLP ("MKW"), Cloud b's accounting firm, was preparing false or inaccurate financial reports for Cloud b. *See id.* ¶¶ 49-50. These alleged activities are discussed in more detail below.

## A. Cloud b Takeover Scheme

Plaintiffs allege that GWhitt conspired with other Defendants in an effort to perform a takeover of Cloud b. *See id.* ¶¶ 65, 67. In approximately November of 2017, Cloud b was indebted to GWhitt for approximately $729,500 pursuant to loans secured by Cloud b's assets. *See id.* ¶ 69. On November 22, 2017, Cloud b paid GWhitt $329,502.54 to satisfy one of the outstanding loans. *See id.* ¶ 70. At that same time, GWhitt requested that Cloud b's Chief Financial Officer, Richard Brenner, wire him an additional $400,000 to satisfy the remaining balance of the loans. *See id.* In January of 2018, Cloud b's board acknowledged that GWhitt's demand for the remaining balance of the loans would place Cloud b in "financial straits." *See id.* ¶ 71. GWhitt's demand for repayment made it so Cloud b was unable to make payments for inventory. *See id.* ¶ 72. Around that same time, GWhitt directed Cloud b to stop making payments on the loan it had with EWBank. *See id.* ¶ 74. Plaintiffs allege that GWhitt did so in an effort to devalue the EWBank loan so that he could purchase it at a discount. *See id.* ¶ 75.

In late 2017 and early 2018, Edison showed interest in purchasing the assets of Cloud b through purchase of the EWBank loan. *See id.* ¶ 84. Plaintiffs allege that GWhitt did not want this purchase to occur, believing there was more money to be made by purchasing the EWBank loan himself. *See id.* ¶¶ 85-86. A representative of EWBank met with CFerguson, the CEO of Edison, to discuss purchasing the Cloud b loan that EWBank held. *See id.* ¶¶ 91-93. CBAV1, Edison's subsidiary, agreed to pay $500,000 for the loan. *See id.* ¶ 94. On June 4, 2018, the purchase of the loan was effectuated. *See id.* ¶ 95. As part of the agreement, SRM, another Edison subsidiary, agreed to finance Cloud b's purchase orders for approximately $1,750,000. *See id.* ¶ 94.

From May 2018 until February 2019, SRM made payments under that agreement totaling $2,888,350, and it received $1,138,564 in return, which left an unpaid balance. *See id.* ¶ 96. Plaintiffs allege that, from June 2018 to December 2018, CBAV1 and SRM loaned approximately $2,227,457 to Cloud b. *See id.* ¶ 97. Around August 2018, Edison offered to purchase 100% of Cloud b's stock for a total value of $3,000,000 to be paid in the form of Edison shares. *See id.* ¶ 98. Only one shareholder, Rex Ours, agreed to sell his shares on the terms offered by Edison. *See id.* ¶ 101. On October 24, 2018, Edison purchased approximately 72.15% of Cloud b's stock. *See id.* ¶ 104. The remaining minority shareholders[5] held the remaining 27.85%. *See id.*

## B. Cloud b's Financial Statements and Article 9 Sale

In or around February of 2019, Plaintiffs noticed issues with Cloud b's financial records, which were unable to be audited. *See id.* ¶ 106. At that time, Plaintiffs decided to foreclose on Cloud b's assets. *See id.* CBAV1 purchased Cloud b's assets at an Article 9 sale for $2,000,000. *See id.* ¶ 107. At the time of that purchase, a balance of $480,000 remained on the EWBank loan. *See id.* Over the period beginning May 2018 and ending February 2019, Edison and its subsidiaries allege that they lost approximately $4,300,000. *See id.* ¶ 108.

## C. Post-Article 9 Sale

After the Article 9 Sale of Cloud b's assets, GWhitt and AWhitt requested corporate records and Cloud b emails for the period March 2019 to November 2019. *See id.* ¶ 120. On May 11, 2019, McFillin provided GWhitt access to the requested documents. *See id.* ¶ 122. Despite this production, GWhitt continued to demand corporate records from members of the Cloud b board. *See id.* ¶ 125. In June 2019, Cloud b hired Ajay Gupta to investigate Cloud b's path to insolvency. *See id.* ¶ 127. At a board meeting in November 2019, a vote was held to voluntarily dissolve Cloud b. *See id.* ¶ 131. The minority shareholders voted against the measure, and the vote to dissolve the company failed. *See id.*

## D. Filing of the California Lawsuit

In or around June 2018, GWhitt and AWhitt engaged Tiffany W. Tai, a California attorney. *See id.* ¶ 111. Tai was engaged to develop a strategy for the minority shareholders of Cloud b to recover against Edison and CBAV1. *See id.* ¶ 113. On October 27, 2020, the minority shareholders of Cloud b filed suit with Tai as their attorney.[6] *See id.* ¶ 53. The California Lawsuit named Edison, CBAV1, SRM, CFerguson, Linda Suh, Jeff Johnson, Richard Brenner, McFillin, KFerguson, and Vroman. *See id.* ¶ 134. Therein, the minority shareholders alleged claims for fraudulent concealment, breach of fiduciary duty, breach of contract, breach of confidence, intentional misrepresentation, negligent misrepresentation, unfair business practices, civil conspiracy, and breach of fiduciary duty. *See id.* Plaintiffs allege that the California Lawsuit is a misuse of process, which was designed to extort $8,000,000 from Plaintiffs. *See id.* ¶ 136. Moreover, Plaintiffs allege that the California Complaint contains "defamatory statements" regarding Plaintiffs. *See id.* ¶ 195. Beyond their publication in the California Complaint itself, Plaintiffs allege that these defamatory statements were published to third parties. *See id.* ¶ 196.

E. Alleged Defamatory Statements

Plaintiffs allege that GWhitt made the following defamatory statements:

(a) Edison Nation and/or CFerguson and/or McFillin engaged in a wrongful conduct in conspiring to take over Cloud b through its subsidiary's purchase of the EWBank Note in violation of a certain NDA; (b) Edison Nation defrauded the creditors of Cloud b, and the Whitt-Tai Complaint Plaintiffs, as minority shareholders, by promising to pay all of Cloud b's creditors as part of the purchase of 72% of Cloud b's stock; (c) Edison Nation's subsidiary CBAV1 did not own the Cloud b Assets; (d) GWhitt and other Defendants were not notified of the Article 9 sale scheduled for February 11, 2019; (e) Edison Nation engaged in conduct intentionally adverse to Cloud b, its creditors and minority shareholders; (f) Cloud b should not hire Kathy Tyler as an attorney for Cloud b, in or around March 2019, because "she was an idiot"; (g) Edison Nation promised that it would pay the unsecured creditors of Cloud b; (h) Defendants sustained in excess of $8,000,000 in damages as a result of Plaintiff's wrongful conduct; (i) other false statements and claims set forth in the Whitt-Tai Complaint which were made and published to third parties hereinafter identified . . . .

*See id.* ¶ 197.

Additionally, Plaintiffs allege that these defamatory statements were made to the following individuals:

(a) Tai, Cloud b's counsel in or around 2018 through the present; (b) Ajay Gupta, Cloud b's counsel, in or around August 2019 through December 2019; (c) Kathy Tyler, Cloud b's counsel, in or around 2017 through 2019; (d) the US Trustee in the Cloud b Bankruptcy ("UST"), in or around November 2020; (e) Lynn E. Feldman, Cloud b's Ch. 7 Trustee ("Cloud b Trustee"), in or around November 2020 through in or around December 2020; (f) Paul Maschmeyer, Esquire ("Maschmeyer"), the attorney for Cloud b Trustee from November 2020 through in or around December 2020; (g) Dave P. Adams, CBAV1's Ch. 11 Bankruptcy Trustee (the "CBAV1 Trustee"); (h) to various unsecured creditors of Cloud b from November 2020 through in or around December 2020; and (i) to investors of Edison Nation and the Securities and Exchange Commission.

*See id.* ¶ 198.

# F. Plaintiffs' Claims

Based on these allegations, Plaintiffs allege the following claims:

Count I: Intentional Misrepresentation (Edison v. MKW, MMilam, Knecht, Ours, and JDoes);

Count II: Negligent Misrepresentation (Edison v. MKW, MMilam, Knecht, Ours, and JDoes);

Count III: Negligence (Edison v. MKW, MMilam, Knecht, Ours, and JDoes);

Count IV: Conspiracy to Abuse Process, Unfair Business Practices, Civil Extortion, Trade Libel, and Defamation (Plaintiffs v. GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, and Knecht);

Count V: Unfair Business Practices (Plaintiffs v. GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, and Knecht and JDoes);

Count VI: Abuse of Process (Plaintiffs v. Tai, GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, and Knecht);

Count VII: Civil Extortion (McFillin v. GWhitt);

Count VIII: Trade Libel (Edison v. Tai, GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, Knecht, and JDoes);

Count IX: Defamation (CFerguson v. Tai, GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, Knecht, and JDoes); and

Count X: Defamation (McFillin v. Tai, GWhitt, AWhitt, CWhitt, MWhitt, MMilam, DMilam, Knecht, and JDoes);

On April 12, 2021, the Whitt-DMilam Defendants moved to dismiss the Amended Complaint for lack of personal jurisdiction, improper venue, and for failure to state a claim.[7] *See* Mot., ECF No. 30. Following a series of responses and replies, the motion is ready for review. *See* Resp.; Reply, ECF No. 39.

## III. LEGAL STANDARDS AND APPLICABLE LAW

## A. Motion to Dismiss for Lack of Personal Jurisdiction — Review of Applicable Law

A motion to dismiss a pleading for lack of personal jurisdiction is properly raised under Federal Rule of Civil Procedure 12(b)(2). A Rule 12(b)(2) motion "is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies." *Patterson ex rel. Patterson v. F.B.I.*, 893 F.2d 595, 603 (3d Cir. 1990) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)). "Unlike a Rule 12(b)(6) motion, the Court's review of a Rule 12(b)(2) motion is not limited to the face of the pleadings and the Court may rely on sworn affidavits submitted by the parties or other competent evidence that supports jurisdiction. *Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 463 (E.D. Pa. 2019) (citing *Patterson*, 893 F.3d at 603-04). Where a defendant challenges the existence of personal jurisdiction, the plaintiff bears the burden of making a prima facie showing that jurisdiction exists. *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 550 (E.D. Pa. 2018) (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)). "The plaintiff meets this burden by `establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction.'" *Hepp v. Facebook, Inc.*, No. CV 19-4034, 2020 WL 4437036, at *3 (E.D. Pa. Aug. 3, 2020) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987)).

A plaintiff may not "rely on the bare pleadings alone in order to withstand a defendant's motion to dismiss for lack of personal jurisdiction." *Time Share Vacation Club*, 735 F.2d at 66 n.9 (citing *Int'l Assoc. of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700 (3d Cir. 1982)). "Instead, the `plaintiff must respond with actual proofs, not mere allegations.'" *Hepp*, 2020 WL 4437036, at *3 (quoting *Time Share Vacation Club*, 735 F.2d at 66 n.9). In responding to a challenge to personal jurisdiction, "plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc., v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Where a court reviewing a Rule 12(b)(2) motion declines to hold an evidentiary hearing, "the Court is bound only to consider Plaintiff's Complaint and supporting evidence." *Laverty v. Cox Enterprises, Inc.*, No. CV18-1323, 2019 WL 351905, at *1 (D.N.J. Jan. 29, 2019) (citing *O'Connor*, 496 F.3d at 316). That is to say, where a district court declines to "hold an evidentiary hearing . . . plaintiff need only establish a prima facie case of personal jurisdiction." *O'Connor*, 496 F.3d at 316 (quoting *Miller Yacht Sales*, 384 F.3d at 97).

## B. Personal Jurisdiction — Review of Applicable Law

Federal Rule of Civil Procedure 4(k) provides that personal jurisdiction in a United States District Court is established in accordance with the law of the state in which the District Court sits. *See* FED. R. CIV. P. 4(k)(1)(A) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located . . . ."); *see also O'Connor*, 496 F.3d at 316. Therefore, this Court looks to the law of Pennsylvania, and Pennsylvania's long-arm statute in particular, to determine whether Plaintiffs can establish the existence of personal jurisdiction over Tai.

Pennsylvania's long-arm statute provides that "the jurisdiction of the tribunals of this Commonwealth shall extend . . . to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this

Commonwealth allowed under the Constitution of the United States." 42 PA. CONS. STAT. § 5322(b); _Mellon Bank (E.)_
_PSFS, Nat. Ass'n v. Farino_, 960 F.2d 1217, 1221 (3d Cir. 1992) ("The Pennsylvania [long-arm] statute permits the courts of
that state to exercise personal jurisdiction over non-resident defendants to the constitutional limits of the due process clause
of the fourteenth amendment." (citing _North Penn Gas Co. v. Corning Nat. Gas Corp._, 897 F.2d 687, 688-90 (3d Cir. 1990))).
"Accordingly, in determining whether personal jurisdiction exists," this Court must ask "whether, under the Due Process
Clause [of the Fourteenth Amendment], the defendant has `certain minimum contacts with . . . [Pennsylvania] such that the
maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" _O'Connor_, 496 F.3d at 316-17
(quoting _Int'l Shoe Co. v. Washington_, 326 U.S. 310, 316 (1945)). "These basic due process principles are reflected in the
two recognized types of personal jurisdiction"—general jurisdiction and specific jurisdiction. _Marten v. Godwin_, 499 F.3d 290,
296 (3d Cir. 2007). A court may exercise _specific_ jurisdiction where a "plaintiff's claim arise[s] from the defendant's contacts
with the forum in which the court sits." _Hepp_, 2020 WL 4437036, at *3 (citing _Helicopteros Nacionales de Colombia, S.A. v._
_Hall_, 466 U.S. 408, 413-14 (1984)); _Marten_, 499 F.3d at 296 ("Specific jurisdiction exists when the claim arises from or
relates to conduct purposely directed at the forum state.").

## 1. Traditional "Minimum Contacts" Test — Review of Applicable Law

The Third Circuit has outlined a three-part inquiry to determine whether specific jurisdiction exists:

First, the defendant must have "`purposefully directed' his activities" at the forum. _Burger King Corp. v. Rudzewicz_, 471 U.S.
472 (1985) (quoting _Keeton v. Hustler Magazine, Inc._, 465 U.S. 770, 774 (1984)). Second, the plaintiff's claim must "arise
out of or relate to" at least one of those specific activities. _Helicopteros_, 466 U.S. at 414. Third, courts may consider
additional factors to ensure that the assertion of jurisdiction otherwise "comport[s] with `fair play and substantial justice.'"
_Burger King_, 471 U.S. at 476 (quoting _Int'l Shoe_, 326 U.S. at 320).

_Marten_, 499 F.3d at 296.

To satisfy the first element of the inquiry, "[t]here must be a `deliberate targeting of the forum'" _Lutz_, 376 F. Supp. 3d at 463-
64 (quoting _O'Connor_, 496 F.3d at 317). "Moreover, `the defendant must have purposefully avail[ed] itself of the privilege of
conducting activities within the forum.'" _Lutz_, 376 F. Supp. 3d at 464 (quoting _O'Connor_, 496 F.3d at 317). With respect to
the second element of the inquiry, the "analysis should hew closely to the reciprocity principle upon which specific
jurisdiction rests"—that is, the relatedness between the benefits and obligations a forum state's law extends to an out-of-
state defendant as a result of conduct directed at the forum state. _Id._ at 464 (quoting _O'Connor_, 496 F.3d at 323). When the
first two elements of the inquiry are satisfied, the existence of minimum contacts is established, making "jurisdiction
presumptively constitutional." _O'Connor_, 496 F.3d at 324. In such circumstances, courts must then consider whether the
exercise of jurisdiction "would otherwise comport with the traditional notions of fair play and substantial justice," and a
"defendant `must present a compelling case that the presence of some other considerations would render jurisdiction
unreasonable.'" _Id._ (quoting _Burger King_, 471 U.S. at 477).

## 2. _Calder_ "Effects Test" — Review of Applicable Law

Alternatively, "a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by
certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum." _IMO Indus., Inc. v._
_Kiekert AG_, 155 F.3d 254, 265 (3d Cir. 1998) (citing _Carteret Sav. Bank, FA v. Shushan_, 954 F.2d 141 (3d Cir. 1992)). The
effects test allows a plaintiff to "demonstrate a court's jurisdiction over a defendant even when the defendant's `contacts with
the forum alone . . . . are too small to comport with the requirements of due process' under [the] traditional analysis." _Marten_,
499 F.3d at 297 (citing _IMO Indus._, 155 F.3d at 259).

To establish personal jurisdiction under the effects test, the following three elements must be satisfied:

> First, the defendant must have committed an intentional tort. Second, the plaintiff must have felt the brunt of
> the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm
> suffered by the plaintiff as a result of the tort. Third, the defendant must have expressly aimed his tortious
> conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

_IMO Indus._, 155 F.3d at 256.

"[O]nly if the `expressly aimed' element of the effects test is met need [the court] consider the other two elements." _Marten_, 499 F.3d at 297 (citing _IMO Indus._, 155 F.3d at 266). "To establish that the defendant `expressly aimed' his conduct, the plaintiff has to demonstrate the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." _Id._ at 297-98 (quoting _IMO Indus._, 155 F.3d at 266). "If a plaintiff fails to show that the defendant `manifest[ed] behavior intentionally targeted at and focused on' the forum, . . . the plaintiff fails to establish jurisdiction under the effects test." _Id._ at 298 (quoting _IMO Indus._, 155 F.3d at 265).

The effects test "prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state." _Ciolli v. Iravani_, 651 F. Supp. 2d 356, 365 (E.D. Pa. 2009) (quoting _Marten_, 499 F.3d at 297). The "mere fact that a plaintiff suffers harm in the forum state is not enough to give rise to personal jurisdiction in that state." _Weiser L. Firm v. Hartleib_, No. CV 19-2728-KSM, 2020 WL 5993628, at *10 (E.D. Pa. Oct. 9, 2020) (citing _Marten_, 499 F.3d at 297). "Even if a defendant's conduct would cause foreseeable harm in a given state, such conduct does not necessarily give rise to personal jurisdiction in that state." _Marten_, 499 F.3d at 297. "[T]he foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." _See id._ (quoting _World-Wide Volkswagen_, 444 U.S. at 297). Additionally, "[s]imply asserting that the defendant knew the plaintiff's principal place of business was located in the forum [is] insufficient in itself to meet [the expressly aimed] requirement." _Weiser Law Firm_, 2020 WL 5993628, at *10 (quoting _IMO Indus._, 155 F.3d at 266) (alterations in original).

## C. Agency Theory — Review of Applicable Law

While "Pennsylvania law permits that jurisdiction may be based on the acts of an agent, the mere fact that a principal-agent relationship exists does not confer personal jurisdiction over a nonresident principal." _Rychel v. Yates_, No. CIV.A. 09-1514, 2011 WL 1363751, at *11 (W.D. Pa. Apr. 11, 2011) (citing _Scott v. Lackey_, 1:02-cv-1586, 2010 WL 272275, at *9 n.18 (M.D. Pa. Jan. 20, 2010); _see also Myelle v. Am. Cyanamid Co._, Civ. No. 92-5243, 1993 WL 93422, at *6 (E.D. Pa. Mar. 31, 1993) ("The proposition that the mere existence of an agency relationship satisfies the minimum contacts requirement, without more, holds no water."). Thus, "irrespective of any agency relationship, the Court must engage in a constitutional inquiry to determine whether Defendants are properly haled into this forum." _Rychel_, 2011 WL 1363751, at *11 (citing _Lackey_, 2010 WL 272275 at *11).

"Under Pennsylvania law, to establish the existence of an agency relationship, a party must show that: (1) there was a manifestation by the principal that the agent would act for it; (2) the agent accepted such an undertaking; and (3) the principal retained control of the endeavor." _See id._ (citing _Castle Cheese, Inc. v. MS Produce, Inc._, Civ. A. No. 04-878, 2008 WL 43728567, at *8 (W.D. Pa. Sept. 19, 2008)). "The burden of establishing the existence of an agency relationship rests on the party making the assertion." _See id._ (citing _Goodway Mktg., Inc. v. Faulkner Advert. Assocs., Inc._, 545 F. Supp. 263, 267 (E.D. Pa. 1982)).

## D. Jurisdictional Discovery — Review of Applicable Law

"Courts should grant jurisdictional discovery unless the plaintiff's claim is `clearly frivolous.'" _Neoport Transit, LLC v. CBM N.A. Inc._, 314 F. Supp. 3d 628, 646 (E.D. Pa. 2018) (citing _Toys "R" Us, Inc. v. Step Two, S.A._, 318 F.3d 446, 456 (3d Cir. 2003)). However, "a court may deny jurisdictional discovery where the plaintiff has failed to meet its burden of making out a threshold _prima facie_ case of personal jurisdiction." _Arch v. Am. Tobacco Co._, 984 F. Supp. 830, 841 (E.D. Pa. 1997) (citing _Rose v. Granite City Police Dep't_, 813 F. Supp. 319, 321 (E.D. Pa. 1993)). Furthermore, "jurisdictional discovery is not warranted unless the plaintiff `presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [the party] and the forum state.'" _Laverty_, 2019 WL 351905, at *5 (quoting _Toys "R" Us_, 318 F.3d at 456)). As a result, "a plaintiff may not undertake a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery." _Eurofins Pharma US Holdings v. BioAlliance Pharma SA_, 623 F.3d 147, 157 (3d Cir. 2010) (citing _Belden Techs., Inc. v. LS Corp._, 626 F. Supp. 2d 448, 459 (D. Del. 2009)); _see also Lincoln Benefit Life Co. v. AEI Life, LLC_, 800 F.3d 99, 108 n. 38 (3d Cir. 2015) ("[J]urisdictional discovery is not available merely because the plaintiff requests it.").

E. Motion to Dismiss for Improper Venue — Review of Applicable Law

Title 28 U.S.C. § 1391(b) provides that A civil action may be brought in—

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

In adjudicating a motion to dismiss for improper venue, courts must "accept as true all of the allegations in the complaint, unless those allegations are contradicted by the defendants' affidavits." *See* *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x 157, 158 n.1 (3d Cir. 2012) (citing *Pierce v. Short Small's of Branson, Inc.*, 137 F.3d 1190, 1192 (10th Cir. 1998)). In evaluating the propriety of venue under § 1391(b)(2), a court must look not to "the defendant's `contacts' with a particular district, but rather the location of those `events or omission giving rise to the claim . . . .'" *See* *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). Moreover, § 1391(b)(2) "favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be `substantial.'" *See id.* "Events or omissions that might only have some tangential connection with the dispute in litigation are not enough." *See id.* The statute "no longer requires a court to select the `best' forum . . . ." *See id.* (citing *Setco Enters. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)).

## F. Motion to Dismiss for Failure to State a Claim — Review of Applicable Law

In rendering a decision on a motion to dismiss, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the `[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *See* *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *See* *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## G. Choice of Law — Review of Applicable Law

"The choice of law rules of the forum state . . . apply when a federal court is sitting in diversity." *Specialty Surfaces Int'l, Inc. v. Cont. Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). In this case, the parties agree that Pennsylvania's choice of law rules apply to this matter. *See* Mot. 26; *see also* Resp. 39.

Under Pennsylvania's choice of law rules, a court "must determine whether a real conflict exists between the respective laws." *See* *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 467-68 (E.D. Pa. 2010) (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007)). "A real conflict exists only where the application of each state's substantive law produces a contrary result." *Id.* at 468. "If the same result would ensue under the laws of the forum state and those of the foreign jurisdiction, then no conflict exists, and the court may avoid the choice of law question altogether." *Id.* Moreover, where parties agree upon the law to be applied, a choice of law analysis is not necessary. *See* *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 737 (E.D. Pa. 2013) (citing *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 228-29 (1996)).

## H. Civil Conspiracy — Review of Applicable Law[8]

In order to state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *See Miller v. Amazon.com Servs., Inc.,* ___ F. Supp. 3d ___, 2021 WL 2388179, at *6 (E.D. Pa. June 11, 2021) (quoting *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)). A plaintiff must set forth "the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *See Pinder v. Kennelly,* Civ. A. No. 18-115 Erie, 2019 WL 1115892, at *3 (E.D. Pa. Mar. 11, 2019) (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989)).

## I. Unfair Business Practices — Review of Applicable Law[9]

"Section 17200 [of California's Business and Professions Code], commonly referred to as >California's Unfair Competition Law ("UCL"), bans unfair business practices and authorizes injunctive and restitutionary relief against `[a]ny person who engages . . . in unfair competition.'" *Tidenberg v. Bidz.com, Inc.,* No. CV 08-5553 PSG (FMOx), 2009 WL 605249, at *3 (C.D. Cal. Mar. 4, 2009) (citing Cal. Bus. & Prof. Code §§ 17200, 17203). "[T]he UCL was neither designed or intended to regulate claims of non-residents arising from conduct occurring entirely outside of California." *Id.* (citing *Nw. Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999)). "However, `state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California.'" *Id.* (quoting *Nw. Mortgage,* 72 Cal. App. 4th at 224-25). "The critical issues here are whether the injury occurred in California and whether the conduct of Defendants occurred in California." *Id.* "If neither of these questions can be answered in the affirmative," then a non-resident plaintiff lacks standing under the UCL. *See id.*

Unfair competition in the UCL is defined to include "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising . . . ." *See* Cal. Bus. & Prof. Code § 17200. A practice is "unlawful" under the UCL if it is "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (Aug. 16, 1994) (citing *People v. McKale*, 25 Cal. 3d 626, 632 (Cal. 1979)). An "unfair" practice is "any practice whose harm to the victim outweighs its benefits." *See id.* (citing *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (Cal. Ct. App. 1980)). A practice is "fraudulent" if "members of the public `are likely to be deceived'" by the practice. *See id.* (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (Cal. 1992)).

## J. Abuse of Process — Review of Applicable Law[10]

"The common law tort of abuse of process is defined as the perversion of legal process after it has begun `primarily to accomplish a purpose for which it is not designed.'" *See Ciolli,* 625 F. Supp. 2d at 296 (quoting *Werner v. Plater-Zyberk*, 799 A.2d 776, 785 (Pa. Super. Ct. 2002)). "To state a claim for abuse of process under Pennsylvania law, a plaintiff must allege facts sufficient to show that `the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff.'" *See EMC Outdoor, LLC v. Stuart,* Civ. A. No. 17-5712, 2018 WL 3208155, at *3 (E.D. Pa. June 28, 2018) (quoting *Naythons v. Stradley, Ronon, Stevens & Young, LLP,* No. 07-4489 (RMB), 2008 WL 1914750, at *3 (E.D. Pa. Apr. 30, 2008)).

The tort is designed to prevent the "use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process." *See id.* (quoting *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. Ct. 1994)). A defendant's "bad or malicious intentions" are not enough; "[r]ather there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action." *See id.* (quoting *Al Hamilton Contracting*, 644 A.2d at 192).

"The torts of malicious prosecution and abuse of process are separate and distinct but often confused." *See Werner,* 799 A.2d at 785 (citing *Al Hamilton Contracting*, 644 A.2d at 191). While abuse of process involves improper use of process *after* the suit has been initiated, malicious prosecution "arises when a party *institutes* a lawsuit with a malicious motive and lacking probable cause." *See id.* (citing *Hart v. O'Malley*, 781 A.2d 1211, 1219 (Pa. Super. Ct. 2001)).

Pennsylvania's judicial privilege provides "immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *See* *Church Mut. Ins.*, 102 F. Supp. 3d at 730 (quoting *Schanne*, 121 A.3d at 947). "The privilege yields only when the communication is not issued as a matter of regular course during the proceedings or is not pertinent and material." *Id.* (citing *Bochetto v. Gibson*, 860 A.2d 67, 72-73 (2004) (noting attorney's transmission of complaint to a reporter was extrajudicial and not related to the proceedings)).

## K. California Civil Extortion — Review of Applicable Law[11]

"California permits a cause of action `for the recovery of money obtained by the wrongful threat of criminal or civil prosecution, [regardless of] whether the claim is denominated as extortion, menace, or duress.'" *Wilson v. Ridgeway,* 20-cv-00381-PJH, 2020 WL 4590241, at *2 (N.D. Cal. Aug. 7, 2020) (quoting *Monex Deposit Co. v. Gilliam*, 666 F. Supp. 2d 1135, 1136 (C.D. Cal. 2009)). "Extortion is the obtaining of property from another, with his or her consent, or the obtaining of an official act of a public officer, induced by wrongful use of force or fear, or under color of official right." CAL. PENAL CODE § 518. Fear, as it is used in this provision, may constitute a threat (1) "[t]o do an unlawful injury to the person or property of the individual threatened or of a third person;" (2) "[t]o accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime;" or (3) "[t]o expose, or to impute to him, her, or them a deformity, disgrace, or crime . . . ." *See id.* § 519.

Courts to apply this standard make clear that a plaintiff must allege both a "civil or criminal prosecution with which defendant threatened [plaintiff]" and property "that defendants demanded plaintiff transfer to them." *See Wilson,* 2020 WL 4590241, at *2.

## L. Trade Libel — Review of Applicable Law[12]

Under Pennsylvania law,

> Trade libel, also called "injurious falsehood," consists of the publication of a disparaging statement concerning the business of another and is actionable where:
>
> "(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity."

*See Maverick Steel*, 54 A.3d at 354 (quoting *Pro Golf Mfg., Inc. v. Tribune Rev. News. Co.*, 809 A.2d 243, 246 (Pa. 2002)).

## M. Defamation — Review of Applicable Law[13]

Under Pennsylvania Law, "[d]efamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *See Mzamane*, 693 F. Supp. 2d at 476 (quoting *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008)). In order to establish a claim of defamation, a plaintiff must show:

(1) The defamatory character of the communication;

(2) Its publication by the defendant;

(3) Its application to the plaintiff;

(4) The understanding by the recipient of its defamatory meaning;

(5) The understanding by the recipient of it as intended to be applied to the plaintiff;

(6) Special harm resulting to the plaintiff from its publication; [and]

(7) Abuse of a conditionally privileged occasion.

*See* 42 PA. CONS. STAT. § 8343(a).

Once a plaintiff establishes these initial elements, the defendant bears the burden of showing (1) "the truth of the defamatory communication," (2) "the privileged character of the occasion on which it was published," or (3) "the character of the subject matter of defamatory comment as of public concern." *See id.* § 8343(b). "A statement is deemed to be defamatory `if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession.'" *Mzamane*, 693 F. Supp. 2d at 477 (quoting *Joseph*, 959 A.2d at 334). "When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory." *See id.*

"[O]ne of the requirements of a defamation claim is to show `special harm' resulting to the plaintiff from its publication." *Pennoyer v. Marriott Hotel Servs., Inc.*, 324 F. Supp. 2d 614, 618 (E.D. Pa. 2004) (citing *Clemente v. Espinosa*, 749 F. Supp. 672, 677 (E.D. Pa. 1990)). "The term `special harm' is defined as `actual damages which are economic or pecuniary losses.'" *Id.* (citing *Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 368-69 (E.D. Pa. 2003)). Notwithstanding, Pennsylvania allows a plaintiff to proceed without proof of special harm where the words constitute "defamation per se." *See Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 365 (E.D. Pa. 2017). "Defamation per se can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Id.* (quoting *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999)).

# IV. DISCUSSION

The Whitt-DMilam Defendants move to dismiss Plaintiffs' Amended Complaint for lack of personal jurisdiction, improper venue, and failure to state a claim. After a review of the allegations in the Amended Complaint and the supporting documents, this Court concludes that jurisdiction is appropriate over GWhitt. Notwithstanding, Plaintiffs fail to carry their burden of establishing personal jurisdiction over the remaining Whitt-DMilam Defendants. Accordingly, those Defendants are dismissed without prejudice. Furthermore, this Court concludes that venue in this district is appropriate over the claims against GWhitt.

After reviewing the sufficiency of the allegations that support the claims against GWhitt, this Court concludes that Edison's trade libel claim, McFillin's defamation claim, and Plaintiffs' UCL claim may proceed as pleaded. On the other hand, CFerguson's defamation claim, Plaintiffs' abuse of process claim; McFillin's civil extortion claim, and Plaintiffs' conspiracy claim are dismissed without prejudice.

## A. Defendants' Personal Jurisdiction Challenge

Plaintiffs allege that this Court has personal jurisdiction over all of the Whitt-DMilam Defendants. Primarily, Plaintiffs allege that GWhitt acted on behalf of or as an agent for the remaining Whitt-DMilam Defendants. Therefore, Plaintiffs argue, if this Court finds personal jurisdiction is appropriate over GWhitt, this Court should similarly find personal jurisdiction appropriate over the remaining Whitt-DMilam Defendants.

While personal jurisdiction is typically measured on a claim-by-claim basis, the jurisdictional facts are common across all of the claims lodged against GWhitt. Namely, the jurisdictional facts all relate to the filing of the California Lawsuit and the communications that GWhitt engaged in thereafter with individuals situated in Pennsylvania. After a review of the Amended Complaint and supporting documents, this Court finds that jurisdiction in this forum is appropriately exercised over GWhitt. Notwithstanding, as this Court explains *infra,* Plaintiffs have failed to meet their burden of establishing the appropriate exercise of agency jurisdiction over the remaining Whitt-DMilam Defendants. Accordingly, while the case may proceed against GWhitt in this forum, it may not proceed against the remaining Whitt-DMilam Defendants.

## 1. Traditional Test for Personal Jurisdiction over GWhitt.

Since Plaintiffs rely on GWhitt to establish the appropriateness of jurisdiction over the whole of the Whitt-DMilam Defendants, this Court begins by analyzing GWhitt's contacts with the forum state. *See Lutz*, 376 F. Supp. 3d at 463-64 (quoting *O'Connor*, 496 F.3d at 317). Turning to Gwhitt's direct contacts with the forum state, there are few, if any, to count.

GWhitt resides in California, and he asserts in his affidavit that he does not conduct any business in the forum state. *See* Mot. Ex. A. 1-2 ("Declr. of GWhitt"), ECF No. 30-3.

Plaintiffs do not dispute GWhitt's lack of direct contacts with the forum state, and instead, Plaintiffs focus on GWhitt's conduct, undertaken in California, that was nonetheless targeted at Pennsylvania. While Plaintiffs associate these communications with "contacts," they are more appropriately analyzed under the effects test. Accordingly, although Plaintiffs fail to show that GWhitt has minimum contacts with the forum state, this Court turns to analyze whether jurisdiction is appropriate under the effects test.

## 2. Effects Test

To establish that an exercise of personal jurisdiction is appropriate under the effects test, Plaintiffs must sufficiently plead (1) that GWhitt committed an intentional tort, (2) that the brunt of the resultant harm was felt in Pennsylvania, and (3) that GWhitt intentionally targeted her behavior at Pennsylvania. *IMO Indus.*, 155 F.3d at 256. Here, Plaintiffs sufficiently establish all three elements such that jurisdiction over GWhitt is appropriate.

Foremost, Plaintiffs plead that GWhitt engaged in multiple intentional torts, including abuse of process, defamation, and trade libel. Second, Plaintiffs allege that the brunt of the resultant harm was felt in Pennsylvania. Specifically, Plaintiffs allege that they suffered harm in the form of lost business due to the statements made and published by GWhitt.

Finally, Plaintiffs sufficiently establish that GWhitt expressly aimed his conduct at Pennsylvania. First, Plaintiffs point to the California Lawsuit as evidence of GWhitt's targeting of Pennsylvania because some of the defendants in that lawsuit are domiciled in Pennsylvania. While the filing of the California Lawsuit alone is insufficient to establish that GWhitt targeted Pennsylvania, the Plaintiffs also point to actions taken by GWhitt beyond the filing of the complaint that were expressly aimed at Pennsylvania. Primarily, Plaintiffs point to communications, in the form of emails and telephone calls, that GWhitt had with individuals in Pennsylvania. *See, e.g.,* Am. Compl. Ex. 8 ("GWhitt Email").

GWhitt disputes that these communications are sufficient to establish jurisdiction over him. However, when viewed in light of the allegations in the Amended Complaint, the communications from GWhitt to individuals in Pennsylvania show an express targeting of the forum. By way of example, GWhitt sent an email to Thomas Bielli, Cloud b's bankruptcy counsel, who was domiciled in Pennsylvania. Therein, GWhitt provided a list of reasons why the Eastern District of Pennsylvania bankruptcy matter involving Cloud b should be dismissed, and he communicated his expectation that Bielli dismiss the bankruptcy action immediately. *See* GWhitt Email 1-2. When viewed in light of the allegations in the Amended Complaint, which are taken as true for the purpose of this motion, GWhitt purposefully reached into Pennsylvania—via this email sent to Bielli—with the intention that his actions effect a legal process operating within the forum state. The email clearly states GWhitt's hope that, following receipt of this email, Bielli "will take the necessary actions to dismiss the Cloud b, Inc. bankruptcy immediately . . . ." *See* GWhitt Email 2. This communication shows that GWhitt intended that the effects of his email, namely the dismissal of the pending bankruptcy proceeding, would occur in Pennsylvania and affect the interests of the Pennsylvania Plaintiffs, some of which he named in his email. *See id.* at 1-2. Accordingly, these communications that GWhitt engaged in with Bielli, the United States Trustee in the Cloud b Bankruptcy, Cloud b's Chapter 7 Trustee, and the attorneys for Cloud b in its bankruptcy proceedings evidences his express targeting of the forum sufficient to sustain jurisdiction over GWhitt.

In rebuttal, GWhitt contends that the fact that his communications ended up in Pennsylvania is insufficient to establish express targeting of the forum under the effects test. *See* Mot. 18. While it is true that "[t]he mere fact that email, phone calls, or regular mail end up in the forum state is not enough to show purposeful availment," GWhitt's communications did not merely "end up" in Pennsylvania. *See Weiser L. Firm,* 2020 WL 5993628, at *11. Rather, the aim of GWhitt's email to Bielli was clear: GWhitt wished to achieve, through his communication with Pennsylvania individuals, the dismissal of an ongoing legal process in the forum state. Therefore, it is unavailing for GWhitt to claim that his communications merely ended up in the forum state, and those communications are in fact sufficient to sustain jurisdiction over him.

Accordingly, when viewed as a whole, GWhitt's actions indicate that he expressly aimed the alleged tortious conduct at the forum state. The communications and resultant harm did not merely "end up" in Pennsylvania; they were directed at the forum. Therefore, the exercise of personal jurisdiction over GWhitt is appropriate.

### 3. Agency Theory of Jurisdiction

Plaintiffs attempt to justify the exercise of jurisdiction over the remaining Whitt-DMilam Defendants by claiming that GWhitt acted "as the authorized agent and/or representative of the other Defendants" when he undertook the actions described above. *See* Am. Compl. ¶ 27. Here, Plaintiffs fail to set forth any allegations, let alone evidence, to support the existence of an agency relationship between GWhitt and the remaining Whitt-DMilam Defendants. Although the remaining Whitt-DMilam Defendants were parties to the California Lawsuit, jurisdiction on this basis alone is not appropriate. As this Court explained above, the actions taken by GWhitt outside of the filing of the California Lawsuit rendered jurisdiction appropriate. Plaintiffs have failed to show that any of the remaining Whitt-DMilam Defendants had anything to do with the actions taken by GWhitt that were directed at Pennsylvania. Rather, Plaintiffs baldly allege that such actions were taken "as the authorized agent and/or representative of the other Defendants." *See id.* ¶ 285. Notwithstanding, Plaintiffs fail to come forth with any facts to support this allegation. Accordingly, this Court finds that the exercise of jurisdiction over AWhitt, MWhitt, CWhitt, and DMilam is inappropriate, and dismisses those parties from this action.

## 4. Plaintiffs are not entitled to Jurisdictional Discovery.

Plaintiffs request that, should this Court find a lack of jurisdiction over any Defendant, that Plaintiffs be permitted to undertake jurisdictional discovery. In an effort to establish jurisdiction over the Whitt-DMilam Defendants, Plaintiffs relied exclusively on the actions of GWhitt, arguing that the remaining Defendants are appropriately in this forum by function of an agency relationship. As Plaintiffs made no effort in the first instance to plead any contacts or expressly aimed conduct on the part of the other Whitt-DMilam Defendants, the only remaining issue upon which jurisdictional discovery could be granted is the existence of an agency relationship between GWhitt and the remaining Whitt-DMilam Defendants.

A court may reject a request for jurisdictional discovery where a Plaintiff does not set forth a prima facie case of personal jurisdiction. *Arch*, 984 F. Supp. at 841 (citing *Rose*, 813 F. Supp. at 321). Here, Plaintiffs fail to set forth a prima facie case for jurisdiction over the remaining Whitt-DMilam Defendants. As indicated above, Plaintiffs do not allege any facts to indicate the existence of an agency relationship between GWhitt and the remaining Whitt-DMilam Defendants. The fact that the Whitt-DMilam Defendants are all plaintiffs to the California Lawsuit, alone, is insufficient to establish a prima facie agency relationship. Moreover, Plaintiffs fail to allege any involvement of the remaining Whitt-DMilam Defendants in the communications undertaken by GWhitt, beyond bald allegations that the communications were "authorized" by those remaining Defendants. Accordingly, Plaintiffs have failed to set forth, with reasonable particularity, facts that would suggest that any such agency relationship even exists. *Laverty*, 2019 WL 351905, at *5 (quoting *Toys "R" Us*, 318 F.3d at 456). To permit jurisdictional discovery here would be to permit a fishing expedition based on bare allegations. *Eurofins Pharma US Holdings*, 623 F.3d at 157 (citing *Belden Techs*, 626 F. Supp. 2d at 459).

Finding that Plaintiffs have failed to establish a prima facie case of jurisdiction or set forth facts that would suggest with reasonable particularity that an agency relationship exists between GWhitt and the remaining Whitt-DMilam Defendants, Plaintiffs' request for jurisdictional discovery is denied.

## B. GWhitt's Venue Challenge

Next, GWhitt asserts that the Eastern District of Pennsylvania is an improper venue for this suit. In support, GWhitt argues that nearly all of Plaintiffs claims relate to the filing of the California Lawsuit, and accordingly, the act giving rise to the claims took place outside of this venue. In response, Plaintiffs point to actions taken in this venue that give rise to their claims.

Venue is appropriate in a district in which a substantial portion of the events giving rise to a claim took place. *See* 28 U.S.C. § 1391(b). After a review of the Amended Complaint, this Court finds that venue is appropriate in this district. With respect to all of the claims alleged against GWhitt, Plaintiffs allege substantial activity in this district that gives rise to those claims. Primarily, all of Plaintiffs claims are based on communications by GWhitt that were published in this district. While it is true that GWhitt maintained the California Lawsuit against the Plaintiffs, 29 the Plaintiffs claims are not based exclusively on that suit. Rather, they relate directly to allegedly defamatory and libelous communications made in this district by GWhitt. Importantly, there may be more than one appropriate venue, and this Court need not decide the best venue for this matter. *See Cottman Transmission Sys.*, 36 F.3d at 294 (citing *Setco Enters.*, 19 F.3d at 1281). With that, this Court finds that venue in this district is appropriate over Plaintiffs' claims.

## C. GWhitt's Challenge to the Sufficiency of Plaintiffs' Allegations

GWhitt next moves to dismiss Plaintiffs' claims on the basis that they are insufficiently pleaded. Before analyzing each claim, GWhitt makes an overarching argument that all of the communications upon which Plaintiffs' claims rely are absolutely privileged under Pennsylvania's judicial privilege. *See* Mot. 27. Notwithstanding, this argument is unavailing because, as the allegations in the Amended Complaint show, Plaintiffs' claims are based, at least in part, on extra-judicial communications.

Pennsylvania judicial privilege provides "immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *See Church Mut. Ins. Co.*, 102 F. Supp. 3d at 730 (quoting *Schanne*, 121 A.3d at 947). However, the privilege does not apply if the communication was extrajudicial or bears no relation to the proceedings. *See id.* (citing *Bochetto*, 860 A.2d at 72-73 (noting attorney's transmission of complaint to a reporter was extrajudicial and not relevant to the proceedings)). Here, Plaintiffs allege at least some extrajudicial communications by GWhitt that fall outside of the protections of the judicial privilege. By way of example, GWhitt's email to Bielli was not made in the course of the ongoing judicial proceedings in California. The focus of that letter was the ongoing bankruptcy of Cloud b in the Eastern District of Pennsylvania.[14] Rather than engage in the formal bankruptcy process, the allegations establish that GWhitt attempted to exert influence over the process through means of the extra-judicial email to Bielli. Accordingly, because Plaintiffs' claims are, at least in part, based on extra-judicial communications, this Court turns to a review of each claim against GWhitt.

## 1. Edison's Trade Libel Claim

In order to state a claim for trade libel, Edison must allege (1) a false publication, (2) the publisher's intent that the publication cause loss or the publisher's reasonable recognition thereof, (3) actual loss, and (4) that the publisher knew of the false nature of the publication or recklessly disregarded the same. *See Maverick Steel*, 54 A.3d at 354. When Edison's allegations are taken as true, it has alleged at least some statements that suffice to state a claim for trade libel.

In its Amended Complaint, Edison alleges that GWhitt published false statements to third parties, including that

> (a) Edison Nation and/or CFerguson and/or McFillin engaged in wrongful conduct in conspiring to take over Cloud b through its subsidiary's purchase of the EWBank Note in violation of a certain NDA; (b) Edison Nation defrauded the creditors of Cloud b, and the Whitt-Tai Complaint Plaintiffs, as minority shareholders, by promising to pay all of Cloud b's creditors as part of the purchase of 72% of Cloud b's stock; (c) Edison Nation's subsidiary CBAV1 did not own the Cloud b Assets . . . (e) Edison Nation engaged in conduct intentionally adverse to Cloud b, its creditors and minority shareholders . . . [and] (g) Edison Nation promised that it would pay the unsecured creditors of Cloud b . . . .

*See* Am. Compl. ¶ 285. Moreover, Edison claims that these false statements were published to numerous third parties including Cloud b's counsel, Cloud b's Chapter 7 Trustee, CBAV1's Chapter 11 Trustee, unsecured creditors of Cloud b, the Securities and Exchange Commission, and investors of Edison. *See* Am. Compl. ¶ 286. GWhitt argues that this publication is protected by Pennsylvania's judicial privilege. This argument is unavailing. Taking the allegations in the Amended Complaint as true, the publication of these statements to bankruptcy trustees, the SEC, creditors of Cloud b, and investors of Edison is not made in the regular course of litigation and bears no relation to the ongoing California Lawsuit. This sort of publication is more akin to transmission of a complaint to a reporter. *See Bochetto*, 860 A.2d at 72-73 (noting attorney's transmission of complaint to a reporter was extrajudicial and not relevant to the proceedings). Accordingly, these communications are not shielded by the judicial privilege, and they may be actionable as libelous.

In addition, for at least some of these statements, Edison plausibly alleges that GWhitt knew of the falsehood of his statements or, at a minimum, recklessly disregarded the same. By way of example, Edison alleges that CBAV1 purchased the assets of Cloud b at an Article 9 sale. *See* Am. Compl. ¶¶ 41-42. Notwithstanding, as Edison alleges, GWhitt disregarded that fact in making statements that CBAV1 did not own Cloud b's assets. Edison also alleges that, at a minimum, GWhitt should have reasonably recognized that false statements such as these would lead to pecuniary loss to Edison. Put another way, it is reasonably predictable that a company could suffer financially adverse results if stakeholders were led to believe that the company did not actually own assets that it claimed to own. Finally, Edison alleges that it did in fact suffer loss including the loss of financing opportunities with existing and potential investors.

Taking its allegations as true, Edison has sufficiently stated a claim for trade libel against GWhitt. Accordingly, GWhitt's motion to dismiss this claim is denied, and the claim may proceed.

## 2. CFerguson's Defamation Claim

In order to state a claim for defamation, CFerguson must allege (1) a communication of defamatory character, (2) publication thereof, (3) application to CFerguson, (4) an understanding by the recipient of its defamatory meaning, (5) an understanding by the recipient of the applicability of the statement to CFerguson, and (6) special harm, or defamation per se.[15] *See* 42 PA. CONS. STAT. § 8343(a).

Beginning with the defamatory statements, CFerguson only alleges two statements that relate to him directly. First, CFerguson alleges that GWhitt made a defamatory statement when he said that "Edison Nation and/or CFerguson and/or McFillin" violated a non-disclosure agreement when they purchased the EWBank note. *See* Am. Compl. ¶ 296. This communication is alleged in list form with a litany of other communications that do not involve CFerguson. *See id.* In a separate allegation identical to Plaintiffs' other defamation and libel claims, CFerguson alleges that this communication, among the others, was published to a long list of individuals. *See id.* ¶ 297. The list does not separate out which claims were communicated to which individuals, only generally alleging that the list of claims was communicated to the list of individuals. Accordingly, with no allegations as to which recipients received this particular statement, CFerguson has failed to plead a number of the elements of a defamation claim. Most notably, having failed to identify who received this particular statement, CFerguson has failed to plead that the recipient understood the defamatory character of the statement and understood its applicability to CFerguson. Accordingly, CFerguson has failed to plead a claim of defamation against GWhitt with respect to this statement.

CFerguson's only other allegation relating to statements made about him is his allegation that "upon information and belief, after October 22, 2020, GWhitt continued to make statements to third parties including, but not limited to, the chapter 7 trustee and her counsel in the Cloud b Chapter 7 Bankruptcy, accusing CFerguson of engaging in fraud and other illegal conduct." *See* Am. Compl. ¶ 297. This allegation again falls short of plausibly alleging a claim of defamation. CFerguson fails to allege the actual contents of the statements, the recipients of the statements, or whether those recipients understood the defamatory character and applicability of the statement to CFerguson. Accordingly, GWhitt's motion to dismiss CFerguson's claim of defamation is granted, and CFerguson's claim of defamation against GWhitt is dismissed without prejudice.

## 3. McFillin's Defamation Claim

In order to state a claim for defamation, McFillin must allege (1) a communication of defamatory character, (2) publication thereof, (3) application to McFillin, (4) an understanding by the recipient of its defamatory meaning, (5) an understanding by the recipient of the applicability of the statement to McFillin, and (6) special harm, or defamation per se.[16] *See* 42 PA. CONS. STAT. § 8343(a)

McFillin points to two sets of statements that he alleges qualify as defamatory. Beginning with the first, McFillin alleges that GWhitt communicated that "Edison Nation and/or CFerguson and/or McFillin engaged in wrongful conduct in conspiring to take over Cloud b through its subsidiary's purchase of the EWBank Note in violation of a certain [non-disclosure agreement]." *See* Am. Compl. ¶ 307. This communication is identical to that which CFerguson used to support his defamation claim. Accordingly, just as CFerguson's allegation regarding this communication was insufficient to sustain a claim of defamation, so too is McFillin's allegation regarding this communication.

Next, McFillin alleges that GWhitt's email to Bielli contained defamatory statements regarding McFillin. *See id.* ¶ 309. Although McFillin does not allege which statements are defamatory, there are two identifiable statements that may take on a defamatory character. First, the email states that McFillin "disregarded [his] duties as [a] director[]" of Cloud b. *See* GWhitt Email 2. Taking McFillin's allegations as true, the defamatory character of this statement is apparent. Namely, falsely communicating that a director disregarded his duties could cause harm to that individual's reputation and character. Second, the email states that McFillin's actions with respect to the Cloud b bankruptcy filing "are probably deliberate, and could be considered acts of bankruptcy fraud." *See id.* Similar to the prior statement, the defamatory character of this statement is also apparent, in that falsely accusing one of bankruptcy fraud could similarly harm their reputation.

Moving to the second element, McFillin has shown publication of the statement, in that it was sent via email to Bielli and was copied to Scott Carlson, Tai, AWhitt, CFerguson, Vroman, and KFerguson. *See id.* Third, McFillin has shown the application of the statements to him, insofar as the statements explicitly name him. Fourth, McFillin has sufficiently pleaded that a recipient of this email would understand the remarks regarding his disregard for fiduciary duties and violation of bankruptcy law to be defamatory. Fifth, because the email directly named McFillin, he has sufficiently pleaded that the recipient would understand the defamatory statement to apply to him.

Sixth and finally, McFillin need not plead special damages in this case because the excerpted statements from the GWhitt email constitute defamation per se. *See Mallory,* 260 F. Supp. 3d at 365. GWhitt's statement regarding McFillin's disregard of fiduciary duties falls within the "business misconduct" category of defamation per se. *See id.* (quoting *Synygy, Inc.,* 51 F. Supp. 2d at 580). Similarly, GWhitt's statement involving McFillin's conduct as bankruptcy fraud falls within the "criminal offense" category of defamation per se. *See id.* Accordingly, McFillin need only plead general damages, or "that one's reputation was actually affected by the slander or that one suffered personal humiliation." *See Synygy,* 51 F. Supp. 2d at 581 (citing *Walker v. Grand Cent. Sanitation, Inc.,* 634 A.2d 237, 242 (Pa. Super. Ct. 1993)). Here, McFillin alleges that he suffered both reputational harm as a result of the statements as well as personal humiliation in the form of public contempt, ridicule, shame, and the threat of criminal investigation. *See* Am. Compl. ¶ 316.

Taking the allegations as true, McFillin has sufficiently pleaded a claim of defamation against GWhitt, and accordingly, GWhitt's motion to dismiss McFillin's defamation claim is denied.

## 4. Plaintiffs' Abuse of Process Claim

To state a claim for abuse of process, Plaintiffs must allege that GWhitt (1) used a legal process against Plaintiff, (2) to accomplish an improper purpose, and (3) that harm resulted to Plaintiff. *See EMC Outdoor,* 2018 WL 3208155, at *3 (quoting *Naythons,* 2008 WL 1914750, at *3). The inquiry focuses on how the process is used *after* filing of the suit, rather than the motives that undergird the filing itself. Accordingly, to the extent Plaintiffs support their abuse of process claim by pointing to an improper motive for GWhitt's filing of the California Lawsuit, they have failed to state a claim. Notwithstanding, this Court reviews Plaintiffs' allegations of conduct occurring after the filing of the California Lawsuit. Following a review of those allegations, this Court concludes that Plaintiffs have failed to state a claim.

Plaintiffs note three instances of alleged abuse of process in their Amended Complaint that occurred after the filing of California Lawsuit. Essentially, Plaintiffs claim that GWhitt transmitted the California Lawsuit complaint to (1) the U.S. Trustee and its counsel, (2) Cloud b's bankruptcy counsel, and (3) CBAV1's bankruptcy trustee. Notwithstanding, Plaintiffs do not explain how transmitting a copy of a complaint amounts to the use of process. The one communication that Plaintiffs do attach to their Amended Complaint is instructive. Plaintiffs attach a copy of the email sent from GWhitt to Bielli regarding Cloud b's bankruptcy filing. To be sure, GWhitt references the existence of the California Lawsuit in the letter. However, at no point in the letter does GWhitt attempt to use that lawsuit "as a tactical weapon to coerce a desired result." *See Ciolli,* 625 F. Supp. 2d at 296 (*Al Hamilton Contracting,* 644 A.2d at 191). Plaintiffs fail to allege how mere reference to an active lawsuit—or transmission of a publicly-available complaint filed therein—without more, constitutes abuse of process.

Plaintiffs fail to allege that GWhitt abused legal process to their detriment after the initiation of the California Lawsuit, and accordingly, Plaintiffs' claim for abuse of process is dismissed without prejudice.

## 5. McFillin's Civil Extortion Claim

In order to state a claim for civil extortion under California law, McFillin must allege that GWhitt used fear to induce the transfer of property from McFillin to GWhitt. *See* CAL. PENAL CODE § 518. Put another way, McFillin must allege that GWhitt threatened civil or criminal prosecution and demanded the transfer of some property from McFillin to himself. Here, even assuming arguendo that McFillin has sufficiently alleged that GWhitt threatened civil or criminal prosecution, McFillin fatally fails to allege any demanded transfer or property or any actual transfer of property.

McFillin bases his claim for civil extortion entirely on the email sent by GWhitt to Bielli on November 29, 2020. *See* GWhitt Email. In that email, GWhitt sought to have Bielli dismiss the ongoing Cloud b bankruptcy matter. In an effort to support that GWhitt demanded property from McFillin, McFillin attempts to liken this case to *People v. Cadman,* 57 Cal. 562 (Cal. 1881). First, McFillin cites *Cadman* for the proposition that an appeal is "property" within the meaning of the California Penal Code.

However, this is a clear misstatement of the case law. In *Cadman*, the defendant addressed a letter to the plaintiff, instructing that he either withdraw his appeal in a separate ongoing case or risk having damaging personal details about him made public. *See id.* 562-63. In its opinion, the California Supreme Court indicated that it was *assuming* that "the right to take and prosecute an appeal is property within the meaning of the [California Penal] Code . . . ." *See id.* at 564. Contrary to McFillin's assertion, that court *did not* hold that the right to take and prosecute an appeal was property within the meaning of the California Penal Code.

Moreover, even if the California Supreme Court had held that the right to take an appeal was itself "property," the factual distinctions between *Cadman* and the present case make it wholly inapposite. McFillin's attempts to analogize himself to Cadman are unavailing. Cadman was the party who prosecuted the underlying suit and who held the right of appeal. *See Cadman*, 57 Cal. At 562-63. Put another way, Cadman was the holder of the property to be extorted. *See id.* Accordingly, it is conceivable that Cadman had a financial stake in his right to appeal. Here, McFillin is not the party seeking bankruptcy; rather, he is corporate counsel to the party seeking bankruptcy. Importantly, McFillin was not the direct recipient of the email that he claims extorted him. Rather, the email was sent to Bielli, and the email itself requested that Bielli dismiss the bankruptcy action. Accordingly, given that McFillin did not hold any property with respect to the bankruptcy action, it is unclear what, if any, property GWhitt could have sought to have transferred from McFillin to himself.[17]

McFillin fails to plead that GWhitt demanded the transfer of property that is necessary to state a claim for civil extortion under California law. Accordingly, this claim is dismissed without prejudice.

## 6. Plaintiffs' UCL Claim

In order to show that the non-resident Plaintiffs have standing to bring a UCL claim, they must allege that either the unlawful conduct or the resultant injury took place in California. *Tidenberg,* 2009 WL 605249, at *3 (citing Nw. Mortgage, 72 Cal. App. 4th at 224-25). Here, Plaintiffs sufficiently allege that the conduct that violates the UCL took place in California. Namely, Plaintiffs allege that GWhitt made the communications underlying their trade libel claim from locations in California. *See* Am. Compl. ¶ 236. Accordingly, Plaintiffs have established that they have standing to bring their UCL claim.

Plaintiffs' response in opposition to GWhitt's motion to dismiss makes clear that they intend to bring a claim under the "unfairness" component of the UCL. *See* Resp. 54. Courts in California have permitted UCL claims under the "unfairness" component to proceed where a plaintiff alleges a viable defamation claim. *See, e.g.,* Hawran v. Hixson, 147 Cal. Rptr. 3d 88, 106 (2012) (noting "UCL claim is derivative of [plaintiff's] defamation cause of action, that is, it is based on the same assertedly false and defamatory press release statements, and likewise that cause of action stands or falls with that underlying claim").

Here, because Plaintiffs have alleged a viable trade libel claim against GWhitt, their UCL claim may proceed on the same theory. However, this Court cautions that Plaintiffs may only seek certain remedies under their UCL claim. *See* Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (Cal. 2003) (citing Bank of the West, 2 Cal. 4th at 1266). Accordingly, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." *See id.* (quoting Cel-Tech Comms., Inc. v. L.A. Cell. Tele. Co., 20 Cal. 4th 163, 180 (Cal. 1999)).

Taking the allegations as true, Plaintiffs have sufficiently pleaded a violation of the UCL based derivatively on their claim for trade libel against GWhitt. Accordingly, this claim may proceed and GWhitt's motion to dismiss this claim is denied.

## 7. Plaintiffs' Conspiracy Claim

In order to state a claim for conspiracy, Plaintiffs must allege a combination of two or more individuals who committed an overt act in furtherance of the same common purpose to the detriment of Plaintiffs. In support, Plaintiffs allege, at multiple places in the Amended Complaint, that GWhitt undertook his unlawful actions "as the authorized agent and/or representative of the other Defendants." *See, e.g.,* Am. Compl. ¶ 307. Plaintiffs also allege that GWhitt acted "in concert with, and as an authorized agent and/or representative for MKW, MMilam, Knecht, Ours, AWhitt, MWhitt, CWhitt and DMilam." *See id.* ¶ 20.

These conclusory allegations are insufficient to sustain a claim of civil conspiracy against the Whitt-DMilam Defendants. *See Pinder,* 2019 WL 1115892, at *3 (dismissing civil conspiracy claim where complaint failed to ascribe any particular actions to

the alleged co-conspirators). Plaintiffs fail to allege any facts that would support an agreement between the Whitt-DMilam Defendants. Moreover, with the exception of GWhitt, Plaintiffs make no effort to allege that any of the remaining Whitt-DMilam Defendants took any actions in furtherance of this alleged conspiracy. That the Whitt-DMilam Defendants appear as plaintiffs in the California Lawsuit is insufficient to establish that they conspired with GWhitt to engage in unlawful activity.

Accordingly, Plaintiffs fail to allege facts sufficient to sustain a claim of civil conspiracy, and therefore, the claim is dismissed without prejudice.

# V. CONCLUSION

Following this Court's review of the Whitt-DMilam Defendants' Motion to Dismiss, the motion is granted in part and denied in part. Jurisdiction is appropriate over GWhitt; however, jurisdiction is not appropriate over the remaining Whitt-DMilam Defendants. Accordingly, AWhitt, CWhitt, MWhitt, and DMilam are dismissed from this action. Venue in this district is appropriate over those claims that involve GWhitt.

After reviewing the sufficiency of the allegations that support the claims against GWhitt, the following claims against GWhitt may proceed as pleaded:

> (1) Edison's trade libel claim;
>
> (2) McFillin's defamation claim; and
>
> (3) Plaintiffs' UCL claim.

The following claims are dismissed without prejudice:

> (1) CFerguson's defamation claim;
>
> (2) Plaintiffs' abuse of process claim;
>
> (3) McFillin's civil extortion claim; and
>
> (4) Plaintiffs' conspiracy claim.

These four claims are dismissed without prejudice as this Court cannot say at this time whether further amendment would be inequitable or futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile"). Accordingly, Plaintiffs are granted leave to amend their Amended Complaint to the extent that they can resolve the factual deficiencies outlined in this Court's Opinion.

A separate Order follows.

[1] Plaintiffs Vinco Ventures, Inc., formerly known as Edison Nation, Inc., Christopher B. Ferguson ("CFerguson"), Phillip McFillin, Kevin Ferguson ("KFerguson"), and Brett Vroman.

[2] Defendants Milam Knecht & Warner, LLP, Michael D. Milam, Gerald Whitt, Alexander Whitt, David Knecht, Rex Ours, Matthew Whitt, Christopher Whitt, Deborah Milam, Tiffany W. Tai, and John Does 1-50.

[3] Collectively, these Defendants are referred to as the Whitt-DMilam Defendants.

[4] Following this purchase, Defendants GWhitt, AWhitt, MWhitt, CWhitt, MMilam, and Knecht collectively owned the remaining minority share of Cloud b. *See* Am. Compl. ¶ 104. This group is referred to as the "minority shareholders."

[5] GWhitt, AWhitt, CWhitt, MWhitt, MMilam and Knecht.

[6] This lawsuit is referred to as the "California Lawsuit" and the complaint therein is referred to as the "California Complaint."

[7] Defendant Tai's motion to dismiss for lack of personal jurisdiction, filed separately, was granted by this Court. *See* ECF Nos. 42, 43.

[8] The parties agree that Pennsylvania law governs this claim, and accordingly, a choice of law analysis need not be undertaken.

[9] The parties agree that California law governs this claim, and accordingly, a choice of law analysis need not be undertaken.

[10] In their reply, Defendants contend that there is a true conflict between the Pennsylvania and California standards for abuse of process. *See* Reply 8. Notwithstanding, a review of the substantive laws of each state shows that this is not the case. Both states use a materially similar standard, requiring a showing that the process was used for a purpose other than that for which it was designed. *Compare Ciolli,* 625 F. Supp. 2d at 296 (noting abuse means use "primarily to accomplish a purpose for which [process] is not designed" (quoting *Werner,* 799 A.2d at 785)), with *Brown v. Kennard,* 94 Cal. App. 4th 40, 44 (Cal. Ct. App. 2001) (noting abuse means use "for a purpose other than that for which the process was designed"). In addition, both jurisdictions employ similar litigation privileges to statements made in the regular course of judicial proceedings that bear relation to the proceedings itself. *See Church Mut. Ins. Co. v. Alliance Adjustment Grp.,* 102 F. Supp. 3d 719, 730 (E.D. Pa. 2015) (quoting *Schanne v. Addis,* 121 A.3d 942, 947 (Pa. 2015)); *Brown,* 94 Cal. App. 4th at 44. Thus, no real conflict exists between the substantive laws of both states on this claim, and this Court applies the law of the forum state to this claim.

[11] The parties agree that California law governs this claim, and accordingly, a choice of law analysis need not be undertaken.

[12] Plaintiffs contend that Pennsylvania law does not provide a cause of action for trade libel. This is incorrect. *See Maverick Steel Co., L.L.C. v. Dick Corp./Barton Malow,* 54 A.3d 352, 354 (Pa. Super. Ct. 2012) (detailing elements of a "trade libel" claim under Pennsylvania law). Notwithstanding, as there appears to be no material difference between California and Pennsylvania law on the subject of trade libel, this Court applies the law of the forum to the substantive claim. *Compare Maverick Steel,* 54 A.3d at 354, *with Rumble, Inc. v. Daily Mail & Gen. Trust PLC,* 459 F. Supp. 3d 1249, 1300 (C.D. Cal. 2020).

[13] In their response, Plaintiffs apply Pennsylvania law to their defamation claims. *See* Resp. 40. In their motion, Defendants note that both California and Pennsylvania law on defamation are similar. *See* Mot. 39. Additionally, Defendants go on to cite Pennsylvania defamation standards in support of their arguments. *See id.* at 40. Accordingly, because there is no material difference between the relevant laws of both states, and because the parties both cite to Pennsylvania defamation law to support their respective arguments, this Court analyzes the defamation claims under Pennsylvania law.

[14] Plaintiffs also allege that defamatory communications were made to bankruptcy trustees, the SEC, creditors of Cloud b, and investors of Edison. *See* Am. Compl. ¶ 286. These communications are also considered extrajudicial communications that would not qualify for the judicial privilege.

[15] Defendants do not raise "conditional privilege" as a defense. Accordingly, CFerguson need not address it here. *See* 42 PA. CONS. STAT. § 8343(a) (indicating plaintiff bears the burden of proving these matters "when the issue is properly raised").

[16] Defendants do not raise "conditional privilege" as a defense. Accordingly, McFillin need not address it at this stage. *See* 42 PA. CONS. STAT. § 8343(a) (indicating plaintiff bears the burden of proving these matters "when the issue is properly raised").

[17] Plaintiffs' effort to allege that GWhitt sought the transfer of $8,000,000 from McFillin is unavailing. *See* Resp. 61. As this Court indicates above, McFillin's civil extortion claim is based solely on the email sent from GWhitt to Bielli. Nowhere in that email does GWhitt demand McFillin pay a sum of $8,000,000. Accordingly, this allegation is implausible.

Save trees - read court opinions online on Google Scholar.

**STEPHEN WALDEN, LESLIE WALDEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; Plaintiffs,**

v.

**THE BANK OF NEW YORK MELLON CORPORATION, BNY MELLON, N.A., Defendants.**

Civil Action No. 2:20-cv-01972-CBB.

**United States District Court, W.D. Pennsylvania, Pittsburgh Division.**

December 16, 2024.

CHRISTOPHER B. BROWN, Magistrate Judge.

# MEMORANDUM OPINION[1] ON ECF No. 180

## I. Introduction

This putative class action was initiated in this Court on December 21, 2020, by Plaintiffs Stephen and Leslie Walden (collectively "the Waldens"), individually and on behalf of those similarly situated, against Defendants Bank of New York Mellon Corporation and BNY Mellon, N.A. (collectively "BNY Mellon"). The Waldens generally assert breach of contract claims and claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 *et seq.* ("UTPCPL") in connection with investment management services BNY Mellon provided to the Waldens as a fiduciary and the putative class under investment management agreements.

Presently before the Court is a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) by BNY Mellon. ECF No. 180. The motion is fully briefed and ripe for disposition. ECF Nos. 181, 185, 188.

For the reasons that follow, BNY Mellon's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## II. Background

The Waldens allege that BNY Mellon breached the investment management agreements and violated the UTPCPL by failing to disclose certain conflicts of interest involved with BNY Mellon investing the Waldens' funds in BNY Mellon-affiliated mutual funds. BNY Mellon seeks dismissal on the basis that the Securities Litigation Uniform Standards Act, 15 U.S.C.§ 78bb(f)(1) ("SLUSA") bars the putative class claims. Because BNY Mellon's argument for dismissal is limited to the application of SLUSA, only the background necessary to resolve this issue will be recounted.

Generally, SLUSA deprives a federal court of jurisdiction to hear class actions based on state law alleging a defendant made a misrepresentation or omission in connection with the purchase or sale of covered securities. 15 U.S.C. § 78bb(f)(1). BNY Mellon originally moved to dismiss the Waldens' class claims arguing that they were barred by SLUSA. The Court disagreed and concluded that SLUSA did not preempt the Waldens' claims because they had alleged that BNY Mellon breached its duties by (1) purchasing BNY Mellon Securities, (2) failing to make individualized and prudent investment decisions, and (3) using a predetermined program that preferred underperforming affiliated funds and that such claims sounded in breach of contract and fiduciary rather than a material misrepresentation about a security transaction. ECF No. 35 at 8. Specifically, the Court recounted the Waldens' claims including that BNY Mellon had breached the investment agreements and violated the UTPCPL by using the Waldens' funds to purchase "BNY Mellon Securities," purchasing BNY Mellon Securities "while operating under an undisclosed conflict of interest" and using a predetermined program that "preferred underperforming, conflicted, affiliated funds that charged excess fees and underperformed other, non-conflicted investment options, rather than making individualized and prudent investment decisions on its clients' behalf[,]" ECF No. 35 at 8, and found that SLUSA did not preempt these claims. The Court found that the Waldens were "alleging that [BNY Mellon] purchased affiliated funds, and benefitted from those purchases, in violations of both their fiduciary duty to [the Waldens] and an

agreement not to purchase those funds[]" and as such, were not material misrepresentations in connection with the securities transactions as required for SLUSA preemption. ECF No. 35 at 8.

After a period of discovery, the Court partially granted summary judgment in favor of BNY Mellon on the Waldens' allegations that BNY Mellon breached contracts or violated the UTPCPL by purchasing BNY Mellon Securities or by failing to make individualized and prudent investment decisions by using a predetermined program that preferred underperforming affiliated funds because the Waldens seemingly abandoned those claims. ECF No. 178 at 23-25. The Court partially denied summary judgment finding that there was sufficient evidence that a reasonable jury could conclude that BNY Mellon failed to disclose potential conflicts of interest by BNY Mellon investing in affiliate mutual funds.[2] ECF No. 178 at 20-21.

After the Court issued its decision on the motion for summary judgment, at the hearing on the pending class certification motion, the Waldens confirmed they intend to proceed solely on the grounds that BNY Mellon had a duty to act as a fiduciary under the investment agreement and breached the investment agreement and violated the UTPCPL by failing to disclose conflicts of interest to the Waldens by purchasing BNY Mellon-affiliate funds for its discretionary customer accounts.[3] BNY Mellon filed the instant motion to dismiss for lack of subject matter jurisdiction arguing that the Waldens' narrowed claim related to undisclosed conflicts was not an allegation the Court previously relied upon in denying BNY Mellon's SLUSA argument at the motion to dismiss stage and raises those arguments now. ECF No. 181 at 2.

## III. Standard of Review

Motions seeking class preemption under SLUSA are jurisdictional and Fed. R. Civ. P. 12(b)(1) applies to such challenges. _In re Lord Abbett Mut. Funds Fee Litig._, 553 F.3d 248, 254 (3d Cir. 2009). Where, as here, the defendant attacks "the factual allegations of jurisdiction, the courts are not limited in their review to the allegations of the complaint. Any evidence may be reviewed and any factual disputes resolved regarding the allegations giving rise to jurisdiction as it is for the Court to resolve all factual disputes involving the existence of jurisdiction." _Leuthe v. Off. of Fin. Inst. Adjudication_, 977 F. Supp. 357, 359 (E.D. Pa. 1997), _aff'd_, 162 F.3d 1151 (3d Cir. 1998). The plaintiff bears the burden of proving that jurisdiction exists, and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case, and no presumptive truthfulness attaches to the plaintiff's allegations." _Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd._, 836 F.3d 261, 268 (3d Cir. 2016) (cleaned up). Jurisdictional statutes, including SLUSA, must be interpreted "to effectuate the intentions of Congress[.]" _New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc._, 101 F.3d 1492, 1510 (3d Cir. 1996). A finding that SLUSA preemption applies means that the lawsuit may not be maintained as a class action, and "does not adjudicate against any plaintiff the right to recover on the claim." _Knopick v. UBS Fin. Services, Inc._, 121 F. Supp. 3d 444, 456 (E.D. Pa. 2015) (quoting _In re Kingate Mgt. Ltd. Litig._, 784 F.3d 128, 135 n. 9 (2d Cir. 2015)).

## IV. Discussion

## a. Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb ("SLUSA") — the Legal Standard

In the wake of the Wall Street Crash of 1929 and resulting Great Depression, Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934 to regulate the securities industry. _See e.g._, _Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit_, 547 U.S. 71, 78 (2006) ("_Dabit_"). In enacting this legislation, Congress allowed aggrieved investors to assert private causes of action for alleged securities violations under state common law in both state and federal courts — a system which persisted for sixty years. _See_ _N. Sound Capital LLC v. Merck & Co._, _Inc._, 938 F.3d 482, 487 (3d Cir. 2019). Congress revisited "this dual system of remedies" and in 1995 enacted the Private Securities Litigation Reform Act ("PSLRA") to curb the "perceived abuses" of federal class-action securities litigation by imposing special requirements and obstacles on claimants filing such actions. _Id_; _Dabit_, 547 U.S. at 81. The provisions of the PSLRA only governed "securities claims brought under federal law in federal court." _N. Sound Capital LLC_, 938 F.3d at 487. After the PSLRA was enacted, claimants responded by avoiding the federal forum altogether and instead brought previously rare securities-based class actions under state law in state forums instead.[4] _Id._ at 82. In 1998, Congress sought to close the gap by enacting SLUSA, which imposes limits on the ability to bring certain class actions for securities litigation in both state and federal courts, so that aggrieved investors would instead have to bring their claims as a federal securities fraud class action. 15 U.S.C. §

78bb(f)(1); _In re Lord Abbett Mut. Funds Fee Litig._, 553 F.3d 248, 251 (3d Cir. 2009) (noting the heightened pleading requirements for securities fraud claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and SEC Rule 10b-5).

SLUSA provides in pertinent part:

> No covered class action based upon statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —
>
> (A) a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). In other words, "SLUSA deprives a federal court of jurisdiction to hear (1) a covered class action (2) based on state law claims (3) alleging that the defendant made a misrepresentation or omission or employed any manipulative or deceptive device (4) in connection with the purchase or sale of (5) a covered security." _Banks v. N. Tr. Corp._, 929 F.3d 1046, 1050 (9th Cir. 2019) (cleaned up). If a claim depends on the "nondisclosure of material facts[,]" under SLUSA, such claims must exclusively "proceed under the federal securities laws[.]" _Holtz v. JPMorgan Chase Bank, N.A._, 846 F.3d 928, 929-30 (7th Cir. 2017) (citing _Dabit_, 547 U.S. 71).

Under SLUSA, the court must determine whether a "reasonable reading of the complaint evidences allegations of `a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security.'" _Rowinski v. Salomon Smith Barney Inc._, 398 F.3d 294, 304 (3d Cir. 2005) (citing § 78bb(f)(1)). The court must scrutinize the pleadings "to arrive at the `essence' of a state law claim, in order to prevent artful drafting from circumventing SLUSA preemption." _Rowinski_, 398 F.3d at 301 (citations omitted). Courts must also broadly construe SLUSA's provisions in accordance with Congressional intent. _Dabit_, 547 U.S. at 86.

## b. Law of the Case Doctrine

Before addressing the merits of BNY Mellon's argument that class treatment of the remaining claim is preempted by SLUSA, the Court must address the Waldens' argument that this Court's initial decision on the motion to dismiss that SLUSA did not preclude the Waldens' claims prohibits reconsideration of that argument under the law of the case doctrine.

The law of the case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case[,]" _Bedrosian v. IRS_, 42 F.4th 174, 181 (3d Cir. 2022), and applies only to issues "expressly" or "necessarily resolved" by prior decisions in the same case. _PDX N., Inc. v. Commr. New Jersey Dept. of Lab. and Workforce Dev._, 978 F.3d 871, 881 n.10 (3d Cir. 2020). At the motion to dismiss stage, the Court previously held that the Waldens' claims were not precluded by SLUSA because the misrepresentations alleged by the Waldens sounded in breach of contract or breach of fiduciary duty rather than being material misrepresentations about securities transactions. _See_ ECF No. 35 at 7-8 ("the Plaintiffs are alleging that Defendants purchased affiliated funds, and benefitted from those purchases, in violation of both their fiduciary duty to Plaintiffs and an agreement not to purchase those funds."). In so finding, the Court referenced the Waldens' complaint that asserted that it was a breach of contract for BNY Mellon to purchase securities "while operating under an undisclosed conflict of interest." _Id._ at 8. While the Court referenced the Waldens' undisclosed conflicts of interest theory, it did not squarely consider the types of conflicts of interest that discovery has since revealed, and this issue is not settled under the law of the case doctrine. Much of the Court's prior decision was anchored on the Waldens' (now abandoned) claims that it was a breach of contract or fiduciary duty for BNY Mellon to invest in affiliate mutual funds, and that BNY Mellon breached its fiduciary duty through imprudent investment decisions. _Id._ at 8.

Even if the Court had squarely addressed this issue, the law of the case doctrine does not prevent a court from revisiting a prior ruling based on subject matter jurisdiction. _See e.g., Council Tree Commun., Inc. v. F.C.C._, 503 F.3d 284, 292 (3d Cir. 2007). Therefore, the Court can consider BNY Mellon's SLUSA preemption argument for the separate reason that SLUSA preclusion is jurisdictional, and this Court has a constant duty to assure itself of its subject matter jurisdiction at all stages of the litigation. _Pinho v. Gonzales_, 432 F.3d 193, 200 (3d Cir. 2005). Litigation has progressed and discovery may have revealed that SLUSA preempts class treatment of the remaining claim, and there is no basis under the law of the case

doctrine, or any other legal basis, to not consider this issue. Therefore, the Court will address the merits of BNY Mellon's SLUSA preclusion argument.

## c. SLUSA Application to the Waldens' Class Claims

BNY Mellon seeks dismissal of the Waldens' class claims arguing that the only remaining claim in this case is whether BNY Mellon failed to disclose conflicts of interest created by BNY Mellon investing in affiliate funds, and this conduct is precluded from class treatment under SLUSA.

Again, SLUSA bars state-law based class claims that allege a misrepresentation or omission of material fact that is made "in connection with the purchase or sale" of a covered security. 15 U.S.C. § 78bb(f)(1). It is undisputed that this case involves a covered class action based on state law claims that involve mutual funds which are covered securities under SLUSA. Therefore, these requirements are met and the Court will address the remaining two requirements of (1) whether BNY Mellon made a misrepresentation or omission; (2) in connection with the purchase or sale of the mutual funds.

## Omission of Material Fact

BNY Mellon argues the Waldens' claim that BNY Mellon failed to fully disclose conflicts when it bought affiliate products in its discretionary customer accounts was an "omission of material fact" and therefore barred under SLUSA. It does not appear the Waldens address this argument.[5] Nevertheless, BNY Mellon is correct that the Waldens' claim involves an omission of material fact under SLUSA.

Preemption under SLUSA "does not turn on whether allegations are characterized as facts or as essential legal elements of a claim, but rather on whether the SLUSA prerequisites are `alleged' in one form or another." *Rowinski*, 398 F.3d at 300. The crux of the Waldens' claim is that BNY Mellon, acting as a fiduciary, failed to disclose conflicts of interest before it invested client funds in BNY Mellon-affiliated mutual funds. *See* ECF No. 184 at 8 ("BNY's failure to disclose conflicts of interest creates potential contractual and UTPCPL liability because BNY made a promise to [the Waldens] to be a faithful fiduciary in account agreements, which imposed a duty on BNY to disclose conflicts."). Failing to disclose a conflict of interest is a material omission under SLUSA and further serves as the factual predicate of the Waldens' breach of contract and UTPCPL claims. *See Rowinski*, 398 F.3d at 300 (finding an investment firm's dissemination of biased and materially misleading investment research that artificially inflated the ratings and analysis of its investors was a material misrepresentation under SLUSA, especially where the misrepresentation served as a factual predicate of the claims at issue). *See also Holtz*, 846 F.3d at 929-30 ("securities claims that depend on the nondisclosure of material facts must proceed under the federal securities laws exclusively."). Accordingly, the Waldens' claims involve an omission of material fact and this requirement is met.

## "In Connection with the Purchase or Sale" of a Covered Security

Turning to the "in connection with" the purchase or sale of a covered security requirement, this issue is less straightforward. The Waldens maintain they did not make decisions regarding specific securities transactions and delegated investment decisions to BNY to manage their investments. ECF No. 184 at 14-16. They therefore argue the nondisclosure of conflicts was not made in connection with the sale or purchase of the mutual funds and was not material to a decision by the Waldens to buy or sell securities. *Id.* BNY Mellon disagrees and argues that the undisclosed conflicts of interest when buying affiliated mutual funds is necessarily in connection with the purchase or sale of a covered security. ECF No. 181 at 11-15.

The United States Supreme Court has considered the "in connection with" element of SLUSA in two opinions: *Dabit*, 547 U.S. 71 and *Troice*, 571 U.S. 377. In *Dabit*, the Supreme Court was asked to determine whether an investment bank acted "in connection with" the purchase or sale of securities under SLUSA when it disseminated misleading research and fraudulently manipulated stock prices. 547 U.S. at 75. The Supreme Court adopted a "broad construction" of SLUSA finding that it is "enough that the fraud alleged `coincide' with a securities transaction — whether by the plaintiff or by someone else[,]" and found that this conduct fell within SLUSA's ambit and was preempted. *Id.* at 85.

Thereafter, in *Troice*, the Supreme Court was again asked to weigh in on the "in connection with" SLUSA requirement. In *Troice*, the plaintiffs were victims of a multi-billion-dollar Ponzi scheme and purchased certificates of deposit (CDs) from Stanford International Bank ("Bank"). The CDs were "debt assets that promised a fixed rate of return" and not "covered securities" under SLUSA, but the victims were told the Bank would use the money to invest in "highly lucrative assets." 571 U.S. at 384. Instead, the Bank used the money to pay old investors, finance an elaborate lifestyle and finance real estate ventures. *Id.* The Supreme Court was asked to determine whether the Bank in selling the CDs to the plaintiffs acted in connection with the purchase or sale of securities by representing that the CDs were invested in covered securities. *Id.* at 386-87. The Supreme Court concluded that it did not, finding that the CD purchase did not involve a transaction of covered securities, and the promise to invest the proceeds from the purchase of CDs was not a "material" connection to the purchase or sale of a covered security. *Id.* at 387-88. The Supreme Court found "[a] fraudulent misrepresentation or omission is not made `in connection with' such a `purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a `covered security.'" *Id.* at 387. It further explained "the `someone' making that decision to purchase or sell must be a party other than the fraudster. If the only party who decides to buy or sell a covered security as a result of a lie is the liar, that is not a `connection' that matters." *Id.* at 388. It noted that "a misrepresentation or omission is `material' if a reasonable investor would have considered the information significant when contemplating a statutorily relevant investment decision." *Id.* at 388. The Supreme Court found that SLUSA did not preempt the plaintiffs' claims because the plaintiffs rested their claims "upon their purchases of uncovered, not of covered, securities[,]" and the Bank's assurances that the Bank invested its own assets in safe and stable securities did not bring the claims within the scope of SLUSA. *Id.* at 395-96. The Supreme Court further found that alleged misrepresentations "about the Bank's ownership of covered securities — fraudulent assurances that the Bank owned, would own, or would use the victims' money to buy for itself shares of covered securities[,]" did not meet the "in connection with the purchase or sale of securities" element of SLUSA because the Bank was the fraudster, not the fraudster's victim, and was not "some other person transacting (or refraining from transacting), . . . in covered securities." *Id.* at 396-97. It also expressly indicated that its decision did not modify its previous decision in *Dabit*. *Id.* at 397.

Following these two decisions, the Court of Appeals for the Third Circuit was also asked to weigh in on the "in connection with the sale or purchase of securities" requirement in *Taksir v. Vanguard Grp.*, 903 F.3d 95 (3d Cir. 2018). The Third Circuit found that while the Supreme Court in *Troice* made the fact that the case involved the purchase of uncovered securities "centrally relevant" to its decision, it "did not limit its reasoning to the uncovered/covered distinction" and found *Troice* applicable in determining whether the connection at issue is a "connection that matters." 903 F.3d at 97-98. The Third Circuit found that commission overcharges were not material to the securities transactions and therefore were not preempted by SLUSA. *Id.* at 100. In *Taksir*, Vanguard advertised that it charged $2 commissions on trades for customers who maintained a $500,000 minimum account balance. *Id.* at 96. Plaintiffs alleged they maintained the minimum balance, made trades, and were charged a $7 commission for each trade. *Id.* The Third Circuit found that the "single-digit" overcharge was not objectively material to the purchase or sale of securities because "a reasonable investor would not be swayed by the overcharges" when they had "such significant investments[.]" *Id.* at 99. It further found that the overcharged commissions were in contrast to other cases that were preempted by SLUSA that involved the breach of duties in executing trades of covered securities and the fraudulent manipulation of stock prices. *Id.* at 100 (collecting cases).

The Waldens rely heavily on *Troice* and *Taksir*, arguing the "wrongdoing and deception at issue here relates not to a securities transaction, but the terms of the advisory relationship between BNY [Mellon] and [the Waldens] (and the class), [and] SLUSA does not preempt [the Waldens'] claims[.]" ECF No. 184 at 16. The Waldens maintain that *Troice* stands for the proposition that where a plaintiff cedes investment authority to the investor, and the investor acts under this authority, because the plaintiff does not make decisions regarding specific securities transactions, the "in connection with" element of SLUSA is not met. ECF No. 184 at 16-17. The Waldens argue that *Troice* has been applied in other cases which found that "passive investment relationships" and those that involve discretionary investment services fall outside of SLUSA's scope and cite to three cases to support this argument: *Banks*, 929 F.3d 1046, *Bernard v. BNY Mellon, Natl. Assn.*, No. 2:18-CV-00783-NBF-CRE, 2019 WL 2492293 (W.D. Pa. June 14, 2019), and *Henderson v. Bank of New York Mellon Corp.*, 146 F. Supp. 3d 438, 440-41 (D. Mass. 2015). ECF No. 184 at 17-18. These cases are inapposite to this case, as they all involved a trust-beneficiary relationship where the trustee bought or sold securities on behalf of the trust, and not on behalf of the beneficiary, as opposed to here where the Waldens have alleged an agent-principal relationship where BNY Mellon is alleged to have acted on behalf of the Waldens pursuant to the investment agreements.[6]

In *Banks*, the Court of Appeals for the Ninth Circuit concluded that the "in connection with" requirement was not met where the allegations involved a trustee's imprudent investment decisions of covered securities brought by the beneficiaries of an

irrevocable trust because the beneficiaries could not direct the trustee's actions and were unable to purchase or sell covered securities. 929 F.3d at 1052. The Ninth Circuit even distinguished the relationship between a trustee and beneficiary and an agent/stockbroker and principal/investor finding that because "an agent acts subject to the control of his or her principal[,]" and "can revoke control from an agent in the course of their relationship" it is not the same as a trust relationship where "a beneficiary cannot alter the powers of a trustee or remove the trustee without petitioning a court of law." Id. at 1052. Therefore, the Ninth Circuit found that under Troice, the "in connection with" requirement could not be met because the deceptive or manipulative conduct only resulted in the trustee purchasing or selling covered securities on behalf of the trust and SLUSA did not preempt the beneficiaries' claims. Id. at 1052. Likewise, the same issue was decided in Bernard and Henderson. See Bernard v. BNY Mellon, Natl. Assn., No. 2:18-CV-00783-CRE, 2019 WL 2462606, at *6 (W.D. Pa. Apr. 25, 2019), report and recommendation adopted, No. 2:18-CV-00783-NBF-CRE, 2019 WL 2492293 (W.D. Pa. June 14, 2019) (BNY Mellon was acting as a trustee and purchased or sold covered securities on behalf of the trust and was not a "victim" who transacted in covered securities); Henderson, 146 F. Supp. 3d at 443 (finding that a trust beneficiary "powerless to buy or sell covered securities" took no action "in connection with" the purchase or sale of covered securities under SLUSA).

Here, the operative agreements are not trust instruments, but rather discretionary investment management agreements that involve an agency-principal relationship between BNY Mellon and the Waldens. As such, the cases relied on are inapplicable. See generally ECF No. 181-1; ECF No. 17-5 at 3.

Additionally, the record reflects that the Waldens were able to exercise control over their investments[7] and they did in fact exercise some control over their investments pursuant to the Agreement. For example, the Waldens specifically assert in their class certification briefing that BNY Mellon's "customers like the Waldens could direct BNY to restrict specific types of instruments." ECF No. 155 at 22. The record also reflects the Waldens exercised this authority on a few occasions — once declining BNY Mellon's investment recommendation and directing BNY Mellon to purchase an affiliate fund and establishing criteria for that purchase, ECF No. 181-2 at 1-7, and once declining BNY Mellon's proposal to sell an affiliate fund in exchange for a non-affiliated fund. ECF Nos. 181-3 at 1-5; 181-4 at 3. The Waldens also restricted BNY Mellon from investing in gun and ammunition manufacturers and had the ability to end the investment relationship. ECF No. 181-8 at 4; ECF No. 17-5 at p. 10 § 8. While the Waldens characterize their control over the investment decisions as a "passive investment relationship," this is belied by the record. Further, this is not a situation where BNY Mellon purchased affiliate funds on behalf of itself, like the fraudster in Troice, or on behalf of a trust where a beneficiary exercises no control over the purchase or sale of securities like in Banks, Bernard and Henderson.

The Waldens also argue that under Troice, the decision to buy or sell securities must be made by someone "other than the fraudster." They argue that BNY Mellon is the alleged "fraudster" by failing to provide informed consent to its clients by not disclosing conflicts of interest involved with investing in affiliated mutual funds. ECF No. 184 at 14. They argue that because BNY Mellon made the decision to invest in affiliated mutual funds, and the Waldens and putative class did not make any decisions to buy or sell securities, the undisclosed conflicts are not material to a decision to buy or sell securities. Id. at 15-16.

The Waldens' argument for the application of Troice does not square with the facts of this case and has been rejected by other courts who have considered this issue. In Troice, the victims purchased uncovered securities (CDs) issued by the Bank, and the Bank represented that it would use those proceeds to invest in covered securities to back the non-covered securities. The Bank did not do so. The Supreme Court found that the misrepresentation was not connected to the purchase or sale of a security because the Bank was the entity that misrepresented that it bought or sold covered securities for itself — not for the victims. Here, BNY Mellon purchased covered securities on behalf of the Waldens pursuant to an investment agreement, not on behalf of itself. Therefore, while Troice stands for the proposition that a connection to a covered security transaction must be "material," it does not stand for the proposition that an agent/investment company that exercises some discretion to invest client funds and does so, negates the "in connection with" element of SLUSA because it purchased covered securities on the client's behalf. This is in accordance with several other cases that have considered this issue. See S.E.C. v. Zandford, 535 U.S. 813, 822 (2002) (finding that a broker-agent who was given discretion to invest the client's assets in the stock market but instead misappropriated the proceeds of the sales met the "in connection" element for Section 10(b) liability); Rowinski, 398 F.3d at 300-301 (applying Zandford to a SLUSA issue and finding the "in connection" element under SLUSA is informed by the caselaw of that same standard under Section 10(b) and Rule 10b-5); Holtz, 846 F.3d at 933 ("That some of the investment decisions were made by investment advisers as [plaintiff's] agent does not take this out of the `in connection with' domain[.]"); Birchfield v. Empower Advisory Group, LLC, No. 22-CV-02716-NYW-SKC, 2023 WL 5748378, at *7 (D. Colo. Sept. 6, 2023) (that the defendants "made the actual trading decisions" for the plaintiff

"did not change the fact that [p]laintiff was the beneficial owner of all covered securities purchased."); _Great W. Ins. Co. v. Graham_, No. 18-CV-6249 (VSB), 2020 WL 3415026, at *39 (S.D.N.Y. June 22, 2020) (considering _Troice_ and finding "even if the fraudster initiated the purchase, so long as the victim `maintained an ownership interest' in the securities" SLUSA preemption applies); _Goodman v. AssetMark, Inc._, 53 F. Supp. 3d 583, 590 (E.D.N.Y. 2014) ("_Troice_ does not stand for the broad proposition that SLUSA cannot apply whenever the defendant accused of fraud, instead of the plaintiff, was the one who purchased the covered securities").

Here, it is undisputed that the Waldens maintained ownership in the affiliate funds and their claims are premised upon the nondisclosure of conflicts related to the purchase of those affiliate funds. That BNY Mellon exercised its discretion to purchase affiliate funds on behalf on the Waldens in accordance with their investment agreement does not negate the "in connection with" requirement under SLUSA.

In a similar case, the Court of Appeals for the Seventh Circuit found that SLUSA preempted claims against JPMorgan Chase Bank ("JPMorgan") who managed clients' portfolios of securities and were alleged to have breached fiduciary duties to its investors by investing in affiliate mutual funds with higher fees and lower returns than third-party mutual funds. _Holtz_, 846 F.3d at 929. The Seventh Circuit found that because the claims depended on the investors' assertion that JPMorgan concealed incentives it gave its employees for investing in affiliate funds this "nondisclosure [was] a linchpin" of the claim no matter how investors framed the pleadings. _Id._ at 930. It found that where "one party to a contract conceals the fact that it planned all along to favor its own interest — is a staple of federal securities law. . . . [T]he Bank promised to recommend investments in [the investor's] best interest, while intending all along to make recommendations in its own interest." _Holtz_, 846 F.3d at 932. Therefore, "[a] fiduciary that makes a securities trade without disclosing a conflict of interest violates federal securities law." _Holtz_, 846 F.3d at 932 (citing _In re E.F. Hutton & Co._, 49 S.E.C. 829 (1988)). The Seventh Circuit noted "[a] statement along the lines of `we will act in your best interest' plus nondisclosure of a competing private interest is the basis of many securities actions." _Holtz_, 846 F.3d at 932.

The Waldens claim that because BNY Mellon failed to disclose material conflicts of interest related to BNY investing the Waldens' money into affiliate mutual funds, the Waldens (and putative class members) were unable to provide informed consent to BNY Mellon to invest their money into those funds. _See_ ECF No. 155 at 15 (BNY Mellon failed "to provide a full and fair explanation concerning the presence of [any] conflict" and "obfuscate[d] actual conflicts to the point where [clients] cannot provide informed consent"). As in _Holtz,_ the omissions here were made in connection with and material to a decision to buy or sell securities because the undisclosed conflicts relate to affiliate funds and were concealed from the Waldens while their fiduciary BNY Mellon transacted in affiliate funds. Therefore, the claim that the Waldens lacked informed consent to allow BNY Mellon to purchase affiliate funds because of the undisclosed conflicts is material to a decision to buy or sell covered securities. The essence of the Waldens' claim is that a reasonable investor would have considered the undisclosed conflicts and resulting lack of informed consent significant information when contemplating investing in affiliate funds.[8] Despite the Waldens labeling their claims as a contractual breach of fiduciary duty or as violating the UTPCPL, the claims are indicative of securities fraud and are preempted by SLUSA. _See Portell v. Zayed_, 375 F. Supp. 3d 1025, 1032-34 (N.D. Ill. 2019) (undisclosed conflicts of interest are preempted by SLUSA "regardless of the label on the cause of action in which they are included[,]" and an "undisclosed scheme" to "maximize fees" instead of the "return to investors" is "intentional conduct that sounds in fraud.").

Additionally, a plaintiff's "theory of damages also bears on the SLUSA `in connection' inquiry." _Rowinski_, 398 F.3d at 301, 305. The Waldens maintain that they have "consistently sought refund of their account fees as the proper remedy." ECF No. 184 at 12. At the hearing on the motion for class certification, the Waldens explained that BNY Mellon "should be required to return the fees and compensation that they received for being unfaithful fiduciaries" and that "our damages model simply adds up the fees and compensation paid to BNY [Mellon] by each customer and calls for the return of that amount of money to the customers." ECF No. 172 at 6:14-17; 16:6-8. Seeking a refund or disgorgement of account fees further "connects" the Waldens' allegations to the purchase or sale of securities. _See Rowinski_, 398 F.3d at 297, 305 (finding that a request for "any and all fees and charges collected" was one of several factors that supported SLUSA preemption).

Accordingly, the omissions — undisclosed conflicts of interest related to investing in BNY Mellon-affiliated funds — upon which the Waldens' claims rest are material to and in connection with the purchase or sale of covered securities and are preempted by SLUSA.[9]

# Additional argument against preemption

The Waldens make one last argument against a finding of preemption — that at least one of the undisclosed conflicts are not connected to the purchase or sale of covered securities. ECF No. 184 at 9. The Waldens claim that "discovery uncovered" that BNY Mellon had financial incentives to place "customers' cash assets into bank accounts" which then "earned fees" for BNY Mellon but was financially disadvantageous to the customers and BNY Mellon failed to disclose these incentives. *Id.* The Waldens argue that bank accounts are not securities and not preempted by SLUSA. *Id.* BNY Mellon responds to this argument in a footnote by stating: "Plaintiffs' belated reliance on an unpled, unsupported theory regarding bank accounts is irrelevant, as affiliated mutual funds are covered securities under SLUSA." ECF No. 188 at 4 n.3.

While BNY Mellon is correct that the Waldens' arguments related to the allocation of customer's cash balances into bank accounts and the undisclosed financial incentives to BNY Mellon that flowed therefrom is not included in the amended complaint and considering the Waldens' implicit acknowledgement that these facts were only uncovered through discovery, the Court must also note that these facts have been incorporated into this lawsuit and litigated. In the Waldens' motion for class certification, they assert that "[t]he contracts fail to disclose . . . incentives to allocate client cash to high fee bank accounts rather than higher return money market funds." ECF No. 106-1 at 9-10. The Waldens further maintained that BNY Mellon

> had an incentive to allocate its clients' cash balances to BNY Mellon bank accounts rather than affiliated money market funds. BNY Mellon waived its Investment Management fee or Account fee when investing in Affiliated Funds (including money market funds). But it did not waive these fees when allocating cash to a BNY [Mellon] bank account. As a result, [BNY Mellon] earned more money when the placed client cash into bank accounts instead of money market funds. Clients, however, often earned less money in the bank accounts than they would have earned in money market funds. In light of this financial incentive, [BNY Mellon] used bank accounts rather than Affiliated Funds for the cash component of Plaintiffs' portfolios.

ECF No. 106-1 at 12-13.

Despite the parties acting as though these allegations have been adequately pleaded, and the Court having referred to these allegations as a basis for finding sufficient evidence of undisclosed conflicts on summary judgment, *see* ECF No. 178 at 14-15; 20-21, this does not change the fact that the Waldens have not included this theory of liability in their operative pleading. The Waldens cannot amend their complaint through argument in a brief opposing summary judgment and the proper procedure for a plaintiff to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15. *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 587 (W.D. Pa. 2011) (collecting cases). And there is no argument for constructive amendment or implied consent of such amendment. Therefore, the Court makes no determination of whether this specific claim is preempted by SLUSA. Should the Waldens seek to litigate these claims further, they may file the appropriate motion.

## V. Conclusion

Based on the foregoing, BNY Mellon's motion to dismiss is GRANTED and the Waldens' complaint is dismissed without prejudice. Should the Waldens seek to amend their complaint to plead individual claims or otherwise, they shall seek leave to submit an amended complaint consistent with the following Order. Further, the pending motion for class certification ECF No. 106 will be denied as moot, as is the deferred ruling on summary judgment on entitlement to disgorged fees.

An appropriate Order follows.

[1] All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq.*

[2] According to the Waldens, BNY Mellon failed to disclose that it had a financial incentive to allocate clients' funds to affiliated funds because of higher fees it charged in connection with affiliated funds, it invested clients' funds using a pre-approved set of investments referred to as the "Solutions Matrix" which heavily favored affiliated funds, it incentivized their employees to select affiliate funds through the employee's compensation structure, and it had a financial incentive to allocate clients' cash balances to BNY Mellon bank accounts rather than money market funds through the fees it charged. ECF No. 178 at 13, 20.

[3] The motion for class certification and a discrete damages issue related to the disgorgement of fees on summary judgment remain pending.

[4] Under the prevailing diversity jurisdiction rules at the time, these suits could not be removed to federal court. *N. Sound Capital LLC*, 938 F.3d at 487.

[5] The Waldens take issue with the materiality of the nondisclosure insofar as materiality is relevant to considering whether the omission was made "in connection with" the purchase or sale of a security under *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 380 (2014) ("*Troice*"). That discussion is set forth below.

[6] The Investment Management Agreement specifically provides: "Client [the Waldens] appoints Manager [BNY Mellon] to act as Client's agent for the investment and disposition of the securities, money, or other property (the `Property') held from time to time in such Account(s) and managed in accordance with the terms of this Investment Management Agreement ..." ECF No. 17-5 at 3.

[7] The Investment Management Agreement provides: "[BNY Mellon] will make and implement all investment decisions with respect to the Account in its sole discretion, subject to such Client approval of Manager's investment plan for the Account that Manager may require. Manager will periodically review the Account, purchase, retain and sell securities, monies, financial instruments and other Property, all in accordance with Client's written investment objectives." ECF No. 17-5 at p. 3 § A.1.

[8] It is undisputed that the investment management agreements disclosed to the Waldens that BNY Mellon invested in affiliate mutual funds. ECF No. 178 at 20.

[9] This finding does not leave the Waldens without a remedy; they may bring these claims in their individual capacities or under a federal securities law class action. They are simply foreclosed from bringing these state law claims under a federal class action vehicle.

Save trees - read court opinions online on Google Scholar.

**STEPHEN WALDEN, LESLIE WALDEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; Plaintiffs,**

**v.**

**THE BANK OF NEW YORK MELLON CORPORATION, BNY MELLON, N.A., Defendants,**

No. 2:20-CV-01972-CRE.

**United States District Court, W.D. Pennsylvania, Pittsburgh.**

April 1, 2024.

CYNTHIA REED EDDY, Magistrate Judge.

# ORDER

AND NOW, this 1st day of April, 2024,

Upon consideration of Defendant BNY Mellon's motion for summary judgment (ECF No. 98), it is HEREBY ORDERED that BNY Mellon's motion for summary judgment is granted in part, deferred in part, and denied in part as follows:

IT IS ORDERED that BNY Mellon's motion for summary judgment is GRANTED as to the Plaintiffs' Stephen and Leslie Waldens' (the "Waldens") breach of contract claim that BNY Mellon breached the Agreements by investing in securities of BNY Corp. and GRANTED as to the Waldens' breach of contract claim that BNY Mellon breached the Agreements by failing to make individualized assessments of the Waldens' financial needs.

IT IS FURTHER ORDERED that the Court will defer ruling on BNY Mellon's motion in part on the issue of disgorgement of fees. Considering the position taken by the Waldens that they base their theory of damages for their breach of contract claim and their UTPCPL claims on the disgorgement of fees paid by the Waldens and putative class members to BNY Mellon, supplemental briefing is required for the Court to determine the pending motion for summary judgment and/or motion for class certification. Accordingly, the parties shall submit supplemental briefing, not to exceed 15 pages, regarding the Waldens' legal entitlement to disgorgement of fees for their breach of contract claim and UTPCPL claims under Pennsylvania law. The parties shall specifically include citations to binding legal authority that illustrates the Waldens' entitlement or lack thereof to these damages. The parties shall also brief the impact of a finding that the Waldens are not entitled to disgorgement of fees as either contractual or UTPCPL damages on their motion for class certification. BNY Mellon's supplemental brief is due April 15, 2024 brief not to exceed 15 pages. The Waldens shall respond by April 29, 2024 brief not to exceed 15 pages. The motion for class certification is held in abeyance pending the Court's receipt of supplemental briefing.

IT IS FURTHER ORDERED that BNY Mellon's motion for summary judgment is denied in all other respects.

IT IS FURTHER ORDERED that as the Court has filed the entirety of this Memorandum Opinion under seal, the parties shall have until April 8, 2024 to jointly propose a redacted version of this Memorandum Opinion to be filed publicly.

Save trees - read court opinions online on Google Scholar.

**19:5bb2feaa9d704fc58d3d1d25c4732425@thread.v2**

Chat Filters   ☑ Events   ☑ History   ☑ Disclaimers

| ☑ | Participant | Entity | Login | Email | 🗨 | 📎 |
|---|---|---|---|---|---|---|
| ☑ | Michael Kraines <michael@dcg.co> | Dcg | michael@dcg.co | michael@dcg.co | 0 | 0 |
| ☑ | Michael Moro <mmoro@ | Genesistrading | mmoro@genesistrading.co | mmoro@genesistrading.com | 5 | 0 |

**Barry Silbert**                                                    2022-06-13 06:09:03.187 PM

Michael
Moro
Derar
Islim ballensweig doesn't really know what he is doing. you guys guiding the ship here?

**Derar Islim**                                                    2022-06-13 06:22:37.327 PM

I am working very closely with him. It is a very stressful situation. He wants to ensure the book is in a good liquidity stand at this point

**Barry Silbert**                                                    2022-06-13 06:23:24.047 PM

of course. i meant the TAC stuff

**Barry Silbert**                                                    2022-06-13 06:24:35.817 PM

i haven't seen you guys chiming in much, so want to make sure you're leading this process with support and guidance from DCG

**Michael Moro**                                                    2022-06-13 06:29:06.013 PM

He is nervous and rattled right now and isn't entirely thinking straight.   We are all nervous of course, but Derar and I are involved every step of what has been happening.

I am speaking to him in a minute.  We will manage through this with help from you and DCG.

**Michael Moro**                                                    2022-06-13 08:34:28.267 PM

Immediate focus areas, just putting them here:

1.
   Continue to shore up liquidity from everywhere we can. Trying to get to north of $2 billion by the morning.

2.
   Now that we've officially declared the default, trying to think through how/if we partner on next steps with a BlockFi or Galaxy

3.
   Keeping our trading book ready for more downside pain

4.

Monitoring very closely our other counterparties as well as lending platforms for liquidity/credit issues with constant communication

In addition, our Comms team is drafting both internal and external talking points on the TAC situation as needs arise.

I am keeping Matt focused on 1 and 4 as his marching orders.

| Barry Silbert | 2022-06-13 08:36:33.420 PM |

on #1, we're willing to pay up for this borrow, right?

| Barry Silbert | 2022-06-13 08:36:39.473 PM |

even short term stuff is helpful

| Michael Moro | 2022-06-13 08:37:13.983 PM |

Absolutely. Not too much though as we don't want to seem desperate, but we are willing to pay above where we have been.

| Barry Silbert | 2022-06-13 10:24:56.517 PM |

we're scheduling a DCG board update and strategy call for tomorrow late morning. pencilling in 11 am. i'd like for moro, derar, matt and arianna to join. okay?

| Michael Moro | 2022-06-13 10:26:43.940 PM |

Yes

| Barry Silbert | 2022-06-13 10:26:57.693 PM |

please give matt and arianna the heads up

| Michael Moro | 2022-06-13 10:27:04.193 PM |

Will do.

| Barry Silbert | 2022-06-13 10:27:05.293 PM |

my office will reach out to you guys to schedule

Confidential

Message

| | |
|---|---|
| **From**: | Barry Silbert [barry@dcg.co] |
| **Sent**: | 6/14/2022 1:03:49 PM |
| **To**: | Lawrence Lenihan - Resonance (lawrence@resonance.nyc) [lawrence@resonance.nyc]; Glenn Hutchins - North Island (glenn@northisland.net) [glenn@northisland.net]; Matthew Harris (mharris@baincapital.com) [mharris@baincapital.com]; Matt Turck [mturck@firstmarkcap.com] |
| **CC**: | Mark Murphy [mark@dcg.co]; Michael Kraines [michael@dcg.co] |
| **Subject**: | Agenda for board call today |

Hi all,

The plan for the call today is to spend the first portion giving the Genesis team an opportunity to update the board on the Three Arrows situation and to answer any questions.  Participants from Genesis will be Mike Moro (CEO), Derar Islam (COO), Arianna Pretto-Sakmann (CLO) and Matt Ballensweig (head of lending).

They will then drop and we will cover the following three paths/strategies, as well as anything else that it would be helpful to cover.

1)      Support Genesis

o       while the Genesis team makes every effort to bolster its own balance sheet, DCG looks to secure our own additional liquidity to keep in reserve should we decide later to contribute capital to stabilize the Genesis balance sheet

o       at the same time continue to work with counsel to ensure best defenses against veil piercing

2)      Jettison the Genesis Capital business

o       the contra of contributing more capital, this would be the worst case scenario

3)      "Shock & Awe" plan

The Shock & Awe Plan

Narrative: in response to the dramatic change in the market landscape, we are reconfiguring Genesis to take maximum advantage of the new environment

•       Barry becomes CEO of Genesis immediately; will of course remain CEO of DCG

•       DCG contributes DCGI assets (crypto, venture, public equity and funds portfolios) and investing team to Genesis (~$1.5 billion at current crypto prices, not reflecting discount on Grayscale products)

•       Genesis improved with additional merchant banking capability unlocking new solutions for clients and opportunity sets

•       Gives lenders, employees, investors, and the public confidence and comfort; gives us time to work through illiquid assets; should be easier/cheaper for Genesis to access debt capital for the loan book

•       We immediately share plans internally (and externally?) about our plans to take Genesis public in 2023; more diversified set of assets make for a more successful IPO & post IPO company

•       Big opportunity for Genesis to come out of this as THE leader in the space

•       As 100% owner of Genesis, DCG shareholders are no worse off, other than DCGI's assets being put under Genesis creditors;

•       Provides clear path to liquidity for DCG shareholders via Genesis IPO

•       We can also consider raising pre-IPO capital into Genesis immediately to further strengthen the balance sheet, or down the road once things have stabilized; putting DCGI assets into Genesis will give investors the opportunity to participate in the upside of our portfolio alongside the Genesis business

**IMPORTANT:** we have not discussed either the Jettison or Shock & Awe plans with the Genesis team.  As far as they know, we're on path #1 right now, so please do not bring up the alternative paths on the call today with the team.

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 98 of 170

**Barry Silbert**
Founder & CEO, Digital Currency Group
www.DCG.co
e: barry@DCG.co
t: (212) 473-2408 | @BarrySilbert
262 Harbor Drive, 3rd Floor
Stamford, CT 06902

*DCG Family of Companies:*

CoinDesk
Luno
Grayscale
Genesis
Foundry
TradeBlock
HQ

NY-DCG_00023797

19:7f8e98add7a1444c9aad12f19905582d@thread.v2

**Chat Filters**   ☑ Events   ☑ History   ☑ Disclaimers

| ☑ | Participant | Entity | Login | Email | 💬 | 📎 |
|---|---|---|---|---|---|---|
| ☑ | Michael Kraines <michael@dcg.co> | Dcg | michael@dcg.co | michael@dcg.co | 22 | 0 |
| ☑ | Reed Werbitt <RWerbitt@ | Genesistrading | RWerbitt@Genesistrading. | RWerbitt@Genesistrading.com | 0 | 0 |

| Arianna Pretto-Sakmann | 2022-06-15 12:25:51.293 AM |

> **Redacted**

| Michael Paleokrassas | 2022-06-15 12:41:12.737 AM |

not sure anyone is awake, but starting to see a steady flow of calls starting

| Matthew Ballensweig | Genesis Cap | 2022-06-15 12:47:49.683 AM |

yeah a lot of smaller lenders 20mm and udner

| Matthew Ballensweig | Genesis Cap | 2022-06-15 12:47:54.033 AM |

coming to ask for withdrawals

| Arianna Pretto-Sakmann | 2022-06-15 12:56:23.733 AM |

> **Redacted**

| Arianna Pretto-Sakmann | 2022-06-15 12:57:17.080 AM |

Matthew
Ballensweig

> **Redacted**

| Matthew Ballensweig | Genesis Cap | 2022-06-15 01:08:01.010 AM |

Thank you! Appreciate everyone's continue help and  all hands effort.

| Michael Paleokrassas | 2022-06-15 01:44:05.707 AM |

going to get some sleep for tomorrow. Matt Ham and the whole singapore office is around

| Matthew Ballensweig | Genesis Cap | 2022-06-15 01:44:29.403 AM |

CONFIDENTIAL TREATMENT REQUESTED

HO14638-DCG0371456

| | |
|---|---|
| Mark Murphy | 2022-06-15 10:57:12.157 AM |

Great

| | |
|---|---|
| Matthew Ballensweig \| Genesis Cap | 2022-06-15 10:57:15.190 AM |

also starting to see some ex-celsians come over

| | |
|---|---|
| Arianna Pretto-Sakmann | 2022-06-15 10:57:21.843 AM |

**Arianna Pretto-Sakmann**

# Redacted

| | |
|---|---|
| Matthew Ballensweig \| Genesis Cap | 2022-06-15 10:57:31.937 AM |

weve been defening the castle all night and day on phone with depositors, prosepcts etc

| | |
|---|---|
| Barry Silbert | 2022-06-15 10:57:58.327 AM |

is there anything we/DCG can do to further install confidence in genesis?

| | |
|---|---|
| Matthew Ballensweig \| Genesis Cap | 2022-06-15 11:06:02.447 AM |

It ultimately comes down to our ops/processing etc, as people see our responsiveness, word spreads fast. We have some portcos that have wanted to hop on calls today - I just spoke to Wyre, we're speaking with Decentraland etc so if they triangulate with you, you can just reaffirm our position etc.

| | |
|---|---|
| Barry Silbert | 2022-06-15 11:06:19.947 AM |

great

| | |
|---|---|
| Barry Silbert | 2022-06-15 11:06:39.417 AM |

marcus says that the word on the street is that genesis is the "blue chip" in this mess

| | |
|---|---|
| Matthew Ballensweig \| Genesis Cap | 2022-06-15 11:06:56.313 AM |

I spoke to Bernard from Luno this AM

| | |
|---|---|
| Barry Silbert | 2022-06-15 11:06:58.650 AM |

Case 4:25-cv-00001-PJC   Document 44-6   Filed 05/27/25   Page 101 of 170

we need to continue to perpetuate that of course

Matthew Ballensweig | Genesis Cap                                2022-06-15 11:07:24.700 AM

yes definitely

Matthew Ballensweig | Genesis Cap                                2022-06-15 11:07:34.193 AM

So who has the best line into CZ?

Barry Silbert                                                    2022-06-15 11:08:48.837 AM

I dm'd with him for the first time a couple weeks ago about meeting up at consensus. don't think i've ever met or spoke with him

Barry Silbert                                                    2022-06-15 11:08:55.697 AM

i'm happy to ping him

Barry Silbert                                                    2022-06-15 11:09:08.003 AM

but don't want to freak him out

Barry Silbert                                                    2022-06-15 11:09:14.913 AM

so probably should come from lower initially

Leon Marshall                                                    2022-06-15 11:11:28.503 AM

Am reaching out to EMEA contact here

Our original path from our APAC desk would've gone via Arthur Hayes.

MikeP and I not sure he can be discreet here so looking to find other paths

If EMEA path doesn't work happy for you to ping - will find out in next hour or so

Matthew Ballensweig | Genesis Cap                                2022-06-15 11:14:10.893 AM

CONFIDENTIAL TREATMENT REQUESTED                                HO14638-DCG0371476

**19:b05cabb1cbff436f8f715db228f42197@thread.v2**

Chat Filters   ☑ Events   ☑ History   ☑ Disclaimers

| ☑ | Participant | Entity | Login | Email | 💬 | 📎 |
|---|---|---|---|---|---|---|
| ☑ | Mike Katz <mike@dcg.co > | Dcg | mike@dcg.co | mike@dcg.co | 0 | 0 |
| ☑ | Rumi Morales <rumi@dc | Dcg | rumi@dcg.co | rumi@dcg.co | 1 | 0 |

---

Barry Silbert                                                   2022-06-21 12:00:49.487 PM

Going to need to cancel the bi weekly today

Matt Beck                                                      2022-06-21 12:02:24.583 PM

no problem - we got a line into Joe Parker at Wyre - we can synch up with them during that slot

---

Barry Silbert                                                   2022-06-21 01:35:37.267 PM

Fyi, I spoke with Daniel to welcome to the team and shared the following:

- our industry is in the midst of a healthy cleansing and deleveraging, but it is painful and nobody has been spared, even us

- across DCG and Genesis we have about ~$2 billion of liquidity, but that is precious right now and we are in bunker mode and not deploying in order to be able to withstand whatever negative event comes next

- we are all focused on making sure that the trust and confidence in Genesis remains high because we can't risk money leaving Genesis and depleting our liquidity

- once we get through this, the Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage in a market where there is limited liquidity and will help power the next stage
of investing

- I told him that as an immediate focus, beyond just getting up to speed, is to see if he can help Foundry assess their loan book and address any issues. He is excited to do so and I connected him with Colyer

- what I didn't say, which we need to keep between us, is that even though our liquidity is super super strong right now, the hole in Genesis equity due to the Three Arrows exposure is something they we will need to fill by 6/30. It is my sense that DCGI will
play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the downstream of certain/all assets until prices recover. The challenge is we don't know what will be the recovery on the Three Arrows claim, or what
will be the BTC price on 6/30, so it is difficult to calculate the hole. We're trying to come up with as many options as possible. This is super confidential/sensitive stuff, so please don't share with anybody, including Daniel, until he is in the circle
of trust

Barry Silbert                                                   2022-06-21 01:35:49.323 PM

Daniel is not in this group yet

Barry Silbert                                                   2022-06-21 01:36:02.613 PM

But we should add him sooner rather than later

Bill Krueger                                                    2022-06-21 01:38:38.233 PM

We had planned to add him after his honeymoon.  If you think sooner, we can do that.

Barry Silbert                                                   2022-06-21 01:39:04.077 PM

After honeymoon makes sense. Minus the history

Matt Beck                                                      2022-06-21 01:40:55.277 PM

---

Confidential

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 103 of 170

This all makes sense - we're standing by ready to do what's necessary

---

Barry Silbert                                                                    2022-06-21 01:41:56.560 PM

Once I get thumbs up from everybody on above I'm going to delete

Bill Krueger                                                                     2022-06-21 01:42:12.020 PM

---

No need

---

Bill Krueger                                                                     2022-06-21 01:42:19.767 PM

We can add him without history

---

Bill Krueger                                                                     2022-06-21 01:42:42.797 PM

There are historic threads about his recruiting process that I don't want us having to pick through.

---

Rumi Morales                                                                    2022-06-21 01:57:43.460 PM

Thank you for confiding in us, Barry, and having us in the circle of trust. We are always here to help at any time.

Confidential

FILED: NEW YORK COUNTY CLERK 03/06/2024 08:50 AM
NYSCEF DOC. NO. 437
INDEX NO. 452784/2023
RECEIVED NYSCEF: 03/06/2024

**From:** Barry Silbert [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6a26b17679934131bffc47c28730c0d1-barry_f89a9]
**Sent:** Thur 10/20/2022 3:27:41 PM (UTC-04:00)
**Subject:** Re: Follow up on Gemini / DCG

Good lunch with Cameron. Tldr: he is intrigued about the idea of a closer partnership between Genesis/Gemini/DCG, including a potential merger of the companies. I put him on clear notice that the path we're on right now could lead to a Genesis bankruptcy, which would put Gemini's deposits (and therefore, Gemini's business) at significant risk. He took that part surprisingly well and appreciates we need to work together to mitigate that risk. Next steps: he is going to chat with Tyler and come back with thoughts on how best to proceed.

These are the points I made to him:

- Big opportunity to lean in together
  - Could take a lot of different forms, ranging from a commercial partnership to joining forces and merging the companies together
- Genesis and Gemini are super complementary
  - Gemini has retail, exchange, custody
  - Genesis has institutional relationships, prime services and is strong in derivatives
  - Both NY based and both approach regulations and compliance seriously
- Joining forces is most exciting to me
  - Combined Gemini and Genesis would be a juggernaut and would be competitive with Coinbase and FTX (I shared Genesis' 2021 revenue and EBITDA with him, fyi)
  - The combined company would be super exciting to investors. We could go raise $500-$1 billion and take the company public in 24 months
  - Opportunity to also acquire and roll up weak competitors
- Benefits of Gemini joining the family of DCG companies
  - Move Grayscale's assets over, thereby making Gemini the largest custody provider in the world
  - Genesis would direct substantial order flow to the Gemini exchange
  - Foundry can direct bitcoin miners to trade and custody via Gemini
  - We could use CoinDesk for customer lead gen
  - Luno could use Gemini for liquidity
  - We could roll out Gemini's stablecoin across DCG and give Circle/USDC and run for their money
- Even without merging, there is a ton more Gemini and Genesis can do together and the two companies should be leaning in together, not pulling apart
- Candidly, ending the Earn partnership introduces potential catastrophic risk to Genesis and thereby Gemini. So at the very least, they need to revisit that decision
- My concerns:
  - Unclear that Genesis can replace the liquidity on the timeframe being discussed
    - Gemini is Genesis' largest and most important partner
    - It took nine months for the Genesis deposits to hit the current amount when the program was launched. And that was at a period in time when rates were basically zero and we were in the midst of a bull market
    - Genesis has ALWAYS maintained sufficient liquidity for day to day withdrawals, but never planned for a bank run scenario where their largest and most important partner asked for all of the money back immediately
  - The thing that scares me is either Genesis falling short on replacing the liquidity or the end of the program triggering a run on Genesis by other lenders
    - This would be very bad and would likely lead to a Genesis bankruptcy, which puts Gemini's deposits at risk
    - Even if Gemini pulled the money today, other Genesis creditors would pursue a preference claim against Gemini for that money. So this puts Gemini's going concern at risk
  - We need to avoid a bank run, no matter what
  - It will be difficult, if not impossible, for Genesis to find replacement liquidity if those new sources of debt and equity know that the Gemini deposits are leaving. And I can't raise money at DCG if there is a Genesis bankruptcy risk. So the ball is in their court to prevent a bad thing from happening

**Barry Silbert**
Founder & CEO, Digital Currency Group

Confidential
NY-DCG_00378398

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 105 of 170

# EXHIBIT C

CONFIDENTIAL
*Genesis 8-15-22 Draft*

# SECURITY AGREEMENT

---

This **SECURITY AGREEMENT** (as amended, restated, supplemented, waived, extended or otherwise modified from time to time, this "Agreement") dated as of August 15, 2022, by and between Genesis Global Capital, LLC (the "Pledgor"), and Gemini Trust Company LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

**WHEREAS**, the Pledgor has entered into or will enter into Loans of Digital Assets under certain Master Digital Asset Loan Agreements (collectively, as amended, restated, supplemented, waived, extended or otherwise modified from time to time, the "Master Loan Agreements"), by and among:

- The Agent, as Custodian;

- A specified Lender (each, in such capacity, a "Principal Lender"), acting through the Agent as agent for such Principal Lender; and

- The Pledgor, as borrower.

All capitalized terms not otherwise defined herein shall have the respective meanings assigned to them in the Master Loan Agreements;

**WHEREAS**, in consideration of the outstanding and future transactions under the Master Loan Agreements, and for other good and sufficient consideration, the Pledgor has agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements;

**NOW, THEREFORE,** the parties hereby agree as follows:

### Section 1. Transfer of Collateral

As promptly as practicable after the execution of this Agreement, the Pledgor shall transfer or cause to be transferred 30,905,782 shares of Grayscale Bitcoin Trust to the account held in the name of the Agent "for the benefit of" ("FBO") the Principal Lenders at Morgan Stanley Smith Barney LLC with account number ending in -6250 (the "GTC Account"); provided that, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale

CONFIDENTIAL
*Genesis 8-15-22 Draft*

Bitcoin Trust or any other shares into the GTC Account after such date except as required under and in accordance with Section 6(b) of this Agreement.

## Section 2. The Pledge.

As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration, or otherwise) of all liabilities and obligations of the Pledgor under the Master Loan Agreements, whether now existing or hereafter arising, whether or not mature or contingent (the "Secured Obligations"), the Pledgor hereby pledges, assigns, and grants to the Agent, for the benefit of the Agent and the Principal Lenders, a security interest in all of the Pledgor's right, title, and interest in and to all property from time to time transferred by or on behalf of the Pledgor to or for the benefit of the Agent or the Principal Lenders in connection with this Agreement or any Master Loan Agreement, including without limitation all shares of and interests in Grayscale Bitcoin Trust credited to the GTC Account (collectively, the "Collateral").

## Section 3. Remedies.

(a) Upon an event of default (or similar term) under any Master Loan Agreement or the failure of the Pledgor to comply with its obligations in Section 1 or Section 6(b) of this Agreement in accordance with the terms thereof, in addition to any other right or remedy the Agent or any Principal Lender may have at law, contract, or equity (including under the Uniform Commercial Code ("UCC") as in effect in any relevant jurisdiction), the Agent shall have the following rights and remedies, all such rights and remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as the Agent deems expedient without any notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Pledgor, to the fullest extent permitted by law):

    (i) To liquidate any or all Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Agent having the right to purchase any such Collateral) and apply the proceeds of such liquidation to the Secured Obligations; and

    (ii) To exercise any rights and remedies available to the Agent or the Principal Lenders under applicable law, including the UCC as in effect in any relevant jurisdiction.

(b) The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:

CONFIDENTIAL
*Genesis 8-15-22 Draft*

(i)  <u>First</u>, to the payment of the costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of the Agent and the reasonable fees and expenses of its agents and counsel;

(ii)  <u>Next</u>, to the payment and satisfaction in full of the Secured Obligations; and

(iii)  <u>Finally</u>, to the Pledgor, its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining. The Pledgor shall be liable for all Secured Obligations that remain unsatisfied after the exercise of rights and remedies by the Agent.

(c)  The Pledgor hereby irrevocably appoints the Agent (such appointment being coupled with an interest) as the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, the Agent, or otherwise during event of default, default, or similar circumstance to take any action and to execute any instrument as it may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limitation to take any of the actions set forth in clause (a) above. The powers conferred on the Agent hereunder are solely to protect the interests of the Agent and the Principal Lenders in the Collateral and shall not impose any duty upon the Agent to exercise any such powers. The Agent and the Principal Lenders shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees, or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence, willful misconduct or fraud.

(d)  Until the occurrence of an event described in Section 3(a) of this Agreement, the Agent shall not sell, rehypothecate, transfer or assign any of the shares transferred by Pledgor into the GTC Account pursuant to Section 2 of this Agreement, except in accordance with Section 6(a) or Section 7(b) hereof.

## Section 4. Security Interest Absolute.

All rights of the Agent hereunder and the grant of a security interest in the Collateral shall be absolute and unconditional irrespective of any circumstance, including without limitation the authority of the Agent to act on behalf of the Principal Lenders.

## Section 5. Representations and Warranties.

The Pledgor represents and warrants to the Agent as of the date hereof and on each day that any Loan remains outstanding that:

CONFIDENTIAL
*Genesis 8-15-22 Draft*

(a) This Agreement creates a legal and valid security interest in the Collateral in favor of the Agent, for its benefit and the benefit of the Principal Lenders, which is enforceable against Pledgor, subject to applicable bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally and subject to general principles of equity;

(b) The Pledgor is the sole owner of the Collateral or otherwise has the right to transfer the Collateral, free and clear of any security interest, lien, encumbrance, or other restrictions; and

(c) The execution and delivery of this Agreement do not contravene any law, rule, regulation, judgment, order, agreement, or instrument to which the Pledgor or any of its property is subject, and would not constitute a default or similar condition thereunder.

### Section 6. Adjustment of Collateral.

(a) <u>Collateral Release</u>. During the term of this Agreement, if the aggregate value of the Collateral (as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a day the OTCQX market is open for trading (such aggregate value, the "<u>Collateral Value</u>")) exceeds 32.5% of the notional USD value of the aggregate loaned amounts (the "<u>Loaned Assets</u>") under the Master Loan Agreements (as calculated based on the price reported on the Agent's cryptocurrency exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the "<u>Gemini Closing Price</u>")), then the Agent shall, upon the Pledgor's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Return Request</u>"), be required to return an amount of Collateral such that the remaining Collateral Value is no greater than 30.0% of the notional USD value of the Loaned Assets (such amount, the "<u>Collateral Return Amount</u>"). The Agent shall deliver the Collateral Return Amount to the Pledgor's brokerage account at such account as the Pledgor may direct in writing no later than two (2) business days after the date of the Collateral Return Request.

(b) <u>Collateral Posting</u>. During the term of this Agreement, if the Collateral Value falls below 27.5% of the notional USD value of the aggregate Loaned Assets under the Master Loan Agreements (as calculated based on the Gemini Closing Price) then the Pledgor shall, upon the Agent's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Top-Up Request</u>"), be required to post an amount of Collateral to the GTC Account such that the Collateral Value in the GTC Account is no less than 30.0% of the notional USD value of the Loaned Assets under the Master Loan Agreements (such amount, the "<u>Collateral Top-Up Amount</u>"); <u>provided that</u>, notwithstanding the foregoing, in

CONFIDENTIAL
*Genesis 8-15-22 Draft*

no event shall the aggregate number of shares of Grayscale Bitcoin Trust in the GTC Account be required to exceed 30,905,782 shares at any time. The Pledgor shall deliver the Collateral Top-Up Amount to the GTC Account no later than two (2) business days after the date of the Collateral Top-Up Request.

## Section 7. Miscellaneous.

(a) <u>Control</u>. The Pledgor and the Agent acknowledge and agree that the Agent holds any Collateral as agent and bailee for the Principal Lenders.

(b) <u>Termination</u>. Upon the earlier of (i) November 15, 2022 and (ii) the date on which all Secured Obligations shall have been paid in full, this Agreement shall automatically terminate, and Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Pledgor, and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of the Agent hereunder, shall immediately be released and deemed to be void.

(c) <u>Applicable Law</u>. This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

(d) <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records

CONFIDENTIAL
*Genesis 8-15-22 Draft*

Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

CONFIDENTIAL
*Genesis 8-15-22 Draft*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: _Andrew Sullivan_  _____
EB257421D624490...

Name: Andrew Sullivan

Title:  General Counsel, Lending

**Gemini Trust Company, LLC**

By: _Noah Perlman_  _____
39FF769C13B746E...

Name: Noah Perlman

Title:   Chief Executive Officer

CONFIDENTIAL

## FIRST AMENDMENT TO SECURITY AGREEMENT

This **FIRST AMENDMENT TO SECURITY AGREEMENT** (the "Amendment") dated as of November 7, 2022, by and between Genesis Global Capital, LLC (the "Pledgor"), and Gemini Trust Company LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

This Amendment is entered into by the Parties in connection with the Security Agreement, dated as of August 15, 2022, entered into by and between Pledgor and Agent (as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"). This Amendment forms a part of, incorporates by reference, and is subject to the terms and conditions in the Security Agreement and except as set forth in this Amendment, the Security Agreement shall continue in full force and effect in accordance with its terms. Capitalized terms used in this Amendment but not otherwise defined herein shall have the same meanings as in the Security Agreement.

## RECITALS

**WHEREAS:**

A.    Pledgor and Agent have entered into the Security Agreement, pursuant to which the Pledgor agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements.

B.    This Amendment is intended to modify certain terms of the Security Agreement.

**NOW THEREFORE**, in consideration of the mutual promises herein contained, the Parties hereby agree:

1. **Amendment to Term/Termination**. Section 7(b) of the Security Agreement shall be amended and restated in its entirety as follows:

"Termination. Upon the date on which all Secured Obligations shall have been paid in full and the Master Loan Agreements are terminated in accordance with their terms, this Agreement shall automatically terminate, and Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Pledgor, and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of the Agent hereunder, shall immediately be released and deemed to be void."

2.    *Entire Agreement*. This Amendment, the Security Agreement and the Master Loan Agreements embody the entire agreement and understanding among the Parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter of this Amendment.

23-01594-shl Doc 1-1 Filed 10/20/23 Entered 10/20/23 07:50:16 Pg Mail 1 Document Pg 55 of 61
DocuSign Envelope ID: DCBA48BB-1EE3-48E6-BBF5-4FCAF863735A

CONFIDENTIAL

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: _Arianna Pretto-Sakmann_

Name: Arianna Pretto-Sakmann

Title: Chief Legal Officer

**Gemini Trust Company, LLC**

By: _Noah B. P_____

Name: Noah Perlman

Title: Chief Executive Officer

CONFIDENTIAL

## SECOND AMENDMENT TO SECURITY AGREEMENT

This **SECOND AMENDMENT TO SECURITY AGREEMENT** (the "Second Amendment") dated as of November 10, 2022, by and among Genesis Global Capital, LLC (the "Pledgor"), Digital Currency Group, Inc. (the "Parent"), solely with respect to Sections 1, 7(c), and 7(d) of the Security Agreement (as defined below), as amended by this Second Amendment, and Gemini Trust Company, LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

This Second Amendment is entered into by the parties hereto in connection with the Security Agreement, dated as of August 15, 2022, entered into by and between Pledgor and Agent (as amended by the First Amendment to Security Agreement and as may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"). This Second Amendment forms a part of, incorporates by reference, and is subject to the terms and conditions in the Security Agreement and except as set forth in this Second Amendment, the Security Agreement shall continue in full force and effect in accordance with its terms. Capitalized terms used in this Second Amendment but not otherwise defined herein shall have the same meanings as in the Security Agreement.

### RECITALS

**WHEREAS,** Pledgor and Agent have entered into the Security Agreement, pursuant to which the Pledgor agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements.

**WHEREAS,** This Second Amendment is intended to modify certain terms of the Security Agreement.

**NOW THEREFORE**, in consideration of the mutual promises herein contained, the Parties hereby agree:

1. **Amendment to Collateral Amount**. Section 1 of the Security Agreement shall be amended and restated in its entirety as follows:

   "As promptly as practicable after the execution of this Agreement, the Pledgor shall transfer or cause to be transferred **30,905,782** shares of Grayscale Bitcoin Trust to the account held in the name of the Agent "for the benefit of" ("FBO") the Principal Lenders at Morgan Stanley Smith Barneys LLC with account number ending in -6250 (the "GTC Account"); provided, that, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale Bitcoin Trust or any other shares into the GTC Account after such date except

CONFIDENTIAL

Pg 59 of 61

as required under and in accordance with the Second Amendment or <u>Section 6(b)</u> of this Agreement.

As promptly as practicable after the execution of this Second Amendment, the Parent shall assign, sell, convey, transfer, and deliver to the Pledgor, or a controlled subsidiary of the Pledgor, all right, title and interest in and to **31,180,804** shares of Grayscale Bitcoin Trust, free and clear of all liens, claims, charges and encumbrances. As promptly as practicable after such assignment, conveyance, transfer, and delivery, the Pledgor shall transfer or cause to be transferred such **31,180,804** shares of Grayscale Bitcoin Trust to the GTC Account; <u>provided</u>, <u>that</u>, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale Bitcoin Trust or any other shares into the GTC Account after such date except as required under and in accordance with <u>Section 6(b)</u> of this Agreement."

2. **Amendment to Remedies.** <u>Section 3(a)</u> of the Security Agreement shall be amended and restated in its entirety as follows:

"(a) Upon an event of default (or similar term) under any Master Loan Agreement, the failure of the Pledgor or the Parent to comply with its respective obligations in <u>Section 1</u> of this Agreement, the failure of the Pledgor to comply with its obligations under <u>Section 6(b)</u> of this Agreement, or the failure of the Pledgor to comply with any other right or remedy the Agent or any Principal Lender may have at law, contract, or equity (including under the Uniform Commercial Code ("<u>UCC</u>") as in effect in any relevant jurisdiction), the Agent shall have the following rights and remedies, all such rights and remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as the Agent deems expedient without any notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Pledgor, to the fullest extent permitted by law):

> (i) To liquidate any or all Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Agent having the right to purchase any such Collateral) and apply the proceeds of such liquidation to the Secured Obligations; and

> (ii) To exercise any rights and remedies available to the Agent or the Principal Lenders under applicable law, including the UCC as in effect in any relevant jurisdiction."

3. **Amendment to Adjustment of Collateral**. <u>Section 6</u> of the Security Agreement shall be amended and restated in its entirety as follows:

CONFIDENTIAL

"(a) Collateral Release. During the term of this Agreement, if the aggregate value of the Collateral (as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a day the OTCQX market is open for trading (such aggregate value, the "Collateral Value")) exceeds 120% of the notional USD value of the aggregate loaned amounts (the "Loaned Assets") under the Master Loan Agreements (as calculated based on the price reported on the Agent's cryptocurrency exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the "Gemini Closing Price")), then the Agent shall, upon the Pledgor's written request (which may be by e-mail or other electronic transmission) (such request, a "Collateral Return Request"), be required to return an amount of Collateral such that the remaining Collateral Value is no greater than 110% of the notional USD value of the Loaned Assets (such amount, the "Collateral Return Amount"). The Agent shall deliver the Collateral Return Amount to the Pledgor's brokerage account at such account as the Pledgor may direct in writing no later than two (2) business days after the date of the Collateral Return Request.

(b) Collateral Posting. During the term of this Agreement, if the Collateral Value falls below 30% of the notional USD value of the aggregate Loaned Assets under the Master Loan Agreements (as calculated based on the Gemini Closing Price) then the Pledgor shall, upon the Agent's written request (which may be by e-mail or other electronic transmission) (such request, a "Collateral Top-Up Request"), be required to post an amount of Collateral to the GTC Account such that the Collateral Value in the GTC Account is no less than 35% of the notional USD value of the Loaned Assets under the Master Loan Agreements (such amount, the "Collateral Top-Up Amount"); provided, that, notwithstanding the foregoing, in no event shall the aggregate number of shares of Grayscale Bitcoin Trust in the GTC Account be required to exceed **62,086,586** shares at any time. The Pledgor shall deliver the Collateral Top-Up Amount to the GTC Account no later than two (2) business days after the date of the Collateral Top-Up Request."

4. **Entire Agreement**. This Second Amendment, the Security Agreement and the Master Loan Agreements embody the entire agreement and understanding among the Parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter of this Second Amendment.

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: _Derar Islim_ _____

Name: Derar Islim

Title:   CEO

**Digital Currency Group, Inc.**

solely with respect to Sections 1, 7(c), and 7(d) of the Security Agreement

By: _Mark Murphy_ _____

Name: Mark Murphy

Title:   Account Owner

**Gemini Trust Company, LLC**

By: _Noah Perlman_ _____

Name: Noah Perlman

Title:   Chief Executive Officer

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 120 of 170

# Exhibit 1

**Short Message Report**

| Conversations: 1 | Participants: 16 |
|---|---|
| Total Messages: 366 | Date Range: 6/15/2022 |

**Outline of Conversations**

 **Microsoft Teams chat between [Alice Chan, Derar Islim, Matthew Ballensweig | Genesis Cap, Matt Kummell, Leon Marshall, Barry Silbert, Adim Offurum, Joshua Lim, Reed Werbitt, Mark Murphy, Michael Moro, Arianna Pretto-Sakmann, Michael Kraines, Michael Paleokrassas, Andrew Sullivan]** · 366 messages on 6/15/2022 · Adim Offurum · Alice Chan · Andrew Sullivan · Arianna Pretto-Sakmann · Barry Silbert · Derar Islim · Joshua Lim · Leon Marshall · Mark Murphy · Matt Kummell · Matthew Ballensweig | Genesis Cap · Michael Kraines · Michael Moro · Michael Paleokrassas · Reed Werbitt · Unknown

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬 | **Microsoft Teams chat between [Alice Chan, Derar Islim, Matthew Ballensweig | Genesis Cap, Matt Kummell, Leon Marshall, Barry Silbert, Adim Offurum, Joshua Lim, Reed Werbitt, Mark Murphy, Michael Moro, Arianna Pretto-Sakmann, Michael Kraines, Michael Paleokrassas, Andrew Sullivan]**

MK | **Matt Kummell** | 6/15/2022, 12:20 AM

Joshua Lim
Apparently TPS Capital (the OTC trading desk that Three Arrows owns) is shopping around this structured note to clients (Arca got it)

closing the loop on this TPS thing that came up prior to Matt's much more interesting development.  I glanced at the write-up - only Authorized Participants can redeem an ETF for the underliers. Joe Investor, even Joe HedgeFund, can't do an in-kind redemption.

MP | **Michael Paleokrassas** | 6/15/2022, 12:22 AM

Do they think they can call back their collateral and offer this? Have we confirmed our collat is still with trade station?

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 12:32 AM

Kraines I'm taking two hours off to put kids to bed. I'm not answering you.

MK | **Michael Kraines** | 6/15/2022, 12:33 AM

I didn't realize I was calling?

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 12:33 AM

Preventative.

MK | **Michael Kraines** | 6/15/2022, 12:34 AM

Let the record show I haven't initiated any of these calls!

MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 12:52 AM

Matt Ballensweig, [6/14/2022 7:54 PM]
hi there

Matt Ballensweig, [6/14/2022 7:55 PM]
we will revert here shortly

Matt Ballensweig, [6/14/2022 8: 07 PM]
do you guys wanna hop on a call shortly?

Kyle, [6/14/2022 8:50 PM]
Would like to setup a call

Kyle, [6/14/2022 8:50 PM]
Are you free now?

Matt Ballensweig, [6/14/2022 8:51 PM]
let me wrangle some people, give me one min

MP | **Michael Paleokrassas** | 6/15/2022, 12:53 AM

Arianna Pretto-Sakmann

MK | **Matt Kummell** | 6/15/2022, 12:53 AM

Ari went offline for 2h she said - can we phone her directly?

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:54 AM
Michael Morowant to be on this as well?

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:55 AM
we need to still be very cautious about what we say and how we say it, we dont know theyre not recording

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:55 AM
I know I sound like a conspiracy theorist but Im very concerned about any leakage of our overall net position

**MM**   **Michael Moro**                                                        6/15/2022, 12:55 AM
I agree with the caution.  Happy to join.

**AP**   **Arianna Pretto-Sakmann**                                             6/15/2022, 12:55 AM
Redacted for Privilege

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:56 AM
Redacted for Privilege

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:56 AM
Redacted for Privilege

**AP**   **Arianna Pretto-Sakmann**                                             6/15/2022, 12:57 AM
Redacted for Privilege

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:58 AM
thats not our total position though

**MP**   **Michael Paleokrassas**                                                6/15/2022, 12:58 AM
I mean guys they know their position with us

**MP**   **Michael Paleokrassas**                                                6/15/2022, 12:58 AM
Ask them what they want to talk about

**MP**   **Michael Paleokrassas**                                                6/15/2022, 12:58 AM
And what's going on

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:58 AM
if theyre actually looking to know what our total loans vs total collateral is we should have them confirm unit by unit and we can tell them well come back

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:58 AM
but yes agree with Mike we should first get their take on what they want to do

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:58 AM
what bailout

**MC**   **Matthew Ballensweig | Genesis Cap**                                   6/15/2022, 12:58 AM
who and how

**MP**   **Michael Paleokrassas**                                                6/15/2022, 12:59 AM
Yep. Let's get on the call. Me you Ari and moro

**MP**   **Michael Paleokrassas**                                                6/15/2022, 12:59 AM
Anyone from DCG want to get on to listen?

**MP**   **Michael Paleokrassas**                                                6/15/2022, 1:00 AM
They should have no qualms on who is on the call

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 1:00 AM |
| | 9:15 PM call | |

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 1:00 AM |
| | sending invite | |

| MP | **Michael Paleokrassas** | 6/15/2022, 1:00 AM |
| | Ok will be on | |

| AS | **Andrew Sullivan** | 6/15/2022, 1:00 AM |
| | I wouldn't mind listening if it's not an issue to have too many people on | |

| MP | **Michael Paleokrassas** | 6/15/2022, 1:00 AM |
| | Sully want to join? Yes add sully | |

| U | **Unknown  DELETED** | 6/15/2022, 1:01 AM |
| | This message has been deleted and its date has been estimated. | |

| > DI | **Derar Islim** | 6/15/2022, 1:01 AM |
| | let's keep it as small as possible, no ? one person from DCG maybe | |

| BS | **Barry Silbert** | 6/15/2022, 1:02 AM |
| | https://twitter.com/zhusu/status/1536876343815983104 | |

| DI | **Derar Islim** | 6/15/2022, 1:05 AM |
| | let us know who wants to join asap | |

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 1:05 AM |
| | call is in 10 min | |

| MM | **Mark Murphy** | 6/15/2022, 1:05 AM |
| | Michael Paleokrassas | |
| | Anyone from DCG want to get on to listen? | |
| | No it's better if you guys do it without us | |

| MP | **Michael Paleokrassas** | 6/15/2022, 1:05 AM |
| | Mark Murphy | |
| | No it's better if you guys do it without us | |
| | Sounds good | |

| MM | **Mark Murphy** | 6/15/2022, 1:05 AM |
| | But please keep us posted | |

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 1:32 AM |
| | still on call but here are notes so far: | |

They apologized for going dark - felt afraid and underrepresented

They do not want to fuck over creditors and they are not sending any money to any creditor right now and especially not sending any money to themselves

They definitely are fearful and want to make amends - work this out the right way (embarrassed is the right way)

They are first pursuing a bailout with another well capitalized entity that wants to basically wipe out Kyle and Su but repay the creditors to not cause daisy chain in space - doesnt want to wipe out people theyve worked with for years

The bailout participant apparently doesnt want the space to become heavily regulated on the news and wants to create industry bailout (I have a very strong feeling this is Alameda based on this call and my conversations with Alameda today - it fits the bill)

If bailout doesnt work or falls through they want to get all creditors in arbitration and fairly lay off assets/pay down debts

steps 1 and 2 will take days/a week but not months

Said right now do not have intention to file bankruptcy because believe steps 1 or 2 will work

So far this does feel like a sincere way of working through it - practically speaking on how this will play out, unsure, but their attempt seems sincere

Reiterating saying that the motivation of the bailout angel is that insane regulation doesnt come back into space and they have funds to do it -- def Alameda in my opinion

**MC**  **Matthew Ballensweig | Genesis Cap**                    6/15/2022, 1:34 AM
will finalize legal counsel tomorrow and in a few days should have transparency of assets and liabilities.

**JL**  **Joshua Lim**                                          6/15/2022, 1:34 AM
Someone just told me "Apparently there is a 3AC deck circulating. Haven't seen."

**JL**  **Joshua Lim**                                          6/15/2022, 1:34 AM
We should ask for a look on it…

**MK**  **Michael Kraines**                                     6/15/2022, 1:34 AM
wow

**MK**  **Michael Kraines**                                     6/15/2022, 1:35 AM
if that's all sincere it would be amazing

**MP**  **Michael Paleokrassas**                                6/15/2022, 1:35 AM
call still going - will post full notes shortly

**JL**  **Joshua Lim**                                          6/15/2022, 1:35 AM
Could also be Binance CZ

**MK**  **Michael Kraines**                                     6/15/2022, 1:35 AM
but then why did they claim they had no ability to meet our margin call and then remove assets from the system?

**MC**  **Matthew Ballensweig | Genesis Cap**                    6/15/2022, 1:35 AM
they are working with one bailout company right now, I definitely think its Alameda

**MK**  **Michael Kraines**                                     6/15/2022, 1:35 AM
would be nice if they could speak to that - simply to add credibility

**MK**  **Matt Kummell**                                        6/15/2022, 1:36 AM
can they connect you with the entity behind the bailout?  giving them days/ a week doesn't feel good

**MC**  **Matthew Ballensweig | Genesis Cap**                    6/15/2022, 1:36 AM
See my notes above

**MK**  **Michael Kraines**                                     6/15/2022, 1:37 AM
Matt I didn't see there an explanation for misrepresenting their status in terms of asset held

**> MK**  **Michael Kraines**                                   6/15/2022, 1:37 AM
Matt I didn't see there an explanation for misrepresenting their status in terms of assets held

**MP**  **Michael Paleokrassas**                                6/15/2022, 1:37 AM

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                                    Genesis_NYAG0143459

Matt Kummell

can they connect you with the entity behind the bailout?  giving them days/ a week doesn't feel good

matt just asked

**MK**   **Michael Kraines**                                                              6/15/2022, 1:38 AM

these are sophisticated people

**DI**   **Derar Islim**                                                              6/15/2022, 1:38 AM

The tone is that they are working on steps to reduce their personal liabilities. They started the conversation by saying that they "freaked out" when they saw our message accusing them of moving assets for personal use.

**MP**   **Michael Paleokrassas**                                                              6/15/2022, 1:38 AM

they will let us know shortly

**MK**   **Michael Kraines**                                                              6/15/2022, 1:38 AM

Derar Islim
The tone is that they are working on steps to reduce their personal liabilities. They started the conversation by saying that they "freaked out" when they saw our message accusing them of moving assets for personal use.😊

**MC**   **Matthew Ballensweig | Genesis Cap**                                                              6/15/2022, 1:38 AM

they are going to connect us with the bailout firm most likely as well

> **JL**   **Joshua Lim**                                                              6/15/2022, 1:38 AM

One more thing that just came out. TAC took money out of an SMA client of theirs:
https://twitter.com/danny8bc/status/1536880989661966336?s=28&t=fPIpTZfLJtjDGoEvkI4Obg

**JL**   **Joshua Lim**                                                              6/15/2022, 1:38 AM

One more thing they just came out. TAC took money out of an SMA client of theirs:
https://twitter.com/danny8bc/status/1536880989661966336?s=28&t=fPIpTZfLJtjDGoEvkI4Obg

**DI**   **Derar Islim**                                                              6/15/2022, 1:39 AM

we are calling here

**MP**   **Michael Paleokrassas**                                                              6/15/2022, 1:39 AM

we are calling this line right now

**MK**   **Michael Kraines**                                                              6/15/2022, 1:39 AM

Matthew Ballensweig | Genesis Cap
they are going to connect us with the bailout firm most likely as well

that would be really helpful - we need to validate the narrative

**MP**   **Michael Paleokrassas**                                                              6/15/2022, 2:08 AM

James Niosi, [6/14/2022 10: 07 PM]
Evening, checking in on any official statement by Genesis on the state of your collateral and capital as we continue to see more concerning firm meltdowns and now recently 3 Arrows. We either have another $5 mio to transfer tomorrow or looking to pull back what we have. Let me know. Thanks.

**MP**   **Michael Paleokrassas**                                                              6/15/2022, 2:08 AM

starting to come hard here

**LM**   **Leon Marshall**                                                              6/15/2022, 2:10 AM

This is working doc we've been using today

*File **"ee73ef4-1655259028680-(14)Genesis Source of Strength Talking Points_06132022 v4 - MGT ONLY_LEON[59].docx"** is missing.*
*Attachment: (14)Genesis Source of Strength Talking Points_06132022 v4 - MGT ONLY_LEON[59].docx (39 KB)*

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS
Genesis_NYAG0143460

**MP**  **Michael Paleokrassas**  6/15/2022, 2:10 AM
Leon

**MP**  **Michael Paleokrassas**  6/15/2022, 2:10 AM
can you answer investdefy

**MP**  **Michael Paleokrassas**  6/15/2022, 2:10 AM
i need to go through this

**LM**  **Leon Marshall**  6/15/2022, 2:11 AM
sure ofc will hit u up direct

**MM**  **Mark Murphy**  6/15/2022, 2:14 AM
https://www.yahoo.com/now/rumors-swirl-financial-stress-three-231531515.html

**AP**  **Arianna Pretto-Sakmann**  6/15/2022, 4:25 AM
Dubai update. The regulator, VARA, was notified this morning that 3AC is insolvent. I have now written to understand
*Redacted for Privilege*

**MP**  **Michael Paleokrassas**  6/15/2022, 4:41 AM
not sure anyone is awake, but starting to see a steady flow of calls starting

**MC**  **Matthew Ballensweig | Genesis Cap**  6/15/2022, 4:47 AM
yeah a lot of smaller lenders 20mm and udner

**MC**  **Matthew Ballensweig | Genesis Cap**  6/15/2022, 4:47 AM
coming to ask for withdrawals

**AP**  **Arianna Pretto-Sakmann**  6/15/2022, 4:56 AM
Singapore update. We have engaged Clasis LLC as our insolvency counsel in Singapore. *Redacted for Privilege*
**Redacted for Privilege**

**AP**  **Arianna Pretto-Sakmann**  6/15/2022, 4:57 AM
Matthew Ballensweig | Genesis Cap Aaron Leung and Asmita are ready to help overnight with any docs for the
withdrawals.

**MC**  **Matthew Ballensweig | Genesis Cap**  6/15/2022, 5:08 AM
Thank you! Appreciate everyone's continue help and  all hands effort.

**MP**  **Michael Paleokrassas**  6/15/2022, 5:44 AM
going to get some sleep for tomorrow. Matt + Ham and the whole singapore office is around

**MC**  **Matthew Ballensweig | Genesis Cap**  6/15/2022, 5:44 AM
that we are!

**MC**  **Matthew Ballensweig | Genesis Cap**  6/15/2022, 5:44 AM
rest up and see you on the battlefield tomorrow am

**MP**  **Michael Paleokrassas**  6/15/2022, 11:23 AM
still managing calls - say a few chunky ones last night but staved off others

**MP**  **Michael Paleokrassas**  6/15/2022, 11:23 AM
matt is obviously getting rest but we can update total collat in the book soon

**MK**  **Michael Kraines**                                                6/15/2022, 11:26 AM

Mike that sounds like good news so far

**MK**  **Michael Kraines**                                                6/15/2022, 11:26 AM

what's our current liquid position relative to the earlier $1.6bb?

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

want matt to run the numbers but thinking 2-3 100 mm lower

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

this also came out:

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

https://tether.to/en/tether-condemns-false-rumours-about-its-commercial-paper-holdings/

**MK**  **Michael Kraines**                                                6/15/2022, 11:27 AM

I'd call that a win

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

US is just getting up

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

now it gets interesting - we have found in general that asian clients are generally farther out on the risk curve

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:27 AM

and Gem most important

**MK**  **Michael Kraines**                                                6/15/2022, 11:28 AM

hey Mike I caught up w Matt at some length last night about the hedge on the existing collateral

**MK**  **Michael Kraines**                                                6/15/2022, 11:28 AM

if memory serves we've hedged about 1/3rd?

**MK**  **Michael Kraines**                                                6/15/2022, 11:30 AM

was curious to get your thoughts on that - feels like there's an important judgment call to be made re whether to leave as is, hedge it all out (w both positives and negatives), etc

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:30 AM

let me get you full numbers

**MK**  **Michael Kraines**                                                6/15/2022, 11:30 AM

cool

**MK**  **Michael Kraines**                                                6/15/2022, 11:30 AM

thanks

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:30 AM

Michael Kraines
was curious to get your thoughts on that - feels like there's an important judgment call to be made re whether to leave as is, hedge it all out (w both positives and negatives), etc

yes, we have been trying to put pen to paper here but also want to just be hedged for now. I want everyone to be in agreement at the Genesis and DCG level across managements

**MP**  **Michael Paleokrassas**                                           6/15/2022, 11:32 AM

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                                   Genesis_NYAG0143462

| Total BTC | Total USD | AVG |
|---|---|---|
| 36,250.00000000 | 824,206,825.00 | 22,736.74 |

*Image: 0-eus-d11-425ab817e9555623dc1a62051582be57.png (43 KB)*

**MK**  **Michael Kraines**                                          6/15/2022, 11:32 AM

so how do you think about the current 1/3 vs a larger hedge?

**MP**  **Michael Paleokrassas**                                     6/15/2022, 11:32 AM

so keep in mind this is more than the liquid BTC we have on hand from TAC, but we are also managing 100mm short in case our counterparty Babel doesnt come through

**MP**  **Michael Paleokrassas**                                     6/15/2022, 11:33 AM

Michael Kraines
so how do you think about the current 1/3 vs a larger hedge?

shorting also ties up liquid collateral, so we are comfortable with this level at the moment while also making sure we can meet client calls

**MP**  **Michael Paleokrassas**                                     6/15/2022, 11:34 AM

its such a balancing act at the moment

**MK**  **Michael Kraines**                                          6/15/2022, 11:34 AM

sounds like it

**MK**  **Michael Kraines**                                          6/15/2022, 11:34 AM

so just to help quantify it, overall if BTC price goes down say 30% or up say 30% what happens to our exposure w the current book?

**MK**  **Michael Kraines**                                          6/15/2022, 11:34 AM

just ballpark

**MP**  **Michael Paleokrassas**                                     6/15/2022, 11:35 AM

up 30% we feel much more comfortable that babel bank can get back to 1-1 with us and we close out 11k of the short on the way up

**MP**  **Michael Paleokrassas**                                     6/15/2022, 11:36 AM

here is our plan so you can conceptulize how we are thinking of Babel

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS
Genesis_NYAG0143463

| MP | **Michael Paleokrassas** | | 6/15/2022, 11:36 AM |

|  | Notional | Units |
|---|---|---|
| **BTC Short Strategy** | $ 250,000,000.00 | 11250 |
| **BTC price assumption** | $ 22,000.00 | |
| | | |
| **Take Profit Plan** | | |
| Drawdown | Cover Price Target | Unit Amount |
| 15% | $ 18,700.00 | 1600 |
| 20% | $ 17,600.00 | 1900 |
| 25% | $ 16,500.00 | 2150 |
| 30% | $ 15,400.00 | 2500 |
| 35% | $ 14,300.00 | 3100 |
| | | |
| **Stop Loss Plan** | | |
| Rally | Stop Loss Cover | |
| 10% | $ 24,200.00 | 3750 |
| 15% | $ 25,300.00 | 3750 |
| 20% | $ 26,400.00 | 3750 |

*Image: 0-eus-d14-be1694deb0185abf844d07d8a691c273.png (218 KB)*

| MP | **Michael Paleokrassas** | 6/15/2022, 11:37 AM |

30% the next domino falls i think - its so important that our risk team has a plan for all those moves including getting counterparties to top up before or just call loans now. I think we did well with this for the 10% move down but that just happened

| MP | **Michael Paleokrassas** | 6/15/2022, 11:38 AM |

we need to stay nimble with assets to send back to clients so i dont think its a great risk reward to go shorter if that means we cant meet calls

| MP | **Michael Paleokrassas** | 6/15/2022, 11:38 AM |

we talked a bit about using the 7 days to return funds to clients but that is emergency only

| MP | **Michael Paleokrassas** | 6/15/2022, 11:38 AM |

people asked to break fixed term loans last night - we stood firm

| MK | **Michael Kraines** | 6/15/2022, 11:39 AM |

Michael Paleokrassas
we need to stay nimble with assets to send back to clients so i dont think its a great risk reward to go shorter if that means we cant meet calls

does that suggest you think BTC will hang in there?

| MM | **Mark Murphy** | 6/15/2022, 11:39 AM |

Agreed Mike. We have to meet our calls promptly.

| MK | **Michael Kraines** | 6/15/2022, 11:39 AM |

Michael Paleokrassas
people asked to break fixed term loans last night - we stood firm

nice!

| MP | **Michael Paleokrassas** | 6/15/2022, 11:39 AM |

Michael Kraines
does that suggest you think BTC will hang in there?

it suggests i dont think it will and we need to be ready

| MP | **Michael Paleokrassas** | 6/15/2022, 11:40 AM |

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS
Genesis_NYAG0143464

Capital picture: $590 cash, $200mm ETH, and $500mm BTC

**MP**  Michael Paleokrassas                                                6/15/2022, 11:40 AM

call it 1.2 bln

**MK**  Michael Kraines                                                    6/15/2022, 11:41 AM

just to help me understand the tradeoff then: if we thought BTC would crash is the balance between more protection on the downside by increasing the size of the short versus the incrementally larger liquidity required to do just that?

**MP**  Michael Paleokrassas                                                6/15/2022, 11:42 AM

the balance is having capital to meet client pulls

**MP**  Michael Paleokrassas                                                6/15/2022, 11:42 AM

versus protecting the TAC long downside

**MM**  Mark Murphy                                                        6/15/2022, 11:42 AM

I think it would be worthwhile to do a check in call shortly. I know we have the comms call at 8 so maybe afterwards? Want to make sure we're on same page.

**MK**  Michael Kraines                                                    6/15/2022, 11:42 AM

right - you're saying you're weighting towards the liquidity over the downside

> **MK**  Michael Kraines                                                  6/15/2022, 11:42 AM

right - you're saying you're weighting towards the liquidity over the downside protection

**MK**  Michael Kraines                                                    6/15/2022, 11:43 AM

Mark Murphy
I think it would be worthwhile to do a check in call shortly. I know we have the comms call at 8 so maybe afterwards? Want to make sure we're on same page.

works for me

**MP**  Michael Paleokrassas                                                6/15/2022, 11:43 AM

we are weighing protecting a further run on Genesis if we cant meet client calls

**MK**  Michael Kraines                                                    6/15/2022, 11:43 AM

got it

**MP**  Michael Paleokrassas                                                6/15/2022, 11:43 AM

I agree on a call

**MP**  Michael Paleokrassas                                                6/15/2022, 11:43 AM

maybe client comms should come second?

**MM**  Mark Murphy                                                        6/15/2022, 11:44 AM

Michael Paleokrassas
maybe client comms should come second?

Whatever you guys want.

**MM**  Michael Moro                                                       6/15/2022, 11:44 AM

We will move the 8 AM call on comms.

**MK**  Michael Kraines                                                    6/15/2022, 11:44 AM

what are next steps re the TAC dialogue?

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                               Genesis_NYAG0143465

| | | | |
|---|---|---|---|
| MM | **Michael Moro** | | 6/15/2022, 11:44 AM |
| | And put in the normal TAC sync instead | | |

| MM | **Michael Moro** | | 6/15/2022, 11:44 AM |
|---|---|---|---|
| | Will send around invite | | |

| BS | **Barry Silbert** | | 6/15/2022, 11:53 AM |
|---|---|---|---|
| | https://twitter.com/hodlKRYPTONITE/status/1536902115540742144 | | |

| BS | **Barry Silbert** | | 6/15/2022, 11:54 AM |
|---|---|---|---|
| | not the most accurate of threads, but claims that they already disposed of deribit | | |

| DI | **Derar Islim** | | 6/15/2022, 12:39 PM |
|---|---|---|---|
| | https://twitter.com/GenesisTrading/status/1537050485785509888?s=20&t=KsFEVBeOYhuNpSibvorsww | | |

| DI | **Derar Islim** | | 6/15/2022, 12:39 PM |
|---|---|---|---|
| | our tweet is out | | |

| MK | **Michael Kraines** | | 6/15/2022, 12:39 PM |
|---|---|---|---|
| | nicely done | | |

| MM | **Mark Murphy** | | 6/15/2022, 12:43 PM |
|---|---|---|---|
| | Barry just RT'ed the Genesis tweet | | |

| MM | **Mark Murphy** | | 6/15/2022, 12:44 PM |
|---|---|---|---|
| | FYI - Bloomberg is asking Grayscale about TAC because they're the biggest GBTC holder. We're not going to comment. | | |

| MM | **Mark Murphy** | | 6/15/2022, 12:45 PM |
|---|---|---|---|
| | But we should anticipate CNBC and others will weigh in | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:45 PM |
|---|---|---|---|
| | This is from Fir Tree: | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:45 PM |
|---|---|---|---|
| | SACHIN GUPTA<br>08:44:22 Good morning. We saw the headlines around Three Arrows and noticed they are one of the largest GBTC holders. Not sure if you have a relationship with them, but we are open to helping provide liquidity to them on the trade. If you do, we can call up one of our clients for size.<br>REED WERBITT<br>08:44:49 Hey Sachin, thanks for reaching out<br>08:44:55 Let us discuss internally and come back shortly<br>SACHIN GUPTA<br>08:45: 02 Ok<br>08:45:13 We'd just need to be hedged on the BTC exposure | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:46 PM |
|---|---|---|---|
| | will keep them in our back pocket to get in bed with them at a later | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:47 PM |
|---|---|---|---|
| | for clarity, they want to buy it at a discount and sell spot against it | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:47 PM |
|---|---|---|---|
| | sully - [ **Redacted for Privilege** ] | | |

| MP | **Michael Paleokrassas** | | 6/15/2022, 12:48 PM |
|---|---|---|---|
| | [ **Redacted for Privilege** ] | | |

**AS**  **Andrew Sullivan**                                          6/15/2022, 12:51 PM

<div style="border:1px solid black">

**Redacted for Privilege**

</div>

**MP**  **Michael Paleokrassas**                                     6/15/2022, 12:51 PM
understood

**MC**  **Matthew Ballensweig | Genesis Cap**                        6/15/2022, 12:54 PM
just out of curiosity

**MC**  **Matthew Ballensweig | Genesis Cap**                        6/15/2022, 12:55 PM

<div style="border:1px solid black">

## Redacted for Privilege

</div>

**AS**  **Andrew Sullivan**                                          6/15/2022, 1:12 PM

<div style="border:1px solid black">

# Redacted for Privilege

</div>

**MM**  **Mark Murphy**                                              6/15/2022, 1:17 PM
It's a non starter for us right now

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:40 PM
ive heard this from a lot of people now, but rumor is that TAC went sold a ton of puts (betting that the price would go up) on Deribit when btc was 30k. A lot of the selling last night was they got liquidated

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:40 PM
now what i dont know is if they posted the equity as collateral

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:40 PM
its all speculation

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:40 PM
but its out there

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:43 PM
so many venture/tradfi guys wanting to buy stuff at a discount

**MP**  **Michael Paleokrassas**                                     6/15/2022, 1:43 PM
every other chat is asking us to facilitate that kind of stuff

**MM**  **Michael Moro**                                             6/15/2022, 2:17 PM
Peter Smith called me.

**MM**  **Michael Moro**                                             6/15/2022, 2:17 PM
He said he had just spoken to Kyle.

**MC**  **Matthew Ballensweig | Genesis Cap**                        6/15/2022, 2:17 PM
how did that go?

**MM**  **Michael Moro**                                             6/15/2022, 2:17 PM
Pretty much the same story that we got last night.

**MM**  **Michael Moro**                                             6/15/2022, 2:18 PM
Except the mystery buyer is CZ.

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

Genesis_NYAG0143467

**MM**  | **Mark Murphy** | 6/15/2022, 2:18 PM
Ah that makes sense

**MM**  | **Michael Moro** | 6/15/2022, 2:19 PM
He's in wait-and-see mode himself as to next steps.  And is also expecting to be able to get daily info.

**MC**  | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 2:20 PM
Michael Moro
Except the mystery buyer is CZ.

very interesting

**MC**  | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 2:20 PM
and makes sense

**MM**  | **Mark Murphy** | 6/15/2022, 2:20 PM
And we're still planning to reach out to TAC at noon?

**MM**  | **Michael Moro** | 6/15/2022, 2:20 PM
And by the way, Kyle refused to do a group call with Blockchain.  Just wanted a one-on-one with Peter.

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:20 PM
matt already did asking for a call

**BS**  | **Barry Silbert** | 6/15/2022, 2:21 PM
why are we not borrowing from binance?

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:23 PM
they will not face Genesis in any capacity - that cant get around the UBO thing

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:23 PM
we have tried so many different angles

**BS**  | **Barry Silbert** | 6/15/2022, 2:23 PM
UBO?

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:24 PM
ultimate beneficiary being US based

**BS**  | **Barry Silbert** | 6/15/2022, 2:24 PM
can they lend to somebody else that lends to us?

**AP**  | **Arianna Pretto-Sakmann** | 6/15/2022, 2:25 PM
Redacted for Privilege

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:28 PM
We really need an in to CZ, which we have never gotten bc we dont do anything with them. ill talk to matt about this

**BS**  | **Barry Silbert** | 6/15/2022, 2:29 PM
100%

**MP**  | **Michael Paleokrassas** | 6/15/2022, 2:33 PM
Michael Moro
And by the way, Kyle refused to do a group call with Blockchain.  Just wanted a one-on-one with Peter.

what was his tone?

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:33 PM

peter that is

**LM**  **Leon Marshall**                                                            6/15/2022, 2:33 PM

Michael Paleokrassas
We really need an in to CZ, which we have never gotten bc we dont do anything with them. ill talk to matt about this


Have a path for us to connect with CZ - will hit you up here

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:34 PM

thank you

**BS**  **Barry Silbert**                                                            6/15/2022, 2:35 PM

larry summers just callled.  DE Shaw reached out re the bloomberg article and offered to get involved with the GBTC situation at TAC

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:35 PM

they reached out direct to us as well

**BS**  **Barry Silbert**                                                            6/15/2022, 2:35 PM

he didn't say anything about genesis exposure and i didn't bring up

**BS**  **Barry Silbert**                                                            6/15/2022, 2:36 PM

he is connecting me to them

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:36 PM

they are one of the firms we are fending off saying we cant touch that stuff

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:36 PM

fir tree a few others as well

**MM**  **Michael Moro**                                                            6/15/2022, 2:36 PM

He sounded tired, definitely picked the wrong week to go to Tuscany on vacation.  He's mostly fingers crossed that this rescue deal/bailout happens.  He thinks if that fails, the liquidation process will get messy, but he agreed that it's better than a bankruptcy proceeding.  He's worried about BlockFi, just anecdotally.

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:48 PM

thank you

**AP**  **Arianna Pretto-Sakmann**                                                  6/15/2022, 2:49 PM

[ Redacted for Privilege ] Thank you.

**MM**  **Michael Moro**                                                            6/15/2022, 2:49 PM

[ Redacted for Privilege ]

**MC**  **Matthew Ballensweig | Genesis Cap**                                        6/15/2022, 2:49 PM

Barry Silbert

## Redacted for Privilege

**MP**  **Michael Paleokrassas**                                                      6/15/2022, 2:49 PM

Sully - [ Redacted for Privilege ]
[ Redacted for Privilege ]

**MC**  **Matthew Ballensweig | Genesis Cap**                                        6/15/2022, 2:49 PM

working on this with them directly as well

**AP**  **Arianna Pretto-Sakmann**                                                6/15/2022, 2:50 PM

Michael Paleokrassas
Sully - Redacted for Privilege

# Redacted for Privilege

**AP**  **Arianna Pretto-Sakmann**                                                6/15/2022, 2:50 PM

Redacted for Privilege

**DI**  **Derar Islim**                                                6/15/2022, 2:50 PM

Michael Paleokrassas
Sully - Redacted for Privilege

## Redacted for Privilege

Andrew Sullivan

**MP**  **Michael Paleokrassas**                                                6/15/2022, 2:50 PM

Redacted for Privilege

**MP**  **Michael Paleokrassas**                                                6/15/2022, 2:50 PM

## Redacted for Privilege

**MC**  **Matthew Ballensweig | Genesis Cap**                                                6/15/2022, 2:50 PM

Redacted for Privilege

**BS**  **Barry Silbert**                                                6/15/2022, 2:53 PM

is there anybody that genesis is or has faced off on the BTC borrow that capped out or gotten uncomfortable that might be open to lending to DCG (so that we can return part of the BTC loan to you guys)?

**AS**  **Andrew Sullivan**                                                6/15/2022, 2:53 PM

Michael Paleokrassas
Sully - Redacted for Privilege

## Redacted for Privilege

Redacted for Privilege

**AP**  **Arianna Pretto-Sakmann**                                                6/15/2022, 2:54 PM

# Redacted for Privilege

**BS**  **Barry Silbert**                                                6/15/2022, 2:54 PM

Michael Paleokrassas how are flows looking today?

**MP**  **Michael Paleokrassas**                                                6/15/2022, 2:55 PM

we have seen some steady buying finally

**MP**  **Michael Paleokrassas**                                                6/15/2022, 2:56 PM

but lots of returns todfay

**MP**  **Michael Paleokrassas**                                                6/15/2022, 2:56 PM

getting closer to 1bln i believe of liquid assets to return

**MC**  **Matthew Ballensweig | Genesis Cap**                                                6/15/2022, 2:56 PM

I will get us updated liquidity picture

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                                                Genesis_NYAG0143470

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 2:56 PM
good news is this:

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 2:57 PM
From Gemini: The rate of redemptions has been slowing since 6/13 at 10: 00pm.

**MM**  **Mark Murphy**                                                           6/15/2022, 2:57 PM
Great

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 2:57 PM
also starting to see some ex-celsians come over

**AP**  **Arianna Pretto-Sakmann**                                                6/15/2022, 2:57 PM
Arianna Pretto-Sakmann

# Redacted for Privilege

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 2:57 PM
weve been defending the castle all night and day on phone with depositors, prosepcts etc

**BS**  **Barry Silbert**                                                         6/15/2022, 2:57 PM
is there anything we/DCG can do to further install confidence in genesis?

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 3:06 PM
It ultimately comes down to our ops/processing etc, as people see our responsiveness, word spreads fast. We have some portcos that have wanted to hop on calls today - I just spoke to Wyre, we're speaking with Decentraland etc so if they triangulate with you, you can just reaffirm our position etc.

**BS**  **Barry Silbert**                                                         6/15/2022, 3:06 PM
great

**BS**  **Barry Silbert**                                                         6/15/2022, 3:06 PM
marcus says that the word on the street is that genesis is the "blue chip" in this mess

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 3:06 PM
I spoke to Bernard from Luno this AM

**BS**  **Barry Silbert**                                                         6/15/2022, 3:06 PM
we need to continue to perpetuate that of course

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 3:07 PM
yes definitely

**MC**  **Matthew Ballensweig | Genesis Cap**                                      6/15/2022, 3:07 PM
So who has the best line into CZ?

**BS**  **Barry Silbert**                                                         6/15/2022, 3:08 PM
I dm'd with him for the first time a couple weeks ago about meeting up at consensus. don't think i've ever met or spoke with him

**BS**  **Barry Silbert**                                                         6/15/2022, 3:08 PM
i'm happy to ping him

**BS**

**Barry Silbert**                                                                                 6/15/2022, 3:09 PM

but don't want to freak him out

**BS**

**Barry Silbert**                                                                                 6/15/2022, 3:09 PM

so probably should come from lower initially

**LM**

**Leon Marshall**                                                                                 6/15/2022, 3:11 PM

Am reaching out to EMEA contact here

Our original path from our APAC desk would've gone via Arthur Hayes.

MikeP and I not sure he can be discreet here  so looking to find other paths

If EMEA path doesn't work happy for you to ping - will find out in next hour or so

**MC**

**Matthew Ballensweig | Genesis Cap**                                                            6/15/2022, 3:14 PM

thanks Leon

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:22 PM

Just caught up with Fir Tree - they are very interested in buying GBTC and putting on the spread trade. Basically they have a ton of balance sheet and want to put it to work in a directionless way

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:22 PM

they are also extremely convinved that Tether is over

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:22 PM

he mentioned that the celsius loan that they liquidated collateral is going to be stuck in bankruptcy court for 10 years

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:23 PM

and that they are undercollateralized by a lot

**AP**

**Arianna Pretto-Sakmann**                                                                        6/15/2022, 3:33 PM

Redacted for Privilege

**AP**

**Arianna Pretto-Sakmann**                                                                        6/15/2022, 3:34 PM

Redacted for Privilege

**AP**

**Arianna Pretto-Sakmann**                                                                        6/15/2022, 3:35 PM

Redacted for Privilege

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:35 PM

Redacted for Privilege

**AP**

**Arianna Pretto-Sakmann**                                                                        6/15/2022, 3:36 PM

Redacted for Privilege

**MP**

**Michael Paleokrassas**                                                                          6/15/2022, 3:37 PM

thank you

**AP**

**Arianna Pretto-Sakmann**                                                                        6/15/2022, 3:46 PM

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                                        Genesis_NYAG0143472

Arianna Pretto-Sakmann

# Redacted for Privilege

**Redacted for Privilege**    Just want everyone to be aware.

**AP**    Arianna Pretto-Sakmann    6/15/2022, 3:47 PM

# Redacted for Privilege

**MC**    Matthew Ballensweig | Genesis Cap    6/15/2022, 3:49 PM

# Redacted for Privilege

**AP**    Arianna Pretto-Sakmann    6/15/2022, 3:49 PM

# Redacted for Privilege

**AP**    Arianna Pretto-Sakmann    6/15/2022, 3:50 PM

**Redacted for Privilege**

**AP**    Arianna Pretto-Sakmann    6/15/2022, 3:50 PM

**Redacted for Privilege**

**AP**    Arianna Pretto-Sakmann    6/15/2022, 3:50 PM

Sully getting numbers from Adim.

**AO**    Adim Offurum    6/15/2022, 3:51 PM

Arianna Pretto-Sakmann
Sully getting numbers from Adim.

Yes, they've been provided. Thanks.

**MC**    Matthew Ballensweig | Genesis Cap    6/15/2022, 3:51 PM

Arianna Pretto-Sakmann

**Redacted for Privilege**

got it

**AS**    Andrew Sullivan    6/15/2022, 3:52 PM

# Redacted for Privilege

**BS**    Barry Silbert    6/15/2022, 4:03 PM

do we borrow from kraken?

**BS**    Barry Silbert    6/15/2022, 4:03 PM

and what do we do with coinbase?

**AO**    Adim Offurum    6/15/2022, 4:04 PM

Barry Silbert
do we borrow from kraken?

No borrows from Kraken or Coinbase

**MC**    Matthew Ballensweig | Genesis Cap    6/15/2022, 4:09 PM

we have dialogues with both though

**BS**    Barry Silbert    6/15/2022, 4:16 PM

let me know if there is something you see we could do with either and if i can be helpful

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS    Genesis_NYAG0143473

**BS**   **Barry Silbert**                                              6/15/2022, 4:16 PM
and now selkis has chimed in:

**BS**   **Barry Silbert**                                              6/15/2022, 4:16 PM
https://twitter.com/twobitidiot/status/1537095474418749440

**MP**   **Michael Paleokrassas**                                       6/15/2022, 4:17 PM
he really does love you

**MP**   **Michael Paleokrassas**                                       6/15/2022, 4:17 PM
Matthew Ballensweig | Genesis Cap
we have dialogues with both though

would either of these parties lend to us unsecured matt?

**MC**   **Matthew Ballensweig | Genesis Cap**                          6/15/2022, 4:18 PM
not at the moment

**MP**   **Michael Paleokrassas**                                       6/15/2022, 4:18 PM
https://www.theblock.co/post/152230/citigroup-celsius-advising-after-withdrawal-freeze

**BS**   **Barry Silbert**                                              6/15/2022, 4:40 PM
are we doing anything on the borrowing front with alan howard?

**BS**   **Barry Silbert**                                              6/15/2022, 4:40 PM
https://twitter.com/MidasTheFool/status/1536937841837584387

**MK**   **Matt Kummell**                                               6/15/2022, 4:44 PM
thread Barry just shared mentioned that Nansen had a wallet tagged as 3AC and removed the tag (as I read it, not the wallet at the top of the thread but a separate 8000 ETH wallet). Is Nansen a data provider / service we use? Is it reliable?

**LM**   **Leon Marshall**                                              6/15/2022, 4:45 PM
Barry Silbert
let me know if there is something you see we could do with either and if i can be helpful

We are not.

We've pitched lending but they are only open to derivs for now

**BS**   **Barry Silbert**                                              6/15/2022, 4:46 PM
do we know if they are sitting on BTC?

**BS**   **Barry Silbert**                                              6/15/2022, 4:46 PM
and how they are doing?

**BS**   **Barry Silbert**                                              6/15/2022, 4:46 PM
working hard to find BTC for DCG to send back to you

**LM**   **Leon Marshall**                                              6/15/2022, 4:51 PM
We suspect it's mainly cash

Their fund is generally 30% directional, 30% mkt neutral, 30% liquid VC

1.4bn USD total. Not all live yet

They are doing well with significant number of ITM puts they are trading around with us

**LM**   **Leon Marshall**                                              6/15/2022, 4:52 PM

On lending we have agreed MBA in principal but due to tax reasons they need to onboard new entities to face us

Ball in their court atm

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 5:22 PM |

## Redacted for Privilege

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 5:23 PM |

### Redacted for Privilege

| MP | **Michael Paleokrassas** | 6/15/2022, 5:23 PM |

## Redacted for Privilege

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 5:24 PM |

Redacted for Privilege

| MK | **Matt Kummell** | 6/15/2022, 5:24 PM |

### Redacted for Privilege

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 5:26 PM |

# Redacted for Privilege

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 5:26 PM |

Redacted for Privilege

| MM | **Mark Murphy** | 6/15/2022, 5:27 PM |

Obviously we're not commenting there.

| MM | **Mark Murphy** | 6/15/2022, 5:27 PM |

What's the status of TAC discussions?

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 5:28 PM |

not getting back to us

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 5:28 PM |

again

| MM | **Mark Murphy** | 6/15/2022, 6:06 PM |

Can we do a team check in at 3 pm?

| MM | **Michael Moro** | 6/15/2022, 6:07 PM |

I can set up the call.

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 6:07 PM |

quick update on liquidity:

We are continuing to see outflows in USD and BTC from uHNWs

Gemini withdrawals are starting to slow- but still will be about 90mm today

Big withdrawal from Pharos fund ($100mm)

Big withdrawal from Coinshares (2k BTC)

We have about 1.05B across majors, 250-300mm in cash, 450mm in BTC, remainder in ETH

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

Generally speaking, we have a ton of capital rolling back to us in mid august, if we were to secure capital for 2-mo, we'd have 2-3B of working capital by August on hand

If we were to receive back the 24k BTC OT out to DCGI via replacement lenders - would be very very helpful

**BS**   **Barry Silbert**                                                                  6/15/2022, 6:13 PM
We're working really hard on the BTC, but don't have any hits yet. I thought DCG borrowed 19.5k?

**BS**   **Barry Silbert**                                                                  6/15/2022, 6:13 PM
Think Alameda would lend BTC to DCG, or do you want to save that bullet?

**MC**   **Matthew Ballensweig | Genesis Cap**                                             6/15/2022, 6:13 PM
ah yes sorry, 19,597 BCT

**MC**   **Matthew Ballensweig | Genesis Cap**                                             6/15/2022, 6:15 PM
Barry Silbert
Think Alameda would lend BTC to DCG, or do you want to save that bullet?

not at the moment, it would be like 30%ann if theyd even consider, they are very protective over liuqidity as well. for reference, we have 150mm USDC expiring on 6/18 coming back to us-- to have them close this out today theyd charge us 2.5mm USD

**MC**   **Matthew Ballensweig | Genesis Cap**                                             6/15/2022, 6:15 PM
to close out $250mm of USD expiring mid aug with them, would cost us $20mm

**BS**   **Barry Silbert**                                                                  6/15/2022, 6:16 PM
Gotcha

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:32 PM
Michael PaleokrassasI have bitcoin IRA on.  The call was pre-existing to discuss this and that, but do you and Matt need to come on?  It is Camilo.

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:32 PM
Matthew Ballensweig | Genesis Cap

**MP**   **Michael Paleokrassas**                                                          6/15/2022, 6:32 PM
no, i think we are fine since they closed everything out

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:32 PM
In view of the withdrawal.

**MP**   **Michael Paleokrassas**                                                          6/15/2022, 6:32 PM
not much to talk about

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:32 PM
Ok.  Then we handle.  Thank you.

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:36 PM
Michael Paleokrassas
no, i think we are fine since they closed everything out

Purpose of the call appears to be to extract information on what our position is, and get info on Genesis's "situation". He is also asking whether we know about BlockFi's earn program?!

**AP**   **Arianna Pretto-Sakmann**                                                        6/15/2022, 6:36 PM
The call is unrelated to any business that I can see.

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS                                              Genesis_NYAG0143476

MP | **Michael Paleokrassas** | 6/15/2022, 6:36 PM
ill DM you

MP | **Michael Paleokrassas** | 6/15/2022, 6:41 PM
are we doing a 3pm TAC call?

MK | **Matt Kummell** | 6/15/2022, 6:41 PM
moro sent

BS | **Barry Silbert** | 6/15/2022, 6:51 PM
Michael Paleokrassas how are flows looking post fed announcement?

MP | **Michael Paleokrassas** | 6/15/2022, 6:52 PM
nothing on the trading side - very very quiet

MP | **Michael Paleokrassas** | 6/15/2022, 6:52 PM
market schizo so not sure people want to take a view quite yet

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 7:33 PM
Back to this chat, I confirm that the arbitration claim was filed.

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 7:33 PM
I will send the filed copy by email.

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 7:33 PM
**Redacted for Privilege**

MP | **Michael Paleokrassas** | 6/15/2022, 8:00 PM
Just heard from Josh B, he said that multiple clients have stated that our tweet helped them get comfortable and keep their loans to us

MP | **Michael Paleokrassas** | 6/15/2022, 8:00 PM
this is out of my wheelhouse but we need to do more of this

MM | **Mark Murphy** | 6/15/2022, 8:01 PM
Good to know, thanks for letting us know

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 8:05 PM
I meant to say that looking relaxed and comfortable to the clients, with video on, seems to project a good sense.  Bitcoin IRA left it that they can't wait to re-engage and that of all yield players out there, we are the ones.

BS | **Barry Silbert** | 6/15/2022, 8:25 PM
https://twitter.com/barrysilbert/status/1537168824235085829?s=21&t=XtpSHKngfqTmYQ3Z3tJTKw

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 8:38 PM
Okay, here goes.

AP | **Arianna Pretto-Sakmann** | 6/15/2022, 8:38 PM

# Redacted for Privilege

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:39 PM

**Redacted for Privilege**

DI  **Derar Islim**                                               6/15/2022, 8:39 PM

Redacted for Privilege

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:56 PM

Redacted for Privilege

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:57 PM

Redacted for Privilege

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:57 PM

**Redacted for Privilege**

MC  **Matthew Ballensweig | Genesis Cap**                         6/15/2022, 8:57 PM

**Redacted for Privilege**

MC  **Matthew Ballensweig | Genesis Cap**                         6/15/2022, 8:57 PM

Redacted for Privilege

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:57 PM

**Redacted for Privilege**

MC  **Matthew Ballensweig | Genesis Cap**                         6/15/2022, 8:58 PM

Redacted for Privilege

MC  **Matthew Ballensweig | Genesis Cap**                         6/15/2022, 8:58 PM

**Redacted for Privilege**

MC  **Matthew Ballensweig | Genesis Cap**                         6/15/2022, 8:58 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:59 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:59 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 8:59 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 9:01 PM

**Redacted for Privilege**

> AP  **Arianna Pretto-Sakmann**                                  6/15/2022, 9:01 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 9:02 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 9:14 PM

**Redacted for Privilege**

AP  **Arianna Pretto-Sakmann**                                    6/15/2022, 9:15 PM

# Redacted for Privilege

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 9:20 PM |
|----|----------------------------------------|--------------------|

**Redacted for Privilege**

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 9:26 PM |
|----|----------------------------------------|--------------------|

thank you Barry Silbert for the added liquidity it will be very helpful and we're also starting to see outflows slow - even some inflows tomorrow

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 9:26 PM |
|----|----------------------------------------|--------------------|

we'll keep cranking and bringing in assets as we can

| BS | **Barry Silbert** | 6/15/2022, 9:26 PM |
|----|-------------------|--------------------|

Go team!

| MM | **Mark Murphy** | 6/15/2022, 9:27 PM |
|----|-----------------|--------------------|

Let's also RT from the Genesis account:

https://twitter.com/barrysilbert/status/1537168824235085829?s=21&t=hgIYaJoav3Q9aa4Ob-X34g

| MM | **Mark Murphy** | 6/15/2022, 9:27 PM |
|----|-----------------|--------------------|

Given the reaction to our earlier tweet

| MM | **Mark Murphy** | 6/15/2022, 9:28 PM |
|----|-----------------|--------------------|

Team, I'm going to miss the 530 sync but will be available here all night. Call or text if you need anything

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 9:38 PM |
|----|----------------------------|--------------------|



*Image: 0-eus-d14-15d0612c663f0055a026651b439ee02d.png (32 KB)*

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 9:39 PM |
|----|----------------------------|--------------------|

This was on twitter Michael Paleokrassas

| BS | **Barry Silbert** | 6/15/2022, 10:12 PM |
|----|-------------------|---------------------|

BlockFi catching a lot of attention now re TAC

| BS | **Barry Silbert** | 6/15/2022, 10:12 PM |
|----|-------------------|---------------------|

https://twitter.com/BlockFi_Insti/status/1537137211686236163

| BS | **Barry Silbert** | 6/15/2022, 10:12 PM |
|----|-------------------|---------------------|

https://twitter.com/MikeBurgersburg/status/1537195940335034372

| MK | **Matt Kummell** | 6/15/2022, 10:25 PM |
|----|------------------|---------------------|

Barry, on last catch-up call - I think Michael Paleokrassasmentioned intel on BlockFi - that BlockFi had liquidated a lot of 3AC assets

| MC | **Matthew Ballensweig \| Genesis Cap** | 6/15/2022, 11:17 PM |
|----|----------------------------------------|---------------------|

Brandon Arvanaghi, [6/15/2022 7:16 PM]
Positive feedback from our customers because we were able to wire them a same-day withdrawal —
"I'll definitely be back"
"This builds a lot of trust"
"Great customer service"

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

This made a difference. Good work team, looking forward to expanding the relationship.

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:17 PM |

^some high notes before we head into the evening

| MP | **Michael Paleokrassas** | 6/15/2022, 11:18 PM |

Where is he from?

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:21 PM |

Meow

| MP | **Michael Paleokrassas** | 6/15/2022, 11:21 PM |

?

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:22 PM |

Meow Tech

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:22 PM |

small payments firm

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:22 PM |

$15mm AUM with s

| MP | **Michael Paleokrassas** | 6/15/2022, 11:22 PM |

Got it

| AP | **Arianna Pretto-Sakmann** | 6/15/2022, 11:36 PM |

Kyle has viewed the tg message with the arbitration claim news.

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:37 PM |

good

| MC | **Matthew Ballensweig | Genesis Cap** | 6/15/2022, 11:37 PM |

time for him to wake up and face another wonderful day

CONFIDENTIAL TREATMENT REQUESTED BY GENESIS

Genesis_NYAG0143480

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 147 of 170

# EXHIBIT 1

Message

| | |
|---|---|
| **From**: | Barry Silbert [barry@dcg.co] |
| **Sent**: | 6/28/2022 7:56:52 AM |
| **To**: | Michael Moro [mmoro@genesistrading.com] |
| **CC**: | Matthew Ballensweig | Genesis Cap [Matt@genesiscap.co]; Mark Murphy [mark@dcg.co]; Michael Kraines [michael@dcg.co]; Derar Islim [DIslim@Genesistrading.com]; Alice Chan [AChan@genesistrading.com]; Michael Paleokrassas [mpaleokrassas@genesistrading.com] |
| **Subject**: | Re: Genesis Equity Injection |

Hi all,

It is certainly our hope and intention to help Genesis address the equity hole – hopefully by 6/30.  To that end, the Genesis team should be working 24/7 with the DCG and DCGI teams to figure out all possible ways to do so along the lines of below.  There are probably lots of different ways to do so, each with their own ramifications that we just need to all understand before we start moving assets around.  First step is all being clear on what is available to move, so please immediately get cranking on the asset injection details with the appropriate folks at DCG and DCGI.

We have a DCG board call this morning and we'll let you know if anything new comes out of that conversation.

**Barry Silbert**
Founder & CEO, Digital Currency Group
www.DCG.co
e: barry@DCG.co
t: (212) 473-2408 | @BarrySilbert
262 Harbor Drive, 3rd Floor
Stamford, CT 06902

*DCG Family of Companies:*

CoinDesk
Luno
Grayscale
Genesis
Foundry
TradeBlock
HQ

---

**From:** Michael Moro <mmoro@genesistrading.com>
**Date:** Tuesday, June 28, 2022 at 12:48 AM
**To:** Barry Silbert <barry@dcg.co>
**Cc:** Matthew Ballensweig | Genesis Cap <Matt@genesiscap.co>, Mark Murphy <mark@dcg.co>, Michael Kraines <michael@dcg.co>, Derar Islim <DIslim@Genesistrading.com>, Alice Chan <AChan@genesistrading.com>, Michael Paleokrassas <mpaleokrassas@genesistrading.com>
**Subject:** Genesis Equity Injection

Barry,

During one of the breaks today, Matt, Mark and I were discussing how to best fill the equity hole at Genesis.  While liquidity is still our number one focus, we only have a couple of days until quarter-end, and here's what Matt and I thought made the most sense within the time constraint.

I believe this has already been discussed, but we both believe that Option 1 would be to put the entirety of DCGI balance sheet into GGC.  This can be done either by either GGC absorbing the assets and liabilities of

DCGI, or by temporarily putting DCGI legal entity underneath GGC in the org chart (and then showing a consolidated GGC balance sheet, including DCGI, to our counterparties.) We wouldn't necessarily need to touch the assets of DCGI for liquidity purposes, it could be just for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

Option 2 would be something similar to Option 1, but utilize Foundry rather than DCGI. (Though we aren't sure how much equity exists on the Foundry balance sheet?)

Option 3 would be some combination of assets from DCG parent and DCGI placed into GGC, again for equity purposes only. But we don't know what free assets might exist up at the parent for this.

Total equity infusion (based on latest figures from Alice and GBTC marked at market value) would be ~$975 million – this would bring GGC balance sheet to $100 million of equity, GGCI to $50 million of equity and GGT unchanged.

The overall plan would be:

1. Plug the equity hole
2. Work on consistent messaging to speak to the loss to counterparties when we put out new balance sheet
3. Decide on long-term hedge strategy with equity now filled
4. Restore confidence in market and keep looking to borrow with term
5. Chip away at Alameda as we can
6. Work with DCG to continue looking to get both debt/equity financing
7. Work through philosophical/practical/logistical points for Genesis 2.0 roadmap and priorities

Again, very appreciative of you and everyone at DCG working through this with us.

Thank you.
Michael

This message is intended only for the addressee. Please notify sender by e-mail if you are not the intended recipient. If you are not the intended recipient, you may not copy, disclose, or distribute this message or its contents to any other person and any such actions may be unlawful. Genesis Global Trading, Inc. (Member FINRA/SIPC, MSRB Registered) ("Genesis Global Trading") does not accept time sensitive, action oriented messages or transaction orders, including orders to purchase or sell securities, via e-mail. Genesis Global Trading reserves the right to monitor and review the content of all messages sent to or from this e-mail address. Messages sent to or from this e-mail address may be stored on the Genesis Global Trading mail system and archived in accordance with FINRA and SEC regulations. This message is intended for those with an in depth understanding of the high risk and illiquid nature of alternative assets and these assets may not be suitable for you. This message is not a solicitation for an order, and there is not enough information contained in this message in which to make an investment decision and any information contained herein should not be used as a basis for this purpose. Genesis Global Trading does not produce in house research, make recommendations to purchase or sell specific securities, provide investment advisory services, or conduct a general retail business .

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 150 of 170

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | | |
|---|---|---|---|
| **PRESENT:** | **HON. MELISSA A. CRANE** | **PART** | **60M** |

*Justice*

-----------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF THE STATE
OF NEW YORK,

Plaintiff,

- v -

GEMINI TRUST COMPANY, LLC, GENESIS GLOBAL
CAPITAL, LLC, GENESIS ASIA PACIFIC PTE. LTD.,
GENESIS GLOBAL HOLDCO, LLC, DIGITAL CURRENCY
GROUP, INC., SOICHIRO MORO, BARRY E. SILBERT

Defendant.

-----------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 452784/2023 |
| **MOTION DATE** | 03/07/2024, 03/06/2024, 03/15/2024 |
| **MOTION SEQ. NO.** | 002 003 005 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 30, 31, 32, 33, 34, 35, 36, 68, 69, 70, 89, 105, 106

were read on this motion to/for _____ DISMISS _____.

The following e-filed documents, listed by NYSCEF document number (Motion 003) 37, 38, 39, 40, 41, 42, 43, 44, 45, 71, 72, 73, 90, 91, 92

were read on this motion to/for _____ DISMISS _____.

The following e-filed documents, listed by NYSCEF document number (Motion 005) 53, 54, 55, 56, 74, 75, 76, 93, 94, 95

were read on this motion to/for _____ DISMISS _____.

The New York State Attorney General (OAG) commenced this cryptocurrency fraud

action under General Business Law (GBL) Article 23-A [the Martin Act] and Executive Law

Section § 63 (12). Former defendant Gemini Trust Company, LLC (Gemini) operated a

cryptocurrency trading platform. Gemini's customers could purchase and trade cryptocurrency

on Gemini's exchange. In addition, Gemini partnered with former defendant Genesis Global

Capital, LLC (Genesis) to launch the Gemini Earn program (Earn). OAG alleges that the Earn

program was a retail investment program through which Genesis raised money from the public.

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL**
**Motion No.  002 003 005**

**Page 1 of 21**

1 of 21

[* 1]

Through the Earn program, Gemini's customers deposited accepted cryptocurrencies with Genesis, and Genesis deployed those assets in its own cryptocurrency lending operations. In June 2022, Three Arrows Capital, Ltd. (Three Arrows)—one of Genesis's largest borrowers— defaulted on loans that Genesis-affiliate and former defendant Genesis Asia Pacific had issued to it, leaving the Genesis entities with a $1.1 billion liquidity hole.

OAG's Martin Act and Executive Law fraud claims against the Genesis and Digital Currency Group defendants (Moro, Silbert, and Digital Currency Group) concern these defendants' alleged misstatements and omissions following the Three Arrows default. Ultimately, Genesis announced that it was suspending all loan withdrawals in November 2022, and it declared bankruptcy in January 2023.

After this case was commenced, OAG settled its claims against Gemini Trust and the Genesis entity defendants (Genesis Global Capital, LLC, Genesis Asia Pacific PTE. LTD., and Genesis Global Holdco, LLC).

Now, defendants Digital Currency Group Inc. (DCG) [MS 02], Barry E. Silbert, and Soichiro Moro move to dismiss the amended complaint. OAG opposes the motions.

## BACKGROUND

The facts are taken from the amended complaint (Doc 17) unless noted otherwise. Former defendant Gemini is a cryptocurrency exchange that offered securities to the public through its alleged investment program, Gemini Earn (*id.*, paras 34-39). As discussed later in this decision, the parties dispute that the Earn program constitutes a "security" within the Martin Act's meaning (*see* discussion section 1, *infra*). Gemini and former defendant Genesis Global Capital, LLC (Genesis) launched the Earn program in January-February 2021. Defendant DCG

452784/2023  THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 2 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

2 of 21

[* 2]

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 152 of 170

owns and operates cryptocurrency businesses, including Genesis, Genesis Holdco, and Genesis Asia.

Under the Earn program, Gemini's customers "invested" their cryptocurrency assets into Earn, Gemini acted as the "custodian" for those assets, and Genesis, as borrower, used those assets to fund its own cryptocurrency lending endeavors. Gemini's clients who elected to join the Earn program as "lenders" had to enter into a Master Digital Asset Loan Agreement (the Earn Agreement). The Earn Agreement set forth the terms regarding the Earn program, including terms for transferring cryptocurrency assets and fee payments. Earn investors' assets were pooled together on Gemini's platform, and Genesis would transfer those assets to its external accounts and wallets (*see* Doc 17, paras 43-49). "When Earn investors withdrew their assets, Genesis Capital had five days from the date of the withdrawal request to return the investor's assets, along with the yield promised to the investor" (*id.,* para 50). Genesis agreed to pay Gemini's investor customers "a financing fee on each Loan (the 'Loan Fee')," as set forth in the Earn Agreement (*see* Doc 33, section III [a] [Earn Agreement]). In addition, Gemini received agent fees for its Earn services. The agent fees were deducted from the Earn investors' assets and yield (Amended Complaint, Doc 17, paras 50, 52-55).

OAG asserts

"As a large institutional lender in the cryptocurrency industry, Genesis Capital negotiated more favorable loan terms and interest rates with borrowers than Earn investors could negotiate on their own. Genesis Capital paid yield to the Earn investors from the interest it earned on its loans to third parties. Thus, the Earn investors' fortunes were tied to the effort and expertise of Genesis Capital, and the investors shared in the profits made by Genesis Capital.
. . . .
The yield paid to Earn investors fluctuated. On a monthly basis, Genesis Capital determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to pay for each type of asset. . . .
. . . .

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

Page 3 of 21

[* 3]

3 of 21

Case 4:25-cv-00001-PJC     Document 44-6     Filed 05/27/25     Page 153 of 170

These rates frequently changed. For example, an Earn investor who invested one bitcoin at the start of Earn could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022. . . .
Gemini and Genesis Capital controlled the interest rates and cautioned their investors: 'rates may increase or decrease in the future' "

(*id.*, paras 53-55).

### The Alleged Genesis/DCG Scheme

OAG asserts that Genesis "lent cryptocurrency and fiat currency to institutions and high-net-worth clients. Genesis Capital funded these loans by receiving financing from third parties, including the Earn investors" (Amended compl., para 39). Another DCG subsidiary, Genesis Asia, "lent assets to Singapore-based clients, such as cryptocurrency hedge fund Three Arrows, on behalf of Genesis" (*id.*, para 41). Genesis "provided virtually all of Genesis Asia Pacific's lending capital" (*id.*).

In June 2022, nonparty Three Arrows "defaulted on billions of dollars in loans" that Genesis Asia issued to it (*id.*, para 8). According to plaintiff, "[t]he resulting losses created . . . a 'structural hole' at Genesis Capital that impaired [Genesis Capital's] ability to repay its open-term liabilities—including to Earn investors" (*id.*). In short, OAG contends that DCG, Genesis, DCG's CEO (Silbert), and Genesis' CEO (Moro) conspired to misrepresent Genesis' financial condition "to conceal this structural hole" (*id.*, para 9). For example,

"the Genesis Entities, DCG, Silbert, and Moro engaged in concerted communications with the public and with counterparties to instill false confidence in Genesis Capital's financial health. For example, on June 15 and June 17, Genesis Capital, Silbert, Moro, and/or DCG published tweets claiming the Genesis Entities' balance sheet was 'strong,' that Genesis Capital was functioning 'normally,' and that it had 'shed the risk and moved on.' In reality, Three Arrows' default on June 13, 2022, created an equity deficiency at the Genesis Entities, and Silbert had ordered Genesis Capital to limit its extension of new loans"

(*id.*).

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL**
**Motion No.  002 003 005**                                                    **Page 4 of 21**

4 of 21

[* 4]

In addition, on June 30, 2022, "Moro and Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis Capital $1.1 billion in a decade at only a 1% per annum interest rate . . . to purportedly backstop losses from the Three Arrows loans" (*id.*, para 10). Then, in order to solicit additional assets through the Earn program, "the Genesis Entities, DCG, Moro, and Silbert falsely assured counterparties and the public that Genesis Capital was 'well-capitalized' and that DCG 'absorbed the losses' from the Genesis Entities" (*id.*, para 11 [also alleging that Moro "tweeted that DCG had 'assumed certain liabilities of Genesis' associated with Three Arrows, leaving Genesis Capital with 'adequate capital' to continue 'business as usual' "]; *see also id.*, para 14 [asserting that Genesis sent a false private balance sheet to Gemini that included the promissory note "as an asset that could be reduced to cash within a year"]). "Meanwhile, from July 2022 to November 2022, DCG further widened Genesis Capital's structural hole" by forcing Genesis "to extend the maturity date for hundreds of millions of dollars' worth of loans to DCG" (*id.*, para 14).

Finally, on November 16, 2022, Genesis "announced that it faced a liquidity crunch and would not return cryptocurrencies invested under Earn or obtained directly from other investors, leaving investors unable to redeem more than $3 billion worth of assets" (*id.*, para 2; *see id.*, para 260). That is, Genesis suspended withdrawals on that date, while "it owed more than $1 billion in cryptocurrencies and dollar-denominated assets to more than 232,000 Earn investors" (*id.*, para 262). Genesis also "owed dozens of Direct Investors more than $2 billion in cryptocurrencies, U.S. dollars, and dollar-denominated assets as of November 16, 2022" (*id.*, para 263). Genesis then filed for bankruptcy in January 2023.

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL Motion No.  002 003 005**      **Page 5 of 21**

[* 5]                                    5 of 21

Case 4:25-cv-00001-PJC     Document 44-6     Filed 05/27/25     Page 155 of 170

## The Causes of Action Against the Remaining Genesis and DCG Defendants

As noted above, OAG settled its claims against Gemini and the Genesis entities (*see* Docs 77, 83 [settlement stipulations]). Thus, this decision addresses only OAG's second, fifth, seventh, eighth, and ninth causes of action against Moro, Silbert, and DCG (together, the defendants). OAG's first, third, fourth, sixth, and tenth causes of action were only against Gemini and/or the Genesis entities.

OAG asserts the following Martin Act [GBL Article 23-A] and Executive Law § 63 (12) claims against the three remaining defendants:

1. OAG's second cause of action [Martin Act] for engaging in fraudulent practices under GBL § 352;

2. OAG's fifth cause of action [Executive Law] for engaging in repeated or persistent fraudulent acts under the Executive Law;

3. OAG's seventh cause of action [Executive Law] for engaging in fraudulent or illegal acts [specifically, illegal acts in violation of the Martin Act/ GBL §§ 352, 352-c, and 353];

4. OAG's eighth cause of action [Executive Law] for engaging in illegal acts [specifically, illegal acts in violation of New York Penal Law § 190.65 (1) (b), Scheme to Defraud in the First Degree]; and

5. OAG's ninth cause of action [Executive Law] for engaging in illegal acts [specifically, illegal acts in violation of New York Penal Law § 105.05 (1), Conspiracy in the Fifth Degree].

Defendants now move to dismiss the amended complaint. Moro, Silbert, and DCG all seek dismissal on the basis that the amended complaint fails to state a cause of action against them. Sibert also moves to dismiss based on documentary evidence. OAG opposes the motions.

## DISCUSSION

"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction" (*Leon v Martinez*, 84 NY2d 83, 87 [1994]). The court accepts the facts as alleged in the complaint as true and accords the non-moving party the benefit of every favorable

**452784/2023  THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL Motion No.  002 003 005**

**Page 6 of 21**

6 of 21

[* 6]

inference (*id.*).  However, the court need not accept conclusory factual or legal allegations (*e.g.* *Wilson v Tully*, 243 AD2d 229, 234 [1st Dept 1998]).

To prevail on a CPLR 3211 (a) (1) motion, the movant must show "that the relied upon documentary evidence 'resolves all factual issues as a matter of law, and conclusively disposes of the plaintiff's claim' " (*Fortis Fin. Servs. v Filmat Futures USA*, 290 AD2d 383, 383 [1st Dept 2002] [citation omitted]).  Movant must demonstrate that "the documentary evidence utterly refutes [the] plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (*Art and Fashion Group Corp. v Cyclops Prod., Inc.*, 120 AD3d 436, 438 [1st Dept 2014] [citation omitted]).

1.  <u>OAG's Martin Act Claim [second cause of action]</u>

The Martin Act (General Business Law Article 23–A) prohibits certain deceitful and fraudulent practices in the distribution, sale, exchange, and purchase of securities, including:

> "(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;
>
> where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section [352] of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted"

(GBL § 352–c [1] [a] – [c]).

    *a.  Plaintiff adequately alleges that Earn is a security under New York law*

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY    Page 7 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

[* 7]                                                   7 of 21

Defendants assert that the Martin Act claims must be dismissed because the Earn program is not a security. Specifically, they contend that "the Earn loans" are not "investment contracts" (*e.g.* Doc 36 [DCG mem supp] at 20-21). OAG responds that Earn was a security and the Earn investors exchanged commodities.

Under GBL § 352, "commodities" are "any commodity dealt in on any exchange within the United States of America or the delivery of which is contemplated by transfer of negotiable documents of title," and "any foreign currency, and any other good, article, or material" (GBL §§ 352 [1], 359-e [14]). Thus, courts "have acknowledged that cryptocurrencies are a type of commodity under the definitions set forth the Martin Act and the Commodities Exchange Act" (*People by James v Mashinsky*, 79 Misc 3d 1237(A), *9 [Sup Ct, NY County 2023]).

The Martin Act defines "securities" as "stocks, bonds, notes, evidences of interest or indebtedness or other securities, including oil and mineral deeds or leases and any interest therein" (GBL § 352). Typically, New York State courts have applied the securities law tests set forth in *S.E.C. v W.J. Howey Co.* (328 US 293 [1946]) (*Howey*) and *In re Waldstein* (160 Misc 763 [Sup Ct 1936]) (*Waldstein*) to determine whether an instrument or transaction qualifies as an investment in a security (*see e.g. All Seasons Resorts, Inc. v Abrams*, 68 NY2d 81, 92 [1986]; *but see Mashinsky*, 79 Misc 3d 1237(A) at *7 n7 [noting it is unclear whether the *Waldstein* approach is still accepted]).

In *Sec. and Exch. Commn. v Genesis Glob. Capital, LLC* (2024 WL 1116877, at *1 [SDNY Mar. 13, 2024]), the federal district court recently addressed similar issues concerning the same Gemini Earn program. In that case, the SEC filed an action against Genesis and Gemini "alleging that they offered and sold unregistered securities through the Gemini Earn program" (*id.*). In resolving defendants' motions to dismiss, the federal court determined that

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

Page 8 of 21

the Gemini Earn program constitutes a security within the meaning of the Securities Act (*id.* at *5 - *9 [finding that Earn is a security under the *Howey* and *Reves* tests]).  While that decision is not controlling, the court finds it persuasive.

Here, defendants contend that OAG's allegations do not establish that the Earn program constitutes a security under the Martin Act.  The court disagrees.  At this pre-answer stage, OAG's allegations are sufficient to state a Martin Act claim under both the *Howey* test and the *Waldstein* test.  The *Waldstein* court "held long ago that 'any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term' " (*People v Van Zandt*, 43 Misc 3d 563, 573 [Sup Ct 2014]).  The *Howey* test asks, "looking at the economic realities, the transaction 'involve[d] an investment of money in a common enterprise with profits to come solely from the efforts of others (328 U.S., at p 301)' " (*All Seasons Resorts, Inc. v Abrams*, 68 NY2d 81, 92 [1986], quoting *Howey, supra*; *see also SEC v Genesis Glob. Capital, LLC*, 2024 WL 1116877, at *5 ["This definition of investment contract 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" (citations omitted)]).

OAG's allegations are sufficient because, "looking at the economic realities," at this pre-answer stage, the transactions involved investment contracts.  This is because the transactions involved Earn customers' investment of cryptocurrency commodities in a "common enterprise" [Genesis Capital's third-party lending operations].  In addition, the court can plausibly infer that the Earn investors' profits derived, at least in part, from Genesis' third-party lending business.  OAG alleges that Genesis would set the interest rate that the Earn customers received based on the performance of Genesis' third-party loaning operations.

OAG credibly alleges that: "[t]o invest in Earn, investors first had to buy or hold cryptocurrency on Gemini's [] platform"; Gemini issues a list of eligible cryptocurrencies for Earn on its webpage; Genesis was the "sole 'approved borrower' [permitted to] receive investors' assets under Earn"; each Earn investor had to enter into a "Master Digital Asset Loan Agreement" (Earn Agreement) with Gemini and Genesis to participate in Earn; the agreement "set forth terms concerning the transfer and return of cryptocurrencies and the payment of fees"; Gemini pooled Earn investors' assets together and transferred them to Genesis; and Genesis "in turn transferred these assets" to their own external accounts "where the assets were pooled and commingled" for Genesis' use "in its lending business" (*id.*, paras 44-49). Upon withdrawal, Genesis was supposed to return the invested assets "along with the yield promised to the investor," less Gemini's "agent fee, which was deducted from the Earn investors' assets and yield" (*id.*, para 50).

OAG explains:

> "As a large institutional lender in the cryptocurrency industry, Genesis Capital negotiated more favorable loan terms and interest rates with borrowers than Earn investors could negotiate on their own. Genesis Capital paid yield to the Earn investors from the interest it earned on its loans to third parties. Thus, the Earn investors' fortunes were tied to the effort and expertise of Genesis Capital, and the investors shared in the profits made by Genesis Capital"

(*id.*, para 51).

The yield rate fluctuated monthly as "Genesis Capital determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to pay for each type of [cryptocurrency] asset" (*id.*, para 53; *see id.* para 55 ["Gemini and Genesis Capital controlled the interest rates and cautioned their investors: 'rates may increase or decrease in the future.' "]). Gemini's Earn webpage "referred to Earn as a 'yield-generating cryptocurrency investment' " and "claimed that '[u]nlike other opportunities to earn interest on your cryptocurrency, [with

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY        Page 10 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

[* 10]                                    10 of 21

Earn] you can redeem your cryptocurrency at any time, with no penalties, and receive it at its current market value—plus the interest you've earned!' " (*id.*, para 52).

Thus, OAG adequately alleges here that Earn customers invested cryptocurrency assets in a common enterprise because "the returns earned by each investor were dependent on how Genesis pooled and deployed the crypto assets" (*SEC v Genesis Glob. Capital, LLC*, 2024 WL 1116877, at *7 [noting that "the complaint need only allege that 'the fortunes of each investor depend upon the profitability of the enterprise as a whole' " (citation omitted)]; *see also People v First Meridian Planning Corp.*, 201 AD2d 145, 153 [3d Dept 1994], *affd* 86 NY2d 608 [1995] [applying the "broad" vertical commonality approach as it "consistent with the liberal interpretation to be given to the Martin Act to give effect to its remedial purpose" and that approach "is an interpretation that New York courts have given the *Howey* test"]; *Mashinsky*, 79 Misc 3d 1237(A) [Sup Ct, NY County 2023] [relying on "broad vertical commonality" test to satisfy common enterprise prong of *Howey* test]).  This satisfies the common enterprise prong of the *Howey* test for a Martin Act claim, at least at this pre-answer stage.

In addition, OAG sufficiently alleges that Earn investors' "expectation of profits was dependent on Genesis' efforts" as "Genesis had 'complete discretion' as to how deploy the crypto assets once it took possession of them" (*SEC v Genesis Glob. Capital, LLC*, 2024 WL 1116877, at *9; *see also SEC v Infinity Grp. Co.*, 212 F3d 180, 189 [3d Cir 2000] ["(T)he definition of security does not turn on whether the investor receives a variable or fixed rate of return."]; *see generally SEC v Edwards*, 540 US 389, 397 [2004] ["[(A)n investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' "]).  This is sufficient to satisfy the expectation of profits prong of the *Howey* test at this juncture, particularly because OAG alleges that investors' yields were generated by Genesis' deployment

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

Page 11 of 21

[* 11]

11 of 21

Case 4:25-cv-00001-PJC     Document 44-6     Filed 05/27/25     Page 161 of 170

of the invested assets, Genesis and Gemini advertised Earn as a "yield-generating cryptocurrency investment," and Gemini touted Genesis as "a partner due to their experience in managing a large loan portfolio."

Next, the court rejects defendants' argument that each Earn agreement constituted a loan, rather than an investment contract, at this time. It is not dispositive that the investors, Genesis, and Gemini agreed that the Earn investments "are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws" (Doc 33, section XXV).

Finally, the federal district court's ruling in *Sec. and Exch. Commn. v Binance Holdings Ltd.* (738 F Supp 3d 20, 62 [DDC 2024]) (*Binance*) does not require a different result. In *Binance*, the district court found that one of the defendant's programs, called "Simple Earn," was not an investment contract. With respect to Simple Earn, the court found that

> "the allegations concerning Simple Earn do not describe a scheme or transaction in which investors were urged to put their money in Binance's hands so that they could share in the return that Binance would generate through its managerial or entrepreneurial efforts. The holders of crypto assets simply agreed to loan them to the company for a specified period of time at a specified rate of interest, and the complaint lacks any allegation that they were led to believe that Binance's efforts would generate the return or make the assets more valuable at the end of the day. Binance could pool the assets or not, and it could deploy them for any purpose, without any connection between the use of the funds and the rewards paid to "investors." Moreover, the interest rate paid would be set at Binance's discretion, at a rate that would take market conditions and competitors' offerings into consideration, and the company explicitly disavowed any relationship between the interest rate to be paid and the company's profitability"

(*id.* at 62).

Unlike Binance's "Simple Earn" program, the Gemini Earn agreements specifically state that "[Genesis] intends to use any Loaned Assets under this Agreement in its Digital Asset lending business," and the defendants advertised the Gemini Earn program as a "yield-generating

Case 4:25-cv-00001-PJC   Document 44-6   Filed 05/27/25   Page 162 of 170

cryptocurrency investment." Thus, the allegations create a plausible inference that the investors'

returns were dependent, to some degree, on the success of Genesis' overall lending operation.

> b.   *OAG's Martin Act claim does not otherwise fail to state a claim*

Under GBL § 353, OAG is authorized to file Martin Act claims against "any person" or

entity "concerned in or in any way participating in . . . fraudulent practices." "[T]he Martin Act

expands upon, rather than codifies, the common law of fraud" (*People by Schneiderman v Credit*

*Suisse Sec. (USA) LLC*, 31 NY3d 622, 632 [2018]). The "broad definition of 'fraudulent

practices[]' . . . encompasses 'wrongs' not cognizable under the common law and dispenses,

among other things, with any requirement that the Attorney General prove scienter or justifiable

reliance on the part of investors" (*id.*; *see also State of New York v Sonifer Realty Corp.*, 212

AD2d 366, 367 [1st Dept 1995]). The Martin Act "is remedial in nature and should be liberally

construed" (*People ex rel. Cuomo v Merkin*, 26 Misc 3d 1237(A) [Sup Ct, New York County

2010], citing *People v Lexington Sixty-First Assocs.*, 38 NY2d 588, 595 [1976]).

"Despite the Martin Act's exceedingly broad scope and its limited elements," CPLR 3016

(b)'s heightened pleading requirements apply to Martin Act claims, and "materiality is 'an

essential element' of a Martin Act claim" (*People ex rel. Schneiderman v Barclays Capital Inc.*,

47 Misc 3d 862, 869 [Sup Ct, NY County 2015] [citations omitted]). That is, "representations

that are immaterial to an investment decision are not actionable," and "the test for materiality is

whether defendants' representations, taken together and in context, would have [misled] a

reasonable investor about the nature of the investment" (*id.* [internal citations and quotation

marks omitted]). "Officers and directors are liable for a corporation's fraud where they either

personally participate in the fraud or have actual notice of its existence" (*People ex rel. Cuomo v*

*Greenberg*, 95 AD3d 474, 483 [1st Dept 2012], *affd* 21 NY3d 439 [2013]).

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL Motion No.   002 003 005**

**Page 13 of 21**

[* 13]

13 of 21

Here, OAG adequately alleges its Martin Act claim against Silbert, Moro, and DCG. OAG asserts that Genesis' second-largest borrower, Three Arrows, defaulted on billions of dollars of loans from Genesis on 6/13/22 (Amended Complaint, paras 117-123). Three Arrows' collateral was insufficient to cover all of the losses, and Genesis was left with about $1 billion in unsecured exposure, creating an equity hole on Genesis' balance sheet (*id.*, paras 145-146). OAG asserts that DCG, Silbert [DCG's CEO], and Moro [Genesis' CEO] each participated in, and had knowledge of, a concerted effort to conceal Genesis' financial condition following the Three Arrows default.

Specifically, OAG alleges Silbert instructed Moro to lead Genesis' response to the default "with support and guidance from DCG" (Amended complaint, para 126). Moro agreed that Genesis "will manage through this with help from [Silbert] and DCG" (Doc 40 [ex 40 to Silber aff in support of MS 03]). Following the default, DCG allegedly helped Genesis create an "overall plan" to cover up Genesis' true financial condition, including by drafting or reviewing misleading internal and external "talking points." OAG's allegations demonstrate that DCG and Genesis, and their respective CEOs, recognized internally that Genesis' financial condition was quickly deteriorating and even worried that Genesis would face a bank run. Thus, Silbert directed Genesis to restrict its normal lending operations to "aggressively shrink[] the loan book" (*id.*, para 130). That is, Silbert told Genesis to stop lending to new borrowers to preserve Genesis' fragile liquidity (*see id.*; *see also id.* paras 126, 147; *cf. also* Doc 42 [email noting Genesis' liquidity issues], Doc 44).

Externally, defendants painted a rosier picture of Genesis' financial condition. On 6/15/22, Genesis' Twitter account stated "[d]espite continued heightened market volatility the Genesis balance sheet is strong," and its "business is operating normally" (amended complaint, ¶

452784/2023  THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 14 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

[* 14]                                  14 of 21

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 164 of 170

132).  Both DCG and Silbert "re-tweeted" that message.  The defendants internally discussed the

tweet and its impact on the public.  In an internal chat including Genesis and DCG officers,

Genesis' Head of Trading reported that "multiple clients have stated that our tweet helped them

get comfortable and keep their loans to us" (*see* Doc 69 [Microsoft Teams chat log between

Genesis and DCG staff from 6/15/22]).

On 6/17/22, Moro issued a public tweet from his personal Twitter account that DCG

allegedly help to draft:

> "Genesis can confirm that we carefully and thoughtfully mitigated our losses with
> [Three Arrows].  **No client funds are impacted.**  We sold and/or hedged all of
> the liquid collateral on hand to minimize any downside. We will actively pursue
> recovery on any potential residual loss through all means available, however our
> potential loss is finite and can be netted against our own balance sheet as an
> organization. **We have shed the risk and moved on**"

(amended complaint, paras 136, 140-141).

Genesis was still facing negative equity in advance of its 6/30/22 deadline to provide a

private balance sheet to select counterparties (including Gemini).  On 6/28/22, Moro emailed

Silbert and suggested "injecting certain assets to 'plug the equity hole' " "**for liquidity**

**purposes, it could just be for balance sheet support**" to coax "additional unsecured funding"

(amended complaint, paras 152-153).  Silbert responded that DCG hoped and intended to help

Genesis "address the equity hole" and "[t]o that end, the Genesis team should be working 24/7

with DCG . . . to figure out all possible ways to do so" (*id.*, para 155).  DCG and Genesis then

entered into a $1.1 billion note whereby DCG agreed to pay Genesis that sum, with 1% interest,

in 10 years.  The note would "replace" Genesis' lost receivables from Genesis Asia that the

Three Arrows default wiped out (*id.* para 156).  Genesis "categorized this $1.1 billion as an asset

on its balance sheet" (*id.*).

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY**                    **Page 15 of 21**
**GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL**
**Motion No.  002 003 005**

[* 15]                                          15 of 21

On 7/6/22, Moro tweeted that "DCG has assumed certain liabilities of Genesis related to [Three Arrows] to ensure [Genesis has] the capital to operate and scale . . . for the long-term" (*id.*, para 160). These tweets were allegedly drafted together with DCG, and Genesis told its sales representatives to share the tweets with "any clients . . . that have either halted doing business with us or slowed down materially citing concerns over our exposure to [Three Arrows]" (*id.*, para 162). From July – November 2022, Genesis deployed "talking points" (that it shared with DCG for "review and approval"). These talking points mischaracterized the Note, and misrepresented that DCG "absorbed" the Three Arrows losses and that Genesis was "well capitalized" (*id.*, paras 167-168). Genesis and DCG allegedly communicated these talking points to investors, as well as counterparties such as Gemini.

Ultimately, Genesis was forced to suspend withdrawals in November 2022. On 11/16/22, Genesis finally admitted "[t]he default of [Three Arrows] negatively impacted [our] liquidity and duration profiles" (*id.*, para 261). In an emergency loan application on 11/12/22, Genesis and DCG revealed that the "liquidity crunch" was caused by three "illiquid assets on its balance sheet following" the Three Arrows default: the $1.1 billion Note, certain collateral [shares in Grayscale Bitcoin Trust] that that Silbert instructed Genesis not to sell, and Genesis' uncollateralized loans to DCG (*id., ¶ 257*).

These facts, and other allegations in the amended complaint, are sufficient to state a Martin Act claim against Moro, Silbert, and DCG. Further, there is at least an issue of fact as to whether defendants' misrepresentations and omissions would have materially misled investors, especially when considered together and in the context of the Three Arrows default (*People v Merkin*, 26 Misc 3d 1237(A) [Sup Ct 2010] ["Where the Martin Act claims are based on the defendant's omissions or failure to disclose, the omitted facts must be material—that is, that there

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY**                **Page 16 of 21**
**GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL**
**Motion No.  002 003 005**

[* 16]                                              16 of 21

is a substantial likelihood that the omitted fact would have assumed actual significance in the deliberations of a reasonable investor."], citing *State of New York v Rachmani Corp.*, 71 NY2d 718, 726 [1988] ["[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the *'total mix'* of information made available."]).  "Materiality is a mixed question of fact and law" that is often "inappropriate for resolution at the motion to dismiss stage" (*People v Merkin*, 26 Misc 3d 1237(A), *supra*, citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v JP Morgan Chase Co.*, 553 F3d 187, 197 [2d Cir 2009]; *In re NovaGold Resources Inc. Sec. Litig.*, 629 F Supp 2d 272, 292 [SDNY 2009]).

In addition, individual defendants Silbert and Moro, CEOs of DCG and Genesis, respectively, are not entitled to dismissal at this juncture.  "Officers and directors are liable for a corporation's fraud where they either personally participate in the fraud or have actual notice of its existence" (*People v Greenberg*, 95 AD3d 474, 483 [1st Dept 2012], *affd* 21 NY3d 439 [2013]).  OAG's allegations plainly establish that Silbert and Moro had knowledge of the purported fraud and participated in the overall scheme to cover up Genesis' liquidity hole to encourage investors to continue doing business with Genesis through the Earn program.

The court disagrees with defendants' argument that the pleading lacks specificity under CPLR 3016 (b).  While CPLR 3016 (b) applies to Martin Act fraud claims, "[t]his requires 'facts sufficient to permit a reasonable inference of the alleged conduct' " (*People v Mashinsky*, 79 Misc 3d 1237(A) [Sup Ct, NY County 2023] [citations omitted]).  CPLR 3016 (b) does not require "unassailable proof of fraud" (*Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 492 [2008]).  OAG alleges its Martin Act claim with adequate specificity by reciting the facts, detailing the alleged misrepresentations and omissions, and explaining the general audience for

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 17 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

[* 17]                                                    17 of 21

those misstatements and omissions. OAG also provides the surrounding context and explains how the statements and omissions were allegedly false or misleading.

The court also rejects defendants' arguments that the complaint must be dismissed under the Communications Decency Act (47 USC § 230) or the federal "maker doctrine." The CDA does not immunize Silbert and DCG because the allegations in the complaint against these defendants are not limited to only two "re-tweets." As discussed above, the "re-tweets" were part of the alleged overall scheme to cover up Genesis' negative liquidity following the Three Arrows default. Likewise, dismissal under the federal maker doctrine is not warranted at this pre-answer stage. "It is well established that liability for fraud may be premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute the fraud" (*Kuo Feng Corp. v Ma*, 248 AD2d 168, 168-169 [1st Dept 1998]).

For these reasons, the court denies defendants' motions to dismiss the second cause of action.

2. OAG's Executive Law Claims

Executive Law § 63 (12) "defines the fraudulent conduct that it prohibits, authorizes the Attorney General to commence an action or proceeding to foreclose that conduct, and specifies the relief, including equitable relief, that the Attorney General may seek" (*People v Trump Entrepreneur Initiative LLC*, 137 AD3d 409, 417 [1st Dept 2016]).

In the context of a § 63 (12) proceeding,

"[t]he word 'fraud' or 'fraudulent' . . . shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term 'persistent fraud' or 'illegality' . . . shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term 'repeated' as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person"

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY                    Page 18 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No. 002 003 005

[* 18]                                         18 of 21

(Exec. Law § 63 [12]).

Thus, fraud claims under § 63 (12) are broader than common law fraud and can be established without proof of scienter or reliance (*see People v Trump Entrepreneur Initiative LLC*, 137 AD3d 409, 417 [1st Dept 2016]; *People v Coventry First LLC,* 52 AD3d 345, 346 [1st Dept 2008]). "The test for fraud under Executive Law § 63 (12) is whether the targeted act has the capacity or tendency to deceive or creates an atmosphere conducive to fraud" (*People v Northern Leasing Sys., Inc.*, 193 AD3d 67, 68 [1st Dept 2021]).

Executive Law § 63 (12) claims have been applied to a wide array of respondents, including persons with knowledge of fraudulent schemes, individuals who perpetrated those schemes, and pass-through entities and knowing recipients of fraudulently obtained proceeds (*see People v Leasing Expenses Co. LLC*, 199 AD3d 521, 523 [1st Dept 2021]; *see also e.g. People v Northern Leasing Sys., Inc.*, 169 AD3d 527, 528 [1st Dept 2019]; *People v One Source Networking, Inc.*, 125 AD3d 1354, 1357 [4th Dept 2015] ["Because Executive Law § 63 (12) allows the Attorney General to seek relief against 'any person,' there is no impediment to imposing personal liability against a corporate officer if it is established that he [or she] personally participated in or had actual knowledge of the fraud or illegality."] [quotations omitted]; *People v Apple Health and Sports Clubs, Ltd., Inc.*, 80 NY2d 803, 808 [1992] [finding that "interlocking corporations" that "acted in concert" can be liable for fraudulent and illegal activities]).

Executive Law § 63 (12) was "meant to protect not only the average consumer, but also the ignorant, the unthinking and the credulous" (*State v Northern Leasing Sys. Inc.*, 193 AD3d at 75). Section 63 (12) actions have also been maintained on behalf of the people of New York (*e.g. People v Sprint Nextel Corp.*, 26 NY3d 98, 109 [2015]), and "to recover overpayments of

**452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY                                        Page 19 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005**

[* 19]                                        19 of 21

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 169 of 170

reimbursements" paid by New York's Medicaid program (*e.g. People v Pharmacia Corp.*, 39 AD3d 1117, 1118 [3d Dept 2007]).

    *a.   OAG's fifth and seventh Executive Law causes of action for repeated or persistent fraud and illegality under the Martin Act*

Defendants move to dismiss the fifth and seventh Executive Law causes of action on the basis that they fail to state a claim. However, the court sustained the Martin Act claim above and OAG's Executive Law causes of action are subject to less restrictive pleading requirements. Thus, the court denies defendants' motions to dismiss OAG's fifth and seventh causes of actions for the reasons discussed above in connection with OAG's Martin Act claim [second cause of action]. That is, these causes of action are sufficiently pleaded as to each defendant.

    *b.   OAG's eighth and ninth Executive Law causes of action for illegality in violation of the Penal Law*

The court grants defendants' motions to dismiss the eighth and ninth causes of action. In these claims, OAG asserts Executive Law 63 § (12) claims for alleged illegality under the New York Penal Law. The eighth cause of action seeks to hold defendants liable for engaging in illegal acts in violation of New York Penal Law § 190.65 (1) (b), Scheme to Defraud in the First Degree. The ninth cause of action seeks to hold defendants liable for engaging in illegal acts in violation of New York Penal Law § 105.05 (1), Conspiracy in the Fifth Degree.

Pursuant to NY Penal Law § 190.65 (1) (b), a person commits a scheme to defraud in the first degree when they engage "in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons." Pursuant to NY Penal Law § 105.05 (1), a person commits conspiracy in the fifth degree when, with intent that conduct

452784/2023  THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY        Page 20 of 21
GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No.  002 003 005

[* 20]                         20 of 21

Case 4:25-cv-00001-PJC    Document 44-6    Filed 05/27/25    Page 170 of 170

constituting a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.

These claims are duplicative as they are based on the same acts and omissions as the less restrictive Martin Act and Executive Law claims that the court sustained above.

## CONCLUSION

The court has considered the defendants' remaining contentions and finds them unavailing.

Accordingly, it is

ORDERED that Motion Seq. Nos. 02, 03, and 05 are granted only to the extent that the eighth and ninth causes of action are dismissed from the amended complaint; and it is further

ORDERED that the motions to dismiss are otherwise denied; and it is further

ORDERED that defendants shall answer the amended complaint within 20 days from the date of this decision and order.

| | |
|---|---|
| **4/9/2025**<br>DATE | *mcc*<br>**MELISSA A. CRANE, J.S.C.** |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED  ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

452784/2023   THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. GEMINI TRUST COMPANY, LLC ET AL
Motion No. 002 003 005

Page 21 of 21

21 of 21

[* 21]