**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**


STEPHEN H. SOKOLOWSKI, and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.                                    Case No. _____

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,
**Defendants.**


**COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF TERMS ........................................................................................................ iii

PREFACE ......................................................................................................................... 1

NATURE OF THE ACTION .......................................................................................... 2

PARTIES .......................................................................................................................... 3

JURISDICTION AND VENUE ...................................................................................... 6

FACTUAL ALLEGATIONS ........................................................................................... 8

    I    Plaintiffs' Ownership and Intent ...................................................................... 8
    II   The Nominal LLC Structure .......................................................................... 11
    III  Creation of the CM LLC Genesis Account ................................................... 13
    IV  The CM LLC Operating Agreement .............................................................. 16
    V   Telegram Chat Group Between Genesis Executives, Employees, and CM LLC Pass-Through Individuals ................................................................................. 18
    VI  Misrepresentation of Consumer Lending Products ....................................... 21
    VII Defendants' Public Representations After the Three Arrows Capital Bankruptcy .......... 26
    VIII Reliance on the Fraudulent Balance Sheet .................................................. 28
    IX  Defendants' Knowledge and Control. ........................................................... 32
    X   DCG's Involvement in Genesis Operations. ................................................. 35
    XI  Damages to Plaintiffs and Mitigation Efforts .............................................. 44

CAUSES OF ACTION ................................................................................................... 46

    COUNT I:  Violation of the Connecticut Unfair Trade Practices Act (CUTPA) ................... 46
    COUNT II:  Fraud .............................................................................................. 48
    COUNT III:  Negligent Misrepresentation ....................................................... 49
    COUNT IV:   Civil Conspiracy ......................................................................... 49
    COUNT V:  Aiding and Abetting Fraud ........................................................... 50
    COUNT VI:  Unjust Enrichment ...................................................................... 50

DAMAGES ..................................................................................................................... 51

PRAYER FOR RELIEF ................................................................................................. 55

# TABLE OF AUTHORITIES

**Cases**

*Calder v. Jones*,
    465 U.S. 783 (1984) .......................................................................................... 7

*Genesis Global Holdco LLC et al. v. Digital Currency Group, Inc. et al.*,
    C.A. No. 2025-0532 (Del. Ch. May 19, 2025) ................................................ 47

*In re Genesis Global Capital, LLC*,
    No. 23-10063-SHL (Bankr. S.D.N.Y.) .................................................. 4, 32, 44

*Kim v. Magnotta*,
    249 Conn. 94 (1999) ........................................................................................ 51

*Moeller-Bertram v. Gemini Tr. Co., LLC*,
    No. 23-cv-2027, slip op. (S.D.N.Y. Apr. 29, 2024).......................................... 8

*People v. Gemini Trust Co., LLC et al.*,
    No. 452784/2023 (Sup. Ct. N.Y. Cnty.) .................................................. passim

*Sokolowski v. Digital Currency Group, Inc.*,
    No. 4:25-cv-00001-PJC (M.D. Pa.) ................................................................. 1

**Statutes**

28 U.S.C. § 1332(a) ....................................................................................................... 6

28 U.S.C. § 1391(b)(2) ................................................................................................... 7

Conn. Gen. Stat. § 42-110a et seq. .......................................................................... iii, 46

Conn. Gen. Stat. § 42-110g(d) ...................................................................................... 55

Fed. R. Civ. P. 17(a)(3) ................................................................................................... 1

Fed. R. Civ. P. 41(a) ....................................................................................................... 2

## TABLE OF TERMS

CM LLC.................................................................................Cryptocurrency Management LLC

CUTPA...............................................................Connecticut Unfair Trade Practices Act,
Conn. Gen. Stat. § 42-110a et seq.

DCG ..................................................................................... Digital Currency Group, Inc.

Gemini........................................................................................ Gemini Trust Co., LLC

Genesis ................................................................................Genesis Global Capital LLC

Genesis Bankruptcy Action......................................................*In re Genesis Global Capital, LLC*,
No. 23-10063-SHL (Bankr. S.D.N.Y.)

Islim .................................................................................... Ahmed Derar Islim

MDPA ................................................................................ Middle District of Pennsylvania

MDPA Action ............................................................ *Sokolowski v. Digital Currency Group, Inc.*,
No. 4:25-cv-00001-PJC (M.D. Pa.)

Moro......................................................................... Soichiro "Michael" Moro

NYAG Action.................................................................*People v. Gemini Trust Co., LLC et al.*,
No. 452784/2023 (Sup. Ct. N.Y. Cnty.

Silbert.......................................................................................... Barry E. Silbert

Tiedy ............................................................................................ Griffin Tiedy

**PREFACE**

1.      Plaintiffs Stephen H. Sokolowski and Christopher H. Sokolowski (collectively,
"Plaintiffs"), by and through their own capacity as pro se litigants, hereby file this Complaint
against Defendants Digital Currency Group, Inc., Barry E. Silbert, and Soichiro "Michael" Moro
(collectively, "Defendants").

2.      Should any court of competent jurisdiction determine that one or more claims
pleaded herein belong, in whole or in part, to Cryptocurrency Management LLC (hereinafter
"CM LLC") rather than to Plaintiffs individually, in the alternative, Plaintiffs will promptly take
all necessary and appropriate steps under Fed. R. Civ. P. 17(a)(3) to ensure the action may
proceed in the name of the real party in interest. Such steps may include, if necessary and
appropriate, seeking to join or substitute CM LLC—at which point CM LLC would appear as
required by law—or taking other permissible actions to ensure the claims may be prosecuted by
the real party in interest.

**REQUEST FOR STAY**

3.      The Plaintiffs, Defendants, and facts surrounding the instant case are identical to
those involved in a case that is currently proceeding in the Middle District of Pennsylvania
(henceforth "MDPA"), *Sokolowski, et al. v. Digital Currency Group, Inc., et. al.*, No.
4:25-cv-00001-PJC (M.D. Pa.) (henceforth the "MDPA Action"). In that case, all Defendants
have moved to dismiss, arguing—most importantly—a lack of personal jurisdiction.

4.      Plaintiffs have waited as long as possible, but the statute of repose in Connecticut
is about to expire. Should the Pennsylvania court rule that a Pennsylvania-specific technical
defense such as a lack of personal jurisdiction precludes that court from hearing the case,

Plaintiffs would be left with no jurisdiction to hear the merits of their claims, permanently losing their life savings.

5.      Plaintiffs believe the MDPA court has the ability to adjudicate the matter on its merits. However, because Defendants have raised jurisdictional and procedural objections there, Plaintiffs have filed the instant case as a protective measure to preserve their rights under Connecticut law and to ensure claims can proceed in the event the MDPA court declines to reach the merits. Plaintiffs do not desire to burden the Court or the Defendants. Therefore, Plaintiffs have concurrently filed a motion requesting that this Court immediately stay the instant case in favor of the "first-filed" Pennsylvania case. In the event the MDPA Action results in a final decision on the merits of Plaintiffs' claims, Plaintiffs will immediately file a Fed. R. Civ. P. 41(a) Notice of Voluntary Dismissal for the instant case.

6.      Plaintiffs allege as follows:

**NATURE OF THE ACTION**

7.      This action arises from Defendants' deceptive and fraudulent conduct that induced Plaintiffs, who sought a safe, consumer-oriented financial service, to entrust their personally owned cryptocurrency and US Dollars to Genesis Global Capital, LLC (hereinafter "Genesis"), a subsidiary of Digital Currency Group, Inc. Through misleading financial statements—specifically, a fraudulent balance sheet (Ex. A)—and assurances presented as stable interest-bearing loan arrangements, Defendants deceived Plaintiffs into maintaining and extending their loans to Genesis.

8.      Plaintiffs believed they were engaging in a transaction akin to a Certificate of Deposit or interest-bearing financial service for their household assets. They did not purchase

securities or equity; they simply lent their personally owned cryptocurrency and US Dollars to Genesis in exchange for interest, relying on Defendants' misrepresentations of Genesis's financial health and stability.

9.    Defendants' fraudulent conduct caused Plaintiffs substantial monetary loss and denied them the safe, consumer-level financial service they reasonably believed they were receiving.

**PARTIES**

10.    Plaintiff Stephen H. Sokolowski is an adult individual residing at 3178 Carnegie Drive, State College, PA 16803. He personally owned substantial amounts of cryptocurrency and US Dollars and treated these assets as personal savings. He engaged with Genesis's platform believing it offered a stable, interest-bearing arrangement suitable for personal, household-level financial management.

11.    Plaintiff Christopher H. Sokolowski is an adult individual residing at 3178 Carnegie Drive, State College, PA 16803. He also contributed personally owned cryptocurrency and US Dollars. Christopher relied on Defendants' representations and believed he was placing his assets into a reliable, consumer-friendly lending environment.

12.    Cryptocurrency Management LLC ("CM LLC") is a nominal Pennsylvania limited liability company formed solely to meet certain Genesis deposit thresholds. Although CM LLC was a signatory to a "Master Loan Agreement" (hereinafter "MLA") with Genesis, none of the named Plaintiffs (in their personal capacities) nor any of the named Defendants were parties to that agreement. As fully discussed below, CM LLC's minimal role was purely clerical:

it held no assets other than those beneficially owned by Plaintiffs, had no employees, and maintained no independent business operations.

13.     Genesis Global Capital, LLC ("Genesis") is the entity through which Plaintiffs engaged in lending activities. Genesis was a subsidiary of Digital Currency Group, Inc. On January 19, 2023, Genesis filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (*In re Genesis Global Capital, LLC*, No. 23-10063-SHL (Bankr. S.D.N.Y.); hereinafter the "Genesis Bankruptcy Action"). Genesis is not named as a defendant in the instant action.

14.     Defendant Digital Currency Group, Inc. (hereinafter "DCG") is a Delaware corporation with its principal place of business in Stamford, Connecticut. DCG owned and controlled Genesis and oversaw the financial strategies and disclosures that misled Plaintiffs.

15.     Defendant Barry E. Silbert (hereinafter "Silbert") is the Chief Executive Officer of DCG and a resident of New York. As CEO of DCG, Silbert was intimately involved in setting policy for how loans to DCG were classified. Silbert knew or should have known that reporting a $1.1 billion long-term, unsecured promissory note as a "current asset" would materially misrepresent Genesis's solvency. Silbert directly signed this fraudulent promissory note.

16.     As CEO of DCG, Silbert received substantial financial compensation, the continued receipt of which was directly dependent on DCG and its subsidiary Genesis remaining operational. His actions in signing the fraudulent promissory note and overseeing Genesis's misleading financial disclosures were motivated, in part, by the desire to prevent the imminent collapse of Genesis and subsequent veil-piercing liability for DCG thereby ensuring the continuation of his lucrative compensation package and maintaining the value of the DCG stock he owned.

17.     Defendant Soichiro "Michael" Moro (hereinafter "Moro") was the Chief Executive Officer of Genesis during the time the fraudulent promissory note was signed and served up until his resignation around August 24, 2022. Moro resides in New York. As CEO of Genesis during the relevant period, Moro supervised the preparation and circulation of Genesis's financial documents. Along with Silbert, Moro directly signed the fraudulent promissory note. Moro approved or knowingly permitted the dissemination of false and misleading balance sheets and failed to stop their dissemination before he resigned. At minimum, he acted with reckless disregard for the truth of the financial classifications that Genesis presented to consumers like Plaintiffs.

18.     As CEO of Genesis until his resignation around August 24, 2022, Moro received significant financial compensation—the continuation of which was directly tied to Genesis's solvency. His actions in signing the fraudulent promissory note and approving or knowingly permitting the dissemination of false and misleading balance sheets were undertaken, in part, to prevent Genesis's collapse during his tenure, thus ensuring the continued payment of his lucrative compensation package.

19.     Griffin Tiedy (hereinafter "Tiedy") was a Genesis employee who communicated the fraudulent balance sheet to Plaintiffs and who resided in Connecticut at the time. Although Plaintiffs currently do not name Tiedy as a defendant, they expressly reserve the right to seek leave of this Court to add him as a defendant if discovery reveals that he had actual knowledge of, or participated in, the fraudulent misclassification or other deceptive practices alleged herein. If evidence demonstrates that Tiedy was aware of internal directives—such as a warning from Genesis's own CFO not to misrepresent Genesis as "well-capitalized"—yet continued to convey

or endorse statements that misled Plaintiffs about Genesis's financial health, Plaintiffs will seek to hold him personally accountable for his role in the fraud.

20.     Ahmed Derar Islim (hereinafter "Islim") was the Chief Executive Officer of Genesis following Moro's resignation. He served as CEO during the time the fraudulent balance sheet was presented to Plaintiffs. Although Plaintiffs currently do not name Islim as a defendant, they expressly reserve the right to seek leave of this Court to add him as a defendant if discovery reveals that he had actual knowledge of, or participated in, the fraudulent misclassification or other deceptive practices alleged herein.

21.     Although Plaintiffs do not presently name as defendants other Genesis employees or agents who may have had knowledge of or participated in the misclassification of the $1.1 billion promissory note and other deceptive acts alleged herein, Plaintiffs expressly reserve the right to seek leave of this Court to add such individuals as defendants if and when discovery reveals their direct knowledge of, substantial assistance in, or personal participation in the fraudulent misrepresentations or other unlawful conduct described in the instant Complaint.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is diversity of citizenship between Plaintiffs (Pennsylvania citizens) and Defendants (New York citizens and a Connecticut corporation).

23.     DCG is subject to general jurisdiction.  The exercise of personal jurisdiction over Defendants Silbert and Moro is proper because they directly benefited financially from the deceptive acts. Their actions in furtherance of maintaining their lucrative employment— including the signing of the fraudulent promissory note and the dissemination of misleading

financial information—were integral to the scheme that harmed Plaintiffs. Silbert worked in

Connecticut. Upon information and belief, Moro also periodically worked in Connecticut while

he participated in the scheme. Both individuals directed communications into Connecticut while

participating in the scheme with DCG's employees. Defendants "expressly aimed" their

fraudulent conduct at this forum, thereby subjecting themselves to personal jurisdiction under the

standard recognized in *Calder v. Jones*, 465 U.S. 783 (1984).

24.     Plaintiffs maintain that the foregoing allegations establish a prima facie basis for

personal jurisdiction over Silbert and Moro. However, should the Court determine that further

factual development is required before ruling on jurisdiction, Plaintiffs request leave to conduct

limited discovery targeted at Defendants' internal communications (emails, chat logs), reports,

and meeting minutes concerning their knowledge of Genesis's Connecticut clientele, their

directives regarding financial reporting and client communications, and the intended scope and

purpose of the $1.1 billion promissory note's accounting treatment as evidence regarding these

matters resides exclusively within Defendants' control.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events and omissions giving rise to these claims occurred here.

26.     Further evidence of Defendants' fraudulent activity is available on the docket of

*The People of the State of New York v. Gemini Trust Co., LLC et al.*, Index No. 452784/2023

(Sup. Ct. N.Y. Cnty.) (hereinafter the "NYAG Action")*,* a case pending in the Supreme Court of

the State of New York, County of New York. The public documents and information in this case

include significant evidence relating to the defendants' deceptive practices, including the

misclassification of the $1.1 billion promissory note that has harmed Plaintiffs. The NYAG

Action also demonstrates that these defendants are already subject to discovery in the state of

New York and that no additional benefit would accrue to the defendants by requiring the current case to take place in that same state.

27.     DCG has successfully transferred a class action arising from similar facts from the Southern District of New York into this District, estopping any motion that Defendant might make to transfer the instant case to New York. See *Moeller-Bertram v. Gemini Tr. Co., LLC*, No. 23-cv-2027, slip op. (S.D.N.Y. Apr. 29, 2024)

28.     Connecticut has a strong interest in ensuring that victims of fraud that was orchestrated in Connecticut have convenient access to redress for fraudulent conduct. This Court is well-versed in applying Connecticut law, promoting judicial economy.

29.     Plaintiffs acknowledge that an arbitration and forum-selection provision exists in the MLA executed only between CM LLC and Genesis. However, Plaintiffs in their individual capacities never signed nor agreed to any arbitration or forum-selection clause with Defendants. Silbert, Moro, and DCG likewise are not signatories or third-party beneficiaries to that MLA, and the instant claims under do not arise from the performance or breach of that MLA but rather from fraudulent misrepresentations and omissions directed at Plaintiffs personally. Consequently, the arbitration and forum-selection clauses in that separate MLA do not bind or affect the parties to this litigation and cannot bar Plaintiffs' statutory consumer-protection claims in this Court.

**FACTUAL ALLEGATIONS**

**I       Plaintiffs' Ownership and Intent**

30.     Plaintiffs were individuals seeking a safe, stable rate of return for their assets. They believed Defendants were offering a hands-off, interest-based lending service suitable for personal and household asset management, not a high-risk, unregistered security or complex

investment scheme involving a web of intercompany loans. They had used and had evaluated competing lending firms in the cryptocurrency industry to earn interest on their assets.

31.    Plaintiffs were not professional traders, possessed no financial licenses, and did not trade crypto assets as speculative instruments. Instead, they treated their cryptocurrency holdings as a form of digital savings—akin to keeping money in a high-yield savings account. Plaintiff Stephen Sokolowski had regularly stated and believed that Bitcoin would eventually become a "world currency" and had intended never to sell any of his Bitcoins.

32.    Plaintiff Stephen Sokolowski had held his Bitcoin and Ethereum holdings continuously for nearly a decade prior to the Defendants' misrepresentations. For seven of those years, he never even transferred his 2013-purchased Bitcoins out of their original "Bitcoin Core" wallet. During this period, he weathered multiple market downturns and never engaged in trading or profit-taking from his Bitcoin investments.

33.    Plaintiffs also saved significant value in US Dollars earned from their employment. During this saving period, Plaintiffs lived a modest lifestyle typical of an average consumer, driving 2005 and 2006 model cars, and residing in an ordinary house in the suburbs of a small city sitting on less than ¼ acre of land. Stephen held a typical "9 to 5" software development job, during which he sometimes worked overtime, and from which he saved over 60% of his income and invested it for early retirement.

34.    Plaintiffs managed their cryptocurrency and US Dollar savings from their Pennsylvania home, made lending decisions there, and relied on the fraudulent balance sheet while physically located in Pennsylvania.

35.    The assets loaned to Genesis were Plaintiffs' personal savings, inherited from a deceased family member, put aside from two decades of work, and saved through years of

9

frugality. The Plaintiffs requested periodic withdrawals from Genesis to pay for personal expenditures, including trivial purchases like a set of wall decorations.

36.     Before the fraud, the Plaintiffs were in a position to achieve early retirement and specifically avoided spending their assets, which were loaned to Genesis, to have money available for retirement.

37.     Plaintiffs actively discussed with Genesis and others the need to leave a small amount of "open term" loans so that immediate expenses could be paid—similar to how money could be withdrawn from a bank account. Records specifically show that the Plaintiffs requested periodic withdrawals from Genesis to pay personal income taxes.

38.     Plaintiffs actively avoided—and Plaintiff Stephen Sokolowski publicly recommended the avoidance of—complex and risky financial products like "flash loans," "distributed exchanges," "NFTs," "ICOs," and "ERC-20 tokens." They retained nearly all their life savings in large, well-established assets like Bitcoin, Ethereum, US Dollars, and large-cap US stocks and used Genesis because Genesis represented itself as a simple, safe alternative for ordinary consumers to earn interest on cryptocurrency and US Dollar assets.

39.     At times, Plaintiffs entrusted over ninety percent (90%) of their total net worth to Genesis under the reasonable belief that they were placing their personal, household-level savings into a stable, interest-bearing financial service. This extreme concentration of their assets in what they believed to be a safe, consumer-oriented lending environment further underscores both their reliance on Defendants' assurances and the magnitude of the harm inflicted when those assurances proved to be deceptive.

40.     The large dollar value of Plaintiffs' cryptocurrency holdings resulted from long-term appreciation rather than from speculative trading, high-risk investments, or sophisticated

10

financial maneuvers. Plaintiffs maintained two distinct accounts for their household finances: a traditional stock account for standard retirement planning and a separate cryptocurrency holding. At the time of the fraudulent balance sheet's presentation, Plaintiffs relied on a financial advisor and delegated management of their stock portfolios to that advisor.

41.    Over time, the cryptocurrency—originally acquired as a personal savings measure—significantly appreciated in value, not due to any complex investment strategy, but simply because Plaintiffs held these assets passively for many years.

42.    The sheer magnitude of the loss does not alter the fundamental consumer nature of the transaction. Plaintiffs were not professional traders or hedge fund managers; they were everyday consumers who passively held cryptocurrency as a form of savings and who relied, to their detriment, on Defendants' misrepresentations that this lending arrangement was stable and trustworthy. In this way, the household character of the Plaintiffs and their intentions remained fundamentally the same even as the nominal value of their assets increased over time.

## II    The Nominal LLC Structure

43.    Plaintiffs each personally owned their cryptocurrency assets and their US Dollars at all times. They did not transfer title to any LLC or other entity; instead, they used a nominal LLC—CM LLC, a bare bones entity with no independent business purpose—at Defendants' suggestion to meet Genesis's minimum deposit thresholds. CM LLC thus was created only weeks before its use with Genesis. Plaintiffs' intention was to safely lend their personally owned assets and earn modest interest—akin to placing money in a high-yield savings account.

44.    Plaintiffs' assets–both cryptocurrency and US Dollars—were nominally funneled through CM LLC—solely for the purpose of meeting Genesis's minimum deposit requirement—

and then immediately loaned to Genesis. At all times, Plaintiffs remained the true beneficial owners of these assets.

45.     At the time of Defendants' fraud, CM LLC had no business activities or assets other than lending to Genesis. CM LLC had no office, and its registered address was the same as that of both Plaintiffs. CM LLC had no employees, no website, no E-Mail addresses, and no marketing, and its bland name ("Cryptocurrency Management") was selected specifically to describe its sole purpose. CM LLC sold no products or services and produced no revenue. Currently, CM LLC holds no assets or liabilities.

46.     CM LLC never adopted formal governance documents beyond the bare minimum required by state law to register; no formal resolutions, meetings, or minutes exist. CM LLC held no insurance, no permits, and no licenses typical of a functioning business entity.

47.     CM LLC never engaged in negotiations, business planning, or due diligence activities separate from the Plaintiffs' personal efforts. Loans passed through CM LLC were often discussed directly between CM LLC's lenders and Genesis. All decisions were personal decisions made by Plaintiffs and simply executed via the nominal LLC structure.

48.     Plaintiffs never intended to convey ownership or title of these assets to CM LLC, nor did CM LLC ever obtain beneficial ownership.

49.     In nearly all cases, Plaintiffs sent their own cryptocurrencies and withdrew cryptocurrencies directly to their personal wallets without CM LLC even taking possession of the coins.

50.     CM LLC's operating agreement contained a clause stating that its owner would never make any profit from CM LLC. CM LLC's tax filings–as an IRS "disregarded entity"– show that CM LLC never earned any profit throughout its lifetime.

51.     No reasonable third party interacting with Plaintiffs would have recognized CM LLC as a genuine, standalone business given its complete lack of separate existence, resources, and operational identity.

52.     Genesis was aware of and facilitated the use of this LLC structure specifically to allow Plaintiffs to circumvent Genesis's minimum deposit requirement. Genesis understood that, despite the LLC form, it was dealing with individual consumers making personal financial decisions.

## III     Creation of the CM LLC Genesis Account

53.     On or about April 13, 2021, Genesis facilitated the creation of an individual account for Plaintiff Stephen Sokolowski, with a Genesis employee instructing him to enter 'Individual' in the signup form's 'title' field (Ex. F, at 1-3). When Stephen Sokolowski inquired about also depositing funds from Plaintiff Christopher Sokolowski, non-party James Webster, and non-party PROHASHING LLC, Genesis employees informed him that they could not open individual accounts due to Genesis's minimum deposit requirements. Genesis employees then suggested and facilitated the creation of an LLC account, knowing that its purpose was to aggregate funds from these persons.

54.     During the creation of CM LLC's account, on or around May 7, 2021, Genesis requested and received the driver's licenses of Stephen Sokolowski, Christopher Sokolowski, and non-party James Webster, which contained their Pennsylvania addresses. Genesis also requested and received the operating agreement and other documents from non-party PROHASHING LLC.

55.     Upon information and belief, Genesis performed KYC/AML checks on all four persons listed in ¶ 54.

56.     Genesis understood at all times that it was working with these four persons directly and individually.

57.     Genesis requested and received the operating agreement for CM LLC (see "The CM LLC Operating Agreement", § IV).

58.     Genesis requested and received a "Balance sheet.pdf" document, which was to contain a listing of all assets held by CM LLC. Rather than a typical balance sheet, the *full text* of the document stated:

> The company currently has no assets because it is awaiting account approval from Genesis. After approval, the company's balance sheet will be the assets held by Genesis, as the company does not have any borrowers other than Genesis.

59.     As part of the onboarding process for CM LLC, Genesis required the completion of a Due Diligence Questionnaire (Ex. K, hereinafter "DDQ"). This DDQ, submitted by Plaintiff Stephen Sokolowski on behalf of CM LLC, listed CM LLC's address and primary location of operations as 3178 Carnegie Drive, State College, PA 16803-1154, the same Pennsylvania residential address as Plaintiffs Stephen and Christopher Sokolowski.

60.     Most significantly, the "Description" section of the DDQ submitted to Genesis explicitly stated: "The purpose of this organization is to collect funds and exceed Genesis's minimum loan amounts and to loan funds to Genesis Trading." (Ex. K, at 1). This statement provided direct, contemporaneous notice to Genesis that CM LLC was not an independent operating business, but rather a special purpose vehicle created solely to aggregate funds from individual lenders (including Plaintiffs) to meet Genesis's deposit thresholds.

61.     Page 2 of the DDQ identifies Plaintiff Stephen Sokolowski as a "Software Engineer," not a "financial advisor" or "investment manager," supporting the assertion that Genesis knew it was dealing with ordinary consumers.

62.     Page 3 of the DDQ states that the "Company will only loan to Genesis, just formed." The same page states "Funds to be sent direct to Genesis, no local storage." It also states that CM LLC is "Not engaged in trading."

63.     After CM LLC's account had been approved, Genesis returned Stephen Sokolowski's funds directly to him and then accepted a deposit of the same amount into the CM LLC account within one day. Stephen Sokolowski's individual account was then closed or made permanently inactive.

64.     A Telegram group chat (Ex. H) between Genesis employee Hanson Birringer and Plaintiff Stephen Sokolowski took place between April 2021 and December 2022, but most of the relevant discussion regarded the setup of the CM LLC account with Genesis in April 2021.

65.     On April 13, 2021, in this chat with Birringer, Birringer provides a refresher of minimum deposit amounts: "Min size is $500k notional so around 1850 LTC at current prices." (Ex. H, at 1)

66.     Another Birringer message on April 13, 2021 demonstrates that it was *Genesis*, not Plaintiffs, that suggested dealing with the Plaintiffs (and the other non-party CM LLC lenders) directly: "In the meantime I am going to create a broader group with the rest of the folks on our side, will add you in a moment. We can use it for all future communication (lending, trading, settlement etc)." (Ex. 8, at 2). This referenced Telegram group chat is Ex. F, discussed in "Telegram Chat Group Between Genesis Executives, Employees, and CM LLC Pass-Through

Individuals." This group was titled "Cryptocurrency Management LLC <-> Genesis," and contained Plaintiffs and non-party CM passthrough individual James Webster, among others.

67.    Later that day (April 13, 2021), Birringer, representing Genesis, was questioned by Plaintiff Stephen Sokolowski about the LLC process: "what sort of information do you need to start the process of opening a corporate account? can part of that be processed before the state officially creates the entity?" (Ex 8, at 6),

68.    To this message, Birringer responds: "The onboarding process is fairly similar, off the top of my head I can't think of a glaring difference between the two but will probably need to have the entity officially created to begin" (Ex. 8, at 6-7). This statement by Birringer demonstrates Genesis's willingness to work directly with Plaintiff Stephen Sokolowski and to facilitate the lending arrangement, even before the formal creation of CM LLC. Birringer's statement that he 'can't think of a glaring difference' between onboarding an individual and an entity, and his uncertainty about whether the LLC needed to be officially created before beginning the process ('probably need to have the entity officially created'), underscores Genesis's flexible approach and its focus on securing the lending relationship, rather than strictly adhering to corporate formalities. This reinforces the argument that CM LLC was a mere instrumentality, created at Genesis's suggestion to accommodate its minimum deposit requirements, and that Genesis was primarily concerned with obtaining funds from the individual lenders, regardless of the formal legal structure.

## IV    The CM LLC Operating Agreement

69.    The CM LLC Operating Agreement (Ex. G) shows that CM LLC was designed to allow CM LLC's lenders to pass through funds directly to Genesis, similarly to how Genesis

accepted pass-through funds from another firm, Gemini Trust Co., LLC (hereinafter, "Gemini") A description of Gemini and its relationship with Genesis is discussed in ¶ 106.)

70.     Section 6 of the operating agreement ("Business Purpose") states: "The sole borrower at the time of formation will be Genesis Trading (https://genesistrading.com.)" (Ex. G, at 2)

71.     The Operating Agreement contains addendums signed by Plaintiffs, signed by Plaintiff Christopher Sokolowski on behalf of non-party PROHASHING LLC, and signed by non-party James Webster, a highly unusual arrangement for a single-owner LLC that would not have occurred if the LLC were not being created with Genesis's knowledge and direction to circumvent deposit requirements. Genesis was aware that all persons had signed this agreement.

72.     Plaintiffs would not have loaned money to Genesis if Genesis had required Plaintiffs to intermingle funds within CM LLC, as Plaintiffs wished to retain title to their assets and were seeking a safe, consumer-oriented platform, not interested in creating an investment firm.

73.     Section 10 of the Operating Agreement ("Loans Only") states that CM LLC "will not purchase stocks or equity." (Ex. G, at 3).

74.     Section 11 ("Licenses") specifically states that if SEC licenses would be required to change the way that CM LLC operates, "unanimous agreement" among the lenders would be required, and that the default action was the dissolution of CM LLC, demonstrating that the lenders were not interested in CM LLC being an investment business. (Ex. G, at 3).

75.     Section 12 ("Redemption") states: "Lenders may call loans at any time, and those calls will be passed on to the borrower. The owner will manage the redemption and return the money to the lender within one day of receiving money from the borrower." (Ex. G, at 3).

76.     Section 15 ("Minimum Loan Amounts") states that "Genesis Trading and other borrowers require minimum loan amounts," a fact that had been told to CM LLC lenders by Genesis employees, showing that everyone on both sides of the CM LLC arrangement was aware of the minimum loan amounts (Ex. G, at 4). This section explicitly states that if enough lenders call their loans and Genesis closes the account due to the minimum threshold, "the remaining money will be returned to Cryptocurrency Management lenders." (Id., at 4).

77.     Section 17 ("Deposits and Withdrawals") reviews a set of procedures that formalizes the agreement that CM LLC individuals were to deposit funds directly to Genesis, and that Genesis would directly return funds to the individuals (Ex. G, at 4-5).

78.     Section 24 ("Profits and Losses") states that "Cryptocurrency Management LLC is not intended to earn profits for its owner. All interest gained from loans will be distributed to its lenders." (Ex. G, at 7). This statement is not consistent with an investment firm or for-profit company.

## V     Telegram Chat Group Between Genesis Executives, Employees, and CM LLC Pass-Through Individuals

79.     Genesis employees, including Hanson Birringer, participated in a group Telegram chat directly with CM LLC's lenders (Ex F.) This chat contains overwhelming evidence that Genesis employees communicated directly with the individual lenders.

80.     After the fraudulent scheme was revealed, several Genesis employees deleted their Telegram accounts and chats. Upon information and belief, discovery will reveal that Tiedy controlled one of the "Deleted Accounts" referenced in the Telegram chats (Ex F.)

81. Genesis employees were aware of Plaintiffs' passthrough lending to Gemini: "we called the loans from Gemini" (Ex. F, at 12), demonstrating that passthrough lending schemes were not limited to the Plaintiffs and they retained title to their coins at Gemini as well.

82. Genesis employees were aware of non-party CM LLC lender James Webster's desire for higher rates: "also, James was asking whether you will have new BTC rates this week" (Ex. F, at 13.)

83. Genesis employees and its CFO were aware of Plaintiff Christopher Sokolowski's personal contributions through CM LLC, and his approval of non-party PROHASHING LLC's contributions through CM LLC: "1400.45257401 from PROHASHING, 1975.64186718 from Chris" (Ex. F, at 20-21)

84. Genesis employees were aware of Plaintiff Stephen Sokolowski's repeated withdrawals to pay personal income taxes: "Hi, I'd like to call the June 1 interest loan of 0.09155949 bitcoins to [BTC Address redacted] - and only that one loan - to pay taxes" (Ex. F, at 23.)

85. Genesis employees were aware of Genesis offering to create a trading account for CM LLC, which was ultimately never used, but which demonstrated that Genesis was willing to offer many different types of products and services to what Genesis knew was a group of individuals. (Ex. F, at 51-53.)

86. Genesis employees were aware of Genesis confirming with non-party James Webster that Plaintiff Stephen Sokolowski had not had a security compromise (3 May 2022.)

87. On March 29, 2022, Steve Sokolowski told Genesis employee Hanson Birringer that an unrelated investment advisor "may also be willing to form an LLC to get together a lot of

money with his investment banking friends…. I told him about you and that you would contact him." Birringer responded "Sounds good thanks Steve." (Ex. F, at 68.)

88.    On December 1, 2021, non-party CM lender James Webster, who was not the owner or an employee of CM LLC, communicated with Genesis employees to reconcile the individual owners' interest payments: "Hi, I'm trying to reconcile our spreadsheet compared with the September EOM balance and can't account for 1000.00 bits. My guess is that the withdrawal on 9/3/2021 has a miner fee that is not being accounted for on our side" (Ex. F, at 43). Genesis also answered a similar communication on August 24, 2022: "Hey James- how can we help?" (Id., at 84-85), and again on September 6, 2022 regarding "Accrued Interest." (Id., at 90).

89.    On December 16, 2021, Plaintiff Steve Sokolowski, in response to a request to change interest rates by Genesis, stated "ok, I need to talk to [Plaintiff Christopher Sokolowski] about whether we would just like to withdrawal," and a Genesis employee responded "Understood. Please let us know," showing that Genesis was fully aware that decisions about withdraws, including those at the time of the fraud, were being made by individual CM LLC lenders (Ex. F, at 46)

90.    Genesis CFO Matthew Ballensweig, who would later conspire with Moro in covering up the Genesis insolvency and who would urge Moro to be careful that Genesis clients might be "recording" their discussions (¶ 144) was also present in the Telegram chats with CM LLC individual lenders. CFO Ballensweig communicated directly with Plaintiff Stephen Sokolowski, Plaintiff Christopher Sokolowski, and Christopher Sokolowski acting on behalf of non-party PROHASHING LLC, regarding the Litecoin loans that were clearly delineated between parties (see ¶ 83.)

91.     Given Ballensweig's position as Chief Financial Officer of Genesis, his direct participation in the Telegram chat with the individual plaintiffs concerning loan terms (Ex. F) and his documented collaboration with Moro in addressing Genesis's financial difficulties, including the fraudulent promissory note (see ¶¶ 144-146), it is highly improbable that Ballensweig was unaware of CM LLC's status as a nominal entity and the fact that Genesis was dealing directly with the individual Plaintiffs.

92.     Upon information and belief, given the close working relationship between Moro and Ballensweig and given their on-record discussions about Genesis's lending status, it is further implausible that Moro would not have discussed the nature of the CM LLC arrangement and its implications for Genesis's lending practices and financial reporting with Ballensweig.

93.     In a Telegram chat message (Ex. I) between Hanson Birringer and Plaintiff Stephen Sokolowski on December 5, 2022, Birringer stated "our work telegrams are monitored" when Plaintiff Stephen Sokolowski requested Genesis's address to serve legal documents. (Id., at 1) It can be reasonably inferred that these monitored Telegram chats—which likely include the identities of the "Deleted Accounts"—are in the possession of Genesis or the Defendants and will provide additional evidence establishing, among other things, personal jurisdiction, the state of mind of the Defendants, and the egregious nature of the conduct that supports punitive damages against all Defendants.

## VI     Misrepresentation of Consumer Lending Products

94.     Genesis's marketing and communications with Plaintiffs emphasized safety, stability, and reliability—qualities a reasonable consumer would associate with a conservative financial service, not a complex investment product. Genesis's marketing made no mention of

their actual business practices, which involved a complex web of unsecured intercompany loans between Genesis, DCG, and DCG's subsidiaries.

95.     Genesis provided a simplified Web dashboard to customers (Exhibit J), which displayed current balances and interest rates. The dashboard, which was polished and user-friendly, provided access to account statements detailing accrued and paid interest.

96.     In marketing materials and communications directed at individual depositors—and specifically to Plaintiffs located in Pennsylvania—Genesis and DCG repeatedly compared their lending services to stable and secure saving mechanisms. This assertion was not "puffery," as Defendants never warned Plaintiffs or similarly situated consumers that their funds would be locked into long-term, unsecured promissory notes to its parent company mischaracterized as current assets.

97.     Genesis did not merely facilitate isolated private loans but actively marketed itself and operated as a comprehensive financial services platform, akin to a bank or prime brokerage, offering integrated lending, trading, custody, and derivatives services. For example, on July 28, 2022, Genesis solicited Plaintiff Stephen Sokolowski directly via email (Ex. L, at 1-2) to use its "Institutional Custody" solution, highlighting features such as segregated cold storage, insurance, integration with other Genesis desks for liquidity and collateral purposes, and its registration with the Financial Conduct Authority. This attempt to cross-sell custody services to an existing lending client, pitching "institutional" services directly to an individual known to be managing pooled funds, further demonstrates that Genesis was operating as a broad financial institution seeking customer assets, not merely as a facilitator of private loans between sophisticated parties.

98.     Genesis routinely communicated with its clients, including Plaintiff Stephen Sokolowski personally, through standard financial notifications typical of consumer banking

institutions. For example, on July 1, 2022, Genesis sent an automated email directly to Mr. Sokolowski informing him, "Your Genesis Interest Statement for June 2022 is ready to view and download on Genesis Prime!" (Ex. L, at 3). This email provided instructions for accessing the statement via the online portal and directed users with questions to Genesis Operations via Telegram or email, further demonstrating the consumer-oriented presentation of Genesis's services and its pattern of direct communication with individual lenders.

99.     Defendants and Genesis provided no meaningful risk disclosures, disclaimers, or warnings that would alert an ordinary consumer to the hidden, long-term, unsecured nature of the critical $1.1 billion promissory note, thereby ensuring that Plaintiffs remained under the misimpression that Genesis was financially sound. Defendants had a duty to warn the Plaintiffs of the insolvent nature of Genesis's finances and failed to do so.

100.     Even if Defendants had provided boilerplate disclaimers warning of general risks or potential volatility, no reasonable disclaimer could excuse or legitimize the deliberate and egregious misrepresentation described herein. The gross misclassification of a $1.1 billion long-term, unsecured promissory note as a "current asset" transcends ordinary risk or volatility and instead constitutes outright fraud. Such an intentional and material deception cannot be disclaimed away by any purported notice of risk, nor would any reasonable consumer reading such a disclaimer understand it to include a massive, carefully orchestrated financial distortion of this nature.

101.     Genesis entered into loans with Plaintiffs using simple one-page term sheets. The term sheets stated the loan amount, the interest rate, and the maturity date. Interest was to be paid at specific times, and the asset loaned was to be returned in full on the maturity date. Plaintiffs

expected to receive the originally loaned asset back with interest and to retain that asset after maturity.

102.    These loans were not subject to risks involving volatile cryptocurrency exchange rates. They involved loaning a single asset and receiving back that same asset at maturity.

103.    Genesis consistently offered relatively modest interest rates—often as low as 1% APY and never exceeding 6% APY—comparable to traditional, low-risk savings or deposit products rather than speculative, high-yield investments. This reasonable rate structure reinforced Plaintiffs' belief that they were participating in a stable, consumer-level financial service rather than a high-risk venture.

104.    All Genesis interest rates were fixed at the time of loan origination and not dependent on Genesis's financial performance.

105.    Plaintiffs believed that Genesis was engaged in simple, bank-type lending, as Plaintiff Stephen Sokolowski stated during a contemporaneous public video interview with journalist Laura Shin for her "Unchained" podcast conducted in January 2023—the same month that Genesis declared bankruptcy (Transcript in Ex. E, hereinafter the "Shin interview"):

> But you also, should--shouldn't be misleading customers about… just kind of like making loans and then, you know charging a higher interest rate and… pocketing the difference. I mean, that was my understanding of what these companies were doing, and it's pretty clear that that was not their entire or even their primary business model to just borrow money and then lend it out at a higher interest rate.

Ex. E, at 6-7

106.    Genesis's claim that it catered solely to sophisticated, institutional clientele is belied by its longstanding, lucrative relationship with Gemini, a well-known cryptocurrency exchange and lending platform. Gemini actively marketed its lending services—which merely

passed customer cryptocurrency deposits through to Genesis—to retail customers. Both at the time of the presentation of the fraudulent balance sheet and also at the time of Genesis's bankruptcy, Gemini had in fact become Genesis's largest creditor.

107.    Many of these Gemini depositors held relatively small amounts of cryptocurrency—often less than $100—reflecting typical consumer-level transactions rather than institutional-scale investments. Genesis, aware that Gemini was aggregating these retail deposits from unsophisticated investors who sought safe returns, accepted them without objection, further demonstrating its knowledge that it was effectively receiving funds sourced from ordinary Connecticut consumers.

108.    Far from catering to large corporations, DCG and Genesis were so dependent upon Gemini's consumer deposits that the companies actively discussed a merger for, among other reasons, streamlining operations. (See the *NYAG Action*) In one E-Mail *(NYAG Action*, NYSCEF No. 45), Silbert states: "Gemini is Genesis' largest and most important partner."

109.    Far from Genesis catering exclusively to sophisticated institutional investors, a June 21, 2022 chat message from Silbert explicitly references retail depositors. In this message (*NYAG Action*, NYSCEF No. 44), Silbert stated "the Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage." This direct acknowledgment of the "retail channel like Gemini" as a source of capital directly contradicts the notion that Genesis operated solely as an institutional lender.

110.    Moro and Silbert knew, or should have known, that both Genesis and Gemini served retail customers.

111.    In fact, Plaintiffs had also previously lent their assets to Gemini. Seeking a moderately higher interest rate and believing that direct lending to Genesis would provide the

same stable, consumer-oriented arrangement, Plaintiffs moved their cryptocurrency loans from Gemini to a direct relationship with Genesis.

## VII    Defendants' Public Representations After the Three Arrows Capital Bankruptcy

112.    Genesis had not been financially sound at least since the company took a massive loss on a loan to Three Arrows Capital (hereinafter "3AC"), a company which declared Chapter 15 bankruptcy in June 2022.

113.    After the 3AC loss, internal communications in the *NYAG Action* show that Genesis and Moro urgently needed to restore solvency but were aware of the need to present Genesis's services as akin to stable, consumer-level financial products.

114.    In a June 13, 2022 chat message, Moro stated in regard to raising interest rates to encourage more deposits: "Not too much though as we don't want to seem desperate, but we are willing to pay above where we have been." (*NYAG Action*, NYSCEF No. 40). This comment suggests a deliberate strategy to avoid appearing like a high-risk venture, consistent with the Plaintiffs' claim that Genesis sought to attract customers by offering rates that would be perceived as reasonable within a consumer lending context.

115.    On June 17, 2022, at 11:40am EDT, Moro publicly posted on X (then Twitter):

> We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on…. We continue to operate 24/7 and have met every client request. We are extremely confident in our ability to service lenders, borrowers and traders within our service level agreements.

116.    In Moro's misleading statement, the term "finite" actually meant that Genesis was insolvent, but that Genesis had by then taken steps to ensure it would not lose *any more money* due to the 3AC disaster. During the *Shin Interview*, Plaintiff Stephen Sokolowski stated:

> And that's by the way what I understood their June 17th statement to—to read, that… they took 1.1 billion dollars, you know, and—and in exchange… they took the debt and they paid Genesis 1.1 billion dollars. Maybe I should have read between the lines or something like that in June, you know, but… that's a little dishonest to me that they didn't state exactly what happened at the time, and, you know, use these terms like they 'netted against their balance sheet' or whatever the exact quote is.

Ex. E, at 14-15

117.    Plaintiffs read Moro's statement while at their home in Pennsylvania.

118.    On or around June 30, 2022, two weeks after posting the misleading tweets, Moro, along with Silbert, willfully and recklessly signed the fraudulent $1.1 billion promissory note. (Ex. B and C.)

119.    This $1.1 billion so-called "promissory note" was not a typical lending transaction at all and involved no actual transfer of money. The arrangement was highly unusual and did not create any real, immediately accessible capital for Genesis. The fraudulent promissory note was signed with conscious disregard for its impact on unsuspecting consumers.

120.    Because no funds changed hands, Defendants had essentially papered over the massive hole in Genesis's finances created by the 3AC bankruptcy. The interest rate charged— 1.0% per annum—was unreasonable for a typical unsecured loan between distinct commercial entities.

121.    The text of the note, among other things, included: "Assignor has substantial doubts that it will be able to recover any additional amounts from TAC [Three Arrows Capital,

3AC] in respect of the TAC Loans." (Ex, C, at 1; see also Ex. B, at 1) As signatories to this contract, Silbert and Moro were thus well-aware that Genesis was deeply insolvent at the time the contract was signed.

122.     During the Shin interview, Plaintiff Stephen Sokolowski also referred to the note's unusual structure:

> Well, I also would dispute, I mean, maybe legally you could call it a loan but I would dispute that in common language that we would call what happened there a loan. I mean… when does a loan ever involve not actually giving somebody any money, right? When I take out a loan to buy a house, they give me money and then I use it to buy the house. I don't get some promise that they'll pay for the house in 10 years.

Ex. E, at 14

## VIII    Reliance on the Fraudulent Balance Sheet

123.     On September 21, 2022, at 1:49pm EDT, while seated in front of his home computer in Pennsylvania, Plaintiff Stephen Sokolowski received an E-Mail from Tiedy. Attached to the message was a balance sheet (Ex. A) purporting to show Genesis's financial condition as stable.

124.     Stephen discussed this balance sheet with Tiedy on the same day (September 21, 2022) during a Telegram audio call. The audio call was conducted in the same room, in Pennsylvania, while viewing the fraudulent balance sheet. This document (Ex. A) included $1.726 billion in the "other assets" row, listed under the "current assets" column. As the fraudulent $1.1 billion promissory note represented the vast majority of these "current" "other assets," the balance sheet grossly misrepresented Genesis's liquidity and solvency.

125.    Plaintiff Stephen Sokolowski talked with Tiedy in multiple other instances throughout 2022. At all relevant times, Tiedy failed to disclose the true nature of the promissory note and its inclusion in "other assets" under the "current assets" header in this balance sheet.

126.    On September 21, 2022, at 2:07pm EDT, Plaintiff Stephen Sokolowski forwarded this balance sheet by E-mail to Plaintiff Christopher Sokolowski, who personally reviewed it later that afternoon, while also located in the same house in Pennsylvania.

127.    Plaintiffs, relying on the deceptive balance sheet provided to them and the overall impression that Genesis's service was safe and well-capitalized, continued to lend their assets to Genesis rather than withdrawing them.

128.    Plaintiffs have obtained a substantially similar fraudulent balance sheet that Genesis presented to another creditor under analogous circumstances (Ex. D.) The second balance sheet lists "Other Assets" of $1.691 billion under "Current Assets" and is watermarked with the name of a different Genesis customer. This second balance sheet, which similarly classified a long-term, illiquid promissory note as a "current asset" to create the illusion of solvency, further demonstrates that Genesis's deception was not confined to Plaintiffs alone.

129.    Both balance sheets (Exs. A and D) include a "Weighted Avg" table, which materially understated the average loan duration of Genesis's loan book. The balance sheet presented to Plaintiffs (Ex. A) stated that the "Total" average term of the loans outstanding due to Genesis was just 35.5 days. This figure was impossible to reconcile with a 10-year promissory note representing roughly one third of Genesis's reported assets, since including even one such note would necessarily push the weighted average duration well beyond 35.5 days. Accordingly, the Weighted Avg table was willfully or recklessly misleading and furthered Defendants' overall scheme to conceal the long-term, unsecured nature of the $1.1 billion promissory note.

130.     The consistency of the "Weighted Avg" table with the misclassified "current assets" further suggests that the inclusion of the fraudulent promissory note as a "current asset" was not a clerical error.

131.     Under Generally Accepted Accounting Principles ("GAAP"), a "current asset" is defined as an asset that is expected to be converted into cash, sold, or consumed within one year or the operating cycle of the business, whichever is longer. This definition is widely understood in the financial and investment communities and informs how investors and creditors interpret a company's balance sheet and assess its liquidity. The classification of an asset as "current" signifies that it is readily available to meet short-term obligations.

132.     The classification of the $1.1 billion unsecured, 10-year promissory note from DCG as a "current asset" was particularly critical to Plaintiffs' decision-making. Plaintiffs understood the term "current asset" to mean that such an asset could be readily liquidated or converted to cash within one year. Because the decision at hand was whether to call expiring short term loans or renew them with a term of one year, the presence of a substantial "current asset" on Genesis's balance sheet assured them that the funds necessary to repay their principal at maturity would be available. In other words, the misclassification reinforced Plaintiffs' belief that Genesis would remain solvent and liquid at the time Plaintiffs' loans came due, significantly influencing Plaintiffs' decision to renew and maintain their lending relationship with Genesis.

133.    During the *Shin interview*, Plaintiff Stephen Sokolowski stated:

So my interpretation of that was I was offering Genesis a one-year loan or considering offering them a one-year loan, and since that's a current asset, that means that all of the assets that are listed in that column should be able to be called before my one-year loan is due. And, apparently now it turns out that one of their assets is this 10-year promissory note to Digital Currency Group, and, if that was listed in the one in the current assets then obviously they do not borrow-- I've never heard of them ever borrowing from a customer for 10 years.

Ex. E, at 4

134.    Plaintiffs also evaluated competing lending platforms and had the opportunity to transfer all assets to competing lending firms at higher rates but chose to sign long-term loans at Genesis for the majority of the assets due to Genesis's perceived safety and stability.

135.    During the Shin Interview, Plaintiff Stephen Sokolowski stated the following, referring to his research on Ledn, a Genesis competitor:

And, [Ledn] told me that they were doing low-risk trades and uh, they uh,--they wanted to offer a lower rate, but they wouldn't present their balance sheet to me. So, that was the reason we didn't go with Ledn. I kept asking them for that balance sheet, and they wouldn't present it to me.

Ex. E, at 13

136.    Classifying this long-term, unsecured promissory note as a current asset was a materially false and deceptive misrepresentation. Silbert and Moro, as high-level executives intimately familiar with Genesis's financial structure, knew or should have known that this misclassification misled anyone viewing the statement into believing Genesis was financially sound.

137.    The misclassification of the promissory note on the balance sheet was so material that its absence would have made it immediately clear to a reasonable person that Genesis faced

significant financial instability. Had this critical misrepresentation not existed, it is highly likely that a reasonable person would have declined to lend their assets to Genesis regardless of any other factors evaluated. The importance of this single factor alone would have played a decisive role in that assessment.

138.    On September 26, 2022 and September 30, 2022, Plaintiffs renewed their large cryptocurrency term loans with Genesis as a direct result of viewing the fraudulent balance sheet. Plaintiffs also elected to continue existing "open term" US Dollar and USDC loans as a direct result of viewing the balance sheet.

139.    But for the presentation of the fraudulent balance sheet, Plaintiffs would not have renewed their loans and would have withdrawn all assets from Genesis.

140.    On January 19, 2023, Genesis and two affiliated entities filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (*Genesis Bankruptcy Action*.)

## IX    Defendants' Knowledge and Control

141.    From communications disclosed in the *NYAG Action*, it is clear that Defendants willfully and recklessly shaped their external messaging to retain lender confidence despite dire internal realities. One docket entry references a Microsoft Teams chat, in which both Silbert and Moro were present and chatting (*NYAG Action*, NYSCEF No. 69).

142.    Upon information and belief, Silbert was in Connecticut most (if not all) of the time when he was writing the scheme-related communications posted to the *NYAG Action* docket that are referenced here, and DCG's board members involved in the conversations were planning the scheme in Connecticut and sending E-Mails and making phone calls from Connecticut.

143.    Upon information and belief, the DCG board meetings and strategy sessions to which Moro was invited occurred in Connecticut, and Moro attended those meetings.

144.    In this chat, one Genesis employee warned, "we need to still be very cautious about what we say and how we say it, we don't know they're not recording." (Matthew Ballensweig, 6/15/2022, 12:55 AM), demonstrating conscious efforts to conceal the truth. In response, Moro (6/15/2022, 12:55AM) stated "I agree with the caution. Happy to join." (*NYAG Action*, NYSCEF No. 69).

145.    These communications also reference a "Genesis Source of Strength Talking Points" document being used that day, indicating a coordinated effort to present a misleading narrative of stability. (*NYAG Action*, NYSCEF No. 69). As members of the Teams chat, Moro and Silbert had access to this document.

146.    Internal communications show that on June 21, 2022, Silbert privately acknowledged a substantial "hole" in Genesis's equity due to the collapse of 3AC. Silbert described the situation as "super confidential/sensitive stuff." In these communications, Silbert urged select DCG and Genesis personnel not to share this information "with anybody" outside a "circle of trust." (*NYAG Action*, NYSCEF No. 44.)

147.    This directive underscores Silbert's and DCG's direct, personal knowledge of Genesis's precarious financial state and their deliberate efforts to keep it hidden from lenders like Plaintiffs, further evidencing that their misrepresentations were not the result of oversight or negligence, but part of a calculated scheme to deceive.

148.    Internal communications dated June 28, 2022, revealed in the *NYAG Action*, show that DCG and Genesis executives, including Silbert and Moro, explicitly acknowledged a significant "equity hole" in Genesis's balance sheet. In these internal emails, Silbert directed

both DCG *and Genesis* personnel to work "24/7" to fill this shortfall by the June 30 reporting deadline (*NYAG Action*, NYSCEF No. 91.). This contemporaneous recognition of a massive deficit, coupled with urgent efforts to mask it, stands in direct contrast to Defendants' public portrayal of Genesis as financially stable, further supporting Plaintiffs' allegations that Defendants knowingly misled lenders such as Plaintiffs regarding Genesis's true financial condition.

149.    On August 24, 2022, Moro posted on X (then Twitter) that he had resigned from his position as CEO of Genesis. At the time of his resignation, Moro failed to notify the public of the fraudulent promissory note that he had signed, and the actions he took at Genesis before resigning were inadequate to prevent fraudulent balance sheets from continuing to be presented to Genesis customers, including the Plaintiffs. Moro, when he failed to disclose the existence of the fraudulent scheme, knew or should have known that the fraudulent note would continue to be used to deceive consumers after his resignation.

150.    DCG, through Silbert and Moro, orchestrated and approved the presentation of Genesis's financial condition. Defendants knew these representations were false or acted with reckless disregard for their truth. As sophisticated corporate actors, Silbert, Moro, and DCG understood the nature of this promissory note and its impact on Genesis's balance sheet because they had personally signed it.

151.    Defendants were well-aware that Plaintiffs and other consumers would rely on these statements when deciding whether to lend their personal assets.

152.    Upon information and belief, Silbert and Moro authorized, were aware of, or recklessly disregarded the practice of Genesis personnel (such as Tiedy) disseminating financial

statements and balance sheets containing the fraudulent "current asset" classification directly to clients, including Plaintiffs.

153.    Defendants carefully avoided calling these arrangements "investments," presumably due to securities law concerns. By doing so, and by actively accepting assets from Genesis customers, they reinforced the consumer perception that these were ordinary, low-risk lending services, not speculative financial instruments.

154.    Plaintiffs relied on Defendants' misrepresentations. Defendants' actions directly impacted Plaintiffs' personal financial decisions and caused them to forgo safer options.

## X      DCG's Involvement in Genesis Operations

155.    Silbert, as CEO of DCG, exerted substantial control over the entire DCG enterprise, including Genesis. His pervasive influence was further underscored by his significant personal financial stake in DCG. As reported by The Wall Street Journal on November 1, 2021, Silbert owned approximately 40% of DCG's stock, making him the largest single shareholder. (See *https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-standard-oil-11635764400?st=7a338mejs53urq0, last accessed Dec. 25, 2024*). This substantial ownership interest not only solidified his control but also directly aligned his personal financial fortunes with the performance of DCG and its subsidiaries.

156.    Multiple records of internal communications in evidence discovered during the NYAG action demonstrate that Silbert was frequently present and actively involved in Genesis's internal affairs, acting on behalf of DCG.

157.    In a June 13, 2022 chat message (*NYAG Action*, NYSCEF No. 40) , Silbert stated directly:

> were scheduling a DCG board update and strategy call for tomorrow late morning, pencilling in 11 am. I'd like for moro, derar, matt and arianna to join. okay?

*NYAG Action*, NYSCEF No. 40

158.    This direct instruction from DCG's CEO to Genesis's top personnel to attend a DCG board strategy session underscores the integrated nature of the two entities and DCG's direct command over Genesis's leadership.

159.    Before this June 14, 2022 board meeting, Silbert E-Mailed DCG and Genesis executives, as well as outside investors (*NYAG Action*, NYSCEF No. 42). He discussed several options to address the crisis at Genesis. The E-Mail outlines three options DCG was considering for Genesis: "Support Genesis," "Jettison the Genesis Capital business," and a "Shock & Awe" plan. (Id.). Notably, Silbert states that the Genesis team was unaware of the "Jettison" and "Shock & Awe" options:

> **IMPORTANT:** we have not discussed either the Jettison or Shock & Awe plans with the Genesis team. As far as they know, we're on path #1 [support Genesis] right now, so please do not bring up the alternative paths on the call today with the team.

*NYAG Action*, NYSCEF No. 42 , (emphasis in original)

160.    This statement further demonstrates that DCG was directing Genesis's future without even the knowledge or input of Genesis's own management, not only actively planning to attend Genesis management's calls but also intending to hide critical information during those calls *(Id.)*.

36

161.    The "Shock & Awe" plan, in particular, provides compelling evidence of DCG's disregard for corporate separateness and its intent to use Genesis as a tool to benefit DCG and its shareholders. The plan involved Silbert becoming CEO of Genesis, DCG contributing the assets and investing team of another subsidiary (DCGI) to Genesis, and pursuing a public offering of Genesis in 2023 (*NYAG Action*, NYSCEF No. 42). This plan constituted a blatant commingling of assets and personnel between DCG and its subsidiaries, treating them as interchangeable parts of a single enterprise.

162.    Silbert's email explicitly acknowledges the potential risks of the "Shock & Awe" plan to DCGI's assets, stating that "as 100% owner of Genesis, DCG shareholders are no worse off, other than DCGI's assets being put under Genesis creditors." (*NYAG Action*, NYSCEF No. 42). This demonstrates that DCG was willing to potentially sacrifice the assets of one subsidiary to prop up another, prioritizing the interests of DCG shareholders over the potential harm to Genesis's creditors. Furthermore, the plan's stated goal of providing "a clear path to liquidity for DCG shareholders via Genesis IPO" reveals that DCG was motivated, at least in part, by a desire to create a liquidity event for its own shareholders even while Genesis was facing a severe financial crisis (*Id*.). The fact that this plan was being considered without the knowledge of Genesis' management further underscores DCG's utter disregard for Genesis' separate corporate existence.

163.    The "Support Genesis" plan contemplated DCG "look[ing] to secure our own additional liquidity to keep in reserve should we decide later to contribute capital to stabilize the Genesis balance sheet" while Genesis "makes every effort to bolster its own balance sheet." (*Id*.) This underscores that DCG would use its own resources—potentially commingling or redirecting funds to shore up Genesis's finances if necessary—even as DCG simultaneously coordinated

"with counsel to ensure best defenses against veil piercing." (*NYAG Action*, NYSCEF No. 42) The notion that DCG might inject its own liquidity to keep Genesis afloat, yet remain free from liability to Genesis's creditors, confirms DCG's recognition that its direct operational involvement blurred corporate boundaries and exposed DCG to potential veil-piercing claims.

164.    Internal communications disclosed in the *NYAG Action* show that Moro also later discussed "Option 3," which involved "some combination of assets from DCG parent and DCGI placed into GGC, again for equity purposes only." (*NYAG Action*, NYSCEF No. 91).

165.    In another internal communication (*NYAG Action*, NYSCEF No. 44), Silbert indicated that Foundry—another DCG subsidiary—would be brought in to address Genesis's lending issues. By stating that a new hire would "help Foundry assess their loan book and address any issues," Silbert effectively enlisted yet another affiliated DCG entity in the effort to stabilize Genesis (Id.). This further demonstrates Defendants' practice of treating DCG subsidiaries as interchangeable resources rather than maintaining their supposed independence and corporate boundaries.

166.    This June 21, 2022 chat message also highlights the importance DCG placed on maintaining "trust and confidence in Genesis" to prevent "money leaving Genesis and depleting our liquidity." (*NYAG Action*, NYSCEF No. 44). Silbert stated that DCG and Genesis had around $2 billion in liquidity but were in "bunker mode" to "withstand whatever negative event comes next." (Id.). This shows that DCG was acutely aware of the risk of a liquidity crisis at Genesis and was actively working to prevent it, not for the benefit of Genesis's creditors, but, as referenced by the use of the word "our," to protect DCG's own liquidity.

167.     Silbert's chat message also reveals DCG's intention to intervene directly in Genesis's affairs to address the "hole" in its equity. He stated that:

> DCGI [another DCG subsidiary] will play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the downstream of certain/all assets until prices recover.

(*NYAG Action*, NYSCEF No. 44)

168.     DCG's active involvement in managing the perception of Genesis's stability is further evidenced in a June 15, 2022 chat involving Silbert and other DCG and Genesis personnel. (*NYAG Action*, NYSCEF No. 43). Amidst reports of increasing withdrawal requests from lenders," Silbert inquired, "is there anything we/DCG can do to further install confidence in genesis?" (Id.).

169.     A Genesis employee reported speaking with representatives from other DCG portfolio companies, stating, "so if they triangulate with you, you can just reaffirm our position etc." (*NYAG Action*, NYSCEF No. 43). This indicates that DCG was actively managing communications across its network of subsidiaries to present a unified front of strength and stability, even as concerns about Genesis's financial health were mounting. Silbert himself stated in the same email chain, "we need to continue to perpetuate that of course," referring to Genesis' reputation as the "blue chip" in the market. (Id.).

170.     All of the previously mentioned E-Mails and chats in the *NYAG Action* discussing the Genesis situation were sent to or from multiple high-ranking DCG employees in addition to Silbert, demonstrating that the involvement of DCG in Genesis's operations went well beyond the CEO's involvement (*NYAG Action*, NYSCEF No. 42, 43, 44).

171.     On October 20, 2022, Silbert sent an E-Mail to DCG and Genesis employees

discussing a potential merger involving DCG, Genesis, and Gemini (*NYAG Action*, NYSCEF No.

45). In this message, Silbert stated:

> Good lunch with Cameron [Winklevoss, CEO of Gemini]. Tldr: he is intrigued
> about the idea of a closer partnership between Genesis/Gemini/DCG, including a
> potential merger of the companies. I put him on clear notice that the path we're on
> right now could lead to a Genesis bankruptcy, which would put Gemini's deposits
> (and therefore, Gemini's business) at significant risk. He took that part
> surprisingly well and appreciates we need to work together to mitigate that risk.
> (*NYAG Action*, NYSCEF No. 45)

172.     This E-Mail not only indicates that DCG and Genesis were acting as a unified

economic entity rather than separate corporate forms but also shows DCG's active consideration

of a merger with Gemini—a company that had taken on consumer deposits. This further

evidences Defendants' willingness to restructure assets and relationships to conceal financial

instability and minimize accountability all at the expense of consumers like Plaintiffs.

173.     Further demonstrating the intertwined nature of DCG and Genesis, and DCG's

direct financial interest in concealing Genesis's true condition, Silbert admitted in this E-Mail

that "I can't raise money at DCG if there is a Genesis bankruptcy risk." (Id.). This statement

reveals that DCG's ability to attract investors and secure funding was inextricably linked to

Genesis's financial stability or at least the appearance of stability. This underscores that Genesis's

continued operation, even while insolvent, was not merely a matter of independent business

judgment but was crucial to DCG's own financial viability.

174.     Later in the same email (*NYAG Action*, NYSCEF No. 45), Silbert mentioned

informing Cameron Winklevoss, CEO of Gemini, that DCG could further entangle the

companies' operations by moving DCG subsidiary Grayscale's cryptocurrency assets over to

40

Gemini's custody. Such a move, he noted, would make Gemini "the largest custody provider in the world," again demonstrating the Defendants' willingness to restructure and merge operations across multiple supposedly independent entities.

175.    Far from being a "hands-off" holding company, DCG directly controlled and actively participated in Genesis's financial affairs throughout Genesis's existence. Genesis and DCG engaged in complex lending and investment strategies, particularly those involving the Grayscale Bitcoin Investment Trust ("GBTC"), managed by DCG subsidiary Grayscale.

176.    On November 10, 2022, as further detailed in the *NYAG Action*, DCG, Genesis, and Gemini entered into an agreement whereby 30,905,782 shares of GBTC (valued at $296 million at the time) were pledged as collateral to secure Gemini's consumer loans to Genesis. (*NYAG Action*, NYSCEF No. 52) This maneuver further demonstrates the Defendants' willingness to disregard corporate distinctions and commingle assets across affiliated entities.

177.    Public filings with the United States Securities and Exchange Commission reveal the significant scale of this collateralization. Grayscale Investments, LLC's Form 10-Q for the quarter ending September 30, 2022, indicates that DCG, Genesis, Grayscale, and CoinDesk, Inc. (another DCG subsidiary at the time) collectively held 66,972,889 shares of GBTC. Therefore, the shares pledged as collateral in the November 10, 2022 agreement constituted nearly half of the entire DCG conglomerate's reported GBTC holdings.

178.    At the time Genesis collapsed, the debt that DCG had incurred with Genesis, in addition to the fraudulent $1.1 billion promissory note, demonstrates that DCG and Genesis were operating together as a single financial entity. Based on media reports from November 2022, the debt owed by DCG to Genesis represented up to 50% of Genesis's total assets.

179.    After Genesis halted withdrawals in November 2022, DCG and Silbert actively

sought investors to provide money to save Genesis from collapse, demonstrating their full

awareness and direct control of Genesis's financial condition and their attempts to directly fix the

financial situation at the company they were intimately involved with. Their failure to adequately

manage Genesis's assets, combined with their fraudulent activity, demonstrates that DCG and

Silbert operated with reckless disregard for the safety of lenders, including the Plaintiffs.

180.    On November 21, 2022, *Bloomberg* reported:

> For the investors who were approached for the $1 billion lifeline being sought,
> some began to balk at the interconnectedness between the entities, according to
> people familiar with the discussions. Another simply said it was a matter of how
> these types of firms do business.

(Available at https://www.bloomberg.com/news/articles/2022-11-21/crypto-firm-
genesis-warns-of-possible-bankruptcy-without-funding, last visited Dec. 25,
2024.)

181.    Significantly, the size of the "lifeline" DCG and Silbert desperately sought–$1

billion–was strikingly similar to the $1.1 billion value of the fraudulent promissory note, strongly

suggesting that these efforts were a direct attempt months later to remedy the same financial

shortfall concealed by the misclassification of that note.

182.    Furthermore, the fact that DCG and Silbert actively sought but ultimately failed to

obtain a $1 billion lifeline for Genesis from independent investors is highly telling. This inability

to attract external funding suggests that the risk associated with lending to Genesis was deemed

too high by those outside the DCG ecosystem. Consequently, DCG's own extension of credit via

the promissory note appears less like a sound financial decision and more like a necessary action

driven by the recognition that their own fortunes were inseparable from those of Genesis.

183.    Upon information and belief, in or around November 2022, Silbert or another

DCG representative circulated a letter to DCG shareholders discussing a "liability" to Genesis of

$575 million—in addition to the $1.1 billion promissory note. According to a publicly reported

copy of that letter, DCG had borrowed this money from Genesis "to fund investment

opportunities and to repurchase DCG stock from non-employee shareholders." (*X post by

@Tier10K, Nov. 21, 2022, available at https://x.com/tier10k/status/1595140018871631873, last

visited Dec. 25, 2024.*) Plaintiffs do not presently possess a copy of this shareholder letter but

intend to obtain it in discovery. This new information—if confirmed—further evidences that

DCG was using Genesis as a source of capital for its own benefit, consistent with Plaintiffs'

allegation that DCG and Genesis functioned as a single commingled entity rather than

independent corporate entities.

184.    The existence of multiple additional loans from Genesis to DCG and DCG

subsidiaries totaling to this $575 million debt is corroborated by loan term sheets contained in

the *Genesis Bankruptcy Action*, Doc. 680, Exs. 1-7, and Doc. 681, Exs. 1-5.

185.    The sheer volume of intercompany transactions, including DCG's multi-billion-

dollar loans to Genesis, coupled with DCG's hands-on orchestration of Genesis's strategic

decisions, demonstrates that DCG, Genesis, and other DCG subsidiaries operated as a single

financial enterprise rather than as truly distinct entities. Internal communications reveal that

DCG executives—often without Genesis's own management's knowledge—unilaterally

considered drastic measures such as "jettisoning" Genesis, merging its assets with other DCG

affiliates, or orchestrating a so-called "Shock & Awe" plan to restructure Genesis and pursue an

eventual IPO. DCG's own recognition of the need to "ensure best defenses against veil piercing"

underscores that it was aware its direct oversight, asset-shuffling, and disregard for corporate

formalities could subject DCG to liability for Genesis's debts. By exercising near-complete control over Genesis's finances, planning massive inter-subsidiary transfers, and misclassifying a $1.1 billion promissory note as a current asset, DCG effectively intermingled funds and personnel across multiple business lines. This lack of corporate separateness deliberately exposed Plaintiffs—who believed they were dealing with a solvent, standalone lender—to undisclosed risks, thereby causing them injury under the CUTPA when Genesis ultimately collapsed.

## XI    Damages to Plaintiffs and Mitigation Efforts

186.    When Genesis declared bankruptcy, the Plaintiffs' personally owned cryptocurrency assets and US Dollars—which would have been withdrawn or placed elsewhere but for Defendants' deception—were lost or severely diminished.

187.    On January 27, 2023, in the *Genesis Bankruptcy Action*, CM LLC sold its bankruptcy claim against Genesis to Jefferies Leveraged Credit Products LLC (hereinafter "Jefferies") (See *Genesis Bankruptcy Action*, Doc. 50.)

188.    This quickly agreed fire sale was directed by Plaintiffs to save their own personal finances after Genesis declared bankruptcy and occurred because Silbert and DCG had pillaged Genesis and spread information falsely suggesting that they were also insolvent. Plaintiffs, at the time, owed around $300,000 to Wells Fargo Bank, N.A, collateralized against their long-term stock portfolio, as a result of a June 2, 2022 home purchase. Plaintiffs had expected to be able to withdraw US Dollars from Genesis to repay that loan. Without the ability to withdrawal US Dollars from Genesis, the Plaintiffs were exposed to potential liquidation of their long-term stock

holdings at a low valuation. When the bankruptcy sale payment was received from Jefferies, Plaintiffs immediately paid off the Wells Fargo loan.

189.    While the sale partially mitigated the losses associated with the Genesis bankruptcy distribution, it did not compensate Plaintiffs for the full measure of their harm as the sale price was substantially lower than the value of their assets—and even on the low end of the market value of the bankruptcy claims at the time.

190.    The sale of CM LLC's bankruptcy claim did not and could not release or waive Plaintiffs' individual claims under CUTPA or their right to recover damages directly from Defendants for the alleged deceptive practices that induced Plaintiffs to maintain their loans with Genesis. Even if it could, no assignment document relevant to this case mentions statutory, consumer protection, fraud, or CUTPA claims.

191.    Plaintiffs never intended to engage in a high-stakes investment gamble. They trusted Defendants' false assurances of solvency and stable returns, a trust based on the fraudulent balance sheet and consumer-oriented marketing approach. This trust and reliance caused Plaintiffs substantial financial harm.

**CAUSES OF ACTION**

**COUNT I:**

**Violation of the Connecticut Unfair Trade Practices Act (CUTPA)**
**Conn. Gen. Stat. § 42-110a et seq.**

**(Against All Defendants)**

192.    Plaintiffs incorporate by reference ¶¶ 1-192 as though fully set forth herein.

193.    Defendants, acting individually and through their controlled subsidiary Genesis, and other affiliates and agents, in the conduct of trade or commerce, engaged in unfair or deceptive acts and practices, including, without limitation:

    a.    misrepresenting Genesis's business model as a safe, consumer-friendly bank-like lending service when it was not;

    b.    misrepresenting Genesis's solvency;

    c.    misclassifying a ten-year, 1% interest, $1.1 billion promissory note as a current asset;

    d.    conducting round-trip transactions to fabricate liquidity;

    e.    issuing public statements from Connecticut designed to induce lenders such as Plaintiffs to leave digital assets on Genesis's platform; and

    f.    sending a fraudulent balance sheet to Plaintiffs.

194.    The foregoing conduct meets each of the "cigarette rule" criteria: it offends public policy, is immoral, oppressive, and unscrupulous, and has caused substantial injury to consumers.

195.    Plaintiffs suffered an ascertainable loss of money and property—including the same number of Bitcoin, Ether, and other digital assets they lent—and are entitled to actual damages, and the court may additionally award punitive damages, costs, and reasonable attorneys' fees under Conn. Gen. Stat. § 42-110g.

196.    Much of the deceptive scheme was orchestrated from DCG's principal place of business at 290 Harbor Drive, 4th floor, Stamford, Connecticut; these allegations are made on information and belief based on public filings and the Verified Complaint in *Genesis Global Holdco LLC et al. v. Digital Currency Group, Inc. et al.*, C.A. No. 2025-0532 (Del. Ch. May 19, 2025).

197.    Defendants' conduct therefore violates CUTPA.

## COUNT II:

## Fraud

## (Against All Defendants)

198.     Plaintiffs re-allege ¶¶ 1–197.

199.     Defendants, individually and acting through Genesis and other controlled agents, knowingly—or with reckless disregard for the truth—made material misrepresentations and omissions, including false statements that DCG had "absorbed" Genesis's $1.1 billion loss and that Genesis was well-capitalized, as well as sending a fraudulent balance sheet to Plaintiffs, while concealing Genesis's insolvency.

200.     Defendants intended that Plaintiffs would rely on these representations to maintain and renew their loans.

201.     Plaintiffs reasonably and justifiably relied on Defendants' misrepresentations and have suffered the foregoing losses.

202.     Defendants' conduct constitutes fraud under Connecticut common law, entitling Plaintiffs to rescissionary and compensatory damages, punitive damages, and other appropriate relief.

### COUNT III:

### Negligent Misrepresentation

### (Pled in the alternative against All Defendants)

203.    Plaintiffs re-allege ¶¶ 1–202.

204.    In the course of their business, Defendants—directly and through Genesis and other agents within their control—supplied false financial information for the guidance of Plaintiffs without reasonable care or competence, thereby breaching the duty recognized by Restatement (Second) of Torts § 552 and Connecticut law.

205.    Plaintiffs reasonably relied on that information and suffered pecuniary loss; they plead this claim in the alternative to Count II.

### COUNT IV:

### Civil Conspiracy

### (Against All Defendants)

206.    Plaintiffs re-allege ¶¶ 1–205.

207.    Defendants and their controlled affiliate Genesis agreed and combined to injure Plaintiffs by fraudulently concealing Genesis's insolvency and misrepresenting its financial condition.

208.    Overt acts in furtherance of the conspiracy include, inter alia, execution of the fraudulent $1.1 billion promissory note, dissemination of false balance sheets, and public statements emanating from Connecticut.

209.    As a direct and proximate result, Plaintiffs sustained damages for which Defendants are jointly and severally liable.

**COUNT V:**

**Aiding and Abetting Fraud**

**(Against All Defendants)**

210.    Plaintiffs re-allege ¶¶ 1–209.

211.    Each Defendant—together with Genesis—knowingly and substantially assisted the others in the commission of the fraud by, among other things, structuring sham transactions, disseminating misleading information, and coordinating public messaging to sustain the scheme.

212.    Plaintiffs suffered the losses outlined above as a direct result of Defendants' concerted misconduct.

**COUNT VI:**

**Unjust Enrichment**

**(Plead in the alternative as an equitable claim against all Defendants)**

213.    Plaintiffs re-allege ¶¶ 1–212 only to the extent they are consistent with the absence of an enforceable contract between these Plaintiffs and Defendants.

214.    Defendants have been unjustly enriched by retaining the benefit of Plaintiffs' lent digital assets and by preserving DCG's equity value and liquidity at Plaintiffs' expense.

215.    Equity and good conscience require restitution in the form of (1) return of the same number and kind of digital coins, or (2) the monetary value thereof, together with pre- and post-judgment interest.

## DAMAGES

216.    Plaintiffs incorporate by reference ¶¶ 1-215 as if fully set forth herein.

217.    When fraud pervades the entire transaction, courts have ordered full restitution of the consumer's property. See *Kim v. Magnotta*, 249 Conn. 94 (1999) (CUTPA expressly authorizes "equitable relief as [the court] deems necessary or proper," including restitution to make the consumer whole).

218.    Plaintiffs entrusted specific amounts of cryptocurrency to Genesis, believing—based on Defendants' misrepresentations—that Genesis was fully solvent and financially sound, and that those same assets would be returned to them at the end of the loan's term. Because these misclassifications of a $1.1 billion promissory note went to the core of Genesis's purported liquidity, the entire lending relationship was tainted from the outset.

219.    The only true way to "undo" Defendants' fraud is to return the same number of coins that Plaintiffs originally lent, given that the asset remains in active commerce and that Plaintiffs never intended to relinquish these coins in a high-risk, deceptive scenario.

220.    Moreover, any damages calculation based solely on cryptocurrency prices around the time of Genesis's bankruptcy would be inherently unjust. By then, Genesis's and Gemini's desperate attempts to cover their insolvency—such as collateral liquidations and forced asset sales—had contributed to an artificial depression of the assets' market prices. In other words, Defendants' own misconduct triggered a chain reaction that drove down Bitcoin's value beyond ordinary market fluctuations, thereby heightening Plaintiffs' losses.

221.    In fact, the price of Bitcoin sharply rose immediately after Genesis declared bankruptcy, climbing roughly 11% within the next week alone, underscoring that the earlier low

was not a simple function of market volatility but rather an outgrowth of Defendants' concealed insolvency.

222.    Awarding damages based on that suppressed price would fail to place Plaintiffs in the position they would have occupied had Defendants' wrongdoing never occurred.

223.    Selecting a valuation at some arbitrary date would be unacceptably speculative, as it assumes that Plaintiffs would have disposed of those assets on whatever chosen date. In truth, Plaintiffs' well-documented practice was to hold these coins for the long term, and they would not have sold them but for Defendants' fraud.

224.    Awarding damages based on the artificially low price of Bitcoin at the time of Defendants' bankruptcy would create an unwarranted windfall for Defendants. By fraudulently inducing Plaintiffs to maintain their assets at Genesis, Defendants suppressed Plaintiffs' ability to benefit from the subsequent price appreciation. If the Court were to measure damages at that artificially depressed snapshot, Defendants—who caused and concealed the financial collapse—would effectively reap the benefit of the later market rebound at Plaintiffs' expense. Such an outcome would neither make Plaintiffs whole nor comport with the principles underlying Connecticut's consumer-protection laws.

225.    Plaintiffs acknowledge they received some monetary proceeds from the sale of their bankruptcy claim—an amount that is only a fraction of the fair value of the coins taken. To the extent that this partial dollar payment might otherwise constitute a double recovery, Plaintiffs seek to offset that amount from the total coin-based award so as to avoid any windfall.

226.    For example, if Plaintiffs lent 1 BTC now worth $100,000 each (total $100,000) but already received $1,000 through bankruptcy distributions, Plaintiffs would remain owed the equivalent of $99,000 worth of BTC. In a scenario where the Court orders in-kind restitution

(i.e., coins), an offset of the partial dollar repayment would simply reduce the number of coins or the total monetary equivalent so that Defendants are credited for that prior payment. This approach ensures that Plaintiffs recover only what is necessary to restore them to their pre-fraud position without duplicating what little they have already received.

227.    Plaintiffs request the return of the following cryptocurrency amounts (and US dollars, for loans denominated in that currency), subject to appropriate offsets for the partial dollar payments already received:

| Plaintiff | Asset | Quantity | Approx. Value 1/2/2025 |
| --- | --- | --- | --- |
| Stephen Sokolowski | BTC | 50 | $5,055,850 |
| Stephen Sokolowski | ETH | 848.9679943 | $3,245,604 |
| Stephen Sokolowski | USDC | 86360.757695 | $86,360 |
| Stephen Sokolowski | USD | $45,282.45 | $45,282 |
| Christopher Sokolowski | ETH | 220.09263209 | $841,414 |
| Christopher Sokolowski | USDC | 155064.735245 | $155,064 |
| Christopher Sokolowski | USD | $2,621.22 | $2,621 |

| Plaintiff | Claim Sale Offset Amount |
| --- | --- |
| **Stephen Sokolowski** | -$618,627.50 |
| **Christopher Sokolowski** | -$123,515.23 |

228.    For claims brought by Stephen H. Sokolowski and Christopher H. Sokolowski in their individual capacities, damages are sought for the losses pertaining to their personal assets as detailed herein.

229.     In the alternative, should it be determined that some or all of the claims for losses detailed herein are properly brought by or on behalf of CM LLC (either directly by CM LLC as a party or by Stephen H. Sokolowski as its successor-in-interest following a potential future dissolution and assignment), damages would be sought based on the total value of all assets transacted by CM LLC with Genesis that were lost or diminished due to Defendants' actions. This includes assets managed or aggregated by CM LLC, including those beyond the direct individual contributions of Stephen H. Sokolowski or Christopher H. Sokolowski, to the extent such losses are attributable to Defendants' wrongful conduct against CM LLC. The specific nature and amount of such damages attributable to CM LLC's transactions will be established through discovery and at trial.

230.     If Defendants are unable to return the exact coins, Plaintiffs seek a monetary award of the remaining fair market value of those coins—again accounting for the partial bankruptcy proceeds as an offset—calculated at the time of payment or at final judgment, whichever the Court deems equitable. Granting only the historic loan-date value would fail to make Plaintiffs whole and would effectively reward Defendants' deception.

231.     Plaintiffs further request that this Court exercise its discretion to award punitive damages. The systematic, knowing misrepresentation of solvency—particularly through the misclassification of a massive, long-term promissory note as a "current asset"—demonstrates willful or reckless disregard for the truth. Defendants' intentionally deceptive actions here—constituting an abuse of the trust placed in them regarding a large percentage of Plaintiffs' net worth—warrant an enhanced award to deter future fraudulent practices and to ensure Plaintiffs are fully compensated.

232.     This intentional or reckless deception was not an isolated incident, as evidenced by Genesis providing similarly misleading financial statements, containing the same material misclassification, to other creditors during the same period (See Ex. D), demonstrating a pattern of fraudulent conduct warranting enhanced damages.

233.     Pursuant to Conn. Gen. Stat. § 42-110g(d), Plaintiffs seek their attorneys' fees and costs. Although they currently appear pro se, they reserve the right to recover all documented legal expenditures if they retain counsel or incur additional litigation costs.

234.     As stated earlier, Plaintiffs do not seek to recover duplicative damages from the Pennsylvania case. They wish this case to be stayed or dismissed with leave to refile so the first-filed Pennsylvania case can be heard on its merits, and intend to voluntarily dismiss this case should there be a final determination in Pennsylvania.

**PRAYER FOR RELIEF**

235.     **WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against all Defendants and grant the following relief:

236.     An order directing Defendants to deliver to Plaintiffs the identical number and type(s) of cryptocurrency coins that Plaintiffs originally entrusted to Genesis, subject to an appropriate offset for the partial bankruptcy claim sale proceeds Plaintiffs have received, so as to avoid any double recovery.

237.     In the event Defendants cannot return the same number of coins, an award to Plaintiffs of the full and fair market value of those coins, measured at the time of payment or at final judgment (whichever the Court deems just), similarly offset by any prior partial recovery, together with prejudgment interest on all sums awarded for Plaintiffs' loaned US Dollar losses

from the date of the wrongful conduct to the date of entry of judgment, and post-judgment interest thereafter, at the highest lawful rate.

238.    For clarity, Plaintiffs do not seek interest on the BTC and ETH portion of their losses, as Plaintiffs request the return of the actual coins or the equivalent value of the coins at the time of payment.

239.    An award of punitive damages considering Defendants' willful misrepresentations and reckless disregard for the truth of their financial condition. Defendants' actions undermined public trust in purportedly "safe" lending platforms and caused Plaintiffs to suffer significant monetary harm that a mere compensatory award would not remedy fully.

240.    While Plaintiffs currently appear pro se, they expressly reserve the right to recover any documented legal expenditures should they retain counsel or incur other recoverable costs.

241.    Such other and further relief as this Court deems just and proper to ensure that Plaintiffs are fully compensated for Defendants' deceptive conduct and deter similar unfair or deceptive practices in the future.

Dated: May 29, 2025

Respectfully submitted,


_____

Stephen H. Sokolowski, Pro Se Plaintiff

3178 Carnegie Drive

State College, PA 16803

(814) 600-9800

steve@shoemakervillage.org



_____

Christopher H. Sokolowski, Pro Se Plaintiff

3178 Carnegie Drive

State College, PA 16803

(814) 600-9804

chris@shoemakervillage.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.                                          Case No. _____

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,
**Defendants.**

**EXHBITS LIST**

**Exhibit A**:    Balance sheet presented to Plaintiffs by Genesis

**Exhibit B**:    $1.1 billion promissory note between Genesis and DCG

**Exhibit C**:    $1.1 billion promissory note between Genesis and DCG

**Exhibit D**:    Balance sheet presented to another Genesis lender by Genesis

**Exhibit E**:    Transcript of interview of Stephen Sokolowski by Laura Shin

**Exhibit F**     Telegram conversation history between CCM and Genesis

**Exhibit G**     CM LLC operating agreement

**Exhibit H:**    Corporate Telegram chat history between Steve Sokolowski and Hanson Birringer

**Exhibit I:**    Private Telegram chat history between Steve Sokolowski and Hanson Birringer

**Exhibit J:**    Screenshot of the Genesis Web Dashboard

**Exhibit K**     Genesis Due Diligence Questionnaire

**Exhibit L:**    E-Mails from Genesis

# Exhibit A

# Exhibit B

# Exhibit C

# Exhibit D

# Exhibit E

# Exhibit F

# Exhibit G

# Exhibit H

# Exhibit I

# Exhibit J

# Exhibit K

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.                                    Case No. _____

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,

**Defendants.**

**DECLARATION OF CHRISTOPHER SOKOLOWSKI AUTHENTICATING**
**TRANSCRIPT EXHIBIT**

I, Christopher H. Sokolowski, declare as follows:

1.    I am over the age of eighteen and am competent to make this Declaration.

2.    I am a Plaintiff in the above-captioned action, proceeding pro se.

3.    A true and correct copy of the transcript of Stephen Sokolowski's video interview with

Laura Shin (the "Transcript") is attached to the Complaint in this matter as Exhibit E.

4.    I prepared (or supervised the preparation of) the Transcript from the original audio/video

recording of the interview to the best of my ability.

5.    To the best of my knowledge and belief, the Transcript accurately reflects the

conversation that occurred during the interview.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Date: May 29, 2025

_____

Christopher H. Sokolowski, Pro Se Plaintiff

3178 Carnegie Drive

State College, PA 16803

(814) 600-9804

chris@shoemakervillage.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.                                          Case No. _____

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT, and
SOICHIRO "MICHAEL" MORO,

**Defendants.**

**DECLARATION OF STEPHEN SOKOLOWSKI AUTHENTICATING EXHIBITS**

I, Stephen H. Sokolowski, declare as follows:

1.      I am over the age of eighteen and am competent to make this Declaration.

2.      I am a Plaintiff in the above-captioned action, proceeding pro se.

3.      I received the fraudulent balance sheet (Exhibit A) from Genesis employee Griffin Tiedy.

4.      A true and correct copy of Stephen Sokolowski's Telegram conversations are included in Exhibits F, H, and I.

5.      A true and correct copy of the Cryptocurrency Management LLC's operating agreement is included in Exhibit G.

6.      A true and correct screenshot of the Genesis Web dashboard is included in Exhibit J.

7.      A true and correct copy of the Genesis Due Diligence Questionnaire is included in Exhibit K.

8.      The E-Mails provided in Exhibit L are true and correct and were received by me.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: May 29, 2025



_____

Stephen H. Sokolowski, Pro Se

3178 Carnegie Drive

State College, PA 16803

(814) 600-9800

steve@shoemakervillage.org

# Exhibit A