# EXHIBIT B

**Hearing Date: To Be Determined**
**Objection Deadline: July 29, 2025 at 4:00 p.m. (Prevailing Eastern Time)**
**Reply Deadline: August 13, 2025 at 12:00 p.m. (Prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Elliot Moskowitz
Daniel J. Schwartz
Marc J. Tobak

*Counsel to Plaintiff Digital Currency Group, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Genesis Global Holdco, LLC, et al.,<br><br>Debtors.[1] | **Case No. 23-10063 (SHL)** |
| DIGITAL CURRENCY GROUP, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>VINCENT FALCO, STEPHEN H. SOKOLOWSKI, AND CHRISTOPHER H. SOKOLOWSKI<br><br>Defendants. | **Adversary Pro. No. 25-01111-SHL** |

## MOTION FOR A PRELIMINARY INJUNCTION

Digital Currency Group, Inc. ("**DCG**"), plaintiff in the above-captioned adversary

proceeding, respectfully states as follows in support of this motion (the "**Motion**")

---

[1] The Wind-Down Debtors in these cases, along with the last four digits of each Wind-Down Debtor's registration number in the applicable jurisdiction, are as follows: Genesis Global Holdco, LLC (8219), Genesis Global Capital, LLC (8564), and Genesis Asia Pacific Pte. Ltd. (2164R).

seeking entry of a preliminary injunction in substantially the form annexed hereto as

**Exhibit A** (the "**Proposed Order**").

<u>**RELIEF REQUESTED**</u>

1.      By this Motion, pursuant to section 105(a) of title 11 of the United States

Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure, Plaintiff in the

above-captioned adversary proceeding respectfully requests that this Court enter a

preliminary injunction enjoining defendants in this adversary proceeding Vincent Falco,

Stephen H. Sokolowski and Christopher H. Sokolowski (collectively the "**Creditor**

**Defendants**") from the continued litigation of the causes of action asserted in (i) the

amended complaint filed on March 25, 2025 [ECF No. 22] (the "**Sokolowski**

**Complaint**") in the action captioned *Sokolowski v. Digital Currency Group, Inc.*, No.

4:25-cv-00001-PJC (M.D. Pa. 2025); (ii) the complaint filed on May 30, 2025 [ECF No.

1] (the "**Connecticut Complaint**" and, together with the Sokolowski Complaint, the

"**Sokolowski Complaints**") in the action captioned *Sokolowski v. Digital Currency*

*Group, Inc.*, No. 3:25-cv-00870 (D. Conn. 2025); and (iii) the complaint filed on May 6,

2025 [ECF No. 1] (the "**Falco Complaint**" and, together with the Sokolowski Complaint,

the "**Creditor Complaints**") in the action captioned *Falco v. Digital Currency Group,*

*Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y. 2025) through and including the date that is

seven days after the date on which a final order is entered in the Debtors' pending suits

against Plaintiff, including but not limited to the cases captioned *Genesis Global HoldCo,*

*LLC v. Digital Currency Grp., Inc.*, No. 25-cv-733 (D. Del. 2025) and *Genesis Global*

*Capital, LLC v. Digital Currency Grp., Inc. (In re Genesis Global HoldCo, LLC)*, Adv.

Pro. No. 25-01097 (Bankr. S.D.N.Y. 2025).  DCG respectfully requests that the Court

exercise its discretion to not require any security in connection with this Preliminary Injunction.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASIS FOR REQUESTED RELIEF

3.      Plaintiff is filing contemporaneously herewith the Complaint and a Memorandum of Law in support of the Motion (the "**Memorandum**"), which details the factual and legal bases for the requested relief, and are incorporated herein by reference.

## RESERVATION OF RIGHTS

4.      Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against Plaintiff, or (ii) a waiver of Plaintiff's or any appropriate party-in-interest's rights to dispute any claim.

## NOTICE

5.      Plaintiff will serve a copy of this Motion and the accompanying Memorandum of Law and declarations on the Defendants, as well as on Soichiro "Michael" Moro, Barry Silbert, and the Standard Parties, as defined in the *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 44]. In light of the nature of the relief requested herein, Plaintiff submits that no other or further notice need be provided.

3

## NO PREVIOUS REQUEST

6. No previous request for the relief sought herein has been made by Plaintiff to this Court or any other court.

WHEREFORE, Plaintiff respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: July 8, 2025
New York, New York

Respectfully submitted,

*/s/ Benjamin S. Kaminetzky*
Benjamin S. Kaminetzky

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Elliot Moskowitz
Daniel J. Schwartz
Marc J. Tobak

*Attorneys for Plaintiff Digital Currency Group, Inc.*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Genesis Global Holdco, LLC, et al.,<br><br>                              Debtors.[1] | **Case No. 23-10063 (SHL)** |
| DIGITAL CURRENCY GROUP, INC.,<br><br>                              Plaintiff,<br><br>              - against -<br><br>VINCENT FALCO, STEPHEN H.<br>SOKOLOWSKI, AND CHRISTOPHER H.<br>SOKOLOWSKI<br><br>                              Defendants. | **Adversary Pro. No.**<br>**25-01111-SHL** |

**[PROPOSED] ORDER PURSUANT TO 11 U.S.C. § 105(a)**
**GRANTING MOTION FOR A PRELIMINARY INJUNCTION**

Upon the motion, dated July 8, 2025 ("**July 8, 2025 Motion**"), of Digital Currency

Group, Inc. ("**DCG**"), Plaintiff in the above-captioned adversary proceeding, for an order

pursuant to section 105(a) of title 11 of the United States Code and Rule 7065 of the Federal

Rules of Bankruptcy Procedure, to enjoin defendants in this adversary proceeding Vincent Falco,

Stephen H. Sokolowski and Christopher H. Sokolowski (collectively the "**Creditor**

**Defendants**") from the continued litigation of the causes of action asserted in (i) the amended

complaint filed on March 25, 2025 [ECF No. 22] (the "**Sokolowski Complaint**") in the action

captioned *Sokolowski v. Digital Currency Group, Inc.*, No. 4:25-cv-00001-PJC (M.D. Pa. 2025);

(ii) the complaint filed on May 30, 2025 [ECF No. 1] (the "**Connecticut Complaint**" and,

---

[1] The Wind-Down Debtors in these cases, along with the last four digits of each Wind-Down Debtor's registration
number in the applicable jurisdiction, are as follows: Genesis Global Holdco, LLC (8219), Genesis Global Capital,
LLC (8564), and Genesis Asia Pacific Pte. Ltd. (2164R).

together with the Sokolowski Complaint, the "**Sokolowski Complaints**") in the action captioned

*Sokolowski v. Digital Currency Group, Inc.*, No. 3:25-cv-00870 (D. Conn. 2025); and (iii) the

complaint filed on May 6, 2025 [ECF No. 1] (the "**Falco Complaint**" and, together with the

Sokolowski Complaint, the "**Creditor Complaints**") in the action captioned *Falco v. Digital*

*Currency Group, Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y. 2025) through and including the date

that is seven days after the date on which a final order is entered in the Debtors' pending suits

against Plaintiff, including but not limited to the cases captioned *Genesis Global HoldCo, LLC v.*

*Digital Currency Grp., Inc.*, No. 25-cv-733 (D. Del. 2025) and *Genesis Global Capital, LLC v.*

*Digital Currency Grp., Inc. (In re Genesis Global HoldCo, LLC)*, Adv. Pro. No. 25-01097

(Bankr. S.D.N.Y. 2025); and the Court having jurisdiction to decide the July 8, 2025 Motion and

to order the relief requested therein under 28 U.S.C. §§ 157(a)-(b) and 1334(b); and there being

due and sufficient notice of the July 8, 2025 Motion; and the Court having reviewed the

Complaint, the July 8, 2025 Motion, DCG's memorandum of law in support of the July 8, 2025

Motion (the "**July 8, 2025 Memorandum**"), and the declaration in support of the relief

requested in the Complaint; all pleadings filed in support of the July 8, 2025 Motion; and all

objections filed in opposition or partial opposition to the July 8, 2025 Motion; and upon the

record of and representations made at the hearing held by the Court on the July 8, 2025 Motion's

request for entry of a preliminary injunction (the "**August [ ], 2025 Hearing**"), the Court having

determined that DCG has established good and sufficient legal and factual grounds to enter a

preliminary injunction.  Now, therefore, the Court finds and concludes as follows:

       (a)      The Defendants in this adversary proceeding are the Creditor Defendants.

(b)      The Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 157(a)-(b) and 1334(b).  This adversary proceeding is a core proceeding

under 28 U.S.C. § 157(b)(2).

(c)      The causes of action asserted in the Creditor Complaints are estate causes of

action.  Under the terms of the Debtors' plan of reorganization (the "**Plan**"), this

Court's order confirming the Plan (the "**Confirmation Order**"), and governing

law, the Debtors have exclusive authority to prosecute and/or resolve such claims

in accordance with the Plan and Confirmation Order.

(d)      DCG has demonstrated that the causes of action asserted in the Creditor

Complaints are estate causes of action.  The Creditor Complaints are predicated

on allegations that are substantially similar to the allegations made in support of

the Debtors' causes of action, and the causes of action asserted in the Creditor

Complaints seek recovery on account of alleged injuries that are general to

creditors of the Debtors.

(e)      DCG has demonstrated that the prosecution of estate causes of action by the

Creditor Defendants would defeat or impair this Court's jurisdiction, and

irreparably harm the orderly administration of the Debtors' estates and the Plan.

(f)      The balance of equities and public interest favor entry of the requested

injunction.

(g)      DCG has demonstrated that no security is warranted in connection with this

preliminary injunction.

(h)     Accordingly, this Court finds it appropriate to impose a preliminary injunction
        as provided herein under section 105(a) of the Bankruptcy Code and Rule 7065
        of the Bankruptcy Rules.

(i)     The legal and factual bases set forth in the Complaint, the July 8, 2025 Motion,
        and other supporting papers, as well as on the record at the August [ ], 2025
        Hearing establish just cause for the relief granted herein.

Based on these findings, it is hereby:

ORDERED, that (i) the Creditor Defendants are prohibited and enjoined from the
continued prosecution of the causes of action asserted in the Creditor Complaints and any other
cause of action that the Debtors hold exclusive authority to prosecute, through and including the
date that is seven days after the date on which a final order is entered in the Debtors' pending
suits against Plaintiff, including but not limited to the cases captioned *Genesis Global HoldCo,
LLC v. Digital Currency Grp., Inc.*, No. 25-cv-733 (D. Del. June 12, 2025) and *Genesis Global
Capital, LLC v. Digital Currency Grp., Inc. (In re Genesis Global HoldCo, LLC)*, Adv. Pro. No.
25-01097 (Bankr. S.D.N.Y. May 19, 2025).

ORDERED, that DCG need not give security in connection with this injunctive relief.

ORDERED, that this Order shall be promptly filed in the Clerk's Office and entered into
the record.

ORDERED, that DCG is authorized to take all steps necessary or appropriate to carry out
this Order.

ORDERED, that the time for all defendants to answer the Complaint is extended to a date
to be set by further order of the Court.  All claims and defenses of the parties, including those

under Rule 12 of the Federal Rules of Civil Procedure made applicable to this proceeding by Rule 7012 of the Bankruptcy Rules, are expressly preserved.

ORDERED, that the Pre-Trial Conference in this adversary proceeding is hereby adjourned.  The Court will, by further order, set the date and time of the Pre-Trial Conference.

ORDERED, that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: _____, 2025
       White Plains, New York

                                      _____
                                        THE HONORABLE SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE

Hearing Date: To Be Determined
Objection Deadline: July 29, 2025 at 4:00 p.m. (Prevailing Eastern Time)
Reply Deadline: August 13, 2025 at 12:00 p.m. (Prevailing Eastern Time)

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

Benjamin S. Kaminetzky

Elliot Moskowitz

Daniel J. Schwartz

Marc J. Tobak

*Counsel to Plaintiff Digital Currency Group, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Genesis Global Holdco, LLC, et al., <br><br> Debtors.[1] | Case No. 23-10063 (SHL) |
| DIGITAL CURRENCY GROUP, INC., <br><br> Plaintiff, <br><br> - against - <br><br> VINCENT FALCO, STEPHEN H. SOKOLOWSKI, AND CHRISTOPHER H. SOKOLOWSKI <br><br> Defendant. | Adversary Pro. No. 25-01111-SHL |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A
PRELIMINARY INJUNCTION**

---

[1] The Wind-Down Debtors in these cases, along with the last four digits of each Wind-Down Debtor's registration number in the applicable jurisdiction, are as follows: Genesis Global Holdco, LLC (8219), Genesis Global Capital, LLC (8564), and Genesis Asia Pacific Pte. Ltd. (2164R).

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................. 1

JURISDICTION .................................................................................................. 3

STATEMENT OF FACTS .................................................................................... 4

    A.   Genesis Files for Bankruptcy in January 2023 ................................... 5

    B.   The Confirmed Genesis Plan Authorizes the Debtors to Pursue Claims
       Against DCG ....................................................................................... 6

    C.   The Debtors Exercise their Exclusive Right to Prosecute Estate Claims
       Against DCG ....................................................................................... 9

    D.   The Creditor Defendants Commence Actions Asserting Estate Causes
       of Action Against DCG ..................................................................... 11

ARGUMENT ..................................................................................................... 13

I.   The Bankruptcy Code Empowers the Court to Enjoin Interference with
    Estate Property and Administration of the Confirmed Plan ...................... 14

II.   The Creditor Defendants Should Be Enjoined From Pursuing the Estate
    Claims Asserted in the Creditor Complaints ............................................ 15

    A.   DCG Is Likely to Succeed on the Merits Because the Creditor
       Complaints Assert Estate Causes of Action ...................................... 15

          1.   Only the Debtors May Pursue Derivative Claims ................... 16

          2.   The Claims Asserted in the Creditor Complaints are Derivative
              Claims ..................................................................................... 18

              a.   The Creditor Defendants assert derivative claims to redress
                  generalized injuries ....................................................... 18

              b.   The Creditor Defendants seek redress based on allegations
                  identical to those made in the Debtors' complaints ........ 22

    B.   The Creditor Suits Irreparably Harm the Orderly Administration of the
       Estates and Interfere with this Court's Jurisdiction ......................... 25

    C.   The Balance of the Equities and Public Interest Favor Enjoining the
       Causes of Action Asserted in the Creditor Complaints .................... 27

      D.    No Bond is Necessary to Enjoin the Creditor Defendants From
           Pursuing Estate Causes of Action ................................................................. 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG), 2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) .............. 28

*Aimco CLO 10 Ltd. v. Revlon, Inc. (In re Revlon, Inc.)*,
   No. 22-01167 (DSJ), 2023 WL 2229352 (Bankr. S.D.N.Y. Feb. 14, 2023) ........ 16, 25

*Baldwin-United Corp. Litig.*,
   765 F.2d 343 (2d Cir. 1985) ..................................................... 15

*Baldwin-United Corp.*,
   770 F.2d 328 (2d Cir. 1985) ..................................................... 30

*In re Bernard L. Madoff Inv. Secs., LLC*,
   512 F. App'x 18 (2d Cir. 2013) ................................................ 14

*In re Bernard L. Madoff Inv. Secs. LLC*,
   740 F.3d 81 (2d Cir. 2014) .................................... 16, 17, 18, 20, 22, 25, 26

*In re Calpine Corp.*,
   365 B.R. 401 (S.D.N.Y. 2007) ................................................. 15

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995) .......................................................... 4

*In re Chanticleer Assocs., Ltd.*,
   592 F.2d 70 (2d Cir. 1979) ................................................... 14

*Cont'l Ill. Nat'l Bank & Tr. Co. v. Chi., R.I. & P.R. Co.*,
   294 U.S. 648 (1935) .......................................................... 14

*Corning Inc. v. PicVue Elecs., Ltd.*,
   365 F.3d 156 (2d Cir. 2004) .................................................. 30

*Doctor's Assocs. v. Distajo*,
   107 F.3d 126 (2d Cir. 1997) .................................................. 29

*Doctor's Assocs. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996) ................................................ 29, 30

*Golden Krust Patties, Inc. v. Bullock*,
   957 F. Supp. 2d 186 (E.D.N.Y. 2013) ......................................... 27

*Gov't Emps. Ins. Co. v. Tolmasov,*
   602 F. Supp. 3d 380 (E.D.N.Y. 2022) ....................................................................... 30

*In re Lyondell Chem. Co.,*
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ..................................................................... 27

*In re Motors Liquidation Co.,*
   829 F.3d 135 (2d Cir. 2016) ...................................................................................... 3

*Maryland v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.),*
   No. 24-Civ-7042, 2024 WL 4894349 (S.D.N.Y. Nov. 26, 2024) ...................... 14, 15

*Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharm. L.P.),*
   619 B.R. 38, 57 (S.D.N.Y. 2020) ............................................................................ 15

*Purdue Pharm. L.P. v. Massachusetts (In re Purdue Pharm. L.P.),*
   666 B.R. 461 (Bankr. S.D.N.Y. 2024) ................................................................ 14, 27

*Ritchie Capital Mgmt., LLC v. Gen. Elec. Capital Corp.,*
   121 F. Supp. 3d 321 (S.D.N.Y. 2015) ................................................................ 21, 25

*In re Schimmelpenninck,*
   183 F.3d 347 (5th Cir. 1999) .................................................................................. 18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
   429 B.R. 423 (Bankr. S.D.N.Y. 2010) ..................................................................... 27

*In re Soundview Elite Ltd.,*
   543 B.R. 78 (Bankr. S.D.N.Y. 2016) ....................................................................... 15

*SPV OSUS, Ltd. v. UBS AG,*
   882 F.3d 333 (2d Cir. 2018) ..................................................................................... 4

*Tenn. Student Assistance Corp. v. Hood,*
   541 U.S. 440 (2004) ................................................................................................. 26

*In re Tronox Inc.,*
   855 F.3d 84 (2d Cir. 2017) ............................................................... 17, 18, 21, 28, 29

## STATUTES & RULES

11 U.S.C. § 105(a) ...................................................................................... 1, 3, 14, 15

28 U.S.C. §§ 157(a)-(b) ......................................................................................... 3

28 U.S.C. § 1334(b) ............................................................................................... 3

28 U.S.C. § 1334(e) ............................................................................................. 26

28 U.S.C. § 1651(a) ............................................................................................. 15

Fed. R. Civ. P. 65 ................................................................................................. 14

iv

Fed. R. Civ. P. 65(c) ................................................................................. 29, 30

## PRELIMINARY STATEMENT

Plaintiff Digital Currency Group, Inc. ("**DCG**") respectfully requests that this Court enjoin three creditors from continuing to use estate property for their personal benefit.  The confirmed Plan and this Court's Confirmation Order—and governing law—give the Debtors the exclusive right to prosecute estate causes of action.  The Debtors have already exercised this exclusive authority:  they have filed two complaints against DCG and certain of its affiliates, officers and principals.  Defendants, Stephen H. Sokolowski, Christopher H. Sokolowski (together, the "**Sokolowskis**"), and Vincent Falco ("**Falco,**" and together with the Sokolowskis, the "**Creditor Defendants**") have also sued DCG.  But Defendants are not asserting their own claims.  They hope to recover from DCG the unpaid balance of their claims against Genesis, and to do so based on conduct that they contend to have been directed at or through Genesis, expressed in allegations identical in substance to those made by Genesis in its complaints.  Those claims are, therefore, derivative claims that belong exclusively to the Debtors.

Section 105(a) of the Bankruptcy Code empowers this Court to enjoin the pursuit of suits that threaten the administration of the Debtors' estates and that impair this Court's jurisdiction over the Debtors' assets.  This Court should, respectfully, exercise that power to enjoin the Creditor Defendants from continuing to interfere with this Court's jurisdiction over estate property, and the confirmed Plan's provisions for administration of that property.  Each of the relevant factors heavily favors an injunction:

The Sokolowskis and Falco are asserting estate claims.  Review of the Creditor Defendants' complaints, and application of controlling Second Circuit law, leave no doubt that the Creditor Defendants are pursuing estate claims exclusively vested in the Debtors.  Their complaints contend that DCG is liable for the unrecovered amounts of

1

their claims against Genesis because DCG's alleged mismanagement led to Genesis's downfall, or because DCG allegedly joined with Genesis to harm Genesis's customers as a group. These are textbook examples of derivative claims that are property of the estates. Because the twin purposes of bankruptcy are to preserve and maximize the estate, and to ensure the estate's equitable distribution according to law, generalized claims may not be pursued by creditors, but only by the estate's representative. And, if there were any doubt remaining about whether the Creditor Defendants assert derivative claims, comparison of the Creditor Defendants' complaints and the Debtors' complaints eliminates it: The Creditor Defendants' complaints are premised on the same alleged facts as those of the Debtors, and all of the complaints seek redress for the same alleged injury to Genesis creditors. Second Circuit precedent teaches that courts look past attempts to repackage such claims as direct claims, and instead, determine that purportedly "direct" claims premised on congruent allegations and injuries are truly derivative claims that only the estate's representative may pursue.

The Creditor Defendants' Pursuit of Estate Claims Interferes with Administration of the Estates and the Court's Jurisdiction. This Court has exclusive jurisdiction over the property of the Debtors' estates. By choosing to prosecute estate claims, the Creditor Defendants have subjected estate property and its potential distribution—those claims and disposition of any proceeds thereof—to the jurisdiction of other courts. The Creditor Defendants also frustrate administration of the estates pursuant to the confirmed Plan by prosecuting claims that the Plan vests in the Debtors, and by doing so for their sole benefit, unconstrained by the oversight mechanisms established under the Plan or the fiduciary duties that the Plan imposes. Section 105(a) is designed to address just this

situation, and the Confirmation Order expressly provides for this Court's retained jurisdiction to enjoin any party's interference with enforcement of the Plan.

An Injunction is Equitable and in the Public Interest.  If not enjoined, the Creditor Defendants' suits will result in a race between the Creditor Defendants and hundreds of similarly situated creditors whose interests are represented in the parallel litigation brought by the Debtors.  And other creditors of Genesis may well decide to launch their own suits, increasing the number of actions competing with the estates.  None of that is consistent with the confirmed Plan or basic bankruptcy principles.  Weighed against the chaotic scenario they have brought about, the Creditor Defendants will suffer little or no cognizable harm by being enjoined from pursuing claims that are not theirs to pursue in the first place.

For the foregoing reasons, and for the reasons set forth below, the Creditor Defendants should be enjoined from continuing to prosecute estate causes of action.

## JURISDICTION

This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. §§ 157(a)-(b), and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012.  The Court has "arising in" jurisdiction over this adversary proceeding because it requires the Court to "interpret and enforce" its order confirming the Debtors' plan of reorganization.  *In re Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016).  The Court also has "related to" jurisdiction over this adversary proceeding, and jurisdiction to enjoin the Creditor Defendants, because the Creditor Defendants' actions "could conceivably have any effect on the estate being administered in bankruptcy."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995); *SPV Osus Ltd. v.*

*UBS AG*, 882 F.3d 333, 339 (2d Cir. 2018) (court had "related to" jurisdiction to stay non-debtor litigation that could have a "conceivable impact" on the estate). DCG seeks to enjoin the Creditor Defendants from prosecuting causes of action that are derivative of estate causes of action, and, if prosecuted, threaten this Court's jurisdiction over the estates and their administration. This Court's exercise of jurisdiction is also consistent with the Debtors' Plan and this Court's Confirmation Order, which provide that the Court retains jurisdiction "over all matters arising in and under, and related to, the Chapter 11 Cases." (Ex. J (Confirmation Order) at ¶¶ 74, 172; Ex. H (Plan) at XI.7, 9, 11, 12.)[2]

## STATEMENT OF FACTS[3]

Genesis Global Holdco, LLC ("**Holdco**") and certain of its affiliates (collectively, "**Genesis**" or the "**Debtors**") were entities involved in digital assets financial services that entered chapter 11 bankruptcy on January 19, 2023.

Plaintiff in the above-captioned adversary proceeding, Digital Currency Group, Inc. ("**DCG**") is a holding company that was the ultimate corporate parent of Genesis.

The Sokolowskis are brothers who, through their wholly owned LLC investment fund, Cryptocurrency Management LLC ("**CM**") loaned cryptocurrencies to Genesis. (Ex. C (Sokolowski Compl.) at ¶¶ 2, 4-5, 8, 105); (Ex. D (Conn. Compl.) at ¶¶ 8, 10-12, 132; *see also* Notice of Transfer of Claim – E1 [ECF No. 50].)[4] The Sokolowskis,

---

[2] Citations in the form of "Ex. A" are to Exhibits to the Declaration of Marc J. Tobak in Support of Plaintiff's Motion for a Preliminary Injunction, dated July 8, 2025 [ECF No. 3].

[3] Unless otherwise noted, ECF numbers reference docket entries in the chapter 11 proceedings *In re Genesis Global HoldCo, LLC*, No. 23-10063-SHL (Bankr. S.D.N.Y.).

[4] Although plaintiffs bring the Sokolowski suit in their own name, they acknowledge that their claims arise from contracts entered into between CM and Genesis. (Ex. C (Sokolowski Compl.) at ¶¶ 8 (admitting that "none of the named Plaintiffs (in their personal capacities) nor any of the named Defendants"—including DCG—"were parties to" the agreements), 22, 31-32); (Ex. D (Conn. Compl.) at

through CM, were general unsecured creditors of the Debtors and resolved their claims against the Debtors in a transfer to Jefferies Leveraged Credit Products, LLC on January 31, 2023.  (*Id.*)  They allege they collectively received $742,142.73 in connection with the sale.  (Ex. C (Sokolowski Compl.) at ¶ 155; Ex. D (Conn. Compl.) at ¶ 227.)  Vincent Falco is an individual who loaned cryptocurrencies to Genesis and is a general unsecured creditor of the Debtors.  (Ex. E (Falco Compl.) at ¶ 64.)

### A.  Genesis Files for Bankruptcy in January 2023

Prior to their chapter 11 filing, the Debtors were involved in cryptocurrency-related financial services, including: (i) facilitating spot trading in digital assets; (ii) digital asset lending and borrowing services in consideration for the payment of interest; (iii) derivatives services; and (iv) custodial services for customers to securely store digital assets.  A. Derar Islim First Day Decl. at ¶ 12 [ECF No. 17] ("**Islim Decl.**").  Holdco was a holding company for Genesis Global Capital, LLC ("**GGC**") and Genesis Asia Pacific PTE. Ltd. ("**GAP**").

In May of 2022, the digital assets market "experienced tremendous dislocation" after two cryptocurrencies—LUNA and TerraUSD—collapsed.  *Id.* at ¶ 28.  Soon thereafter, digital asset hedge fund Three Arrows Capital Ltd. ("**3AC**") was unable to meet its creditors' margin calls and commenced liquidation proceedings.  *Id.*  The Debtors had extended various loans to 3AC since 2020, which loans amounted to approximately $2.4 billion in cash and digital assets.  *Id.* at ¶ 31.  The Debtors were only able to foreclose on approximately $1.2 billion of the outstanding obligations, leaving

---

¶¶ 12, 29, 43-44 (same)).  CM sold all its claims to Jefferies early in the Debtors' bankruptcy, and the Sokolowski plaintiffs do not allege they have any claims against Genesis separate from the claims of CM.

$1.1 billion remaining payable in connection with the 3AC lending relationship. *Id.*

¶¶ 31-32.  On June 30, 2022, DCG assumed the remainder of GAP's loans with 3AC, and

entered into a $1.1 billion promissory note in favor of GGC that had a 10-year maturity

and fixed interest rate of 1% that could, at DCG's option, be paid in kind, thereby

assuming and replacing GAP's intercompany loan payable to GGC. *Id.* ¶ 32.

Meanwhile, market decline spread to other crypto-associated companies: in July

2022, both Celsius Network LLC and Voyager Digital Holdings, Inc. filed for

bankruptcy.  Islim Decl. ¶ 29.  Mere months later, FTX Trading Ltd. ("FTX") and,

Alameda Research Ltd. ("Alameda") filed for Chapter 11 bankruptcy on November 11,

2022, creating unprecedented and widespread market contagion in the crypto industry.

*Id.* at ¶¶ 29, 33-35.  This period has since been dubbed the "crypto winter."

In response to these "drastic market shifts," Genesis experienced unprecedented

withdrawals.  Islim Decl. at ¶ 30.  As FTX began to collapse, the Debtors received calls

on their loans amounting to approximately $827 million—essentially, a bank run. *Id.* at ¶

37.  Unable to meet the unprecedented volume and size of the loan calls, the Debtors

paused all lending and borrowing on November 16, 2022. *Id.* at ¶ 39.  The Debtors filed

for chapter 11 bankruptcy on January 19, 2023. *See* Chapter 11 Voluntary Pet. For Non-

Individual [ECF No. 1].

### B. The Confirmed Genesis Plan Authorizes the Debtors to Pursue Claims Against DCG

The Debtors' Plan and Disclosure Statement make clear that pursuit of estate

claims against DCG is a centerpiece of the confirmed Plan.  As explained in the Debtors'

Amended Disclosure Statement [ECF No. 1031] (the "**Disclosure Statement**"), "the

most valuable Distributable Assets are the estates' claims against the DCG Parties."  (Ex.

F (Disclosure Statement) at 119.) Consequently, the Disclosure Statement highlights that a "key component[]" (Ex. F (Disclosure Statement) at 2) of the Plan consideration provided to Genesis creditors is the value of such claims: the Disclosure Statement describes the distribution to Holders of Allowed General Unsecured Claims as including "certain Avoidance Recoveries (including proceeds from any and all Causes of Action or other claims against any of the DCG Parties) . . . ." (Ex. F (Disclosure Statement) at 2.) To ensure that no creditor failed to understand the risk that this posed, the Disclosure Statement cautions that "[a]ny litigation against the DCG Parties would involve significant time and expense for an uncertain outcome . . . Distributions to creditors could be significantly delayed pending the results of litigation, and would not be available to the extent that the [Debtors] were not successful in litigation." (Ex. F (Disclosure Statement) at 123.) Consistent with the Debtors' view that claims against DCG represent a significant form of value for the benefit of Genesis's creditors, the Disclosure Statement sets forth, at length, the results of the "Special Committee Investigation" into the Debtors' purported claims against DCG. (Ex. F (Disclosure Statement) at 35-46.)

The Debtors' plan of reorganization [ECF No. 1874] (the "**Plan**") therefore provides that the Debtors retain the exclusive right to prosecute causes of action against DCG. Provisions to preserve and prosecute these causes of action are woven throughout the confirmed Plan. For example:

- The Plan provides for "Retained Causes of Action," which are defined as causes of action "that belong to the Debtors or their Estates . . . which shall include . . . all such Causes of Action or other claims against . . . any of the DCG Parties." (Ex. H (Plan) at Art. I.A.208.)

- The Plan vests the "Retained Causes of Action" in the Debtors, which may "exclusively enforce any and all such Causes of Action". (Ex. H (Plan) at Art. IV.B.14.)

- The Plan reserves to the Debtors "the exclusive right**,** authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action." (Ex. H (Plan) at Art. IV.B.14.)

- The Plan creates the office of "PA Officer," that is charged with "enforcing Retained Causes of Action" (Ex. H (Plan) at Art. IV.A.2).

- The Plan creates a Litigation Oversight Committee to review and advise the PA Officer on "strategy and pursuit of the Retained Causes of Action."  (Ex. H (Plan) at Art. IV.A.4.)

- The Plan imposes on both the PA Officer and Litigation Oversight Committee fiduciary duties owed to "all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan," and charges them with pursing the Debtors' causes of action consistent with their duties to creditors.  (Ex. H (Plan) at Art. IV.A.4.)

- The Plan Supplement [ECF No. 1117] (the **"Plan Supplement"**) emphasizes that the Debtors "expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors [and] their Estates . . . against any DCG Party (including DCG and Barry Silbert) . . . including claims for alter ego, preference, fraudulent conveyance, breach of fiduciary duty, equitable subordination, recharacterization, and improper setoff, breach of contract, and claims sounding in fraud or aiding and abetting fraud."  (Ex. G (Plan Supplement) at 2.)

This Court confirmed the Plan on July 21, 2024, [ECF No. 1736] (the

"**Confirmation Order**").  The Court explained in its memorandum opinion confirming

the Plan [ECF No. 1691] (the "**Confirmation Opinion**") that "[t]he contemplated focus

of post-confirmation activity under this "No Deal" Plan is litigation aimed at DCG."  (Ex.

I (Confirmation Opinion) at 92.)  Accordingly, in addition to confirming the Plan, the

Confirmation Order's decrees provide that only the Debtors may pursue estate causes of

action.  Paragraphs 40 and 116-118 of the Confirmation Order state that "the Debtors

shall retain, and may enforce, all rights to commence and pursue, as appropriate, any and

all Causes of Action belonging to the Debtors or their Estates . . . including any Retained

Causes of Action," while Paragraph 118 further provides that the right to pursue those

causes of action is "exclusively" vested in the Debtors.

Having vested the Debtors with exclusive authority to prosecute estate Causes of Action, the Court further ordered that it retained jurisdiction to administer and enforce the Plan and Confirmation Order. This Court thus retains jurisdiction to:

- "adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor" (Ex. H (Plan) at Art. XI.7; Ex. J (Confirmation Order) at ¶ 74);

- "enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan" (Ex. H (Plan) at Art. XI.9; Ex. J (Confirmation Order) at ¶ 172);

- "resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan" (Ex. H (Plan) at Art. XI.11; Ex. J (Confirmation Order) at ¶ 118);

- "issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan" (Ex. H (Plan) at Art. XI.12; Ex. J (Confirmation Order) at ¶ 38).

### C. The Debtors Exercise their Exclusive Right to Prosecute Estate Claims Against DCG

In May 2025, the Debtors exercised their exclusive right to prosecute claims against DCG, and against individual defendants including Barry Silbert and Soichiro "Michael" Moro. *See* Notice of Removal, *Genesis Global HoldCo, LLC v. Digital Currency Grp., Inc.*, No. 25-cv-733, at Ex. A (D. Del. June 12, 2025) (the "**Delaware Suit**") [ECF No. 1-1]; Complaint, *Genesis Global Capital, LLC v. Digital Currency Grp., Inc. (In re Genesis Global HoldCo, LLC)*, Adv. Pro. No. 25-01097 (Bankr. S.D.N.Y. May 19, 2025) [ECF No. 1] (the "**Adversary Proceeding**" and, together with the Delaware Suit, the "**Debtor Suits**").

The Delaware Suit asserts a number of claims seeking to hold DCG and individual defendants including Messrs. Silbert and Moro liable for alleged breaches of duties owed to Genesis and its customer-creditors. The Debtors assert claims against DCG for breaches of fiduciary duties to Genesis and Genesis's creditors (Ex. A (Del. Compl.) at ¶¶ 216-229), aiding and abetting breaches of fiduciary duties, (Ex. A (Del. Compl.) at ¶¶ 259-268), operating Genesis as the "alter ego and instrumentality" of DCG, (Ex. A (Del. Compl.) at ¶¶ 220, 355-365), and for unjust enrichment (Ex. A (Del. Compl.) at ¶¶ 279-289). The Debtors also bring claims against DCG in their capacity as the assignee of Gemini Trust Co.'s claims for fraud and negligent misrepresentation.[5]

In the Adversary Proceeding, the Debtors seek to claw back certain transfers allegedly made to DCG as avoidable fraudulent or preferential transfers. (Ex. B (Adv. Pro.) at ¶¶ 146-188.) The Debtors allege that DCG was an insider at Genesis and therefore "knew through [its] close relationship with Genesis that its business was on the brink of collapse (Ex. B (Adv. Pro.) at ¶¶ 1, 152), and that certain transfers from Genesis to DCG were made while Genesis was insolvent (Ex. B (Adv. Pro.) at ¶ 180).

Taken together, the Debtor Suits assert that DCG and the individual defendants are liable because DCG allegedly controlled and made decisions for Genesis to such an extent that Genesis was an alter ego and "puppet" of DCG; because DCG purportedly facilitated Genesis's alleged misconduct—including, critically, by helping Genesis draft statements that Genesis and its employees made and by entering into an allegedly "sham"

---

[5] The Debtors assert their eighth cause of action—alter ego—both as Genesis Debtors and as assignees of Gemini's claims. (Ex. A (Del. Compl.) at ¶ 356.)

$1.1 billion promissory note; and because DCG and the individual defendants obtained for themselves value that allegedly should have gone to Genesis's creditors.

### D. The Creditor Defendants Commence Actions Asserting Estate Causes of Action Against DCG

Long after confirmation of the Plan and entry of the Confirmation Order vesting the Debtors with the "exclusive right" to pursue estate causes of action, the Creditor Defendants commenced their own actions against DCG and individual defendants. Amended Complaint, *Sokolowski v. Digital Currency Group, Inc.*, No. 4:25-cv-00001-PJC (M.D. Pa. Mar. 25, 2025) [ECF No. 22] (the "**Sokolowski Complaint**"); Complaint, *Sokolowski v. Digital Currency Group, Inc.*, No. 3:25-cv-00870 (D. Conn. May 30, 2025) [ECF No. 1] (the "**Connecticut Complaint**" and, together with the Sokolowski Complaint, the "**Sokolowski Complaints**"); Complaint, *Falco v. Digital Currency Group, Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y. May 6, 2025) [ECF No. 1] (the "**Falco Complaint**" and, together with the Sokolowski Complaints, the "**Creditor Complaints**"). Each of these actions, in the Creditor Defendants' own words, seeks to hold DCG liable for the amounts of the Creditor Defendants' claims against Genesis that they have not yet recovered through the bankruptcy. (Ex. E (Falco Compl.) at ¶¶ 5-6; Ex. C (Sokolowski Compl.) at ¶¶ 155-56; Ex. D (Conn. Compl.) at ¶ 189.) And in each of these actions, the Creditor Defendants hope to hold DCG and individual defendants liable for injuries to Genesis or Genesis creditors at large, <u>not</u> for any conduct specifically directed to the Creditor Defendants.

Falco, who sued DCG and Messrs. Silbert and Moro, contends that he was "fraudulently induced into loaning a substantial amount of bitcoin to a company that was in its death throes"—i.e. Genesis. (Ex. E (Falco Compl.) at ¶ 2.) Falco asserts that he

relied on various false representations that Genesis and Genesis personnel made to him—for example, he alleges a "Genesis Global representative" presented Falco with a lending report that included "false" figures (Ex. E (Falco Compl.) at ¶¶ 60-62) and that "Genesis Global sent . . . individual investors like Falco[] reports falsely describing Genesis Global's financial condition," (Ex. E (Falco Compl.) at ¶ 114). Falco seeks to hold DCG and the individual defendants liable for these misrepresentations by Genesis because, he contends, they were "mere alter egos of Genesis Global," or because they "caused" or "orchestrated" these false statements by Genesis. (Ex. E (Falco Compl.) at ¶¶ 4, 65, 78, 84, 88 n.21, 106, 113-14.)

Falco does not allege that he had any direct communication with DCG or any of the individual defendants in his action. In connection with his allegations, Falco asserts causes of action for common law fraud; aiding and abetting fraud; conspiracy to commit fraud; New York tortious interference with contract; violation of New York Business Law § 349; violation of California consumer protection and unfair competition laws; and violation of Connecticut unfair trade practices law. (Ex. E (Falco Compl.) at ¶¶ 149-207.)

The two Sokolowski Complaints, which are, in the Sokolowskis' own words "identical," also name DCG, Mr. Silbert and Mr. Moro. The Sokolowskis claim that "a Genesis employee" showed them a "fraudulent balance sheet" (Ex. C (Sokolowski Compl.) at ¶ 11; Ex. D (Conn. Compl.) at ¶ 19), and that "relying on the deceptive balance sheet provided to them and the overall impression that Genesis's service was safe and well-capitalized," they caused their investment fund, CM, to continue to lend assets to Genesis. (Ex. C (Sokolowski Compl.) at ¶ 97; Ex. D (Conn. Compl.) at ¶ 127.) Like

Falco, the Sokolowskis allege that "Genesis routinely communicated with its clients, including Plaintiff" (Ex. C (Sokolowski Compl.) at ¶ 80; Ex. D (Conn. Compl.) at ¶ 98), and that CM relied on a "deceptive balance sheet" provided to them by "a Genesis employee," which purportedly listed the promissory note entered into between DCG and Genesis as a "current asset" (Ex. C (Sokolowski Compl.) at ¶¶ 11, 94, 97; Ex. D (Conn. Compl.) at ¶¶ 19, 123, 127). The Sokolowskis posit that DCG should be held liable for Genesis' alleged misrepresentations because DCG "orchestrated," "approved" and had "control" over Genesis and its communications with customers (Ex. C (Sokolowski Compl.) at ¶¶ 111, 115, 124; Ex. D (Conn. Compl.) at ¶¶ 150, 155, 175)—including, by way of example, its preparation for Genesis of "Genesis Source of Strength Talking Points" that allegedly were designed to "present a misleading narrative of stability." (Ex. C (Sokolowski Compl.) at ¶ 107; Ex. D (Conn. Compl.) at ¶ 145.) In connection with these allegations, the Sokolowskis assert one cause of action for violation of Pennsylvania's consumer protection law in their Pennsylvania action (Ex. C (Sokolowski Compl.) at ¶¶ 136-149) and claims for violation of Connecticut's unfair trade practices law; fraud; negligent misrepresentation; conspiracy; aiding and abetting fraud; and unjust enrichment in their Connecticut action. (Ex. D (Conn. Compl.) at ¶¶ 192-215.)

## ARGUMENT

The Sokolowskis and Falco seek to recover on claims that are properly assertable exclusively by the Debtors, and that the Debtors have already asserted. Both the law and facts weigh in favor of a temporary injunction of the claims asserted in the Creditor Complaints.

I.    **The Bankruptcy Code Empowers the Court to Enjoin Interference with Estate Property and Administration of the Confirmed Plan**

Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a); *see also Purdue Pharm. L.P. v. Massachusetts (In re Purdue Pharm. L.P.)*, 666 B.R. 461, 467 (Bankr. S.D.N.Y. 2024) (Lane, J.) ("In appropriate circumstances, Section 105 has been used to enjoin actions that were filed against non-debtors where such suits might impede the reorganization process."); *In re Bernard L. Madoff Inv. Secs., LLC*, 512 F. App'x 18, 20 (2d Cir. 2013) ("Section 105(a) is to be 'construed liberally to enjoin suits that might impede the reorganization process.'" (quoting *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988))).  The authority to temporarily enjoin litigation between non-debtor parties which threatens a bankruptcy court's jurisdiction has long been recognized; it predates the Code and is rooted in the All Writs Act.  *See Cont'l Ill. Nat'l Bank & Tr. Co. v. Chi., R.I. & P.R. Co.*, 294 U.S. 648, 675-77 (1935) (holding that "[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is [] inherent in a court of bankruptcy, as it is in a duly established court of equity" and is also sourced in the All Writs Act and the predecessor to Section 105(a) of the Bankruptcy Code); *In re Chanticleer Assocs., Ltd.*, 592 F.2d 70, 74 (2d Cir. 1979) (citing section 105(a)'s predecessor for the principle that "the court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate is fundamental to the scheme of the Bankruptcy Act"); *Maryland v. Purdue Pharma L.P. (In re Purdue Pharma L.P.) ("Maryland")*, No. 24-Civ-7042, 2024 WL 4894349, at *5 (S.D.N.Y. Nov. 26, 2024) (recognizing that section 105(a) vests bankruptcy courts with

14

the authority to temporarily enjoin non-debtor litigation); 28 U.S.C. § 1651(a) ("[A]ll

courts established by Act of Congress may issue all writs necessary or appropriate in aid

of their respective jurisdictions.").  This equitable power is an essential characteristic of

bankruptcy courts and ensures "the orderly conduct of the reorganization proceedings."

*Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985).

## II.  The Creditor Defendants Should Be Enjoined From Pursuing the Estate Claims Asserted in the Creditor Complaints

Federal Rule of Civil Procedure 65, modified to fit the bankruptcy context, sets

forth the four factors courts evaluate in connection with requests for a preliminary

injunction: (1) whether there is a reasonable likelihood of success on the merits;

(2) whether the "reorganization process" may suffer imminent irreparable harm in the

absence of an injunction; (3) whether the balance of harms weighs in favor of the moving

party; and (4) whether the injunction is in the public interest.  *See Maryland*, 2024 WL

4894349 at *7 (applying modified four-factor test and affirming this Court's preliminary

injunction against litigation that threatened the debtors' most valuable assets); *Dunaway

v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*, 619 B.R. 38, 58 (S.D.N.Y. 2020)

(same); *In re Soundview Elite Ltd.*, 543 B.R. 78, 118-20 (Bankr. S.D.N.Y. 2016).  "In

evaluating these factors, the court takes a flexible approach and no one factor is

determinative."  *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal

quotation marks omitted).  Here, all four factors weigh strongly in favor of the requested

relief.

### A.  DCG Is Likely to Succeed on the Merits Because the Creditor Complaints Assert Estate Causes of Action

DCG is likely to succeed on its claim that the Creditor Defendants seek to

prosecute estate causes of action.  The Creditor Complaints arise out of the same facts as

the Debtor Suits, seek to hold DCG liable for generalized harm to Genesis and its creditors, and hope to recover from DCG the unpaid amounts of the Creditor Defendants' claims against the Debtors' estates.

      1.   Only the Debtors May Pursue Derivative Claims

The Plan and Confirmation Order vest the Debtors with the exclusive right to pursue all estate causes of action against DCG. Those causes of action encompass, at minimum, any claims that Genesis could have pursued in its own name before filing for bankruptcy. (*See* Ex. H (Plan) at Art. I.A.35.) As a result, any claim that is "derivative" under governing state law, and that as a result can be pursued only by the corporation outside of bankruptcy, is estate property that can be prosecuted only by the Debtors and pursuant to the Plan. *E.g.*, *In re 305 East 61st Street Group LLC*, 130 F.4th 272, 280-81 (2d Cir. 2025) (affirming bankruptcy court's determination that certain claims were derivative as a matter of state law and that as a result creditors could not pursue them); *St Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 697 (2d Cir. 1989).

Once a debtor files for bankruptcy, however, the analysis does not end with state law. In addition to its entitlements under state law, as a matter of bankruptcy law the estate alone may pursue claims that "arise from harm done to the estate" and that seek relief from third parties that allegedly caused that harm to the estate and its creditors. *In re Bernard L. Madoff Inv. Sec. LLC ("Madoff")*, 740 F.3d 81, 89 (2d Cir. 2014); *see also Aimco CLO 10 Ltd. v. Revlon, Inc. (In re Revlon, Inc.)*, Adv. Pro. No. 22-01167 (DSJ), 2023 WL 2229352 at *14 (Bankr. S.D.N.Y. Feb. 24, 2023) (explaining considerations of both state law and bankruptcy law to determine whether claim is derivative); *In re Port Morris Tile & Marble LP*, 645 B.R. 500, 515 (Bankr. S.D.N.Y. 2022) ("The proper

analysis, then, involves a comparison between the harms that are subject of the creditors'

claim and the harms that are actionable via the trustee's claims.").

Thus, creditors of a bankrupt debtor cannot sue a third party for having allegedly

mismanaged or looted the debtor or participated in acts which led to the debtor's

bankruptcy. Such claims are classically derivative and may be pursued only by the estate

(i.e., by a trustee, debtor in possession, or their successor). *Madoff*, 740 F.3d at 93.

Likewise, claims that seek to augment the estate by holding third parties—such as

DCG—liable for the conduct of the debtor on theories such as alter ego and veil piercing

"benefit all creditors of the [] debtors generally" and are derivative. *E.g.*, *In re Tronox*

*Inc.*, 855 F.3d 84, 107 (2d Cir. 2017).

The estate's sole authority to pursue derivative claims is not limited to claims that

on their face seek redress for harm done to the estate. The estate also has sole authority

to pursue "generalized" claims that seek to hold third parties liable for harm <u>caused by</u>

the debtors in which the third parties allegedly participated. As the Second Circuit

explained, the estate is "conferred the right to recover for derivative, generalized claims"

because "[t]he whole point of channeling claims through bankruptcy is to avoid creditors

getting ahead of others in line of preference and to promote an equitable distribution of

debtor assets." *Id.* at 106. When assessing whether a claim is "generalized" and thus

derivative, or "particularized" and thus direct (and properly brought by an individual

creditor), courts must look beyond pleading "labels" and avoid "putting form over

substance," by "inquir[ing] into the factual origins of the injury, and, more importantly,

the nature of the legal claims asserted." *Id.* at 100 (quoting *Madoff*, 740 F.3d at 89). To

that end, in determining whether claims are direct or derivative, courts evaluate

17

(a) whether the plaintiff's alleged harm is particularized to the individual plaintiff-creditor, or shared by the body of all creditors, or all similarly situated creditors, and (b) whether the estate could pursue or is pursuing causes of action predicated on identical alleged facts to those in the plaintiff's suit. *Madoff*, 740 F.3d at 92 (rejecting creditors' efforts to "plead[] around" what were essentially causes of action based on estate claims); *Tronox*, 855 F.3d at 99 (holding claims were derivative where they were "based on rights 'derivative' of, or 'derived' from, the debtor's"); *see also In re Schimmelpenninck*, 183 F.3d 347, 360 (5th Cir. 1999) (defining derivative claims as "[a]ctions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors").

## 2. The Claims Asserted in the Creditor Complaints are Derivative Claims

The allegations of the Creditor Complaints conclusively demonstrate that the Creditor Defendants are improperly asserting derivative claims. They seek to recover for generalized injuries to customers of Genesis—or Genesis creditors as a whole—and, conversely, fail to allege that they suffered any particularized harm that DCG caused directly, as opposed to through Genesis. They also seek to recover based on alleged misconduct directed to <u>Genesis</u>, unsurprisingly premised on the exact same facts alleged in the Debtors' complaints.

### a. The Creditor Defendants assert derivative claims to redress generalized injuries

The Creditor Defendants all contend that DCG's conduct caused Genesis to be unable to repay the Creditors' claims in full, and that, as a result, DCG should be liable to the Creditor Defendants for the unrecovered balance of their claims. (Ex. E (Falco Compl.) at ¶¶ 5-6 ("Because the Genesis Global estate has not recovered nearly enough

18

to make Falco whole, Falco is still out a significant amount of the bitcoin he loaned to Genesis Global, and he seeks to recover the bitcoin the Defendants fraudulently took from him."), 160-161, 191; Ex. C (Sokolowski Compl.) at ¶¶ 130-33, 159 (seeking recovery from DCG of "the identical number and type(s) of cryptocurrency coins that Plaintiffs originally entrusted to Genesis, subject to an appropriate offset for the partial bankruptcy claim sale proceeds Plaintiffs have received"); Ex. D (Conn. Compl.) at ¶¶ 186-88, 236 (same).)

The core allegations of the Creditor Complaints bear out that the Creditor Defendants seek to hold DCG liable for allegedly mismanaging Genesis or working with Genesis to cause the injuries the Creditor Defendants aver they suffered. The Creditor Defendants (like the Debtors) allege:

- Genesis was the alter ego of and controlled by DCG. (Ex. C (Sokolowski Compl.) at ¶ 122; Ex. D (Conn. Compl.) at ¶¶ 172-73; Ex. E (Falco Compl.) at ¶ 88 n. 21, 43; Ex. B (Adv. Pro.) at ¶ 2; Ex. A (Del. Compl.) at ¶ 54.)

- DCG caused Genesis to engage in deficient risk management practices, be overconcentrated in the cryptocurrency market, and operate with insufficient liquidity. (Ex. E (Falco Compl.) at ¶¶ 42, 62, 65; Ex. C (Sokolowski Compl.) at ¶¶ 90-91; Ex. D (Conn. Compl.) at ¶¶ 112-13; Ex. B (Adv. Pro.) at ¶¶ 49-56; Ex. A (Del. Compl.) at ¶ 222.)

- When cryptocurrency prices declined, Genesis faced outsize exposure to the risk of a counterparty default, which materialized when cryptocurrency hedge fund 3AC failed to meet a margin call that the Debtors had made on an outstanding $2.36 billion obligation. (Ex. C (Sokolowski Compl.) at ¶¶ 90-92; Ex. D (Conn. Compl.) at ¶¶ 112-13; Ex. E (Falco Compl.) at ¶¶ 40-42, 66; Ex. B (Adv. Pro.) at ¶ 74, Ex. A (Del. Compl.) at ¶¶ 118-121.)

- Genesis was left with a balance sheet "hole" after the 3AC failure, which DCG filled by issuing a promissory note of $1.1 billion to GGC. (Ex. C (Sokolowski Compl.) at ¶¶ 91-93, 101; Ex. D (Conn. Compl.) at ¶¶ 112-13, 132; Ex. E (Falco Compl.) at ¶¶ 44, 69, 103, 112, 124-25; Ex. B (Adv. Pro.) at ¶ 80; Ex. A (Del. Compl.) at ¶¶ 147, 156, 158.)

- At the direction of DCG, Genesis used its misleadingly repaired balance sheet to offer "false assurances" and disseminate misinformation regarding Genesis'

financial health.  (Ex. C (Sokolowski Compl.) at ¶¶ 112-14; Ex. D (Conn. Compl.) at ¶¶ 152-54, 236; Ex. E (Falco Compl.) at ¶¶ 43-45; Ex. B (Adv. Pro.) at ¶ 86; Ex. A (Del. Compl.) at ¶¶ 159-176, 210.)

- In reality, Genesis was effectively insolvent, and when it could no longer meet its customers' loan calls, it filed for bankruptcy.  (Ex. E (Falco Compl.) at ¶¶ 5, 69, 148; Ex. C (Sokolowski Compl.) at ¶ 93; Ex. D (Conn. Compl.) at ¶ 121; Ex. B (Adv. Pro.) at ¶ 86; Ex. A (Del. Compl.) at ¶ 212.)

It is equally clear from the face of the Creditor Complaints that the Creditor Defendants seek to hold DCG liable for generalized, not particularized, injuries.  As alleged, DCG's misconduct <u>directly</u> harmed Genesis, and only <u>derivatively</u> harmed Genesis creditors by diminishing the Genesis estates or by otherwise causing Genesis's bankruptcy.  These are textbook examples of derivative claims.  *Madoff*, 740 F.3d at 89 ("We have defined so-called "derivative claims" in the context of bankruptcy as ones that "arise[ ] from harm done to the estate" and that "seek [ ] relief against third parties that pushed the debtor into bankruptcy.").  To the extent the alleged misconduct did not harm Genesis itself, the Creditor Defendants allege that DCG's conduct—making public statements about the crypto market or helping Genesis craft allegedly misleading statements that Genesis disseminated to customers—helped <u>Genesis</u> injure its customers <u>as a whole</u>.  This is amply illustrated by the Falco Complaint and Connecticut Complaint, which assert claims for aiding and abetting <u>Genesis's</u> fraud (*e.g.*, Ex. E (Falco Compl.) at ¶¶ 165-68; Ex. D (Conn. Compl.) at ¶ 211), for conspiring <u>with</u> <u>Genesis</u> to harm customers (*e.g.*, Ex. E (Falco Compl.) at ¶¶ 172-74; Ex. D (Conn. Compl.) at ¶ 207), or for <u>causing</u> <u>Genesis</u> to make false representations to customers (*e.g.*, Ex. E (Falco Compl.) at ¶¶ 180-182; Ex. D (Conn. Compl.) at ¶ 199).  All of this conduct, the Creditor Defendants allege, was not directed to the Creditor Defendants in particular, and did not injure them particularly or individually.  In Falco's own words, this conduct injured

20

"thousands of investors" similarly situated. (*E.g.* Ex. E (Falco Compl.) at ¶¶ 162 ("Defendants defrauded thousands of investors"), 170 ("Defendants substantially aided the defrauding of thousands of investors"), 176 ("Defendants conspired to defraud thousands of investors"), 192 ("Defendants tortiously interfered with and damaged thousands of investors").) Such claims, which seek to recover for injury to the body of Genesis's customer-creditors, are derivative. *Tronox*, 855 F.3d at 106.

Conversely, it is equally clear that the Creditor Complaints fail to allege any particularized injury as would be needed to state a direct claim. None of the Creditor Complaints contains any allegation that DCG acted or failed to act in any manner directed to a Customer Defendant; DCG is only alleged to have acted <u>through</u> Genesis, by allegedly crafting, causing, or otherwise facilitating the allegedly false or misleading statements that <u>Genesis</u> made to the Creditor Defendants. (*See, e.g.*, Ex. E (Falco Compl.) at ¶¶ 2, 30-31, 40, 47, 51, 53, 54, 58-59, 61-62, 84, 92, 94, 96, 99, 114-15, 119, 134; Ex. C (Sokolowski Compl.) at ¶¶ 52, 66, 69, 70-74, 80, 92-94; Ex. D (Conn. Compl.) at ¶¶ 79; 87, 88-93.) Neither the Falco nor the Sokolowski Complaints allege a <u>single communication</u> directly between DCG and the Creditor Defendants. The Creditor Complaints therefore assert generalized, derivative claims that only the Genesis estates may pursue. *See Ritchie Cap. Mgmt., LLC v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 335 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (claims were derivative where they failed to plead any "direct relationship or communication between the plaintiffs and defendants").

b. The Creditor Defendants seek redress based on allegations identical to those made in the Debtors' complaints

That the Creditor Complaints assert only derivative claims is also apparent from the striking similarity of the factual allegations underlying those complaints and the Debtor Complaints. The Creditor Defendants' attempts to package those allegations into different causes of action is of no moment.[6] The Second Circuit instructs courts to look beyond pleading "labels" and avoid "putting form over substance, and, instead, to examine "the factual origins of the injury," *Madoff*, 740 F.3d at 89, and whether the estate could pursue or is pursuing causes of action predicated on identical alleged facts to those in the plaintiff's suit, *id.* at 92 (rejecting creditors' efforts to "plead[] around" what were essentially causes of action based on estate claims). Judge Engelmayer's decision in *Richie Capital Management* is particularly instructive. In that case, an aggrieved "customer" of a Ponzi scheme sought to sue a third party that had already been sued by the trustee liquidating the scheme for the benefit of its injured customers. *Ritchie*, 121 F. Supp. 3d at 335-36. When evaluating whether the customer's claims were direct or derivative, Judge Engelmayer compared the "core allegations" of the trustee's complaint with those of the customer's complaint, and found that "although the names of the causes of action asserted by the . . . [t]rustee and [customer] may vary somewhat, the allegations underpinning them overwhelmingly overlap." *Id.* at 336. Observing that the "[customer] now attempts to relitigate—but for its sole benefit, rather than for all creditors' benefit— the same series of events" that the trustee was litigating, Judge Engelmayer concluded

---

[6] Indeed, while the Connecticut Complaint and Sokolowski Complaint are, by the Sokolowskis' own admission, "identical" (Ex. D (Conn. Compl.) at ¶ 3), the Sokolowskis assert different causes of action in each case.

that the customer's "putative claims unavoidably have the same focus as the [trustee's] claims," which "confirms that only the [trustee] has standing to bring these claims." *Id.* at 335, 337.

For the same reasons, the near-perfect overlap between the Debtor Complaints and the Creditor Complaints eliminates any doubt that the Creditor Complaints assert derivative claims based on conduct directed to Genesis, not to the Creditor Defendants. The chart below illustrates but a small sample of the extent to which the allegations in the Creditor Complaints mirror the allegations in the estate actions:

| Estate Allegations | Falco Allegations | Sokolowski Allegations |
|---|---|---|
| "**DCG prepared talking points and dictated misrepresentations to the public**, including Silbert's party line that Genesis was operating 'BAU' (or 'business as usual') and had robust liquidity, high capitalization, and a 'strong balance sheet.'" (Ex. A (Del. Compl.) at ¶ 12.) | DCG's "**talking points included the misrepresentations** that DCG 'absorbed' the losses, that Genesis Global was 'well capitalized,' and that 'DCG has assumed certain liabilities of Genesis related to [3AC] to ensure [Genesis Global] ha[d] more than adequate capital to operate and scale our business for the long-term.'" (Ex. E (Falco Compl.) at ¶ 120.) | Defendants put together a "**Genesis Source of Strength Talking Points** document being used that day, indicating a coordinated effort to present a misleading narrative of stability." (Ex. C (Sokolowski Compl.) at ¶ 107; Ex. D (Conn. Compl.) at ¶ 145.) |
| "Facing lender panic . . . **Murphy [sent] Moro a DCG-drafted "blog post"** . . . Moro followed Murphy's instructions, posting the statement (the 'June 17 statement') on his personal twitter account**. DCG then retweeted the June 17 statement.**" (Ex. A (Del. Compl.) at ¶ 135.) | "**Murphy—DCG's COO— reviewed and edited these tweets before Moro posted them.** In strategizing the release of the tweets, **Murphy directed Moro to send these tweets 'from Moro['s] [personal Twitter account]'** . . . **DCG . . . reposted Moro's misleading twitter thread.**" (Ex. E (Falco Compl.) at ¶¶ 95-96.) | "On **June 17, 2022**, at 11:40am EDT**, Defendant Moro publicly posted on X (then Twitter)** . . . ." (Ex. C (Sokolowski Compl.) at ¶ 92; Ex. D (Conn. Compl.) at ¶ 115.) |

23

| Estate Allegations | Falco Allegations | Sokolowski Allegations |
|---|---|---|
| "DCG operated Genesis without proper risk management and failed to implement any risk controls, which effectuated DCG's self-dealing." (Ex. A (Del. Compl.) at ¶ 222.) | "[N]either DCG nor Genesis Global had worked to 'derisk' Genesis Global's balance sheet since May. The 3AC collapse was disastrous for DCG's multitude of subsidiaries, and DCG's companies desperately needed assets." (Ex. E (Falco Compl.) at ¶ 65) | DCG's "failure to adequately manage Genesis's assets, combined with their fraudulent activity, demonstrates that DCG and Silbert operated with reckless disregard for the safety of lenders, including the Plaintiffs." (Ex. C (Sokolowski Compl.) at ¶ 127; Ex. D (Conn. Compl.) at ¶ 179.) |
| "The De Facto Managers and other DCG Employees and officers made decisions for Genesis." (Ex. A (Del. Compl.) at ¶ 221.) | "DCG and Silbert were mere alter egos of Genesis Global." (Ex. E (Falco Compl.) at ¶ 88 n. 21.) | "Far from being a 'hands-off' holding company, Defendant DCG directly controlled and actively participated in Genesis's financial affairs throughout Genesis's existence." (Ex. C (Sokolowski Compl.) at ¶ 124; Ex. D (Conn. Compl.) at ¶ 175.) |
| "DCG [d]ominated and [c]ontrolled Genesis." (Ex. A (Del. Compl.) at ¶¶ 54-58.) | Silbert "controll[ed] and manag[ed] his subsidiaries." (Ex. E (Falco Compl.) at ¶ 83.) | "Defendant DCG directly controlled and actively participated in Genesis's financial affairs throughout Genesis's existence." (Ex. C (Sokolowski Compl.) at ¶ 125; Ex. D (Conn. Compl.) at ¶ 175.) |
| "Genesis is the puppet of DCG . . . controlled by DCG and does what DCG tells it to do." (Ex. A (Del. Compl.) at ¶ 6.) | "DCG and Silbert were mere alter egos of Genesis Global." (Ex. E (Falco Compl.) at ¶ 88 n. 21.) | "Defendant Silbert, as CEO of DCG, exerted substantial control over the entire DCG enterprise, including Genesis." (Ex. C (Sokolowski Compl.) at ¶ 115; Ex. D (Conn. Compl.) at ¶ 155.) |
| "Silbert and DCG were bracing themselves for a bank run but directing Genesis to 'continue to show the market that [Genesis is] lending.'" (Ex. B (Adv. Pro.) at ¶ 7.) | "Defendants Silbert and DCG . . . falsely represented that Genesis Global's balance sheet was 'strong' when at that time it had massive unsecured exposure to 3AC. . . . Far from 'operating normally,' the Defendants knew that Genesis Global was facing a 'bank run.'" (Ex. E (Falco Compl.) at ¶ 92.) | "Genesis and Defendant Moro urgently needed to restore solvency but were aware of the need to present Genesis's services as akin to stable, consumer-level financial products." Ex. C (Sokolowski Compl.) at ¶ 91; Ex. D (Conn. Compl.) at ¶ 113.) |

| Estate Allegations | Falco Allegations | Sokolowski Allegations |
|---|---|---|
| **The promissory note was a "sham note" designed to "set up the artifice that Genesis Capital's balance sheet would reflect the DCG Note as a $1.1 billion current asset"** (Ex. B (Adv. Pro.) at ¶ 80.) | **The promissory note "wasn't an infusion of capital**; rather, DCG kept hidden from the public and its investors and lenders that the terms of the DCG Note dictated only that DCG would repay the principal at an annual rate of 1% over a period of 10 years." (Ex. E (Falco Compl.) at ¶ 44.) | Defendants "**willfully and recklessly signed the fraudulent $1.1 billion promissory note**," which "**involved no actual transfer of money**"; subsequently, a Genesis employee "**failed to disclose the true nature of the promissory note** and its inclusion in 'other assets' **under the 'current assets' header in this balance sheet**." (Ex. C (Sokolowski Compl.) at ¶¶ 93, 95; Ex. D (Conn. Compl.) at ¶¶ 118-19, 125.) |

When faced with similar overlap between estate and purportedly direct claims, the Second Circuit and courts therein have routinely concluded that such purportedly "direct" claims are in reality derivative. *E.g. Madoff*, 740 F.3d at 91-92 (concluding that claims for which the supporting allegations "echo those made by the Trustee" are derivative); *Ritchie*, 121 F. Supp. 3d at 336–37 (creditor claims that "overwhelmingly overlap[ped]" with trustee's fraudulent transfer claims were derivative); *Revlon*, 2023 WL 2229352, at *15 (Plaintiffs' claims were derivative because they mirrored those "available to (and pursued and resolved through settlement by) the Trustee").

### B. The Creditor Suits Irreparably Harm the Orderly Administration of the Estates and Interfere with this Court's Jurisdiction

Unless enjoined, the causes of action asserted in the Creditor Complaints threaten to interfere with the orderly administration of the Debtors' estates and Plan, and undermine this Court's exclusive jurisdiction over the Debtors' estates. It is a basic feature of bankruptcy law that "[b]ankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate." *Tenn. Student Assistance Corp v. Hood*, 541 U.S. 440, 447 (2004); 28 U.S.C. § 1334(e). That exclusive jurisdiction

extends to the estates' derivative claims against DCG and the individual defendants, which the Debtors apparently believe to be among the estates' most valuable property. (*See* Ex. F (Disclosure Statement) at 119 ("[T]he most valuable Distributable Assets are the estates' claims against the DCG Parties.").)

By attempting to "jump the line" and prosecute estate claims for their personal benefit, the Creditor Defendants threaten this Court's exclusive jurisdiction over the estates: If they were to succeed, proceeds of estate claims would be distributed solely to the Creditor Defendants pursuant to the orders of the courts in which those claims are pending, rather than pursuant to the Plan. The Creditor Defendants would also obtain the full amount of any such recoveries, which might well exceed their equitable and ratable share of recoveries as provided by the Bankruptcy Code and the confirmed Plan. That possibility in itself warrants an injunction. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 437 (Bankr. S.D.N.Y. 2010) (enjoining creditor prosecution of derivative claims because such actions "have the potential to substantially undermine this Court's jurisdiction" through distribution of proceeds of estate claims in excess of creditors' ratable share), *aff'd Madoff*, 740 F.3d at 81; *Purdue*, 666 B.R. at 471 (granting preliminary injunction where the estates' similar causes of action constituted the "most valuable asset" of the *res*).

The Creditor Defendants' interference with this Court's jurisdiction is not a mere potentiality. It is a fact. The Plan and Confirmation Order unambiguously provide that the Debtors have exclusive authority to prosecute estate causes of action under the supervision of the PA Officer and the Litigation Oversight Committee. (Ex. H (Plan) at Art. IV.A.2, 4; Ex. J (Confirmation Order) at ¶¶ 87, 92.) And they impose fiduciary

26

duties on the PA Officer and Litigation Oversight Committee to act in the interests of all relevant holders of claims against the Debtors. (Ex. H (Plan) at Art. IV.A.2, 4; Ex. J (Confirmation Order) at ¶¶ 88, 92.) By contrast, the Creditor Defendants are pursuing their suits for their personal benefit, not for the benefit of the estates as a whole. And the Creditor Defendants are prosecuting their suits at their sole discretion, not under the supervision of the Plan's designated creditor fiduciaries, and without any duty to act in a manner that protects the interests of the estates or other creditors. By prosecuting litigation that competes with the estates and that evades the Plan's reticulated oversight mechanism, the Creditor Defendants are impeding the full execution of the Plan and, therefore, the administration of the estates. *See In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (irreparable harm prong is satisfied "where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 1529357, at *5 (Bankr. S.D.N.Y. June 5, 2006) ("[I]nfringement on this Court's jurisdiction constitutes irreparable harm"). This, too, is sufficient basis to enjoin the Creditor Defendants from continuing to interfere with the orderly administration of the estates.

### C. The Balance of the Equities and Public Interest Favor Enjoining the Causes of Action Asserted in the Creditor Complaints

Enjoining the Creditor Defendants from pursuing estate claims is both consistent with the balance of equities and serves the public interest in the efficient and equitable conduct of bankruptcy proceedings. If not enjoined, the Creditor Defendants' suits will result in a situation where three claimants are permitted to race ahead of hundreds of similarly situated creditors by prosecuting estate claims in two actions that attempt to

obtain priority of time and recovery <u>in competition with</u> the parallel litigation brought by the Debtors. And, if the Creditor Defendants are not enjoined from pursuing estate claims, other creditors may well decide that they, too, would like to jump the line, leading to ever more disorderly litigation of estate claims and a broadening scope of competition among the estates and separately litigating creditors.

Developments in those actions risk both undermining the claims brought by the Debtors or, alternatively, subjecting DCG to the unfairness of conflicting decisions in cases asserting congruent claims and seeking recovery for the same injuries. None of this is consistent with the confirmed Plan or basic bankruptcy principles. As the Second Circuit explained in *Tronox*, "[t]he whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets . . . That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property." *Tronox*, 855 F.3d at 106.

Weighed against the chaotic scenario they have brought about, the Creditor Defendants will suffer little or no cognizable harm by being temporarily enjoined from pursuing claims that are not theirs to pursue in the first place. Nor would allowing the Creditor Defendants to pursue estate claims in competition with the Debtors advance— indeed, it materially impedes—meaningful public interests. The balance of equities and public interest therefore heavily weigh in favor of the requested injunction.

### D. No Bond is Necessary to Enjoin the Creditor Defendants From Pursuing Estate Causes of Action

Rule 65(c) vests the Court with "wide discretion" to determine whether any bond is required as a condition to imposing a preliminary injunction. *Doctor's Assocs., Inc. v.*

28

*Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted); *see also, e.g. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) ("[D]espite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant." (internal quotation marks omitted)); *Int'l Controls Corp. v. Verco*, 490 F.2d 1334, (2d Cir. 1974) ("The district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined."), *cert. denied sub nom.,* 417 U.S. 932 (1974).

No bond is necessary or appropriate here because the risk that the Creditor Defendants will have been 'wrongfully enjoined' is minimal and because the Creditor Defendants are not likely to suffer any cognizable damages from an injunction. The requested preliminary injunction is wholly distinct from an injunction issued in the early days of a civil action where discovery may undermine the factual bases for the claims that underlie the injunction. And the risk that the Creditor Defendants will have been 'wrongfully enjoined' is far less significant because DCG's claim for relief turns entirely on the application of controlling Second Circuit law to the allegations of the Creditor Defendants' complaints. The injunction sought is thus akin to an anti-suit injunction, an injunction to compel arbitration, or any other injunction necessary to protect the court's jurisdiction. Courts routinely issue such injunctions without requiring security under Rule 65(c). *E.g.*, *Doctor's Associates Inc. v. Distajo*, 107 F.3d 126, 136 ("Rule 65(c) gives the district court wide discretion to . . . dispense with the bond requirement . . . where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved."); *Doctor's Assoc's Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.

1996) (district court "did not abuse its discretion in dispensing with the bond" because the injunction was issued "to preserve the district court's jurisdiction over the action to compel arbitration"); *In re Baldwin-United Corp.*, 770 F.2d 328, 337-38 (2d Cir. 1985) (waiving bond requirement in anti-suit injunction); *Gov't Emps. Ins. Co. v Tolmasov*, 602 F Supp 3d 380, 389, 393 (E.D.N.Y. 2022) (waiving bond requirement in connection with granting "an injunction staying the state lawsuits until this action is resolved is necessary to aid this Court's jurisdiction").

In addition, no bond need be imposed because the Creditor Defendants will not suffer cognizable damages or costs from being enjoined. *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (quoting *Distajo*, 107 F.3d at 136, for proposition that district courts have "wide discretion . . . to dispense with the bond requirement where there has been no proof of likelihood of harm" to the defendant). The Creditor Defendants have no legal right to pursue claims that are reserved to the Debtors and cannot suffer cognizable damages simply by being ordered to comply with controlling law and the terms of the confirmed Genesis Plan. The only "damage" or "harm" the Creditor Defendants could suffer is being treated like every other similarly situated Genesis creditor. This, of course, is not cognizable harm that requires a bond. It is the law.

## CONCLUSION

For the foregoing reasons, DCG respectfully requests that this Court enter a preliminary injunction enjoining the causes of action in the Creditor Complaints in substantially the form set forth in the Proposed Order attached to the Motion filed herewith.

Dated: July 8, 2025
New York, New York

Respectfully submitted,

_/s/ Benjamin S. Kaminetzky_
Benjamin S. Kaminetzky

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Elliot Moskowitz
Daniel J. Schwartz
Marc J. Tobak

_Attorneys for Plaintiff Digital Currency
Group, Inc._