# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI,
CHRISTOPHER H. SOKOLOWSKI,
and PROHASHING LLC
**Plaintiffs,**

v.

BARRY E. SILBERT,
DIGITAL CURRENCY GROUP, INC.,
SOICHIRO "MICHAEL" MORO,
JEFFERIES FINANCIAL
GROUP, INC.,
JEFFERIES LEVERAGED CREDIT
PRODUCTS, LLC,
XCLAIM, INC.,
ANDREW GLANTZ, and
VINCENT FALCO
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM-
PJC

Hon. Karoline Mehalchick
Hon. Phillip J. Caraballo

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... v

TABLE OF TERMS ............................................................................. x

DICTIONARY OF TECHNICAL TERMS ........................................ xiii

DOCKET REFERENCE TABLE ...................................................... xvii

I    INTRODUCTION ........................................................................1

II   SUMMARY OF THE PREDICATE ACTS .................................5

III  PARTIES ....................................................................................18

IV   NON-PARTIES ..........................................................................25

V    JURISDICTION AND VENUE..................................................33

    A    Subject Matter Jurisdiction..............................................33

    B    Personal Jurisdiction.........................................................35

    C    Venue ................................................................................36

        1.    General Venue (28 U.S.C. § 1391).............................36

        2.    RICO Venue (18 U.S.C. § 1965)................................37

VI   BACKGROUND OF BITCOIN, MINING, PLAINTIFFS, THE LITIGATION WEB, AND THE ENTERPRISE ..................................40

    A    Mining ..............................................................................40

    B    The Block Size .................................................................43

    C    Plaintiffs' Involvement in Bitcoin and Their Loans to GGC ....................48

    D    The Connecticut Action....................................................52

VII  DESCRIPTION OF PLAINTIFFS' LLCs .................................54

    A    Cryptocurrency Management LLC ...................................54

    B    PROHASHING LLC.........................................................59

VIII ACTIVITIES OF THE ENTERPRISE .......................................63

    A    The Motive: The Block Size and Harassment...................64

        1.    Brief Overview of Block Size Positions.....................64

i

2. Stephen's Advocacy About Bitcoin's Block Size ........................ 65

3. Silbert and the Enterprise's Views ............................................ 68

4. Enterprise Capture of Bitcoin Discourse .................................. 74

5. Harassment and Censorship of Stephen Sokolowski ................ 79

B Scheme 1: The PROHASHING Scheme ....................................... 82

1. Summary .................................................................................... 82

2. Comparison of Accounts ........................................................... 83

3. The Quasar Account .................................................................. 91

4. Systems and Database Access .................................................... 92

5. The Merge Mine Skim ............................................................... 96

6. The Block Withholding Attacks ............................................... 101

7. The Connection to Monero ...................................................... 106

8. The Digital Gold Logs .............................................................. 109

9. Additional Links to DCG, Silbert, Moro, and the Enterprise ... 118

10. One Plausible Inference of the PROHASHING Scheme From Start To Finish ................................................................................. 124

11. DCG's, Silbert's, and Moro's Effects on Customer Acquisition and Retention ............................................................................ 127

C Scheme 2: The Fraudulent Balance Sheet Scheme ................... 129

1. Summary .................................................................................. 129

2. The Enterprise's Misrepresentation of Consumer Lending Products ... 130

3. Inducement And Deposits ........................................................ 136

4. GGC's Collapse and The Fraudulent Promissory Note ........... 145

5. Reliance on the Fraudulent Balance Sheet .............................. 156

6. The Final Slide Towards Bankruptcy ...................................... 164

7. Monitored Telegram Chats and Destruction of Evidence ....... 170

D Scheme 3: The Jefferies Claim Sale Scheme .......................... 171

1. Summary .................................................................................. 171

2. Background .............................................................................. 171

3. The Transaction ....................................................................... 177

4. The Agreement's Unusual Clauses .......................................... 199

5. The Fraudulent Disregard of the Passthrough Structure and the *Nemo Dat* Principle ............................................................... 207

6.   The Manufactured Ownership Controversy and Jefferies' Refusal to Disclaim ...................................................................... 210

7.   Conclusion on the Jefferies Claim Sale Scheme ...................................... 214

E   Scheme 4: The *Falco* Adversary Proceeding Scheme ............................. 216

1.   Summary ................................................................................................ 216

2.   Overview of Falco's Objectively Baseless Case ..................................... 217

3.   Falco's Adversary Proceeding ............................................................... 224

4.   Falco's Dismissal and Pivot to Intimidation ......................................... 228

5.   The Subpoena Crisis .............................................................................. 235

6.   Conclusion on the Falco Adversary Proceeding Scheme ....................... 241

F   The Gemini Earn Assignment .................................................................. 243

G   Full Circle ................................................................................................ 245

1.   Harassment and Censorship, Regarding the Litigation .......................... 245

2.   Conclusion .............................................................................................. 247

IX   TIMELINESS AND TOLLING ..................................................................... 250

X   CLAIMS FOR RELIEF ................................................................................ 255

COUNT I ........................................................................................................ 255

A   The Enterprise ......................................................................................... 255

B   Defendants as RICO "Persons" and Participation in the Enterprise's Affairs 256

C   Pattern of Racketeering Activity ............................................................. 256

D   Predicate Acts by Scheme ....................................................................... 258

1.   Scheme 1: The PROHASHING Scheme ................................................. 258

2.   Scheme 2: The Fraudulent Balance Sheet Scheme ................................ 259

3.   Scheme 3: The Jefferies Claim Sale Scheme ......................................... 260

4.   Scheme 4: The *Falco* Adversary Proceeding Scheme ......................... 262

E   Relatedness and Continuity ..................................................................... 263

F   Injury and Causation ............................................................................... 263

COUNT II ....................................................................................................... 264

COUNT III ...................................................................................................... 268

COUNT IV ...................................................................................................... 269

COUNT V ....................................................................................................... 271

COUNT VI ...................................................................................275

COUNT VII...................................................................................279

COUNT VIII ................................................................................282

XI   DAMAGES ................................................................................284

   A   Loss of Funds (The GGC Deposits)........................................284

   B   Destruction of Enterprise Value (PROHASHING)..................286

   C   Direct Theft of Mining Rewards (The Block Withholding Loss)...........287

   D   Litigation Expenses During the Falco AP Subpoena Crisis....................289

   E   Alternative Assignment-Inducement Damages (Counts VI–VIII): .........289

   F   Calculation of Total Damages ................................................290

XII  PRAYER FOR RELIEF .............................................................292

   A   On Count I (RICO) and Count II (RICO Conspiracy):...........................292

   B   On Count III (UTPCPL):.......................................................293

   C   On Count IV (Tortious Interference with Contractual and Prospective Economic Relations): ..........................................................293

   D   On Count V (Declaratory Judgment) (Jefferies Defendants):.................294

   E   On Counts VI–VIII (Fraudulent Misrepresentation / Negligent Misrepresentation / Civil Conspiracy) (Xclaim and Glantz) (Pled in the Alternative):.......................................................................294

   F   General Relief: .....................................................................295

# TABLE OF AUTHORITIES

**Cases**

*Calder v. Jones*,
  465 U.S. 783 (1984)............................................................................35

*Digital Currency Group, Inc. v. Falco et al.*,
  Adv. Pro. No. 25-01111-SHL (Bankr. S.D.N.Y. July 8, 2025) ..............................

*Falco v. Digital Currency Group, Inc.*,
  No. 1:25-cv-03771-DLC (S.D.N.Y.)........................................................ passim

*Gemini Trust Company, LLC v. Genesis Global Capital, LLC, et al.*, Adv. Pro. No.
  23-01192 (SHL) (Bankr. S.D.N.Y.). .................................................................244

*Genesis Global Holdco, LLC, et al. v. Digital Currency Group, Inc., et al*,
  C.A. No. 2025-0532-KSJM (Del. Ch. May 13, 2025) ........................... 223, 244

*In re Genesis Glob. Holdco, LLC*,
  No. 23-10063 (SHL) (Bankr. S.D.N.Y).................................................................

*People v. Gemini Trust Co., LLC et al.*,
  No. 452784/2023 (N.Y. Sup.

*Sokolowski v. Digital Currency Group, Inc., et al.*,
  No. 3:25-cv-00870-VAB (D. Conn. May 30, 2025).......................................x, 52

*United Brands and Marketing International S.à r.l. v. Prohashing, LLC*,
  No. 2:25-cv-03046 (E.D. Pa. June 13, 2025) ....................................................232

**Statutes**

18 U.S.C. § 1965 ...................................................................................37

18 U.S.C. § 1965(b) .......................................................................... 36, 38

18 U.S.C. §§ 1961–1968 ................................................................................

28 C.F.R. Part 9 ...................................................................................201

28 U.S.C. § 1391 ...................................................................................36

28 U.S.C. § 1391(b)(2) ..........................................................................36

28 U.S.C. § 157(b)(2) ............................................................................34

73 P.S. §§ 201-1 et seq. (UTPCPL) ...............................................................

**Rules**

Fed. R. Bankr. P. 7026–7037 ................................................................237

Fed. R. Civ. P. 15(c) ...........................................................................254

Fed. R. Civ. P. 23 .................................................................................32

Fed. R. Civ. P. 26(f) ...........................................................................237

Fed. R. Civ. P. 26–37 .........................................................................237

Fed. R. Civ. P. 45 ......................................................................... 237, 238

Rule 34 ...............................................................................................237

**Docket Entries**

*[Amended] Complaint*
   *(ECF No. 22)* ............................................................................ xvii

*Complaint*
(Falco AP, ECF No. 1) ............................................................ xvii, 221

*Complaint*
(Conn. Action, ECF No. 1) ...................................................xx

*Complaint*
(Falco Action, ECF No. 1) ...................................................xx

*Counterclaim Plaintiffs' Memorandum of Law In Opposition to Debtors' Motion to Dismiss the Counterclaim* (Falco AP, ECF No. 34)........................................ xix

*Debtors' Brief in Support of Their Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)*
(Falco AP, ECF No. 30) ................................................... xviii

*Debtors' Motion for Authority to Redact and File Certain Information Under Seal in Connection with the Debtors' Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski*
(Falco AP, ECF No. 32) ..................................................... xix

*Debtors' Motion to Enforce the Plan Against Digital Currency Group, Inc*
(Genesis Bankruptcy, ECF No. 2180) ..................................... xix, 226

*Debtors' Reply Brief in Support of Their Motion to Enforce the Plan Against Digital Currency Group, Inc.*
(Genesis Bankruptcy, ECF No. 2217) ...................... xx, 173, 206, 231

*Declaration of Benjamin S. Kaminetzky in Support of Digital Currency Group Inc.'s Objection to Debtors' Motion to Enforce the Plan*
(Genesis Bankruptcy, ECF No. 2214) ..................................... xx, 226

*Declaration of Jennifer M. Selendy in Support of Debtors' Brief in Support of Their Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)*
(Falco AP, ECF No. 31) ..................................................... xix

*Declaration of Jennifer M. Selendy In Support of Debtors' Reply Brief In Support Of Their Motion To Enforce The Plan Against Digital Currency Group, Inc.*
(Genesis Bankruptcy, ECF No. 2218) ..................................... xx, 234

*Declarations of Stephen H. Sokolowski and Christopher H. Sokolowski in Opposition to Debtors' Motion to Dismiss the Counterclaim*
(Falco AP, ECF No. 35) .......................................................... xix, 237, 238, 241

*Declarations of Stephen H. Sokolowski and Christopher H. Sokolowski in Opposition to Motion for Preliminary Injunction*
(Falco AP, ECF No. 21) ................................................... xviii, 231, 233

*Defendants' Answer, Affirmative Defenses, Counterclaim, and Request for Case Management Order*
(Falco AP, ECF No. 12) ................................................. xviii, 227, 234

*Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction*
(Falco AP, ECF No. 20) ................................................. xviii, 211, 218

*Limited Response and Statement of Neutral Position Regarding Debtors' Motion to Enforce, with Request for Targeted Procedural Relief and Reservation of Rights*
(Genesis Bankruptcy, ECF No. 2215) ................................................. xx

*Memorandum of Law in Support of Motion for a Preliminary Injunction*
(Falco AP, ECF No. 4) ............................................................ xvii, 227

*Memorandum of Law in Support of Motion to Dismiss of Defendants Digital Currency Group, Inc. and Barry E. Silbert*
(ECF No. 37) ............................................................... passim

*Memorandum of Law in Support of Soichiro 'Michael' Moro's Motion to Dismiss Plaintiffs' Amended Complaint*
(ECF No. 38) ..................................................................... xvii

*Motion for Preliminary Injunction*
(Falco AP, ECF No. 2) ........................................................... xvii

*Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)*
(Falco AP, ECF No. 29) ......................................................... xviii, 228

*Notice of Adjournment of September 15, 2025 Hearing*
(Falco AP, ECF No. 24) ......................................................... xviii, 241

*Notice of Stay in Connecticut*
(Falco AP, ECF No. 26.) ........................................................ xviii

*Notice of Voluntary Dismissal Without Prejudice*
    (Falco Action, ECF No. 42) ..................................................................xx

*Objection to Debtors' Motion to Enforce the Plan*
    (Genesis Bankruptcy, ECF No. 2213) ........................................... xix

*Order*
    (Falco Action, ECF No. 39) ...............................................................xx

*Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss*
    *(ECF No. 44)* ................................................................................ xvii

*Plaintiffs' Motion to Stay Proceedings*
    (Conn. Action, ECF No. 2) .................................................................xx

*Reply in Support of Soichiro 'Michael' Moro's Motion to Dismiss Plaintiffs' Amended Complaint*
    *(Pa. Action, ECF No. 53)* ................................................................ xvii

*Reply Memorandum of Law in Support of Motion for a Preliminary Injunction*
    (Falco AP, ECF No. 25) .................................................................. xviii

*Reply Memorandum of Law in Support of Motion to Dismiss of Defendants Digital Currency Group, Inc. and Barry E. Silbert*
    *(Pa. Action, ECF No. 52)* ................................................................ xvii

*Request for Expedited Informal Discovery Conference*
    (Falco AP, ECF No. 23) .................................................................. xviii

Transcript of Aug. 15, 2025 Hearing
    (Genesis Bankruptcy, ECF No. 2223) .............................. xx, 234, 235

# TABLE OF TERMS

AP.................................................................................Adversary Proceeding

Aronsky..................................................................................Matthew Aronsky

Block Size War......................................The technical and governance dispute within
the Bitcoin ecosystem concerning
proposed increases to Bitcoin's block size.

Boyapati ................................................................................. Vijay Boyapati

Bankruptcy Court..............Bankruptcy Court for the Southern District of New York

CCV.......................................entry found in the Digital Gold Logs, inferred to mean
an organization in China laundering funds through PROHASHING

Christopher..........................................................................Christopher Sokolowski

Conn. Action ..............................*Sokolowski v. Digital Currency Group, Inc., et al.*,
No. 3:25-cv-00870-VAB (D. Conn. May 30, 2025)

CM LLC ...........................................................Cryptocurrency Management, LLC

DCG ........................................................................ Digital Currency Group, Inc.

DDQ .................................................GGC Due Diligence Questionnaire (Exhibit K)

Digital Gold............................................................. The characterization of bitcoin
as a long-term store of value
rather than a medium of exchange

Digital Gold Logs................ Encoded entries appearing in PROHASHING database
and payout records, alleged to have been created
by an individual with administrative access (Exhibit Q)

Enterprise ......................................The association-in-fact alleged in the Complaint
to have engaged in the conduct described herein.

Falco.................................................................................... Vincent Falco

Falco Action .................................................*Falco v. Digital Currency Group, Inc.*,
No. 1:25-cv-03771-DLC (S.D.N.Y.)

Falco AP ..........Adversary Proceeding (*Digital Currency Group, Inc. v. Falco et al.*,
Adv. Pro. No. 25-01111-SHL (Bankr. S.D.N.Y. July 8, 2025))

First Amended Complaint ..................................................................... ECF No. 22

Foundry ....................................... Foundry USA, Inc., a cryptocurrency mining pool
and related mining services provider.

GBTC .................................................................................. Grayscale Bitcoin Trust

Genesis Bankruptcy ............................................. *In re Genesis Glob. Holdco, LLC*,
No. 23-10063 (SHL) (Bankr. S.D.N.Y)

Genesis Debtors ..........Genesis Global Capital, LLC, Genesis Global Holdco, LLC,
and Genesis Asia Pacific Pte. Ltd.
[the debtors of the Genesis Bankruptcy]

Genesis Entities................. The four Genesis companies: Genesis Debtors and GGT

GGC ........................................................................Genesis Global Capital, LLC

GGT........................................................................Genesis Global Trading, LLC

Glantz ...................................................................................... Andrew Glantz

Grayscale Trust ...................................... One or more digital asset investment trusts
sponsored or managed by affiliates of DCG,
including the GBTC.

Jefferies Defendants ................................................. Jefferies FG and Jefferies LCP

Jefferies FG ................................................................. Jefferies Financial Group, Inc.

Jefferies LCP........................................... Jefferies Leveraged Credit Products, LLC

Marquardt................................................................ Michael "Theymos" Marquardt

Monero Group.................................................... A set of Monero-related accounts or
mining activity referenced in the Complaint.

Moro ................................................................................ Soichiro "Michael" Moro

NYAG Action............................................... *People v. Gemini Trust Co., LLC et al.*,
No. 452784/2023 (N.Y. Sup. Ct)

Quasar Account ................... A PROHASHING account or accounts identified in the
Complaint as associated with unauthorized access activity.

Quasar Insider(s)................................................................ John Does 1 through 10

RICO ...................................... Racketeer Influenced and Corrupt Organizations Act
(18 U.S.C. §§ 1961–1968)

Satoshi ........................................................................................ Satoshi Nakamoto

Silbert ........................................................................................ Barry E. Silbert

Stephen ..................................................................................... Stephen Sokolowski

UTPCPL ....... [Pennsylvania] Unfair Trade Practices and Consumer Protection Law
(73 P.S. §§ 201-1, et seq.)

## DICTIONARY OF TECHNICAL TERMS

| | |
|---|---|
| **A1Z26** | simple coding scheme where A=1, B=2, etc. |
| **altcoin** | any cryptocurrency other than bitcoin |
| **ASIC miner** | "Application Specific Integrated Circuit," a highly specialized computer specifically designed to have a higher hashrate than a standard general purpose computer, but with the tradeoff that it cannot perform any computations other than for what it was originally designed. |
| **Core / Bitcoin Core** | organization generally considered to be the leader of the Bitcoin cryptocurrency's development. Bitcoin Core creates the most widely used version of Bitcoin software and has a large influence. |
| **block** | a group of transactions on a cryptocurrency blockchain. Transactions not within blocks are not considered "confirmed" and are not yet final |
| **blockchain** | ledger of all validated transactions of a cryptocurrency |
| **block withholding attack** | a type of attack against a mining pool where a miner fails to submit found blocks at the expected rate, stealing money the pool's owners should have earned |
| **chain reorganization** | an operation on a blockchain where multiple of the latest blocks of transactions are reverted and replaced with different blocks containing different transactions. Chain reorganization of more than a few blocks is not a normal operation and is indicative of an attack where an entity send a payment, waits for the payment to confirm and the seller to send whatever product is being purchased, and then reorganizes the chain to claw back the payment while keeping the purchased product. |
| **coin** | alternative term for a cryptocurrency |

| | |
|---|---|
| **cold wallet** | a cryptocurrency wallet that is not accessible from the Internet, such that it can only be stolen physically. Opposite of "hot wallet." |
| **confirmed block** | a mined block that has been recorded on the applicable blockchain and is acknowledged as valid by a majority of peers |
| **custodial wallet** | a cryptocurrency wallet in which a third party controls the private keys on behalf of the user |
| **digital asset** | a cryptographically secured token or unit recorded on a blockchain or distributed ledger |
| **ETF** | "Exchange Traded Fund", a type of investment traded on stock markets |
| **hard fork** | software update that mandates users to upgrade their software by a deadline (the "fork time") or else be disconnected from the cryptocurrency network at the fork time. Compare with "soft fork" |
| **hashrate** | unit of measurement of a miner's computational power |
| **hot wallet** | the opposite of a "cold wallet,"; this type of wallet is connected to the Internet and can be spent at any time |
| **ICO** | "Initial Coin Offering", where a new cryptocurrency is first offered to the public by selling a large quantity on the open market (for the developers to obtain money) as opposed to being generated through mining. Equivalent to an Initial Public Offering in the stock market. |
| **Lightning Network** | a system for consolidating and hiding transactions on the Bitcoin network to work around the network's small block size |
| **MB** | megabyte, a unit of data |
| **merge mining** | method by which one miner can compute solutions for multiple cryptocurrency networks simultaneously. Merge mining does not divide a fixed amount of hashrate |

| | |
|---|---|
| | among these cryptocurrencies, all cryptocurrencies are mined at miner's original hashrate, multiplying the amount of work they can do. Only specific cryptocurrencies can be merge mined as designated by their creators. |
| **miner** | a computer used to solve puzzles on cryptocurrency networks. |
| **non-custodial wallet** | a cryptocurrency wallet in which the user retains control of the private keys. |
| **orphan block** | a valid block that is not included in the main blockchain due to competing blocks. |
| **pool / mining pool** | a collection of miners that independently works in parallel on mining cryptocurrencies, and splits the mining profits |
| **proof of work** | one of many methods through which cryptocurrency networks throttle the rate of block generation. Requires solving complex puzzles using a miner. Only once a solution is found is a miner allowed to submit a block to the blockchain and be paid a reward of newly generated cryptocurrency in return. |
| **remote access trojan** | malicious software designed to provide unauthorized remote control of a computer system |
| **segregated witness / SegWit** | a technical change on the Bitcoin, Litecoin, and other cryptocurrency networks to provide a small capacity increase and support the Lightning Network |
| **soft fork** | software update that introduces new features after a set deadline (the "fork time") but does not mandate users to upgrade. If a user does not upgrade, the user will not have access to new features introduced at the fork time but can still use existing features and remain connected to the cryptocurrency network. Compare with "hard fork" |

| | |
|---|---|
| **Segwit2X** | a failed plan that would have implemented segregated witness as well as doubled Bitcoin's block size |
| **share** | small unit of work, less than that needed to find a block, used in mining pools to track progress of a miner |
| **transaction fee** | the fee paid to miners for including a transaction in a block |
| **UXTO** | Unspent Transaction Output: represents spendable cryptocurrency |
| **wallet** | software or hardware used to store cryptocurrencies |

## DOCKET REFERENCE TABLE

| Case | ECF No. | Title |
|------|---------|-------|
| This Case | 22 | *[Amended] Complaint* |
| 4:25-CV-1 (Pa. Action) | | [Copied in Falco AP, ECF No. 3-3] |
| | 37 | *Memorandum of Law in Support of Motion to Dismiss of Defendants Digital Currency Group, Inc. and Barry E. Silbert* |
| | 37-2 | [Copy of Genesis Bankruptcy, ECF No. 50] |
| | 38 | *Memorandum of Law in Support of Soichiro 'Michael' Moro's Motion to Dismiss Plaintiffs' Amended Complaint* |
| | 44 | *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss* |
| | 52 | *Reply Memorandum of Law in Support of Motion to Dismiss of Defendants Digital Currency Group, Inc. and Barry E. Silbert* |
| | 53 | *Reply in Support of Soichiro 'Michael' Moro's Motion to Dismiss Plaintiffs' Amended Complaint* |
| *Falco* Adversary Proceeding (Falco AP) | 1 | *Complaint* |
| | 2 | *Motion for Preliminary Injunction* |
| 25-01111 | 3-3 | [Copy of Amended Complaint (Pa. Action, ECF No. 22)] |
| | 4 | *Memorandum of Law in Support of Motion for a Preliminary Injunction* |

| Case | ECF No. | Title |
|------|---------|-------|
| | 10 | [Copy of Genesis Bankruptcy, ECF No. 2215] |
| | 12 | *Defendants' Answer, Affirmative Defenses, Counterclaim, and Request for Case Management Order* |
| | 20 | *Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction* |
| | 21 | *Declarations of Stephen H. Sokolowski and Christopher H. Sokolowski in Opposition to Motion for Preliminary Injunction* |
| | 23 | *Request for Expedited Informal Discovery Conference* |
| | 24 | *Notice of Adjournment of September 15, 2025 Hearing* |
| | 25 | *Reply Memorandum of Law in Support of Motion for a Preliminary Injunction* |
| | 26 | *Notice of Stay in Connecticut* |
| | 29 | *Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)* |
| | 30 | *Debtors' Brief in Support of Their Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)* |

| Case | ECF No. | Title |
|------|---------|-------|
| | 31 | *Declaration of Jennifer M. Selendy in Support of Debtors' Brief in Support of Their Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski Pursuant to Federal Rule of Bankruptcy Procedure 12(b)(1)* |
| | 31-1 | [Copy of Genesis Bankruptcy, ECF No. 50] |
| | 32 | *Debtors' Motion for Authority to Redact and File Certain Information Under Seal in Connection with the Debtors' Motion to Dismiss the Counterclaim of Stephen H. and Christopher H. Sokolowski* |
| | 34 | *Counterclaim Plaintiffs' Memorandum of Law In Opposition to Debtors' Motion to Dismiss the Counterclaim* |
| | 35 | *Declarations of Stephen H. Sokolowski and Christopher H. Sokolowski in Opposition to Debtors' Motion to Dismiss the Counterclaim* |
| Genesis Bankruptcy 23-10063 | 50 | *Notice of Transfer of Claim – E1* <br> [Copied in Falco AP, ECF No. 31-1 & Pa. Action, ECF No. 37-2] |
| | 2180 | *Debtors' Motion to Enforce the Plan Against Digital Currency Group, Inc* |
| | 2213 | *Objection to Debtors' Motion to Enforce the Plan* |

| Case | ECF No. | Title |
|---|---|---|
| | 2214 | *Declaration of Benjamin S. Kaminetzky in Support of Digital Currency Group Inc.'s Objection to Debtors' Motion to Enforce the Plan* |
| | 2215 | *Limited Response and Statement of Neutral Position Regarding Debtors' Motion to Enforce, with Request for Targeted Procedural Relief and Reservation of Rights* [Copied in Falco AP, ECF No. 10] |
| | 2217 | *Debtors' Reply Brief in Support of Their Motion to Enforce the Plan Against Digital Currency Group, Inc.* |
| | 2218 | *Declaration of Jennifer M. Selendy In Support of Debtors' Reply Brief In Support Of Their Motion To Enforce The Plan Against Digital Currency Group, Inc.* |
| | 2223 | Transcript of Aug. 15, 2025 Hearing |
| Falco Action | 1 | *Complaint* |
| | 39 | *Order* |
| | 42 | *Notice of Voluntary Dismissal Without Prejudice* |
| Conn. Action | 1 | *Complaint* |
| | 2 | *Plaintiffs' Motion to Stay Proceedings* |

1.     Plaintiffs Stephen H. Sokolowski, Christopher H. Sokolowski, and

PROHASHING LLC bring this civil action for violations of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"),

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (73 P.S. §§

201-1, et seq., "UTPCPL"), and related claims against Barry E. Silbert, Digital

Currency Group, Inc., Jefferies Leveraged Credit Products, LLC, Jefferies

Financial Group, Inc., Soichiro "Michael" Moro, Xclaim, Inc., Andrew Glantz, and

Vincent Falco (collectively, the "Defendants"), and allege as follows:


# I      INTRODUCTION

2.     This Complaint details a racketeering enterprise (the "Digital Gold

Enterprise" or the "Enterprise") that operated and continues to operate between

2015 and 2026, led by Defendants Barry E. Silbert ("Silbert") through his

conglomerate Digital Currency Group, Inc. ("DCG"). The Enterprise was created

several years after Bitcoin's founder Satoshi Nakamoto ("Satoshi") ceased his

active involvement in protocol development. In a calculated coup to centralize a

decentralized protocol, the Enterprise successfully captured and has maintained

control of the Bitcoin network and its development.

3.     The Digital Gold Enterprise's objective was and continues to be to

create and market a fraudulent "**Digital Gold**" narrative to enrich itself and its

institutional allies by eliminating the "peer-to-peer electronic cash" Bitcoin was designed to be by its founder. The Enterprise has engaged in a pattern of racketeering—involving wire fraud, obstruction of justice, witness tampering, money laundering, interstate transportation of stolen property, and other predicate acts—to accomplish the objectives required for its Digital Gold scheme to be believed and, more importantly, invested in, by the American public.

4.     The primary prerequisite for Digital Gold was to ensure that the "block size" of Bitcoin, which affects the number of transactions that can be sent over the network in a given time period, would never be increased beyond its current, small, 1 megabyte (MB) limit. This limit, which Satoshi intended as a temporary attack mitigation measure, was seized upon by the Enterprise to create the chokepoint the Enterprise required to inflate the bitcoin price, and this 1 MB chokepoint was enforced and paid for through harassment, theft, and fraud.

5.     Plaintiff PROHASHING LLC ("PROHASHING"), and one of its owners, Plaintiff Stephen Sokolowski ("Stephen"), represented perhaps the largest threat to the Enterprise. Stephen was outspoken about his support for honesty and transparency. PROHASHING supported the open "big block" system and was one of the largest and fastest growing mining pools in 2016-2018. Its technology mined hundreds of cryptocurrencies simultaneously, making it far more profitable for its customers than its competitors were. Unlike the foreign competition,

PROHASHING provided customers with detailed displays of coin prices, mining activity and expected payouts, offered a "Trusted Mining" program if users identified themselves, and complied with IRS regulations.

6.     The Enterprise gained unauthorized root database access to PROHASHING and systematically destroyed a mining pool operated by law-abiding American citizens, permitting Chinese competitors to become the dominant miners instead. These competitors would agree to lock in the small block size required for the Enterprise's criminal activities, preventing the public from adopting the "big blocks" which would have allowed regulators to view transactions on-chain, detect fraud, and protect citizens. The Digital Gold Enterprise conducted attacks worth a minimum of $22,850,919.45, likely with the assistance of Chinese investors. The stolen and laundered coins dating from this decade-old foundational fraud have tainted most of the modern cryptocurrency industry because the entire DCG empire is built upon this stolen property.

7.     The Enterprise's small block size and high fees, locked in by the destruction of PROHASHING, made it impossible for an everyday citizen to hold bitcoin in a simple home wallet. The block size and fees were intended to, and did, create a market for impossible-to-audit "custody" services, which the Enterprise and the American financial services industry stepped in to provide. The Enterprise's Grayscale Bitcoin Trust ("GBTC") and other Exchange Traded Fund

("ETF") products proliferated across the US financial industry and stock markets. Companies like non-party Strategy (named Microstrategy prior to 2025) and its CEO Michael Saylor developed "Bitcoin Treasuries," turning their stocks into ETFs in all but name. The Securities and Exchange Commission ("SEC"), likely unaware of the Enterprise's sabotage of PROHASHING and of Digital Gold's racketeering origins, granted a legal stamp of approval to ETF products, including *DCG's own* Grayscale ETFs built from PROHASHING's destruction and stolen money. Lending providers like the Enterprise's Genesis Global Capital ("GGC") and non-party BlockFi marketed "savings" products to everyday consumers to "invest" in Digital Gold bitcoin. After these companies were able to gain access to billions of dollars of everyday consumers' deposits using the manipulated Digital Gold narrative, many of them then misused those deposits for their own gain, ruining the lives of millions of innocent American families and retirees.

8.      Digital Gold is a lie. It is the marketing slogan for a criminal enterprise. The Enterprise—commanded by Barry E. Silbert through DCG, and covered up by massive investment bank Jefferies and investor Vincent Falco— conspired to deceive Americans for eleven years about the racketeering scheme that had been conducted against Plaintiffs to fund its creation and inflate its value. Instead of an auditable, open payment system that could be built upon for legal activity, the Enterprise created a corrupt and closed Bitcoin network controlled by

foreign actors designed for money laundering, theft, fraud, insolvent investment schemes, and the fleecing of the American public through rampant tax evasion.

9.    Silbert stole Satoshi's vision by stealing from the Sokolowskis.

## II    SUMMARY OF THE PREDICATE ACTS

10.    To achieve its goal of forcing the fraudulent Digital Gold narrative upon the public, the Enterprise engaged in multiple predicate acts alleged in detail in this Complaint. As background ("Scheme 0"), in the mid-2010s, the Enterprise manipulated discussion on public internet forums, including but not limited to Reddit, to silence dissent and make it appear as if support for a small block size was greater than it actually was. The Enterprise targeted critics, with a specific focus on Stephen. Stephen, who advocated for transparency, the rule of law, and a large block size, had become widely read by thousands, and was personally targeted with harassment, "troll" replies, and censorship on public platforms. The Enterprise, supported by its allies, harassed and censored Stephen starting in 2015 and continuing to the present day, suppressing his criticism of the block size debate and the criminal activity of PROHASHING's competitors, and it further engaged in witness intimidation by suppressing his posts about his litigation against Enterprise members. (This scheme is detailed in Section VIII(A).) The Enterprise's allies maliciously seized upon Stephen's controlled bipolar I disorder condition,

labeling a vulnerable victim "schizo" in an attempt to discredit his statements and testimony about this case.

11.     To capture the bitcoin network and create the Digital Gold narrative, an absolute necessity of the Enterprise was to destroy Stephen's and Christopher's business PROHASHING. PROHASHING was the first mining pool that advocated for honesty and transparency from its beginning and (most dangerously for the Enterprise) complied with US tax regulations—making it an existential threat to the racketeering Enterprise's Digital Gold takeover. Starting no later than 2016 and continuing until no earlier than 2023, the Enterprise exploited security vulnerabilities in PROHASHING's software to gain root access to its database server, likely through the use of the "Quasar" Remote Access Trojan. (This is detailed in "Scheme 1: The PROHASHING Scheme," Paragraph 168).

12.     Through "block withholding" attacks, the Enterprise's accounts generated a total of at least $22,850,919.45, valued at the time of the fraud, from PROHASHING. These exploit accounts stole 14.06% of their earnings – creating an enormous decline in profitability for honest customers in a low-margin industry where even a single percent difference in payouts can differentiate competitors. The thefts were at their peak during the critical period when Silbert worked to censor Stephen and manipulated public opinion to cancel the block size increase planned in his proposed SegWit2x fork. Because DCG, Silbert, and Moro failed to

submit the tax data PROHASHING required of U.S. companies, PROHASHING was unable to report this stolen income to the IRS.

13.     An analysis determined that the Enterprise had not only gained root access to PROHASHING's database server, it also had the ability to modify and copy code, send money from PROHASHING's hot wallet, read employees' emails for two-factor confirmation codes, and exploit a vulnerability to receive duplicate mining rewards. The analysis found no statistically significant evidence that the Enterprise engaged in any of these activities despite being able to steal up to $100,000 from exchanges and hot wallets if it had wanted to. Instead, the Enterprise *wasted* a minimum of $3,212,645.58 to destroy PROHASHING with the block withholding attacks because they were impossible to prove, demonstrating that the purpose was pure sabotage. The Enterprise fraudulently concealed these attacks until December 7, 2025.

14.     PROHASHING had a commanding lead in the U.S.-based market before the Enterprise's destruction of its business and was poised to grow to become one of the largest mining pools in the world. If PROHASHING continued to grow, it would eventually gain enough hashrate to mine Bitcoin, vote for a block size increase, and comply with regulations – which would obsolete the Digital Gold narrative the Enterprise had engineered to enrich itself and promote criminality on Bitcoin.

15.     The Enterprise and its Chinese allies—many of whom were upon information and belief based in or around Heihe—could not outpay PROHASHING because of its superior technology, so they attacked it instead. The attacks prevented PROHASHING from providing high payouts that attracted customers, stopping the company from hiring employees and investing in servers and infrastructure. Additionally, the attacks prevented PROHASHING's complex trading engine from aborting pump-and-dump bubbles and stabilizing the cryptocurrency markets.

16.     As a result of the Enterprise's racketeering, PROHASHING laid off its employees, closed on December 2, 2025, and is at risk of Chapter 7 bankruptcy. PROHASHING's systems are so compromised by the Enterprise that Plaintiffs can never connect them to any network again. They determined that the entire company, if it were to relaunch, must be rebuilt from scratch.

17.     Once the Enterprise had successfully destroyed PROHASHING, and the Enterprise had completed marginalizing Stephen, Chinese mining farms became dominant on the Bitcoin network. Later, after the Chinese Communist Party began enforcement actions against Bitcoin mining, DCG created its own mining pool, Foundry USA, and it became the dominant US-based mining pool rather than PROHASHING. Foundry USA now mines 25% of the world's Bitcoin blocks.

18.    While the theft at PROHASHING was ongoing, an individual with root database access within the Enterprise, witnessing the predicate acts in real time, encoded messages using the A1Z26 algorithm into PROHASHING's payout database. These entries—the **Digital Gold Logs** — include values like "CCV BCH HT BIB GF" and "CODI" that can be interpreted in the context of the specific dates they were recorded to infer the inner workings of the Enterprise. One entry in the Logs, "PCY I SPE GCI," is associated with the coin Binancecoin and recorded on the exact day (August 11, 2020) that non-party Microstrategy (renamed to Strategy in 2025), directed by its CEO Michael Saylor, created its "Bitcoin Treasury" and became one of the largest promoters of the Enterprise's fraudulent Digital Gold Bitcoin investment narrative. The Digital Gold Logs are detailed in Section VIII(B)(8).

19.    The Enterprise used the profits from the continuing PROHASHING theft to build the Digital Gold ecosystem as it stands today, such that DCG's entire enterprise value was created on the ruins of PROHASHING. Because the massive number of stolen coins were laundered and "mixed" through DCG's and its hopelessly intertwined subsidiaries' wallets, nearly everything associated with the entire institutional ecosystem is now tainted with stolen funds. The funds, because most were "virgin," untainted coins generated by mining, were difficult to trace and exceptionally valuable to the Enterprise in making its activities appear

legitimate. The stolen coins were, upon information and belief, among other things used to: seed one or more of DCG's Grayscale Trust financial products, engage in money laundering schemes with Chinese investors to support capital flight, keep the ever-insolvent Enterprise from collapsing into bankruptcy, create Foundry USA, and fund a massive secret operation mining the cryptocurrency Monero. The Enterprise was able to multiply the millions it stole using mixing and leverage to artificially inflate the value of Bitcoin, promoting the holding of Digital Gold among the American public to the size and scale it is today.

20.     In mid-May 2021, Plaintiffs deposited funds at GGC, a non-party that was one of the Enterprise's instrumentalities. Stephen's and Plaintiff Christopher Sokolowski ("Christopher")'s deposited funds in this second Scheme were of a personal, family, and household nature; Stephen's were his earnings from 10 years of working for software firms. 2021 was likely the Enterprise's best year after non-party Strategy's aggressive bitcoin purchases continued to inflate the bitcoin price, which provided liquidity to DCG. However, the Enterprise shortly returned to insolvency. The Enterprise's insolvency soon became too great to patch and the Enterprise could no longer hide its schemes when, in June 2022, the Enterprise claimed that Three Arrows Capital, one of its borrowers, failed to repay $1.1 billion that had been lent to it. Thus, the Enterprise shifted to a series of increasingly desperate schemes and predicate acts to cover up the PROHASHING

Scheme, the true origins of Digital Gold, the theft of Satoshi's vision, and its manipulation of the Block Size War.

21.     The first of these coverups was to sign a fraudulent $1.1 billion promissory note, a scheme currently under investigation by the New York Attorney General ("Scheme 2: The Fraudulent Balance Sheet Scheme" detailed in Section VIII(C)). The public (and likely NY Attorney General Letitia James) was misled to believe that this promissory note was intended to cover up the bad loan from GGC to bankrupt investment firm Three Arrows Capital. In reality, the more important reason for the creation of the promissory note was to prevent discovery into the PROHASHING Scheme and the Chinese connections associated with it. If Silbert had allowed GGC to fail in June 2022, an uncontrolled bankruptcy of GGC might occur and a trustee would gain control of the Enterprise's assets, perform an investigation where DCG could not withhold evidence, and discover the true origins of Digital Gold. This fear of an uncontrolled bankruptcy would be directly confirmed by Defendant Andrew Glantz in a January 2023 conversation with Stephen.

22.     A critical use of the promissory note was to claim it as a "current asset" on a fraudulent balance sheet that Defendants DCG, Silbert, and Moro caused to be sent to Stephen and which was later shared with Christopher and Christopher acting on behalf of PROHASHING — because Plaintiffs (without

knowing it at the time) possessed the key evidence that would expose Digital Gold as a lie and reveal the theft that had funded it, destroying the Enterprise. Plaintiffs relied on this balance sheet that Defendants caused to be created. They renewed their personal, family, and household loans at GGC in September 2022, losing much of their life savings when GGC declared Chapter 11 bankruptcy. PROHASHING, which was already under financial strain from the Enterprise's attacks, lost its reserve and laid off multiple employees, including a single mother raising a child with autism. The fraudulent promissory note and the deposits it induced allowed the Enterprise to avoid bankruptcy for another six months.

23.     Shortly before GGC declared bankruptcy, at the beginning of 2023, Jefferies Leveraged Credit Products, LLC ("Jefferies LCP"), with the participation of its parent Jefferies Financial Group, Inc ("Jefferies FG"), Xclaim, and its owner Andrew Glantz ("Glantz"), acting on behalf of the Enterprise, escalated the coverup by facilitating a fraudulent bankruptcy claim sale ("Scheme 3: The Jefferies Claim Sale Scheme", Section VIII(D)) targeting Plaintiffs and their LLCs. The Jefferies Claim Sale Scheme was an attempt to intimidate Plaintiffs by creating an agreement that fraudulently attempted to assign the right to bring this case – a right that the signatory never owned – so that both Jefferies Defendants could adopt a posture of "strategic ambiguity" that benefitted the Enterprise. So long as Plaintiffs (and their potential attorneys) were intimidated by this fraudulent

agreement, the Jefferies Defendants succeeded in preventing discovery that the PROHASHING Scheme had funded the entire Digital Gold industry.

24.     Demonstrating maliciousness and scienter, Jefferies LCP included an attempted assignment of "DOJ forfeiture funds" in this non-standard agreement even though no forfeiture fund had been announced. This clause suggests that the Jefferies Defendants knew that criminal activity had occurred related to this agreement. Plaintiffs bring a claim for a declaratory judgment (Count V) to put an end to the Jefferies Defendants' and the Enterprise's abuse of this agreement. Then. after engaging in this fraudulent first trade in the Genesis Bankruptcy that the evidence strongly suggests involved the guidance of DCG and Silbert, the Jefferies Defendants continued buying tens of millions of dollars in claims from other creditors – despite knowing that there was so much criminality involved in the bankruptcy that it was necessary to include a clause attempting to assign "DOJ forfeiture" funds to itself.

25.     By 2025, the Enterprise, increasingly desperate that the Sokolowskis were finally getting to the truth, then pivoted to attempting to commit a fraud on the bankruptcy court in the Southern District of New York (the "Bankruptcy Court") in the GGC bankruptcy ("Scheme 4: The Falco Adversary Proceeding Scheme," Section VIII(D)). On January 2, 2025, the Sokolowskis initiated this action suing Silbert, Moro, and DCG under the UTPCPL. Unknown to Plaintiffs at

the time, this lawsuit would likely lead to the revelation of Digital Gold's "original sin" in discovery. Therefore, non-party Davis Polk & Wardwell, upon information and belief knowing of the fraudulent bankruptcy claim sale, threatened the Sokolowskis in a brief in this Court that Stephen had committed "criminal bankruptcy fraud," was subject to Rule 11 sanctions, and cited criminal statutes. This accusation was the exact same crime Jefferies LCP had actually committed during the Jefferies Claim Sale Scheme.

26.    The next phase in the fraud on the court involved Defendant Vincent Falco ("Falco") filing a sham, objectively baseless lawsuit for an improper purpose in the Southern District of New York, which no reasonable litigant, including Falco, could expect to win on its merits. Falco's consumer protection complaint claimed in its third paragraph that his bitcoins had become "property of Genesis Global's estate" and that Silbert, Moro, and DCG were "mere alter egos" of GGC. Falco, in collaboration with Silbert and DCG, created an "elongated briefing schedule" on their motions to dismiss so that his sham lawsuit would not be dismissed for its intentional derivativeness before his co-conspirator DCG, led by Silbert, could file an adversary proceeding (the "Falco AP").

27.    The Falco AP was intended to trick the Bankruptcy Court and the presiding Hon. Sean H. Lane into enjoining the Sokolowskis' First Amended Complaint as derivative/property of the debtors (the "Genesis Debtors"), by

14

conflating Falco's objectively baseless lawsuit with this case. Falco's goal was to race as quickly as possible to a preliminary injunction hearing before the Bankruptcy Court had time to evaluate the differences between his complaint and the Sokolowskis's First Amended Complaint, and before the fake "briefing" had been concluded in the Falco Action's motions to dismiss. Genesis litigation representative Vijay Boyapati would state that the Falco Action's complaint had been "copied and pasted" from the Debtors' derivative complaint.

28.     When Falco's sham lawsuit was dismissed in response to an unexpected *sua sponte* order from the Hon. Denise Cote in the Southern District of New York, the racketeers then filed the Falco AP anyway, attempting to enjoin Plaintiffs' consumer protection case as derivative/property of the Genesis Debtors, despite all attorneys and law firms involved understanding or stating unequivocally that the Sokolowskis' claim in this case was actually direct. The Falco AP relied on a brief filed by experienced litigation firm Davis Polk & Wardwell LLP that *cited no Pennsylvania cases* despite attempting to enjoin this Pennsylvania state law case. In addition to trying to obtain an injunction, non-party Vijay Boyapati, acting on behalf of the Enterprise, threatened the Sokolowskis multiple times to dismiss this Action, warning "Judge Lane is going to enjoin your cases," stating that he "thought you had assigned your claims," and offering that he and non-party attorney Jennifer Selendy were willing to discuss the case "as we did several times

with Falco and his counsel," while omitting that Falco would dismiss his case and pivot his scheme because of the *sua sponte* order pointing out its flaws.

29.    The witness intimidation failed when the Sokolowskis revealed to the Bankruptcy Court Jennifer Selendy's statement that "the consumer protection claims were direct" in a case she supported to enjoin them as derivative. When it became clear that a "direct" ruling would occur, non-party Kayleigh Yerdon escalated even further to abuse of process—sending mislabeled subpoenas with a 3-day return time only 4 days before the preliminary injunction hearing, despite no Rule 26(f) conference having been held. These subpoenas attempted to obtain last-minute testimony from non-party Matthew Aronsky, on behalf of Jefferies LCP, to convince the Bankruptcy Court to rule that the Sokolowskis had no standing because they had assigned their claims based upon a narrow interpretation of the clauses in the fraudulent bankruptcy claim sale Agreement. Yerdon additionally failed to respond to the Sokolowskis regarding the subpoenas and did not provide even basic information about Aronsky's background. Had the Bankruptcy Court not finally frozen Falco's sham AP, the Sokolowskis would have been unable to prepare a fair cross-examination of Aronsky, would likely have lost both the Falco AP and this case, and Falco's obstruction of justice scheme would have succeeded in preventing Plaintiffs and the American public from learning of the Digital Gold fraud.

30.     Upon information and belief, the Enterprise has collaborated with other non-parties to strip the 232,000 depositors in the Gemini Earn program, which had previously been defrauded by some of the Defendants, of their personal, nonassignable tort rights for that fraud. (This scheme is detailed in Section VIII(F).) Upon information and belief, the purpose of this assignment of rights was to—yet again—prevent discovery from any Gemini Earn depositor into the PROHASHING Scheme and how it funded the Digital Gold narrative from which the Enterprise and its institutional allies continued to profit at the expense of ordinary American retail investors. While this Gemini Earn assignment scheme is described in the body of this Complaint, it is not referenced as a predicate act and Plaintiffs suffered no losses at Gemini. Plaintiffs' claims in this action are not typical of and share no commonality with any claims the Gemini Earn depositors may have against these or any other Defendants.

31.     Were it not for the Enterprise's racketeering, PROHASHING would have become the dominant U.S. cryptocurrency firm instead of DCG. It would have become the Foundry Digital of its time, and earned the capital to invest in venture companies as DCG has. PROHASHING would have pursued a different, honest path advocating for a blockchain that allowed citizens to control their own money, using compliant, fully backed, and regulated entities, rather than the "custody services" and reckless lending and money laundering schemes that DCG

17

pursued. Therefore, while imperfect, the best available estimate of the value of PROHASHING's damages is the current enterprise value of DCG trebled, and all of the racketeers who controlled and conspired in the scheme, including the Jefferies Defendants, are jointly and severally liable for those damages.

32.     After eleven years of harassment, business destruction, the enabling of Chinese miners to capture the Bitcoin protocol, balance sheet fraud, a fraudulent agreement, obstruction of justice, and a lengthy investigation, Plaintiffs are finally able to share the truth of Digital Gold with the public below. The ruin of millions of lives originates from the greed and hubris of one man, Barry Silbert, and the Enterprise, lawyers, and Chinese miners that enabled him. The rot Silbert created has spread to Wall Street banks and Big Law firms, and has deceived government officials. Plaintiffs bring this action and seek maximum damages to cripple the Enterprise by defunding it, finally putting an end to the era of the Digital Gold Enterprise's repeated defrauding of millions of innocent American investors.

## III    PARTIES

33.     Plaintiff **Stephen Sokolowski** ("Stephen") is a natural person and citizen of the United States who is domiciled in State College, Pennsylvania. He is a co-founder and co-owner of PROHASHING LLC, a Pennsylvania limited liability company headquartered in State College, Pennsylvania, and owner of

Cryptocurrency Management LLC ("CM LLC"), a passthrough entity that was used to lend to Enterprise participant Genesis Global Capital LLC. Stephen passed his personal, family, and household funds through CM LLC.

34.     Plaintiff **Christopher Sokolowski** ("Christopher") is a natural person and citizen of the United States who is domiciled in State College, Pennsylvania. He is a co-founder and co-owner of PROHASHING, and passed his personal, family, and household funds through CM LLC. Together, Stephen and Christopher are referred to as the "Sokolowskis."

35.     Plaintiff **PROHASHING LLC** ("PROHASHING") is a limited liability company registered in Pennsylvania. Starting on December 23, 2013, PROHASHING provided cryptocurrency mining services to the public. PROHASHING closed on December 2, 2025 and is winding down operations. PROHASHING is co-owned by the Sokolowskis and passed its business reserve through CM LLC.

36.     Defendant **Digital Currency Group, Inc.** ("DCG") is a corporation organized under the laws of the State of Delaware with its principal place of business on Harbor Drive in Stamford, Connecticut, including offices at 262 Harbor Drive, Stamford, Connecticut 06902. DCG describes itself as a "venture capital company" and holding company that builds and supports Bitcoin and blockchain businesses, and it was the parent of Genesis Global Capital, Inc. and

other Genesis entities involved in institutional digital-asset trading and lending[1]. At all relevant times, DCG exercised ownership and control over trading and lending operations at all Genesis entities, and, upon information and belief, directed or approved the conduct alleged herein, including exploiting security vulnerabilities in PROHASHING, manipulating cryptocurrency markets, deceiving depositors with fraudulent balance sheets, engaging in fraudulent bankruptcy claim sales, obstructing justice, intimidating witnesses, harassing Plaintiffs, censoring and manipulating discussion, and laundering its stolen coins into the rest of the institutional cryptocurrency ecosystem.

37.     Defendant **Barry E. Silbert** ("Silbert") is a natural person and citizen of the United States who, according to SEC data, resides at 222 Purchase St #283, Rye NY 10580. Silbert is the founder, controlling shareholder, and chief executive officer of DCG. He previously founded SecondMarket, Inc. and has for years been one of the most prominent early investors in Bitcoin and digital assets businesses. At all relevant times, Silbert exercised ultimate control over DCG's strategy and over trading and lending operations of all Genesis entities through his role as

---

[1] There are at least four former subsidiaries of DCG containing the name "Genesis." In the original version and first amendment to the Complaint in this action, Plaintiffs referred to Genesis Global Capital, LLC as "Genesis." To avoid confusion in this Complaint, the unqualified term "Genesis" will not be used. Instead, "GGC" will refer to Genesis Global Capital, LLC, and "GGT" will refer to Genesis Global Trading, LLC. "Genesis Debtors" will refer to the three companies that collectively filed bankruptcy (the "Genesis Bankruptcy") in *In re Genesis Glob. Holdco, LLC, No. 23-10063 (SHL) (Bankr. S.D.N.Y)*: Genesis Global Capital, LLC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd. "Genesis Entities" refers to all four Genesis companies. None of the four Genesis companies are parties to this Complaint.

DCG's CEO and as a key decisionmaker in the Genesis entities' "line of credit" structure at issue in multiple regulatory and private actions. Silbert personally participated in, and directed others to participate in, the manipulation, harassment, racketeering, fraud, money laundering, and computer intrusion scheme described in this Complaint.

38.     Defendant **Jefferies Leveraged Credit Products, LLC** ("Jefferies LCP") is a limited liability company organized under the laws of the State of Delaware, with its legal and headquarters address listed as c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and principal business offices at 520 Madison Avenue, New York, New York 10022—the same address as Jefferies Financial Group Inc. Jefferies LCP is an institutional brokerage and credit-products affiliate of Defendant Jefferies Financial Group Inc., and it acts as a lender, counterparty, and claims trader in distressed and structured credit markets. In connection with the Genesis Bankruptcy and related claim sales, Jefferies LCP executed the highly unusual Claim Sale and Purchase Agreement with Cryptocurrency Management LLC ("CM LLC.") Jefferies LCP fraudulently solicited CM LLC to sell its GGC bankruptcy claim in an insider trading scheme, either by working with DCG to delay the Genesis Bankruptcy filing to close the deal or by knowing when the bankruptcy filing would occur. Jefferies LCP additionally used unusual and

unenforceable contract terms to intimidate Plaintiffs, adopt a position of "strategic ambiguity" to chill prosecution, and paint CM LLC as something other than the passthrough entity it was, so that Plaintiffs would not conduct discovery into the racketeering activities described in this Complaint.

39.    Defendant **Jefferies Financial Group, Inc.** ("Jefferies FG") is a publicly traded financial services holding company incorporated under the laws of the State of New York, with its principal executive offices located at 520 Madison Avenue, New York, New York 10022. Jefferies Financial is the parent company of the Jefferies operating subsidiaries (including Jefferies Group LLC and related broker/dealer subsidiaries operating under the Jefferies brand), and Jefferies FG's own public filings describe it as a holding company dependent on payments from subsidiaries for liquidity and the funding of its obligations. Jefferies FG is not named solely because it is Jefferies LCP's owner. Rather, Jefferies FG directly participated in and benefited from the racketeering acts alleged in this Complaint— including the fraudulent Jefferies Claim Sale Scheme and the subsequent intimidation/obstruction campaign—by authorizing, directing, approving, and later ratifying Jefferies LCP's conduct. Jefferies FG also deployed Jefferies personnel and counsel to use Jefferies LCP's bespoke "Claim Sale and Purchase Agreement" as a litigation-control device designed to silence Plaintiffs, manufacture standing/ownership disputes, and obstruct discovery into the Enterprise's earlier

22

misconduct. Collectively, Jefferies FG and Jefferies LCP are referred to as the "Jefferies Defendants."

40.    Defendant **Xclaim Inc** ("Xclaim") is a corporation formed in Delaware and registered to do business in California, with its principal address listed in corporate and bankruptcy filings as 5792 W. Jefferson Blvd., Ste. 1194, Los Angeles, CA 90016. Xclaim operates an online financial marketplace and clearinghouse for the buying and selling of bankruptcy and other distressed claims, advertising itself as the "world's largest and most trusted bankruptcy claims marketplace." In connection with the Genesis Bankruptcy and other crypto bankruptcies, Xclaim has acted as a broker and exchange for claims against GGC and related entities. Xclaim worked directly with Stephen, in his capacity as owner of CM LLC, and collaborated with Jefferies LCP, Silbert, and DCG to pressure and fraudulently induce CM LLC to sell its bankruptcy claim against GGC as described in Section VIII(C).

41.    Defendant **Andrew Glantz** ("Glantz") is a natural person and citizen of the United States who, upon information and belief, resides in Forest Hills, New York. Public professional biographies identify Glantz as Chief Strategy Officer, Chief Business Officer, and Senior Counsel of Xclaim, Inc., overseeing its bankruptcy-claims marketplace and legal strategy. Corporate records list Glantz as a director of Xclaim. Glantz personally participated in the Jefferies Claim Sale

Scheme described starting at Paragraph 401 and was the primary contact with Stephen acting on behalf of CM LLC.

42.     Defendant **Soichiro "Michael" Moro** ("Moro") is a natural person and citizen of the United States who resides in the State of New York at 1 Clinton St., Apt. 32C, Brooklyn, NY 11201. From approximately February 2016 until August 2022, Moro served as Chief Executive Officer of GGC and GGT, DCG's institutional prime-brokerage and over-the-counter trading subsidiary, and was one of the key executives responsible for GGC's trading and lending activities. Regulatory filings and enforcement actions by the New York Attorney General and the U.S. Securities and Exchange Commission identify Moro as GGC's former CEO and describe his role in concealing or downplaying GGC's losses and risk concentrations. Moro knew of, approved, or recklessly disregarded GGC's and DCG's use of trading desks and related entities to enforce the Enterprise's small block size goals by conducting the hacking of PROHASHING, and directed or knew of the laundering of stolen assets from the Genesis Entities through the banking system.

43.     Defendant **Vincent Falco** ("Falco") is a natural person and a citizen of the United States who invested significant amounts of bitcoin with GGC and who later became a creditor of the Genesis Bankruptcy. Falco is the named plaintiff in *Falco v. Digital Currency Group, Inc., et al.*, No. 1:25-cv-03771-DLC (S.D.N.Y.)

(the "Falco Action"), a federal action alleging that DCG, Silbert, and Moro misled him and other customers regarding GGC's financial condition and the safety of the GGC lending program. The Falco Action pleads consumer protection laws but states that his bitcoins became "property of Genesis Global's estate" and that the defendants were "mere alter egos" of GGC. On July 7, 2025, the Hon. Denise Cote of the S.D.N.Y. issued a *sua sponte* order in the case, providing Falco with 3 weeks to amend his complaint, which he instead dismissed. The Falco Action was a sham lawsuit intentionally designed to be enjoined as derivative. Falco's goal was to obstruct justice by tricking the Hon. Sean H. Lane in the Genesis Bankruptcy Court into enjoining both his and the Sokolowskis' consumer protection lawsuits as derivative, hoping that the Bankruptcy Court would conflate Falco's objectively baseless derivative complaint with the Sokolowskis' honestly direct complaints.

## IV    NON-PARTIES

44.    Non-party **Selendy Gay PLLC** ("Selendy Gay") is a professional limited liability company organized under the laws of the State of New York, with its principal and only office located at 1290 Avenue of the Americas, New York, New York 10104. The firm markets itself as a premier litigation boutique representing businesses and individuals in a wide range of complex commercial matters, public interest cases, and investigations, and its website and legal industry

profiles emphasize its work on high stakes financial and restructuring disputes. In the Genesis Debtors' bankruptcies and related proceedings, Selendy Gay has appeared as counsel for the Genesis Debtors. Selendy Gay, directed by partner Jennifer Selendy, conspired with the Enterprise to engineer the fraudulent Falco AP while its founding partner admitted that the claims the Falco AP was trying to enjoin as derivative were actually direct.

45.    Non-party attorney **Jennifer Selendy** ("Selendy") is a natural person and, upon information and belief, a citizen of the United States who resides in New York, New York. She is a founding and managing partner of Selendy Gay. Public biographies describe her as a seasoned trial and appellate litigator who represents plaintiffs and defendants in complex commercial disputes, investigations, and arbitrations in state and federal courts, and note that she has been recognized as a top general litigation attorney and named to Forbes' list of America's Top 200 Lawyers. Selendy participated in the Enterprise's attempt to obstruct justice by being "aligned on the requested relief" with DCG in filing the Falco AP. She coordinated with Defendant Falco to use Falco's sham lawsuit to attempt to trick the Hon. Sean H. Lane into granting an improper injunction – while privately admitting to the Sokolowskis that "the consumer protection claims were direct" and "to be honest, the claims are different than those of the estate," despite

claiming to have "not read" or "not really understood" this case's First Amended Complaint.

46.    Non-party attorney **Kayleigh A. Yerdon** ("Yerdon") is a natural person and, upon information and belief, a citizen of the United States who resides in or around New York, New York. She is an associate attorney at Selendy Gay PLLC, with a listed office address of 1290 Avenue of the Americas, New York, New York 10104. Her professional biography states that she advises domestic and international companies and lenders in connection with financial restructurings, bankruptcy-related matters, and mergers and acquisitions, and that she was previously an associate in the restructuring group at Davis Polk & Wardwell LLP. Yerdon furthered the Enterprise's goals by abusing process: she signed and sent subpoenas that she knew or should have known were improper because they contained a 3-day return time just 4 days before a hearing, because they all contained the same obviously incorrect captions, because there had been no Rule 26(f) conference, and because she failed to respond to the Sokolowskis when they asked questions about the subpoenas.

47.    Non-party **Davis Polk & Wardwell LLP ("Davis Polk")** is an international law firm with its principal office located at 450 Lexington Avenue, New York, New York 10017. Davis Polk appeared as counsel of record for Defendants DCG and Silbert in this Action and in the Falco AP. Davis Polk

participated in the Enterprise's obstruction and intimidation schemes by filing briefs in this Court that threatened the Sokolowskis with Rule 11 sanctions and accused him of committing "criminal bankruptcy fraud" under federal statutes. Davis Polk made these threats while, upon information and belief, knowing that the "fraud" allegation relied upon the unenforceable Jefferies Claim Sale Agreement. Davis Polk furthered the Falco Adversary Proceeding Scheme by filing a preliminary injunction brief that cited no Pennsylvania case law despite attempting to enjoin a Pennsylvania state law claim, and by engaging in staged briefing in the Falco Action to manufacture a "derivative" narrative. During the Falco AP, Davis Polk attorney Benjamin S. Kaminetzky admitted on the record that his client was in "violent agreement" with the Sokolowskis' counterclaim against his client, further evidencing that the proceeding was an objectively baseless sham designed to obstruct justice rather than a genuine adversarial dispute.

48.    Non-party **Vijay Boyapati** ("Boyapati") is a natural person who, according to publicly available biographies, was born and raised in Australia and later moved to the United States. He is a former Google software engineer and a widely recognized commentator on bitcoin and Austrian economics, best known as the author of *The Bullish Case for Bitcoin*. Published author biographies state that he lives with his family in Seattle, Washington, and recent event materials describe him as a bitcoin evangelist and educator. Boyapati participated in the Enterprise's

racketeering by privately threatening the Sokolowskis on multiple occasions to dismiss their UTPCPL claims that would lead to discovery of the Enterprise, by making false or misleading statements about having "not read" the Sokolowskis' First Amended Complaint, warning them the Bankruptcy Court would enjoin their claims anyway, and attempting to trick Plaintiffs into producing the fraudulent bankruptcy claim sale agreement that Yerdon would later attempt to obtain through the improper subpoenas. Boyapati admitted that the Falco complaint had been "copied and pasted" from the Genesis Debtors' derivative complaint, even though the Debtors' complaint was not filed publicly until one week after the Falco complaint was filed.

49.     Non-party **McDermott Will & Emery LLP** (now known as McDermott Will & Schulte following a merger effective August 1, 2025) is an international law firm with offices in New York, New York, including at One Vanderbilt Avenue, New York, New York 10017. McDermott Will & Emery appeared as counsel of record for Plaintiff Vincent Falco in Falco v. Digital Currency Group, Inc., et al., No. 1:25-cv-03771-DLC (S.D.N.Y.) (the "Falco Action"), including through attorneys Joseph B. Evans and Alexander H. Southwell, and drafted and filed the complaint in the Falco Action. McDermott Will & Emery's drafting and filing of the Falco Action's complaint was questionable because it repackaged and echoed allegations and phrasing derived

from the Sokolowskis' pleadings and was deployed as part of a coordinated

litigation and public messaging strategy designed to manufacture a misleading

"race to the courthouse" narrative, pressure and intimidate the Sokolowskis, and

impede scrutiny into the Enterprise's misconduct.

50.    Non-party attorney **Matthew Aronsky** ("Aronsky") is a natural

person and, upon information and belief, a citizen of the United States who works

in the distressed-investing and claims-trading industry and resides in or around

New York, New York. Public records from Chapter 11 cases show that he has

served on boards of reorganized debtors and restructuring committees in

connection with distressed and turnaround investments, including as a member of

the initial board of directors of reorganized GT Advanced Technologies Inc. and as

a beneficiary of compensation tied to distressed-debt transactions. Aronsky directly

communicated with Stephen (who was acting on behalf of CM LLC) and

participated in the Enterprise's activities by serving as a primary facilitator of the

fraudulent insider trading bankruptcy claim sale that was intended to strip

Plaintiffs' and their LLCs' right to bring this action.

51.    Non-party **Michael "Theymos" Marquardt** ("Marquardt") is a

natural person and, according to published interviews and profiles, was born in the

United States in the early 1990s and has long been active in the Bitcoin ecosystem.

He is widely known by the pseudonym "Theymos" and is described in press

coverage as the longtime administrator of Bitcointalk.org (the primary bitcoin discussion forum early in Bitcoin's history), a moderator of the /r/bitcoin Reddit "subreddit," and the creator of one of the first Bitcoin "block explorers" at blockexplorer.com. Articles in mainstream and industry media, including reporting on the early Silk Road investigations and the Bitcoin "civil war" over the block size, identify him as the individual behind the "Theymos" persona and note that his control over major communication channels allowed him to shape or suppress debate over protocol changes. Marquardt furthered the Enterprise's goals by censoring and manipulating the Sokolowskis' posts in the mid-2010s to ensure that the Enterprise was successful in capturing the Bitcoin network to maintain its small block size.

52.     Non-party **moderators and participants** of Reddit subreddits /r/bitcoin and /r/singularity, Manifold Markets, and other forums are individuals who intentionally manipulated discussion around Stephen's posts regarding the block size and this and other litigation to censor him and engage in witness intimidation. Plaintiffs reserve the right to seek to add these parties should discovery reveal that any of these individuals were paid to participate in the manipulation, censorship, and harassment, or that they have continued to engage in those activities now that they have learned about the Enterprise through the filing of this Complaint.

53.     The **Gemini Earn depositors** are not parties to this action. Plaintiffs expressly disclaim any intention to represent, join, or be consolidated with any potential class of Gemini Earn depositors. Plaintiffs were not depositors at Gemini Earn. Furthermore, the injuries alleged herein—arising from targeted racketeering, and specific proprietary mining theft directed at PROHASHING's infrastructure—are factually and legally distinct from the claims asserted by Gemini Earn users. Plaintiffs' claims lack the requisite "typicality" and "commonality" under Fed. R. Civ. P. 23 to be joined with such actions. Plaintiffs are victims of active competitive sabotage and theft; therefore, any attempt to consolidate this action with Gemini Earn proceedings would be prejudicial to Plaintiffs.

54.     In addition to the named Defendants, Plaintiffs allege that certain currently unidentified individuals and/or entities (collectively, "John Doe(s)"), including without limitation the unknown person(s) who controlled, registered, accessed, and/or operated the PROHASHING attack accounts and other unknown operators who executed or assisted the technical aspects of the PROHASHING Scheme and related concealment activity described herein, acted as agents of, at the direction of, for the benefit of, and/or in coordination with one or more Defendants and the Enterprise. These John Doe(s) are not named as parties at this time because their true identities are presently unknown to Plaintiffs and are believed to be uniquely within the knowledge and control of Defendants and third

parties. Plaintiffs intend to seek discovery to identify these John Doe(s), and expressly reserve the right to amend this Complaint to name and join them as defendants (and to assert additional claims against them) if and when investigation and discovery reveal facts establishing their identities, roles, and knowing participation in the Enterprise's conduct.

## V    JURISDICTION AND VENUE

### A  Subject Matter Jurisdiction

55.    **Federal Question Jurisdiction:** This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Specifically, Plaintiffs assert claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

56.    **Supplemental Jurisdiction:** This Court has supplemental jurisdiction over the Plaintiffs' state law claims (including, but not limited to, fraudulent inducement, tortious interference with contractual relations, and civil conspiracy) pursuant to 28 U.S.C. § 1367(a). These state law claims are so related to the federal RICO claims that they form part of the same case or controversy under Article III of the United States Constitution. The state and federal claims derive from a common nucleus of operative fact: the Enterprise's systematic scheme to destroy

PROHASHING LLC through a coordinated campaign of theft, fraud, and financial sabotage.

57.    **Diversity Jurisdiction:** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiffs and Defendants. Plaintiffs are citizens of Pennsylvania. Upon information and belief, and after a reasonable investigation of publicly available records, no Defendant is a citizen of Pennsylvania. To the extent any Defendant is a corporation, it is incorporated and has its principal place of business outside Pennsylvania; to the extent any Defendant is a limited liability company or other unincorporated entity, it is a citizen of each state of citizenship of its members, and upon information and belief none of those members is a citizen of Pennsylvania. If any Defendant contends that complete diversity does not exist or that additional detail is required at this stage regarding the citizenship of an unincorporated entity whose membership information is uniquely within Defendants' control, Plaintiffs request leave to conduct limited jurisdictional discovery and to amend these allegations consistent with the results.

58.    **Independent of Bankruptcy:** This action asserts direct and independent tort claims against non-debtor third parties. It is not a "core proceeding" under 28 U.S.C. § 157(b)(2), nor does it seek to recover property of

the GGC bankruptcy estate. Therefore, jurisdiction properly lies in the District Court, not the Bankruptcy Court. To the extent any Defendant contends Plaintiffs' claims are "derivative" estate property, Plaintiffs deny that contention; Plaintiffs seek recovery for particularized injuries to Plaintiffs, not generalized injury to any debtor's estate.

**B  Personal Jurisdiction**

59.    **Specific Jurisdiction:** Defendants are subject to specific jurisdiction because they expressly aimed intentional misconduct at Plaintiffs in this District, and knew the brunt of the injury would be suffered here, satisfying Calder's purposeful-direction "effects" framework. *Calder v. Jones*, 465 U.S. 783 (1984).

a.        **Targeting of Pennsylvania Assets:** The "PROHASHING Scheme" (multiple RICO predicate acts) involved the unauthorized access to and manipulation of computer servers owned by PROHASHING LLC, a State, College, Pennsylvania entity, causing digital assets to be stripped from Pennsylvania-based accounts.

b.        **Targeting of Pennsylvania Residents**: Defendants directed fraudulent communications, including the claim sale solicitations, false financial statements, and harassment to the Sokolowskis' residence, computer systems, and place of business in State College, Pennsylvania.

60.　**RICO Jurisdiction (18 U.S.C. § 1965):** This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(b), which authorizes nationwide service of process and jurisdiction over RICO co-conspirators when the "ends of justice" so require. Because the Enterprise operated across multiple jurisdictions (New York, Connecticut, Pennsylvania, California, offshore, and others), and because at least one act of racketeering (theft) occurred within this District, the statute confers jurisdiction over all members of the conspiracy in this Court. The Jefferies Defendants communicated the fraudulent bankruptcy claim sale agreement into Pennsylvania, establishing personal jurisdiction over at least one Defendant.

61.　**Pendent Personal Jurisdiction:** Because this Court has personal jurisdiction over the Defendants for the federal RICO claims, it may exercise "pendent personal jurisdiction" over the Defendants for all state law claims arising from the same common nucleus of operative fact.

## C　Venue

### 1.　General Venue (28 U.S.C. § 1391)

62.　Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and acts

giving rise to the claims occurred in this District, and a substantial part of property that is the subject of the action is situated in this District. Specifically:

    a.      **Location of PROHASHING Servers:** The computer servers, hardware, and digital infrastructure of PROHASHING LLC, which were the target of the PROHASHING Scheme and unauthorized access were physically located, maintained, and operated within State College, Pennsylvania, and other locations within Pennsylvania.

    b.      **Situs of the Injury:** Plaintiffs are domiciled and maintain their principal place of business in this District. The financial injury resulting from the theft of assets, the destruction of enterprise value, and the interference with prospective economic advantage was suffered within this District.

### 2. RICO Venue (18 U.S.C. § 1965)

63.    Venue is proper pursuant to 18 U.S.C. § 1965(a) and (b).

    a.      **Transaction of Affairs:** Defendants transact their affairs in this District by soliciting and accepting digital assets from residents of this District, maintaining contractual lending relationships with entities in this District (CM LLC), and directing data transmissions to computer servers located in this District.

b.          **The "Ends of Justice":** To the extent that certain

Defendants (such as DCG) may reside in different districts (e.g., Connecticut or

New York), 18 U.S.C. § 1965(b) authorizes this Court to exercise personal

jurisdiction over all co-conspirators because the "ends of justice" require that the

entire RICO Enterprise be adjudicated in a single forum where the primary injury

occurred. It would be unjust to force the Pennsylvania victims of a coordinated

cyberattack to litigate piecemeal across the multiple jurisdictions where the

aggressors happen to reside.

64.    **Judicial Economy (Related Case):** While not a statutory basis for

venue, the interests of judicial economy heavily favor retention of this action in

this District. This Court is already familiar with many of the facts of this case

through the briefing on the First Amended Complaint's motions to dismiss, and

transfer would result in a new court duplicating work and conducting legal

research this Court has already completed.

65.    **Inapplicability / Unenforceability of Contractual Forum-Selection
and Related Clauses:** This action asserts federal statutory claims under RICO (18

U.S.C. § 1962) and related Pennsylvania statutory and tort claims (including the

UTPCPL and tortious interference). Plaintiffs do not seek to enforce performance

under the Claim Sale and Purchase Agreement (Ex. N) or to recover contract

damages under its terms. Rather, Plaintiffs plead the Agreement as part of the

Enterprise's racketeering conduct—including alleged obstruction and wire fraud—and, as to the Jefferies Defendants, seek declaratory relief that the Agreement did not and could not assign or transfer Plaintiffs' direct statutory and tort claims against non-debtors and does not bind non-signatory individuals or cloud Plaintiffs' standing to prosecute this action. Accordingly, any forum selection, waiver, confidentiality, or liability limitation provisions in the Agreement are inapplicable and/or unenforceable here: they cannot be invoked by Defendants who were not parties to the Agreement; and Plaintiffs deny that Stephen Sokolowski, Christopher Sokolowski, or PROHASHING LLC—who did not assent to the Agreement and are not suing to obtain benefits under it—are bound by its forum terms. Further, because Plaintiffs allege that the Agreement and its restrictive provisions were procured and deployed as part of a fraudulent and obstructive scheme to strip statutory rights and chill witnesses, enforcing its forum selection clause to require dismissal or transfer would be unreasonable and contrary to strong public policy. Venue is therefore proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

## VI    BACKGROUND OF BITCOIN, MINING, PLAINTIFFS, THE LITIGATION WEB, AND THE ENTERPRISE

### A  Mining

66.    Bitcoin[2] is a decentralized digital currency system that operates on a public ledger known as a blockchain. Unlike traditional banking, where a central authority (like a bank) verifies transactions, Bitcoin relies on a distributed network of computers to process and record payments. The security and integrity of this network rely on a process known as mining[3].

67.    To update the ledger with new transactions, specialized computers on the network known as miners compete to solve complex mathematical puzzles, whose complexity serves to throttle the rate of generation of new blocks of transactions. This process is called "proof of work." The computational power of a miner is measured in hashrate. The miner that solves the puzzle first gets to add a "block" of transactions to the blockchain and is provided with a reward of newly minted bitcoin. This reward is the primary income stream for the mining industry.

68.    As the Bitcoin network grew, more miners connected and the mathematical puzzles became more difficult, which caused two major changes to mining. First, miners became very specialized with manufacturers developing

---

[2] In standard industry terminology, "Bitcoin" (or any other cryptocurrency with a capitalized first letter) refers to the network of that cryptocurrency and its associated blockchain. "bitcoin" (or any other cryptocurrency with a lowercase first letter) refers to the currency itself.

[3] For convenience, a dictionary of technical terms is provided in the front matter.

miners with application specific integrated circuits ("ASIC miners"), which use computer chips designed to solve these puzzles faster than a general purpose computer but with the tradeoff that they can only solve one type of puzzle and cannot do anything else—not even solve other types of puzzles. Second, the puzzles became too difficult for any single miner to solve. Consequently, owners of individual miners aggregated their computing power into "mining pools."

69.    In pooled mining, an entity (such as PROHASHING or Foundry USA) coordinates the combined computing power of many miners—increasing the chance that at least one of the miners will solve the puzzles and find blocks—and then distributes rewards proportionally to the computing power contributed. To ensure that owners of individual miners are paid fairly and proportionally to the computational power they contribute, miners regularly submit possible solutions to the puzzle, known as "shares," to the pool operator as a way for the pool operator to track their work.

70.    Mining pools can pay miners using many different formulas, but in most configurations, including the dominant configuration at PROHASHING, the pool operator pays the pool's users for every valid share submitted by their miners, regardless of whether that specific share solves the puzzle and finds a block. (See Section VII(B) for a full description of PROHASHING.) If no miner submits a share that finds a block, then the pool operator earns nothing; if a share does find a

block, then the pool operator earns the full reward of finding that block, and those profits go into the pool's capital reserve. Most of that reserve is distributed to the users who contributed computing power and the rest is profit.

71.    Because pool operators pay cash or cryptocurrencies in exchange for shares, the integrity of the share accounting system is the financial heart of a mining pool. If a malicious actor can trick a pool operator into crediting the same share twice (a "duplicate share"), the actor can drain the pool's reserves by getting paid double for single work. This is the specific technical vector of the "PROHASHING Scheme" theft described herein.

72.    Another attack vector against a mining pool is a "block withholding" attack. In this type of attack, a malicious user modifies the software running on their miner. The modified software submits to the pool most shares the hardware finds but silently drops shares that would find blocks. This attack does not earn the user any extra money compared to if the miner was running unmodified software. However, because mining pools that pay a set value per share will still pay the malicious user per share without that user ever providing the pool with something of value (blocks), the pool loses money.

73.    A block withholding attack is difficult to detect because the success of finding a block in any given share is independent of the success in any other share. Honest miners can also have "bad luck"—not finding blocks despite submitting

many shares. Therefore, a malicious user can modify software so that it fails to submit blocks, and then later appear to simply have had a string of "bad luck" in mining.

74.    All mining pools also require some sort of database to store the amounts owed and paid to their customers. A third type of attack vector involves simply gaining access to that database and modifying the rows assigning the payout amounts to increase the amount due. Once increased, the customer is paid coins equal to the unauthorized modification.


**B   The Block Size**

75.    The Bitcoin protocol places a limit on the amount of data (transactions) that can fit into a single block. This is known as the block size. This limit dictates the economics of the entire Bitcoin ecosystem.

76.    If the block size were larger, then more transactions could be inserted into each block, allowing the throughput of the network to rise. With a large block size, the Bitcoin network would resemble the Mastercard or Visa payment systems—which have the capacity to record tens of thousands of transactions per second—and could potentially become a competitor to these credit card processing systems. Proponents of this "big block" model refer to this hypothetical variant of Bitcoin as "electronic cash."

43

77.     On the other hand, if blocks are small and the number of transactions waiting to be included in a block exceeds the block size, then "transaction fees" would be required. In Bitcoin, users bid the fee they are willing to pay for their transaction to be included in a block, incentivizing miners to prioritize including the transactions with the highest fees into the limited block size.

78.     Initially, the block size of Bitcoin was unlimited. However, in 2010, the creator of Bitcoin, Satoshi Nakamoto, added what he stated was a temporary limit on the size of blocks—1 MB—to protect the then-small network against malicious users who might attempt to destroy Bitcoin by creating massive blocks filled with frivolous transactions that would overwhelm the computers hosting the blockchain. Bitcoin had little value at the time, but despite the block size limit, the transaction fee remained near-zero because the rate of transactions on the network was still not enough to fill entire blocks and cause scarcity. Satoshi intended for the block size to be raised when the price of Bitcoin rose high enough to ensure this "denial of service" attack was no longer affordable.

79.     In 2011, Satoshi ceased active protocol development, leaving the small block size in the Bitcoin code at the time he left. The lead developer of the "core" Bitcoin client became Gavin Andresen, who also publicly supported increasing the block size of the network.

80.     As 2015 approached, Bitcoin network usage grew and blocks were becoming full. Since then, transaction fees have rarely fallen below $1 and have exceeded $50 during periods of high demand. These high fees caused by the limited block size make Bitcoin impractical for low value transactions; a $5 coffee is not worth purchasing with bitcoin if a fee of $1 is required to pay for it. In such an environment, a Bitcoin "wallet" containing less than $1 is referred to as "dust"—an amount that is uneconomical to spend because the cost of the transaction fee is higher than the payment amount.

81.     While a small block size harms users who wish to spend bitcoin on everyday purchases, and hurts regulatory agencies who wish to prevent theft and fraud, it benefits business models that involve aggregating large amounts of bitcoin —such as those in which the Enterprise engaged—because the small block size makes only high-value transactions economically feasible. If the block size were large and transaction fees were low, then any person could cheaply hold small amounts of bitcoin in their own home wallets. With the block size small and transaction fees high, bitcoin must be aggregated and "custodied" by large institutions because small quantities of bitcoin are "dust".

82.     The small block size and its resulting high transaction fees facilitated the surge of lending platforms that aggregated retail customers' small amounts of bitcoin—platforms such as BlockFi, GGC (which was operated by the Enterprise),

Celsius, Voyager, Ledn, and others. GGC, for example, paid the transaction fees for its outgoing withdrawals as a complimentary service to its customers. High fees also slow the velocity of money in the Bitcoin ecosystem, inflating the price of bitcoin, which created a feedback loop to allow the Enterprise to sell Digital Gold as an investment.

83.    The small block size also led to the widespread adoption of (and later SEC approval of) ETFs and other Wall Street financial instruments backed by bitcoin, as users would have little incentive to pay management fees to the financial institutions managing these financial instruments if they could inexpensively and easily hold bitcoin themselves. The Enterprise benefited from the adoption of these funds because the Enterprise's Grayscale Bitcoin Trust was one of the first such ETFs approved by the Securities and Exchange Commission. DCG's Grayscale Bitcoin Trust fund takes 1.5% of the fund's value in fees annually, and earned $282.1 million in revenue in 2024.

84.    The small block size also necessitated the creation of proprietary solutions, such as the Enterprise's Lightning Network, to work around the artificially limited transaction capacity. The Lightning Network consists of "nodes" that must be run continuously, compared to the base Bitcoin chain's ability for users to send transactions and then go offline while they are processed. The fundamental design of the Lightning Network depends upon "mixing" coins sent

into the nodes, so that coins that come out of the Lightning Network cannot be easily traced to those that went into it. In fact, one of the stated design goals of the Lightning Network was to provide "privacy," which also eases the ability to launder money. This built-in mixing feature benefits organizations like the Enterprise who wish to hide the origin of their funds and conceal their racketeering activities.

85.    The small block size also encouraged the creation of workarounds such as alternative cryptocurrencies—for example Ethereum, Dogecoin, and the numerous "ERC-20 tokens"—that currently rise and fall monthly. Because demand for cryptocurrency transactions was greater than the Bitcoin block size permitted, the small block size mandated fragmentation into many cryptocurrency networks. A single network with a large block size is transparent, but moving coins between multiple networks requires using cryptocurrency exchanges, which hide transactions on their internal ledgers, making it more difficult for regulators to trace money flows between the numerous coins. The consequences are twofold: first, exchanges like Coinbase can earn more profit because of this need to move money between chains; and second, the complexity makes it much more difficult for agencies like the FBI to track criminals and scammers using bitcoin for illegal activities.

### C  Plaintiffs' Involvement in Bitcoin and Their Loans to GGC

86.    After simultaneously moving to State College, Pennsylvania in early 2008, Stephen worked two ordinary software jobs while Christopher attended Penn State University. The Sokolowskis were interested in cryptocurrency since at least 2011. They mined bitcoin and litecoin in 2013, and founded PROHASHING on December 23, 2013. Stephen worked full time at other employers until November 13, 2017; the money spent on his bitcoin purchases that was later lost due to the Enterprise's racketeering was his earnings from this employment. Christopher earned his cryptocurrencies as distributions from PROHASHING's profits. Except for the assets that remained as property of PROHASHING in its reserve, the Sokolowskis' assets were used for personal, family, and household purposes.

87.    Plaintiffs were not professional traders, possessed no financial licenses, and did not trade crypto assets as speculative instruments. Instead, they treated their cryptocurrency holdings as a form of digital savings—akin to keeping money in a high-yield savings account. Stephen had regularly stated and believed that Bitcoin would eventually become a "world currency" and that he had intended never to sell any of his bitcoin.

88.    Stephen had held his bitcoin and ethereum holdings continuously for nearly a decade prior to the Defendants' misrepresentations. For seven of those years, he never even transferred his 2013-purchased bitcoin out of their original

48

"Bitcoin Core" wallet. During this period, he weathered multiple market downturns and never engaged in trading or profit-taking from his Bitcoin investments.

89.     The Sokolowskis also saved significant value in U.S. Dollars earned from their employment. During this saving period, they lived a modest lifestyle typical of an average consumer, driving 2005 and 2006 model cars, and residing in an ordinary house in the suburbs of a small city sitting on less than ¼ acre of land. Stephen sometimes worked overtime, and he saved over 60% of his income, used it to purchase bitcoin, and invested it in stocks for early retirement.

90.     The Sokolowskis managed their cryptocurrency and US Dollar savings from their Pennsylvania home, made lending decisions there, and relied on the fraudulent balance sheet while physically located in Pennsylvania. They conducted all research relating to the renewal of their loans and participated in all calls with GGC representatives while in Pennsylvania.

91.     The assets loaned to the Enterprise were the Sokolowskis' personal savings, inherited from a deceased family member, put aside from two decades of work, and saved through years of frugality. Before the fraud, the Sokolowskis were in a position to achieve early retirement and specifically avoided spending their assets to have money available for retirement. These assets would later be loaned to the Enterprise's lending arm, GGC.

92.     Plaintiffs actively avoided, and Stephen publicly recommended the avoidance of, complex and risky financial products like "flash loans," "distributed exchanges," "NFTs," "ICOs," and "ERC-20 tokens." The Sokolowskis retained nearly all their life savings in large, well-established assets like Bitcoin, Ethereum, US Dollars, and large-cap US stocks, and used GGC because GGC represented itself as a simple, safe alternative for ordinary consumers to earn interest on cryptocurrency and US Dollar assets.

93.     At times, the Sokolowskis entrusted over ninety percent (90%) of their total net worth to GGC under the reasonable belief that they were placing their personal, household-level savings into a stable, interest-bearing financial service. This extreme concentration of their assets in what they believed to be a safe, consumer-oriented lending environment further underscores both their reliance on Defendants' assurances and the magnitude of the harm inflicted when those assurances proved to be deceptive.

94.     The large dollar value of the Sokolowskis' cryptocurrency holdings resulted from long-term appreciation rather than from speculative trading, high-risk investments, or sophisticated financial maneuvers. They maintained two distinct accounts for their household finances: a traditional stock account for standard retirement planning and a separate cryptocurrency holding. At the time of

the fraudulent balance sheet's presentation, the Sokolowskis relied on a financial advisor and delegated management of their stock portfolios to that advisor.

95.     Over time, the cryptocurrency—originally acquired as a personal savings measure—significantly appreciated in value, not due to any complex investment strategy, but simply because Plaintiffs held these assets passively for many years. The sheer value of Plaintiffs' coins does not fundamentally alter their consumer nature. At no time were the Sokolowskis professional traders or "hedge fund" managers; they relied on an investment advisor to manage their stock portfolios. The Sokolowskis earned their money through work on PROHASHING, and when profits were taken, would deposit it to GGC.

96.     When Plaintiffs would later deposit to the Enterprise's GGC service, they were seeking a safe, stable rate of return for their assets. They believed Defendants were offering a hands-off, interest-based lending service suitable for personal and household asset management, not a racketeering Enterprise involving unsecured intercompany loans, fraudulent promissory notes, and assets stolen from their own company PROHASHING.

97.     **The GGC lending program was not a securities offering.** For the individual Plaintiffs (the Sokolowskis), GGC presented and sold the program as a consumer financial service—lending, custody, and account-management services—purchased and used for personal, family, and household wealth

management purposes, not as an investment in a security. For Plaintiff PROHASHING, GGC provided a privately negotiated customer lending and account servicing relationship in connection with PROHASHING's operations, not an instrument offered or distributed to the investing public as an investment security. None of the Plaintiffs received any equity interest, profit participation rights, or other ownership stake in any issuer or pooled venture; and none received an instrument designed for resale or secondary market trading. Yield was represented as contractual interest and account credits arising from the purchase of a lending relationship and service functions, rather than profits generated from participation in a common enterprise. The services at issue were not structured or distributed as exchange traded or freely transferable investment instruments, were not marketed as an opportunity to share in the profits of a common enterprise, and did not depend on Plaintiffs' participation in a pooled venture in which profits would be generated primarily by the managerial or entrepreneurial efforts of others.

## D  The Connecticut Action

98.    In May 2025, the Sokolowskis filed a protective action in the District of Connecticut—*Sokolowski v. Digital Currency Group, Inc., et al.*, No. 3:25-cv-00870-VAB (D. Conn.) (the "Conn. Action")—asserting Connecticut law claims

arising from the same nucleus of operative facts as this first-filed Pennsylvania action. The Conn. Action was not filed to create a second, parallel merits track; it was filed solely to preserve a forum to adjudicate the merits if Defendants succeeded on their then-pending defense that the Middle District of Pennsylvania lacked personal jurisdiction over DCG, Silbert, and/or Moro, and because Connecticut's strict repose periods were approaching expiration. See ECF No. 45 (Notice of Related Action).

99.     Consistent with that purpose, Plaintiffs sought an immediate stay of the Conn. Action in deference to this first-filed case, expressly representing that they did not seek duplicative litigation and would voluntarily dismiss the Conn. Action if the Pennsylvania case reached a merits disposition. (Conn. Action, ECF No. 1 ¶¶ 3–5; Conn. Action, ECF No. 2 at 2–4.) Defendants indicated they would not oppose the requested stay (Conn. Action, ECF Nos. 20, 26), and the District of Connecticut granted Plaintiffs' motion and stayed the Conn. Action pending resolution of this Middle District of Pennsylvania case. (Conn. Action, ECF No. 49.)

## VII    DESCRIPTION OF PLAINTIFFS' LLCs

### A    Cryptocurrency Management LLC

100.    On May 7, 2021, Plaintiffs, PROHASHING LLC, and a non-party lender, in response to solicitations in April 2021 by GGC, caused Stephen to form a Pennsylvania LLC—Cryptocurrency Management, LLC ("CM LLC")—as a passthrough holding conduit at the suggestion of GGC employees.

101.    CM LLC was not an independent investment adviser or fund; rather, it served as a nominal passthrough account structure through which lenders' assets were transmitted to institutional borrowers in exchange for interest that was distributed back to the lenders.

102.    The purpose of CM LLC was to aggregate assets from CM LLC's passthrough lenders and lend them to GGC. CM LLC was created with the support of GGC employees to bypass GGC's own minimum loan thresholds. GGC induced these passthrough LLCs like CM LLC—as well as near-identically structured passthrough products like Gemini Earn—to work around its own loan minimums so that GGC–which existed as a source of funds to conduct the Enterprise's activities and enrich its parent company DCG—could collect money from retail lenders while avoiding attention from regulators and banks.

103.   As part of GGC's onboarding process, CM LLC submitted a "due diligence questionnaire", which **clearly, precisely, and unequivocally** stated "The purpose of this organization is to collect funds and exceed Genesis's [GGC's] minimum loan amounts and to loan funds to Genesis [GGC]," providing contemporaneous evidence that CM LLC was not an independent operating business. Ex. K.

104.   As part of the GGC onboarding process, GGC requested and received a "Balance sheet.pdf" document, which was to contain a full list of all assets of CM LLC. Rather than a typical balance sheet, the *full text* of the document stated:

> The company currently has no assets because it is awaiting account approval from Genesis [GGC]. After approval, the company's balance sheet will be the assets held by Genesis [GGC], as the company does not have any borrowers other than Genesis [GGC].

105.   Christopher, acting on behalf of PROHASHING, provided GGC (and, by extension, the Enterprise), with documentation related to PROHASHING, including its operating agreement. All individuals (not just CM LLC) produced identity documents, such as driver's licenses, to GGC. Upon information and belief, GGC conducted KYC/AML checks on all the passthrough depositors, including Plaintiffs.

106.   GGC understood that, at all times, it was working with individual lenders despite its account being registered in the name of CM LLC, as demonstrated in chat logs with CM LLC's individual lenders. See Exs. F, H. In one instance, GGC CFO Matthew Ballensweig personally brokered a deal with Christopher, acknowledging that GGC was receiving funds belonging to PROHASHING. Ex. F at 20. When funds were sent to GGC, in all or nearly all cases, they were sent from the individuals' cryptocurrency wallets; there was no official "CM LLC wallet."

107.   CM LLC never adopted formal governance documents beyond the bare minimum required by state law to register; no formal resolutions, meetings, or minutes exist. CM LLC held no insurance, no permits, no marketing, and no licenses typical of a functioning business entity. CM LLC had no dedicated office—its registered address was the same as the Sokolowskis' residence— and it never had any employees. The bland name "Cryptocurrency Management" was selected specifically to describe its sole purpose. Currently, CM LLC is a defunct, non-operating entity and holds no assets or liabilities.

108.   Plaintiffs never intended to convey ownership or title of these assets to CM LLC, nor did CM LLC ever obtain beneficial ownership. CM LLC never engaged in negotiations, business planning, or due diligence activities separate from the Plaintiffs' individual efforts. Plaintiffs would not have loaned money to

GGC if GGC had required Plaintiffs to intermingle funds within CM LLC, as Plaintiffs wished to retain title to their assets and were seeking a safe, consumer-oriented platform, not interested in creating an investment firm.

109.   The CM LLC Operating Agreement (Ex. G) contains addendums signed by all three Plaintiffs and by non-party James Webster, a highly unusual arrangement for a single-owner LLC that would not have occurred if the LLC were not being created with GGC's knowledge and direction to circumvent deposit requirements. GGC was aware that all persons had signed this operating agreement.

110.   Section 10 of the operating agreement states that CM LLC "will not purchase stocks or equity." Section 12 reads: "Lenders may call loans at any time, and those calls will be passed on to the borrower. The owner will manage the redemption and return the money to the lender within one day of receiving money from the borrower." Section 15 reads: "Genesis [GGC] and other borrowers require minimum loan amounts," and states that if enough lenders call their loans such that accounts are closed due to not meeting the minimum, "the remaining money will be returned to Cryptocurrency Management lenders." Section 17 formalizes an agreement where, when CM LLC was working with GGC, direct transfers between the passthrough lenders and the end borrower would be arranged so CM LLC wouldn't have to take possession of any coins.

111.    Section 11 ("Licenses") specifically states that if SEC licenses would be required, "unanimous agreement" among the lenders would be required, and that the default action was the dissolution of CM LLC, demonstrating that the lenders were not interested in CM LLC being an investment business.

112.    Section 24 ("Profits and Losses") states that "Cryptocurrency Management LLC is not intended to earn profits for its owner. All interest gained from loans will be distributed to its lenders." This statement is not consistent with an investment firm or for-profit company.

113.    PROHASHING's operating capital was also stored at GGC through CM LLC. When the Sokolowskis withdrew their distributions of the profits from PROHASHING, they were often removed from the mining pool's reserve and sent directly to the Enterprise (at GGC) to earn interest, through CM LLC's account.

114.    CM LLC was the contractual counterparty to GGC and therefore would have been a contractual creditor of GGC had it not agreed to sell its future bankruptcy claim against GGC several hours before the bankruptcy in the Jefferies Claim Sale Scheme. CM LLC's bankruptcy claim is distinct from the personal torts alleged under the UTPCPL.

115.    After GGC and other cryptocurrency lenders ceased honoring withdrawals in the Fall of 2022, CM LLC ceased operating as a passthrough lending conduit and passed through all bankruptcy payouts and the claim sale

proceeds proportionally to its lenders. CM LLC is currently a defunct, non-operating entity with no assets or liabilities.

116.  The design of CM LLC is critical to all of the activities the Enterprise conducted – even though the Enterprise itself induced its creation to bypass its own deposit minimums. As described in Schemes 2, 3 and 4, CM LLC's nominal passthrough structure later became the focus of Defendants' efforts to characterize CM LLC as the purported holder of Plaintiffs' litigation rights and thereby impede Plaintiffs' ability to pursue statutory and tort claims arising from the Enterprise's conduct.

## B  PROHASHING LLC

117.  PROHASHING LLC was a mining pool that engaged in the mining of multiple cryptocurrencies, including Bitcoin, Bitcoin Cash, and others, and which paid customers, who were independent contractors, for their work in cryptocurrencies of their choice. PROHASHING was founded on December 23, 2013. Due to the Enterprise's racketeering, PROHASHING determined that it would become insolvent within 5 months and ceased mining services on December 2, 2025 to ensure all customers would be paid in full. PROHASHING, which has settled its final debts with customers, is currently winding down by preparing final paperwork to submit to the IRS. PROHASHING maintained ongoing contractual

and economic relationships with thousands of mining customers and had a

reasonable expectation of continued revenue from those relationships absent

Defendants' interference.

118.    PROHASHING's competitive advantage was its proprietary, custom-

built "Proswitching" algorithm. Unlike standard mining pools that force users to

mine a single currency (e.g., only Bitcoin), PROHASHING's software dynamically

analyzed the global cryptocurrency market in real-time to direct computing power

to the most profitable cryptocurrency network at any given second.

119.    PROHASHING was inspired by an older mining pool, Multipool,

with a similar business model. The older pool provided better returns than solely

mining Bitcoin by switching between coins. However, Multipool lacked

transparency; when users connected their miners to the pool, the only user interface

was a list of network addresses along with the daily payouts they received,

computed after the fact. Because the pool operator posted no information about

how payouts were calculated (or even who he was), it was impossible for users to

determine whether they were being paid at the market rate or how much profit the

owner was taking. PROHASHING was founded to provide detailed and

transparent statistics about customers' mining. PROHASHING provided a

canonical dashboard earnings number that increased throughout the day, so that

customers knew what they were earning at all times, could compare the value to competitors, and could switch pools if they were dissatisfied with their earnings.

120.    Because PROHASHING's software was unique and closed source (not public), its specific internal logic—including how it handled share submissions and switched between networks—was a closely guarded trade secret, not discoverable by casual observation.

121.    PROHASHING's technology represented a direct threat to the market manipulation strategies employed by institutional trading desks, like the Enterprise's Genesis Global Trading. PROHASHING's trading code automatically directed massive amounts of computational power to what it determined were overvalued cryptocurrency networks to earn the most money possible for its customers. Once those cryptocurrencies were mined, PROHASHING sold the cryptocurrencies for the best price it could obtain at any exchange that would do business with it.

122.    Thus, PROHASHING's algorithm acted as a force for market efficiency, narrowing the arbitrage spreads that predatory trading desks relied upon for profit. The neutralization of automated competitors like PROHASHING that would mathematically counteract their manipulations was essential for any entity that wished to manipulate cryptocurrency prices.

123.    Beyond its technical capabilities, PROHASHING was a vocal and influential advocate for the "big block" scaling vision of Bitcoin. This ideological stance placed PROHASHING in direct opposition to the business model of the Enterprise, which relied on the small block size (high fee/congestion) model to drive users toward its fee-generating intermediaries (the Grayscale Bitcoin Trust) and lending products (GGC). As a mining pool, PROHASHING possessed "signaling power" (votes) on the Bitcoin network and on other cryptocurrency networks, which could have been used to support a large block size. This made PROHASHING not just a business competitor, but a political obstacle to the Enterprise's efforts to capture and centrally plan Bitcoin protocol development with a small block size (e.g., the "New York Agreement").

124.    PROHASHING mined coin networks other than Bitcoin, which stabilized those smaller networks and prevented their usage for criminality. When PROHASHING directed large numbers of honest miners to those networks, malicious miners intending to limit transactions on those networks, or initiate "chain reorganizations" that stole money from exchanges, were required to spend a significant sum of money to execute their attacks on networks PROHASHING mined, making those attacks unprofitable so long as PROHASHING possessed enough hashrate to overpower malicious miners.

125.    PROHASHING operated as one of the few independent, U.S.-compliant alternatives to Foundry USA, a mining subsidiary subsequently launched and aggressively expanded by DCG. Upon information and belief, the Enterprise viewed the destruction of PROHASHING as a necessary precondition to consolidating Foundry USA's monopoly over the North American mining market. By degrading PROHASHING's operational stability and profitability, the Enterprise sought to force PROHASHING's customer base to migrate to Foundry USA.

## VIII   ACTIVITIES OF THE ENTERPRISE

126.    The Enterprise involved itself in at least five distinct schemes between 2015 and 2026. The first is reviewed as the motive, with the remaining four serving as predicate acts. They are reviewed in chronological order; each Act builds upon the last as the Enterprise's schemes began to unravel and required increasingly desperate acts to conceal.

## A  The Motive: The Block Size and Harassment

### 1.  Brief Overview of Block Size Positions

127.    During the debates over how to solve the block size problem between 2014 and 2017, several alternatives emerged, which are explained first as background.

128.    Advocates of the "unlimited" proposal supported simply removing the 1 MB restriction altogether, and allowing Bitcoin blocks to be as large as the network would support; a variant of this proposal would split from Bitcoin and become the cryptocurrency Bitcoin Cash.

129.    Advocates of Segregated Witness, commonly referred to as "SegWit," supported leaving the block size at 1 MB but changing the format of transactions so that additional data could be stored separately from the block data; this proposal "won" by default.

130.    Advocates of "SegWit2x" supported Segregated Witness, but also wanted to double the block size to 2 MB; this proposal was presented as a "compromise" position. It was initially supported by Silbert and the Enterprise.

## 2. Stephen's Advocacy About Bitcoin's Block Size

131.  In 2014, several years after Satoshi had left Bitcoin development, online discussion ramped up about how and whether the Bitcoin block size should be increased. During this period, Stephen, posting as /u/quintin3265, became an active contributor to the "/r/BitcoinMarkets" "subreddit"[4] on the Internet discussion site Reddit. Stephen's "Daily Thoughts" posts received a disproportionate number of upvotes and views as reflected in the r/BitcoinMarkets daily discussion threads[5]. On at least one occasion, one post so dominated the discussion in the subreddit that Stephen left for a few days so that the forum would not become taken over by a single voice.[6] In 2014 and early 2015, Stephen's Reddit handle was recognizable, and his posts were frequently stickied and featured as "Top posts" of the month or year in /r/btc, /r/bitcoinxt, /r/btcfork, and even /r/ethereum, demonstrating that his work resonated with a substantial portion of the ecosystem.

132.  Many of Stephen's posts across the internet included his strong views that the block size must be increased as soon as possible as a preventative measure *before* the blocks became full and so-called "second layer" solutions (like the

---

[4] On the internet forum website Reddit, topic-specific forums are known as "subreddits" and are referred to as "/r/[forum]" as a shorthand for the URL https://reddit.com/r/[forum]. For example, the subreddit "bitcoinmarkets" would be referred to as "/r/bitcoinmarkets" and would be accessible at the URL https://reddit.com/r/bitcoinmarkets.

[5] See, e.g., https://www.reddit.com/r/BitcoinMarkets/comments/25c0ef/daily_discussion_monday_may_12_2014/

[6] See https://www.reddit.com/comments/279jad/_/chywagh/

Lightning Network, custody providers, and exchange-traded funds the Enterprise profited from) became necessary and "locked in," (gaining enough momentum that they would be impossible to unwind).

133.    After moderators began censoring Stephen's posts on social media sites (see "Harassment and Censorship of Stephen Sokolowski," subsection 5, *supra*), Stephen began writing at the PROHASHING forums instead. An archive of many of Stephen's posts is available at the "Bitcoin Thoughts" archives.[7] The archive contains dozens of such posts, many with view counts in the tens or hundreds of thousands. On May 7, 2015, in an article titled "A few thoughts— Thursday, May 7, 2015"[8] Stephen focused entirely on Gavin Andresen's proposal to raise the block size limit, criticizing the Bitcoin Core development team for ignoring the 1 MB cap since their formation in 2013 and arguing that the issue had been allowed to become a crisis.

134.    Stephen was quoted by other community leaders and incorporated into more permanent technical resources. For example, in the Bitcoin category of the website StackExchange, the question "Are there any altcoins that have tried a contentious hardfork?[9]" cites and extensively quotes his May 7, 2015 "A few thoughts" article as the canonical description of the cryptocurrency Elacoin's failed

---

[7] https://forums.prohashing.com/viewforum.php?f=9.
[8] https://forums.prohashing.com/viewtopic.php?t=389.
[9] https://bitcoin.stackexchange.com/questions/42939/are-there-any-altcoins-that-have-tried-a-contentious-hardfork.

hard fork, using his account to illustrate how economic actors (such as the Enterprise) can veto contentious consensus changes.

135.   Over the next two years, Stephen repeatedly warned that keeping the block size artificially small would cause practical failures and drive users to alternatives to Bitcoin. In an article titled "Why Bitcoin's problems are people problems"[10] dated November 11, 2015, he argued that the Block Size War was less a technical dispute than a "people problem," created by a small number of bad actors and a refusal to resolve governance issues transparently. Upon information and belief, the reason there were a small number of bad actors with a larger number of opponents—which Stephen lacked evidence to recognize at the time—is because the Enterprise engineered the small block size position to support its criminality.

136.   In a subsequent article titled "Why payouts didn't execute today"[11] dated December 11, 2015, he used concrete examples of payout failures at PROHASHING to show that Bitcoin's congestion had reached the point where it was "officially impossible to depend upon the bitcoin network" to deliver payments within predictable timeframes. That article was later cited in academic work on cryptocurrency regulation, including A.A. Gikay, "Regulating

---

[10] https://forums.prohashing.com/viewtopic.php?t=654.
[11] https://forums.prohashing.com/viewtopic.php?t=679.

Decentralized Cryptocurrencies under Payment Services Law," which footnotes "Why Payouts Didn't Execute Today" as evidence of real-world transaction delays.

137.   Later that year, in an article dated September 13, 2016 and titled "Segregated Witness's soft fork and a vote of no confidence"[12] Stephen criticized SegWit as dangerously opaque, arguing that it would silently break existing software and reduce developer productivity for years. The criticism of SegWit's "opacity" shows that Stephen recognized its potential use for criminality early on. Such criticism was an obstacle for the Enterprise's goals.

138.   In 2017, Stephen continued to publish on topics like "Why exchanges collapse during high volume"[13] and "Why you should oppose Segwit2x to bring an end to the block size debate"[14], both of which were again cross-posted and discussed on Reddit. However, by that time, the only way that Stephen's views escaped the servers he controlled was through the posting of others.

### 3.  Silbert and the Enterprise's Views

139.   DCG and Silbert publicly positioned themselves as power brokers in the block size debate. Contemporary reporting and later accounts uniformly identify them as key architects of what became known as the "New York

---

[12] https://forums.prohashing.com/viewtopic.php?t=951.
[13] https://prohashing.com/blog/why-exchanges-collapse-during-high-volume.
[14] https://prohashing.com/blog/oppose-segwit2x-to-bring-an-end-to-the-blocksize-debate.

Agreement", a May 2017 closed-door deal under which a small group of exchanges, mining firms, and infrastructure companies pledged to support the "SegWit2x" expansion plan (see ¶ 128)—activation of Segregated Witness ("SegWit") followed by a hard-fork increase of the block size to 2 MB.[15]

140.    Media outlet CoinDesk, a subsidiary of DCG that functioned as a friendly media outlet for the Enterprise, reported at the time that SegWit2x was an "industry-backed scaling proposal" brokered by Silbert, noting that it was drawn up at this invite-only meeting of operators of large miners and business executives held during the May 2017 "Consensus" conference, which itself was organized by another subsidiary of DCG. Those reports emphasized that the proposal was not authored by Bitcoin Core developers but instead by corporate stakeholders coordinated by DCG and Silbert.[16]

141.    Commentators contemporaneously described the New York Agreement as the "Silbert Agreement" or "DCG Agreement," underscoring that the compromise was viewed in the marketplace as a DCG-driven political arrangement rather than a community-driven technical consensus. In public statements and on

---

[15] See Harper, Bitcoin Independence Day, https://bitcoinmagazine.com/culture/bitcoin-independence-day-how-this-watershed-day-defines-community-consensus; Samson Mow, The Battle For Bitcoin: The Network's First Major Civil War, Bitcoin Magazine (Aug. 1, 2022), available at https://bitcoinmagazine.com/business/the-first-major-bitcoin-civil-war.

[16] See Digital Currency Group, Bitcoin Scaling Agreement at Consensus 2017 (May 23, 2017), available at https://dcgco.medium.com/bitcoin-scaling-agreement-at-consensus-2017-133521fe9a77; Alyssa Hertig, Explainer: What Is SegWit2x and What Does It Mean for Bitcoin?, CoinDesk (July 12, 2017), available at https://www.coindesk.com/markets/2017/07/12/explainer-what-is-segwit2x-and-what-does-it-mean-for-bitcoin/.

social media during the lead-up to the New York Agreement, Silbert personally advocated for a SegWit-plus-2MB "compromise" rather than a straightforward large-block increase or removal of the cap. As DCG itself framed it, the "Bitcoin Scaling Agreement at Consensus 2017" committed signatories to "immediately support the activation of Segregated Witness" and to "activate a 2 MB hard fork within six months."[17] Later histories and explanatory articles characterize this as "Silbert's scaling compromise" presented through the New York Agreement.[18]

142.   In promoting this compromise, Silbert repeatedly described his objective as bringing "both sides" of the scaling debate together—owners of miners and large businesses skeptical of SegWit on one side, and small-block or SegWit-only advocates on the other. Bitcoin Magazine, however, later described the meeting as "invite-only" and "clandestine," with a "singular agenda: plan and execute a hard fork," and emphasized that it was "led by Digital Currency Group and its founder Barry Silbert." [19] In reality, advocates of large blocks were not invited.

---

[17] See Digital Currency Group, Bitcoin Scaling Agreement at Consensus 2017 (May 23, 2017), available at
https://dcgco.medium.com/bitcoin-scaling-agreement-at-consensus-2017-133521fe9a77.
[18] See BitMEX Research, The Blocksize War – Chapter 20 – SegWit2x (July 31, 2021), available at
https://web.archive.org/web/20250716111745/https://blog.bitmex.com/the-blocksize-war-chapter-20-segwit2x/;
SegWit2x – Bitcoin Wiki, https://en.bitcoin.it/wiki/SegWit2x (last visited Nov. 27, 2025).
[19] See Harper, Bitcoin Independence Day, https://bitcoinmagazine.com/culture/bitcoin-independence-day-how-this-
watershed-day-defines-community-consensus; Samson Mow, The Battle For Bitcoin: The Network's First
Major Civil War, Bitcoin Magazine (Aug. 1, 2022), available at https://bitcoinmagazine.com/business/the-first-
major-bitcoin-civil-war.

143.    Following the agreement, a large share of Bitcoin's mining hashrate began "signaling" for the New York Agreement using a specific version-bit in block headers, and industry commentators noted that SegWit2x was the scaling proposal spearheaded by Silbert and DCG.[20]

144.    In parallel, Silbert pushed the Digital Gold narrative in the media, even stating the term directly: "as far as I'm concerned bitcoin has won the race to be *digital gold*," emphasizing its role as a long-term store of value rather than as an everyday payments network.[21]

145.    Under the written terms published by DCG on May 23, 2017, the signatories of the New York Agreement "agree[d] to immediately support the following parallel upgrades to the bitcoin protocol … Activate Segregated Witness at an 80% threshold, signaling at bit 4; [and] Activate a 2 MB hard fork within six months."[22] The first step required only a software upgrade; the "hard fork" required the consensus of Bitcoin miners.

---

[20] See Bitcoin Magazine, "NO2X: Breaking Bitcoin Shows No Love for the SegWit2x Hard Fork in Paris" (Sept. 12, 2017) (describing SegWit2x as "the Bitcoin scaling proposal spearheaded by Barry Silbert's Digital Currency Group"), republished at Nasdaq, https://www.nasdaq.com/articles/no2x%3A-breaking-bitcoin-shows-no-love-for-the-segwit2x-hard-fork-in-paris-2017-09-12; SegWit2x – Bitcoin Wiki, supra; see also Unchained (Laura Shin), "Barry Silbert on What Wall Street Says Privately About Crypto vs. What It Says Publicly" (Oct. 9, 2018) (host to Silbert: "you brokered what became known as the New York Agreement"), https://unchainedcrypto.com/barry-silbert-on-what-wall-street-says-privately-about-crypto-vs-what-it-says-publicly-ep-87/.

[21] See, e.g., Barry Silbert: "Bitcoin Has Won the Race to Be Digital Gold", Bitcoinist (Feb. 14, 2019), available at https://bitcoinist.com/barry-silbert-bitcoin-digital-gold/; Billy Bambrough, Bitcoin Ethereum, Ripple's XRP And EOS Soar As Markets Add $10 Billion—Here's Why, Forbes (Feb. 19, 2019), available at https://www.forbes.com/sites/billybambrough/2019/02/19/bitcoin-ethereum-ripples-xrp-and-eos-soar-as-markets-add-10-billion-heres-why/.

[22] Digital Currency Group, "Bitcoin Scaling Agreement at Consensus 2017" (May 23, 2017), https://dcgco.medium.com/bitcoin-scaling-agreement-at-consensus-2017-133521fe9a77.

146.    Despite the written promise that a 2 MB "hard fork" would follow SegWit, the second phase of SegWit2x never occurred. On November 8, 2017— just days before the planned fork—the Wall Street Journal reported on a statement from the Bitcoin Core developers, where they announced the cancellation of the block size increase—noting that while they "strongly believe" that a capacity increase was necessary, "there is something we believe is even more important: keeping the community together."[23] Commentators later noted that the SegWit2x implementation also contained subtle bugs that would have made it difficult for miners to actually mine valid 2 MB blocks, underscoring that the 2x phase was, at best, technically fragile.[24]

147.    The SegWit2x implementation was estimated to activate, if it had been supported by the miners, around **November 15–16, 2017**, the time when critical evidence involving the PROHASHING Scheme (Paragraph 168) exists**.**

148.    Although Defendant Silbert coordinated the New York Agreement and committed to increasing the block size as its second phase, when the November 2017 fork date approached, Silbert did not insist on enforcing the 2x half of his own agreement. The suspension announcement was signed by many prominent

---

[23] Wall Street Journal, "Bitcoin Dodges Split That Threatened Its Surging Price," Nov. 8, 2017, https://www.wsj.com/articles/bitcoin-dodges-split-that-threatened-its-surging-price-1510172701 (describing cancellation of the November hard fork due to lack of consensus).
[24] Song, "SegWit2x Bugs Explained," https://medium.com/bitcoin-tech-talk/segwit2x-bugs-explained-8e0c286124bc.

figures, but not by Silbert, despite his acknowledged role as New York Agreement coordinator.[25]

149.   Upon information and belief, this combination of (a) aggressively promoting a bundled SegWit-plus-2x "compromise" to secure miner support for SegWit, and then (b) acquiescing in or quietly blessing the cancellation of the 2x phase once SegWit had safely activated, resulted in precisely the outcome that served the Enterprise's interests: activation of SegWit (which enabled fee-maximizing, off-chain solutions like the Lightning Network that, had they become widely used, would have greatly facilitated "mixing" and criminal activity on the main Bitcoin network), without any block size increase that would have destroyed the Digital Gold narrative they planned to create.

150.   From at least 2015 onward – the time when DCG was founded and the time when the censorship described next began, Silbert thus publicly aligned himself with a vision of Bitcoin that prioritized scarcity, high-fee on-chain transactions, and off-chain or custodial solutions—including trusts and other financial products operated by DCG affiliates that he and Wall Street institutions

---

[25] See Brave New Coin, "Segwit2x hard fork abandoned — what happened and why" (Nov. 9, 2017), https://bravenewcoin.com/insights/segwit2x-hard-fork-abandoned-what-happened-and-why (noting "there has been no word from NYA coordinator Barry Silbert at press time"); CCN, "SegWit2x Hard Fork Called Off: 'Common Sense' or 'Delaying the Inevitable?'" (Nov. 9, 2017), https://www.ccn.com/segwit2x-hard-fork-called-off-common-sense-delaying-inevitable/ (observing that the cancellation statement "was not signed by Barry Silbert, whose Digital Currency Group was instrumental in organizing the New York Agreement"); "Don't Fork With Me," Dec. 5, 2017, https://einzelgaengerinmotte.wordpress.com/2017/12/05/dont-fork-with-me/ (noting that Silbert, "the initiator of the so-called 'New York Agreement,'" remained silent on social media from late September until after the 2x suspension email).

could monetize—over a vision of Bitcoin as high-throughput, low fee "electronic cash."

### 4. Enterprise Capture of Bitcoin Discourse

151.   DCG was founded in 2015. From approximately 2015 onward, the Enterprise recognized that controlling public discussion about Bitcoin's development was as important as controlling the code itself. Because Bitcoin has no formal governance mechanism, protocol changes are effectively decided through social consensus—what users, miners, exchanges, and developers believe is legitimate. To maintain the small-block Digital Gold roadmap and suppress support for Satoshi's original "electronic cash" vision, upon information and belief the Enterprise and its allies deliberately captured the primary communication channels of the Bitcoin ecosystem and used them to censor and harass advocates of openness and transparency like Stephen.

152.   At the center of this censorship regime was non-party Michael Marquardt, known pseudonymously as "Theymos." Multiple contemporaneous sources identify Marquardt as (a) the administrator of Bitcointalk.org, the primary Bitcoin forum in the early years; (b) the head moderator of the /r/Bitcoin subreddit on Reddit; and (c) a controller of bitcoin.org, the website prominently linked from Satoshi Nakamoto's original white paper. A 2015 discussion thread titled "Who is

Theymos and what did he do?" on bitco.in succinctly described the problem: "most of the online social interactivity [around Bitcoin] could be controlled by one person," who simultaneously operated Bitcointalk and /r/Bitcoin and was "censoring near majority opinion concerning … block size on /r/bitcoin."[26]

153.   That same thread collects contemporaneous documentation that Marquardt used his consolidated control to suppress discussion of alternative Bitcoin implementations that supported larger blocks. Participants in these threads—including moderators of competing forums—expressed alarm that "most of the popular bitcoin forum[s] are controlled by 1 guy," and that Marquardt "also controls bitcoin.org and has propagated changes to the apolitical site that reflect his political opinion," including labeling large block bitcoin implementations as "altcoins" (an alternative cryptocurrency; i.e. not Bitcoin) in order to exclude it from legitimate debate. Id.

154.   In a widely cited 2016 essay entitled "A (brief and incomplete) history of censorship in /r/Bitcoin," author John Blocke (a pseudonym) catalogued dozens of specific examples in which /r/Bitcoin moderators deleted or banned posts simply asking how consensus could be reached if hard fork proposals could not even be discussed and deleted or banned posts reporting on a cryptocurrency mining

---

[26] "Who is Theymos and what did he do?," bitco.in forum (Oct. 1, 2015), https://bitco.in/forum/threads/who-is-theymos-and-what-did-he-do.87/.

conference in China at which more than 300 attendees "were overwhelmingly in favor of a block size increase."[27]

155.   Blocke's article quotes /r/Bitcoin moderator "BashCo" expressly admitting that moderators used custom website code to hide visual indicators of deleted comments so that casual readers could not see that censorship was occurring. Id. (explaining that /r/Bitcoin's "70,000 lines" of custom CSS [website code] were used to mask the existence of removed comments).

156.   On August 16, 2015, Marquardt publicly announced an "emergency" moderation policy on /r/Bitcoin in which he declared that users who disliked the new rules—rules that forbade discussion of specific block size proposals—should simply leave the community. In that post, Marquardt wrote: "If 90% of /r/Bitcoin users find these policies to be intolerable, then I want these 90% of /r/Bitcoin users to leave." The full text of that statement has been preserved in multiple independent sources, including a 2015 Finance Magnates news article[28] and later analyses by John Blocke and Vitalik Buterin.[29]

157.   These were not isolated incidents. Blocke's article documents (with archived Reddit threads and screenshots) that between May 2015 and early 2016:

---

[27] John Blocke, "A (brief and incomplete) history of censorship in /r/Bitcoin," Medium (Nov. 14, 2016), https://medium.com/@johnblocke/a-brief-and-incomplete-history-of-censorship-in-r-bitcoin-c85a290fe43.

[28] "Reddit Bitcoin Mod: If 90% Don't Like Our Policies, They Should Leave," Finance Magnates (Aug. 18, 2015), https://www.financemagnates.com/cryptocurrency/news/reddit-bitcoin-mod-if-90-dont-like-our-policies-they-should-leave/.

[29] Vitalik Buterin, "Reflections on the Bitcoin Block Size War," Binance Square (May 31, 2024), https://www.binance.com/en/square/post/8924868886714.

(a) a top-voted thread calling for the /r/Bitcoin moderators to step down, which accused them of censorship, was itself deleted; (b) users were banned for merely pointing out that bans were happening; (c) posts quoting Satoshi in favor of larger blocks were removed; and (d) the moderation team quietly changed the default sort order of comments to prioritize "controversial" so that the most down-voted comments would appear at the top of certain threads, creating a false perception that pro-censorship views were widely supported.[30]

158.   The scale of this censorship has been quantified. A later statistical analysis, prepared by open-source contributors and summarized in the "reddit_dataset_223" dataset on HuggingFace, notes that /r/Bitcoin "censored 5,683 posts and comments just in the month of September 2017 alone," citing a "September 2017 stats post" from the alternative subreddit /r/noncensored_bitcoin.[31] September 2017, as is reviewed later, is the month when the Defendants began executing the PROHASHING Scheme.

159.   Mainstream industry leaders confirmed that this moderation policy was targeting big block viewpoints and companies that expressed them. In January 2016, Coinbase co-founder and CEO Brian Armstrong published an essay titled

---

[30] See John Blocke, "A (brief and incomplete) history of censorship in /r/Bitcoin," supra.
[31] Mattnguyendev, "reddit_dataset_223," HuggingFace (dataset description), https://huggingface.co/datasets/Mattnguyendev/reddit_dataset_223/viewer/default/train?q=noncensored&row=0&views%5B%5D=train.

"Scaling Bitcoin: The Great Block Size Debate" on the company's official blog[32]. There, Armstrong explained that when Coinbase expressed support for scaling the block size, his tweet "was being discussed on the bitcoin sub-reddit" but "was censored by the mods there (since it seems they don't like the particular solution we were experimenting with)," and that "Coinbase was even removed from the bitcoin.org site by an anonymous contributor to that project."[33]

160.   In his 2024 retrospective on the Block Size War, prominent figure and Ethereum founder Vitalik Buterin wrote that "small blockers are indeed engaging in very uncool social media censorship to impose their views, culminating in Theymos' infamous quote: 'If 90% of /r/Bitcoin users find these policies intolerable, then I want 90% of /r/Bitcoin users to leave,'" and noted that "even relatively modest posts in favor of large blocks were often deleted" and that "custom CSS was used to make these deleted posts invisible."[34]

161.   Plaintiffs allege that this censorship regime did not arise spontaneously. It aligned perfectly with the Enterprise's financial incentives: suppress public support for larger blocks, entrench the high-fee, low-throughput Digital Gold narrative that favored custodial intermediaries and synthetic financial products like the Grayscale Bitcoin Trust, and marginalize actors—such as

---

[32] Brian Armstrong, "Scaling Bitcoin: The Great Block Size Debate," Coinbase Blog (Jan. 3, 2016),
        https://medium.com/the-coinbase-blog/scaling-bitcoin-the-great-block-size-debate-d2cba9021db0.
[33] Id. at 51–52, 143.
[34] Vitalik Buterin, "Reflections on the Bitcoin Block Size War," supra.

PROHASHING and Stephen—who advocated and built toward high-throughput blockchain payment systems that would be open and transparent to regulators. The Enterprise's "small block" allies used their control of Bitcointalk, /r/Bitcoin, and bitcoin.org as a de facto propaganda and gatekeeping arm for the Enterprise's roadmap.

### 5. Harassment and Censorship of Stephen Sokolowski

162.   Plaintiffs allege that as Stephen's writings attracted attention, the same censorship apparatus that had been deployed against other big block advocates was turned on him personally. Stephen's articles, when submitted to /r/Bitcoin and related subreddits, were routinely removed or hidden by moderators aligned with the Enterprise's small block faction. Posts that criticized SegWit's soft fork deployment, explained real-world harms from high fees, or linked to big block software implementations were deleted or met with coordinated "troll" attacks and mass down-voting. Over time, Stephen's accounts were blocked or banned from participating in /r/Bitcoin and certain Bitcointalk threads, forcing him to use pseudonyms and to relocate his writing to alternative subreddits like /r/btc. Eventually, all of his accounts were banned across multiple platforms, forcing him to avoid social media entirely and to relocate his writing to the PROHASHING forums.

163.    Reddit accounts that Stephen used include, but are not limited to the following:

- /u/ProHashing (banned)

- /u/quintin3265 (banned)

- /u/MattAbrams (banned)

- /u/SteveSokolowski (deleted/inactivated in response to censorship)

- Upon information and belief, /u/chrisdaniels[several numeric digits] (banned)

- /u/Ok-Bullfrog-3052 (in use in 2025 but actively censored in /r/singularity, /r/law, and others)

Because these accounts contain thousands of posts, the vast majority of Stephen's writings on the Block Size War will not be accessible before subpoenas may be sent to Reddit.

164.    Several of these Reddit accounts were reported and banned for trivial rules violations that most accounts are never punished for, such as mentioning the real name of a person whose name is already well-publicized. As Reddit was and remains the centralized hub for most discussion about Bitcoin, the Enterprise's efforts on Reddit alone were sufficient to marginalize Stephen's views regarding the block size.

165.   In or around June 2017, a Reddit administrator (upon information and belief, one of Reddit's founders), intervened in a block size debate on behalf of Bitcoin investor Roger Ver, restoring Stephen's account access after it had been banned. This account, like all of Stephen's other prior accounts, was later banned again.

166.   Contemporaneous community commentary confirms that Stephen was recognized as a target of this campaign. For example, in a 2017 /r/btc thread titled "ProHashing developer Steve Sokolowski: 'I've been warning for years that bitcoin's future was in jeopardy due to the 1MB transaction limit … Bitcoin is a broken, unusable, unaffordable network, and people are leaving it in droves,'" another user responded: "Yes, he warned for years, and like many other intelligent people trying to build businesses in the space, he got e-lynched by Core"[35]

167.   In a later PROHASHING blog post titled "The Bitcoin Core won the war—so why is someone still fighting it?," dated July 23, 2019, Stephen summarized what he had learned about the tactics employed by the small-block faction. He wrote that the Core-aligned group "used their money to pay off forum administrators to censor content, to hire low-paid workers in Asia to post negative

---

[35] "ProHashing developer Steve Sokolowski: 'I've been warning for years…'," /r/btc (approx. 2017), https://www.reddit.com/r/btc/comments/6ftgbd/prohashing_developer_steve_sokolowski_ive_been/.

comments about their opponents," and to otherwise manipulate online discourse in favor of the small-block roadmap[36].

168.   The censorship of Stephen's views continued for years, until it morphed into outright witness intimidation in 2025. The story of the later censorship continues after the last Scheme. See Section VIII(G)(1).

## B  Scheme 1: The PROHASHING Scheme

### 1.  Summary

169.   In this scheme, the Digital Gold Enterprise, operating through DCG, Silbert, and Moro gained root access to PROHASHING's systems. The Enterprise then conducted block withholding attacks to sabotage the American-led PROHASHING in favor of the Chinese competitors it was working with to capture the Bitcoin protocol, eliminate honesty and transparency, and force the block size limitation required for Digital Gold. The Enterprise engaged in money laundering and likely used a massive Monero mining operation to pay the saboteurs.

170.   PROHASHING was attacked between at least 2017 and 2023 by the Enterprise. The Enterprise chose not to execute any significant attacks which could directly steal money, instead wasting its own money for direct sabotage.

---

[36] Steve Sokolowski, "The Bitcoin Core won the war – so why is someone still fighting it?," PROHASHING Blog (July 23, 2019), https://prohashing.com/blog/the-bitcoin-core-won-the-war-so-why-is-someone-still-fighting-it.

## 2. Comparison of Accounts

171.    Christopher performed an analysis of PROHASHING's mining database to determine the type of attacks that targeted PROHASHING, the user accounts that were involved in the attacks, and the value of the cryptocurrencies stolen by those users. This section describes how he analyzed the data and the conclusions he drew.

172.    PROHASHING's mining database contains 17 terabytes of data covering the entire history of PROHASHING's operations from December 23, 2013 to December 2, 2025. The database consists of 214 tables and includes, among other data, the following:

a.    User registration data

b.    Shares submitted by all users and earnings associated with shares

c.    All payouts earned and paid with coin amounts, dollar values at time of payout, and payout address

d.    Miner connection information, errors, and statistics generated by miners

e.    Prices of all coins at all exchanges, updated every minute, from 2013 to 2025

f.    All trades made by PROHASHING to pay customers

g.      Statistics of 1,161 blockchains from 2013 to 2025, including difficulty, block times, transaction fees, etc.

h.      IP addresses of miners, login locations, detected hacking attempts, and other security data

i.      Electricity usage of users' miners and of the pool's servers

j.      Data on the 33,054,321 blocks mined by PROHASHING, including times, status, block reward, fees, transactions, etc.

k.      For many tables, a changelog history showing when rows were changed

l.      Miscellaneous data: user polls, blog posts, luck, business accounting, terms of service history, marketing data, USD payouts at Dwolla, block explorer data, Poisson distribution calculations for luck, etc.

173.    During a 16-day period in November 2025, Christopher restored archives of the database and purchased computer hardware to host a duplicate, unaltered copy of the data that was not exposed to modifications from the production system.

174.    To allow his database queries to finish in a reasonable amount of time, Christopher limited his analysis to users who had earned at least $1,000 in their

mining history. In the course of this research, Christopher identified three

categories of pool users of interest for the purposes of this Complaint.

175.    PROHASHING's systems actively adjusted profitability based on a

number of factors to target an *average* gross profit of the promised fees (which for

this analysis were almost always 4.99%.) The profit adjustment is an average

because it accounted for both honest customers and the Enterprise's attacking

accounts, and the difference between the honest miners and the attacking miners

that weighs down this average indicates the aggressive nature of the Enterprise's

attacks. The "PROHASHING's profit" numbers in the next few paragraphs are

computed *after* the system's adjustments. Therefore, PROHASHING's earnings

exceeding 4.99% on an account does not indicate that that account was honest.

Instead, any number significantly less than the known good honest control of

18.71% is suggestive of wrongdoing.

176.    The pool's targeted gross profit differs from the actual amounts earned

for a number of technical and market reasons: one out of the thousands of data files

restored had some corrupted rows, high system load during several periods

dropped some rows, and (most notably) profit is higher than it appears because

coin prices were far more likely to rise over time than to decline between earnings

and the daily payout time. Critically, however, Christopher swears in his

declaration that he certified that all of these issues, if at all, affected all accounts'

data *equally*, and therefore any inaccuracies in the data could not impact the reliability of his analysis of the Enterprise's attacks. See Declaration of Christopher H. Sokolowski Regarding Methods Used To Analyze PROHASHING's Mining Database.

177.    PROHASHING's Terms of Service, attached as Exhibit W, publicly state: "the canonical amount owed will be the amount credited to the customer's balances" and also: "PROHASHING's liability will not exceed the amount currently owed to customers," thus, the Enterprise knew that it was intentionally targeting PROHASHING and its owners (not other users) with its sabotage. The Enterprise's deliberate attacks caused many customers to notice the lower payouts on their live updated dashboard and they stopped mining at PROHASHING because the Enterprise caused the system to adjust its payout rate. Many honest customers publicly complained on the PROHASHING forums about how PROHASHING was unable to offer competitive payouts.

178.    The first category consists of a single user, "salad." Salad (https://salad.com/) is a company that previously aggregated video gamers' graphics cards for cryptocurrency mining; it now focuses on AI training. The company advertised that these gamers could earn money to pay for their gaming computers when they were not playing games. As Salad was a registered American company that aggregated many miners and found many blocks, it serves as a

statistically significant "known good" control. Salad was paid $1,908,660.82, found 157,259 blocks, and earned a gross profit margin of 18.71% for PROHASHING, well above PROHASHING's target 4.99% fee for all users. This large profit margin was earned because Salad was one of the few honest operators of miners using PROHASHING; had the Enterprise's dishonest miners not been present, PROHASHING would have been able to pay Salad (and all honest users) much more.

179.   The second group also consists of a single account: "quasar" (the "Quasar Account.") This account, which was controlled by DCG, Silbert, Moro, and the Enterprise, is significant for reasons described later in this Scheme. The Quasar Account earned $483,645.38 and generated a gross profit of 8.88% for PROHASHING in this controlled analysis. This gross profit, 9.83% lower than the control (salad), demonstrates that the Quasar Account was actively attacking the pool. Given that the Quasar Account found 85,797 blocks over 4 years, it is impossibly unlikely that this "low luck" was due to chance and indicates that this account stole an expected value of $47,528.00 of PROHASHING's services.

180.   Christopher's analysis determined that the severity of the attacks varied across the many accounts the Enterprise controlled, with some (like the Quasar Account) stealing less money than the "average attacking account" and others stealing their entire payouts while contributing nothing to PROHASHING.

181. The third target group, referred to as the "Monero Group," was selected because the research concluded that it is strongly associated with the Monero mining scheme the Enterprise participated in. The reasons for the significance are explained in Subsection 7, "The Connection to Monero," *supra*.

182. The Monero Group consists of 3,399 users who registered an account between 2016 and 2019, mined at least $1,000, stopped mining on March 9, 2019 (the date of a critical Monero fork affecting Monero mining), and then either permanently stopped or resumed mining no earlier than March 23, 2019. The Quasar Account is contained within this group. This group earned $22,850,919.45 but generated an average gross profit of 4.65% for PROHASHING—offsetting the control user. The group, which found 6,143,468 blocks, earned 14.06% less profit than the statistically expected value, a theft of service of an expected value of $3,212,645.58. The group did not primarily mine Monero or request Monero payouts. The deviation of this specific group provides clear evidence that (1) attacks occurred, (2) that the attacks supported an *external* Monero mining operation, and (3) combined with other evidence, that the Enterprise orchestrated this group's attacks.

| Group | Users | Blocks | Earned | Adj. Pool Profit |
|---|---|---|---|---|
| Salad | 1 | 157,259 | $1,908,660.82 | 18.71% |
| Quasar Account | 1 | 85,797 | $483,645.38 | 8.88% |
| Monero Group | 3,399 | 6,143,468 | $22,850,919.45 | 4.65% |

183. The total value of all mining considered in the analysis data—including both Salad and the Monero Group (which contains the Quasar Account), other dishonest users, and other honest users, was $92,165,312. Therefore, the Monero Group's block withholding attacks alone were responsible for 24.79% of PROHASHING's entire hashrate—even though the Monero Group contributed relatively little work before 2017 or after 2023.

184. Figure 1 shows the number of Monero Group users active over time. It is likely that, by random chance, some honest customers who meet the criteria to be included in the Monero Group happened to stop mining on the date of the Monero fork for unrelated reasons. The numbers are an average at any time

throughout the year.



Figure 1: Number of active users in the Monero Group over time

185.    Consistent with the Enterprise's objective of sabotage, the Monero Group's average number of active users dramatically rose in 2017 to 2,551; this value is consistent with low activity at the beginning of the year and maximum activity near year's end, as the Block Size War was at its decisive point. The active users peaked at 3,069 in 2018. The Monero fork in early 2019 caused the average active users during that year to plummet to 636, likely because the large number of users mining at the beginning of the year is offset by the fewer users mining for the remainder of 2019 after the fork. By 2020, once PROHASHING's profitability and customer count had been successfully sabotaged, the number of users in the

Monero Group declined to a "maintenance mode." And, after the GGC bankruptcy in 2023, the active user value falls to the baseline number of likely honest users that by chance happened to stop mining on the Monero fork date – the same users in this group present in 2016 before the Enterprise began its sabotage.

### 3.  The Quasar Account

186.   On September 25, 2017, at 11:18:14am EDT, a John Doe, who can be inferred to have been directed by Silbert, DCG, and Moro, registered the account "quasar" at PROHASHING to utilize its mining services and began mining, one of the key acts in the PROHASHING Scheme.

187.   While the Enterprise controlled thousands of accounts at PROHASHING, the Quasar Account is significant because—while the Enterprise and its allies registered many accounts that mined minimal balances with random usernames, the Quasar Account is easily identifiable and appears to be a "signaling" account designed to track activities within the Enterprise. The Quasar Account's mining activity is distinctly correlated with dates of key events within the Enterprise and related to the Enterprise's activities, with mining stopping and starting during key events. The person(s) controlling the Quasar Account also encoded the Digital Gold Logs in its balances (see Subsection 8, *supra*). The

Quasar Account mined at PROHASHING between September 26, 2017 and November 19, 2021.

188.   Exhibit Q lists the balances that were reported as owed to the Quasar Account and lists each payout to the Quasar Account, containing time paid, number of coins, wallet address, coin name, and network transaction hash.

189.   The name of the Quasar Account is shared with the Quasar Random Access Trojan, an open source Windows tool that allows a malicious user to connect remotely to a compromised system. After an independent security vulnerability in a Windows system or any of its installed software has been identified, the attacker uses that vulnerability to install the Quasar client software on the target host. The tool was first released in July 2014 and its most widely available version was released in the summer of 2016, shortly before the Enterprise's attacks began.[37]

### 4.  Systems and Database Access

190.   Sometime in 2016, the Enterprise gained root access to the shell terminal on PROHASHING's database server. Upon information and belief, the root access was obtained by installing the Quasar malware on one or both of

---

[37] The Cybersecurity and Infrastructure Security Agency (CISA) published an overview of the software at https://www.cisa.gov/news-events/analysis-reports/ar18-352a.

Stephen's and Christopher's desktop computers through a security vulnerability. PROHASHING's database server password was only ever written on a piece of paper, but after the trojan had been installed, the Enterprise would have been able to use the Quasar tool to record one of the Sokolowskis entering the server password to log into the database server from their Windows desktops. Then, when neither were using their computers, the hacker could log in himself and install a control tool—either some other widely available malware or custom code—on the database server.

191.   Once the hacker had installed the control tool on the database server, regardless of whether the Quasar Remote Access Tool was originally used or not, the Enterprise and its allies were then able to log into the server at will. They could (and did) change their accounts' balances. Since the database server was the central hub of the PROHASHING network, the Does that acted on behalf of DCG, Silbert, and Moro also could also log in to other PROHASHING systems, including the mining servers, the trading servers, the live data servers, the webserver, the support ticketing system, the forums, the source control repositories, and the email server.

192.   Until December 7, 2025, Christopher was unaware that the server had been compromised. Christopher periodically reviewed the database server's logs and did not identify any security vulnerabilities or evidence of intrusion. Christopher regularly installed security updates on all servers.

193.   On May 22, 2019, the "chris" website administrator account's balance was modified so that it was owed exactly 10.0000000000000000000000000 Ripple coins, but which were recorded as having a value of exactly $78175.50000000000000000000000000. As Ripple's all time high, recorded in January 2018, was $3.84, the dollar value of these coins could not have been recorded during ordinary mining as the true value of 10 Ripple was $38.40 even at its maximum – and the "chris" account was not used by the administrators for mining. Additionally, because shares are not valued in exact whole numbers, the dollar equivalent fractional value of exactly 50 cents is statistically impossible to achieve through normal mining. Finally, two denormalized tables—the sum of all "daily balances" and the single "all time balance"—should match during normal operations, but they would not if a direct database modification had occurred. All of these reasons prove that the "chris" account's modifications could only have occurred if the database were directly modified.

194.   In December 2025, while researching this Complaint and after identifying the hack, Christopher performed an analysis of all of PROHASHING's servers and did not identify any write modifications to the source code that was deployed for the website, the mining servers, the trading software, or any other sensitive system, although these systems could have been read and copied undetected. The Enterprise could have modified this code to make unauthorized

payouts to DCG, Silbert, or Moro, and it did not, suggesting a primary motive of sabotage.

195.   PROHASHING's IRS compliance data, the only significant source of personally identifiable information (PII) that PROHASHING collected, had always been encrypted immediately with a public key upon submission using asymmetric cryptography and copied to a remote server. The private decryption key was stored offline on a memory card, and was never stored on the database server or any online PROHASHING systems. Because the card was never replaced since PROHASHING had launched, any modifications to the card made by a hacker would have persisted to the present day. This card was examined on a disconnected computer and Christopher found no indications of any intrusions to obtain the PII private key, which combined with the other evidence in this Complaint, supports the conclusion that the Enterprise was unable to or did not target this data store. Yet again, this lack of intrusion supports that the motivation for the theft was sabotage, not the compromise or sale of personal data.

196.   The root access on the database server could have been used to significantly modify balances. However, while the Quasar Account did create trivially small balances in its own account to create the Digital Gold Logs, no conclusive evidence was found of any widespread modification of balances. PROHASHING recorded detailed audit data of approximately one in every 200

submitted shares in the event a situation like the present one arose where a payout discrepancy required investigation. Christopher multiplied the audit values by the "earnings multiplier" and compared them with the recorded balance data. He concluded that the recorded owed balance data was exactly equal to the amount actually paid to customers, and that the audit data differed from the canonical balances by 1.42%—near the boundary between statistical significance and insignificance caused by the probabilistic audit data. Thus, yet again, while DCG, Silbert, and Moro could have directed the Does to outright steal money, it is probable that they did not, and even if they had, the amount stolen through database modification was insignificant compared the amount involved in the block withholding attacks. Thus, yet again, the Enterprise passed up certain theft in favor of outright sabotage.

### 5. The Merge Mine Skim

197.  During the investigation into the PROHASHING Scheme, Stephen identified a bug that any miner could have exploited even without root database access. The Merge Mine Skim involved a security vulnerability in PROHASHING's implementation of "merge mining."

198.  In merge mining, one miner attempts to find solutions for two or more cryptocurrency networks simultaneously. Merge mining does not allocate a miner's

fixed amount of computing power over many cryptocurrencies; instead, a miner simultaneously computes solutions at its maximum rate for one "primary" network and many merge mined cryptocurrencies, thus multiplying the amount of work that a miner can accomplish. Less valuable cryptocurrency networks developed merge mining to take advantage of the computing power dedicated to more valuable cryptocurrency networks—like Bitcoin and Litecoin—so that the less valuable network would require more computing power (and therefore more cost) for a malicious actor to attack.

199.   Blockchains are built serially: each new block must incorporate data from the previous block. Therefore, when a miner anywhere on a cryptocurrency network finds a solution and submits a new block to the blockchain, all miners connected to the network must restart their computations with new work building upon that block, and the current work assigned to miners becomes "stale," or worthless. This ability for work to become stale applies to both the "primary" cryptocurrency being mined, like Litecoin or Bitcoin, as well as to the merge mined cryptocurrenc(ies) being mined, like Dogecoin or Namecoin. Because all cryptocurrency networks are independent, work for each network becomes stale at different times.

200.   Many older miners have a design flaw. They have a "work restart time" of several seconds between the time new work is received and when they

start performing their mathematical computations. With the 10 or more merge mined coins PROHASHING supported, these miners would never finish restarting before new merge mined blocks arrived.

201.   To work around this problem, PROHASHING allowed miners to select whether to update their work, or alternatively to forego extra rewards. In the case when a merge mined coin became stale, the primary coin was not stale, and the ASIC miner chose to continue work on the old job, an honest miner would receive credit only for the primary coin (which was not stale) and the other merge mined coins which were not stale.

202.   In a simplified example, the ASIC miner might elect to ignore two optional new work packages and continue mining. In this example, suppose there is work for one primary coin worth 50% of the share value, and work for 10 merge mined coins worth 5% each. With two merge mined coins stale, the system would credit 90% of the value of a normal share—the primary coin's value plus the value of the eight non-stale merge mined coins. The reason PROHASHING's systems were implemented this way is that mathematically, foregoing 10% of their profits might make sense for this miner with a long work restart time. If the work restart time for the miner is 3 seconds, and the primary coin network's work becomes invalid every 30 seconds, then, in this example, restarting twice for merge mined updates during that period would result in a total credit for 24/30 seconds of actual

mining—or just 80%, inferior to continuing to work with some merge mined coins stale.

203.   Share solutions submitted to a mining pool should never be duplicated; duplicate solutions are worthless and indicate that no new computations were performed by the miner. The PROHASHING system did not check for duplicate solutions correctly after the merge mined coin's work became stale; it only checked for duplicates across primary blocks. Therefore, a miner could find a solution and resubmit it repeatedly.

204.   Using the example from Paragraph 202, the user would earn 190% of the honest value of the share—100% for the first solution, and then 90% for the replayed solution when the second work was active, even though no additional computations had been performed and they should have only received 100%.

205.   In September 2021, Stephen noticed that the PROHASHING database contained share submissions that appeared to be duplicated. In response to this discovery of duplicate rows, and not knowing the true cause, Stephen directed Christopher to add a UNIQUE database index, which would cause rows with this duplicate "submitted_difficulty" value to be rejected by the database. This index was added sometime in mid-September 2021. The addition of the index caused, as intended, occasional errors in inserting the duplicate rows into the database, which would sometimes cause shares to "disappear" in a very noticeable fashion,

including to the paranoid Enterprise which was trying to avoid detection of its other attacks.

206.    The ultimate cause of the bug was that each work object contained its own separate list of submitted jobs. The list within each job was checked to reject duplicate shares before the system credited and recorded them—but because PROHASHING allowed miners to continue to mine work from old jobs so long as the primary coin (i.e., Litecoin) was not stale, the miner could submit the same work for multiple jobs for minutes at a time until the primary coin became stale.

207.    This bug was found and fixed on April 2, 2022 in a code change by PROHASHING co-owner Stephen Sokolowski, but he did not recognize its significance or impact at the time. The code change for this "commit" is shown in Exhibit U. The fix was to add a large "global" list that contained all previously submitted solutions regardless of what work they applied to.

208.    After Stephen discovered this exploit in December 2025, Christopher examined the database for evidence that the Merge Mine Skim was exploited by the Enterprise. The Merge Mine Skim required only simple user-side modifications to miner software and therefore could be abused without any privileged access to PROHASHING's servers at all. Had this vulnerability been widely exploited, like any excess payout (including direct database modification) it would have been

revealed in the PROHASHING data if users' canonical earnings had diverged widely from the sampled audit values.

209.   Yet, as already shown in paragraph 196, the actual deviation is only 1.42% from the probabilistic audit data—suggesting either minimal exploitation or none at all. Therefore, yet another vulnerability existed which was present for seven years, which the Enterprise could have found in the code it had access to, and which would have allowed the Enterprise to increase its profitability, but the Enterprise declined to exploit it, proving yet again that the Enterprise's primary goal was sabotage.

### 6.  The Block Withholding Attacks

210.   The method through which DCG, Silbert, and Moro, operating on behalf of the Enterprise, decided to attack PROHASHING was through block withholding attacks which, as detailed in Paragraph 72, involve modifying software to fraudulently obtain payouts by concealing a plan to sabotage. They stole money by causing PROHASHING to pay the Enterprise as if the Enterprise were acting in good faith.

211.   Sometime in 2016 or early 2017, the Enterprise began conducting the continuous block withholding attacks against PROHASHING. Christopher's data

analysis determined that these attacks most likely continued until GGC declared bankruptcy in early 2023.

212.    These attacks are proven to be block withholding, and not any type of attack that increases payouts, because the Monero Group's block submissions were 14.06% lower than the expected value, while the actual payouts to all users deviated by only 1.42%. Had these attacks been some type of attack motivated by greed, the payout deviation would have been equal to the missing block values.

213.    Block withholding attacks are not an attack vector that would be engaged in for profit. The attacker engaging in a block withholding attack not only steals money from the pool (in this case PROHASHING) but also *decreases* the value of the pool's payouts to himself by reducing that pool's income that is distributed to users. Thus, the block withholding attacks of the Enterprise and its allies created a massive cost for the Enterprise. Christopher's research concluded that because PROHASHING's payouts were 14.06% below the expected value that would have been paid had the Enterprise not conducted its attacks, that the Enterprise intentionally wasted a minimum $3,212,645.58 of its own money to conduct the attacks.

214.    It is likely that accounts were controlled by the Enterprise other than the Monero Group, as the total pool luck of the remaining accounts is not equal to the control (Salad)'s luck. Plaintiffs have presented a conservative estimate by only

attributing to the Enterprise the accounts which were likely related to the Monero mining operation, but they expect discovery to reveal that additional accounts were controlled by the Enterprise, therefore increasing these costs to the Enterprise.

215.   This massive cost to the Enterprise proves that the attacks were not designed for profit but were intended to sabotage DCG's, Silbert's and Moro's existential threat to the Enterprise's Digital Gold narrative. The money was not speculative and was not even an "opportunity cost." Mining has a massive electricity cost, and this $3,212,645.58 was spent to pay electricity bills for work that was intentionally being wasted. The Enterprise was so threatened by PROHASHING and the possibility that an honest, American pool would grow to outcompete its Chinese allies that it was willing to spend millions of dollars to destroy it for nothing tangible in return.

216.   The Enterprise, with the attacks directed by Silbert, DCG, and Moro, had the ability to conduct any of the following types of exploits which would have caused them to earn money, rather than to waste it:

     a.        Modifying database balances to pay more than they were earned

     b.        Injecting malicious code into any of PROHASHING's systems to steal all of the money located in PROHASHING's hot wallet, which at times exceeded $100,000

       c.          Exploiting the "Merge Mine Skim" vulnerability and crediting themselves for duplicate shares

       d.          While difficult because it was encrypted, attempting to intercept or otherwise copy data intended for transmission to the IRS

Yet, after a comprehensive search, no evidence with high confidence was found to suggest that the Enterprise engaged in any of these attacks, and if they did, these other attacks were minimal. Instead, they *spent* money to destroy PROHASHING for the benefit of their own fraudulent Digital Gold narrative.

217.   Block withholding attacks are, by design, intended to be impossible to prove as a fraudulent act without corroborating evidence. An outright theft through code modification would, by contrast, be possible to prove immediately because money would disappear from the pool's hot wallet. The Enterprise's choice to focus on block withholding attacks demonstrates a conscious choice to fraudulently conceal its activities. Avoiding detection was an integral part of the Enterprise's scheme. The entire purpose of the attacks was to sabotage PROHASHING, and PROHASHING would grow and outcompete the Enterprise if DCG's, Silbert's, and Moro's attacks were detected.

218.   PROHASHING's Terms of Service (Ex. W) state the following: "Intentional failure to submit found shares or blocks constitutes theft of service, and our policy is to take legal action against such miners to recover damages."

Since the actions of the Enterprise were intentional, they constitute a violation of these Terms.

219.    PROHASHING employees were diligent in their research into the pool's luck issues throughout the pool's history. They published multiple blog posts and threads at PROHASHING's discussion forums about their attempts to determine the cause of the low luck. Despite hundreds of hours of research over the years, the fraudulent concealment by the Enterprise, combined with the nature of the attacks, prevented Plaintiffs from discovering the fraud until the Digital Gold Logs were discovered on December 7, 2025.

220.    Upon information and belief, the exact amount the Enterprise spent to lower PROHASHING's luck through the block withholding attacks was equal to what was required to ensure that PROHASHING's profitability fell slightly below the profitability of competing pools. This sweet spot allowed the Enterprise to burn as little money as possible on electricity costs while also ensuring that mining pools with inferior technology—such as the Enterprise's Chinese allies and its own pool Foundry USA—would attract all the customers who would otherwise choose PROHASHING.

221.    While it was willing to forego the money stolen from PROHASHING with the block withholding attacks, the costs of the sabotage operation were enormous, and DCG, Silbert, and Moro could not afford to simply dispose of all

the coins they were actually paid by PROHASHING. Therefore, they needed a way to reimburse their co-conspirators, and the timing of the Monero Group's mining activities suggests they found one in Monero.

### 7.  The Connection to Monero

222.   Plaintiffs allege that the Chinese miners with whom the Enterprise was allied and who were assisting the Enterprise in conducting the block withholding attacks were likely paid for their activities in Monero.

223.   Monero is a privacy coin that makes tracing money laundering difficult, and Monero generated through mining is difficult to associate with a specific owner. However, *purchasing* Monero at a cryptocurrency exchange would leave a trail of evidence by attributing wallet addresses to the name of the registered user at the exchange. Therefore, DCG, Silbert, and Moro would be incentivized to use accounting tricks to purchase Monero miners and launder the stolen funds through the Monero privacy network rather than leaving a paper trail by trading the stolen coins at an exchange for Monero.

224.   On or about 2018 and early 2019, the Monero cryptocurrency network became heavily dominated by specialized ASIC miners, with up to approximately eighty-five percent (85%) of network hashrate reportedly attributable to ASIC

miners.[38] Since designing and manufacturing the computer chips for an ASIC miner requires large capital investment (which is then recouped through operating the miners), the presence of ASIC miners implies that most of the miners and thus control of the network is concentrated in a few large entities rather than distributed among many smaller individuals. In response to this threat of a concentration of power, Monero's developers repeatedly and publicly declared their intent to preserve "ASIC resistance" by periodically changing the proof-of-work algorithm so that previously deployed ASIC miners would no longer function on the network.[39]

225.    On March 9, 2019, the same day the Quasar Account and the 3,399 accounts in the Monero Group paused or stopped mining at PROHASHING, Monero implemented a scheduled protocol upgrade known as version 0.14 "Boron Butterfly." This upgrade changed Monero's proof-of-work algorithm from "CryptoNight v2" to a new variant known as "CryptoNight-R,"[40] which would make existing ASIC miners worthless since they physically cannot mine a different algorithm. Monero's contemporaneous release notes and industry coverage

---

[38] See Binance Research, *Examining the Implications of Monero's Latest Fork* (Mar. 25, 2019).

[39] See Andrew Ancheta, *Monero Upgrades to Bulletproof Privacy: XMR Dev News*, Crypto Briefing (Oct. 17, 2018) (quoting Monero developers as committing to modify the CryptoNight PoW "every scheduled fork" to curb ASIC miners).

[40] See *Monero Technical Specs*, Monero Docs (showing CryptoNight v3 / CryptoNight-R active "since block height 1788000 (forked on 2019-03-09)"); dEBRUYNE, Justin Ehrenhofer & community members, *A Note on Scheduled Protocol Upgrades*, Monero Blog (Sept. 1, 2020) (listing version 0.14 "Boron Butterfly," protocol upgrade date March 9, 2019, PoW algorithm "CryptoNight-R").

describe the March 9, 2019 fork as a "third PoW tweak (CryptoNight-R) to curb the ASICs currently present on the network and further preserve ASIC resistance," and warn that existing miners would need to update or be unable to mine.[41]

226.    Data collected after that fork show that Monero's aggregate network hashrate fell by more than seventy percent (70%), dropping from just under 1 gigahash per second to roughly 140 megahashes per second, before stabilizing around 300 megahashes per second—behavior consistent with the sudden ejection of ASIC miners from the network following the CryptoNight-R change.[42]

227.    Upon information and belief, the Enterprise paused the block withholding attacks on the date of the Monero fork, and only partially resumed them later, because it was mining Monero using its own miners outside PROHASHING. The coins stolen from PROHASHING by the Quasar Account, the Monero Group accounts, and the other block withholding accounts were mixed with coins from the other business operations of DCG and its commingled subsidiaries. The offset cash on DCG's balance sheet was then available to purchase and operate Monero ASIC mining machines.

---

[41] Julio Gil-Pulgar, *Monero Successfully Upgrades Its Protocol*, Bitcoinist (Mar. 10, 2019); Mitchell Moos, Monero Upgrade Successful: Improved ASIC Resistance, Security, and Privacy, CryptoSlate (Mar. 9, 2019).

[42] Will Heasman, ASIC Mining Profitability Plummets Following Monero's Network Upgrade, Decrypt (Dec. 12, 2019); Coinguides, Monero hardfork v0.14.0 Boron Butterfly – CryptoNight-R (CryptoNight v4) (Mar. 9, 2019) (predicting that CryptoNight-R would "effectively eliminate existing ASICs" and cause a "massive drop in overall network hashrate").

228. The ASIC miners that the Enterprise was using to launder the stolen PROHASHING funds into Monero would have become worthless on March 9, 2019, when Monero changed its mining algorithm – requiring that the Enterprise stop mining at PROHASHING until it replaced its Monero miners or otherwise set up a new money laundering method.

229. The Monero mining was an efficient way to pay the Chinese miners who were allied with the Enterprise. In exchange for assisting DCG, Silbert, and Moro in their goal of destroying PROHASHING and creating the Digital Gold narrative, the Chinese miners were likely able to achieve capital flight out of China. The Chinese citizens paid the operating costs of the ASIC miners directed to PROHASHING that were conducting the block withholding attacks, and in return they received virgin, untraceable Monero from the Enterprise's Monero miners, which the Chinese citizens could then spend or sell in the United States.

### 8. The Digital Gold Logs

230. Inside the Quasar Account's mining balances exists a number of coded entries (the "Digital Gold Logs"). These entries were recorded in the PROHASHING database by an individual within the Enterprise. They associate the Enterprise's activities with external events and appear to have existed for eight years before they were discovered.

231.    The messages are encoded using the A1Z26 algorithm into the balances of the Quasar Account. The A1Z26 algorithm is a simple cipher that assigns the number 1 to the letter A, 2 to the letter B, and so on. While most of the balance entries for the Quasar Account appear to be uninteresting mining balances, there are at least six messages that are extremely unlikely to have occurred due to chance. The messages exist independently of the other evidence, such as the type of payout coins and when mining occurred, which can be gathered from these mining balances.

232.    The A1Z26 algorithm's encoding scheme and the fact that the database was intentionally manipulated are confirmed by the existence of four messages on March 9, 2019, each with a value that is too small to have been created by normal mining. PROHASHING's PostgreSQL database used "Decimal" fields of high precision—24 digits to the right of the decimal place—to ensure that payout figures would not accumulate errors over the constant addition of many shares. However, any single share is typically worth from 0.001 cents to 1 cent. The balances recorded on this date had a value as low as 0.000000000000000000000003—an astronomically low value that could never be achieved through normal mining; the only way such a value could have been inserted is through direct database access.

233.   If the datatype of the database columns had been a double precision floating point value like that which is used commonly in computer science, the insertion of a precise message into the field would be impossible, because that datatype is encoded with a "base" and "mantissa"—two fields that interact together and therefore would be extraordinarily unlikely to be able to produce the precise values the author intended to record. By recording the messages in Decimal values, the engineer was able to ensure that his intended numeric values would be exactly reproduced when the entries were later discovered.

234.   The messages were encoded in balances that were smaller and out of place. For example, one message was placed on August 11, 2020—despite the Quasar Account not having mined during the six months prior or subsequent to that single relatively small balance.

235.   Further supporting that these records were intentionally manipulated is that the actual payouts for the Quasar Account are not equal to these coded messages in the owed balances, suggesting that the person(s) modifying the balances—the "Quasar Insider"—wished to record private messages that wouldn't be visible on public blockchains.

236.   Because the messages often contain only the first letter of each word, they sometimes can have multiple interpretations. Plaintiffs simply offer the most likely interpretation in the context of the date and current events.

237.   Plaintiffs analyzed the probability of the Digital Gold Log entries appearing by chance. Plaintiffs deliverately gave the "chance coincidence" hypothesis every reasonable benefit. The analysis (i) permits a flexible "human" A1Z26 family consistent with multiple encoding schemes (e.g., one-digit or two-digit encodings where appropriate; optional "00" padding/separators; and limited shortcut encodings used by a someone wanting to avoid detection while writing quickly), and (ii) uses digit-frequency distributions empirically observed in Plaintiffs' own ledger by decimal position (rather than assuming uniform random digits). The analysis further uses an intentionally conservative "anywhere in the dataset" approach—meaning it assumes the target strings could have appeared in any of the ledger entries rather than requiring them to appear on any particular date or row—thereby substantially increasing (not decreasing) the probability of coincidence.

238.   Even under these defense-favoring assumptions and under the conservative "anywhere in the dataset" framework, the probability that a ledger of 2,026 random 24-digit fractional strings would contain—by coincidence—the full observed set of the identified A1Z26-interpretable strings is no greater than 1 in $3.23 \times 10^{158}$. This computation is intentionally framed as an upper bound and does not rely on any correlation to external events, business timelines, or subjective definitions of "meaningfulness." It addresses only the probability of the observed

structured strings arising from chance under conservative mathematical assumptions.

239.   It is probable that Plaintiffs missed some messages that the Quasar Insider encoded and that additional messages may emerge through further examination of the data or during discovery. The full Quasar Account ledger, which contains the raw source numbers used for the decoding, is provided in Ex. Q.

240.   The first payout record in the Quasar Account (September 26, 2017) is an encoded entry in the Digital Gold Logs: "H DDE HHH DB FG Y PH DC HHE." Taken in context, one interpretation of this entry may be "Header / Data Definition Entry / [Unknown] / Discard Block / Fake Gains / [Unknown] / PROHASHING / Digital Currency [Group] / Header Hash End." While much of the rest of the message regarding block withholding has a greater number of possible interpretations, the inclusion of the terms "PH" and "DC" next to each other is clear and, given that this is the first record, suggests the Quasar Insider indicated he was recording a log between PROHASHING and DCG from day one.

241.   On February 18, 2018, the Quasar Insider recorded a second entry: "CCV BCH HT BIB GF," in a balance associated with the coin Litecoin Cash – a coin that was attracting media attention at the time. One interpretation of this entry is "Chinese Capital Vehicle / Bitcoin Cash / Hashrate Theft / Bitcoin Investment Bank / Grayscale Fund." This interpretation suggests that DCG's, Silbert's, and

Moro's scheme had evolved into money laundering: using funds from Chinese investors to steal hashrate from PROHASHING, and using the Bitcoin Cash mined and paid out to the Enterprise to seed DCG's Grayscale Bitcoin Cash Trust, which would launch just weeks after this entry was recorded (or possibly one of DCG's other Grayscale funds).

242.    This interpretation of the second entry is taken from the context in which it was written. In early February 2018, as China intensified its cryptocurrency crackdown, Reuters reported that Chinese regulators were preparing additional restrictions on ICO (initial coin offering) activity— particularly offerings conducted through overseas platforms—against the backdrop of prior exchange closures and the ICO ban.[43] In financial usage, a "capital vehicle" refers to an entity or structure through which capital is pooled and deployed, and "CCV" is used in other regulatory contexts as shorthand for "corporate capital vehicle." Given academic research finding economically meaningful capital flight out of China through Bitcoin markets, Plaintiffs allege that the insider's use of "CCV" is most consistent with "Chinese Capital Vehicle"—i.e., a vehicle for moving or deploying Chinese-source capital through crypto rails notwithstanding tightened restrictions.[44]

---

[43] See China Prepares Fresh ICO Rules, Eyes Overseas Platforms: China Daily, Reuters (Feb. 6, 2018).
[44] See Maggie R. Hu, Adrian D. Lee & Tālis J. Putniņš, Evading Capital Controls via Cryptocurrencies: Evidence from the Blockchain (SSRN Working Paper, Dec. 22, 2021).

243.   On December 3, 2018, an entry in the Digital Gold Logs was written into the Quasar Account's balance: "HEIHE UF SS W J DT DX," in an anomalous Litecoin balance. The surrounding data (which consists of far higher balance totals) and the low amount of this balance makes it extremely likely that the message was intentionally encoded with direct database modification. The first word, "HEIHE," is the name of a region in China near the Russian border. Heihe was a mining hub because its cold climate allows mining machines to reject heat easily and because of the region's surplus electricity.

244.   On March 9, 2019, the date of the Monero fork that would destroy the mining capabilities of the specialized ASIC miners that could previously earn revenue mining Monero, and which upon information and belief Defendants DCG, Silbert, and Moro were using operating, four distinct entries were encoded in the Digital Gold Logs each with an impossibly small value—much smaller than would be able to be earned with the submission of even a single share:

- 0.0000000000000000000000003 (C)

- 0.0000000000000000000000015 (O)

- 0.0000000000000000000000004 (D)

- 0.0000000000000000000000009 (I)

245.   One interpretation of this acronym (CODI) is "cancellation of debt income," a tax rule mandating U.S. taxpayers to report debts that are cancelled

(never repaid) as taxable income. Upon information and belief, this entry suggests that DCG, Silbert, and Moro forgave debt between the entities in the DCG conglomerate around this period, perhaps because the Monero mining was now unable to produce income.

246.    On August 11, 2020, an entry was recorded with the coin Binancecoin: "PCY I SPE GCI." One interpretation of this message is that a "Public Company / Is / Special Purpose Entity / Genesis Capital Incorporated." This message is one of the few mining activities recorded in 2020 for the Quasar Account—the account did not mine at all for most of that year, with this message being recorded on that specific day.

247.    On that day, non-party Strategy publicly announced that it had purchased 21,454 bitcoins for the first time for an aggregate purchase price of $250 million (inclusive of fees and expenses) and explained that it was making Bitcoin the principal holding in its treasury reserve strategy as part of a revised capital-allocation approach (including the view that Bitcoin could serve as a dependable store of value relative to holding cash).[45] The company contemporaneously disclosed the same Bitcoin purchase in an SEC filing on Form 8-K, attaching the press release as an exhibit.[46]

---

[45] See MicroStrategy Adopts Bitcoin as Primary Treasury Reserve Asset, Business Wire (Aug. 11, 2020).
[46] See MicroStrategy Inc., Current Report (Form 8-K) (Aug. 11, 2020) (Item 8.01).

248.    On November 30, 2025, just weeks before this Second Amended Complaint was filed, Strategy's CEO Michael Saylor stated on X: "What if we started adding green dots?" Ex. R at 11. The logo for Bitcoin Cash is a green dot, and US currency is green. After buying bitcoins for years, Saylor in the previous two months had increased the company's cash holdings to $2.19 billion according to Strategy's December 22, 2025 SEC filing.

249.    On May 20, 2021, two weeks after CM LLC had opened an account with the Enterprise through GGC, a Digital Gold Logs entry was recorded, associated with the coin XRP: "CC BIC GGD GCC AGREED GHD." One interpretation of this message is "Crypto Currency [Management] / Borrower Inter Company / Genesis Global Debt / Genesis Capital Corporation / Agreed / Genesis Holdco Debt." This interpretation suggests that CM LLC's deposits were used to service the debt of DCG's empire, contrary to the re-lending that the Enterprise represented to the Sokolowskis in the Fraudulent Balance Sheet Scheme (Section VIII(C)).

250.    Importantly, the recording of this entry shows that GGC was involved in the PROHASHING scheme; otherwise, the Quasar Insider would not have been knowledgeable of PROHASHING's onboarding to GGC. Upon information and belief, it is implausible that Moro, who served as CEO of GGC during the PROHASHING Scheme, was unaware of his subordinates' attacks against the

company. Moro did not force his subordinates to stop the attacks and could have, but did not, resign at any time while the PROHASHING Scheme was being conducted as early as 2017.

### 9.  Additional Links to DCG, Silbert, Moro, and the Enterprise

251.   The behavior of the Quasar Account in response to external events provides additional undeniable circumstantial evidence linking the Quasar Account to the activities of DCG/Silbert, Moro, and the Enterprise.

252.   As shown in Section VIII(A), DCG and Silbert manipulated internet discussion to solidify the Enterprise's desired small block size. In May 2017, Silbert facilitated the New York Agreement, complied with the first half of the agreement by allowing SegWit to activate on August 24, 2017, and then failed to comply with the remainder of the New York Agreement and advocate for the block size increase in the face of the same internet discussion opposing the block size increase.

253.   The Quasar Account began mining at PROHASHING on September 28, 2017, six weeks before the block size increase was to occur. The thefts decreased profitability for PROHASHING, preventing PROHASHING from increasing rewards during a critical time in Bitcoin's history.

254.    By ramping up the attacks against PROHASHING during a decisive moment and preventing it from gaining market share—starting exactly six weeks before the increased Bitcoin block size would be locked in—the Enterprise, at the direction of DCG, Silbert and Moro and executed by the John Does, diminished PROHASHING's ability to oppose the Enterprise's required small block size. This was at the same time as Silbert's intended outcome—the cancellation of the "2x" portion of SegWit2x—occurred on November 8, 2017, when the upgrade lost support from the community. However, miners still had the final vote regardless of what Silbert wished, and a minority of Bitcoin node operators who disagreed with Silbert (like Stephen and PROHASHING) could still have theoretically "split" with him and attempted to upgrade anyway.

255.    On November 15, 2017, as detailed in the Quasar Account's payout logs (Ex. Q), the Quasar Account began receiving its exploit payouts in Bitcoin Cash, a cryptocurrency that was a "fork" (split) from Bitcoin created by big block supporters. In contrast, prior to November 15, 2017, the account had received its payouts in the cryptocurrency Litecoin, whose community was neutral towards Bitcoin. One effect of the Quasar Account stealing money from PROHASHING and receiving payment in Bitcoin Cash was to deplete PROHASHING of its bitcoin cash reserves, which the pool would not have paid to it otherwise. As one of the Enterprise's goals was to artificially inflate the price of Bitcoin, exchanging

this bitcoin cash for bitcoin at an exchange would have achieved downward price pressure on Bitcoin Cash and upward pressure on Bitcoin—at a time when Bitcoin was near the top of a 4-year bubble.

256.   As detailed in the next section ("Scheme 2: The Fraudulent Balance Sheet Scheme"), PROHASHING onboarded onto GGC, passing through CM LLC. As part of the onboarding process, KYC/AML documents were provided to GGC, which was operated by the Enterprise. These documents were provided beginning on May 8, 2021.

257.   Christopher provided basic KYC/AML information to GGC as a passthrough lender to GGC. Upon information and belief, Christopher, acting on behalf of PROHASHING, also provided the Enterprise, through GGC, with the PROHASHING operating agreement, its financial statements, and other sensitive business information.

258.   On May 10, 2021, within 24 hours after PROHASHING provided KYC/AML data to GGC, the Enterprise's Quasar Account stopped mining with PROHASHING for ten days. During those ten days, CM LLC provided additional documentation to open its accounts and the passthrough lenders coordinated with each other to determine amounts to deposit to GGC and to actually send the deposits.

259.   On May 20, 2021, a support ticket was submitted to PROHASHING

claiming to be from the Quasar Account's username. The ticket read:

> Hello,
>
> We have been mining LTC with you guys since quite long time.
>
> We have not entered the doge coin address there for it is sad to say we didnt received any dogecoin bonus at since the period we were mining LTC.
>
> Is it possible to get the deposit now in to our account ?
>
> Thanks.
> _____
> Support Ticket, Exhibit S

260.   Stephen, acting on behalf of PROHASHING, replied to this vague

ticket with a standardized form response:

> Hi Quasar,
>
> Thanks for contacting us.
>
> There are two fields in the ticket - "password arguments" and "connected port" - which it doesn't seem like you filled out. Those fields are important to help me get to the bottom of what could be going on.
>
> Could you respond with the password arguments your miners are using and the port to which they are connected?
>
> Thanks,
>
> -Steve Sokolowski
> _____
> Support Ticket Response, Exhibit S

261.   The ticket was closed when no response was received. Upon information and belief, an Enterprise member submitted the support ticket to determine if PROHASHING had detected the activities of the Quasar Account or any of the other attacks being run against PROHASHING and/or if PROHASHING was joining GGC to determine whether GGC's interest payments to PROHASHING would be sourced from the attackers' mining payouts.

262.   The Enterprise, operating the Quasar Account, did not respond to the form request sent by Stephen. On May 21, 2021 (Ex. Q), the Quasar Account resumed mining. The hashrate of the Quasar Account rose slowly over the next few days, until it stabilized at a level of approximately 1/3 of its previous value. This lower level of exploitation would continue until the database constraint related to the Merge Mine Skim (see Section VIII(B)(5)) was added and caused PROHASHING to have display errors, likely panicked the Enterprise thinking their other attacks had been discovered. The Quasar Account paused mining on September 15, 2021. Upon information and belief, when the Enterprise was convinced that the risk of discovery was too high, they temporarily reduced mining to avoid detection.

263.   On November 18, 2021, the block withholding attacks escalated to an extreme degree, to the point where Christopher sent a series of Telegram messages to Stephen. One read:

> I spent most of the night investigating various possibilities for
> monetary losses including but not limited to incorrect block
> rewards, incorrect difficulties, wasteful trades, forks, and luck. I
> came across no major problems, so I still must conclude that the
> losses not are anything more than bad luck.
>
> _____
>
> Christopher Sokolowski, Telegram message to Stephen
> Sokolowski

264.   Christopher then manually adjusted several system configuration

variables in an emergency attempt to prevent PROHASHING's bankruptcy.

265.   This message contemporaneously demonstrates how Christopher's

extreme diligence, even after this entire night of research, was unable to identify

that block withholding attacks were occurring or that the Enterprise was

responsible for them.

266.   On November 19, 2021, the Enterprise's Quasar Account stopped

mining. Three days later, PROHASHING's records show that Stephen directed

Christopher to undo the emergency adjustments, and the pool returned to its

previous (unnaturally low due to the continuing attacks) payout rate. Upon

information and belief, discovery will reveal that a currently unidentified event

involving DCG, Silbert, Moro, or the Genesis companies occurred that prompted a

dramatic temporary increase in their block withholding attacks around this period

of November 2021.

267.   PROHASHING, when creating work for users, embedded the text of the username that mined the block in the "coinbase transaction"—the transaction that paid out the mining rewards—in all work products. When blocks based on the work were successfully found, they were incorporated into the public blockchain with this username included. Therefore, the list of blocks that the Quasar Account (and all of the Enterprise's other block withholding accounts) mined through its fraudulent mining is permanently embedded in the blockchains of cryptocurrency networks.

268.   Upon information and belief, one intended side effect for the Enterprise of its activities is that, if Federal law enforcement had discovered the money laundering of DCG, Silbert, and Moro through PROHASHING, Plaintiffs might be wrongfully charged in a criminal indictment or targeted with a civil asset forfeiture, resulting in the closure of PROHASHING and the elimination of the Enterprise's foundational rival.

### 10. One Plausible Inference of the PROHASHING Scheme From Start To Finish

269.   While the exact sequence of events in the PROHASHING Scheme will be revealed in discovery, Plaintiffs in this section present one plausible inference from the available evidence combined with publicly available

information regarding how the Enterprise paid for the minimum of $22,850,919.45 required to execute it:

270.   In 2016, while the censorship and Block Size War were ongoing, a Chinese hacking group obtained access to Christopher's Windows 10 laptop using the Quasar remote access trojan (RAT) through an undetermined software vulnerability. When Christopher connected to the PROHASHING database server in the course of routine work, the attacker logged the server's password.   Later, using the Quasar malware, he installed a different tool on the database server that permitted the hacking group to control the database server. The Quasar client access to Christopher's desktop was no longer required, and was likely removed to avoid detection. DCG, Silbert, Moro, the John Does, and others at the Enterprise gained access to the database server and to PROHASHING's network.

271.   Individuals in China, the CCV ("Chinese Capital Vehicle"), in communication with DCG, Silbert, and the Digital Gold Enterprise, purchase significant amounts of mining hardware from Chinese manufacturers like Bitmain. This mining equipment was set up in Heihe and directed to mine at PROHASHING. The firmware of the mining equipment was modified, or the mining equipment was directed through an altered proxy server, so that a proportion of the blocks these rigs mined were never submitted to PROHASHING.

272.　The CCV's mined coins are directed to DCG's payout addresses. DCG's payout addresses are large consolidated wallets—perhaps at an exchange or as part of GGC's treasury. Some of these coins are used to seed Grayscale's funds.

273.　The CCV must be paid for its services. To achieve this, the Enterprise offsets the revenue by sending dollars from its bank accounts as "loans" to a subsidiary that purchases and operates a massive and secret Monero mining operation. The mined Monero is sent back to the CCV "investors" as payment for their services, thus providing the Chinese miners with newly mined, untraceable privacy coins that can be spent in the West, removing their assets from China.

274.　When the March 9, 2019 Monero algorithm change disabled all of the ASIC miners in DCG's fleet, the CCV investors were no longer able to be paid, and this first phase of the scheme collapsed, so all the Chinese miners disconnected. The "debt" at the DCG subsidiary was then cancelled (CODI) because the subsidiary's miners had no economic value.

275.　Although DCG had survived the Block Size War, some of the Chinese investors' accounts would later reactivate, potentially being paid through a different scheme, to ensure that PROHASHING never gained legitimate miners and that the Digital Gold narrative was never threatened by a competitor located in the United States which was opposed to opacity, money laundering, and scams.

### 11.DCG's, Silbert's, and Moro's Effects on Customer Acquisition and Retention

276.    As a direct and foreseeable consequence of the Enterprise's block withholding sabotage (alleged above) causing PROHASHING's payouts to appear materially less profitable than competitor pools, PROHASHING customers publicly reported reallocating or removing their hashrate from PROHASHING—confirming real-world customer attrition and resulting loss of fee revenue, liquidity, and network effects. PROHASHING's public discussion forums provide a real-time view of these customer complaints and departures.

277.    In a December 10, 2017 forum thread entitled "PH profitability edge gone :(,"[47] a user posting as "Jakeg5280" stated that he "can't mine here anymore," that he "pointed [his] miners somewhere else," and that he "took PH off [his] backup list," explaining that he had earned "around 8% less" than a competing pool that week and that the diminished profitability was "unacceptable."

278.    The same December 10, 2017 thread reflects that profitability-driven attrition was not isolated: another user ("gpopprohashing") reported that he had "switched" and was "split[ting]" his miners among different pools, and warned that "it will be hard with low profitability" because "at the end of the day … everybody is looking at the bottom dollar."

---

[47] PROHASHING Mining Pool Forums, "PH profitability edge gone :(" (Dec. 10, 2017), available at https://forums.prohashing.com/viewtopic.php?t=2729 (last visited Dec. 29, 2025).

279.   On September 13, 2020—during the same period in which Plaintiffs allege the "low luck" phenomenon consistent with block withholding sabotage was depressing pool profitability—a user posting as "hfslayer" stated "switched to Pirl for the time being," and explained that he could "make twice as much on NiceHash [a competitor], including fees," than mining the next most profitable coin through PROHASHING. In the same thread, that customer expressly referenced PROHASHING's discussion of "low luck miners" and stated that he "check[s] the profitability reports each day" and sees "how much [PROHASHING is] losing," demonstrating that customers themselves monitored PROHASHING's profitability, not only their own.[48]

280.   In May 2022, a PROHASHING customer ("TechElucidation") posted a detailed departure announcement entitled "Why I am leaving ProHashing (at least for now)," explaining that "profitability here is low," that "ProHashing is lagging behind" other pools' rewards, and that "to improve the earnings and reduce the costs" he "moved [his] mining to a new pool," adding that he was "not sure that is going to be with ProHashing." This customer's public explanation corroborates Plaintiffs' allegation that the Enterprise's profitability suppressing sabotage foreseeably caused customer departures and that this interference with current and

---

[48] See Prohashing Mining Pool Forums, "Authorization failed because static pay per share?" (Sept. 13, 2020), available at https://forums.prohashing.com/viewtopic.php?p=26978 (last visited Dec. 29, 2025).

prospective customer contractual relations compounded Plaintiffs' damages far beyond any single "delta" in block rewards.[49]

## C  Scheme 2: The Fraudulent Balance Sheet Scheme

### 1.  Summary

281.   In this scheme, Defendants Silbert, Moro, and DCG signed a fraudulent $1.1 billion promissory note to delay the bankruptcy of GGC by seven months. While the public explanation for the fraudulent promissory note was that DCG had made a bad loan and in the worst case made fraudulent representations to regulators, Silbert, Moro, and DCG, acting on behalf of the Enterprise, actually needed to save GGC from bankruptcy at any cost to cover up their more foundational fraud involving Stephen and PROHASHING.

282.   Had GGC entered a chaotic bankruptcy where DCG and Silbert had no control, evidence of the Merge Mine Skim and the Block Size War would have fallen into the hands of a trustee, been revealed to the public, and resulted in negative consequences for Silbert and the Enterprise. The $1.1 billion promissory note was the first step in a series of increasingly desperate Schemes to cover up the Enterprise's activities.

---

[49] See Prohashing Mining Pool Forums, "Why I am leaving ProHashing (at least for now)" (May 22, 2022), available at https://forums.prohashing.com/viewtopic.php?t=8853 (last visited Dec. 29, 2025).

283.   This Act constituted a classic "lulling" operation. By falsifying the solvency of GGC, the Enterprise prevented the Plaintiffs from conducting the forensic inquiries that would have revealed the PROHASHING Scheme.

### 2.  The Enterprise's Misrepresentation of Consumer Lending Products

284.   One of the primary sources of funding for the Enterprise was GGC. GGC sourced its funds primarily from consumers through its Gemini Earn program, and additionally through passthrough LLCs like CM LLC.

285.   Upon information and belief, the Enterprise "mixed" the funds of depositors and the proceeds of the PROHASHING Scheme (and the profits of the businesses built with the PROHASHING Scheme's capital) into GGC's lending pool.

286.   While Moro is also fully liable for the Enterprise's Acts as the CEO of GGC, Silbert, as CEO of DCG, also exerted substantial control over the entire Enterprise, including GGC. His pervasive influence was further underscored by his significant personal financial stake in DCG. As reported by The Wall Street Journal on November 1, 2021, Silbert owned approximately 40% of DCG's stock, making him the largest single shareholder.[50] This substantial ownership interest not only

---

[50] See *https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-standard-oil-11635764400, last accessed Dec. 25, 2024.*

solidified his control but also directly aligned his personal financial fortunes with the performance of DCG and its subsidiaries.

287.    GGC provided a simplified dashboard to customers on its website, which displayed current balances and interest rates. Exhibit J. The dashboard, which was polished and user-friendly, provided access to account statements detailing accrued and paid interest.

288.    In marketing materials and communications directed at individual depositors—and specifically to Plaintiffs located in Pennsylvania—GGC and DCG repeatedly compared their lending services to stable and secure savings mechanisms. This assertion was not "puffery" but a concrete misrepresentation of the Enterprise's racketeering activities.

289.    In their contacts with GGC, GGC's marketing and communications with Plaintiffs emphasized safety, stability, and reliability—qualities a reasonable consumer would associate with a conservative financial service, not a complex investment product. GGC's marketing made no mention of their actual business practices, which involved a complex web of unsecured intercompany loans between GGC, DCG, and DCG's subsidiaries that were mischaracterized as "current assets," and the racketeering activities in which GGC, DCG, and Silbert participated, such as the PROHASHING Scheme described in Section VIII(B).

290.   GGC did not merely facilitate isolated private loans but actively marketed itself and operated as a comprehensive financial services platform, akin to a bank or prime brokerage, offering integrated lending, trading, custody, and derivatives services. For example, on July 28, 2022, GGC solicited Stephen directly via email to use its "Institutional Custody" solution, highlighting features such as segregated cold storage, insurance, integration with other Genesis entities for liquidity and collateral purposes, and its registration with the Financial Conduct Authority. Exhibit L at 1-2. This attempt to cross-sell custody services to an existing lending client, pitching "institutional" services directly to an individual known to be passing through pooled funds, further demonstrates that GGC was operating as a broad financial institution seeking customer assets, not merely as a facilitator of private loans between sophisticated parties. This manner of operation and marketing brings GGC's conduct within the scope of consumer protection statutes like the UTPCPL.

291.   GGC routinely communicated with its clients, including Stephen personally, through standard financial notifications typical of consumer banking institutions. For example, on July 1, 2022, GGC sent an automated email directly to Stephen, informing him, "Your Genesis Interest Statement for June 2022 is ready to view and download on Genesis Prime!" Exhibit L at 3. This email provided instructions for accessing the statement via the online portal and directed

users with questions to "Genesis Operations" via Telegram or email, further demonstrating the consumer-oriented presentation of GGC's services and its pattern of direct communication with individual lenders.

292.   GGC entered into loans with Stephen, Christopher, and other consumers using simple one-page term sheets. The term sheets stated the loan amount, the interest rate, and the maturity date. Interest was to be paid at specific times, and the asset loaned was to be returned in full on the maturity date. Plaintiffs expected to receive the originally loaned asset back with interest and to retain that asset after maturity.

293.   These loans were not subject to risks involving volatile cryptocurrency exchange rates. They involved loaning a single asset and receiving back that same asset at maturity. GGC consistently offered relatively modest interest rates—often as low as 1% APY and never exceeding 6% APY—levels comparable to traditional, low-risk savings or deposit products rather than speculative, high-yield investments. This reasonable rate structure reinforced Plaintiffs' belief that they were participating in a stable, consumer-level financial service rather than a high-risk venture.

294.   All GGC interest rates were fixed at the time of loan origination and not dependent on GGC's financial performance.

295.    Plaintiffs believed that GGC was engaged in simple, bank-type lending, as Stephen stated during a contemporaneous public video interview with journalist Laura Shin for her "Unchained" podcast conducted in January 2023—the same month that Genesis declared bankruptcy (Transcript in Exhibit E)–hereinafter the "Shin Interview":

> But you also, should--shouldn't be misleading customers about… just kind of like making loans and then, you know charging a higher interest rate and… pocketing the difference. I mean, that was my understanding of what these companies were doing, and it's pretty clear that that was not their entire or even their primary business model to just borrow money and then lend it out at a higher interest rate.
>
> ───────────────────────────────
>
> Shin Interview, Ex. E at 6-7

296.    GGC's claim that it catered solely to sophisticated, institutional clientele is belied by its longstanding, lucrative relationship with Gemini, a well-known cryptocurrency exchange and lending platform. Gemini actively marketed its lending services—which merely passed customer cryptocurrency deposits through to GGC—to retail customers in Pennsylvania and elsewhere, branding it as Gemini Earn. Both at the time of the presentation of the fraudulent balance sheet and also at the time of GGC's bankruptcy, Gemini, through Gemini Earn, had in fact become GGC's largest creditor.

297.   Many of these Gemini Earn depositors held relatively small amounts of cryptocurrency—often less than $100—reflecting typical consumer-level transactions rather than institutional-scale investments. GGC, aware that Gemini was aggregating these retail deposits from unsophisticated investors who sought safe returns, accepted them without objection, further demonstrating its knowledge that it was effectively receiving funds sourced from ordinary Pennsylvania consumers.

298.   Far from catering to large corporations, DCG and GGC were so dependent upon Gemini's consumer deposits that the companies actively discussed a merger for, among other reasons, streamlining operations. See *The People of the State of New York by Letitia James, Attorney General of the State of New York v. Gemini Trust Company, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte. Ltd., Genesis Global Holdco, LLC, Digital Currency Group, Inc., Soichiro Moro (a.k.a. Michael Moro), and Barry E. Silbert*, Index No. 452784/2023 (Sup. Ct. N.Y. Cnty.)—hereafter the "NYAG Action."

299.   In one email, Silbert states: "Gemini is Genesis' largest and most important partner." NYAG Action, Doc. 45.

300.   Far from GGC catering exclusively to sophisticated institutional investors, a June 21, 2022 chat message from Silbert explicitly references retail depositors. In this message, Silbert stated "the Genesis access to low priced capital

via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage." NYAG Action, Doc. 44. This direct acknowledgment of the "retail channel like Gemini" as a source of capital directly contradicts the notion that GGC operated solely as an institutional lender. Moro and Silbert knew, or should have known, that both GGC and Gemini served Pennsylvania retail customers.

301.   In fact, the Sokolowskis had also previously lent their assets to Gemini. Seeking a moderately higher interest rate and believing that direct lending to GGC would provide the same stable, consumer-oriented arrangement, the Sokolowskis moved their cryptocurrency loans from Gemini to a direct relationship with GGC to cut out Gemini's middleman fee.

302.   Defendants carefully avoided calling their products "investments." By doing so, and by actively accepting assets from GGC customers, they reinforced the consumer perception that these were ordinary, low-risk lending services, not speculative financial instruments.

### 3. Inducement And Deposits

303.   On or about April 13, 2021, GGC facilitated the creation of an individual account for Stephen, with a GGC employee instructing him to enter "Individual" in the signup form's "title" field. Ex. F (Telegram Chat Log), April

14, 2021. When Stephen inquired about also depositing funds from Christopher, non-party James Webster, and non-party PROHASHING LLC, GGC employees informed him that they could not open individual accounts due to GGC's minimum deposit requirements. GGC employees then suggested and facilitated the creation of an LLC account, knowing that its purpose was to aggregate funds from these individuals, three of whom were consumers providing personal funds for family or household purposes, to meet those minimums.

304.   During the creation of CM LLC's account, on or around May 7, 2021, GGC requested and received the driver's licenses of Stephen, Christopher, and James Webster, which contained their Pennsylvania addresses. GGC also requested and received the operating agreement and other documents from non-party PROHASHING LLC.

305.   Upon information and belief, GGC performed KYC/AML checks on all four persons listed in Paragraph 304, including the Enterprise's critic Stephen and its target of theft PROHASHING LLC. These checks occurred on or around May 8, 2021. As shown in the PROHASHING Scheme (Section VIII(B)), the Quasar Account stopped mining the next day (May 9, 2021).

306.   GGC understood at all times that it was working with these four persons directly and individually.

307.    GGC requested and received the operating agreement for CM LLC. See "Cryptocurrency Management LLC", Section VII(A).

308.    GGC requested and received a "Balance sheet.pdf" document (Ex. Y), which was to contain a listing of all assets held by CM LLC. Rather than a typical balance sheet, the full text of the document stated:

> The company currently has no assets because it is awaiting account approval from Genesis [GGC].
>
> After approval, the company's balance sheet will be the assets held by Genesis [GGC], as the company does not have any borrowers other than Genesis [GGC].
>
> _____
>
> "Balance sheet.pdf," Ex. Y

309.    As part of the onboarding process for CM LLC, GGC required the completion of a "Due Diligence Questionnaire" (the "DDQ", Ex. K). This DDQ, submitted by Stephen on behalf of CM LLC, listed CM LLC's address and primary location of operations as 3178 Carnegie Drive, State College, PA 16803-1154, the same Pennsylvania residential address as the Sokolowskis.

310.    Most significantly, the "Description" section of the DDQ submitted to GGC explicitly stated: "The purpose of this organization is to collect funds and exceed Genesis's [GGC's] minimum loan amounts and to loan funds to Genesis Trading [GGC]." (Ex. K). This statement provided direct, contemporaneous notice to GGC that CM LLC was not an independent operating business, but rather a

special purpose vehicle created solely to aggregate funds from individual lenders (including Plaintiffs) to meet GGC's deposit thresholds.

311.   Page 2 of the DDQ identifies Stephen as a "Software Engineer," not a "financial advisor" or "investment manager," supporting the assertion that GGC knew it was dealing with ordinary consumers.

312.   Page 3 of the DDQ states that the "Company will only loan to Genesis [GGC], just formed." The same page states "Funds to be sent direct to Genesis [GGC], no local storage." It also states that CM LLC is "Not engaged in trading."

313.   After CM LLC's account had been approved, GGC returned Stephen's funds directly to him and then accepted a deposit of the same amount into the CM LLC account within one day. Stephen's individual account was then closed or permanently inactive.

314.   A Telegram group chat between GGC employee Hanson Birringer and Stephen took place between April 2021 and December 2022 (included as Exhibit H), but most of the relevant discussion regarded the setup of the CM LLC account with GGC in April 2021.

315.   On April 13, 2021, in this chat with Birringer, Birringer provides a refresher of minimum deposit amounts: "Min size is $500k notional so around 1850 LTC at current prices."

316.   Another Birringer message on April 13, 2021 demonstrates that it was GGC, not Plaintiffs, that suggested dealing with the Plaintiffs (and the other non-party CM LLC lenders) directly: "In the meantime I am going to create a broader group with the rest of the folks on our side, will add you in a moment. We can use it for all future communication (lending, trading, settlement etc)." This referenced Telegram group chat is included as Ex. F. This group was titled "Cryptocurrency Management LLC <-> Genesis," and contained Plaintiffs and non-party CM LLC passthrough individual James Webster, among others.

317.   Later that day, Birringer, representing GGC, was questioned by Stephen about the LLC process: "what sort of information do you need to start the process of opening a corporate account?.... can part of that be processed before the state officially creates the entity?" Ex. H (April 13, 2021).

318.   To this message, Birringer responds: "The onboarding process is fairly similar, off the top of my head I can't think of a glaring difference between the two but will probably need to have the entity officially created to begin"

319.   This statement by Birringer demonstrates GGC's willingness to work directly with Stephen and to facilitate the lending arrangement, even before the formal creation of CM LLC. Birringer's statement that he "can't think of a glaring difference" between onboarding an individual and an entity, and his uncertainty about whether the LLC needed to be officially created before beginning the process

("probably need to have the entity officially created"), underscores GGC's flexible approach and its focus on securing the lending relationship, rather than strictly adhering to corporate formalities. This reinforces the argument that CM LLC was a mere instrumentality, created at GGC's suggestion to accommodate its minimum deposit requirements, and that GGC was primarily concerned with obtaining funds from the individual lenders, regardless of the formal legal structure.

320. To ensure the success of the Fraudulent Balance Sheet Scheme, the Enterprise relied on a pre-existing web of direct communications established by GGC employees. Employees, including Hanson Birringer, participated in a group Telegram chat directly with CM LLC's lenders. Ex. F. This chat contains overwhelming evidence that GGC employees communicated directly with the individual lenders.

321. GGC employees, among other things, were aware of:

a.     The Sokolowskis' passthrough lending to Gemini: "we called the loans from Gemini," (May 14, 2021), demonstrating that passthrough lending schemes were not limited to the Sokolowskis and that they retained title to their coins at Gemini as well.

b.     Non-party CM lender James Webster's desire for higher rates: "also, James was asking whether you will have new BTC rates this week" (May 17, 2021)

c.      Christopher's personal contributions through CM LLC, and his approval of non-party PROHASHING LLC's contributions through CM LLC: "1400.45257401 from PROHASHING, 1975.64186718 from Chris" (May 20, 2021)

d.      Stephen's repeated withdrawals to pay personal income taxes: "Hi, I'd like to call the June 1 interest loan of 0.09155949 bitcoins to [BTC Address redacted due to Local Rules] – and only that one loan – to pay taxes" (June 14, 2021)

e.      GGC offering to create a trading account for CM LLC, which was ultimately never used, but which demonstrated that GGC was willing to offer many different types of products and services to what GGC knew was a group of individuals. (Multiple days in 2022)

f.      GGC confirming with non-party James Webster that Stephen had not had a security compromise (May 3, 2022)

322.   On March 29, 2022, Stephen told GGC employee Hanson Birringer that an unrelated investment advisor "may also be willing to form an LLC to get together a lot of money with his investment banking friends…. I told him about you and that you would contact him." Birringer responded "Sounds good thanks Steve"—demonstrating that GGC was always willing to accept more passthrough LLCs to collect money from individual depositors.

323.   On December 1, 2021, non-party CM lender James Webster, who was not the owner or an employee of CM LLC, communicated with GGC employees to reconcile the individual owners' interest payments: "Hi, I'm trying to reconcile our spreadsheet compared with the September EOM balance and can't account for 1000.00 bits. My guess is that the withdrawal on 9/3/2021 has a miner fee that is not being accounted for on our side…." GGC also answered a similar communication on August 24, 2022: "Hey James, how can we help?", and again on September 6, 2022 regarding "Accrued Interest."

324.   On December 16, 2021, Stephen, in response to a request to change interest rates by GGC, stated "ok, I need to talk to [Christopher] about whether we would just like to withdrawal," and a GGC employee responded "Understood. Please let us know," showing that GGC was fully aware that decisions about withdrawals, including those at the time of the fraud, were being made by individual CM LLC lenders.

325.   Other chat messages show that Plaintiffs requested periodic withdrawals from GGC to pay for personal expenditures, including trivial purchases like a set of wall decorations. Plaintiffs actively discussed with GGC and others the need to leave a small amount of "open term" loans so that immediate expenses could be paid—similar to how money could be withdrawn from a bank

account. Records specifically show that Plaintiffs requested periodic withdrawals from GGC to pay taxes to the IRS.

326.   GGC CFO Matthew Ballensweig, who would later conspire with Defendant Moro (Paragraph 339.a) in dealing with the GGC's insolvency, and who would urge Moro to be careful that GGC clients might be "recording" their discussions, was also present in the Telegram chats with CM LLC individual lenders. Ballensweig communicated directly with Stephen, Christopher, and Christopher acting on behalf of PROHASHING, regarding the Litecoin loans that were clearly delineated between parties (see Paragraph 321.c).

327.   Given Ballensweig's position as Chief Financial Officer of GGC, his direct participation in the Telegram chat with the individual Plaintiffs concerning loan terms (Ex. F), and his documented collaboration with Moro in addressing GGC's financial difficulties, including the fraudulent promissory note (see Paragraph 339.a), it is highly improbable that Ballensweig was unaware of CM LLC's status as a nominal entity and the fact that GGC was dealing directly with the individual Plaintiffs. Upon information and belief, given the close working relationship between Moro and Ballensweig, and given their on-record discussions about GGC's lending status, it is further implausible that Moro would not have discussed the nature of the CM LLC arrangement and its implications for GGC's

lending practices and financial reporting with Ballensweig, particularly given DCG's involvement in the PROHASHING Scheme.

### 4. GGC's Collapse and The Fraudulent Promissory Note

328. GGC had not been financially sound at least since the company took a massive loss on a loan to Three Arrows Capital, a company which declared Chapter 15 bankruptcy in June 2022.

329. After the Three Arrows Capital loss, internal communications in the *NYAG Action* show that GGC and Moro urgently needed to restore solvency but were aware of the need to present GGC's services as akin to stable, consumer-level financial products.

330. In a June 13, 2022 chat message, Moro stated in regards to raising interest rates to encourage more deposits: "Not too much though as we don't want to seem desperate, but we are willing to pay above where we have been." NYAG Action, Doc. 40. This comment suggests a deliberate strategy to avoid appearing like a high-risk venture, consistent with the Plaintiffs' claim that GGC sought to attract customers by offering rates that would be perceived as reasonable within a consumer lending context.

331. Multiple records of internal communications in evidence discovered during the NYAG Action demonstrate that Silbert was frequently present and

actively involved in GGC's internal affairs, acting on behalf of DCG. In a June 13, 2022 chat message, Silbert stated directly:

> were scheduling a DCG board update and strategy call for tomorrow late morning, pencilling in 11 am. I'd like for moro, derar, matt and arianna to join. okay?

NYAG Action, Doc. 40

332.   This direct instruction from DCG's CEO to GGC's top personnel to attend a DCG board strategy session underscores the integrated nature of the two entities and DCG's direct command over GGC's leadership.

333.   Before this June 14, 2022 board meeting, Silbert emailed DCG and GGC executives, as well as outside investors. NYAG Action, Doc. 42. He discussed several options to address the crisis at GGC. The email outlines three options DCG was considering for GGC: "Support Genesis," "Jettison the Genesis Capital business," and a "Shock & Awe" plan. Id. Notably, Silbert states that the GGC team was unaware of the "Jettison" and "Shock & Awe" options:

> **IMPORTANT:** we have not discussed either the Jettison or Shock & Awe plans with the Genesis team. As far as they know, we're on path #1 [support Genesis] right now, so please do not bring up the alternative paths on the call today with the team.

NYAG Action, Doc. 42 (emphasis in original).

334.    This statement further demonstrates that DCG was directing GGC's future without even the knowledge or input of GGC's own management, not only actively planning to attend GGC management's calls but also intending to hide critical information during those calls.

335.    The "Shock & Awe" plan in particular provides compelling evidence of DCG's disregard for corporate separateness and its intent to use GGC as a tool to benefit DCG and its shareholders. The plan involved Silbert becoming CEO of GGC, DCG contributing the assets and investing team of another DCG subsidiary (DCGI) to GGC, and GGC pursuing a public offering in 2023. NYAG Action, Doc. 42. This plan constituted a blatant commingling of assets and personnel between DCG and its subsidiaries, treating them as interchangeable parts of a single enterprise.

336.    Silbert's email explicitly acknowledges the potential risks of the "Shock & Awe" plan to DCGI's assets, stating that "as 100% owner of Genesis, DCG shareholders are no worse off, other than DCGI's assets being put under Genesis creditors." NYAG Action, Doc. 42. This demonstrates that DCG was willing to potentially sacrifice the assets of one subsidiary to prop up another, prioritizing the interests of DCG shareholders over the potential harm to GGC's creditors. Furthermore, the plan's stated goal of providing "a clear path to liquidity for DCG shareholders via Genesis IPO" reveals that DCG was motivated, at least

in part, by a desire to create a liquidity event for its own shareholders even while GGC was facing a severe financial crisis. Id. The fact that this plan was being considered without the knowledge of GGC's management further underscores DCG's utter disregard for GGC's separate corporate existence.

337.    The "Support Genesis" plan contemplated DCG "look[ing] to secure our own additional liquidity to keep in reserve should we decide later to contribute capital to stabilize the Genesis balance sheet" while GGC "makes every effort to bolster its own balance sheet." NYAG Action, Doc. 42. This underscores that DCG would use its own resources—potentially commingling or redirecting funds to shore up GGC's finances if necessary—even as DCG simultaneously coordinated "with counsel to ensure best defenses against veil piercing." Id. The notion that DCG might inject its own liquidity to keep GGC afloat, yet remain free from liability to GGC's creditors, confirms DCG's recognition that its direct operational involvement blurred corporate boundaries and exposed DCG to potential veil-piercing claims.

338.    Internal communications show that Moro also later discussed "Option 3," which involved "some combination of assets from DCG parent and DCGI placed into GGC, again for equity purposes only." NYAG Action, Doc. 91

339.    Silbert, DCG, and Moro willfully and recklessly shaped their external messaging to retain lender confidence despite dire internal realities. One NYAG

Action docket entry references a Microsoft Teams chat, in which both Silbert and Moro were present and chatting. NYAG Action, Doc. 69.

      a.      In this chat, one GGC employee warned, "we need to still be very cautious about what we say and how we say it, we don't know they're not recording." (Matthew Ballensweig, 6/15/2022, 12:55 AM), demonstrating conscious efforts to conceal the truth.

      b.      In response, Moro stated, "I agree with the caution. Happy to join." (6/15/2022, 12:55 AM). NYAG Action, Doc. 69.

      c.      These communications also reference a "Genesis Source of Strength Talking Points" document being used that day, indicating a coordinated effort to present a misleading narrative of stability. NYAG Action, Doc. 69. As members of the Teams chat, Moro and Silbert had access to this document.

340.   This directive underscores Silbert's and DCG's direct, personal knowledge of GGC's precarious financial state and their deliberate efforts to keep it hidden from lenders like Plaintiffs, further evidencing that their misrepresentations were not the result of oversight or negligence, but part of a calculated scheme to deceive.

341.   DCG's active involvement in managing the perception of GGC's stability is further evidenced in a June 15, 2022 chat involving Silbert and other DCG and Genesis personnel. NYAG Action, Doc. 43. Amidst reports of increasing

withdrawal requests from lenders," Silbert inquired, "is there anything we/DCG can do to further install confidence in genesis?" Id.

342.   A GGC employee reported speaking with representatives from other DCG portfolio companies, stating, "so if they triangulate with you, you can just reaffirm our position etc." NYAG Action, Doc. 43. This indicates that DCG was actively managing communications across its network of subsidiaries to present a unified front of strength and stability, even as concerns about GGC's financial health were mounting. Silbert himself stated in the same email chain, "we need to continue to perpetuate that of course," referring to Genesis' reputation as the "blue chip" in the market. Id.

343.   All the previously mentioned emails and chats in the NYAG Action discussing the GGC situation were sent to or from multiple high-ranking DCG employees in addition to Silbert, demonstrating that the involvement of DCG in GGC's operations went well beyond the CEO's involvement. NYAG Action, Docs. 42, 43, 44.

344.   In another internal communication, Silbert indicated that Foundry USA—another DCG subsidiary—would be brought in to address GGC's lending issues. By stating that a new hire would "help Foundry assess their loan book and address any issues," (NYAG Action, Doc. 44), Silbert effectively enlisted yet another affiliated DCG entity in the effort to stabilize GGC. This further

demonstrates Silbert's, Moro's, and DCG's practice of treating DCG subsidiaries as interchangeable resources rather than maintaining their supposed independence and corporate boundaries.

345.   This June 21, 2022 chat message also highlights the importance DCG placed on maintaining "trust and confidence in Genesis" to prevent "money leaving Genesis and depleting our liquidity." NYAG Action, Doc. 44. Silbert stated that DCG and GGC had around $2 billion in liquidity but were in "bunker mode" to "withstand whatever negative event comes next." Id. This shows that DCG was acutely aware of the risk of a liquidity crisis at GGC and was actively working to prevent it, not for the benefit of GGC's creditors, but, as referenced by the use of the word "our," to protect DCG's own liquidity.

346.   Silbert's chat message also reveals DCG's intention to intervene directly in GGC's affairs to address the "hole" in its equity. He stated that:

> DCGI [another DCG subsidiary] will play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the downstream of certain/all assets until prices recover.
>
> NYAG Action, Doc. 44

347.   Internal communications show that on June 21, 2022, Silbert privately acknowledged a substantial "hole" in GGC's equity due to the collapse of Three Arrows Capital. Silbert described the situation as "super confidential/sensitive

stuff." In these communications, Silbert urged select DCG and Genesis personnel not to share this information "with anybody" outside a "circle of trust." NYAG Action, Doc. 44.

348.   On June 17, 2022, at 11:40 AM EDT, Moro publicly posted on X (then Twitter), constituting a transmission of fraudulent information via interstate and international wires:

> We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on…. We continue to operate 24/7 and have met every client request. We are extremely confident in our ability to service lenders, borrowers and traders within our service level agreements.
>
> _____
>
> Michael Moro, June 17, 2022, at 11:40 AM EDT (Ex. R at 1-3)

349.   In Moro's misleading statement, the term "finite" actually meant that GGC was insolvent, but that GGC had by then taken steps to ensure it would not lose *any more money* due to the Three Arrows Capital disaster.

350.   During the *Shin Interview*, Stephen stated:

And that's by the way what I understood their June 17th statement to—to read, that… they took 1.1 billion dollars, you know, and—and in exchange… they took the debt and they paid Genesis 1.1 billion dollars. Maybe I should have read between the lines or something like that in June, you know, but… that's a little dishonest to me that they didn't state exactly what happened at the time, and, you know, use these terms like they "netted against their balance sheet" or whatever the exact quote is.

Ex. E at 14-15.

351. Plaintiffs read Moro's June 17, 2022 tweet thread while in Pennsylvania and understood his assurances as a concrete representation of Genesis's then-present liquidity, solvency, and ability to honor client demands. In reliance on that reassurance, and as part of their individualized ongoing decision-making about whether to continue doing business with GGC, Plaintiffs remained engaged with GGC and did not take protective steps they otherwise would have undertaken during that period (such as materially reducing their exposure or attempting to withdraw), thereby maintaining their assets and credit relationship with GGC through the summer of 2022. Although later balance sheet representations were made months afterward and separately informed Plaintiffs' subsequent renewal decision, Moro's June 17 statements were a material part of the broader reassurance campaign that kept Plaintiffs' relationship and exposure in place leading into those later representations.

352.   Internal communications dated June 28, 2022 show that DCG and GGC executives, including Silbert and Moro, explicitly acknowledged a significant "equity hole" in GGC's balance sheet. Silbert directed both DCG *and GGC* personnel to work "24/7" to fill this shortfall by the June 30 reporting deadline NYAG Action, Doc. 91.

353.   This contemporaneous recognition of a massive deficit, coupled with urgent efforts to mask it, stands in direct contrast to Silbert's, Moro's, and DCG's public portrayal of GGC as financially stable, further supporting Plaintiffs' allegations that Silbert, Moro, and DCG knowingly misled lenders such as Plaintiffs regarding GGC's true financial condition.

354.   On or around June 30, 2022, two weeks after posting the misleading tweets, Moro, along with Silbert, willfully and recklessly signed the fraudulent $1.1 billion promissory note. This was revealed in the NYAG Action and documentation of it is attached to this Complaint as Exhibits B and C. The fraudulent promissory note was signed with conscious disregard for its impact on unsuspecting consumers in Pennsylvania, including the Sokolowskis.

355.   For context, on April 9, 2025, the court in the NYAG Action, having reviewed its exhibits and the promissory notes in Exhibits B and C attached to this case, denied motions to dismiss Defendants Silbert, Moro, and DCG from that action, dismissing only certain duplicative penal law illegality causes of action.

That court further rejected defenses that would confine DCG and Silbert's alleged role to mere re-publication of others' statements, explaining that liability may be premised on knowing participation in a scheme to defraud at the pleading stage.[51]

356.   Because no funds changed hands, Silbert and Moro had essentially papered over the massive hole in GGC's finances created by the Three Arrows Capital bankruptcy. The interest rate charged – 1.0% per annum – was unreasonable for a typical unsecured loan between distinct commercial entities.

357.   The text of the note, among other things, included: "Assignor has substantial doubts that it will be able to recover any additional amounts from TAC [Three Arrows Capital] in respect of the TAC Loans." As signatories to this contract, Silbert and Moro were thus well aware that GGC was deeply insolvent at the time the contract was signed.

358.   DCG, through Silbert and Moro, orchestrated and approved the presentation of GGC's financial condition. Silbert, Moro, and DCG knew these representations were false or acted with reckless disregard for their truth. As sophisticated corporate actors, Silbert, Moro, and DCG understood the nature of this promissory note and its impact on GGC's balance sheet because they had personally signed it. Silbert, Moro, and DCG were well-aware that Stephen,

---

[51] See People v. Gemini Tr. Co., LLC, Index No. 452784/2023 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 9, 2025)

Christopher, other consumers, and PROHASHING would rely on these statements when deciding whether to lend their assets.

359.   Upon information and belief, Silbert and Moro authorized, were aware of, or recklessly disregarded the practice of GGC personnel (such as Griffin Tiedy) disseminating financial statements and balance sheets containing the fraudulent "current asset" classification directly to clients, including Plaintiffs whom GGC records identified as residing and operating in Pennsylvania.

360.   On August 24, 2022, Moro posted on X (then Twitter) that he had resigned from his position as CEO of GGC. Ex. R at 4-5. At the time of his resignation, Moro failed to notify the public of the fraudulent promissory note that he had signed, and the actions he took at GGC before resigning were inadequate to prevent fraudulent balance sheets from continuing to be presented to GGC customers, including the Plaintiffs. Moro, when he failed to disclose the existence of the fraudulent scheme, knew or should have known that the fraudulent note would continue to be used to deceive consumers after his resignation.

### 5.  Reliance on the Fraudulent Balance Sheet

361.   On September 21, 2022, at 1:49pm EDT, while seated in front of his home computer in Pennsylvania, Stephen received an email from GGC employee Griffin Tiedy. Attached to the message was a balance sheet purporting to show

GGC's financial condition as stable. This transmission of the balance sheet by email constituted use of interstate wires in furtherance of the scheme to defraud.

362.   Stephen discussed this balance sheet with Tiedy on the same day (September 21, 2022) during a Telegram audio call. The audio call was conducted in the same room, in Pennsylvania, while viewing the fraudulent balance sheet.

363.   This document, attached to this Complaint as Ex. A, included $1.726 billion in the "other assets" row, listed under the "current assets" column. As the fraudulent $1.1 billion promissory note represented the vast majority of these "current" "other assets," the balance sheet grossly misrepresented Genesis's liquidity and solvency.

364.   Stephen talked with Tiedy during multiple other instances throughout 2022. During all calls, Stephen was located in Pennsylvania, and all discussions about the content of those calls with Christopher Sokolowski took place in Pennsylvania.

365.   At all relevant times, Tiedy failed to disclose the true nature of the promissory note and its inclusion in "other assets" under the "current assets" header in this balance sheet.

366.   On September 21, 2022, at 2:07pm EDT, Stephen forwarded this balance sheet by email to Christopher, who personally reviewed it later that

afternoon, while also located in the same house in Pennsylvania. Stephen and Christopher also reviewed it on behalf of PROHASHING.

367.    Plaintiffs, relying on the deceptive balance sheet provided to them and the overall impression that GGC's service was safe and well-capitalized, continued to lend their assets to GGC rather than withdrawing them.

368.    Plaintiffs have obtained a substantially similar fraudulent balance sheet that GGC presented to another creditor under analogous circumstances and is attached to this Complaint as Exhibit D. The second balance sheet lists "Other Assets" of $1.691 billion under "Current Assets" and is watermarked with the name of a different GGC customer. This second balance sheet, which similarly classified a long-term, illiquid promissory note as a "current asset" to create the illusion of solvency, further demonstrates that GGC's deception was not confined to Plaintiffs alone.

369.    Both balance sheets (Exhibits A and D) include a "Weighted Avg" table, which materially understated the average loan duration of GGC's loan book. The balance sheet presented to Plaintiffs (Exhibit A) stated that the "Total" average term of the loans outstanding due to GGC was just 35.5 days. This figure was impossible to reconcile with a 10-year promissory note representing roughly one-third of GGC's reported assets, since including even one such note would necessarily push the weighted average duration well beyond 35.5 days.

158

Accordingly, the Weighted Avg table was willfully misleading and intentionally manipulated to further Defendants' overall scheme to conceal the long-term, unsecured nature of the $1.1 billion promissory note.

370.   The consistency of the "Weighted Avg" table with the misclassified "current assets" further suggests that the inclusion of the fraudulent promissory note as a "current asset" was not a clerical error.

371.   Under Generally Accepted Accounting Principles (GAAP), a "current asset" is defined as an asset that is expected to be converted into cash, sold, or consumed within one year or the operating cycle of the business, whichever is longer. This definition is widely understood in the financial and investment communities and informs how investors and creditors interpret a company's balance sheet and assess its liquidity. The classification of an asset as "current" signifies that it is readily available to meet short-term obligations.

372.   The classification of the $1.1 billion unsecured, 10-year promissory note from DCG as a "current asset" was particularly critical to Plaintiffs' decision-making. Plaintiffs understood the term "current asset" to mean that such an asset could be readily liquidated or converted to cash within one year. Because the decision at hand was whether to call expiring short term loans or renew them with a term of one year, the presence of a substantial "current asset" on GGC's balance sheet assured them that the funds necessary to repay their principal at maturity

would be available. In other words, the misclassification reinforced Plaintiffs' belief that GGC would remain solvent and liquid at the time Plaintiffs' loans came due, significantly influencing Plaintiffs' decision to renew and maintain their lending relationship with GGC.

373.   Silbert, Moro, DCG, and GGC provided no meaningful risk disclosures, disclaimers, or warnings that would alert an ordinary consumer to the hidden, long-term, unsecured nature of the critical $1.1 billion promissory note they would sign, or the Enterprise's racketeering schemes, thereby ensuring that Plaintiffs remained under the misimpression that GGC was financially sound. DCG, Silbert, and Moro had a duty to warn Stephen, Christopher, other consumers, and PROHASHING of the insolvent nature of GGC's finances and failed to do so.

374.   During the Shin Interview, Stephen stated:

> So my interpretation of that was I was offering Genesis a one-year loan or considering offering them a one-year loan, and since that's a current asset, that means that all of the assets that are listed in that column should be able to be called before my one-year loan is due. And, apparently now it turns out that one of their assets is this 10-year promissory note to Digital Currency Group, and, if that was listed in the one in the current assets then obviously they do not borrow--I've never heard of them ever borrowing from a customer for 10 years.

Shin Interview, Ex. E at 4

375.    Plaintiffs also evaluated competing lending platforms and had the opportunity to transfer all assets to competing lending firms at higher rates but chose to sign long-term loans at GGC for the majority of the assets due to GGC's perceived safety and stability.

376.    During the Shin Interview, Stephen stated the following, referring to his research on Ledn, a GGC competitor:

> And, [Ledn] told me that they were doing low-risk trades and uh, they uh,--they wanted to offer a lower rate, but they wouldn't present their balance sheet to me. So, that was the reason we didn't go with Ledn. I kept asking them for that balance sheet, and they wouldn't present it to me.

Shin Interview, Ex. E at 13

377.    Plaintiffs' rejection of Ledn proves that the balance sheet was the dispositive factor in their decision-making. This negates any defense that Plaintiffs relied on "general market sentiment" rather than specific Enterprise lies.

378.    Classifying this long-term, unsecured promissory note as a current asset was a materially false and deceptive misrepresentation. Silbert and Moro, as high-level executives intimately familiar with GGC's financial structure, knew or should have known that this misclassification misled anyone viewing the statement into believing GGC was financially sound.

379.   During the Shin Interview, Stephen also referred to the promissory note's unusual structure:

> Well, I also would dispute, I mean, maybe legally you could call it a loan but I would dispute that in common language that we would call what happened there a loan. I mean… when does a loan ever involve not actually giving somebody any money, right? When I take out a loan to buy a house, they give me money and then I use it to buy the house. I don't get some promise that they'll pay for the house in 10 years.

Shin Interview, Ex. E at 14

380.   The misclassification of the promissory note on the balance sheet was so material that its absence would have made it immediately clear to a reasonable person that GGC faced significant financial instability. Had this critical misrepresentation not existed, it is highly likely that a reasonable person would have declined to lend their assets to GGC regardless of any other factors evaluated. The importance of this single factor alone would have played a decisive role in that assessment.

381.   Even if Silbert, Moro, and DCG had provided boilerplate disclaimers warning of general risks or potential volatility, no reasonable disclaimer could excuse or legitimize the deliberate and egregious misrepresentation described herein. The gross misclassification of a $1.1 billion long-term, unsecured promissory note as a "current asset" transcends ordinary risk or volatility and

instead constitutes outright fraud. Such an intentional and material deception cannot be disclaimed away by any purported notice of risk, nor would any reasonable consumer reading such a disclaimer understand it to include a massive, carefully orchestrated financial distortion of this nature.

382.   Furthermore, Silbert, Moro, and DCG failed to disclose a specific, material conflict of interest: that GGC's balance sheet was artificially inflated by assets stolen specifically from PROHASHING. Unlike other creditors, the Sokolowskis were unknowingly induced to lend additional personal funds to the very same entity that was actively suppressing their business and misappropriating its revenue. Silbert, Moro, and DCG had a specific duty to disclose this adversarial relationship to Plaintiffs before soliciting further funds.

383.   On September 26, 2022, and September 30, 2022, Plaintiffs renewed their large cryptocurrency term loans with GGC as a direct result of viewing the fraudulent balance sheet. Plaintiffs also elected to continue existing "open term" U.S. Dollar and USDC loans as a direct result of viewing the balance sheet. But for the presentation of the fraudulent balance sheet, Plaintiffs would not have renewed their loans and would have withdrawn all assets from GGC.

### 6. The Final Slide Towards Bankruptcy

384.   On October 20, 2022, Silbert sent an email to DCG and GGC employees discussing a potential merger involving DCG, GGC, and Gemini. In this message, Silbert stated:

> Good lunch with Cameron [Winklevoss, CEO of Gemini]. Tldr: he is intrigued about the idea of a closer partnership between Genesis/Gemini/DCG, including a potential merger of the companies. I put him on clear notice that the path we're on right now could lead to a Genesis bankruptcy, which would put Gemini's deposits (and therefore, Gemini's business) at significant risk. He took that part surprisingly well and appreciates we need to work together to mitigate that risk.
>
> _____
>
> NYAG Action, Doc. 45

385.   This email not only indicates that DCG and GGC were acting as a unified economic entity rather than separate corporate forms but also shows DCG's active consideration of a merger with Gemini—a company that had taken on consumer deposits from Pennsylvania residents. This further evidences Silbert's, Moro's, and DCG's willingness to restructure assets and relationships to conceal financial instability and minimize accountability all at the expense of consumers like the Sokolowskis.

386.   Further demonstrating the intertwined nature of DCG and GGC, and DCG's direct financial interest in concealing GGC's true condition, Silbert

admitted in this email that "I can't raise money at DCG if there is a Genesis bankruptcy risk." NYAG Action, Doc. 45. This statement reveals that DCG's ability to attract investors and secure funding was inextricably linked to GGC's financial stability or at least the appearance of stability. This underscores that GGC's continued operation, even while insolvent, was not merely a matter of independent business judgment but was crucial to DCG's own financial viability.

387.    Later in the same email, Silbert mentioned informing Cameron Winklevoss, CEO of Gemini, that DCG could further entangle the companies' operations by moving DCG subsidiary Grayscale's cryptocurrency assets over to Gemini's custody. Such a move, he noted, would make Gemini "the largest custody provider in the world," again demonstrating DCG's and Silbert's willingness to restructure and merge operations across multiple supposedly independent entities. NYAG Action, Doc. 45.

388.    Far from being a "hands off" holding company, DCG directly controlled and actively participated in GGC's financial affairs throughout GGC's existence. GGC and DCG engaged in complex lending and investment strategies, particularly those involving the Grayscale Bitcoin Investment Trust ("GBTC"), managed by DCG subsidiary Grayscale.

389.    On November 10, 2022, DCG, GGC, and Gemini entered into an agreement whereby 30,905,782 shares of GBTC (valued at $296 million at the

time) were pledged as collateral to secure Gemini's consumer loans to GGC.

NYAG Action, Doc. 52. This maneuver further demonstrates DCG's, Silbert's, and

Moro's willingness to disregard corporate distinctions and commingle assets across

affiliated entities.

390.   Public filings with the United States Securities and Exchange

Commission reveal the significant scale of this collateralization. Grayscale

Investments, LLC's Form 10-Q for the quarter ending September 30, 2022,

indicates that DCG, GGC, Grayscale, and CoinDesk, Inc. (another DCG subsidiary

at the time) collectively held 66,972,889 shares of GBTC. Therefore, the shares

pledged as collateral in the November 10, 2022 agreement constituted nearly half

of the entire DCG conglomerate's reported GBTC holdings.

391.   At the time GGC collapsed, the debt that DCG had incurred with

GGC, in addition to the fraudulent $1.1 billion promissory note, demonstrates that

DCG and GGC were operating together as a single financial entity. Based on media

reports from November 2022, the debt owed by DCG to GGC represented up to

50% of GGC's total assets.

392.   After GGC halted withdrawals in November 2022, DCG and Silbert

actively sought investors to provide money to save GGC from collapse,

demonstrating their full awareness and direct control of GGC's financial condition

and their attempts to directly fix the financial situation at the company they were

intimately involved with. Their failure to adequately manage GGC's assets, combined with their fraudulent activity, demonstrates that DCG and Silbert operated with reckless disregard for the safety of lenders, including the Plaintiffs.

393.   On November 21, 2022, *Bloomberg* reported:

> For the investors who were approached for the $1 billion lifeline being sought, some began to balk at the interconnectedness between the entities, according to people familiar with the discussions. Another simply said it was a matter of how these types of firms do business.
>
> _____
>
> https://www.bloomberg.com/news/articles/2022-11-21/crypto-firm-genesis-warns-of-possible-bankruptcy-without-funding, last visited Dec. 25, 2024.

394.   Significantly, the size of the "lifeline" DCG and Silbert desperately sought–$1 billion–was strikingly similar to the $1.1 billion value of the fraudulent promissory note, strongly suggesting that these efforts were a direct attempt months later to remedy the same financial shortfall concealed by the misclassification of that note.

395.   Furthermore, the fact that DCG and Silbert actively sought but ultimately failed to obtain a $1 billion lifeline for GGC from independent investors is highly telling. This inability to attract external funding suggests that the risk associated with lending to GGC was deemed too high by those outside the DCG ecosystem. Consequently, DCG's own extension of credit via the promissory note

appears less like a sound financial decision and more like a necessary action driven by the recognition that their own fortunes were inseparable from those of GGC. Alternatively, the potential investors may have been aware of the PROHASHING Scheme and recognized the danger of becoming entwined with the Enterprise and its racketeers.

396.   Upon information and belief, in or around November 2022, Silbert or another DCG representative circulated a letter to DCG shareholders discussing a "liability" to GGC of $575 million—in addition to the $1.1 billion promissory note. According to a publicly reported copy of that letter, DCG had borrowed this money from GGC "to fund investment opportunities and to repurchase DCG stock from non-employee shareholders."[52] Plaintiffs do not presently possess a copy of this shareholder letter but intend to obtain it in discovery. This new information—if confirmed—further evidences that DCG was using GGC as a source of capital for its own benefit, consistent with Plaintiffs' allegation that DCG and GGC functioned as a single commingled entity rather than independent corporate entities.

397.   The existence of multiple additional loans from GGC to DCG and DCG subsidiaries totaling $575 million is corroborated by loan term sheets

---

[52] *X post by @Tier10K, Nov. 21, 2022, available at https://x.com/tier10k/status/1595140018871631873, last visited Dec. 25, 2024.*

contained in the Genesis Bankruptcy Action, Doc. 680, Exhibits 1-7 and Doc. 681, Exhibits 1-5.

398.    The sheer volume of intercompany transactions, including DCG's multi-billion-dollar loans to GGC, coupled with DCG's hands-on orchestration of GGC's strategic decisions, demonstrates that DCG, GGC, and other DCG subsidiaries operated as a single financial enterprise rather than as truly distinct entities. Internal communications reveal that DCG executives—often without GGC's own management's knowledge—unilaterally considered drastic measures such as "jettisoning" GGC, merging its assets with other DCG affiliates, or orchestrating a so-called "Shock & Awe" plan to restructure GGC and pursue an eventual IPO. DCG's own recognition of the need to "ensure best defenses against veil piercing" underscores that it was aware its direct oversight, asset-shuffling, and disregard for corporate formalities could subject DCG to liability for GGC's debts. By exercising near-complete control over GGC's finances, planning massive inter-subsidiary transfers, and misclassifying a $1.1 billion promissory note as a current asset, DCG effectively intermingled funds and personnel across multiple business lines. This lack of corporate separateness deliberately exposed Plaintiffs—who believed they were dealing with a solvent, standalone lender—to undisclosed risks, thereby causing them injury when GGC ultimately collapsed.

399.   When GGC declared bankruptcy, the Plaintiffs' personally owned cryptocurrency assets and U.S. Dollars—which would have been withdrawn or placed elsewhere but for Silbert's, Moro's, and DCG's deception—were lost or severely diminished.

### 7.  Monitored Telegram Chats and Destruction of Evidence

400.   In a Telegram chat message between GGC employee Hanson Birringer and Stephen on December 5, 2022, Birringer stated "our work telegrams are monitored" when Stephen requested GGC's address to serve legal documents. Exhibit I. It can be reasonably inferred that these monitored Telegram chats are in the possession of GGC, DCG, Silbert, or Moro and will provide additional evidence establishing, among other things, personal jurisdiction, the state of mind of Silbert, Moro, and DCG, and the egregious nature of the conduct that supports treble damages against all of them. Upon information and belief, these monitored Telegrams will also contain discussion about the PROHASHING Scheme and the payments and associated actions required to execute it.

401.   After the Fraudulent Balance Sheet Scheme was revealed, several GGC employees deleted their Telegram accounts and chats. Upon information and belief, discovery will reveal that GGC employee Griffin Tiedy controlled one of the "Deleted Accounts" referenced in the Exhibit F Telegram chats.

### D  Scheme 3: The Jefferies Claim Sale Scheme

#### 1.  Summary

402.   In this scheme, the Jefferies Defendants, Xclaim, Glantz, Silbert, and DCG conspired to manufacture a cloud over the title to the claims brought in this case by executing a fraudulent bankruptcy claim sale that purported to assign rights they knew the contract's signatory, CM LLC, never owned. The Jefferies Defendants would then adopt a position of "strategic ambiguity" by refusing to disclaim those unassigned rights. The purpose of the scheme was to deter Plaintiffs from suing Enterprise members and discovering the truth of Digital Gold.

#### 2.  Background

403.   Prior to the advent of artificial intelligence tools, which did not become capable enough for use in the field of law with the release of OpenAI's GPT-4 (April 2023), Stephen possessed limited knowledge of the law and legal principles.

404.   Defendant Silbert is not a naïve cryptocurrency entrepreneur who stumbled into bankruptcy and claims trading issues. He began his career as an investment banker at Houlihan Lokey, Howard & Zukin, Inc., a premier restructuring adviser that represents creditor groups in complex Chapter 11 cases.

In sworn Congressional testimony, Silbert stated that, while at Houlihan Lokey, Howard & Zukin, Inc., he "worked on some of the most prominent bankruptcies of the last decade, including Enron and WorldCom."[53] After he left Houlihan Lokey, Howard & Zukin, Inc., Silbert founded SecondMarket, Inc., which he testified had "added markets for structured products (e.g., auction-rate securities, mortgage-backed securities, etc.), bankruptcy claims, and private company stock," completing "several billion dollars in trades" across those asset classes.[54] Silbert testified that this experience with post-confirmation distributions to creditors in Chapter 11 cases "led [him] to the idea for SecondMarket." Contemporary reporting and regulatory materials likewise describe SecondMarket as an electronic trading platform that specialized in illiquid assets—including bankruptcy claims—by acquiring "trade receivables exchange" and operating a marketplace where thousands of bankruptcy claims worth billions of dollars changed hands.[55]

405.    By the time of the fraudulent claim sale scheme alleged in this Complaint, Silbert thus had decades of experience in Chapter 11 restructurings and in structuring, marketing, and closing trades in bankruptcy claims and other

---

[53] Written Testimony of Barry E. Silbert, Founder & CEO, SecondMarket, Inc., Before the H. Comm. on Oversight & Gov't Reform, 112th Cong., at 2–3 (Dec. 14, 2011).

[54] Id. at 3–5.

[55] Nasdaq Private Market (formerly SecondMarket) entry, describing SecondMarket's June 2008 entry "into the bankruptcy claims market" through its acquisition of trade receivables exchange; Reuters, *Bankruptcy Claims Trading at Record High in April* (May 5, 2010) (noting that SecondMarket "runs a trading platform for bankruptcy claims and other illiquid assets")

distressed obligations—and he knew exactly how a claim sale contract can be drafted and used to shift control of litigation rights.

406.   The participation of Silbert and DCG in the Jefferies Claim Sale Scheme can be inferred by the actions of their attorneys, non-party Davis Polk and Wardwell LLP, which would later accuse the Sokolowskis of having committed "criminal bankruptcy fraud" in this case (ECF No. 37 at 2), and the action of their "aligned" allies (Genesis Bankruptcy, ECF No. 2217 at 8 n.7), the Genesis Debtors in the Falco AP. Were DCG and Silbert truly independent parties, they would have had no reason to believe that the bankruptcy claim sale was not a standard transaction in these briefs.

407.   To sell CM LLC's bankruptcy claims, Stephen contacted representatives of claims sale "marketplaces." These marketplaces serve as intermediaries in the trade of claims against bankrupt estates and allow holders of claims to obtain immediate lump-sum payments for bankruptcy claims that may otherwise be paid out years in the future. One of these marketplaces is Defendant Xclaim, Inc., which had its website at x-claim.org. The owner and representative of Xclaim, who facilitated the bankruptcy claim sale at issue, was Defendant Andrew Glantz.

408.   Glantz and Xclaim also hold themselves out as subject matter experts on what "standard" bankruptcy claim sale contracts look like and how they are

used on electronic trading platforms. In February 2024, restructuring attorney Sam Ashuraey (acknowledging "helpful comments and insights" from "Andrew Glantz, Chief Strategy Officer at X-Claim") published an article on Xclaim's website titled *Navigating Your Claim Sale: From Finding the Best Price to Negotiating Trading Agreements Like a Pro*. This article explains that modern claim-trading platforms allow buyers and sellers to transact on "frequently used form documentation," describes in detail how typical claim transfer contracts allocate recourse and non-recourse risk, and states that platform "form contracts" are intended to reflect "middle of the road" terms that do not favor either buyer or seller and focus on transferring the seller's right to payment from the debtor together with related rights under the proof of claim.[56]

409.   By publicly sponsoring and contributing to this guidance—and by marketing the Xclaim marketplace as a platform where creditors "transact on standard documents" and sign a "transfer of claim contract" for claim trades, Glantz cannot plausibly claim ignorance of neutral, "market standard" claim sale documentation. Glantz also cannot plausibly claim he was unaware that he was steering CM LLC into what will later be shown was a bespoke, one-sided contract

---

[56] Sam Ashuraey, *Bankruptcy Claim Sales: Overview, Crypto and Claim Trading Platforms* (Feb. 14, 2024), https://www.x-claim.com/blog/navigating-your-claim-sale.

that radically departs from those norms and that his behavior was inadvertent, not knowing and deliberate.

410. To refresh, as part of the onboarding process with the near-bankrupt GGC, Stephen, Christopher, PROHASHING, and non-parties provided sensitive information and KYC/AML data (see Section VII(A)) that identified CM LLC as a passthrough entity which GGC had induced the creation of.

411. After GGC had failed to send approximately $500,000 that Stephen requested on behalf of CM LLC in a withdrawal request on November 11, 2022 at 9:30am (Ex. Z), Stephen, having obtained permission from CM LLC's passthrough lenders, stated publicly that he intended to sell CM LLC's bankruptcy claims against GGC and BlockFi (another cryptocurrency lender). Discovery will reveal that these posts exist on the servers of Reddit, blocked behind the bans of the Enterprise's aligned moderators (see Section VIII(A5)).

412. Plaintiffs, at the time of this scheme, owed approximately $300,000 to Wells Fargo Bank, N.A., collateralized against their long-term stock portfolio, because of a June 2, 2022 home purchase. Plaintiffs had expected to be able to withdraw US Dollars from GGC to repay that loan. Without the ability to withdraw US Dollars from GGC, the Plaintiffs were exposed to potential liquidation of their long-term stock holdings at a low valuation. Because Stephen had posted publicly about his financial issues and the need to sell the claim (Ex. R at 6-10), Glantz,

Xclaim, DCG, Silbert, the Jefferies Defendants, and the Enterprise in general were aware of Stephen's vulnerability.

413.    While the Claim Sale and Purchase Agreement formally names Jefferies LCP as "Buyer," Jefferies LCP is an indirect wholly-owned subsidiary of Defendant Jefferies FG, and Jefferies FG has voting and investment power over assets held by Jefferies LCP. The Agreement's extraordinary, non-market provisions—its "existence" secrecy, its litigation control "direction of and on behalf of" mechanism, and its forfeiture/remission language keyed to 28 C.F.R. Part 9—are not the kind of routine boilerplate a small affiliate drafts or deploys without meaningful institutional oversight. Upon information and belief, these provisions were reviewed and authorized through Jefferies FG's centralized legal/compliance and litigation-risk functions operating for the benefit of Jefferies FG and its Jefferies affiliates, and were adopted to convert a simple bankruptcy claim purchase into an enforceable-looking instrument of intimidation and obstruction aimed at suppressing discovery into earlier Enterprise wrongdoing.

The "control" provisions demonstrate that the Jefferies Defendants were not simply passive co-conspirators. They sought to actively control the Enterprise's affairs by directing the litigation rights the contract purported to assign.

### 3. The Transaction

414.    In early 2023, Stephen, acting on behalf of CM LLC, began talking with Defendants Xclaim and Glantz regarding the sale of CM LLC's bankruptcy claim against GGC.

415.    Concurrently, Stephen informed Glantz that PROHASHING was not successful and that he wanted to sell the company. On January 10, 2023, Glantz acknowledged that he had been informed of the desire to sell PROHASHING. Therefore, Glantz and Xclaim were fully aware of PROHASHING's financial difficulties (which, unbeknownst to Stephen at the time, were caused not only by the Fraudulent Balance Sheet Scheme but also by the PROHASHING Scheme):

> I have not yet pitched the idea of selling your business. That's a potentially more complicated deal structure that we can pivot to if the bids that come in are not sufficiently enticing or buyers are wary of execution risk related to transferability issues.

Ex. M, Message from 10 Jan at 23:57:17

416.    On January 12, 2023, Stephen also notifies Glantz about the Fraudulent Balance Sheet Scheme: "I do have documents, and also have evidence that the documents were fraudulent." Ex. M, Message from 12 Jan at 05:59:55.

417.    Therefore, Glantz and Xclaim had knowledge of both prior predicate acts and had ample opportunity to inform the Jefferies Defendants of these acts; the

notice was made 15 days before Stephen notified Jefferies LCP of the Fraudulent

Balance Sheet Scheme himself on January 27.

418.    Later that day (January 12, 2023), Stephen **clearly, precisely, and**

**unequivocally** informed Glantz and Xclaim that CM LLC was not an operating

business, and that he was willing to educate his buyers on how CM LLC worked:

> "If it would help, feel free to schedule education sessions with
> me and your buyers. I can teach them about anything you
> would like - from trading, to my experiences with Celsius, how
> our fund worked, to the financials of the companies, to who is
> committing the fraud, to mining, or whatever else they want to
> know."

Ex. M, Message from 13 Jan at 13:26:45

419.    Even later on January 12, 2023, Glantz, operating on behalf of

Xclaim, notified Stephen of an offer by Jefferies LCP to purchase CM LLC's

bankruptcy claim. Glantz stated that Jefferies LCP wanted to meet with Stephen on

January 13, 2023 at 1:00pm EST via video call to ensure that CM LLC was

comfortable with the deal. Ex. M, Message from 12 Jan at 16:24:21. At the time,

Stephen found it unusual that, for a simple transaction of an abstract asset (a

bankruptcy claim), the buyer would want to have a video chat with the seller, but

Stephen took the call anyway.

420.    The meeting was moved forward by one hour and held at 12pm EST.

Stephen will testify that the call was brief and awkward. The call was attended by

Glantz and approximately four representatives from the Jefferies Defendants. Non-party Matthew Aronsky was invited to and attended the call. Ex. M, Message from 12 Jan at 16:24:21. As Stephen had previously thought, there seemed to be no reason to have a lengthy video conversation to discuss a simple transfer of money for a bankruptcy claim to what appeared at the time to be a trustworthy major financial institution. At one point, the other parties asked Stephen if he had any questions, and he stated he had none. Upon information and belief, this call was structured as a live meeting (rather than written diligence) to evaluate Stephen's sophistication and to reduce the creation of written evidence concerning (i) the unusual scope of "rights" the Jefferies Defendants sought to obtain, (ii) Plaintiffs' and other creditors' fraud allegations and red flags concerning the Enterprise's prior activities, and (iii) the extent of the knowledge of Stephen about the Enterprise's racketeering activities.

421.    On January 15, 2023, Stephen, who at the time was unaware of the PROHASHING scheme, the Enterprise's involvement in the Block Size War, the decade-long harassment campaign, and the Enterprise's racketeering activities, made an offhand comment about forcing GGC into an involuntary bankruptcy with the help of other creditors who were aligned with CM LLC. Ex. M, Message from 15 Jan at 08:31:31. GGC had defaulted on the passthrough loans of CM LLC and stopped processing its withdrawals on November 11, 2022, but two months later

had not filed for bankruptcy or provided any public statements on how any of its lenders would recover their funds, leaving involuntary bankruptcy as possibly the only way to recover from the company.

422.    Glantz, in response, wrote seven paragraphs warning Stephen against forcing an involuntary bankruptcy. Ex. M, Message from 15 Jan at 09:29:13. Unknown to Stephen at the time, a chaotic involuntary bankruptcy would have prevented DCG and its allies from selecting the forum and other parameters of the Genesis bankruptcy, and without that selection, discovery into the Enterprise's prepetition misconduct—including the Fraudulent Balance Sheet Scheme and, as later discovered, the PROHASHING Scheme and the true nature of the Digital Gold narrative—was far more likely to occur.

423.    In his message, Glantz included a threat about sanctions from the Bankruptcy Court—the exact same threat about sanctions in the same exact court that would later be recycled repeatedly by DCG in its motions in the instant case:

> Filing an involuntary bankruptcy also comes a fair bit of risk for you in terms of possible sanctions so I would discuss this carefully with your lawyer before going down that path.

Ex. M, Message from 15 Jan at 09:29:13

424.    This threat suggests that Glantz (unlike Stephen) was aware of the Enterprise's racketeering. It also is strikingly similar to DCG's legal strategies (e.g.

ECF No. 37, at 4) despite Glantz, Xclaim, and the Jefferies Defendants seeming to be independent of DCG.

425.　Stephen will testify that at no time during any of the contract negotiations in the fraudulent claim sale scheme was he aware of or did he mention the PROHASHING Scheme, the Block Size War, or the harassment campaign, because despite his intense diligence, he had not discovered the PROHASHING Scheme yet.

426.　Later that day, Stephen stated "I'd love to be able to simply dissolve the company and move on," requesting protection from clawbacks given that CM LLC was a passthrough entity that did not possess its individual lenders' tort claims. Ex. M, Message from 15 Jan at 16:10:33. However, the actual claim sale agreement (the "Agreement") misleadingly contained a clause stating that CM LLC is prohibited from dissolving essentially indefinitely, demonstrating that the Agreement was a predatory instrument arranged by Glantz, Xclaim, and the Jefferies Defendants, and did not represent a "meeting of the minds":

> Seller shall not wind-down, liquidate dissolve, merge, or enter into any insolvency or restructuring proceeding, either voluntarily or involuntarily, until such time as: (a) the Claim is fully and finally allowed in the Proceedings; and (b) any obligations or liabilities relating to or resulting from the Prepetition Withdrawals, if any, are fully and finally resolved.

Ex. N, Agreement, Section 15(a)

427.   The Agreement's non-dissolution requirement was not a neutral "anti-dissolution" covenant. Glantz, Xclaim, and the Jefferies Defendants already knew that (i) CM LLC was a passthrough vehicle for multiple lenders (not a real operating company) (see Paragraph 418), and (ii) Plaintiffs were asserting serious fraud arising from GGC's prepetition solvency communications (the Fraudulent Balance Sheet Scheme). In that context, Section 15(a) functioned as an enforcement lever: it ensured that the passthrough entity could not be dissolved and would remain available for Defendants to invoke as a vehicle for manufactured standing/ownership disputes and contractual "control" over Plaintiffs' fraud claims, including UTPCPL claims.

428.   Throughout the negotiations, Glantz stated that he was working to get CM LLC a deal to sell its unrelated claim against the BlockFi bankruptcy estate (Ex. M, Message from 12 Jan at 18:24:43), but while Xclaim did have a dedicated webpage for selling BlockFi bankruptcy claims (Ex. M, Message from 10 Jan at 23:57:17), Glantz repeatedly asserted that there were no buyers for CM LLC's BlockFi bankruptcy claim, and later, presented multiple buyers who backed out on the proposed deals. CM LLC never sold its BlockFi bankruptcy claim.

429.   Later on January 18, 2023, Glantz acknowledged that Stephen had "imperfect information" and would have to make a decision about Jefferies LCP's offer with that limited knowledge:

Right. But the AR [accounts receivable] discount is the big unknown and that's what the buyers are having trouble with. Anyway, I heard from Jefferies that they don't want to bid on BlockFi at all right now. So I'm afraid you'll need to make a decision about their Genesis offer with imperfect information unless you got an offer from Vlad [a representative of Xclaim competitor Cherokee Acquisition].

Jefferies is asking that we get to a deal in principal tomorrow. They're offering a really attractive deal on Genesis [GGC] and i think you should think carefully about that before letting it slip away.

Ex. M, Message from 18 Jan at 21:38:11

430.    A chain of emails between Glantz and Stephen details the pressure campaign Glantz and Xclaim exerted upon Stephen on January 19, 2023. Stephen starts by acknowledging Jefferies LCP's time pressure and the nature of CM LLC's passthrough design:

Thanks for working with us. I understand that Jeffries is under time pressure, but I can't make a decision right now because all of the people in the fund aren't yet awake. Some of them work the night shift at our mining pool and won't be awake until the evening. I will definitely talk to them immediately when they wake up.

Ex. M, Message from 19 Jan at 11:15:02

431.    This communication with Glantz shows that the passthrough nature of CM LLC was again **clearly, precisely, and unequivocally** communicated to Glantz. Glantz, therefore, knew about how CM LLC and its lenders were

structured, and, despite that, as demonstrated in Subsection 5, *supra*, attempted to erroneously frame CM LLC in the contract as the beneficial owner of the depositors' assets.

432.    In this email chain, after Stephen asked for a second bid to compare prices, Glantz stated that he has another bidder who "doesn't understand the balance sheet." Ex. M, Message from 19 Jan at 09:08:00. Glantz stated that "More info comes out every day on genesis and they're threatening to pull the deal," adding to the pressure campaign. Id. Stephen asked to evaluate the balance sheet with Glantz in a call, which Glantz attended after stating that Jefferies LCP is "asking for an answer by mid day," (Id.) and later "Can you commit to an answer by 2pm ET," Ex. M, Message from 19 Jan at 10:09:51. Glantz then requested that Stephen call him by phone. Ex. M, Message from 19 Jan at 10:12:41. Stephen will testify that during this call, which was upgraded to a Zoom video call, Glantz refused to spend any significant amount of time evaluating GGC's balance sheet, instead indicating to Stephen that there would always be uncertainty in the valuations and that a good deal was already on the table.

433.    On January 19 at 08:38am, Glantz stated that he had a new buyer who was interested. Ex. M, Message from 19 Jan at 08:38:29. Glantz put Stephen in contact with this new buyer—Thomas Braziel, a managing partner at 507 Capital.

Ex. M, Message from 19 Jan at 10:48:01. Before this call, Stephen wrote to Glantz

regarding Jefferies LCP's offer:

> So far, the calculations are going well and it seems unlikely that
> tax issues or disagreements over distribution amounts will kill
> any deal. The main concern at this moment is that we don't have
> a way to evaluate whether Jeffries' offer is fair, since there are
> no other offers. If this second buyer is interested in Genesis
> [GGC], even if he offers a low bid, that would increase our
> chances of closing the deal.

Ex. M, Message from 19 Jan at 08:52:57

434.   This reiterated Stephen's stance, previously stated on January 13, that

he would not close a deal without seeing a second offer. Ex. M, Message from 13

Jan at 13:24:03. At 12:14pm, while the discussion with Glantz was occurring,

Braziel contacted Stephen with an alternative offer. Braziel stated:

> Hey Steve - thanks for chatting earlier and great to connect.
> Given the limited disclosure, we have to stay conservative and
> offer 15% subject to DD [due diligence] and final
> documentation. If you wanted to circle back in a few months its
> likely our pricing would improve, but currently this is where the
> CIO [chief information officer]'s head is.

Ex. M, Message from 19 Jan at 12:14:50

435.   Braziel's offer of 15% was significantly below Jefferies's 25% offer.

This strongly suggested both that Jefferies possessed material non-public

information and also that the Enterprise was willing to pay nearly double the rate

of other uninformed buyers to obtain the CM LLC bankruptcy claim – as Braziel himself admitted that he had "limited disclosure." Additionally, Glantz and Xclaim, as experienced traders, knew or should have known that the dramatic difference in price between Braziel's offer and Jefferies's offer was a strong indication that Jefferies was in possession of such non-public information.

436.    As the discussions regarding the fraudulent claim sale were ongoing, the price of bitcoin hovered around $20,800. Jefferies LCP, during the negotiations, offered to value the bankruptcy claim at a higher bitcoin price of $21,000. Stephen agreed to this valuation, given that it was higher than the current price. At the time of the bankruptcy filing, the price of bitcoin ended up being exactly $21,055.10.

437.    On January 19, 2023 at 4:05pm EST, Benjamin Hirsch, representing Jefferies LCP, states:

> Cryptocurrency Management LLC (CM) will agree to Jefferies' purchase of their claims against the Genesis entities at a stipulated claim value of $4,000,000.00 at a purchase price of 25% ($1,000,000.00). The claim purchase will include an assignment of all rights associated with the claim, including all potential preference liability as disclosed to Jefferies during the diligence process (see detail and limitations in trade confirmation below).
>
> ───────────────────────────────
>
> Ex. M, Message from 19 Jan at 16:05 (included in message from 19 Jan at 16:31:38)

438.   This email led to Stephen, acting on behalf of CM LLC, agreeing to the deal in principle. Hirsch, in this message, indicates that the sale would include assignment of rights "associated with the *claim*"—derivative rights of the estate, not any tort rights—as would occur in standard bankruptcy claim trades. Of course, the actual final contract purports to assign much more than Hirsch's misrepresentation.

439.   Jefferies LCP is not a retail "claims trader" operating in the dark; it is a sophisticated broker-dealer with a distressed credit practice. Upon information and belief, Jefferies LCP received Plaintiffs' balance sheet fraud allegations and supporting materials from Glantz/Xclaim and/or directly from Plaintiffs during diligence. Thus, when Jefferies LCP insisted that any trade include an "assignment of all rights associated with the claim" and then demanded execution of a bespoke contract reaching beyond the bankruptcy claim itself to future litigation and third-party "controlling persons," the Jefferies Defendants were not merely buying a right to plan distributions; they were seeking leverage over Plaintiffs' Fraudulent Balance Sheet Scheme claims and other litigation rights, and knowingly joining the Enterprise's effort to suppress discovery and accountability for that fraud. Even if the Jefferies Defendants claim that they had no knowledge of the PROHASHING Scheme, discovery in the Fraudulent Balance Sheet Scheme alone would have

revealed the Digital Gold truth the Enterprise, of which the Jefferies Defendants were a part, was fighting to protect.

440.   Stephen hosted weekly sessions of the board game Dungeons and Dragons on Tuesdays. Stephen will testify that on January 19, 2023, as the weekly game was starting at 5:00pm, Glantz continued to pressure Stephen to close the deal in principle. Stephen told five player witnesses, two of whom were CM LLC passthrough lenders, about how Glantz needed the deal to be closed quickly, joking "we just signed a million-dollar deal during a D&D [Dungeons and Dragons] game." The deal was then agreed to in principle at 5:01pm that day when Stephen responded "Agreed" to Glantz's emails. Ex. M, Message from 19 Jan at 17:01:39.

441.   This verbal commitment served as the method by which the Enterprise manipulated Stephen into signing the Agreement despite his later objections to its terms and its trivial mistakes like sloppy proofreading.

442.   On January 19, 2023 at 11:11:01pm, the Genesis Debtors filed for bankruptcy, just six hours and ten minutes after the fraudulent claim sale had been agreed upon verbally. Upon information and belief, the timing of the bankruptcy filing and the pressure on the fraudulent claim sale were related—either Jefferies LCP had material non-public information about the timing of the filing, or it can also be inferred that DCG, Silbert, and the Genesis Debtors coordinated to delay the bankruptcy filing until the claim sale could receive the verbal commitment due

to the importance of Stephen's, Christopher's, and PROHASHING's tort claims that this scheme was designed to chill.

443.    Stephen had previously communicated to Glantz on January 12 that he had received leaked information that the Genesis Debtors would file for bankruptcy on January 13 (Ex. M, Message from 12 Jan at 06:59:55). This message did not result in any pressure to close a deal before that deadline, unlike the pressure on January 19 hours before the Genesis Debtors actually did file for bankruptcy.



Figure 2: Price of bitcoin in mid-Jan. 2023

444.    By 10:00am the day after the Genesis Bankruptcy filing, the price of bitcoin began to rise; by 6:00pm that day the price had reached $23,200, a 10% increase. See Figure 2. Had the claim sale been agreed upon after the delayed

bankruptcy filing, its value, based upon the estate potentially paying in-kind recoveries, would have been significantly higher. Upon information and belief, Jefferies LCP, DCG, Glantz, Silbert, and Xclaim knew that the price of bitcoin would rise after the bankruptcy filing; or in the alternative, coordinated to suppress the price of bitcoin until the trade was agreed upon—in either case, the sale was an insider trade.

445.   On January 20, 2023, Stephen, in another email chain, admits: "I have never issued a W9 form and don't know much about what they are"—both demonstrating the information asymmetry between CM LLC and the Defendants, and also that CM LLC was not an operating business with independent employees, profits, or business deals.

446.   On January 21, 2023, Stephen emailed Glantz about an appearance he intended to make on Laura Shin's "Unchained" Podcast, and an interview with the news organization Reuters. The transcript of the podcast appearance, which occurred on January 30, 2023, is included in Exhibit E. In this message, Stephen asked Glantz: "Would Jefferies like to remain anonymous, or would they like me to talk about how they were great to work with?" Glantz replied:

I would prefer you just mention us. I doubt jefferies wants a
bunch of small creditors who may be following trying to go to
them directly. And the deal hasn't closed yet so better not to
talk specifics of the price you got or the details of your claim. **I
would also refer to what you agreed to sell as your "claim"
against Genesis rather than your loan. That's how it will be
documented.**

Ex. M, Message from 21 Jan at 19:10:16 (emphasis added)

447.    This message is strong circumstantial evidence of scienter: Glantz was

not merely facilitating an arm's-length trade; he was actively managing Plaintiffs'

public speech and press contacts to prevent premature disclosure of the deal's

price, structure, and parties, and to frame the transaction as a mere sale of a

"claim" rather than a broader transfer of rights. Ex. M, Message from 21 Jan at

19:10:16. This "recommendation" from Glantz occurred **before** Jefferies LCP had

sent the fraudulent Agreement's text to Stephen, demonstrating that the

conspirators were designing the Agreement text to achieve their fraudulent

objectives, rather than recharacterizing a contract that already existed.

448.    Glantz and Xclaim preferred that the word "loan" not be used because

standard bankruptcy claim sale contracts trade claims, not the full "loan." The

"notice of transfer" that Jefferies LCP posted on the Genesis bankruptcy docket

(Genesis Bankruptcy, ECF No. 50) intentionally omits some of the other personal,

non-assignable rights that the Enterprise knew could not be assigned but was

fraudulently attempting to convey, and to convince Stephen they could be conveyed, with the Agreement.

449.   Upon information and belief, Glantz, working on behalf of Xclaim, also preferred that Stephen not talk about the price of the claim because the price was far higher than the competing price offered by Braziel's firm, which, presumably, was the actual market rate for Genesis claims at the time. The higher price might have caused the public to question why this particular trade was purchased by Jefferies LCP at that price.

450.   On January 24, 2023, Stephen contacted Glantz regarding some discrepancies in the data CM LLC provided to Glantz regarding the filing of the bankruptcy proof of claim. For a reason (possibly a mistake) Stephen is not aware of, Jefferies LCP and Glantz appeared to have received different figures to be listed on CM LLC's bankruptcy claim form. Stephen, acting on behalf of CM LLC, states "If this is not simply a data entry error... I think it would be difficult for us to move forward with this deal." Ex. M, Message from 24 Jan at 09:25:57. Hearing that Stephen had concerns about the deal, Glantz immediately moved to communicate off the record. Before taking the call, Glantz warns about the January 19 verbal statement: "*You made a binding agreement.* If an adjustment needs to be made to the purchase price, we can work through that." Ex. M, Message from 24 Jan at 13:17:27 (emphasis added)

451.   Instead of modifying the sale price, Glantz, Xclaim, and Jefferies LCP accepted a *reduction* of over one bitcoin in the bankruptcy claim – a more than 1% loss in valuation – free of charge. Since a typical purchaser who was interested primarily in the claim value itself would demand compensation for this error, the allowance of this change in valuation suggests that, while the Enterprise certainly used insider trading to profit from the runup in the price of bitcoin after the delayed bankruptcy, the Enterprise's primary goal in purchasing the claim was not to make money.

452.   On January 26, 2023, Stephen emailed Jefferies LCP and Glantz. In this message, Stephen complained about how an Agreement draft was unreadable, and about the behavior of Aronsky and Jefferies LCP's claims trading desk:

> They wanted an in-person meeting, but what I'm trying to get across to them in a nice way is that they sent us a contract that was pasted together from legal templates, and that it's a mess. The numbers aren't right, it contradicts itself on multiple issues, there are grammar mistakes, and so on. They want me to spend time with them on the phone, or even spend money on a lawyer, when the main issue is that they need to proofread.
>
> If you can get this point across to them somehow, that would be great. There may not be any actual issues here, it's just that I can't understand what they want because whoever created this document didn't make even a cursory glance to correct obvious errors.

Ex. M, Message from 26 Jan at 08:14:54

453.   The number of obvious grammatical errors in the draft Agreement and its poor formatting indicates that the Agreement was not a standard template, which would have been written and proofread years before and copied repeatedly. Upon information and belief, the Agreement was intentionally made difficult to understand to hide the most important (to the Enterprise) clauses.

454.   A contrasting contract, agreed to between Stephen in his individual capacity and bankruptcy claims purchaser Cherokee Acquisition, shows the stark differences between Cherokee Acquisition's form-like bankruptcy claim assignment and Jefferies LCP's cut-and-pasted "Claim Sale and Purchase Agreement." This contrasting contract is included as Ex. O. The Cherokee Acquisition contract, unlike the Jefferies LCP's Agreement, contains no reference to any of the aggressive terms the Enterprise created to intimidate Plaintiffs.

455.   In response to Stephen's criticism, Glantz dismissed the Agreement's problems as minor:

> What you're asking Jefferies to do is to fix the typos and grammar first before dealing with your bigger points. I suggest speaking to them about the bigger points this morning, letting them come back to you with a revised draft and then dealing with the typos and grammar on the final turn in consultation with your lawyer.

Ex. M, Message from 26 Jan at 08:41:09

456.   Glantz knew or should have known that Stephen could not afford to have an attorney spend hours reviewing the Agreement because Stephen stated as much publicly in multiple instances (e.g. Ex. R at 6-10).

457.   To get the Agreement signed, Glantz then stated:

> I wouldn't waste your energy picking apart Jefferies' form…. **These things rarely get litigated** and Jefferies is well known, solid actor in the market. They're not playing any games here. They just want to move quickly and may not be paying as close attention to the details as you (rightly) are.

Ex. M, Message from 26 Jan at 08:41:09 (emphasis added)

458.   Frustrated, Stephen then railed against Glantz about Jefferies's problems and indicated he would not move forward without fixes:

> That contract was a mess; they didn't even bother to spell USDC correctly. It doesn't reflect well upon them to be putting out documents like that. … I can't be dealing with their proofreading errors and spending so much time on this anymore; I've already worked 10 hours every single day, including Christmas, since November 11 and still can't get enough done.
>
> I need to take my mom to the hospital right now for her surgery and then spend a few uninterrupted hours on employee performance reviews. When I get something that isn't contradictory, has accurate numbers, and isn't missing words, I think we can move forward very quickly.

Ex. M, Message from 26 Jan at 09:02:15

459.   In the next response, Glantz then attempts to suggest Stephen have his attorney speak with the Jefferies Defendants' attorneys directly. Stephen will testify that another reason (besides the cost) that he did not contact an attorney at that time was because the Agreement was so disorganized that he felt the problem was not legal but simply that the draft was unprofessional and required corrections:

> I'm not saying you don't deserve a proper contract, I'm just suggesting that you let your lawyer speak directly with Jefferies lawyer to hammer out the substance first and then deal with the nits. Again, your email to them was fine and let's see what they say.
>
> ---
> Ex. M, Message from 26 Jan at 09:15:00

460.   Jefferies LCP, in this chain, again requested an in-person meeting— which, like the previous in-person (video) meeting, would generate less paper evidence of discussions for this action. These multiple requests for in-person communication demonstrate scienter for the Jefferies Defendants, which knew that the transaction was fraudulent and upon information and belief wished to limit the generation of evidence.

461.   The Agreement was signed by Stephen, in his capacity as owner of CM LLC, on January 27, 2023. Before Jefferies LCP signed the Agreement, Stephen sent Jefferies LCP a copy of all of the documents associated with the Jefferies Claim Sale Scheme, thus demonstrating that the Jefferies Defendants were

fully aware that a prior predicate act had occurred before they signed the

Agreement:

> Please download any documents you need from
> https://shoemakervillage.org/068d7853-07f4-4283-91c1-
> 203f8a070281/. After our BlockFi claim has been sold, I may
> archive that site offline. You should probably also download
> their fraudulent balance spreadsheet and that image of their
> employees trying to cover up what happened.
>
> _____
>
> Ex. M, Message from 27 Jan at 08:54:44

462.    Benjamin Hirsch, on behalf of Jefferies LCP, responded: "Thank you

for sending this over and granting us account access," providing an unequivocal

acknowledgment that the Jefferies Defendants had received the notice of a prior

predicate act. Ex. M, Message from 27 Jan at 16:10:43. Jefferies LCP signed the

Agreement, with its unusual clauses (such as the "DOJ forfeiture" clause), anyway

on this same day.

463.    On January 30, 2023, Jefferies LCP posted a "Notice of Transfer of

Claim" to the Genesis bankruptcy docket. Genesis Bankruptcy, ECF No. 50. The

Notice of Transfer, which appears to be a form similar to many of the other similar

notices Jefferies LCP posted to the Genesis Bankruptcy docket, does not include

the full scope of what the Enterprise attempted to convey in the non-standard

Agreement.

464.   On February 2, 2023, Glantz acknowledged, during a discussion about selling CM LLC's BlockFi bankruptcy claim, a long history of case law on "anti-assignment provisions," demonstrating Glantz's knowledge of and familiarity with assignment law:

> There is a long history of case law on anti-assignment provisions and whether such provisions can be enforced in bankruptcy. Of course none of that case law has been tested in the crypto context or litigated here in this case so there is some uncertainty around the issue. I'm sure you will want to discuss with your attorney as well. We of course cannot advise either you or the buyer on these issues.
>
> _____
> Ex. M, Message from 2 Feb. at 22:57:22

465.   On the same day (February 2, 2023), the Jefferies Defendants declined to bid on the BlockFi claims, supporting the inference that the Jefferies Claim Sale Scheme was intended to suppress discovery into the Enterprise: "Hi Steve, Jefferies has declined to bid on your BlockFi claims. They appreciated working with you but just aren't sufficiently interested at anything close to your level right now." Ex. M, Message from 2 Feb at 12:06:17,

466.   On February 10, 2023, Stephen suggested to Jefferies LCP: "Perhaps Jeffries should publish an article somewhere explaining to people why they aren't going to end up with 80% in cash... to try to combat some of the misinformation." Ex. M, Message from 10 Feb at 14:42:54. In response, Benjamin Hirsch, acting on

behalf of Jefferies LCP, ignored the suggestion and pivoted to discussing an introductory call from another potential seller to Jefferies LCP. Jefferies LCP's ignorance of Stephen's suggestion again suggests that Jefferies LCP possessed material non-public information—that the claims ended up being worth not just 80% of the bankruptcy valuation, but more than ten times the sale value.

### 4.  The Agreement's Unusual Clauses

467.   The Agreement contains an unusual confidentiality clause, stating that each party is not only to keep the Agreement confidential, but also that it may not even disclose the "existence" of the Agreement to anyone:

Each Party agrees that, without the prior written consent of the other Party, which consent will not be withheld, delayed or conditioned unreasonably, it will not disclose this Agreement, its contents or its existence to any other person (other than its affiliates and any of its or their officers, directors, employees, professional advisers and auditors), except with respect to the filing and notice requirements set forth in the Bankruptcy Rules and as required to do so by any law, court or regulation or as required or requested by any governmental authority having or asserting jurisdiction over it, and except for Seller's disclosure regarding the sale of the Assigned Claim at a discount via the Xclaim Marketplace; provided, however, that Buyer (and its direct and indirect successors and assigns) also may disclose the content of this Agreement (excluding the Purchase Price and the Purchase Rate) without Seller consent to prospective purchasers or assignees of its interests in the Assigned Rights and/or this Agreement if such prospective purchasers or assignees agree to be similarly bound by the confidentiality provisions of this Agreement (which will accrue for the benefit of Seller). Seller agrees that, following the Agreement Date, it will not disclose to any other person (other than its affiliates and any of its or their officers, directors, employees, professional advisers and auditors) any nonpublic information related to the Assigned Rights, except as required to comply with any filing and notice requirements set forth in the Bankruptcy Rules and as required to do so by law, court or regulation or as required or requested by any governmental authority having or asserting jurisdiction over it.

Ex. N, Agreement, Section 22

468.    This clause is not present in a standard Cherokee Acquisition contract signed by Stephen in an unrelated bankruptcy claim sale (Ex. O) and demonstrates evidence of scienter—the Jefferies Defendants, Xclaim, and Glantz knew that the

Agreement's terms were predatory and unenforceable and needed to hide the contents from public scrutiny.

469.   Standard bankruptcy claim transfer contracts typically define "purchased assets" as claims against the debtor's estate and distributions arising therefrom. However, Section 1(a)(G) of the Agreement contains highly specific, non-standard language assigning to Jefferies rights to:

> any forfeiture fund established or to be established pursuant to 28 C.F.R. Part 9 or otherwise... administered by (or on behalf of) any entity... (including, without limitation, the U.S. DOJ).
> _____
> Agreement, Ex. N, Section 1(a)(G)

470.   28 C.F.R. Part 9 is the specific federal regulation governing the DOJ's remission or mitigation of civil and criminal forfeitures. At the time the Agreement was executed (January 23, 2023), no public information existed suggesting that the Genesis Bankruptcy involved DOJ criminal forfeiture actions and the PROHASHING Scheme, which could foreseeably generate one, was not publicly known.

471.   The inclusion of this unusually specific forfeiture/remission language in a purported bankruptcy claim trade supports the inference that the Jefferies Defendants and their co-conspirators anticipated that fraud-related government recovery or restitution mechanisms could become relevant to GGC-related losses.

Upon information and belief, the Jefferies Defendants included this provision to ensure that, if any restitution, remission, or similar recovery became available in connection with the misconduct described herein—including misconduct later discovered to include the PROHASHING Scheme—those recoveries would be diverted away from the victims and into Jefferies LCP's hands, thereby impairing Plaintiffs' ability to obtain restitution and facilitating the Enterprise's retention of ill-gotten gains.

472.   In a standard bankruptcy claim sale, the buyer does not typically purchase the seller's personal, independent tort claims against non-debtor third parties. Yet, Section 1(a)(H) of the Agreement defines the assigned rights to include:

> any class action or other cases... arising in the future against Genesis... or any other third parties (including, without limitation, any of Genesis's affiliates... principals... stockholders, 'controlling persons'... directors, officers...)

Agreement, Ex. N, Section 1(a)(H)

473.   This clause was drafted with the specific intent to strip Plaintiffs of standing to sue DCG and Silbert (the "controlling persons") for the PROHASHING Scheme and Fraudulent Balance Sheet Scheme described herein. By burying this release of third-party liability within a bankruptcy claim assignment, the Enterprise attempted to fraudulently obtain a general release of

liability for RICO predicate acts and UTPCPL causes of action, without paying fair consideration for those tort claims, if they could even be assigned at all. This constitutes an attempt to obstruct justice by purchasing the silence of the victim/witnesses.

474.    However, because the Agreement consistently refers to the "assigned claims" rather than an "assigned contract" or "assigned tort rights," the wording leaves enough ambiguity such that someone reading the Agreement before signing it would not view the language as assigning the right to bring this action; yet the strange language would still require a lengthy court battle—even if ultimately futile for Jefferies LCP—over contract law. Attorneys, aware that the cost of this winning but lengthy court battle over contract interpretation could stretch for years and cost hundreds of thousands of dollars that Plaintiffs no longer had, would likely be unwilling to represent such a client.

475.    Section 8(a)(i) of the Agreement explicitly states:

> Seller acknowledges that (i) Buyer might now possess and might hereafter possess certain non-public information concerning the Debtors... (collectively, the 'Buyer Non-Public Information') that might or might not be independently known to Seller that might constitute material information...
>
> ───────────────────────────────
> Agreement, Ex. N, Section 8(a)(i)

476.   While such "big boy" clauses can appear in distressed debt trading, in this context it is an admission that Jefferies LCP was trading with information asymmetry and expected to possess material non-public information about GGC, the bankruptcy, and rights related to the claim. Combined with Jefferies LCP's above-market pricing and the strategic timing of the bankruptcy filing, this clause supports an inference that the Jefferies Defendants knew they were not engaging in an ordinary arm's length trade, but were participating in a transaction structured to secure leverage over Plaintiffs' tort claims.

477.   Section 2(a) of the Agreement contains a "participation" provision stating that if the claims are legally unassignable (as personal tort claims are under Pennsylvania law), Plaintiffs must continue to hold the claims but utilize them "at the direction of and on behalf of" Jefferies LCP. Plaintiffs assert that this clause, even if it were not void because the Agreement was fraudulently induced, is ineffective because of the *nemo dat* principle.

478.   While such clauses are customary in commercial loan trading to bypass consent requirements, in the context of personal statutory fraud claims (UTPCPL), this provision constitutes an illicit attempt to circumvent state public policy regarding the non-assignability of personal torts.

479.   Specifically, the Enterprise drafted this clause with the fraudulent intent to neutralize Plaintiffs as independent litigants. Defendants knew that

Plaintiffs' relationship with GGC had already produced direct, personal fraud claims arising from the Fraudulent Balance Sheet Scheme (including UTPCPL claims) that could not lawfully be sold as part of a bankruptcy claim trade, and Defendants further knew that additional fraud existed or might later be uncovered. Therefore, they included Section 2(a) to ensure that even if assignment failed, they would retain operational control over Plaintiffs' litigation posture and recovery efforts, including with respect to later discovered claims such as those arising from the PROHASHING Scheme.

480.   This clause was designed to function as a "kill switch," allowing the Jefferies Defendants—acting in concert with the Enterprise—to demand that Plaintiffs abandon, dismiss, or settle their fraud claims (including the balance sheet claims and PROHASHING-related claims) on terms dictated by the Enterprise, thereby delaying or preventing discovery and concealing the racketeering activity related to Digital Gold.

481.   Section 12 of the Agreement imposes a sweeping indemnification obligation upon Plaintiffs, requiring them to reimburse Jefferies LCP for any losses or "disgorgement" demands from the bankruptcy estate.

482.   This provision was maliciously drafted in anticipation of the Digital Gold scheme being discovered. The Enterprise knew that its fraudulent activity might trigger a clawback action by the Genesis Debtors or the DOJ. By including

this clause, Defendants sought to shift the financial liability for their own criminal

conduct onto the victim (Plaintiffs), creating a "poison pill" designed to financially

ruin Plaintiffs if they ever attempted to expose the illegality of the transaction.

483.   Section 5(b) of the Agreement defines an "impairment" to include any

instance where the assigned claim is "listed on the Schedule [of Liabilities]... in a

lesser amount." If such an event occurs, CM LLC is required to "immediately

repay" the purchase price to Jefferies LCP with interest.

484.   This provision effectively granted the Genesis Debtors and, by

extension, DCG—who filed in court later that they were "aligned on the requested

relief" (Genesis Bankruptcy, ECF No. 2217 at 8 n.7)—the unilateral power to

trigger a massive financial liability against CM LLC simply by administratively

amending their bankruptcy schedules. The Enterprise structured this "trigger" to

ensure that if Plaintiffs ever attempted to speak out or litigate against the

Enterprise, the Genesis Debtors could retaliate by altering the schedules, thereby

forcing Jefferies LCP to claw back the purchase funds, which would bankrupt CM

LLC, and then CM LLC's bankruptcy trustee would attempt to claw back the

payouts from the passthrough lenders, bankrupting Plaintiffs too.

### 5.  The Fraudulent Disregard of the Passthrough Structure and the *Nemo Dat* Principle

485.   At all times relevant to the formation of the Agreement, the Jefferies Defendants, DCG, GGC, Glantz, and Xclaim possessed direct, actual knowledge that CM LLC was a nominal passthrough entity with no independent beneficial ownership of the assets it lent.

486.   Section 5(a)(xxiii) of the Agreement required CM LLC to represent that there were "no other ultimate beneficiaries" of the CM LLC account. Glantz, Xclaim, the Jefferies Defendants, Silbert, and DCG knew this to be false at the time of drafting, as the Enterprise had specifically instructed Plaintiffs to use CM LLC as a passthrough vehicle for multiple individuals (see Ex. K "Due Diligence Questionnaire"). Defendants suborned this false representation to create a "perjury trap," intending to use the inevitable breach of this warranty as blackmail to silence Plaintiffs should they ever attempt to expose the PROHASHING Scheme and the Digital Gold history.

487.   This "no ultimate beneficiaries" clause is not present in the standard Cherokee Acquisition contract. Ex. O.

488.   Defendants, at the same time as the Agreement, required CM LLC to sign a separate "beneficial ownership certification form," requiring each individual

that "owns, directly or indirectly, 25 percent or more of the **equity** interests in the legal entity (i.e. the beneficial owners)." (emphasis added) Ex. T.

489.    As CM LLC had only one member and was an organization that made no profit, Stephen listed himself on this certification form as full owner of CM LLC, because none of the passthrough lenders had **equity** in the company. He thus understood this "beneficiaries" clause in the Agreement to have the same meaning as the beneficial ownership certification form that was provided alongside it.

490.    The Enterprise included this known false "beneficial ownership" representation in the Agreement to manufacture a "breach of contract" claim against CM LLC. This created immediate leverage that Defendants could use to blackmail or silence Plaintiffs if they ever attempted to assert their rights or expose the PROHASHING Scheme. It was a calculated entrapment mechanism.

491.    This constituted a scheme to violate the fundamental legal principle of *nemo dat quod non habet* ("no one gives what they do not have"). The Jefferies Defendants knowingly induced the signatory of CM LLC to execute an instrument purporting to transfer rights belonging to third parties (Plaintiffs) to Jefferies, even though CM LLC had no authorization to assign those claims.

492.    The Enterprise executed this legal maneuver with the specific fraudulent intent of manufacturing a colorable but legally void defense against future litigation. By ignoring the known passthrough nature of the entity in the

Agreement text, Glantz, Xclaim, and the Jefferies Defendants sought to create a facially valid document they could later brandish in bankruptcy court to deceive the judiciary into enjoining the personal claims of the victims, knowing full well that the LLC never possessed the title to those claims. These clauses may also have discouraged lawyers from representing Plaintiffs, had Plaintiffs contacted an attorney for representation in this Pa. UTPCPL Action.

493.    Because Plaintiffs were unaware of the PROHASHING Scheme at the time, CM LLC could not bargain to expressly carve out or preserve PROHASHING-related claims, evidence, and recovery rights. The Agreement's sweeping language—reaching "any class action or other cases … arising in the future" and imposing a participation/"direction" mechanism if assignment failed— was therefore designed to reach precisely such later-discovered claims and to force Plaintiffs into a threshold standing/ownership dispute before Plaintiffs could pursue merits discovery.

The signature appended to the employees of the Jefferies Defendants' emails reads as follows:

> Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies Disclaimer (e.g., Ex. M, message from 19 Jan at 16:31:38)

Therefore, since the Jefferies Defendants themselves admit that Jefferies "archives" emails and that emails may be "produced… in connection with civil litigation," the Jefferies Defendants are in possession of the evidence that can prove the extent of their knowledge about the entire conspiracy – including their knowledge of and participation in the PROHASHING Scheme – and their goals in furthering the coverup.

### 6. The Manufactured Ownership Controversy and Jefferies' Refusal to Disclaim

494.    The Enterprise's objective in drafting the Agreement with sweeping "assignment" and "direction" language was not limited to the immediate economic purchase of a bankruptcy claim. Rather, it was to manufacture a persistent, facially "contractual" ownership dispute over Plaintiffs' direct statutory and tort rights

against non-debtors—an ownership dispute that could later be invoked to obstruct discovery, create standing delays, and chill enforcement of Plaintiffs' claims.

495.　That manufactured dispute has not remained theoretical. Since the Agreement was executed, Enterprise members and counsel have repeatedly treated the Agreement as a litigation lever—arguing that Plaintiffs' direct claims belong to "someone else" (the estate, CM LLC, or Jefferies), while shifting positions opportunistically depending on the procedural posture and forum. An opposition brief filed by Plaintiffs contains tables summarizing the shifting positions of the Enterprise's co-conspirators. See Falco AP, ECF No. 34 at 25. The intended effect is to keep Plaintiffs in a perpetual threshold fight over "who owns what," rather than allowing the Court to reach the merits of the Enterprise's fraud and racketeering.

496.　Crucially, the Agreement's weaponization depends on Jefferies LCP's ability to avoid committing to a position that would bind it—a tactic of "strategic ambiguity." When Stephen, acting on behalf of CM LLC, sought to resolve the question directly by requesting a simple confirmation that Jefferies did not acquire the personal UTPCPL rights of the Sokolowskis (in their individual capacities) to sue non-debtors, Jefferies—through counsel—refused to provide that confirmation and instead took the posture that it "declines to engage" and "reserves all rights." Ex. V.

497.   The Jefferies Defendants' counsel did not disclaim ownership, did not disclaim control, and did not disclaim entitlement to proceeds; instead, the Jefferies Defendants affirmatively reserved the ability to assert rights later, while simultaneously using counsel to manage subpoena and disclosure posture regarding the Agreement. This "reserve all rights" position preserves the Agreement's intimidation value, perpetuates the cloud over Plaintiffs' direct claims, and enables collaboration with other Defendants and non-parties to complicate the litigation web and prevent discovery into the Digital Gold narrative.

498.   This is the core of the scheme enabled by the Jefferies Defendants: (i) other Enterprise actors can point to Jefferies LCP as a purported assignee/owner and argue Plaintiffs lack standing or control, while (ii) Jefferies LCP avoids binding itself to that position when directly questioned, avoiding testimony and preserving the option to assert contractual rights later—potentially after years of litigation and after a merits judgment or settlement.

499.   The controversy is live, immediate, and concrete because it affects the litigation now: it creates a threshold ownership/standing dispute that can be raised by Defendants to delay merits discovery; it threatens to complicate settlement by creating uncertainty over who is entitled to receive proceeds; and it risks a "late appearance" scenario where the Jefferies Defendants attempt to assert an

entitlement to proceeds only after Plaintiffs have borne the cost and risk of prosecuting the action to judgment.

500.   This controversy affects all three Plaintiffs. The Sokolowskis assert their own personal statutory rights (including UTPCPL) arising from their consumer purchase of Genesis services; PROHASHING asserts business/property injuries from the PROHASHING Scheme; all assert RICO claims. The Agreement's drafting strategy—purporting to reach "future" claims, "direction" of litigation, and rights beyond the bankruptcy distribution—was designed to cast a cloud over each Plaintiff's ability to prosecute and recover on their direct claims.

501.   Plaintiffs seek to remove the manufactured cloud over Plaintiffs' direct claims against non-debtors and to obtain a binding determination—now, in this Court—that the Jefferies Defendants have no right to own, control, or claim proceeds of Plaintiffs' direct statutory, tort, and federal claims asserted herein.

502.   Accordingly, Plaintiffs bring a count for declaratory relief to resolve the dispute that the Agreement was designed to create: whether the Jefferies Defendants have any right, title, interest, control, or entitlement to proceeds with respect to Plaintiffs' direct causes of action (including Plaintiffs' UTPCPL and RICO claims).

503.   Plaintiffs seek to resolve this ownership/proceeds dispute first — before merits discovery and trial — and request that the Court phase the

proceedings to do so – so that the Jefferies Defendants may not profit from their continued strategic "wait and see" posture that preserves a latent proceeds claim while imposing years of litigation cost and risk on Plaintiffs.

### 7.  Conclusion on the Jefferies Claim Sale Scheme

504.   The Jefferies Claim Sale Scheme was designed to strip Plaintiffs of their rights to sue the Enterprise for fraud—Plaintiffs' direct statutory and tort claims arising from the Fraudulent Balance Sheet Scheme (including UTPCPL claims), and also, once discovered, the claims and damages arising from the PROHASHING Scheme and the decade-long harassment campaign.

505.   The purpose of the Jefferies Claim Sale Scheme was to obstruct and delay discovery by neutralizing Plaintiffs as victim-witnesses and independent litigants. Glantz, Xclaim, and the Jefferies Defendants intended to create (and created) an Agreement that they knew — or were willfully blind — would be unenforceable as to Plaintiffs' personal fraud claims under *nemo dat* and state public policy, but that would nonetheless intimidate Plaintiffs and create a manufactured standing/ownership dispute that could be continually invoked to derail Plaintiffs' prosecution of those claims, as well as chill attorneys into not prosecuting their claims.

506.    Silbert, with his extensive background in bankruptcy claims trading, directed and coordinated DCG's collaboration with Glantz, Xclaim, and the Jefferies Defendants to execute the claim sale scheme because he and DCG displayed their knowledge of this scheme in their brief when they moved to dismiss the First Amended Complaint in this case. ECF No. 37. By ensuring that a friendly and sophisticated financial institution held CM LLC's Genesis claim and simultaneously claimed "all rights associated with" that claim, the Enterprise positioned itself to (i) reduce Plaintiffs' ability to object to the Genesis plan and related relief, and (ii) deploy the Agreement as a leverage tool to suppress Plaintiffs' Fraudulent Balance Sheet Scheme claims and any later-discovered claims (including PROHASHING-related claims) before they could be investigated in discovery.

507.    By knowingly providing and implementing this leverage tool after receiving notice of the Jefferies Claim Sale Scheme, the Jefferies Defendants, Glantz, and Xclaim joined the Enterprise's concealment and retention phase and agreed to facilitate the Enterprise's continued avoidance of accountability. The Jefferies Defendants, Glantz, and Xclaim are therefore liable for the Enterprise's racketeering activities described herein, including the Fraudulent Balance Sheet Scheme and the PROHASHING Scheme, to the extent Plaintiffs' injuries were proximately caused and/or exacerbated by their conduct.

### E   Scheme 4: The *Falco* Adversary Proceeding Scheme

#### 1.  Summary

508.   In this scheme, Defendant Vincent Falco—acting through non-party counsel McDermott Will & Emery and in coordination with the Enterprise—knowingly filed an objectively baseless federal action for an improper purpose (the "Falco Action") that mirrored the Sokolowskis' direct UTPCPL fact pattern while embedding "derivative/property of the estate" cues, with the objective of creating a procedurally "live" parallel case that could be enjoined in bankruptcy and used to suppress discovery in this case. Consistent with that objective, DCG informed the judge in Falco's SDNY action, the Hon. Denise Cote, that under the parties' so-ordered briefing schedule, DCG would file motions to dismiss and "promptly file" an "injunction application" to enjoin Falco from pursuing claims DCG contended belonged to the Genesis Debtors' estate. Falco Action, ECF No. 24 at 2.

509.   The scheme relied on staged, "elongated briefing" to keep the Falco Action pending long enough for the Bankruptcy Court to enjoin it first. However, an unexpected *sua sponte* order from Judge Cote imposed a July 25, 2025 amendment deadline, disrupting the staging. Falco Action, ECF No. 39. The fact that a judge would issue a *sua sponte* order without viewing the full briefing from all parties first is itself strong evidence of the sham nature of the proceeding.

510.    Falco then executed a controlled pivot by dismissing on the court-ordered deadline through a Rule 41(a)(1)(A)(i) notice—avoiding any merits ruling. The Enterprise immediately used Falco's dismissal to pressure the Sokolowskis to abandon their direct claims, thereby obstructing discovery into the Enterprise's earlier racketeering, including the PROHASHING Scheme and the Fraudulent Balance Sheet Scheme. Falco Action, ECF No. 42.

## 2.  Overview of Falco's Objectively Baseless Case

511.    On January 2, 2025, the Sokolowskis filed their complaint in this Action against Silbert, Moro, and DCG for UTPCPL violations related to a fraudulent balance sheet Plaintiffs received on September 20, 2022 in what is now called the Fraudulent Balance Sheet Scheme. ECF No. 1.

512.    The Sokolowskis amended that complaint on March 25, 2025 to include hundreds of pages of exhibits to bolster the Sokolowskis' equitable estoppel argument against the arguments of Silbert, Moro, and DCG. ECF No. 22. The First Amended Complaint asserts that the real parties in interest in this litigation — and as an implication in all of the passthrough lending programs that GGC onboarded — are the passthrough lenders. It also asserts that the personal UTPCPL torts alleged are categorically non-assignable as a matter of public policy.

513.   In response to the amended complaint, DCG and Silbert, represented by non-party Davis Polk & Wardwell LLP, characterized CM LLC as a "sham," alleged that the Plaintiffs committed "criminal bankruptcy fraud," claimed they were subject to "sanctions," and cited felony statutes. ECF No. 37 at 2, 4. Upon information and belief, DCG, Silbert, and Davis Polk & Wardwell were aware of the fraudulent Jefferies Claim Sale Scheme and attempted to use the fraudulent Jefferies Agreement, which they knew was unenforceable, to intimidate the *individual* Sokolowskis into dismissing this Action by implying the Sokolowskis would be indicted for criminal activity. This action is aligned with the "strategic ambiguity" plan of the Jefferies Defendants – the Agreement was used as an intimidation tool to prevent discovery of Digital Gold, not as a meaningful defense against the UTPCPL claim.

514.   The Sokolowskis previously filed a brief that provided a summary of a subset of events in this scheme, to which the reader may refer. AP, ECF No. 20, Section VI.

515.   On May 6, 2025, several weeks after the filing of the First Amended Complaint in this Action, Defendant Falco filed an action in the Southern District of New York against DCG, Silbert, and Moro. See *Falco v. Digital Currency Group, Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y.) (the "Falco Action"). Falco's complaint was intentionally deficient in multiple ways. The complaint pleaded

direct consumer protection claims from multiple states, but in the opening

paragraphs stated that Falco's bitcoin "became property of Genesis Global's

estate." Falco Action, ECF No. 1 at 3. Later in the complaint, Falco alleged that the

defendants (Silbert, Moro, and DCG) were "mere alter-egos" of the bankrupt GGC,

among other similar allegations. Id. at 29 n.21.

516.    In the Falco Action, Falco was represented by non-party law firm

McDermott Will & Emery LLP.

517.    While the Falco Action contained many phrases implying that his

claim was derivative of the bankruptcy estate, it also mirrored the Sokolowskis'

First Amended Complaint in this Action. Falco sued the same defendants (DCG,

Silbert, and Moro), alleged violations of consumer protection statutes similar to the

UTPCPL, and the damages theory was that Falco relied upon a fraudulent balance

sheet similar to the one that the Sokolowskis had relied upon in the Fraudulent

Balance Sheet Scheme.

518.    Upon information and belief, Falco intentionally engineered his action

so that the facts appeared to be as close as possible to the Sokolowskis' UTPCPL

complaint, while also including clearly derivative phrasing.

519.    On June 24, 2025—several weeks before Judge Cote's *sua sponte*

order and before any merits adjudication—DCG and Davis Polk wrote the SDNY

court that, pursuant to the parties' "agreed-upon and so-ordered briefing schedule,"

DCG "intend[ed] to promptly file" an "Injunction Application" to "enjoin [Falco]" from pursuing claims DCG contended were "*property of*" the Genesis estate (i.e. a claim for bitcoins that "became *property of* Genesis Global's estate.") Falco Action, ECF No. 24 at 2. This contemporaneous statement, coordinated with the same phrasing, is powerful circumstantial evidence that the Falco Action was not designed to be litigated to a merits result, but rather to remain procedurally pending long enough to serve as the "live" parallel case needed for a bankruptcy court injunction.

520.   By filing the Falco Action and requesting a massive number of bitcoins that dwarfed the Sokolowskis' by over 20-fold, Falco intended to create a narrative of a "race to the courthouse"—a term that was reiterated over and over in multiple briefs in the AP (e.g. AP, ECF No. 2 paragraph 6; AP, ECF No. 4 at 3; AP, ECF No. 25 at 2). This "race" narrative was designed to make it appear to the Bankruptcy Court that a huge flood of derivative "creditor" lawsuits would soon usurp the Genesis Debtors' supposed exclusive authority to sue DCG. In reality, the Genesis Debtors were actually "aligned on the requested relief" with DCG (Genesis Bankruptcy, ECF No. 2217 at 8 n.7), with Falco providing the key ingredient in his scheme to obstruct justice and prevent discovery into Digital Gold.

521.   The "race" narrative was designed to take advantage of the Sokolowskis' Conn. Action that was only filed to ensure this case was heard on the merits if DCG's, Silbert's, and Moro's defense of lack of personal jurisdiction against the First Amended Complaint of this Action had succeeded. The briefs of opposing counsel frequently warned about three "creditor" suits—Falco's, the Conn. Action, and this case—without mentioning that all parties wished to stay the Conn. Action (it was indeed later stayed) and that the Falco Action would soon be dismissed.

522.   While the Falco AP—a proceeding where the Genesis Debtors "aligned" and had signed a "common interest agreement" with DCG (Genesis Bankruptcy, ECF No. 2217 at 8 n.7)—claimed there would be a flood of "creditor actions" (Falco AP, ECF No. 1), Genesis Debtors' attorney Jennifer Selendy later stated privately that she didn't actually believe such a flood would really occur because the statute of limitations had expired on such actions in most states (Ex. P, Notes taken on August 18, 2025).

523.   Non-party Vijay Boyapati is a member of the Genesis Debtors' Litigation Oversight Committee, which is charged with overseeing the Genesis Debtors' litigation efforts. The Genesis Debtors' primary litigation target is DCG. In multiple instances, the Sokolowskis reminded Boyapati that this Pa. Action was the first-filed case in the litigation web and offered to cooperate with discovery

against DCG. Ex. P at 3, 7. Boyapati deferred or declined to cooperate in each instance, which would appear to be against the interest of an estate whose derivative actions are progressing at least half a year behind the first-filed action.

524.    Upon information and belief, some or all of the Delaware-based litigation between the Genesis Debtors and DCG has been carefully staged to ensure that evidence of the PROHASHING Scheme and the Enterprise's intervention in the Block Size War and Digital Gold scheme is suppressed, and therefore Boyapati, as a member of the Litigation Oversight Committee, knew of the Enterprise's existence because of his actions described below.

525.    In a meeting between the Sokolowskis and Boyapati, which occurred on August 17, 2025 around 11:30am EDT while the Sokolowskis were in State College, Pa. and Boyapati was at a sporting event in Las Vegas, Boyapati would state that the Falco Action's complaint had been **"copied and pasted"** from the Genesis Debtors' Delaware complaint that asserts the Debtors' *derivative* claims. The unaltered contemporaneous notes from this and all meetings with Boyapati and the Litigation Oversight Committee's attorney Jennifer Selendy are featured in Exhibit P. These notes were written ten minutes after each meeting.

526.    The Genesis Debtors' main complaint against DCG filed in Delaware Chancery Court, alleging derivative claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy, and "assigned" Gemini

Earn direct claims of fraud and negligent misrepresentation (and also asserting unjust enrichment and alter ego in both capacities) was filed on May 13, 2025, and sealed until June 11, 2025. See *Genesis Global Holdco, LLC, et al. v. Digital Currency Group, Inc., et al.*, C.A. No. 2025-0532-KSJM (Del. Ch. May 13, 2025). The Falco Action was filed earlier, on May 6, 2025. A timing conflict exists if the Falco Action had been "copied and pasted" from the public docket, so the only method by which the complaint could have been copied is if the estate's complaint had been provided to Defendant Falco prior to the estate filing the complaint itself.

527.   Because Boyapati stated that Falco had "copied and pasted" the Genesis Debtors' complaint to create Falco's sham lawsuit, communications relating to the creation of Falco's and the Genesis Debtors' complaints are subject to the crime-fraud exception. Defendant Falco was coordinating the filing of a document in a racketeering conspiracy with the Genesis Debtors, not engaging in legitimate legal inquiry with his or the Genesis Debtors' counsel. Similarly, communications of non-parties Davis Polk & Wardwell LLP, Selendy Gay, and Jennifer Selendy related to the creation and execution of the AP are also subject to the crime-fraud exception, because the communications of these lawyers regarding Falco's AP were part of Falco's scheme to obstruct justice and later engage in witness intimidation, not discussing the strategy of a legitimate lawsuit.

### 3. Falco's Adversary Proceeding

528.    On July 1, 2025, in this action, DCG and Silbert filed their consolidated memorandum in support of their motion to dismiss the First Amended Complaint, and DCG and Silbert recorded a footnote, stating the following: "[the Sokolowskis'] claims are derivative of the estate's claims and thus belong to the bankruptcy estate... DCG reserves all rights to seek relief from the Bankruptcy Court, including an injunction preventing Plaintiffs from pursuing claims that are property of the estate." ECF No. 52 at 24 n.12. This was the first time in the six-month history of the litigation that any of the then-Defendants had raised a "derivative" argument, signaling the beginning of the coordinated attack in the Bankruptcy Court.

529.    Falco's plan had relied on the Falco Action serving as a precedent for a "derivative" claim that the Bankruptcy Court could easily enjoin. However, on July 7, 2025—one day before the adversary proceeding was filed—the Honorable Denise Cote of the Southern District of New York issued a *sua sponte* order in the Falco Action, which contained a warning that "It is unlikely that plaintiff will have a further opportunity to amend." Falco Action, ECF No. 39.

530.    The order from that court further noted that an "elongated briefing schedule" had been created. The briefing for the Falco Action's motions to dismiss was scheduled to conclude on September 26, 2025. The preliminary injunction

hearing in the upcoming adversary proceeding that DCG would file as part of the scheme was scheduled for September 15, 2025. Therefore, had this *sua sponte* order not been issued, the Falco Action would have been undergoing staged "briefing" by Falco, DCG, Silbert, and Moro at the time of the preliminary injunction hearing, and would not yet have been dismissed by Judge Cote for its obvious flaws.

531.    DCG, Silbert, and Moro participated in the staged briefing in Falco's sham lawsuit. DCG and Silbert knew the case was staged because they invented the scheme with Falco, and they wrote the briefs to make it appear to the Bankruptcy Court that a real adversarial case was underway. Upon information and belief, Moro also knew or should have known that Falco's case was a sham. Moro did not take any action to disclose the scheme publicly, nor did he oppose DCG's and Silbert's actions in any brief in the Falco case.

532.    On July 8, 2025, DCG filed its adversary proceeding in the United States Bankruptcy Court for the Southern District of New York with a preliminary injunction to halt this Action. See *Digital Currency Group, Inc. v. Falco et al.*, Adv. Pro. No. 25-01111-SHL (Bankr. S.D.N.Y. July 8, 2025) (the "Falco AP").

533.    The Genesis Debtors subsequently admitted that, despite their public posture of suing DCG, they were in fact working in concert with the Enterprise to stop the Sokolowskis. The Genesis Debtors stated they were "aligned on the

requested relief"—i.e., the injunction against the Sokolowskis—and would "likely file a 'me too' submission of some kind in support of enjoining the actions." Genesis Bankruptcy, ECF No. 2217, at 9–10 & n.7. This admission proves that the Genesis Debtors' fiduciaries – such as non-party Boyapati — were conspiring with the target of their own billion-dollar litigation (DCG) and Defendant Falco to silence Plaintiffs.

534.   On July 12, 2025, the Genesis Debtors filed a "Motion to Enforce the Plan" against DCG. Genesis Bankruptcy, ECF No. 2180. This motion, written by Jennifer Selendy and which contained circular and contradictory arguments, did not state that the Sokolowskis' UTPCPL claims were derivative. Instead, it argued that the Genesis Debtors, not DCG, had the right to enjoin the Sokolowskis. Then, in the same brief, Selendy argued they were not interested in doing so now. Yet, internal communications and subsequent filings reveal that at 7:17 p.m. on July 8—mere seconds before the Genesis Debtors' motion was docketed—Genesis Debtors' counsel emailed DCG's counsel, claiming that DCG, with whom they had previously been "aligned," was using the Falco AP to benefit its position in litigation between the Genesis Debtors and DCG in Delaware. Genesis Bankruptcy, ECF No. 2214, Ex A. Selendy made no mention in this motion that the reason she was now opposed to DCG was because Judge Cote had destroyed Falco's case.

535.   This "benefit" to the Delaware litigation is that a "direct" ruling would have wiped out the fraudulent Gemini Earn assignment contract (see Section VIII(F)) and eliminated $1 billion of potential liability to DCG. A "direct" ruling would also have benefitted DCG by exposing the Genesis Debtors' fraud on the court when they had previously convinced the Hon. Sean H. Lane to approve the bankruptcy plan that relied on that Gemini Earn assignment contract.

536.   DCG's preliminary injunction motion's supporting memorandum contains no Pennsylvania case citations in its 31 pages, despite arguing a position brought to enjoin an action containing a claim brought under Pennsylvania state law. AP, ECF No. 4. This lack of briefing, and a later statement that DCG was "violently agreed" with the Sokolowskis (defendants in the Falco AP), are atypical of a firm of Davis Polk & Wardwell's caliber, further suggesting that DCG and Davis Polk knew that the Falco AP, like the Falco Action, was not a true adversarial proceeding.

537.   Recognizing the farcical nature of the Falco AP, the Sokolowskis filed a counterclaim that would "end [the action] on its merits" and force a ruling that would bind the Genesis Debtors. Falco AP, ECF No. 12.

538.   The Genesis Debtors would continue to file the same contradictory briefing as their Motion to Enforce throughout the sham Falco AP. For example, in a single brief to dismiss the counterclaim, Jennifer Selendy representing the

Genesis Debtors would simultaneously argue that DCG's preliminary injunction should not be granted because DCG had no right to request an injunction under the bankruptcy Plan, that an injunction should still be granted because the Plan was self-executing (but not because DCG asked for one or because the claim was derivative), and that this Court (rather than the Bankruptcy Court) should decide whether to dismiss this UTPCPL action. Falco AP, ECF No. 29.

539.    Upon information and belief, Jennifer Selendy wrote her contradictory arguments because even a "derivative" ruling would require *her* to conduct discovery into the Genesis Debtors' own affairs on behalf of the derivative UTPCPL claim, which she knew would reveal the PROHASHING Scheme, the Enterprise's involvement in the Block Size War, the inflation of the price of bitcoin, and the Digital Gold narrative. Jennifer Selendy's and Selendy Gay's actions were intended to "clean up" the failing scheme she, DCG, Silbert, Davis Polk, and Falco were coordinating by getting the Falco AP dismissed without a ruling on the nature of the First Amended Complaint.

### 4.  Falco's Dismissal and Pivot to Intimidation

540.    On July 16, 2025, Christopher contacted McDermott Will & Emery attorney Alexander Southwell, who was listed as Defendant Falco's counsel in the Falco Action, to coordinate a joint defense. The message sent is included as Exhibit

X. Falco's counsel did not respond, supporting an inference that Defendant Falco and non-party McDermott Will & Emery knew that Judge Cote had ended the first phase of their plan, and that there was no need to coordinate a defense because they were already planning to dismiss the Falco Action.

541.   The Falco Action and DCG's bankruptcy adversary proceeding were not sequential improvisations but a coordinated two-track litigation device. Falco filed first in SDNY to plant and amplify the "derivative/property of the estate" framing while mirroring Plaintiffs' direct UTPCPL fact pattern, so that DCG could then pivot to the Bankruptcy Court and seek an emergency injunction before Plaintiffs could obtain merits discovery into the Enterprise's misconduct. When Judge Cote's *sua sponte* order made the Falco Action's defects impossible to hide, Falco then waited as long as possible to dismiss and permitted his dismissal to be used as false evidence that the Genesis Debtors had intimidated him into dismissal, as they implied Plaintiffs eventually would.

542.   Judge Cote's *sua sponte* order forced Falco to either (i) amend to remove the deficient language, thereby risking a "direct" ruling that would collapse the Enterprise's "derivative" narrative, or (ii) exit without a merits decision. Falco chose the latter: on July 25, 2025—the court-ordered amendment deadline—Falco filed a Notice of Voluntary Dismissal Without Prejudice under Rule 41(a)(1)(A)(i), terminating his action without any merits adjudication of its defects. Falco Action,

ECF No. 42. To cover up the actual reason he dismissed the action, Falco made a post to X:

> Today, I voluntarily withdrew my complaint against Digital Currency Group, Barry Silbert, and Michael Moro. My claims are strong and I am confident I would prevail, but because the Genesis Bankruptcy Litigation Oversight Committee has now brought an action on behalf of all Genesis bankruptcy crypto-creditors seeking in-kind recovery, I want to defer to that action, at least for now. I appreciate the goal of the LOC to achieve justice and maximize full in-kind recovery, which has been my desire all along, and have confidence in the LOC and its counsel in seeking that goal.
> _____
> X post by Vincent Falco at 2025-07-25 (Ex. R at 4)

This post was intentionally designed to mislead the public because Falco never mentioned the *sua sponte* order that demonstrated his sham case never had any chance of success. Contrary to Falco's misleading post, his objectively baseless claims were clearly not "strong" and it is implausible that he was "confident [he] would prevail."

543.   The Falco Action sought greater than 1,000 bitcoins in damages. Upon information and belief, no reasonable legitimate plaintiff, when given the opportunity to amend his complaint to fix the deficiencies the *sua sponte* order had highlighted, would simply voluntarily dismiss such an enormously valuable case.

544.   Falco's public messaging was not isolated "PR." It was operational: by claiming he "voluntarily withdrew" while simultaneously expressing

"confidence in the LOC and its counsel," Falco created a public pretext that (i) concealed the effect of Judge Cote's sua sponte order and (ii) allowed the Enterprise to pivot to part 2 of his scheme and portray the dismissal as the product of superior legal position and coordinated creditor compliance. The Enterprise used Falco's dismissal as a coercive persuasion device in subsequent communications with the Sokolowskis—pressing the message that dismissal was inevitable and that Plaintiffs should follow Falco's lead—thereby chilling the Sokolowskis' pursuit of discovery and their communications of evidence to courts and regulators.

545.    The Genesis Debtors insisted multiple times in briefs that they had met with all "creditors" regarding "creditor actions" and were working to resolve them (see, e.g., Genesis Bankruptcy, ECF No. 2217). However, apart from friendly conversations encouraging the Sokolowskis to proceed, the Genesis Debtors did not contact the Sokolowskis until July 25, 2025, only after Falco's dismissal, when they wanted to schedule a meeting. See Falco AP, ECF No. 21, Ex. D.

546.    On July 28, 2025, Boyapati met with the Sokolowskis via video conference. During this meeting, Boyapati leveraged the Falco Action's dismissal to pressure the Sokolowskis, stating that Falco had "dropped his case" and implying that the Sokolowskis should do the same to avoid inevitable defeat in the Bankruptcy Court. In this meeting, Boyapati warned: "Judge Lane is going to enjoin your cases." Ex. P at 2.

547.    In this first meeting with the Sokolowskis, Boyapati, in his second substantive comment, stated that he had "thought [the Sokolowskis] had assigned" the UTPCPL claims (Ex. P at 1), which, given that it was the first substantive discussion about the Sokolowskis' case, shows that Boyapati also had knowledge of the fraudulent Jefferies Claim Sale Scheme.

548.    On July 30, 2025, non-party Jennifer Selendy, along with Boyapati, met with the Sokolowskis, and provided them with an overview of their theory of the case. Selendy stated immediately: "to be honest, the claims were different from those of the estate" and also stated that "the consumer protection claims were direct." Ex. P at 4, 6. This admission by Selendy contradicts both her reasoning for being "aligned" with DCG in filing the sham Falco AP to obtain a "derivative" ruling, and also contradicts her later claims to have "not read" the First Amended Complaint.

549.    At the July 30, 2025 meeting, Plaintiffs informed Selendy of a case against PROHASHING which had been filed in the Eastern District of Pennsylvania. See *United Brands and Marketing International S.à r.l. v. Prohashing, LLC*, No. 2:25-cv-03046 (E.D. Pa. June 13, 2025). This case had imposed a fiduciary duty upon the Sokolowskis due to its large damages request that placed PROHASHING at risk of bankruptcy. Because PROHASHING had passed funds through CM LLC, this duty prevented the Sokolowskis from

dismissing any of their cases, as Boyapati had been threatening the Sokolowskis to do, and required them to take additional steps they had not originally intended regarding the Conn. Action. When Selendy was notified of this fiduciary duty, she asked "what district was that filed in again?" Declaration of Stephen H. Sokolowski. After being informed of this duty, Selendy did not again bring up dismissal, although Boyapati would continue to warn the Sokolowskis to dismiss their cases anyway (which the Sokolowskis could not legally do anymore).

550.   After the July 30, 2025 meeting had ended, Boyapati sent an email to Stephen. In this message, Boyapati wrote:

> To the extent that we believe your claims are property of the estate, we are willing to meet to discuss that issue, as we did several times with Falco and his counsel.
>
> Falco AP, ECF No. 21, Ex. E (2025-07-31 23:31:04 email)

551.   These communications used Falco as the "example creditor": the Enterprise implicitly represented that Falco had already been compelled to withdraw, and sought to leverage that withdrawal to induce the Sokolowskis to abandon their own direct claims. This is consistent with the staged briefing strategy described above: the Falco Action was kept alive only as long as it had value to the injunction narrative, then dismissed on the amendment deadline, and immediately

repurposed as a pressure tool against the Sokolowskis—i.e., "Falco dismissed; you will be enjoined; you should dismiss too."

552.    On August 6, 2025, the Genesis Debtors proposed holding the Falco AP in abeyance. DCG refused on August 12, 2025, forcing the matter toward a preliminary injunction hearing scheduled for September 15, 2025. Genesis Bankruptcy, ECF No. 2218 ¶ 4 & Ex. 2.

553.    On August 14, 2025, as reviewed earlier, Plaintiffs filed an answer and counterclaim in the Falco AP, joining the Genesis Debtors as third-party defendants and seeking a declaratory judgment that the UTPCPL claims are direct and non-assignable. Falco AP, ECF No. 12. This filing disrupted the Enterprise's strategy by forcing the Genesis Debtors to defend their position on the merits rather than attempting to get the Falco AP dismissed without a ruling. During the status conference the next day, immediately after the announcement of the counterclaim that also named *DCG* as a counterclaim defendant, Davis Polk & Wardwell LLP attorney Benjamin S. Kaminetzky stated that DCG "might be in violent agreement" with the counterclaim plaintiffs. Genesis Bankruptcy, ECF No. 2223 (Aug. 15, 2025 Hr'g Tr.) at 46:4.

554.    During that August 15 status conference, the Hon. Sean H. Lane, presiding over the Bankruptcy Court, stated on behalf of the court that while the hearing would remain a preliminary injunction hearing, he wished to make one

final ruling to address all issues, which presumably would address the

counterclaim:

> [G]iven that there's litigation pending in various different jurisdictions, what you all need is some clarity and some finality. So I think actually we all may be singing from the same sheet of music on that, that nobody wants to have anything that is, that is not in sort of any—in any way can be viewed as interim.
>
> ───────────────────────────────
> Hon. Sean H. Lane, Aug. 15, 2025 Hr'g Tr. (Genesis Bankruptcy, ECF No. 2223) at 47:1-6

### 5. The Subpoena Crisis

555.    With a counterclaim now filed, and the Sokolowskis unable to dismiss

their cases due to the fiduciary duty in the UBMI v. PROHASHING Action, the

Genesis Debtors shifted tactics in the Falco AP to attacking the Sokolowskis on

standing with the Jefferies fraudulent claim sale Agreement.

556.    During meetings on August 17 and 18, 2025, Boyapati and Selendy

told the Sokolowskis that they "hadn't read" (and later "hadn't really understood")

the First Amended Complaint before aligning with DCG and Falco on the Falco

AP. Ex. P at 13. This statement is implausible for the owner and partner of a 50-

lawyer firm in New York and demonstrates that Selendy, on behalf of the Genesis

Debtors, engaged in a fraud on the court in filing the Falco AP to protect the

PROHASHING Scheme and Digital Gold secrets. The Genesis Debtors' own

briefs and statements in court—signed by Jennifer Selendy—contradict Selendy's claims that she "hadn't read" the complaint, because they contain statements describing it.

557.   During the August 18, 2025 meeting, Selendy stated she would "consider" acknowledging to the Court that the Sokolowskis' claims were direct, but only if the Sokolowskis first provided her with a copy of the fraudulent bankruptcy claim sale Agreement with Jefferies. Ex. P at 11-12. This *quid pro quo* attempt to extract evidence in exchange for an ill-defined stipulation or acknowledgment confirms that the Genesis Debtors' legal positions were transactional and strategic—not based on the law—and that Selendy knew that the Jefferies Agreement, unlike standard bankruptcy claim sales forms, was designed with non-standard clauses she could use to confuse the court at the preliminary injunction hearing.

558.   Upon information and belief, because DCG and Silbert had ordered Jefferies, Glantz, and Xclaim to create the fraudulent Agreement, Selendy already possessed a copy of the Agreement but needed the Sokolowskis to give her another copy so that she could legally introduce it as evidence. The fact that she possessed the Agreement can be inferred by the brief that she signed in support of her motion to dismiss the Sokolowskis' counterclaim in the Falco AP, where she lists a number of clauses that are actually present in the Agreement. Falco AP, ECF No. 30 at 13.

559.    The Enterprise's desperation peaked during the Falco AP's "Subpoena Crisis." On September 8, 2025—just one week before the preliminary injunction hearing was scheduled to occur—Genesis Debtors' counsel (Selendy Gay PLLC), acting through non-party Kayleigh A. Yerdon, issued subpoenas to Jefferies and Aronsky. These subpoenas are on the docket of the Falco AP, ECF No. 35, Exs. C-F.

560.    The subpoenas in the Subpoena Crisis were sent despite no Fed. R. Civ. P. 26(f) conference having been held and after the court indicated multiple times that the preliminary injunction hearing would proceed without delay. The captions on the subpoenas were inaccurate, listing the Genesis Debtors, not DCG, as the plaintiffs in the Falco AP. Further, Yerdon served the Debtors' September 8, 2025 subpoenas on Stephen and Christopher under Fed. R. Civ. P. 45 (as incorporated by Fed. R. Bankr. P. 9016), even though Stephen and Christopher were parties in the adversary proceeding. Party discovery in an adversary proceeding is governed by Fed. R. Bankr. P. 7026–7037 (incorporating Fed. R. Civ. P. 26–37), meaning the proper vehicles to demand documents from party defendants were Rule 34 requests for production (Bankr. R. 7034).

561.    The communications between the Genesis Debtors and chambers are provided in the docket of the Falco AP, ECF No. 35, Ex. B. In these communications, a clerk writes:

> The Judge intends to hold firm on the September 15 hearing
> date for the motion to enforce, the motion for a preliminary
> injunction against the Sokolowski defendants in the adversary
> proceeding (25-01111), and related pleadings.
>
> _____
>
> Falco AP, ECF No. 35, Ex. B (2025-09-04 14:19:11 email from
> Tessa M. Ptucha)

562.    Yerdon's subpoenas demanded the production of the Agreement and commanded Aronsky to appear for testimony with a return date of September 11, 2025—only three days. This timeframe is unreasonable and constitutes an abuse of process, designed to harass the witness and force the production of a fraudulent instrument without allowing time for proper legal review or objections.

563.    The Sokolowskis, who at the time were not aware that Aronsky had communicated with them by email years ago, objected to the subpoenas and requested basic information from Yerdon about Aronsky and what he would be testifying about, but Yerdon did not reply. On the morning of September 9, the Sokolowskis paid costs of $250, for the first time, in a communication with an attorney regarding how to respond to the blatant abuse of process the subpoenas represented.

564.    Upon information and belief, the purpose of the subpoenas was to force Aronsky, acting on behalf of Jefferies, to authenticate the fraudulent Agreement and testify that it transferred the Sokolowskis' personal tort rights, thereby creating a record to strip Plaintiffs of standing. The desperate last-minute

timing was intended to generate this testimony before the Sokolowskis had time to discover the PROHASHING Scheme and the circumstances surrounding the fraud. If the Court had ruled that the Sokolowskis had no standing to bring the UTPCPL claim, then *res judicata* would likely have applied to standing to bring this action as well. The Enterprise could not achieve its standing-stripping objective without Jefferies's participation as the "authenticator" and explanatory witness for the Agreement's purpose, drafting history, and intended effect.

565.    The Jefferies Defendants, likely realizing that such testimony would require admitting to the existence of the "forfeiture fund" clause, the possibility of being subject to cross-examination as to the reasons surrounding the need for the Agreement's strange clauses and the "strategic ambiguity," as well as questions regarding Jefferies LCP and Jefferies FG's knowledge of the Enterprise's racketeering activities, refused to comply.

566.    The Subpoena Crisis and the $250 in damages would not have occurred but for the Jefferies Defendants' Fraudulent Claim Sale Scheme.

567.    Proskauer Rose, representing the Jefferies Defendants, responded on behalf of its client when questioned about whether Jefferies LCP believed it owned the Sokolowskis' UTPCPL claim:

> Jefferies is not at present a party to the proceeding before Judge
> Lane. Consequently, Jefferies declines to engage on the point
> you raise at this time and reserves all rights.

Ex. V, 2025-09-10 12:37:45 email from Michael T. Mervis

568.   Stephen then met with Proskauer Rose attorney Mervis by video call on September 11, 2025 at noon EDT. After a discussion of other matters, Stephen requested that the Jefferies Defendants provide a limited disclaimer of the individuals' UTPCPL rights, similar to the relief requested in Count V of this Complaint. Yet again, the Jefferies Defendants declined to disclaim the rights of the individuals who were not parties to the fraudulent bankruptcy claim sale Agreement. Declaration of Stephen H. Sokolowski.

569.   If the Jefferies Defendants were truly unaware of the prior predicate acts and were solely purchasing a bankruptcy claim, then they, faced with becoming embroiled in expensive briefing over rights unrelated to their claimed core business of bankruptcy claims trading, would have immediately disclaimed the UTPCPL claims of the individuals. Such a disclaimer would have ended the Jefferies Defendants' involvement in the adversary proceeding scheme that Defendant Falco created and allowed the preliminary injunction hearing to proceed at zero cost to Jefferies. Instead, the Jefferies Defendants continued their strategy of strategic ambiguity that was the goal of their Agreement.

570.   On September 17, 2025, the Jefferies Defendants' counsel communicated to Plaintiffs and the Genesis Debtors via email that they were "reluctant" to produce the Agreement prior to the Bankruptcy Court addressing the Sokolowskis' objections. Falco AP, ECF No. 35, Ex. G (2025-09-17 21:59:04 email from Michael T. Mervis.)

571.   Confronted with the Plaintiffs' counterclaim, the refusal of the key witness (Jefferies LCP and Aronsky) to cooperate, the exposure of the "alignment" between the Genesis Debtors and DCG, the improper nature of the subpoenas, and Boyapati's admission that the Falco Action had been "copied and pasted" from the Debtors' complaint, the Bankruptcy Court recognized the procedural impropriety. On September 12, 2025, the Honorable Sean H. Lane adjourned the preliminary injunction hearing *sine die* (indefinitely), effectively freezing the Falco AP, with no further action taken by the Bankruptcy Court as of the filing of this Second Amended Complaint. Falco AP, ECF No. 24.

### 6. Conclusion on the Falco Adversary Proceeding Scheme

572.   The Falco Action was a litigation-based obstruction device integrated into the Enterprise's overall concealment strategy. From the outset, the Falco Action was framed as an injunction target rather than a merits vehicle: DCG told the SDNY court that, under the parties' so-ordered briefing schedule, it intended to

file an injunction application to "enjoin" Falco from pursuing claims DCG

contended belonged to the Genesis estate. Falco Action, ECF No. 24 at 2. The

strategy depended on staged, elongated briefing to keep the Falco Action pending

long enough for the Bankruptcy Court to rule first and suppress discovery into the

Enterprise's conduct. Falco Action, ECF No. 39.

573.    When Judge Cote disrupted the staging by imposing a July 25

amendment deadline and demanding jurisdictional clarification, Falco pivoted in a

manner consistent with a coordinated scheme: he dismissed on the amendment

deadline through a Rule 41(a)(1)(A)(i) notice, avoiding any merits ruling that

would have exposed his pleading defects and collapsed the "derivative" narrative

that the Enterprise sought to weaponize in bankruptcy. Falco Action, ECF No. 42.

Falco then issued public messaging portraying his withdrawal as voluntary and

aligned with the LOC and its counsel, concealing the impact of the sua sponte

order and enabling the Enterprise to repackage the dismissal as an inevitability.

574.    The Enterprise used Falco's dismissal and messaging as a coercive

persuasion tool against the Sokolowskis—pressing that the Sokolowskis should

follow Falco's "example," and threatening or implying that the Sokolowskis would

be enjoined if they continued to pursue their direct claims. See Ex. P, Meeting

Notes.

575.  By participating in this staged briefing, deadline dismissal, and intimidation sequence, Falco knowingly joined and advanced the Enterprise's concealment/retention phase: the phase designed to prevent discovery and accountability for the Enterprise's prior racketeering, including the PROHASHING Scheme, the Fraudulent Balance Sheet Scheme, and the Jefferies Claim Sale Scheme. Falco is therefore liable, as a member of the Enterprise and conspirator, for the entire damages caused by the Enterprise's racketeering activities, including the business destruction value of PROHASHING.

576.  The Falco Action was one step in a coordinated series of petitioning activities (the Falco Action, the Falco AP, and related injunction/subpoena/intimidation tactics) pursued without regard to merit and for the purpose of obstructing Plaintiffs' access to adjudicatory tribunals and discovery; the Enterprise's and Falco's misuse of the governmental process must therefore be evaluated as a pattern of sham petitioning.

## F  The Gemini Earn Assignment

577.  While Plaintiffs are not Gemini Earn depositors, Plaintiffs' claims are not typical of or common to any claims the Gemini Earn investors may have against some of the Defendants, the Gemini Earn depositors are not part of this

action, and Plaintiffs do not allege the Gemini Earn assignment as a predicate act, background is provided here to show further motive for the Enterprise's activities.

578.   Gemini Earn is a passthrough entity nearly identical to CM LLC. The Gemini Earn terms of service provided that Earn participants were direct lenders to GGC, with Gemini acting as custodian and authorized agent, a characterization the Bankruptcy Court has recognized. See ECF No. 35, *Gemini Trust Company, LLC v. Genesis Global Capital, LLC, et al.*, Adv. Pro. No. 23-01192 (SHL) (Bankr. S.D.N.Y.).

579.   Had a "direct" ruling occurred in the Falco AP, a precedent would have been set that passthrough lenders, like Gemini Earn, never possessed, and therefore could not assign, the personal tort rights of its depositors (which may also be non-assignable anyway) that were purported to be assigned along with Gemini's own rights to the Genesis Debtors. This precedent could have led to Selendy, the Genesis Debtors, and the non-parties who signed the contract facing liability over the attempted assignment of the rights.

580.   Furthermore, if the assignment contract were voided, then DCG would have been excused from nearly $1 billion in potential liability in the Delaware litigation in which they are defending against the Genesis Debtors. See *Genesis Global Holdco, LLC, et al. v. Digital Currency Group, Inc., et al.*, C.A. No. 2025-0532-KSJM (Del. Ch. May 13, 2025).

## G  Full Circle

### 1.  Harassment and Censorship, Regarding the Litigation

581.    In addition to Stephen's posts on the Block Size War that have always been manipulated and censored, posts regarding this Action and its related litigation continue to be systematically censored and responded to with "troll" comments. On January 2, 2025, Stephen posted "Announcement of the first o1 pro guided Federal litigation," to Reddit and X, which announced the filing of this Action and was the first post regarding this litigation. This post received 68 upvotes and 144 comments[57].

582.    By contrast, subsequent posts about the litigation web have been categorically censored across almost all of Reddit's subreddits. For example, "The Machine Is Always Watching," like all of Stephen's posts after approximately June 2025, was deleted after 6 hours. That post was heavily downvoted and received two comments before the entire post was censored[58]. Both comments read "Schizo," referring to Stephen's documented medical history in an attempt to discredit him and his testimony – even though he had no diagnosis of schizophrenia – by making it appear as if his statements (and, upon information

---

[57] https://www.reddit.com/r/singularity/comments/1hs32ql/announcement_of_the_first_o1_pro_guided_federal/.
[58] https://www.reddit.com/r/singularity/comments/1nryrcq/the_machine_is_always_watching_first_o1_federal/.

and belief, future testimony) were being influenced by his controlled mental illness, which had been diagnosed and treated in 2006.

583.   In response to the censorship and harassment, Stephen registered his own domain, https://stevesokolowski.com/, to have one location he can safely post his long form content without its being deleted. The setup of this website required—and continues to require—days of Stephen's time as a software developer—opportunity costs which would not be required if Stephen were able to post on social media sites other than X – the only site without lower-level moderators able to be corrupted by the Enterprise's interests.

584.   Stephen has publicly stated that the Enterprise's harassment and racketeering, which required him to work far more often would have been required of someone who was not subject to the same harassment, and which in turn limited his opportunity to have a family life outside of work. The Enterprise and its allies, including Silbert, DCG, Marquardt and Reddit moderators aligned with the small block faction, knew that their campaign of censorship, ridicule, and exclusion was targeted at a vulnerable individual, and knew or should have known that it was likely to inflict severe emotional distress, health consequences, and a significant loss of time and extra costs.

585.   The continuing censorship — into 2025 — shows a continuing pattern of coordinated conduct that did not end when the small block size was

locked in; it just shifted to force the Sokolowskis to drop this case. The harassment has continued up until the present day, to ensure that he would never pose a threat to Barry Silbert's takeover of the Bitcoin protocol. Thus, this Complaint comes full circle. The Enterprise succeeded in destroying the life of its biggest critic with its targeted harassment campaign, while inflicting collateral damage on everyone around him.

## 2. Conclusion

586.    Bitcoin could have developed along a different path. Instead, Digital Gold owes its existence to a foundational fraud.

587.    First, Silbert and DCG successfully harassed Stephen over his views of openness, transparency, and compliance with regulations to push their Digital Gold narrative, and later attempted to intimidate and discredit a witness by manipulating and censoring his discussions about this case.

588.    Next, they, along with Moro, systematically destroyed his American-owned business PROHASHING in favor of its Chinese competitors, ignoring the costs to Christopher, his family, its employees, and millions of investors who would be tricked into buying into the Digital Gold narrative. But for their actions, PROHASHING would have dominated the mining industry and had the resources to build cryptocurrency companies like DCG did, but without the racketeering and

criminality. Silbert did what he did not just to eliminate a competitor, but to extinguish a vision of an open, transparent, and American-led financial future.

589.    Having destroyed PROHASHING, DCG, Silbert, and Moro then defrauded Plaintiffs of their remaining life savings with a false balance sheet, all to cover up their continuing Enterprise. They misled the public and elected officials about the true reason they signed their fraudulent $1.1 billion promissory note that harmed 232,000 Gemini Earn investors and caused a bankruptcy cascade throughout the industry.

590.    Now that Plaintiffs were nearly bankrupt and Stephen's passthrough organization CM LLC was ready to sell its bankruptcy claim to another entity, DCG and Silbert enlisted the Jefferies Defendants, Xclaim, and Glantz to create a fraudulent bankruptcy claim sale Agreement that allowed them to profit from material non-public information and chill any future attempt by Plaintiffs to discover the Enterprise's sordid history.

591.    Next, the Enterprise recognized that it was on the verge of collapse after this case's First Amended Complaint appeared headed to discovery, so Falco, with the help of DCG, Silbert, and non-parties Davis Polk, Jennifer Selendy, Selendy Gay, Vijay Boyapati, and Kayleigh Yerdon, took one last desperate gamble. Recognizing the rewriting of history that would come to light, they decided to abuse the Federal court system with a pattern of two sham lawsuits.

Finally, when all was lost, they participated in or allowed the serving of abusive subpoenas to save themselves, their Enterprise members, multiple big law firms, the Wall Street partners, and their foreign allies. All of this occurred while the Jefferies Defendants facilitated the coverup with their policy of "strategic ambiguity" using their fraudulent claim sale Agreement.

592.    They corrupted a revolutionary technology. They defrauded millions of American families using an empire built on stolen and laundered money. They attacked the integrity of our courts, deceived our regulators, and aided our nation's adversaries.

593.    All of this, for a lie: **Digital Gold**.

## IX    TIMELINESS AND TOLLING

594.    **Applicable Limitations Principles and Accrual Standard:** Civil RICO claims are subject to a four-year limitations period running from the time a plaintiff knew or should have known of the injury to business or property and the source of that injury. Accrual does not require discovery of every element of a RICO pattern, the full scope of the enterprise, or all participants; it turns on when Plaintiffs, exercising reasonable diligence, knew or should have known that they had suffered a business/property injury and had sufficient notice of the source of that injury to prompt suit.

595.    **Claims and Injuries Timely on Their Face (Schemes 2 and 4; and Certain Scheme 3 Injuries).** Plaintiffs' claims and damages arising from the Fraudulent Balance Sheet Scheme (Scheme 2) and the Falco Adversary Proceeding Scheme (Scheme 4) are timely because the operative misconduct, reliance decisions, and injuries occurred in 2022–2025 and were known or knowable to Plaintiffs within the applicable limitations periods. In Scheme 2, Plaintiffs plead that they received, reviewed, and relied upon specific solvency representations and balance sheet materials in 2022 while located in Pennsylvania and made concrete lending/renewal decisions in reliance thereon, resulting in ascertainable business/property losses when withdrawals became unavailable. In Scheme 4, Plaintiffs plead 2025 litigation conduct—including the Falco Action/AP and related

coercive subpoena tactics—inflicting new business/property injuries (including forced mitigation and litigation costs and impairment of valuable legal rights) within the limitations period. In addition, certain injuries arising from the Jefferies Claim Sale Scheme (Scheme 3)—including later deployment of the Agreement as a litigation weapon and coercive attempts to manufacture a record impairing Plaintiffs' standing—also occurred within the limitations period.

596.   **Discovery Rule and Fraudulent Concealment (Schemes 1 and 3); Tolling Applicable to Concealment Participants (Including Jefferies and Falco).** Plaintiffs plead that the Enterprise's most consequential concealed misconduct—namely the PROHASHING Scheme (Scheme 1) and the rights stripping/standing-clouding function of the Jefferies Claim Sale Scheme (Scheme 3)—was fraudulently concealed and was not reasonably discoverable, despite diligence, until December 7, 2025, when Plaintiffs' investigation identified corroborating forensic patterns linking (among other evidence) the Quasar account activity, the Digital Gold Logs, and the block withholding sabotage described in Scheme 1.

a.         **Scheme 1 (PROHASHING) concealment and diligence.** Plaintiffs plead that block withholding sabotage was uniquely selected because it mimics ordinary mining variance ("luck"), and therefore does not reveal its source through routine profitability review. Plaintiffs further plead that they

exercised reasonable diligence for years by investigating profitability anomalies, reviewing accounting and audit data, and pursuing technical explanations, but could not reasonably identify the source of the Scheme 1 injury without corroborating evidence demonstrating intentional operator knowledge and database manipulation. Plaintiffs allege that the decisive corroboration establishing the non-random character of the sabotage—and providing the first reasonable basis to identify the source of the Scheme 1 injury as deliberate racketeering conduct—was not available to Plaintiffs until the December 7, 2025 discovery described above.

b.         **Scheme 3 (Jefferies Claim Sale) latent injury and concealed source.** Plaintiffs have long been aware that a bankruptcy claim sale agreement was executed in January 2023. However, Plaintiffs plead that they did not discover—and could not reasonably have discovered—that the Agreement functioned as an instrument designed to strip or cloud Plaintiffs' direct statutory and tort rights arising from Scheme 1 until December 7, 2025, when Plaintiffs' Scheme 1 investigation revealed the existence, nature, and value of the concealed direct claims that the Agreement purported to reach. Only in that context did Plaintiffs identify that the Agreement contained extraordinary rights capture, litigation control, and secrecy provisions not typical of ordinary bankruptcy claim sales—confirmed by comparison to a standard form claim sale agreement—and that those provisions were capable of being deployed (and were later attempted to

be deployed) to impair Plaintiffs' standing, chill prosecution of Plaintiffs' claims, and obstruct discovery into the underlying misconduct.

c.         **Scheme 4 concealment and chilling (Falco).** Plaintiffs plead that the Falco Action, Falco AP, and related subpoena tactics were undertaken to impede adjudication and discovery concerning the Enterprise's prior misconduct, including the PROHASHING Scheme, and to manufacture a record supporting the false narrative that Plaintiffs' direct statutory and tort claims were "derivative" or had been transferred away. Plaintiffs plead that this conduct further delayed Plaintiffs' ability to identify, investigate, and vindicate the source and scope of the Scheme 1 injury and constitutes affirmative concealment and obstruction conduct supporting tolling principles.

d.         **Enterprise-wide concealment conduct supporting tolling.** Plaintiffs further plead that Defendants engaged in affirmative concealment and suppression conduct beyond the underlying wrongdoing itself—including secrecy provisions, strategic ambiguity designed to cloud title to claims, monitoring and destruction of communications, and coercive litigation tactics intended to deter inquiry and manufacture a record impairing Plaintiffs' standing— thereby preventing earlier discovery of the source and scope of the injuries described in Schemes 1 and 3. Plaintiffs plead that these concealment and obstruction acts were undertaken in concert and that Defendants who participated

in such concealment cannot invoke a limitations defense premised on concealment they helped effectuate.

597.    **Separate Accrual for New and Independent Injuries Within the Limitations Period; Damages Segmentation.** Plaintiffs further plead that, even to the extent any discrete injuries are deemed to have accrued outside the limitations period, Defendants committed additional predicate acts and obstruction conduct within the limitations period that inflicted new and independent business/property injuries. These include (without limitation) litigation and mitigation costs incurred in response to Scheme 4; delay harms and impairment of recovery pathways caused by efforts to cloud Plaintiffs' standing; and injury to Plaintiffs' valuable choses in action and ability to prosecute claims in a single forum. Plaintiffs therefore seek recovery at minimum for the injuries accruing within the limitations period under a separate-accrual theory, while pleading the earlier concealed conduct as part of the Enterprise's continuing pattern, relatedness, continuity, motive, and method of operation.

598.    **Relation Back:** Pursuant to Fed. R. Civ. P. 15(c), the claims in this amended Complaint relate back to the date of the original pleading (January 2, 2025) because they arise out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading (the fraudulent relationship with DCG and Silbert).

# X     CLAIMS FOR RELIEF

## COUNT I

## Violation of Racketeer Influenced and Corrupt Organizations Act (RICO)
## 18 U.S.C. § 1962(c)
## (All Plaintiffs Against All Defendants)

599.   Plaintiffs incorporate by reference the allegations set forth above.

### A   The Enterprise

600.   As alleged above, Defendants—together with certain non-party agents, intermediaries, and currently unidentified participants described in the Non-Parties section (Section IV)—formed and operated an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), having a shared purpose and functioning as a continuing unit with an ascertainable structure.

601.   The Enterprise's activities affected interstate and foreign commerce through, among other things, nationwide and international digital asset transactions; interstate wire communications; interstate movement and conversion of stolen proceeds; and multi-forum litigation and judicial proceedings.

## B  Defendants as RICO "Persons" and Participation in the Enterprise's Affairs

602.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) and is distinct from the Enterprise.

603.   As alleged above in the defendant-specific allegations and in Schemes 1–4, each Defendant conducted and/or participated—directly or indirectly—in the conduct of the Enterprise's affairs (including by directing, authorizing, coordinating, implementing, and exploiting Enterprise schemes; and by committing and causing the commission of racketeering predicates) and participated in the Enterprise's operation and management within the meaning of 18 U.S.C. § 1962(c). As set forth in Schemes 1–4, Defendants' participation included directing and implementing core Enterprise functions within each scheme, including technical execution (Scheme 1), solvency messaging and asset-retention strategy (Scheme 2), contractual litigation control architecture (Scheme 3), and coordinated litigation and process suppression strategy (Scheme 4).

## C  Pattern of Racketeering Activity

604.   As alleged above and described in Section VIII, Defendants conducted and participated in the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), consisting of

multiple related predicate acts committed over an extended period for the common

purposes of: (i) obtaining and retaining money and property by fraud and theft; (ii)

concealing the Enterprise's misconduct and proceeds; and (iii) suppressing

exposure through coercion, witness tampering, and obstruction of justice.

605.   The Enterprise's pattern of racketeering activity includes, among other

racketeering acts described above, acts indictable under (and therefore racketeering

activity within the meaning of) 18 U.S.C. § 1961(1), including:

> a.      Wire Fraud (18 U.S.C. § 1343);

> b.      Money Laundering (18 U.S.C. § 1956);

> c.      Interstate Transportation of Stolen Property (18 U.S.C. § 2314);

> d.      Witness Tampering (18 U.S.C. § 1512(b), including 18 U.S.C. § 1512(b)(1) and/or § 1512(b)(3));

> e.      Obstruction of Justice (18 U.S.C. § 1512(c)); and

> f.      Obstruction of Justice (18 U.S.C. § 1503).

606.   To the extent other unlawful acts are described above, they are

pleaded as additional unlawful conduct in furtherance of the Enterprise and as

evidence of intent, means, and continuity, whether or not separately enumerated as

racketeering activity in 18 U.S.C. § 1961(1).

607. The particular communications, transactions, documents, concealment steps, litigation maneuvers, subpoenas, and coercive acts constituting these predicates are alleged with specificity in the "Summary of the Predicate Acts" and in Schemes 1–4 and the related exhibit citations incorporated above. As alleged above, DCG, Silbert, and Moro are principal actors in Schemes 1–2; DCG, Silbert, the Jefferies Defendants, Xclaim, and Glantz are principal actors in Scheme 3; DCG, Silbert, and Falco are principal actors in Scheme 4; each Defendant is liable as alleged because these Acts are interlocking phases of a single Enterprise pattern.

### D  Predicate Acts by Scheme

#### 1.  Scheme 1: The PROHASHING Scheme

608. As alleged in Scheme 1, Defendants and Enterprise participants executed and concealed the PROHASHING Scheme to steal and divert mining rewards and other digital asset value belonging to PROHASHING for the purpose of sabotage, and to transport, convert, and conceal the resulting proceeds.

609. In furtherance of Scheme 1, Defendants committed and caused to be committed predicate acts including, without limitation:

    a.      **Wire Fraud (18 U.S.C. § 1343)**, through interstate wire transmissions and electronic communications used to execute and conceal the theft

and diversion of mining rewards and related digital-asset value, as alleged in

Scheme 1 and Section VIII(B).

        b.        **Money Laundering (18 U.S.C. § 1956)**, through

financial transactions involving proceeds of specified unlawful activity (including

wire fraud and theft-related conduct) designed to conceal or disguise the nature,

source, ownership, control, and disposition of the stolen proceeds, as alleged in

Scheme 1 and Section VIII(B); and

        c.        **Interstate Transportation of Stolen Property (18**

**U.S.C. § 2314)**, through the interstate and/or foreign movement, transfer, and

transmission of stolen digital assets and/or proceeds valued at $5,000 or more,

knowing the same to have been stolen, converted, or taken by fraud, as alleged in

Scheme 1 and Section VIII(B).

## 2. Scheme 2: The Fraudulent Balance Sheet Scheme

610.   As alleged in Scheme 2, Defendants executed and exploited the

Fraudulent Balance Sheet Scheme to induce and maintain reliance on materially

false solvency representations in order to retain and control customer and creditor

property (including Plaintiffs' deposits and digital assets), to prevent withdrawals,

and to conceal the Enterprise's financial exposure and prior wrongdoing.

611.    In furtherance of Scheme 2, Defendants committed and caused to be committed predicate acts including, without limitation:

a.        **Wire Fraud (18 U.S.C. § 1343)**, through interstate wire communications transmitting and amplifying materially false and misleading statements and omissions regarding solvency, asset quality, and financial condition, as alleged in Scheme 2 and Section VIII(C).

### 3.  Scheme 3: The Jefferies Claim Sale Scheme

612.    As alleged in Scheme 3, Defendants executed and exploited the Jefferies Claim Sale Scheme to disable and control Plaintiffs' valuable legal rights and proceeds, to manufacture and maintain a cloud over Plaintiffs' direct claims and recovery pathways (including restitution/remission/restoration and similar government-administered recovery pathways referenced in the Claim Sale Agreement), to suppress Plaintiffs' pursuit of discovery and public disclosures, and to preserve the Enterprise's retention of proceeds and concealment of misconduct.

613.    In furtherance of Scheme 3, Defendants committed and caused to be committed predicate acts including, without limitation:

a.        **Wire Fraud (18 U.S.C. § 1343)**, through interstate wire communications used to negotiate, market, transmit, and consummate the Claim Sale Agreement and related instruments by means of material misrepresentations

and omissions concerning the nature and effect of the transaction, Plaintiffs' rights, and the coercive "control/silencing" features of the deal, as alleged in Scheme 3 and Section VIII(D);

b.        **Witness Tampering (18 U.S.C. § 1512(b))**, through intimidation, threats, and corrupt persuasion (including contract-based coercive mechanisms and strategic ambiguity) intended to deter, hinder, and prevent Plaintiffs' communications and testimony—including communications to courts, regulators, and law enforcement—regarding the Enterprise's federal offenses and to chill Plaintiffs' prosecution of their direct claims, as alleged in Scheme 3 and Section VIII(D); and

c.        **Obstruction of Justice (18 U.S.C. § 1512(c) and/or 18 U.S.C. § 1503)**, through corrupt efforts to obstruct, influence, and impede (and attempts to obstruct, influence, and impede) official proceedings and the due administration of justice, including the Genesis bankruptcy case and related federal proceedings, including by interfering with and impairing the availability or integrity of records, documents, electronically stored information, and other evidence or things for use in such proceedings; by manufacturing standing/ownership disputes; by imposing and exploiting coercive leverage; and by otherwise interfering with discovery and evidence development, as alleged in Scheme 3 and Section VIII(D).

### 4. Scheme 4: The *Falco* Adversary Proceeding Scheme

614.    As alleged in Scheme 4 and Section VIII(E), Defendants executed and exploited the Falco Adversary Proceeding Scheme to weaponize litigation and subpoena process—including sham and objectively baseless proceedings—to enjoin and derail Plaintiffs' claims, suppress evidence, chill Plaintiffs' disclosures and testimony, and obstruct the fair administration of justice.

615.    In furtherance of Scheme 4, Defendants (including Falco and DCG-aligned participants) committed and caused to be committed predicate acts including, without limitation:

a.        **Obstruction of Justice (18 U.S.C. § 1512(c) and/or 18 U.S.C. § 1503)**, through corrupt endeavors to obstruct, influence, and impede (and attempts to obstruct, influence, and impede) official proceedings and the due administration of justice—including the Genesis Bankruptcy case and related federal proceedings—by filing and prosecuting sham and objectively baseless proceedings and by using litigation and subpoena process as instruments to delay, derail, and suppress Plaintiffs' prosecution of their claims and discovery, including by interfering with and impairing the availability or integrity of records, documents, electronically stored information, and other evidence or things for use in such proceedings, as alleged in Scheme 4 and Section VIII(E); and

b.        **Witness Tampering (18 U.S.C. § 1512(b))**, through intimidation, threats, corrupt persuasion, and misuse of process intended to deter, hinder, delay, and prevent Plaintiffs' testimony and communications to courts, regulators, and law enforcement regarding the Enterprise's offenses, as alleged in Scheme 4 and Section VIII(E).

## E   Relatedness and Continuity

616.   The racketeering predicates described above are related and form a pattern because they share common purposes, participants, victims, methods, and results, including theft and retention of money and property by fraud, concealment of misconduct and proceeds, and suppression of exposure through coercion, witness tampering, and obstruction. They demonstrate both closed-ended continuity (repeated racketeering over a substantial period) and open-ended continuity (a threat of continued racketeering whenever exposure risk arises), as alleged above.

## F   Injury and Causation

617.   As alleged in Section XI ("Damages") and throughout Schemes 1–4 (Sections VIII(B)-VIII(E)), Plaintiffs have been injured in their business and property, as applicable to each Plaintiff, by reason of Defendants' violation of 18

U.S.C. § 1962(c), including without limitation: (a) theft and diversion of mining rewards and related digital assets; (b) destruction and impairment of PROHASHING's business and enterprise value; (c) loss of Plaintiffs' deposits and related property interests due to materially false solvency representations; (d) increased litigation and mitigation costs and delay damages caused by obstruction and witness tampering conduct; and (e) impairment, clouding, and threatened diversion of Plaintiffs' valuable choses in action and recovery proceeds.

618.   Defendants' racketeering acts were a substantial factor in causing Plaintiffs' injuries, and these injuries were the foreseeable and intended consequence of Defendants' conduct of the Enterprise's affairs through the pattern of racketeering activity alleged above.

619.   By reason of the foregoing, Plaintiffs are entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other and further relief as the Court deems just and proper.

## COUNT II

### Conspiracy to Violate RICO
### 18 U.S.C. § 1962(d)
### (All Plaintiffs Against All Defendants)

620.   Plaintiffs incorporate by reference the allegations set forth above.

621.   Section 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962, including § 1962(c).

622.   As alleged above, Defendants knowingly and intentionally agreed with one another and with other persons known and unknown to Plaintiffs to conduct and participate—directly or indirectly—in the conduct of the Enterprise's affairs through a pattern of racketeering activity, as alleged in Count I and throughout this Complaint.

623.   Defendants' Agreement encompassed the Enterprise's common purposes and objectives, including: (a) obtaining and retaining money and property through the PROHASHING Scheme and the Fraudulent Balance Sheet Scheme; (b) concealing the existence, source, ownership, and disposition of the Enterprise's proceeds; (c) suppressing exposure, discovery, and victim recovery through coercion, witness tampering, and obstruction of justice; and (d) manufacturing and exploiting procedural and ownership/standing controversies to disable Plaintiffs' direct claims and recovery pathways, including through the Jefferies Claim Sale Scheme and the Falco Adversary Proceeding Scheme.

624.   Defendants joined the conspiracy at different times and played different roles, but each Defendant knew the essential nature and scope of the Enterprise and knowingly agreed to facilitate at least one component of the

Enterprise's racketeering pattern while furthering the overarching objectives described above.

625.    In furtherance of the conspiracy, Defendants agreed and understood that one or more members of the Enterprise would commit (and did commit) multiple acts of racketeering activity as defined by 18 U.S.C. § 1961(1), including the predicate acts identified in Section VIII and mapped by scheme in Count I. It is not required that each Defendant personally committed two predicate acts; it is sufficient that each Defendant knowingly agreed to facilitate the Enterprise's conduct of its affairs through the racketeering pattern alleged.

626.    The Jefferies Defendants, Xclaim, and Glantz knowingly joined and furthered the conspiracy by facilitating, negotiating, transmitting, and consummating the Jefferies Claim Sale Scheme—including through trade confirmations, contract instruments, and related wire communications—and by deploying and maintaining coercive leverage and strategic ambiguity (including refusing to disclaim ownership/control over Plaintiffs' Direct Claims and Proceeds while reserving all rights) designed to disable and control Plaintiffs' valuable legal rights and proceeds, to chill Plaintiffs' disclosures and communications, and to obstruct Plaintiffs' pursuit of discovery and recovery.

627.    Defendant Falco knowingly joined and furthered the conspiracy by lending his participation and name to the Falco Adversary Proceeding Scheme,

including sham and objectively baseless proceedings and related litigation and subpoena tactics, designed to enjoin, delay, derail, and suppress Plaintiffs' prosecution of their direct claims and to chill Plaintiffs' testimony and communications concerning the Enterprise's federal offenses.

628.   By virtue of the foregoing, each Defendant is liable for the acts of co-conspirators committed in furtherance of the conspiracy and for all business- and property-related injuries proximately caused by the Enterprise's racketeering acts and other independently wrongful conduct undertaken to execute, preserve, and conceal the Enterprise's racketeering schemes, including the injuries and damages alleged in Section XI and throughout Schemes 1–4 (Section VIII).

629.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business and property, and are entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other and further relief as the Court deems just and proper.

## COUNT III

### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) (73 P.S. §§ 201-1, et seq.)
### (Stephen and Christopher Sokolowski Against DCG, Silbert, and Moro)

630.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

631.    The Sokolowskis purchased services (lending and custody) from Defendants primarily for personal, family, or household purposes.

632.    The Sokolowskis' purchase of services from their own personal and household funds was distinct from that of CM LLC passthrough lender PROHASHING, which purchased services using its business funds and does not allege this Count.

633.    Defendants engaged in unfair or deceptive acts or practices within the meaning of the UTPCPL, including but not limited to:

a.    Representing that GGC had "Current Assets" sufficient to cover liabilities when it did not (Section 201-2(4)(v));

b.    Representing that services had characteristics (solvency, safety) that they did not have (Section 201-2(4)(v)); and

c.    Engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding (Section 201-2(4)(xxi)).

634.   Specifically, the classification of the $1.1 billion illiquid promissory note as a "Current Asset" on the balance sheet presented to Plaintiffs was a deceptive act.

635.   The Sokolowskis justifiably relied on these misrepresentations to their detriment by renewing their loans and keeping their personal savings at GGC.

636.   As a result, the Sokolowskis suffered an ascertainable loss of money or property. The Sokolowskis request an award of treble damages and attorneys' fees pursuant to 73 P.S. § 201-9.2.

## COUNT IV

**Tortious Interference with Contractual and Prospective Economic Relations**
**(Restatement (Second) of Torts §§ 766 and 766B)**
**(PROHASHING LLC Against DCG, Silbert, and Moro)**

637.   PROHASHING LLC ("PROHASHING") incorporates by reference all prior paragraphs as if fully set forth herein.

638.   PROHASHING had ongoing contractual and/or at-will economic relationships with third-party miners (the "Miner Relationships") and reasonably probable prospective economic relationships with additional miners who, absent Defendants' misconduct, would have continued mining with PROHASHING or begun mining with PROHASHING (the "Prospective Miner Relationships").

639.    Defendants Digital Currency Group, Inc., Barry E. Silbert, and Soichiro "Michael" Moro (collectively, "Defendants") knew of these relationships and knew PROHASHING's business depended on attracting and retaining miners' hashrate.

640.    As alleged herein, Defendants intentionally and improperly interfered with PROHASHING's Miner Relationships and Prospective Miner Relationships by inducing and/or otherwise causing third-party miners to (a) reduce or cease directing hashrate to PROHASHING, (b) terminate or refuse to continue relationships with PROHASHING, and/or (c) refrain from entering into relationships with PROHASHING, including by coordinating, funding, incentivizing, and/or maintaining sabotage of PROHASHING's pool operations (including block withholding and related sabotage tactics) designed to degrade PROHASHING's profitability and perceived reliability and to drive miners away from PROHASHING.

641.    Defendants' conduct was improper and unprivileged; no justification or privilege applies.

642.    As a direct and proximate result, PROHASHING suffered damages, including lost fee revenue and profits attributable to diminished/diverted hashrate and consequential losses including loss of goodwill and loss of going concern/business value, in amounts to be proven at trial.

643.    This Count seeks recovery only for PROHASHING's own injuries to its business and property arising from Defendants' interference with PROHASHING's contractual and prospective economic relations.

644.    WHEREFORE, PROHASHING requests judgment against Defendants on this Count, compensatory damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT V

### Declaratory Judgment (28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57) (All Plaintiffs Against Jefferies Financial Group, Inc. and Jefferies Leveraged Credit Products, LLC)

645.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

646.    This Court has authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and Fed. R. Civ. P. 57 to declare the rights and legal relations of the parties where an actual controversy exists.

647.    An actual, present controversy exists between Plaintiffs and the Jefferies Defendants regarding whether the Jefferies Defendants acquired, own, control, or have any entitlement to the proceeds of Plaintiffs' direct causes of action asserted in this Complaint—particularly Plaintiffs' direct statutory, tort, and

federal claims against non-debtors—by virtue of the Claim Sale and Purchase

Agreement and related transaction documents.

648.   The controversy is concrete and ripe because: (a) the Agreement

contains non-standard provisions purporting to seize, assign, or control claims

beyond the purchased bankruptcy claim and distributions; (b) Defendants have

invoked the Agreement as a litigation weapon to create standing/ownership

disputes; and (c) when directly asked to disclaim ownership/control of the

Sokolowskis' personal UTPCPL rights against non-debtors, the Jefferies

Defendants refused to disclaim and instead stated that they "decline to engage" and

"reserve all rights," thereby preserving the threat of later assertion of rights.

649.   Plaintiffs are, and at all relevant times have been, the real parties in

interest and owners of the direct causes of action pleaded in this case as follows:

a.         The Sokolowskis own their personal statutory and tort

rights arising from their consumer purchase of GGC lending and custody services,

including their UTPCPL claim pleaded in Count III, and the related counts pleaded

in the Conn. Action.

b.         PROHASHING owns its business and property injuries

pleaded in this case, and its RICO injuries arising from the alleged theft and

destruction of enterprise value.

272

c.      None of Plaintiffs' direct claims against non-debtors— and none of Plaintiffs' entitlement to recover damages and proceeds on such claims—were owned by CM LLC (a nominal passthrough vehicle) in a manner that could be conveyed through a bankruptcy claim trade; in any event, a contract between Jefferies and CM LLC cannot transfer claims belonging to non-parties under the *nemo dat* principle.

650.   Accordingly, to the extent the Agreement or related documents purport to assign, convey, transfer, grant control over, or create an entitlement to proceeds from Plaintiffs' direct statutory, tort, or federal claims against non-debtors (including, without limitation, Plaintiffs' UTPCPL and RICO claims asserted herein), such purported assignment, conveyance, control mechanism, or proceeds entitlement is void, unenforceable, and/or legally ineffective as applied to Plaintiffs' direct causes of action and recoveries.

651.   Plaintiffs therefore request that this Court enter a declaratory judgment declaring that:

a.      The Jefferies Defendants did not acquire and do not own Stephen Sokolowski's or Christopher Sokolowski's personal UTPCPL rights (or any other personal statutory or tort rights) to sue non-debtors arising from Genesis's conduct;

b.         The Jefferies Defendants did not acquire and do not own PROHASHING's property, business, and federal statutory claims or any entitlement to proceeds arising from such claims;

c.         The Jefferies Defendants did not acquire and do not own any portion of Plaintiffs' direct federal RICO cause(s) of action asserted in this case, and have no right to control, direct, veto, compel dismissal of, or otherwise dictate Plaintiffs' prosecution of this action;

d.         The Jefferies Defendants have no right, title, interest, control right, or entitlement to proceeds from any judgment or settlement obtained by Plaintiffs in this action on Plaintiffs' direct causes of action against non-debtors, except to the extent of distributions payable on the bankruptcy claim actually purchased; and

e.         The Jefferies Defendants are barred from asserting—now or in the future—any right, title, interest, control right, lien, or entitlement to proceeds inconsistent with this Court's declaration.

652.   Plaintiffs further respectfully request that the Court resolve this declaratory judgment controversy on an expedited basis and prior to merits discovery and trial on the remaining Counts, because the ongoing cloud and uncertainty created by Jefferies' refusal to disclaim (while "reserving all rights") threatens immediate and continuing prejudice, including settlement impairment,

274

standing and proceeds disputes, and the risk of inconsistent or duplicative proceedings. The outcome of this count will determine whether the primary or the alternative Counts will be litigated by Plaintiffs. Plaintiffs therefore request that the Court, pursuant to Fed. R. Civ. P. 57 and 42(b) and the Court's inherent case-management authority, order phased proceedings and enter an early determination of Count V, with discovery (if any) initially limited to the ownership/control/proceeds issues raised by Count V.

## COUNT VI

### Fraudulent Misrepresentation
### (Pled in the Alternative)
### (All Plaintiffs Against Xclaim, Inc. and Andrew Glantz)

653.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

654.    This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d). It is asserted to ensure that, to the extent the Court determines that the Claim Sale and Purchase Agreement described in "

655.    Scheme 3: The Jefferies Claim Sale Scheme" assigned, transferred, encumbered, diverted, or otherwise subjected to Jefferies LCP's control any portion of Plaintiffs' personal and/or direct statutory and tort claims asserted in this action (including but not limited to Plaintiffs' RICO claims and UTPCPL claims,

and any other direct claims arising from the Fraudulent Balance Sheet Scheme and the PROHASHING Scheme) and/or any proceeds therefrom (collectively, the "Direct Claims and Proceeds"), then Xclaim and Glantz are liable for the resulting loss because they fraudulently induced and facilitated the Claim Sale Agreement and its sweeping assignment/control provisions.

656.    In the course of marketing, negotiating, and facilitating the Claim Sale Agreement, Glantz—acting individually and as an officer/agent of Xclaim—made material misrepresentations and half-truths to Plaintiffs and concealed material facts, and Plaintiffs did in fact rely on those statements and omissions.

657.    Glantz and Xclaim misrepresented that the Claim Sale Agreement was a standard or "form" contract used in ordinary claim trades, that "these things rarely get litigated," that Jefferies was a "solid actor" and "not playing any games," and that Plaintiffs should not "waste [their] energy picking apart" the Agreement, while omitting that the Agreement contained bespoke, highly unusual, and unusually sweeping provisions designed to seize or control far more than a bankruptcy claim;

658.    Glantz and Xclaim misrepresented that the transaction was a straightforward sale of a Genesis bankruptcy claim, while omitting that the Claim Sale Agreement's sweeping language purported to reach beyond a proof of claim transfer and into Plaintiffs' personal and later-discovered Direct Claims and

Proceeds (including "any class action or other cases … arising in the future"), and further included "participation," "direction," and/or litigation-control mechanisms designed to manufacture a threshold standing/ownership dispute and obstruct merits discovery;

659.   Glantz and Xclaim omitted that the Claim Sale Agreement required representations and warranties (including a "no other ultimate beneficiaries" or similar provision) that were inconsistent with—and, as alleged elsewhere, knowingly false in light of—Xclaim and Glantz's actual knowledge that CM LLC was a nominal passthrough holding conduit for multiple individual lenders and PROHASHING LLC, such that the Agreement's text was engineered to disregard the known passthrough structure and create leverage, a "breach" narrative, and intimidation risk against Plaintiffs;

660.   Glantz and Xclaim omitted that the Claim Sale Agreement contained provisions concerning criminal forfeiture, DOJ forfeiture/restitution funds, and/or material non-public information that, upon information and belief, reflected awareness of criminal proceeds and/or insider information relating to the Enterprise's misconduct and were included to further the Enterprise's concealment and retention phase; and

661.   Glantz and Xclaim used time pressure and deadline representations to induce execution without counsel and without negotiated carve-outs,

notwithstanding Xclaim's and Glantz's public positioning as subject matter experts in "market-standard" claim-sale documentation and the availability of tailored carve-outs where a seller retains tort and statutory rights.

662.    The foregoing misrepresentations and omissions were material because Plaintiffs were deciding whether to execute a contract that would later be invoked as a litigation-control device and as a manufactured standing/ownership dispute to derail Plaintiffs' prosecution of their Direct Claims and delay discovery into the Enterprise's racketeering activity.

663.    Glantz and Xclaim intended to mislead Plaintiffs and intended that Plaintiffs would rely upon these misrepresentations and omissions in deciding whether to sign the Claim Sale Agreement and whether to sign it without negotiated carve-outs or independent counsel.

664.    Plaintiffs did reasonably and justifiably rely on Xclaim and Glantz's misrepresentations and omissions. Plaintiffs executed and performed the Claim Sale Agreement as facilitated by Xclaim and Glantz.

665.    As a direct and proximate result of Xclaim and Glantz's fraudulent inducement and fraudulent misrepresentations/omissions, Plaintiffs have suffered pecuniary harm, including but not limited to:

        a.        To the extent the Claim Sale Agreement is construed or enforced to assign, transfer, encumber, divert, or subject to Jefferies' control any

portion of Plaintiffs' Direct Claims and Proceeds, Plaintiffs' loss of the value of those Direct Claims and Proceeds (including loss of statutory multipliers, remedies, and litigation control), and the resulting impairment of Plaintiffs' ability to obtain recovery from the Enterprise;

b.      Independently, the costs, delay damages, and other pecuniary losses associated with the manufactured controversy and cloud over ownership/standing created by the Claim Sale Agreement's nonstandard assignment/control provisions, including the costs of investigating, responding to, and litigating that controversy and the delay and disruption to Plaintiffs' pursuit of merits discovery.

666.   Xclaim and Glantz's conduct was willful, wanton, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages to the extent permitted by law, as well as compensatory damages, interest, costs, and such other relief as the Court deems just and proper.

## COUNT VII

### Negligent Misrepresentation
### (Pled in the Further Alternative)
### (All Plaintiffs Against Xclaim, Inc. and Andrew Glantz)

667.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

668.   This Count is pled in the further alternative to Count VI, to the extent the Court finds that Xclaim and/or Glantz did not knowingly make misrepresentations with the intent to mislead Plaintiffs, but nonetheless supplied false or misleading information and failed to exercise reasonable care.

669.   In the course of their business as a bankruptcy claims marketplace, intermediary, and self-described subject matter expert in claim sale documentation and transactions, Xclaim and Glantz supplied information to Plaintiffs for the guidance of Plaintiffs in a business transaction—namely, whether and how to execute the Claim Sale Agreement.

670.   Xclaim and Glantz supplied the information described above for the guidance of Plaintiffs in a business transaction affecting Plaintiffs' valuable direct claims and recovery proceeds, and Plaintiffs were within the limited and foreseeable class of persons whom Xclaim and Glantz intended (or knew) would rely on that information in deciding whether and how to proceed.

671.   Xclaim and Glantz supplied false and misleading information and/or material omissions regarding the nature, market standard character, and legal effect of the Claim Sale Agreement—particularly its sweeping assignment/control provisions purporting to reach Plaintiffs' Direct Claims and Proceeds—without exercising reasonable care or competence in obtaining, communicating, and/or

correcting that information, and without reasonably disclosing the Agreement's nonstandard litigation control and claim seizure features.

672.   Plaintiffs reasonably and justifiably relied on Xclaim and Glantz's negligent misrepresentations and omissions in executing and performing the Claim Sale Agreement as facilitated by Xclaim and Glantz, including by proceeding without the negotiated carve-outs and protections that a reasonably careful intermediary would have disclosed as necessary given Plaintiffs' passthrough structure and the personal nature of Plaintiffs' Direct Claims.

673.   As a direct and proximate result of Xclaim and Glantz's negligent misrepresentations and omissions, Plaintiffs suffered pecuniary loss, including but not limited to:

   a.      To the extent the Claim Sale Agreement is construed or enforced to assign, transfer, encumber, divert, or subject to Jefferies' control any portion of Plaintiffs' Direct Claims and Proceeds, the loss of the value of those Direct Claims and Proceeds; and

   b.      Independently, the costs and delay damages associated with the manufactured ownership/standing controversy and cloud created by the Agreement's nonstandard assignment/control provisions.

674.   Plaintiffs therefore seek compensatory damages, interest, costs, and such other relief as the Court deems just and proper.

## COUNT VIII

### Civil Conspiracy
### (Pled in the Further Alternative)
### (All Plaintiffs Against Xclaim, Inc. and Andrew Glantz)

675.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

676.    This Count is pled in the further alternative pursuant to Fed. R. Civ. P. 8(d) and is derivative of, and based upon, the underlying unlawful acts and torts described in Count VI (fraudulent inducement / fraudulent misrepresentation) and/or Count VII (negligent misrepresentation), and the unlawful objective of using the Claim Sale Agreement as a silencing, leverage, and litigation control device.

677.    Xclaim and Glantz combined and agreed with one or more other persons or entities (including the Jefferies Defendants, DCG, and Silbert) to accomplish an unlawful purpose and/or a lawful purpose by unlawful means— namely, to procure and deploy a facially colorable but legally defective claim-sale instrument that (i) disregarded the known passthrough structure, (ii) purported to seize or control Plaintiffs' Direct Claims and Proceeds contrary to *nemo dat* and public policy, and (iii) manufactured a standing/ownership dispute designed to obstruct, delay, and chill Plaintiffs' prosecution of their Direct Claims and pursuit of discovery into the Enterprise's misconduct.

678.   Overt acts in furtherance of the conspiracy included, but were not limited to: drafting, proposing, marketing, pressuring, and facilitating execution of the Claim Sale Agreement with sweeping assignment/control provisions; communicating misleading assurances about the Agreement's market-standard nature and litigation risk; urging Plaintiff Stephen Sokolowski not to scrutinize or negotiate the Agreement; concealing the Agreement's true legal effect and nonstandard litigation-control devices; and coordinating the closing of the transaction in a manner designed to maximize leverage over Plaintiffs and minimize the creation of discoverable evidence.

679.   The conspiratorial conduct described above was undertaken with malice and with the intent to injure Plaintiffs by depriving Plaintiffs of control over their Direct Claims and Proceeds and by obstructing and delaying Plaintiffs' ability to pursue merits discovery into the Enterprise's racketeering activity.

680.   Xclaim and Glantz acted with malice and an intent to injure Plaintiffs by impairing Plaintiffs' standing and chilling prosecution of Plaintiffs' claims.

681.   As a direct and proximate result of the civil conspiracy, Plaintiffs suffered damages as described above, including the loss or impairment of the value of Plaintiffs' Direct Claims and Proceeds to the extent the Claim Sale Agreement is construed or enforced to transfer or control them, and independently the pecuniary

costs and delay damages stemming from the manufactured controversy and cloud created by the Agreement.

682.   Xclaim and Glantz are jointly and severally liable for all damages caused by the conspiracy, as well as interest, costs, and such other relief as the Court deems just and proper.

## XI    DAMAGES

683.   As a direct and proximate result of the Defendants' racketeering, fraud, and unlawful conduct, Plaintiffs have suffered actual, concrete, and ascertainable losses in the following categories. Plaintiffs plead these damages categories in the alternative and/or cumulatively to the extent they are not duplicative, and will present expert testimony and other proof to allocate damages and avoid any double recovery.

### A  Loss of Funds (The GGC Deposits)

684.   Plaintiffs entrusted specific quantities of cryptocurrency and fiat currency to GGC based on the fraudulent representations of the Enterprise. These assets were misappropriated or lost when GGC collapsed.

685.   The following table details the specific assets held by Plaintiffs at GGC as of the bankruptcy petition date (January 19, 2023), along with their highest intermediate value between the date of the fraud and the date of filing:

| Plaintiff (UTPCPL and wire fraud) | Asset | Quantity | Approx. Value at All Time High |
|---|---|---|---|
| Stephen Sokolowski | BTC | 50 | $6,304,000 |
| Stephen Sokolowski | ETH | 848.9679943 | $4,199,038 |
| Stephen Sokolowski | USDC | 86360.757695 | $86,360 |
| Stephen Sokolowski | USD | $45,282.45 | $45,282 |
| Christopher Sokolowski | ETH | 220.09263209 | $1,088,589 |
| Christopher Sokolowski | USDC | 155064.735245 | $155,064 |
| Christopher Sokolowski | USD | $2,621.22 | $2,621 |
| Plaintiff (Wire fraud only) | Asset | Quantity | Approx. Value at All Time High |
| PROHASHING LLC | USDC | 252498.8562 | $252,498 |

| Plaintiff | Claim Sale Offset Amount |
|---|---|
| Stephen Sokolowski | -$618,627.50 |
| Christopher Sokolowski | -$123,515.23 |
| PROHASHING LLC | -$62,897.08 |

686.   The total actual loss of personal funds—the amount at issue for Count III—amounts to approximately $11,880,954 (valued at highest intermediate prices).

687.   The total loss of personal funds summed with PROHASHING's funds—the amount at issue for the wire fraud act—amounts to $12,133,452.

688.   But for the Fraudulent Balance Sheet Scheme directed by DCG, Silbert, and Moro on behalf of the Enterprise, and which was later covered up by Xclaim, Glantz, the Jefferies Defendants, and Falco, Plaintiffs would not have renewed their loans at GGC and suffered these losses.

## B  Destruction of Enterprise Value (PROHASHING)

689.   PROHASHING's primary injury to business and property is the destruction of its going concern enterprise value—including the loss of its established customer base, goodwill, market position, and expected future profits—caused by the Enterprise's sabotage, theft, and diversion of the market PROHASHING built to the Enterprise's own competing businesses, including Foundry Digital.

690.   Plaintiffs will prove the amount of PROHASHING's lost enterprise value through expert testimony using accepted valuation methodologies, including discounted cash flow and comparable-company/comparable-transaction "yardstick" analyses. As one particularly probative yardstick for the magnitude of the market value captured through the Enterprise's conduct, DCG has publicly represented that its enterprise valuation was approximately $4.4 billion as of

December 31, 2023. Plaintiffs contend that DCG's represented valuation reflects, at least in material part, value created through the Enterprise's capture of the mining/pool market and related businesses at PROHASHING's expense, including through Foundry Digital.

691.　While PROHASHING would have created different lines of business on the more honest and open Bitcoin network that would have resulted but for the Enterprise's Digital Gold scheme and its attacks on PROHASHING, the best available estimate of the "opportunity cost" or "lost enterprise value" of PROHASHING is the current valuation of DCG.

692.　In the alternative, and to the extent not already reflected in the lost enterprise value measure, PROHASHING also suffered substantial lost operational profits and fees during the sabotage period, in an amount to be proven at trial through business records and expert analysis (estimated to exceed $250 million).

## C　Direct Theft of Mining Rewards (The Block Withholding Loss)

693.　This represents the value of cryptocurrency rewards that were generated by PROHASHING's servers but diverted to the Enterprise via the Merge Mine Skim (to the extent it was exploited), block withholding attacks, and database modifications (to the extent they were exploited). This injury is distinct from and in addition to the loss of funds deposited at GGC. It is equal to the total value of

blocks expected by the Enterprise's mining minus the total value of blocks the Enterprise actually found.

694. **Valuation (Highest Intermediate Value):** Due to the fraudulent concealment of the theft and the Defendants' retention of the stolen assets (or their proceeds) in constructive trust, Plaintiffs are entitled to the highest intermediate value of the stolen assets between the time of theft and the date of judgment.

695. **Digital Gold Scheme Impact:** Plaintiffs are further entitled to the highest intermediate value because the market value of these digital assets was influenced by the Enterprise's own racketeering activities—specifically, the manipulation of the Bitcoin Block Size War to establish a "Digital Gold" narrative. Plaintiffs were unaware that the asset valuations were driven by this artificial constraint and the Enterprise's schemes. Having now discovered that the asset prices were inextricably linked to the very fraud that victimized them and because those prices will likely collapse, Plaintiffs assert that the Enterprise cannot benefit from market fluctuations it helped engineer, and thus the highest valuation achieved during the scheme's operation is the appropriate measure of restitution.

696. **Theft Amount:** At the time of the theft, the cryptocurrencies wrongly appropriated to the Enterprise through the block withholding attacks were worth no less than $3,212,645.58. However, PROHASHING has reason to believe that

additional attacking accounts will be revealed during discovery and increase this initial valuation.

697.   Because of the appreciation of the specific stolen cryptocurrencies (including Bitcoin, Litecoin, and Bitcoin Cash) during the concealment period, the actual value of this loss, which Plaintiffs will prove with expert testimony, is estimated to exceed $50,000,000.

### D  Litigation Expenses During the Falco AP Subpoena Crisis

698.   During the adversary proceeding scheme created by Vincent Falco, Kayleigh Yerdon, acting on behalf of the Enterprise, sent facially invalid and abusive subpoenas to the Sokolowskis seeking documents and testimony from them, Jefferies LCP, and Matthew Aronsky.

699.   **Litigation Costs:** To determine how to respond to the abusive subpoenas, the Sokolowskis paid an attorney $250 in legal fees.

### E  Alternative Assignment-Inducement Damages (Counts VI–VIII):

700.   Plaintiffs plead in the alternative that, if any Defendant succeeds in establishing that the Claim Sale Agreement assigned, transferred, encumbered, diverted, or subjected to Jefferies' control any portion of Plaintiffs' Direct Claims and Proceeds beyond the purchased bankruptcy claim and distributions, then

Plaintiffs have suffered (and will suffer) an additional and distinct pecuniary injury: the loss or diversion of the value of Plaintiffs' Direct Claims and Proceeds. In that event, and to avoid any double recovery, Plaintiffs seek against Xclaim and Glantz compensatory damages equal to the value of the Direct Claims and Proceeds thereby lost, diverted, or made subject to Jefferies' control, together with consequential damages including the costs and delay harms caused by the manufactured ownership/proceeds controversy.

## F   Calculation of Total Damages

701.  **RICO Damages (Treble):** This section presents a best estimate of damages. Pursuant to 18 U.S.C. § 1964(c), the total injury to business and property must be trebled.

- Lost enterprise value (best yardstick estimate): $4.4 billion

- Value of stolen coins: $50 million

- Value of lost operational profits: $250 million

- Value of lost GGC deposits: $12,133,452

- Value of Litigation Expenses: $250

- Base damages: $4.712 billion

- Multiplier: 3x

- Total RICO damages: $14.136 billion

702.   **Credit for Mitigation:** Plaintiffs acknowledge receipt of $805,039.73 from the Jefferies transaction. This amount should be deducted from the final judgment to prevent double recovery of damages related to Count III or the predicate acts relating to the Fraudulent Balance Sheet Scheme.

703.   **Punitive Damages:** Plaintiffs seek separate punitive damages against DCG, Silbert, Moro, and the Does for the tortious interference alleged in Count IV, in an amount determined by the fact finder to be sufficient to punish and deter such conduct.

704.   **Attorney's Fees**: Plaintiff PROHASHING must obtain counsel to prosecute this Second Amended Complaint and requests an award of attorney's fees as provided by law. The Sokolowskis also reserve the right to obtain counsel and request fees should they do so.

705.   **Total Sum Sought:** Accordingly, Plaintiffs seek judgment in an amount to be determined at trial, estimated to exceed $14,136,000,000 in trebled RICO damages (subject to any required credit/setoff), plus punitive damages on Count IV, plus pre-judgment and post-judgment interest, attorneys' fees where authorized, and costs.

## XII   PRAYER FOR RELIEF

706.   **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

### A  On Count I (RICO) and Count II (RICO Conspiracy):

707.   Awarding Plaintiffs actual damages in an amount to be determined at trial, including (inter alia) PROHASHING's lost enterprise value (to be proven at trial using accepted valuation methodologies and yardsticks including DCG's publicly stated valuation and the value of the market captured through Foundry USA), the value of mining rewards diverted through the PROHASHING Scheme, and Plaintiffs' GGC deposit losses, in each case to the extent proven and not duplicative and subject to any credit/setoff required to prevent double recovery;

708.   Trebling Plaintiffs' proven RICO damages pursuant to 18 U.S.C. § 1964(c);

709.   Awarding Plaintiffs the costs of suit and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

710.   Ordering that Defendants found liable under Count I and/or Count II are jointly and severally liable for the full amount of trebled damages and statutory attorneys' fees and costs awarded pursuant to 18 U.S.C. § 1964(c), to the extent permitted by law.

**B  On Count III (UTPCPL):**

711.    Awarding actual damages in an amount to be determined at trial, including the value of Plaintiffs' lost GGC deposits, to the extent not duplicative of damages awarded under Count I and/or Count II;

712.    In the Court's discretion, trebling Plaintiffs' proven actual damages pursuant to 73 P.S. § 201-9.2(a), to the extent not duplicative of any trebling awarded under 18 U.S.C. § 1964(c) and to avoid double recovery;

713.    Awarding reasonable attorneys' fees and costs as permitted by 73 P.S. § 201-9.2(a).

**C  On Count IV (Tortious Interference with Contractual and Prospective Economic Relations):**

714.    Awarding compensatory damages (including lost fee revenue and profits attributable to diminished/diverted hashrate and consequential losses including loss of goodwill and loss of going concern/business value), together with such additional relief (including punitive damages to the extent permitted by law and to the extent not duplicative of any trebled or otherwise enhanced recovery) as the evidence may warrant, plus interest and costs.

**D  On Count V (Declaratory Judgment) (Jefferies Defendants):**

715.   Entering declaratory judgment consistent with Count V, including a declaration that the Jefferies Defendants possess no right, title, interest, control right, or entitlement to proceeds with respect to Plaintiffs' Direct Claims and Proceeds (as defined herein); and

716.   Awarding supplemental relief pursuant to 28 U.S.C. § 2202 sufficient to effectuate the declaration, including an order requiring a binding written disclaimer/release and/or an order precluding any later assertion by Jefferies LCP or Jefferies FG inconsistent with the Court's declaration.

717.   Ordering that Count V be adjudicated at the earliest practicable time, including by bifurcating and sequencing Count V for an initial determination under Fed. R. Civ. P. 42(b) and 57, and ordering phased discovery so that initial discovery and briefing address only the ownership/control/proceeds issues necessary to resolve Count V.

**E  On Counts VI–VIII (Fraudulent Misrepresentation / Negligent Misrepresentation / Civil Conspiracy) (Xclaim and Glantz) (Pled in the Alternative):**

718.   Awarding compensatory damages, including (a) present pecuniary harms caused by the manufactured ownership/proceeds controversy, and (b) if and to the extent the Claim Sale Agreement is construed or enforced to assign, transfer,

encumber, divert, or subject to the Jefferies Defendants' control any portion of Plaintiffs' Direct Claims and Proceeds, the value of the Direct Claims and Proceeds thereby lost or diverted;

719.   Awarding punitive damages to the extent permitted by law; and

720.   Ordering joint and several liability to the extent applicable under the governing law, together with interest and costs.

**F   General Relief:**

721.   Awarding pre-judgment and post-judgment interest;

722.   Awarding costs of suit and such attorneys' fees as are authorized by statute or otherwise available;

723.   Granting such other and further relief as the Court deems just and proper.

Dated: January 2, 2026

Respectfully submitted,


/s/ Stephen H. Sokolowski
Stephen H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9800
steve@shoemakervillage.org

/s/ Christopher H. Sokolowski
Christopher H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804
chris@shoemakervillage.org

/s/ PROHASHING LLC
PROHASHING LLC, Pro Se Seeking Counsel
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804 (via Christopher Sokolowski, after closing)
chris@prohashing.com (via Christopher Sokolowski, after closing)