# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI,
CHRISTOPHER H. SOKOLOWSKI,
and PROHASHING LLC
**Plaintiffs,**

v.

BARRY E. SILBERT,
DIGITAL CURRENCY GROUP, INC.,
SOICHIRO "MICHAEL" MORO,
JEFFERIES FINANCIAL
GROUP, INC.,
JEFFERIES LEVERAGED CREDIT
PRODUCTS, LLC,
XCLAIM, INC.,
ANDREW GLANTZ, and
VINCENT FALCO
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM-PJC

Hon. Karoline Mehalchick
Hon. Phillip J. Caraballo

## DECLARATION OF CHRISTOPHER H. SOKOLOWSKI
## AUTHENTICATING EXHIBITS

I, Christopher H. Sokolowski, declare as follows:

1.      I am over the age of eighteen and am competent to make this

Declaration.

2.      I am a Plaintiff in the above-captioned action, proceeding pro se.

1

3.     A true and correct copy of the transcript of Stephen Sokolowski's interview with Laura Shin (the "Transcript") is attached to the Complaint in this matter as Exhibit E.

4.     I prepared the Transcript from the original audio/video recording of the interview to the best of my ability.

5.     To the best of my knowledge and belief, the Transcript accurately reflects the conversation that occurred during the interview.

6.     Exhibit Q provides true and correct payout and earnings data for the "Quasar" account at PROHASHING.

7.     Exhibit W is a true and correct copy of the final version of the PROHASHING Terms of Service.

8.     Exhibit X represents a true and correct copy of the email I sent to Alexander Southwell regarding the coordination of a joint defense in the Falco Adversary Proceeding.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.


Dated: January 2, 2026

Respectfully submitted,

/s/ Christopher H. Sokolowski
Christopher H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804
chris@shoemakervillage.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI,
CHRISTOPHER H. SOKOLOWSKI,
and PROHASHING LLC
**Plaintiffs,**

v.

BARRY E. SILBERT,
DIGITAL CURRENCY GROUP, INC.,
SOICHIRO "MICHAEL" MORO,
JEFFERIES FINANCIAL
GROUP, INC.,
JEFFERIES LEVERAGED CREDIT
PRODUCTS, LLC,
XCLAIM, INC.,
ANDREW GLANTZ, and
VINCENT FALCO
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM-PJC

Hon. Karoline Mehalchick
Hon. Phillip J. Caraballo

## DECLARATION OF STEPHEN H. SOKOLOWSKI

I, Stephen H. Sokolowski, declare as follows:

1.      I am over the age of eighteen and am competent to make this

Declaration.

2.      I am a Plaintiff in the above-captioned action, proceeding pro se.

1

3.      A true and correct copy of Stephen Sokolowski's Telegram conversations is included in Exhibits F, H, and I.

4.      A true and correct copy of the Cryptocurrency Management LLC's operating agreement is included in Exhibit G.

5.      A true and correct screenshot of the Genesis Web dashboard is included in Exhibit J.

6.      A true and correct copy of the Genesis Due Diligence Questionnaire is included in Exhibit K.

7.      The emails provided in Exhibit L are true and correct and were received by me.

8.      The emails provided in Exhibit M are true and correct and were sent and received by me.

9.      The Claim Sale and Purchase Agreement featured in Exhibit N is the true and correct document signed by Jefferies Leveraged Credit Products LLC and me, when I was acting on behalf of Cryptocurrency Management LLC.

10.      Exhibit O is a true and correct copy of a contract I executed to sell my claim against the bankruptcy estate of cryptocurrency lender Celsius.

11.      The notes taken ten minutes after each meeting with the Genesis Debtors in Exhibit P are true, correct, and unmodified, except for font size and spacing.

12.    During the meeting with Jennifer Selendy on August 18, 2025, when Selendy was notified of the fiduciary duty towards PROHASHING in the UBMI case, she asked the following question "what district was that filed in again?"

13.    The posts from social media site X in Exhibit R are true and correct, and I authored the posts in my name.

14.    Exhibit S is a true and correct copy of a support ticket submitted to PROHASHING regarding the "Quasar" account.

15.    A true and correct copy of the "Beneficial Ownership Certification Form" provided by Jefferies Leveraged Credit Products LLC, which was reviewed simultaneously with the Claim Sale and Purchase Agreement in Exhibit N, is provided in Exhibit T.

16.    I authored the PROHASHING code changes featured in Exhibit U.

17.    Exhibit V is a true and correct copy of the emails I sent to and received from Proskauer Rose, which was representing the Jefferies companies during the Falco Adversary Proceeding.

18.    I met with Proskauer Rose attorney Mervis by video call on September 11, 2025 at noon EDT. After a discussion of other matters, I requested that the Jefferies Defendants provide a limited disclaimer of the individuals' UTPCPL rights, similar to the relief requested in Count V of this Complaint. The

Jefferies Defendants declined to disclaim the rights of the individuals who were not parties to the fraudulent bankruptcy claim sale Agreement.

19.    Exhibit Y is a true and correct copy of "Balance sheet.pdf" that I provided to Genesis Global Capital, LLC.

20.    Exhibit Z is a true and correct copy of the email I sent to Genesis Global Capital, LLC on Nov. 11, 2022 requesting a withdrawal.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.


Dated: January 2, 2026

Respectfully submitted,

/s/ Stephen H. Sokolowski
Stephen H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9800
steve@shoemakervillage.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI,
CHRISTOPHER H. SOKOLOWSKI,
and PROHASHING LLC
**Plaintiffs,**

v.

BARRY E. SILBERT,
DIGITAL CURRENCY GROUP, INC.,
SOICHIRO "MICHAEL" MORO,
JEFFERIES FINANCIAL
GROUP, INC.,
JEFFERIES LEVERAGED CREDIT
PRODUCTS, LLC,
XCLAIM, INC.,
ANDREW GLANTZ, and
VINCENT FALCO
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM-PJC

Hon. Karoline Mehalchick
Hon. Phillip J. Caraballo

# DECLARATION OF CHRISTOPHER H. SOKOLOWSKI REGARDING
# METHODS USED TO ANALYZE PROHASHING'S MINING DATABASE

I, Christopher H. Sokolowski, declare as follows:

1

1.      **Personal knowledge and competency.** I am over the age of eighteen (18) and competent to make this declaration. I have personal knowledge of the facts stated in this declaration. If called as a witness, I could and would testify competently to these facts.

2.      **Relationship to PROHASHING.** I am an owner and operator of PROHASHING, LLC ("PROHASHING"). Through my work at PROHASHING, I am familiar with PROHASHING's mining services, internal accounting records, mining database structure, and the data that PROHASHING maintained in the ordinary course of business to track shares, earnings, payouts, blocks, and related operational information.

3.      **Purpose of declaration.** I submit this declaration to describe—accurately and in detail—the methods I used to conduct my analysis of PROHASHING's mining database in connection with the "PROHASHING Scheme" allegations in Plaintiffs' complaint, including the steps I took to (a) preserve and analyze the data in a controlled manner, (b) compute and compare account-level metrics relevant to block-withholding and related attacks, and (c) assess whether any data-quality issues could have biased the results.

## A  Data Source, Scope, and Preservation Methods

4.      **The mining database.** PROHASHING maintained a large mining database that recorded operational data spanning essentially the full history of PROHASHING's mining operations (including, among other categories):

a.      user registration data;

b.      shares submitted by users and earnings associated with those shares;

c.      payouts earned and paid (including coin amounts, dollar values at the time of payout, and payout address information);

d.      miner connection data, errors, and statistics;

e.      coin prices at multiple exchanges, updated frequently over time;

f.      trades made by PROHASHING to pay customers;

g.      blockchain statistics over time (e.g., difficulty, block times, transaction fees);

h.      IP addresses and security-related information;

i.      electricity usage data of miners and pool servers (where recorded);

j.      block-level data for blocks mined through PROHASHING, including timestamps and reward data;

3

k.          (for many tables) changelog/audit-history information reflecting when rows changed; and

l.          miscellaneous operational and accounting fields relevant to earnings and payouts.

5.     **Controlled restoration and duplicate copy.** During a focused investigation period in November 2025, I purchased $3,200 in solid state disks, restored archived versions of PROHASHING's mining database, and set up a duplicate, unaltered copy of the restored data on separate hardware so that my analysis could be performed on a dataset that was not exposed to ongoing changes from PROHASHING's production systems. My intent and practice was to ensure that the data I analyzed reflected the restored records, rather than being influenced by later production modifications or live operations.

6.     **Why this preservation method matters.** Establishing a duplicate, unaltered copy is a standard and appropriate method to help ensure analytical integrity because it:

a.          reduces the risk that results change due to live updates;

b.          supports repeatability (i.e., the same query against the same restored copy yields the same results); and

c.          supports later review of what data was present at the time the analysis was performed.

4

**B  Query Design, Feasibility Limits, and Analytical Approach**

7.    **Feasibility limits.** The restored dataset was extremely large. To allow queries to complete in a reasonable amount of time and to focus analysis on accounts whose activity was large enough to be analytically meaningful, I limited portions of my account comparison analysis to users who had earned at least $1,000 in their mining history.

8.    **General method used.** Using the restored copy of the mining database, I performed database queries and computations designed to determine:

a.        the **type(s)** of attacks reflected in the data (including conduct consistent with block withholding and related sabotage);

b.        the **user accounts** whose activity was statistically or operationally consistent with such attacks; and

c.        the **magnitude** (including "expected value") of the pool losses attributable to those accounts, based on differences between the performance of known-good mining activity and the performance reflected by target accounts or groups.

9.    **Why comparative analysis is appropriate for block withholding.** In a mining pool environment where miners are paid (in whole or in substantial part) in exchange for computational work (shares), a block withholding attack can cause a pool to lose money because the pool may pay for the work while the

5

attacker fails to deliver the valuable output (blocks) at the statistically expected

rate. The key analytical challenge is that mining inherently includes randomness

("luck"), so a miner who appears to have unusually low block results might claim

"bad luck." A comparative analysis that:

        a.              examines large sample sizes,

        b.              uses known-good baselines, and

        c.              evaluates sustained deviations across many blocks and/or

many accounts

is a sound way to distinguish randomness from systematic underperformance

consistent with an intentional attack if an external characteristic allows a set of

accounts to be identified.

## C  Treatment of PROHASHING Profitability Targeting and Interpretation of "Profit" Metrics

### 10.  Profitability targeting in PROHASHING systems.

PROHASHING's systems adjusted profitability across users based on multiple

factors in order to target an average gross profit roughly consistent with its

advertised/published fee levels (for much of the relevant period, approximately

4.99%). Those adjustments are an average across the full set of users participating

at any given time, and therefore the per-account or per-group "profit" values I

computed and compared reflect that the system's payouts were influenced by the presence of both honest and dishonest mining activity.

11. **How the profit targeting affects interpretation.** Because the profitability adjustment is an average that is pulled downward by loss-causing accounts, a profit margin greater than 4.99% for a particular account does not, by itself, prove the account was honest. Instead, in the controlled comparison approach I used, the more reliable indicator was whether an account or group produced a profit margin significantly lower than a large, known-good honest baseline (described below). In other words, unusually low profit margins—especially across large samples—are consistent with loss-causing activity such as block withholding.

## D  Data-Quality Considerations and Why They Do Not Undermine the Comparison Results

12. **Potential data-quality issues considered.** In the restoration and analysis process, I identified several technical or market-related factors that could cause measured profitability to differ from a nominal targeted fee. These included:

a.       one restored data file that contained some corrupted rows;

b.          periods where high system load could have resulted in dropped rows; and

c.          the fact that profit can appear lower than it truly was because coin prices were more likely to rise than fall between the time earnings were accrued and the time of daily payout processing.

13.    **Certification that these issues were not account-specific.** Based on my review of how these issues arose and how they affected the dataset, I certified that, to the extent any of these issues affected the data at all, they affected accounts generally rather than selectively targeting only certain accounts or groups. In my professional judgment, these issues therefore could not plausibly explain the specific, sustained deviations observed in the target accounts/groups as compared to the control baseline.

14.    **Why the comparative design is robust even with imperfections.** The core of my method was comparative: I evaluated accounts/groups relative to a known-good control baseline under the same restored dataset conditions. As a result, even if small imperfections existed in the dataset, the comparative analysis remains reliable because the imperfections do not provide a credible mechanism to selectively depress one specific account/group's observed performance while leaving the control unchanged across large sample sizes.

8

**E   Establishing a Known-Good Control Baseline and Comparing Target Accounts/Groups**

15.     **Known-good honest control baseline.** In my analysis, I used as a known-good baseline a large, identifiable mining customer (referred to in the complaint as "salad") that, based on my knowledge and the nature of the customer, presented characteristics consistent with honest mining and large sample size. Because the control produced a very large number of blocks, it provides a meaningful benchmark for expected honest behavior in the database.

16.     **Control metrics used.** In my controlled analysis, the control account:

a.           was paid approximately $1,908,660.82;

b.           found approximately 157,259 blocks; and

c.           generated an adjusted profit margin of approximately 18.71% for PROHASHING.

17.     **Comparison method.** For each target account or group, I computed comparable metrics (including total paid/earned amounts, blocks found, and adjusted pool gross profit/profit margin) and compared those values to the control baseline. Where a target account/group generated a profit margin significantly below the control baseline—especially across tens of thousands to millions of blocks—I treated that as evidence consistent with sustained "low-luck" results not

9

credibly attributable to randomness, and therefore consistent with block

withholding or related sabotage.


### F   Example Results Used in the Complaint and How I Computed/Validated Them

18.     **The "Quasar" account.** In my controlled analysis, the account

referenced in the complaint as "quasar" (the "Quasar Account") earned

approximately $483,645.38, found approximately 85,797 blocks, and generated an

adjusted profit margin of approximately 8.88% for PROHASHING—

approximately 9.83% lower than the control baseline.

19.     **Why this is not credibly attributable to chance.** Because the Quasar

Account found approximately 85,797 blocks over multiple years, the deviation

reflected by an approximately 9.83% profit margin gap from the control baseline

cannot be credibly explained by random short-term variance; the sample size is far

too large. Instead, it is consistent with sustained performance that causes the pool

to lose expected value as compared to an honest baseline.

20.     **Expected value computation.** Using the same methodology as the

complaint, I computed an expected value of pool losses attributable to the Quasar

Account of approximately $47,528.00, based on the difference between (a) the

baseline honest profitability observed in the control and (b) the observed

profitability attributable to the Quasar Account, applied to the scale of the Quasar Account's mining activity.

21.     **The "Monero Group."** I also identified and analyzed a group of accounts referred to in the complaint as the "Monero Group," defined using objective criteria applied to the database records, including:

      a.          account registration during a specified time window;

      b.          lifetime earnings above $1,000; and

      c.          a pause/cessation of mining activity on or around March 9, 2019, with either a permanent stop or resumption no earlier than approximately March 23, 2019.

22.     **Monero Group metrics.** For this group (consisting of approximately 3,399 accounts), I computed and compared:

      a.          total earned/paid of approximately $22,850,919.45;

      b.          blocks found of approximately 6,143,468; and

      c.          adjusted profit margin of approximately 4.65%.

23.     **Expected value of losses for the group.** Based on the difference between the observed profitability for this group and the statistically expected value indicated by the honest control baseline, I computed an expected value of theft-of-services/pool losses attributable to this group of approximately $3,212,645.58.

24.     **Total mining considered in analysis.** The total value of mining considered in the broader analysis dataset—including honest and dishonest users and users earning smaller lifetime amounts—was approximately $92,165,312. The scale of the Monero Group's activity in that context underscores why the deviations are analytically meaningful.

### G  Additional Integrity Check for Balance Manipulation Using Probabilistic Audit Data

25.     **Audit sampling method.** PROHASHING maintained audit data for a subset of submitted shares (approximately one out of every 200 shares) for the purpose of later verifying aggregate balances in the event an investigation was needed. This sampling rate was stored with every share recorded.

26.     **Comparison performed.** I multiplied the sampled audit values by the recorded sampling rate (to scale the sample) and compared the scaled audit values to recorded balance data.

27.     **Results of audit comparison.** Based on that analysis, I concluded:

a.          the recorded "owed balance" data was exactly equal to the amount actually paid to customers; and

b.          the sampled audit data differed from the canonical balances by approximately 1.42%, which I assessed as being within the expected

boundary effects of a probabilistic sampling method rather than evidence of widespread balance manipulation that could explain the large comparative deviations described above.

28.    **Why this matters for methodology reliability.** This audit comparison supports the reliability of my account-comparison analysis because it provides an additional check against the possibility that the observed deviations were artifacts of widespread balance manipulation rather than being attributable to block withholding and related attack behavior reflected in the comparative profitability results.

### H  Statement of Accuracy

29.    **Accuracy of methods and results.** The methods described in this declaration are the methods I used. The computations and comparisons I performed were derived from PROHASHING's restored mining database records and were performed in a controlled manner designed to support accurate and repeatable results. To the best of my knowledge, the summary metrics and expected value calculations stated above accurately reflect the outputs of my analysis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on January 2, 2026

Respectfully submitted,


/s/ Christopher H. Sokolowski
Christopher H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804
chris@shoemakervillage.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT,
SOICHIRO "MICHAEL" MORO,
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM-PJC

Hon. Karoline Mehalchick
Hon. Phillip J. Caraballo

## CERTIFICATE OF USE OF GENERATIVE AI

Pursuant to the Order of the Honorable Phillip J. Caraballo regarding the use of Generative AI in any document filed in this Court, Plaintiffs hereby certify as follows:

1

1.    **Specific AI Tool Used:** Plaintiffs utilized Google Gemini Pro 3.0, Google Gemini Pro 3.0 Flash, Google Gemini Pro 2.5, OpenAI ChatGPT 5.0 Thinking, OpenAI ChatGPT 5.1 Thinking, OpenAI ChatGPT 5.2 Thinking, OpenAI ChatGPT 5.0 Pro, OpenAI ChatGPT 5.1 Pro, OpenAI ChatGPT 5.2 Pro, Anthropic Claude 4.5 Sonnet, and Google Gemini Deep Research in the preparation of this Second Amended Complaint

2.    **Portions of the Filing Prepared by AI:** Most of the Complaint was written by AI models, rewritten by humans, and double-checked to be legally sound by the models without making additional changes.

3.    **Accuracy Check:** Plaintiffs have thoroughly reviewed and verified the accuracy of all text, citations, and legal authority generated by the AI tool. All citations and references included in the filing have been confirmed to exist and accurately reflect the cited authorities. Plaintiffs have ensured that no confidential or privileged information was disclosed to the AI tool.

I declare under penalty of perjury that the foregoing is true and correct.

2

Dated: January 2, 2026

Respectfully submitted,


/s/ Stephen H. Sokolowski
Stephen H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9800
steve@shoemakervillage.org

/s/ Christopher H. Sokolowski
Christopher H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804
chris@shoemakervillage.org