# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED BRANDS AND MARKETING INTERNATIONAL S.ÀR.L, | : | Civil Action No. |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PROHASHING, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## COMPLAINT

Plaintiff, United Brands and Marketing International S.àr.l ("Plaintiff" or "UBMI"), by and through its counsel, brings this action against Prohashing, LLC ("Defendant" or "Prohashing") in support of its complaint ("Complaint"), Plaintiff avers as follows:

## NATURE OF THE ACTION

1.      This action seeks payment of crypto assets, specifically Dogecoin, Defendant failed to remit to Plaintiff as a customer of Defendant's cloud mining service.

## PARTIES

2.      Plaintiff, United Brands and Marketing International S.àr.l., is a company formed under the laws of Luxembourg with its principal place of business in Luxembourg.

3.      Defendant Prohashing, LLC is a Pennsylvania limited liability company with its principal place of business at 3178 Carnegie Drive, State College, PA 16803.

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

## JURISDICTION AND VENUE

4.      Prohashing is subject to personal jurisdiction in this Court because it resides in Pennsylvania, and the claims at issue arise from its breach of a contract entered into in Pennsylvania.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Specifically, Defendant's mining pool platform is accessible to and actively used by persons residing in this district. The platform's availability and engagement with users in this district, including through user participation, transactions, and related activities, constitute significant contacts. Furthermore, Defendant's purposeful operation of an interactive online platform targeting users, including those in the Eastern District, supports venue under 28 U.S.C. § 1391(d), as Defendant is subject to personal jurisdiction in this district due to its substantial business activities conducted therein.

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of Pennsylvania and a citizen of a foreign state.

## STATEMENT OF FACTS

### A.      Digital Assets and Digital Asset Mining

7.      Digital assets, referred to as "cryptocurrencies," "crypto assets," and "tokens," are essentially computer code entries on "blockchain" technology that record the owners' rights to access an application or service on a computer network. A blockchain is a public, encoded electronic ledger that tracks every transaction on a given network, including token transfers if applicable.

2

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

8. The security of any blockchain network depends on the legitimacy of validators. Cryptocurrency networks generally use one of two methods to check the validators: "proof of work" or "proof of stake." In a proof-of-work network, like Bitcoin, validators compete to solve a computational puzzle to earn the right to validate the transaction. Under both proof-of-work and proof-of-stake programs, validators earn additional cryptocurrency as compensation for validating other users' transactions and maintaining consensus on the blockchain.

9. The process of validating and recording transactions on a proof-of-work blockchain is known as "mining."

10. As a reward for this work and for securing the network, the successful miner receives newly created cryptocurrency units (called "block rewards") and any transaction fees included in the block. Through proof-of-work mining, persons who dedicate computing resources to validate transactions on the Litecoin blockchain and the Dogecoin blockchain can earn Litecoin and Dogecoin, respectively.

11. Practically, because mining requires significant computational power and the difficulty of solving cryptographic puzzles increases as more miners participate, mining requires specialized computers to perform complex mathematical calculations.

12. For individual miners, competing alone to solve puzzles is often not profitable due to the enormous computational power required and the low probability of successfully mining a block.

13. To address this, miners often agree to aggregate their computing power in what is referred to as a mining pool.

14. A mining pool is a collective group of miners who aggregate their computational resources to increase their chances of successfully mining blocks.

3

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

15. By combining their computing power, the group increases the likelihood that the pool will mine blocks and earn rewards.

16. When the pool successfully mines a block, the reward is distributed among the miners proportionally based on the computational work they each contributed.

17. Mining pools provide smaller, more frequent payouts, reducing the variance and unpredictability of mining revenue for individual miners.

18. Mining pools are often operated by established hardware manufacturers or dedicated service providers.

19. Generally, mining pool operators are responsible for certain services, such as (i) maintaining the servers that run the pool's mining-job distribution, share collection, block validation, and wallet for payouts, (ii) maintaining nodes to stay in sync with the network and often deploy software to communicate efficiently with miner clients; and (iii) providing security and transparency by publishing pool statistics (hash rate, found blocks, fee structure) and maintaining security measures to safeguard miners' earnings.

20. As compensation for providing these services, mining pool operators collect a fee, typically calculated as a portion of the total cryptocurrency mined by the pool.

**B. Prohashing's Mining Pool Service**

21. Prohashing operates a mining pool that offers a Full-Pay-Per-Share ("FPPS") payment model, meaning miners are paid a fixed amount for each unit of computational work (called a "share") they contribute, regardless of whether the pool successfully mines a block.

22. This payment structure is advertised as providing miners with consistent and predictable earnings.

4

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

23. Prohashing supports mining for various cryptocurrencies, enabling miners to mine different cryptocurrencies based on profitability.

24. Prohashing uses a proprietary algorithm called Proswitching that is supposed to automatically mine the most profitable cryptocurrency at any given moment, optimizing miners' returns.

25. Prohashing supports "merge mining," a process that allows miners to mine multiple cryptocurrencies simultaneously without additional computational work. For example, Litecoin and Dogecoin can be merge mined because their blockchain networks are secured using compatible proof-of-work algorithms.

26. When a miner elects to participate in merge mining, that miner is entitled to receive block rewards in multiple cryptocurrencies concurrently, such as Litecoin as the primary reward and Dogecoin as a secondary reward. Prohashing allows miners to select the cryptocurrency they receive as a primary reward.

27. Prohashing manages the distribution of these rewards through its platform, crediting miners' accounts based on their proportional contribution.

28. The relationship between users and Prohashing is governed by Prohashing's Terms of Service.

**C.     UBMI's Business with Prohashing**

29. UBMI participated in Prohashing's mining pool between September 2017 and November 2021 (the "Mining Term").

30. In or around September 2017, UBMI notified Prohashing of its election to merge mine Litecoin and Dogecoin and contributed computational power to mine multiple cryptocurrencies, including Litecoin and Dogecoin.

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

31.     In or around September 2017, UBMI elected to receive Dogecoin as its primary reward.

32.     Throughout the Mining Term, UBMI received daily payouts from Prohashing, including approximately $177,121 worth of Litecoin, $16,303 worth of Dogecoin, and $308,883 worth of various other cryptocurrencies (together, the "Distributions").

33.     Upon information and belief, at all relevant times, Prohashing did not pay UBMI Dogecoin as a primary reward, contrary to UBMI's election.

34.     Because Prohashing failed to distribute Dogecoin as UBMI's primary reward, UBMI either received no corresponding reward or received cryptocurrencies of significantly lesser value, as determined at the time such distributions should have been paid. Upon information and belief, Prohashing owes UBMI a number of Dogecoin (the "Unpaid Tokens") valued in excess of $2,000,000.

35.     The exact delta between the number and value of Dogecoin paid to UBMI and the number and value of Dogecoin rightfully owed to UBMI cannot be ascertained without reviewing documents and information solely within the possession and control of Prohashing.

36.     UBMI has attempted to resolve this matter without resorting to litigation but Prohashing has failed to meaningfully respond.

37.     In 2021, UBMI notified Prohashing of the discrepancy in its Distributions and requested its assistance in remedying the matter. Prohashing failed to respond.

38.     On March 24, 2022, UBMI sent a notice to Prohashing, via first-class mail and email, requesting that Prohashing produce "all documents related to the UBMI account, including the Worker History Charts and Balance Details, so that UBMI can accurately determine whether any amounts remain outstanding." Prohashing responded on March 31, 2022, and required UBMI

6

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

to sign a notarized limited power of attorney evidencing that its counsel may represent UBMI in the matter. On May 4, 2022, UBM sent Prohashing a limited Power of Attorney authorizing its counsel to request and obtain records related to UBMI's account and mining activity. Again, Prohashing failed to respond.

39.     UBMI subsequently emailed Prohashing on May 6, 2022, but again, Prohashing failed to respond.

40.     UBMI, to this date, has not received the requested information or the Unpaid Tokens.

## CAUSES OF ACTION

### Count I

### *Breach of Contract*

41.     Plaintiff repeats and realleges the foregoing allegations of the Complaint as if fully set forth at length herein.

42.     Prohashing's website includes its Terms of Service (the "Terms"). A true and correct copy of the Terms is attached hereto as **Exhibit A**. According to the Terms, "[b]y using any of PROHASHINGS's services, you acknowledge and agree to the following rules."

43.     The Terms act as the contract between Prohashing's users, including Plaintiff, and Prohashing.

44.     The Terms constitute a valid and binding contract between Plaintiff and Defendant.

45.     The Terms impose a duty upon Prohashing to "issue[] payouts once per coin per day. When a customer becomes eligible for a payout after the daily payout has been issued, that customer will be paid in the next day's payout transaction."

7

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

46.     UBMI fully performed its obligations under the Terms by continuously contributing its computing resources to Prohashing's mining pool, thereby actively participating in the validation and mining of cryptocurrency blocks as contemplated by the agreement. In doing so, UBMI complied with all operational requirements outlined by Prohashing, including maintaining the necessary hardware and software configurations to support the mining process and submitting valid proof-of-work shares, all in accordance with the Terms governing the mining pool participation.

47.     Prohashing materially breached its contractual obligations under the Terms both by initially failing to pay out the tokens owed to UBMI in accordance with the agreed-upon payment formulas governing mining rewards and by its continued withholding of those tokens to date.

48.     Prohashing further materially breached its contractual obligations under the Terms by: (i) its failure to provide UBMI with essential account information, including the Worker History Charts and Balance Details, despite repeated requests, information critical for UBMI to verify and calculate its rightful earnings; and (ii) neglecting to respond to UBMI's legal inquiries and formal communications regarding these issues, demonstrating a disregard for its duty to engage in good faith and transparency under the contractual framework.

49.     As a result of this breach, Plaintiff has been damaged in an amount that cannot be ascertained without review of Prohashing's internal documentation, but is reasonably believed to be approximately $2,000,000.

## Count II

### *Unjust Enrichment*

50.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1 through 40 as if fully set forth herein.

8

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

51.     This Count is pled in the alternative to Count I (Breach of Contract), to the extent that the Court finds no enforceable contract governed all or part of the relationship between Plaintiff UBMI and Defendant Prohashing.

52.     Plaintiff conferred substantial and measurable benefits on Defendant by (i) dedicating significant computing power and technical resources to Prohashing's mining pool over an extended period of time, and by (ii) generating valuable digital assets, including but not limited to Dogecoin and Litecoin, which were retained by Prohashing rather than distributed to UBMI as expected.

53.     Prohashing benefited from Plaintiff's contributions by securing increased hash rate, processing more profitable mining operations, collecting digital rewards, and potentially earning fees or commissions from the pooled mining activity, all made possible through UBMI's computing contributions.

54.     In addition, Prohashing was enriched by its continued possession and use of the digital assets that were mined through Plaintiff's contributions but never transferred to Plaintiff, including the Unpaid Tokens that UBMI earned but never received.

55.     Defendant appreciated and accepted the benefits conferred by Plaintiff, as demonstrated by its tracking of Plaintiff's hash rate, its own calculations of mined rewards, and its retention of Unpaid Tokens generated through the Plaintiff's mining efforts.

56.     Under the circumstances, including repeated written demands by Plaintiff and Plaintiff's legal representatives for the release of those Unpaid Tokens and supporting documentation, it would be inequitable for Defendant to retain the benefit of Plaintiff's computing contributions and the resulting tokens without providing UBMI with the corresponding value to which it was entitled.

9

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

57.     As a result of Defendant's unjust enrichment, Plaintiff has suffered financial loss, including but not limited to the value of the Unpaid Tokens, and is entitled to restitution in an amount to be determined by this Court, together with interest and such other relief as the Court deems just and proper.

## Count III

### *Conversion*

58.     Plaintiff repeats and realleges by reference herein paragraphs 1 through 40 as if set forth in full.

59.     At all relevant times, Plaintiff possessed a legal and equitable ownership interest in the digital assets generated through its mining activities, including but not limited to cryptocurrency tokens such as Litecoin and Dogecoin, mined through the computing resources it contributed to Defendant's mining pool.

60.     As a result of its mining activity under the Terms with Defendant, Plaintiff was entitled to receive payment in the form of tokens proportional to its contributed hash power and mining success.

61.     Defendant has intentionally exercised dominion and control over Plaintiff's rightful share of those Unpaid Tokens by withholding their distribution and refusing to remit them upon demand, thereby depriving Plaintiff of the use, benefit, and possession of its property.

62.     Defendant's interference with Plaintiff's ownership interest in the Unpaid Tokens occurred without Plaintiff's consent and despite repeated formal and informal requests for release of the assets.

10

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

63.     Defendant has failed to offer any lawful justification for its continued withholding of Plaintiff's tokens, and its refusal to provide necessary documentation or to respond to Plaintiff's legal inquiries further evidences its lack of justification.

64.     As a direct and proximate result of Defendant's conversion, Plaintiff has suffered significant financial harm, including the loss of access to valuable digital assets, the ability to liquidate or transfer those assets, and consequential damages related thereto. Plaintiff seeks compensatory damages in an approximate amount of $2,000,000, plus interest, costs, and any other relief the Court deems just and proper.

## Count IV

### *Fraudulent Misrepresentation*

65.     Plaintiff repeats and realleges by reference herein paragraphs 1 through 40 as if set forth in full.

66.     Defendant represented to Plaintiff that Plaintiff could contribute its computing power to Defendant's mining pool and receive rewards in the form of select cryptocurrencies.

67.     Defendant further represented to Plaintiff that, among the select cryptocurrencies available as rewards, Plaintiff could choose which of these cryptocurrencies to receive as a reward in consideration for Plaintiff's contributions to the mining pool.

68.     These representations were material to the transactions at hand because the cryptocurrencies available as rewards held differing values, therefore the ability to select a specified cryptocurrency as a reward played a significant role in Plaintiff's decision to contribute to Defendant's mining pool.

69.     In fact, Defendant's mining pool did not pay out cryptocurrency rewards in the manner selected by Plaintiff.

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

70.     Defendant made these representations to Plaintiff with knowledge that its mining pool system would not pay out the Plaintiff's selected cryptocurrency.

71.     Defendant intended to mislead Plaintiff in order to induce Plaintiff to contribute computing power to Defendant's mining pool and to withhold excess rewards for its own benefit.

72.     Plaintiff was justified to rely on Defendant's misrepresentation because such earning structures are common practice in the cryptocurrency mining industry.

73.     Plaintiff directly suffered harm from Defendant's misrepresentations because it contributed valuable computing power to Defendant's mining pool and received rewards of substantially lesser value than those rightfully selected and expected by Plaintiff.

74.     As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff has suffered significant financial harm, including the loss of access to valuable digital assets, the ability to liquidate or transfer those assets, and consequential damages related thereto.

75.     Plaintiff seeks compensatory damages in an approximate amount of $2,000,000, plus interest, costs, and any other relief the Court deems just and proper.

## Count V

### *Negligent Misrepresentation*

76.     Plaintiff repeats and realleges by reference herein paragraphs 1 through 40 as if set forth in full.

77.     This Count is pled in the alternative to Count IV (Fraudulent Misrepresentation), to the extent that the Court finds that Defendant did not knowingly make a misrepresentation with the intent to mislead another into relying on it.

78.     Defendant represented to Plaintiff that Plaintiff could contribute its computing power to Defendant's mining pool and receive rewards in the form of select cryptocurrencies.

12

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

79. Defendant further represented to Plaintiff that, among the select cryptocurrencies available as rewards, Plaintiff could choose which of these cryptocurrencies to receive as a reward in consideration for Plaintiff's contributions to the mining pool.

80. Defendant intended to make such representation to Plaintiff in order to induce Plaintiff to contribute computing power to Defendant's mining pool, thereby improving its operations and generating fees for Defendant.

81. In fact, Defendant's mining pool did not pay out cryptocurrency rewards in the manner selected by Plaintiff.

82. Defendant ought to have known Plaintiff opted to receive Dogecoin as a primary reward because Defendant's mining pool system did or should have recorded Plaintiff's selection and does or should have records of the incorrect distributions.

83. Plaintiff was justified to rely on Defendant's misrepresentation because such earning structures are common practice in the cryptocurrency mining industry.

84. Plaintiff directly suffered harm from Defendant's misrepresentations because it contributed valuable computing power to Defendant's mining pool but did not receive the Dogecoin that Plaintiff rightfully selected and expected to receive.

85. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff has suffered significant financial harm, including the loss of access to valuable digital assets, the ability to liquidate or transfer those assets, and consequential damages related thereto.

86. Plaintiff seeks compensatory damages in an approximate amount of $2,000,000, plus interest, costs, and any other relief the Court deems just and proper.

13

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, UBMI, respectfully requests that the Court grant the following relief:

A.       Award Plaintiff all actual, general, special, statutory, incidental, punitive, and consequential damages to which Plaintiff is entitled;

B.       Award pre-judgment interest on that sum at the rate of 12% per annum and post-judgment interest as authorized by Pennsylvania law;

C.       Award reasonable attorneys' fees and costs; and

D.       Award all other relief as the Court may deem to be appropriate and just.

(*Remainder of page left intentionally blank*)

14

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

Dated: June 13, 2025

Respectfully submitted,

**BULL BLOCKCHAIN LAW LLP**

By: _____

Andrew Bull (PA No. 323989)
Tyler Harttraft (PA No. 325148)
Charles Scrimalli (PA No. 332306)
21 S 11th Street
Philadelphia, PA 19107
Telephone: (215) 695-5860
Email: Andrew@bullblockchainlaw.com
Email: Tyler@bullblockchainlaw.com
Email: Charles@bullblockchainlaw.com

*Attorneys for Plaintiff*

15

Doc ID: c2a127da82e297863f362849eace2e33bb5fbbde

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | UDMI - Complaint EDPA (Final) |
| **File name** | UDMI%20-%20Compla...20%28Final%29.pdf |
| **Document ID** | c2a127da82e297863f362849eace2e33bb5fbbde |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| **SENT** | **06 / 13 / 2025**<br>21:51:10 UTC | Sent for signature to Andrew Bull (andrew@bullblockchainlaw.com) from ssutherland@bullblockchainlaw.com<br>IP: 24.117.192.169 |
| **VIEWED** | **06 / 13 / 2025**<br>21:58:56 UTC | Viewed by Andrew Bull (andrew@bullblockchainlaw.com)<br>IP: 72.92.32.114 |
| **SIGNED** | **06 / 13 / 2025**<br>21:59:04 UTC | Signed by Andrew Bull (andrew@bullblockchainlaw.com)<br>IP: 72.92.32.114 |
| **COMPLETED** | **06 / 13 / 2025**<br>21:59:04 UTC | The document has been completed. |