**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

STEPHEN H. SOKOLOWSKI and
CHRISTOPHER H. SOKOLOWSKI,
**Plaintiffs,**

v.

DIGITAL CURRENCY GROUP, INC.,
BARRY E. SILBERT,
SOICHIRO "MICHAEL" MORO,
**Defendants.**

Electronically Filed

Case No. 4:25-cv-00001-KM

Hon. Karoline Mehalchick

**SECOND AMENDED COMPLAINT**

1. Plaintiffs Stephen H. Sokolowski and Christopher H. Sokolowski, for their Second Amended Complaint against Digital Currency Group, Inc. ("DCG"), Barry E. Silbert, and Soichiro "Michael" Moro (collectively, "Defendants"), allege as follows:

**INTRODUCTION**

2. This is a Pennsylvania state law, direct reliance consumer protection action arising from Defendants' deceptive conduct concerning Genesis Global Capital, LLC ("Genesis")'s financial condition after the June 2022 default of Three Arrows Capital ("TAC").

3. Plaintiffs are two brothers who live in State College, Pennsylvania. They placed personally owned Bitcoin, Ether, USDC, and U.S. dollars with Genesis to earn fixed interest through a passive lending relationship that Genesis and its parent, Digital Currency Group, Inc., held out as stable, well-capitalized, and suitable for conservative yield on digital assets and cash equivalents.

4. After the default of TAC, DCG executed a $1.1 billion promissory note in favor of Genesis. The note did not provide Genesis with current liquidity because it had a 10-year maturity, one percent interest, no collateral, no current principal payments, and no practical ability to satisfy short term lender withdrawals. DCG and Silbert nevertheless caused Genesis's lender-facing financial reporting to portray the note or note-related receivable in a way that made Genesis appear solvent and liquid.

5. On September 21, 2022, while Plaintiffs were located in Pennsylvania, Genesis sent Stephen Sokolowski a "Genesis Lending Snapshot as of 9/21/2022" watermarked "Cryptocurrency Management LLC." The balance

sheet listed $1.726 billion of "Other Assets" under "Current Assets" and showed a "Weighted Avg" total loan duration of only 35.5 days, while omitting the true terms and liquidity consequences of the 10-year DCG note.

6. Plaintiffs personally received, reviewed, discussed, and relied on that balance sheet in Pennsylvania when deciding whether to withdraw, renew, or maintain their Genesis loans. Had Plaintiffs known that Genesis's apparent current assets and short duration metrics concealed a 10-year, illiquid, unsecured insider note from DCG, Plaintiffs would have withdrawn or refused to renew.

7. Plaintiffs seek damages from Defendants for Defendants' own deceptive conduct and for Plaintiffs' individual reliance injury, including money damages measured by the value of the digital assets and U.S. dollars beneficially owned by Plaintiffs personally that Plaintiffs would have withdrawn or would not have renewed but for Defendants' conduct, subject to credits and offsets necessary to prevent double recovery. Plaintiffs do not seek recovery on behalf of CM LLC or any other nonparty.

**PARTIES**

8. Plaintiff Stephen H. Sokolowski is an individual citizen of Pennsylvania domiciled at 3178 Carnegie Drive, State College, Pennsylvania.

9. Plaintiff Christopher H. Sokolowski is an individual citizen of Pennsylvania domiciled at 3178 Carnegie Drive, State College, Pennsylvania.

10. Defendant Digital Currency Group, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut. DCG was Genesis's ultimate parent company and exercised substantial control over the DCG note transaction, Genesis financing, related-party transactions, and the lender-facing conduct alleged below.

11. Defendant Barry E. Silbert is an individual who founded DCG and Genesis, served as DCG's chief executive officer, controlled DCG's conduct, signed the $1.1 billion promissory note for DCG, and directly participated in the conduct that concealed Genesis's insolvency and induced lenders to remain on Genesis's platform. Upon information and belief, Silbert is a citizen of New York.

12. Defendant Soichiro "Michael" Moro is an individual who served as Genesis's chief executive officer through August 2022. Upon information and belief, Moro is a citizen of New York. During the relevant period, Moro personally participated in Genesis's response to the TAC default, signed the June 30, 2022 DCG promissory note on behalf of Genesis, and made lender-facing public statements concerning Genesis's losses and DCG's assumption of TAC-related liabilities.

13. Nonparty Genesis Global Capital, LLC is the bankrupt entity through which Plaintiffs lent their assets. The claims against Defendants seek recovery for their own deceptive conduct and for Plaintiffs' individual reliance injury.

14. Nonparty Cryptocurrency Management LLC ("CM LLC") is a dissolved Pennsylvania limited liability company used as a lending intermediary to meet Genesis's minimum deposit requirements. CM LLC dissolved on June 21, 2026. The claims against Defendants arise from Plaintiffs' own receipt, review, and reliance on the September 21, 2022 balance sheet and from damages to Plaintiffs' personal assets.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs are citizens of Pennsylvania. DCG is a citizen of Delaware and Connecticut. Silbert and Moro are citizens of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs.

16. This Court has specific personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and 42 Pa. C.S. § 5322(b). Defendants purposefully caused the suit-related financial representations alleged here to be used to retain Genesis lenders, including Plaintiffs, and those representations were transmitted to and relied upon by Plaintiffs in Pennsylvania.

17. Silbert and Moro are subject to specific jurisdiction for their own suit-related acts alleged below, including their personal participation in the DCG note transaction and in creating, approving, or causing lender-facing representations concerning Genesis's post-TAC financial condition. Plaintiffs' claims arise from those acts and the resulting Pennsylvania reliance and injury.

18. If Silbert or Moro contests personal jurisdiction, Plaintiffs request limited jurisdictional discovery concerning their roles in directing or approving the challenged lender communications and financial reporting to Pennsylvania and other Pennsylvania contacts related to the claims.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here. Plaintiffs received and reviewed the challenged balance sheet, communicated with Genesis about it, made the relevant renewal and withdrawal decisions, and suffered the alleged injury in State College, Pennsylvania.

## FACTUAL ALLEGATIONS

### A Plaintiffs' Personal Savings and Genesis Account Structure

20. Plaintiffs were not hedge funds, broker dealers, banks, or professional financial institutions. They were individuals who had accumulated personal savings over many years.

21. Stephen held Bitcoin and Ether as long-term personal savings before the Genesis loans. In June 2017, he discussed cryptocurrency holdings with his personal financial adviser when planning his investment and retirement accounts. Christopher also contributed personally owned assets.

22. Plaintiffs' Genesis loans included personal Bitcoin, Ether, USDC, and U.S. dollars.

23. Plaintiffs used Genesis because they understood Genesis to provide a passive, fixed rate, interest-bearing lending service. Plaintiffs requested and reviewed financial information from Genesis because Genesis's balance sheet, liquidity, asset duration, and ability to repay lenders were material to Plaintiffs' personal lending decisions.

24. Genesis's service included account onboarding, account administration, aggregation of customer assets, deployment of those assets to counterparties selected by Genesis, risk and duration management, generation of fixed interest returns from Genesis's lending spread, servicing and renewal of open term and fixed term loans, withdrawal administration, and financial reporting that customers used to decide whether to renew or withdraw.

25. Plaintiffs acquired the lending and account services relationship by transferring their assets to Genesis for Genesis's use and by accepting a fixed net yield while Genesis retained the spread, revenue, or other economic benefit

generated from deploying those assets. Plaintiffs used those services for personal, family, and household financial purposes.

26. Plaintiffs' assets were used for personal, family, and household financial planning. Plaintiffs expected the assets to support financial independence, retirement planning, home related expenses, tax obligations, and other personal needs. The December 2022 reconciliation allocated the identified payroll tax withdrawal from Genesis and tax penalty sale at BlockFi to PROHASHING. In a pre-collapse discussion of his loans at BlockFi, another cryptocurrency lender, Stephen stated, "My goal is simply to have my rent paid by interest without having to sell the coins." In October 2022, Stephen publicly described "moving most of PROHASHING's money from Genesis to BlockFi while keeping our personal savings at Genesis."

27. Genesis imposed high minimum deposit thresholds. To meet those thresholds, Plaintiffs and others used CM LLC as an administrative account.

28. CM LLC was created with Genesis's knowledge and approval to satisfy Genesis's minimum deposit amounts after Genesis declined to aggregate separate individual and business accounts toward those minimums. Stephen would not have created CM LLC but for Genesis's advance agreement to accept funds through it. The sole member and owner of CM LLC was Stephen Sokolowski. In a

February 11, 2022 email to his financial adviser, Christopher described CM LLC as "Stephen Sokolowski's company, Cryptocurrency Management LLC."

29. CM LLC had no employees or marketing and initially lent only to Genesis. Its operating agreement provided for participants to lend to CM LLC for onward lending to Genesis. CM LLC maintained loan records separately identifying each lender's principal and interest. Participants ordinarily negotiated terms and transferred assets directly with Genesis.

30. Under the signed September 26, 2022 addendum, each participant controlled which borrower received his or its funds. Lending to anyone other than Genesis required that participant's approval; losses due to a borrower's default were allocated only among participants who approved that borrower. A December 2022 agreement signed by all participants separately fixed CM LLC's debts to each participant for the Genesis and BlockFi loans.

31. Each Plaintiff retained the beneficial and economic interest in his own personal assets contributed through the CM LLC account and underlying the individual losses alleged here. CM LLC served as the disclosed lending intermediary through which Genesis accepted assets from identified passthrough lenders to satisfy Genesis's minimum deposit thresholds. Christopher would not have used CM LLC unless it served as a passthrough entity preserving his ownership rights in his contributed assets.

32. During onboarding on May 11, 2021, Stephen told Genesis representative Hanson Birringer that he alone owned CM LLC and that loan records would identify what each participant was owed. Genesis then requested and received Plaintiffs' driver's licenses, which showed their Pennsylvania addresses.

33. Genesis required a due diligence questionnaire for CM LLC. That questionnaire listed CM LLC's address and primary place of operations as 3178 Carnegie Drive, State College, Pennsylvania, the same home address as Plaintiffs.

34. The due diligence questionnaire described CM LLC's purpose as collecting funds to exceed Genesis's minimum loan amounts and to loan funds to Genesis. It also stated that the company would only loan to Genesis, had just been formed, and was not engaged in trading. A "balance sheet.pdf" requested by and received by Genesis stated that the company had no assets because it was awaiting approval by Genesis.

35. The due diligence materials identified Stephen as a software engineer, not a financial adviser or professional investment manager.

36. Genesis therefore knew, or was reckless in not knowing, that the personal assets Plaintiffs contributed through the CM LLC account came from Plaintiffs individually, who were making personal financial decisions from Pennsylvania.

37. On January 10, 2022, Genesis activated trading for CM LLC under its standard terms. The account gave Plaintiffs access through CM LLC to a trading desk and quote system available around the clock. An accepted quote fixed the trade price before settlement, subject to applicable trade size and prefunding requirements. Genesis told Stephen that weekend settlement was on a best-effort basis but that trading remained available.

38. Genesis also confirmed that an existing USDC loan could be called, converted into Bitcoin through the quote process, and made into a new loan promptly without first withdrawing the assets. This trading and settlement access was available before Plaintiffs' June and September 2022 lending decisions. CM LLC did not execute trades through Genesis, but retained that access. On June 15, 2022, Stephen reported that an attempt to obtain an online Ether purchase quote had failed; Genesis responded that it could quote him directly in the chat.

39. Plaintiffs' claims against Defendants arise from their individual reliance on Defendants' deceptive conduct and from damages to their personal assets. The claims are independent of any contractual right to payment from Genesis or any bankruptcy claim asserted by CM LLC.

### B Genesis's Solvency and the Three Arrows Capital Default

40. Genesis was a DCG subsidiary and a digital asset lending business. Genesis accepted digital assets and dollars from lenders and used those assets to make loans to counterparties.

41. DCG and Silbert exercised substantial control over Genesis's financing, risk posture, related party transactions, and communications strategy.

42. In June 2022, TAC defaulted on obligations to Genesis and affiliated Genesis entities. The default left Genesis with a substantial exposure and created a shortfall in Genesis's balance sheet and liquidity.

43. After the default of TAC, Genesis's financial condition was materially worse than represented to lenders. Genesis faced the risk that lenders with open term or short term loans would demand return of their assets, causing a run and forcing Genesis into bankruptcy.

44. Silbert knew that Genesis had an equity shortfall caused by exposure to TAC and that questions about Genesis's solvency could trigger withdrawals, threaten Genesis's survival, and expose DCG's own financial position.

45. DCG and Silbert had a financial interest in preventing Genesis from entering bankruptcy in June or July 2022. A Genesis bankruptcy would likely expose the true nature of the DCG note, reveal Genesis's liquidity deficiency, and threaten DCG's financial position.

46. On June 17, 2022, while serving as Genesis's chief executive officer, Moro publicly stated from his personal Twitter account that Genesis had "shed the risk and moved on," had met every client request, and remained extremely confident in its ability to service lenders. That statement was materially misleading because Genesis remained exposed to changes in the value of the collateral associated with the TAC loans and faced a substantial shortfall following TAC's default.

47. Moro knew of that continuing exposure. Plaintiffs read the statement while in Pennsylvania. That assurance contributed to Plaintiffs' decisions to retain their assets and renew loans in June 2022. On June 20, when Genesis representative Hanson Birringer sent him the link to Moro's statement, Stephen replied, "yep, I saw that already, thanks." CM LLC's Bitcoin renewal term sheet is dated June 20.

48. Rather than provide Genesis with cash, liquid assets, or market rate financing sufficient to meet lender withdrawals, DCG executed a $1.1 billion promissory note in favor of Genesis.

49. Silbert signed the note on behalf of DCG.

50. Moro signed the note on behalf of Genesis.

51. Defendants therefore knew the note's actual terms, including its 2032 maturity, one-percent interest rate, lack of collateral, and lack of current principal payments.

52. The note required no principal payments until 2032, except to the extent of recoveries from TAC. It carried only one percent interest, was unsecured, was not callable by Genesis within one year, and did not provide Genesis with cash to satisfy lender withdrawals.

53. The note was not worth $1.1 billion on a present value or fair value basis. Its real value was materially discounted because of its 10-year maturity, one percent interest rate, lack of collateral, lack of market liquidity, and dependence on DCG's future ability to pay.

54. The note nevertheless allowed Genesis to show positive equity and to avoid disclosing the full impact of the loss from TAC.

55. On July 6, 2022, Moro publicly stated that DCG had assumed TAC-related Genesis liabilities to ensure Genesis had capital to operate and scale. He did not disclose that the transaction consisted of the ten year, one percent, unsecured note and supplied no current liquidity. Each Plaintiff read and considered Moro's July 6 statement before making the September 2022 decisions described below and relied on that statement, together with the June 17 assurance and September 21 balance sheet, in evaluating Genesis's ability to repay his loans.

### C Defendants' Use of the DCG Note in Genesis Balance Sheet Reporting

56. Defendants used the note to create the appearance that Genesis's balance sheet remained solvent and liquid after the default of TAC.

57. Defendants knew that Genesis lenders would request and rely on financial reports, including balance sheets, current asset classifications, and duration metrics, when deciding whether to withdraw, maintain, or renew loans.

58. Defendants knew that disclosing the note's true terms would materially change how lenders understood Genesis's liquidity and ability to repay the lenders.

59. Defendants therefore caused Genesis's lender-facing financial reporting to emphasize apparent solvency, current assets, and short asset duration while omitting the note's true terms and economic effect.

60. That financial reporting treatment was materially false or misleading because DCG had not transferred $1.1 billion in cash or current liquid assets to Genesis. DCG had substituted an illiquid, long-term, unsecured insider receivable for an immediate shortfall.

61. The September 21, 2022 balance sheet sent to Plaintiffs reflected that deceptive reporting treatment, which Defendants directed, approved, or caused Genesis to use in lender facing financial reports after the default of TAC.

62. Defendants' conduct was direct. DCG executed the note. Silbert signed the note for DCG. Moro signed the note for Genesis. Defendants had superior knowledge of the note's true terms and economic effect. DCG and Silbert benefited from the concealment because continued lender confidence delayed a Genesis run and protected DCG's own financial position, and Moro benefited from the concealment because signing the note allowed Genesis to continue operating and paying him compensation.

**D The September 21, 2022 Balance Sheet Sent to Plaintiffs**

63. On September 21, 2022, at approximately 1:49 p.m. EDT, Genesis representative Griffin Tiedy emailed Stephen a document titled "Genesis Lending Snapshot as of 9/21/2022."

64. The document was marked "Strictly Confidential" and watermarked "Cryptocurrency Management LLC." It was directed to the account through which Plaintiffs' assets were lent.

65. Stephen received and opened the balance sheet while at his home computer in State College, Pennsylvania.

66. Stephen discussed the balance sheet with Tiedy by Telegram voice call the same day while Stephen was in Pennsylvania and while viewing the

balance sheet. Tiedy assured Stephen that Genesis was in good financial condition and was not insolvent.

67. At approximately 2:07 p.m. EDT, Stephen forwarded the balance sheet to Christopher by email. Christopher reviewed the balance sheet later that afternoon while located in the same Pennsylvania residence.

68. The balance sheet listed total assets of approximately $7.380 billion, liabilities of approximately $7.230 billion, and equity of approximately $150 million.

69. The snapshot described its figures as an "approximate calculation across all lending entities." Genesis nevertheless furnished it in response to Plaintiffs' request for financial information relevant to their renewal and withdrawal decisions.

70. It listed approximately $3.352 billion of "Current Assets." Within that line, it listed approximately $1.726 billion of "Other Assets."

71. Upon information and belief, a material portion of the $1.726 billion "Other Assets" figure was the $1.1 billion DCG note or related amount attributable to the TAC loss that DCG had purportedly assumed.

72. By including the note or note-related amount in "Current Assets," the balance sheet represented that the asset was expected to be converted into cash,

sold, consumed, or otherwise available within one year or within Genesis's operating cycle.

73. That representation was false. The DCG note was not payable for ten years, had only one percent interest, was not callable within one year, was unsecured, and could not be used by Genesis to meet short term withdrawal requests.

74. The balance sheet did not disclose the note's 10-year maturity, one percent interest rate, lack of collateral, lack of marketability, absence of current principal payments, discounted fair value, or inability to satisfy lender withdrawals.

75. The same balance sheet included a "Weighted Avg." table representing that Genesis's total average loan duration was 35.5 days.

76. The 35.5-day figure was materially misleading when presented alongside the current assets classification of the note or note-related amount without disclosing the note's ten-year maturity and lack of current liquidity.

77. The "Current Assets" classification and the 35.5-day weighted average duration metric reinforced each other. Together, they conveyed that Genesis's assets were sufficiently short term and liquid to repay short term or one year lender obligations.

78. Plaintiffs were deciding whether to withdraw, maintain open term loans, or renew expiring loans for terms up to one year. The classification of the DCG note as a current asset was therefore material to the exact time horizon of Plaintiffs' decision.

79. A lender deciding whether to renew for a one-year term would reasonably understand "current assets" to mean assets expected to be available within the same period. Plaintiffs so understood the term.

80. The balance sheet omitted facts necessary to make its current asset and duration representations not misleading.

81. During Moro's tenure, Genesis provided substantially similar post-TAC financial reports to other lenders, including Gemini Trust Company, LLC, that used the same treatment of "Other Assets" as "Current Assets" and the same weighted-average duration presentation. Genesis later provided a substantially similar balance sheet to at least one other lender in November 2022, after Moro's departure.

## E Plaintiffs' Reliance and Renewals

82. Before receiving the balance sheet, Plaintiffs were evaluating whether to continue lending to Genesis, renew loans, withdraw assets, or use another lender, including BlockFi or Ledn.

83. Stephen requested Ledn's balance sheet, but Ledn declined to provide it. Genesis's willingness to provide a balance sheet contributed to his decision to maintain and renew loans with Genesis.

84. The balance sheet reassured Plaintiffs that Genesis had positive equity, substantial current assets, and a short weighted average asset duration. On September 22, 2022, Stephen emailed Tiedy that Genesis's books had impressed him as he evaluated a one-year renewal.

85. Each Plaintiff continued to consider Moro's assurances when making the September decisions, together with the September 21 balance sheet and Genesis's related financial assurances. Plaintiffs knew of Genesis's TAC-related losses but understood the balance sheet and related assurances to show that Genesis was then solvent and able to service lenders.

86. Plaintiffs did not know the DCG note's true terms. Plaintiffs did not know that the note was due in 2032, carried only one percent interest, was unsecured, lacked current liquidity, and would have materially changed Genesis's reported liquidity and duration metrics had it been properly described.

87. In reliance on the balance sheet and related assurances, Plaintiffs did not withdraw assets that they otherwise would have withdrawn and renewed or maintained Genesis loans after September 21, 2022, including Bitcoin and Ether loans documented in term sheets dated September 23 and September 30,

respectively. On January 12, 2023, Stephen publicly identified Tiedy's balance-sheet explanation and the note's apparent short maturity as reasons for retaining assets at Genesis in September 2022.

88. Plaintiffs' reliance was reasonable and justifiable. After the Master Loan Agreement and term sheet framework was already in place, Plaintiffs requested current financial information from Genesis for renewal and withdrawal decisions, received a balance sheet specifically watermarked for CM LLC, discussed it with Genesis's representative, and reviewed facially objective financial metrics showing positive equity, current assets, and short duration.

89. Had Genesis disclosed its insolvency and the true terms and effect of the DCG note, Plaintiffs would have declined renewals, withdrawn their U.S. dollars, and withdrawn their cryptocurrency to offline cold storage in their possession rather than continue lending to Genesis or another lender. In a June 17, 2022 reply to a reader of his lending guide, Stephen recommended Genesis or cold storage.

90. At the time of Plaintiffs' September 2022 decisions, Genesis was still permitting withdrawals and had not yet frozen redemptions. Plaintiffs therefore lost a real opportunity to withdraw or reduce exposure. Genesis in fact returned assets that were transferred to BlockFi during this period; this action concerns Plaintiffs' assets that remained at Genesis.

## F Defendants' Knowledge, State of Mind, and Direct Participation

91. DCG and Silbert knew, or were reckless in not knowing, that Genesis was insolvent or materially liquidity-impaired after the TAC default; that the $1.1 billion note did not provide Genesis with current liquidity; that treating the note or related receivable as a current asset would mislead lenders about Genesis's ability to repay short term or one year obligations; and that omitting or obscuring the note's 10-year duration would mislead lenders.

92. DCG and Silbert intended that Genesis lenders, including Plaintiffs, would rely on the balance sheet and solvency representations when deciding whether to keep assets with Genesis.

93. DCG and Silbert benefited from Plaintiffs' and other lenders' reliance. By inducing lenders to maintain or renew loans and delaying withdrawal pressure, DCG and Silbert avoided or delayed a Genesis run or bankruptcy in the summer and early fall of 2022, delayed exposure of DCG's own obligations to Genesis, and preserved DCG's broader business interests.

94. DCG is liable for its own acts and omissions. DCG acted through Silbert and other DCG personnel who participated in the note, lender-facing financial reporting, accounting treatment, and concealment of Genesis's true condition.

95. Upon information and belief, on July 26, 2022, Genesis's Matt Ballensweig told Bitvavo, a platform that offered cryptocurrency yield to its customers, that a financial response was prepared with assistance from DCG's and Genesis's finance and accounting teams, copying DCG's Mark Murphy and Ron DiPrete. On August 16, Genesis's Hamill Serrant sent Bitvavo a July 29 balance sheet, copying Murphy, DiPrete, and Jason Yacavone.

96. Silbert personally signed the note for DCG and, as DCG's founder, chief executive officer, and central decisionmaker, personally participated in the note transaction and Genesis crisis response. He is liable for his own deceptive conduct notwithstanding that he acted through DCG. Upon information and belief, after Moro's July 6, 2022 statement, Silbert instructed Ballensweig to consult DCG CFO Michael Kraines about what financial information to share with large Genesis lenders.

97. Moro likewise is liable for his own conduct. He personally executed the note on behalf of Genesis and personally made lender-facing statements concerning Genesis's ability to service lenders and DCG's assumption of TAC-related liabilities while knowing the note's long-term, illiquid terms.

## G Plaintiffs' Losses and Mitigation

98. Genesis froze withdrawals in November 2022 and filed for bankruptcy in January 2023.

99. Plaintiffs' personally owned assets remaining at Genesis included, among other things, approximately:

a. Stephen: 50 BTC;

b. Stephen: 848.96979943 ETH;

c. Stephen: 86,360.757695 USDC;

d. Stephen: $45,282.45 in U.S. dollars;

e. Christopher: 220.09263209 ETH;

f. Christopher: 155,064.735245 USDC; and

g. Christopher: $2,621.22 in U.S. dollars.

100. In January 2023, CM LLC sold its Genesis bankruptcy claim and associated rights to Jefferies Leveraged Credit Products LLC for $1 million. The final agreement identified CM LLC as "Seller." Stephen executed it for CM LLC on January 27, 2023, signing with the title "Owner." Plaintiffs allege that the sale did not transfer their separate personal claims against Defendants.

101. Christopher authorized the sale of CM LLC's bankruptcy claim and received his share of its proceeds. Neither Plaintiff, in his individual capacity, authorized Stephen, acting as CM LLC's owner, to assign that Plaintiff's personal

claims. Plaintiffs do not dispute Jefferies's ownership of CM LLC's bankruptcy claim.

102. Stephen had borrowed U.S. dollars from Wells Fargo Bank, N.A. to purchase the home in which his mother lived while he also held U.S. dollars at Genesis. He contemplated withdrawing those Genesis dollars to repay the dollar-denominated debt and later used dollar proceeds from the bankruptcy claim sale to repay it.

103. Any judgment may be offset by amounts Plaintiffs actually received for the same injury, if any, to the extent required by law.

104. Plaintiffs seek only their individual reliance damages from Defendants for inducing each Plaintiff to maintain or renew his loans when he otherwise would have withdrawn his assets. Plaintiffs do not seek to enforce the DCG note, avoid Genesis's transfers, recover estate property or CM LLC's proof of claim, obtain Genesis plan distributions, or recover for generalized creditor injury.

## COUNT I

## Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
## 73 P.S. §§ 201-1 et seq.

105. Plaintiffs incorporate paragraphs 1 through 104.

106. Pennsylvania law governs this count because Plaintiffs are Pennsylvania residents who received, reviewed, discussed, and relied on the deceptive balance sheet and related assurances in Pennsylvania and suffered injury there.

107. Plaintiffs used Genesis's lending and account services relationship primarily to manage personal savings and household financial affairs. Those services included trading access with fixed prices before settlement, account administration, renewal processing, withdrawal and return-of-asset administration, lender-facing financial reporting, and liquidity and solvency communications that Plaintiffs relied upon when deciding whether to maintain, renew, or withdraw their personal assets.

108. Plaintiffs provided economic consideration for that lending and account services relationship by transferring their assets to Genesis for Genesis's use and by accepting a fixed net yield while Genesis retained the spread, revenue, or other economic benefit generated from deploying those assets.

109. Plaintiffs' Unfair Trade Practices and Consumer Protection Law claim is based on deceptive conduct in the sale, provision, reporting, servicing, and continuation of financial services, including false solvency and balance sheet representations that induced Plaintiffs to renew and maintain loans and caused direct injury to Plaintiffs.

110. Defendants engaged in trade or commerce by participating in, directing, and benefiting from the customer-facing continuation of Genesis's financial services, including by using deceptive balance sheet and solvency reporting to induce continued customer participation.

111. Through their respective acts alleged above, Defendants engaged in fraudulent or deceptive conduct that created a likelihood of confusion or misunderstanding, including:

a. using the DCG note to create the appearance that Genesis's balance sheet remained solvent and liquid after the TAC default;

b. causing the DCG note or note-related receivable to be treated as a current asset;

c. causing financial reports to omit the note's 10-year maturity, one percent interest rate, lack of collateral, non-callable character, and discounted fair value;

d. causing weighted average duration metrics to omit or obscure the note's 10-year duration;

e. causing Genesis to send Plaintiffs a balance sheet that falsely portrayed Genesis as liquid and solvent; and

f. concealing facts necessary to make the balance sheet and solvency representations not misleading.

112. Having chosen to provide affirmative current asset and duration representations to lenders, Defendants were required to disclose facts necessary to prevent those representations from creating a materially misleading statement.

113. Plaintiffs justifiably relied on the deceptive conduct alleged above, including Moro's lender-facing assurances and the September 21, 2022 balance sheet, when deciding to maintain and renew loans.

114. Plaintiffs suffered ascertainable loss of money and property as a result.

115. Plaintiffs are entitled to recover actual damages or $100, whichever is greater, up to treble actual damages in the Court's discretion, costs, reasonable attorneys' fees, and additional relief the Court deems necessary or proper under 73 P.S. § 201-9.2(a).

**DAMAGES**

116. Plaintiffs' damages against Defendants include the loss of the digital assets and U.S. dollars identified in paragraph 99 that would have been withdrawn or not renewed but for Defendants' deceptive conduct alleged above.

117. Plaintiffs seek money damages measured by the value of the same quantity and type of digital assets and U.S. dollars that Plaintiffs would have withdrawn or would not have renewed but for Defendants' conduct, valued at

judgment or another valuation date the Court determines is necessary to make Plaintiffs whole.

118. Plaintiffs also seek lost interest, consequential losses, prejudgment and post-judgment interest, attorneys' fees where permitted, and statutory enhanced damages where permitted.

## PRAYER FOR RELIEF

119. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award:

a. Actual, compensatory, reliance, out-of-pocket, consequential, statutory, and other recoverable damages, including money damages measured by the value of the same quantity and type of digital assets and U.S. dollars Plaintiffs would have withdrawn or would not have renewed but for Defendants' conduct, valued at judgment or another valuation date the Court determines is necessary to make Plaintiffs whole;

b. Statutory damages, up to treble actual damages, additional relief, costs, and reasonable attorneys' fees under the Pennsylvania Unfair

Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1–201-9.2;

c. Prejudgment and post-judgment interest; and

d. Such other and further relief as the Court deems just and proper.

Dated: October 19, 2026

Respectfully submitted,

/s/ Stephen H. Sokolowski
Stephen H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9800
steve@shoemakervillage.org

/s/ Christopher H. Sokolowski
Christopher H. Sokolowski, Pro Se
3178 Carnegie Drive
State College, PA 16803
(814) 600-9804
chris@shoemakervillage.org